**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
08/24/2020

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| BJ SERVICES, LLC, *et al.*,[1] | ) |
|  | ) Case No. 20-33627 (MI) |
| Debtors. | ) |
|  | ) (Jointly Administered) |
|  | ) |
|  | ) Re: Docket No. 39, 224, 292 |

**ORDER (I) APPROVING THE SALE OF
THE CEMENTING BUSINESS FREE AND CLEAR
OF CLAIMS, LIENS, INTERESTS AND ENCUMBRANCES;
(II) APPROVING THE ASSUMPTION OR ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (the "Debtors"), for, among other things, entry of an order (this "Order"): (a) authorizing and approving the sale (the "Sale") of the Cementing Business pursuant to the Stalking Horse Agreement (attached hereto at **Exhibit 1**), as amended, supplemented, or modified from time to time, and which for purposes of this Order shall include all exhibits, schedules and ancillary documents related thereto, (collectively, the "Transaction Documents"), free and clear of all claims, liens, interests and encumbrances (other than Assumed Liabilities and Permitted Liens); (b) authorizing the assumption or assumption and assignment of certain executory contracts and

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BJ Services, LLC (3543); BJ Management Services, L.P. (8396); BJ Services Holdings Canada, ULC (6181); and BJ Services Management Holdings Corporation (0481). The Debtors' service address is: 11211 Farm to Market 2920 Road, Tomball, Texas 77375.

[2]   *Debtors' Emergency Motion for Entry of an Order (I) Establishing Bidding Procedures for the Sale of the Cementing Business, (II) Scheduling Bid Deadlines and an Auction, (Iii) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 39]. Unless otherwise defined herein, capitalized terms shall have the meanings given to them in the Motion, the Bidding Procedures Order (defined below), or the Stalking Horse Agreement, as applicable.

unexpired leases (collectively, the "<u>Assumed Contracts</u>"); and the assumption of certain liabilities (collectively, the "<u>Assumed Liabilities</u>"), each as more fully described in the Stalking Horse Agreement; and (c) granting related relief, and the Court having held a hearing on August 21, 2020 (the "<u>Sale Hearing</u>") to approve the Sale; and the Court having reviewed and considered the relief sought in the Motion with respect to the Sale, the declarations submitted in support of the Sale, all objections to the Sale and the Debtors' reply thereto, and the arguments of counsel made and the testimony and evidence proffered or adduced at the Sale Hearing; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale and the relief requested in this Order; and due and sufficient notice of the Sale Hearing and the relief sought therein having been given under the particular circumstances and in accordance with the Bidding Procedures Order; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion and at the Sale Hearing with respect to the Sale is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and upon the record of the Sale Hearing and these chapter 11 cases (the "<u>Chapter 11 Cases</u>"), and after due deliberation thereon, and good cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A. **Jurisdiction and Venue**.  This Court has jurisdiction over the Motion and the Sale pursuant to 28 U.S.C. §§ 157 and 1334 and may enter a final order on the Motion consistent with Article III of the United States Constitution.  This is a core proceeding under 28 U.S.C. § 157(b).

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. Furthermore, any findings of fact or conclusions of law made by the Court on the record at the close of the Sale Hearing are incorporated herein pursuant to Fed. R. Bank. P. 7052.

Venue of these chapter 11 cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.     **Statutory Predicates**.  The legal predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363, 364, 365 and 503.  Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014.

C.     **Opportunity to Object**.  A reasonable opportunity to object or to be heard regarding the requested relief has been afforded to all interested parties and entities.

D.     **Bidding Procedures Order**.  On July 29, 2020 the Court entered an order [Docket No. 224] (the "Bidding Procedures Order"), which, among other things, (i) approved the Bidding Procedures, and (ii) approved the Assumption and Assignment Procedures and the form and manner of the Cure Notice in connection thereto.  In accordance with the Bidding Procedures Order, the Stalking Horse Agreement was deemed a Qualified Bid, and upon conclusion of the Auction, the Winning Bid.

E.     On August 6, 2020, the Debtors entered into the Stalking Horse Agreement, subject to higher or better offers.

F.     On August 19, 2020, the Debtors and the Buyer (hereinafter defined) entered into an amendment to the Stalking Horse Agreement (filed contemporaneously herewith).

G.     **Opportunity to Bid**.  The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Acquired Assets (as defined in the Stalking Horse Agreement).  The Debtors conducted the sale process without collusion and in accordance with the Bidding Procedures.  The Debtors and their professionals adequately marketed the Acquired Assets and conducted the marketing and sale

3

process in compliance with the Bidding Procedures and the Bidding Procedures Order.  Based upon the record of these proceedings, creditors and other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Acquired Assets.  The Debtors and their professionals conducted the sale process in compliance with the Bidding Procedures Order, and afforded potential purchasers a full, fair and reasonable opportunity to make a higher or otherwise better offer for the Acquired Assets than the offer reflected in the Stalking Horse Agreement.

H.     **Extensive Efforts by Debtors**.  The Debtors, with the assistance of their counsel, investment banker, and other advisors, evaluated strategic alternatives including extensive marketing efforts.  The Debtors have presented credible evidence that they explored various strategic alternatives for the Debtors' businesses over an extended period of time and communicated with numerous parties regarding, among other potential transactions, a sale of all or substantially all of the Acquired Assets.  The Sale is the result of the Debtors' extensive efforts in seeking to maximize recoveries to the Debtors' estates for the benefit of creditors.

I.     **Business Justification**.  The Debtors have articulated good and sufficient business reasons for the Court to authorize (i) the immediate assumption of the Stalking Horse Agreement, and, subject to the terms of this Order, consummation of the Sale including the sale of the Acquired Assets to the Stalking Horse Bidder and/or its permitted assigns (collectively, the "Buyer") pursuant to the terms of the Stalking Horse Agreement, (ii) the assumption or assumption and assignment of the Assumed Contracts as set forth herein and in the Stalking Horse Agreement, and (iii) the assumption of the Assumed Liabilities as set forth herein and in the Stalking Horse Agreement.  Entry into the Stalking Horse Agreement and consummation of the Sale are sound

exercises of the Debtors' business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.

J.      The Debtors have articulated good and sufficient business reasons justifying the sale of the Acquired Assets to the Buyer.  Additionally:  (i) the Debtors conducted a robust marketing process to sell the Acquired Assets and the Stalking Horse Agreement constitutes the highest or best offer for the Acquired Assets; (ii) the Bidding Procedures utilized were designed to yield the highest or otherwise best bids for the Acquired Assets; (iii) the Stalking Horse Agreement and the closing of the Transaction (as defined in the Bidding Procedures Order) present the best opportunity to realize the highest value for the Acquired Assets; (iv) there is risk of deterioration of the value of the Acquired Assets if the Stalking Horse Agreement is not immediately assumed and the Sale is not consummated in accordance with the terms of the Stalking Horse Agreement and this Order; (v) the Stalking Horse Agreement and the sale of the Acquired Assets to the Buyer provide greater value to the Debtors' estates than would be provided by any other presently available alternative; and (vi) the Buyer would not agree to purchase the Acquired Assets pursuant to the terms of the Stalking Horse Agreement and this Order if the Acquired Assets remained subject to higher or better offers after the entry of this Order.  Good and sufficient reasons for approval of the Stalking Horse Agreement and the Sale have been articulated by the Debtors.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose for (i) the sale of the Acquired Assets outside of the ordinary course of business pursuant to Bankruptcy Code section 363(b); (ii) a restriction on the Debtors pursuing, considering or accepting any further offers for the Acquired Assets from and after the entry of this Order through the earlier of the consummation of the Sale or termination of the Stalking Horse Agreement in accordance with its terms; and (iii) the immediate assumption of the Stalking Horse

Agreement. To maximize the value of the Acquired Assets and preserve the viability of the operations to which the Acquired Assets relate, it is essential that the Sale occur within the time constraints set forth in the Stalking Horse Agreement and this Order and that the Buyer be protected against any further offers for the Acquired Assets.

K.      **Notice**. As evidenced by the affidavits of service [Docket Nos. 103, 212, 244, 330, 335, 337, 338, 349, 367] previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Sale Hearing, the Sale, the Assumption and Assignment Procedures and the assumption or assumption and assignment of the Assumed Contracts, and the applicable Cure Costs (as defined herein) has been provided in compliance with the Bidding Procedures Order and in accordance with Bankruptcy Code sections 102(1), 363, and 365, and Bankruptcy Rules 2002, 4001, 6004, 6006, 9006, 9007, and 9014, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale, the assumption or assumption and assignment of the Assumed Contracts, or the Cure Costs is or shall be required. Such notice was sufficient and reasonably calculated under the circumstances to reach all known and unknown holders of claims and interests and non-Debtor counterparties to executory contracts.

L.      **Auction**. The Debtors' marketing process with respect to the Sale afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer. Therefore, in accordance with the Bidding Procedures Order, following the Auction, the Debtors determined that the Stalking Horse Agreement constituted the highest and best offer and selected the Stalking Horse Agreement as the Successful Bid. The Debtors therefore determined in a valid and sound exercise of their business judgment, and in accordance with the Bidding Procedures and

Bidding Procedures Order, that the highest and best Qualified Bid for the Acquired Assets is that of the Buyer and that the Stalking Horse Agreement will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.

M. **Good Faith**. The Stalking Horse Agreement was negotiated and is undertaken by the Debtors and the Buyer at arm's-length, without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m). The Buyer is not an "insider" or "affiliate" of any of the Debtors as those terms are defined by Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Debtors and the Buyer. The Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets, complied with the Bidding Procedures Order, and agreed to, and did, subject its bid to the competitive Bidding Procedures approved in the Bidding Procedures Order. All releases and payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed. The Buyer has not violated Bankruptcy Code section 363(n) by any action or inaction on its part. As a result of the foregoing, the Buyer is entitled to the protections of Bankruptcy Code section 363(m), including in the event this Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with these cases.

N. **Title to Acquired Assets**. The Acquired Assets sought to be transferred and/or assigned, as applicable, by the Debtors to the Buyer pursuant to the Stalking Horse Agreement are property of the Debtors' estates and good title thereto is presently vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. Except as provided in the Stalking Horse Agreement, the Debtors are the sole and rightful owners of the Acquired Assets with all

rights, title and interests to the Acquired Assets, and no other person has any ownership right, title, or interest therein.

O.    **Authority**.  The Debtors:  (i) have full power and authority to execute and assume the Stalking Horse Agreement and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the transactions contemplated by the Stalking Horse Agreement subject to the terms of this Order, and (iii) have taken all corporate action necessary to authorize and approve the Stalking Horse Agreement and the immediate assumption thereof, the sale of the Acquired Assets, and all other actions required to be performed by the Debtors in order to consummate the transactions contemplated in the Stalking Horse Agreement.  No consents or approvals, other than those already obtained or expressly provided for in the Stalking Horse Agreement or this Order, are required for the Debtors to consummate the Sale.

P.    **Highest or Otherwise Best Offer**.  The total consideration provided by the Buyer for the Acquired Assets represents the highest or best offer received by the Debtors, and the amount of aggregate consideration provided by the Buyer to the Debtors pursuant to the Stalking Horse Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable laws, and may not be avoided under Bankruptcy Code section 363(n) or any provision of chapter 5 of the Bankruptcy Code or under any other law of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount of aggregate consideration that would provide greater economic value to the Debtors' estates than the Buyer.  The Debtors' determination that the Stalking Horse Agreement constitutes the highest or best offer for the Acquired Assets

constitutes a valid and sound exercise of the Debtors' business judgment. The Court's approval of the Motion, the Sale, and the Stalking Horse Agreement, and the immediate assumption thereof, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

Q.      **No Further Bidding**. The Buyer would not have entered into the Stalking Horse Agreement and would not consummate the Sale if the sale of the Acquired Assets to the Buyer were subject to higher or better bids from and after the entry of this Order, through and including the earlier of the consummation of the Sale or termination of the Stalking Horse Agreement in accordance with its terms.

R.      **Necessity of Order; Free and Clear**. Other than the Assumed Liabilities and Permitted Liens, the Buyer would not have entered into the Stalking Horse Agreement and would not consummate the Sale without all of the relief provided for in this Order, including if (i) the Sale was not free and clear, pursuant to Section 363(f) of the Bankruptcy Code, of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges, charges, security interests, of whatever kind or nature, rights of first refusal, rights of offset or recoupment, royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights-of recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets, recoupments, claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other interests of any kind or nature whatsoever against the Debtors or any of the Acquired Assets, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability

claims, environmental liabilities, employment or labor law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against any of the Debtors, claims or liabilities relating to any act or omission of any originator, holder or servicer of mortgage loans prior to the Closing Date, any indemnification claims or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing Date, any derivative, vicarious, transferee or successor liability claims, alter ego claims, de facto merger claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether known or unknown, contingent or matured, liquidated or unliquidated, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material statutory or non-statutory, legal or equitable, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Acquired Assets, the operation of any of the Debtors' businesses before the Closing Date (collectively, the "Claims"), or (ii) if the Buyer would, or in the future could, be liable for any such Claims.

      S.     Except as provided otherwise in the Stalking Horse Agreement or this Order, neither the Buyer nor any of the Buyer's affiliates (including any subsidiary of Buyer, any person or entity that could be treated as a single employer with the Buyer pursuant to Section 4001(b) the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 414(b), (c), (m) or (o) of the Internal Revenue Code of 1986, as amended ("IRC")), shall be responsible

for any Claims, including in respect of the following: (i) any labor or employment agreements; (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between one or more of the Debtors and any Debtor; (iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability, (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the IRC and of any similar state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) any liabilities arising under any Environmental Laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the Closing Date; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the IRC; and (ix) any any excluded liabilities.

T.        **Satisfaction of 363(f) Standards**.  The Debtors may sell the Acquired Assets free and clear of all Claims (other than Assumed Liabilities and Permitted Liens) because, with respect to each creditor asserting a Claim, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied.  Those holders of Claims that did not object to or that withdrew their objections to the Sale or the Motion, are deemed to have consented to the Motion and the Sale pursuant to Bankruptcy Code section 363(f)(2).

U.        Neither the Debtors nor the Buyer engaged in any conduct that would cause or permit the Stalking Horse Agreement, the other Transaction Documents, or the consummation of the Sale to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable law.

V.        **Valid and Binding Contract**.  The Stalking Horse Agreement is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms. The Stalking Horse Agreement and the consideration offered by the Buyer pursuant to the Stalking Horse Agreement constitute reasonably equivalent value and fair consideration.  The Stalking Horse Agreement was not entered into, and the Sale is not consummated, for the purpose of hindering, delaying or defrauding the Debtors' creditors under the Bankruptcy Code or under any other law of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Buyer has entered into the Stalking Horse Agreement or the other Transaction Documents or is consummating the Sale for any fraudulent or otherwise improper purpose.

W.        **No Successor Liability**.  Except as provided for in the Stalking Horse Agreement or in this Order, upon the Closing, the Buyer shall not be deemed to, (i) be the successor of or

successor employer to any of the Debtors, including without limitation, with respect to any collective bargaining agreement, works council agreement, or other labor Contract, any benefit plans, or any multiemployer plans, and the Buyer and/or its affiliates, as applicable, shall instead be, and be deemed to be, a new employer, including with respect to, among other things, any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws (provided that the Buyer shall pay any employee-related liabilities to the extent included in the Assumed Liabilities); (ii) have any common law successorship liability in relation to any benefit plan or multiemployer plan, including with respect to withdrawal liability or contribution obligations; (iii) have, *de facto*, or otherwise, merged or consolidated with or into Debtors; (iv) be a mere continuation or substantial continuation of Debtors or the enterprise(s) of Debtors; or (v) be liable for any acts or omissions of Debtors in connection with any collective bargaining agreement, works council agreement, or other labor Contract, the conduct of the Business, or the operation, funding or administration of the benefit plans or multiemployer plans or arising under or related to the Acquired Assets other than as expressly set forth in the Stalking Horse Agreement and the Transaction Documents.  Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse Agreement, the parties intend and the Court hereby finds that the Buyer shall not be liable for any encumbrance or liability (other than Assumed Liabilities and Permitted Liens) against any Seller, or any of its predecessors or affiliates, and the Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, any collective bargaining agreement, works council agreement, or other labor Contract, the operation, funding, or administration of the benefit plans or multiemployer plans, the Acquired Assets or any liabilities of any Seller arising or attributable

to periods prior to the Closing Date.  The Buyer would not have acquired the Acquired Assets but for the foregoing protections against potential claims based upon "successor liability," *de facto* merger, or theories of similar effect.

X.      **Cure Costs**.  The Debtors have proven and demonstrated that it is an exercise of their sound business judgment to assume or assume and assign the Assumed Contracts to the Buyer in connection with the consummation of the Sale, and the assumption or assumption and assignment of the Assumed Contracts to the Buyer is in the best interests of the Debtors, their estates and creditors and all parties in interest.  The Assumed Contracts are an integral part of the Acquired Assets being purchased by the Buyer, and accordingly, such assumption or assumption and assignment of the Assumed Contracts is reasonable and enhances the value of the Debtors' estates.  The cure amounts required to be paid pursuant to Bankruptcy Code section 365(b), whether agreed or judicially resolved (the "Cure Costs"), are deemed to be the entire cure obligation due and owing under the Assumed Contracts under Bankruptcy Code section 365(b). To the extent that any non-Debtor counterparty to an Assumed Contract failed to timely file an objection to the proposed Cure Cost filed with the Bankruptcy Court, the Cure Cost listed in the Cure Notice shall be deemed to be the entire cure obligation due and owing under the applicable Assumed Contract.

Y.      Each provision of the Assumed Contract or applicable non-bankruptcy law that purports to prohibit, restrict or condition, or could be construed as prohibiting, restricting or conditioning, assignment of any Assumed Contract has been satisfied or is otherwise unenforceable under Bankruptcy Code section 365.

Z.      Assumption or assumption and assignment of any Assumed Contract to the Buyer pursuant to this Order and the Stalking Horse Agreement and full payment of any applicable Cure

Cost shall result in the full release and satisfaction of any and all cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Contract at any time prior to the Closing Date, and shall relieve the Debtors and their estates from any liability for any breach of such Assumed Contract occurring after such assignment.

AA.    **Adequate Assurance**.   Subject to the terms of this Order, the Buyer has demonstrated adequate assurance of future performance of all Assumed Contracts within the meaning of Bankruptcy Code section 365.

BB.    Upon the assumption or assumption and assignment to the Buyer and the payment of the relevant Cure Cost (if applicable), (i) each Assumed Contract shall be deemed valid and binding and in full force and effect in accordance with its terms, and all defaults thereunder, if any, shall be deemed cured, subject to the provisions of this Order; and (ii) the Buyer shall assume all obligations under each Assumed Contract.

CC.    **Injunction**.   An injunction against creditors and third parties pursuing Claims against, and liens, interests and encumbrances on, the Acquired Assets is necessary to induce the Buyer to close the Sale, and the issuance of such injunctive relief is therefore necessary to avoid irreparable injury to the Debtors' estates and will benefit the Debtors' creditors.

DD.    **No *Sub Rosa* plan**.   The Sale does not constitute a *sub rosa* chapter 11 plan.   The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for any of the Debtors.

EE.    **Final Order**.   This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).   Notwithstanding Bankruptcy Rules 6004(h), 6006(d) and 7062, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause

having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the immediate approval and consummation of the Sale as contemplated by the Stalking Horse Agreement.  The Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the Sale subject to the terms of this Order.

FF.    **Best Interests**.  The relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

GG.    **Time is of the Essence**.  Time is of the essence in the Stalking Horse Agreement consummating the Sale.  In order to maximize the value of the Acquired Assets, it is essential that the Sale and assumption and assignment of the Assumed Contracts to the Buyer occur within the time constraints set forth in the Stalking Horse Agreement.  Specifically, the Stalking Horse Agreement must be assumed immediately and the Sale must be approved promptly in order to preserve the viability of the business subject to the Sale as a going concern, to maximize the value to the Debtors, their estates, their creditors, and all other parties in interest.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.    **Relief Granted**.  The Motion is **GRANTED**, to the extent set forth herein.

2.    **Objections Overruled**.  Any objections to the Motion, or any other relief granted in this Order, to the extent not resolved, adjourned for hearing on a later date, waived or withdrawn or previously overruled, and all reservations of rights included therein, is hereby **OVERRULED** and **DENIED** on the merits.

3.    **Bidding Procedures**.  The Bidding Procedures utilized by the Debtors with respect to the Sale, including the Stalking Horse Protections, are hereby ratified and were and are

appropriate under the circumstances in order to maximize the value obtained from the Sale for the benefit of the Debtors' estates.

4. **Immediate Assumption of Stalking Horse Agreement.** The Stalking Horse Agreement, including the Stalking Horse Protections therein, shall be deemed assumed immediately upon entry of this Order without the need for further action by any party or the Court.

5. **No Further Bidding**. Immediately upon entry of this Order, and pending consummation of the Sales or termination of the Stalking Horse Agreement in accordance with its terms, the Debtors shall neither solicit nor accept any bids or offers for the Acquired Assets. The Debtors shall immediately close access to any "due diligence data room" or similar information sharing medium to all third parties other than the Buyer, and shall require that all information provided to prospective bidders in connection with the sale process be returned or destroyed in accordance with the terms of applicable confidentiality agreements. The Stalking Horse Protections provided for in the Stalking Horse Agreement shall continue in accordance with the terms of the Stalking Horse Agreement notwithstanding that no further bids may be accepted by the Debtors from or after the date hereof.

6. **Approval of Stalking Horse Agreement and Sale**. Pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503 and the Stalking Horse Agreement, the Sale is hereby approved and the Debtors are authorized to enter into and perform under the Stalking Horse Agreement and the other Transaction Documents. Pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503 and in accordance with the terms of the Stalking Horse Agreement and this Order, each of the Debtors and the Buyer are hereby authorized and directed to take any and all actions necessary or appropriate to: (i) consummate the Sale and the Closing in accordance with the Winning Bid, the Transaction Documents, and this Order; (ii) assume or assume and assign

the Assumed Contracts; (iii) provide for the assumption of the Assumed Liabilities; and (iv) perform, consummate, implement and close fully the Stalking Horse Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale pursuant to the Stalking Horse Agreement.  The Debtors and each other party to the Transaction Documents are hereby authorized and directed to perform each of their covenants and undertakings as provided in the Stalking Horse Agreement and the Transaction Documents prior to, on or after the Closing Date without further order of the Court.  The Buyer and the Debtors shall have no obligation to close the Sale except as is contemplated and provided for in the Stalking Horse Agreement and this Order.

7.     **Resolution of Bharat Forge Objection**.  Bharat Forge Limited ("BFL") and the Debtors are parties to that certain Agreement (as defined in the Objection filed by BFL at Docket No. 328) (the "Agreement").  The Agreement is not being assumed by the Debtors or assigned to the Purchaser.   Notwithstanding anything contained in this Order or the attached Purchase Agreement to the contrary, all of BFL's rights, claims and interest under the Agreement are preserved and not affected by the proposed sale.  Accordingly, the rights, claims or interests of BFL under the Agreement are reserved with respect to the sale of any intellectual property owned by the Debtor covered by the Agreement.  Additionally, no intellectual property owned by BFL is being sold, nor is BFL's interest in any joint intellectual property under the Agreement being sold.  Moreover, the goods subject to the Open Purchase Orders (as defined in the Objection and listed on an Exhibit thereto) are not being sold by the Debtor free and clear, and such goods are owned by BFL.  For avoidance of doubt, no IP Rights (as defined in the Agreement) are being sold or assigned free and clear of the rights and interests granted to BFL under the Agreement and BFL may continue to use any intellectual property licensed to it under the Agreement.  And, all rights,

interests and claims of BFL under the Agreement with respect to all IP Rights is preserved. Specifically, BFL's right, title and interest in any Joint Project IP (as defined in the Agreement) is preserved.  BFL retains its right to file a claim in this case, including a possible rejection claim. The Purchaser shall have no rights or interest in the Agreement.  If the Purchaser later desires to purchase goods from BFL, whether subject to a current or future purchaser order issued to BFL, it shall make satisfactory payment arrangements with BFL, which will likely include payment in advance of the commencement of the manufacture of the goods.

8. **Section 365(f) of Bankruptcy Code**.  Pursuant to Bankruptcy Code section 365(f), notwithstanding any provision of any Assumed Contract or applicable non-bankruptcy law that prohibits, restricts or conditions the assignment of the Assumed Contracts, the Debtors are authorized to assume the Assumed Contracts and to assign the Assumed Contracts to the Buyer or to any permitted assign, which assignment shall take place on and be effective as of the Closing or as otherwise provided by order of this Court or by the Stalking Horse Agreement.  There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.  The Debtors shall have assumed or assumed and assigned the Assumed Contracts in accordance with the Stalking Horse Agreement, and pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assumed Contracts shall not be a default thereunder.  After the payment of the relevant Cure Cost (if applicable), neither the Debtors, their bankruptcy estates nor the Buyer shall have any further liabilities to the non-Debtor counterparties to the Assumed Contracts, other than the Buyer's obligations under the Assumed Contracts that accrue or become due and payable on or after the Closing Date.

9.      **Assumed Contracts**.   The assumption or assumption and assignment of the Assumed Contracts is subject to the consummation of the Sale.  To the extent that an objection by a counterparty to any Assumed Contract, including all objections related to Cure Costs, is not resolved prior to the Closing Date, the Debtors, with the consent of the Buyer and in accordance with the Stalking Horse Agreement, may elect to: (i) not assume or assume and assign to the Buyer the Assumed Contracts; (ii) postpone the assumption of such Assumed Contracts until the resolution of such objection; or (iii) reserve the disputed portion of the Cure Cost and assume the Assumed Contracts on the Closing Date.  So long as the claimed Cure Cost is held in reserve, and there are no other unresolved objections to the assumption or assumption and assignment of the applicable Assumed Contracts, the Debtors can, without further delay, assume or assume and assign the Assumed Contracts that are the subject of the objection.  Under such circumstances, the respective objecting counterparty's recourse would be limited to the funds held in reserve.

10.     **Valid Transfer**.   Upon the Closing:  (a) the Debtors are hereby authorized to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of all of the Debtors' rights, title and interest in the Acquired Assets to the Buyer free and clear of all Claims (other than the Assumed Liabilities and Permitted Liens); and (b) except as otherwise expressly provided in the Stalking Horse Agreement, all encumbrances and liabilities (other than the Assumed Liabilities and Permitted Liens) shall not be enforceable as against the Buyer or the Acquired Assets.  Unless otherwise expressly included in the Assumed Liabilities and Permitted Liens, or as otherwise expressly provided by this Order, the Buyer shall not be responsible for any Claims, liens, liabilities, obligations, interests or encumbrances, including in respect of the following: (i) any labor or employment agreements; (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between one or more of

the Debtors and any Debtor; (iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) COBRA, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) any liabilities arising under any Environmental Laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the Closing Date; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the IRC, as amended; and (ix) any excluded liabilities.  A certified copy of this Order may be filed with the appropriate clerk and/or recorder to act to cancel any such lien, claim, interest or encumbrance of record.

11.    The transfer to the Buyer of the Debtors' rights, title, and interest in the Acquired Assets pursuant to the Stalking Horse Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' rights, title, and interest in the Acquired Assets, notwithstanding any requirement for approval or consent by any person, and vests with or will vest

in the Buyer all rights, title, and interest of the Debtors in the Acquired Assets, free and clear of all Claims of any kind or nature whatsoever (other than the Assumed Liabilities and Permitted Liens), with any such Claims attaching to the net available proceeds with the same validity, extent, and priority as immediately prior to the sale of the Acquired Assets, subject to the provisions of the Stalking Horse Agreement and this Order, and any rights, claims, and defenses of the Debtors and other parties in interest; provided, that all liens, claims, interests, and encumbrances on the Acquired Assets, including, without limitation the Prepetition ABL Liens, Prepetition GACP Liens, and Adequate Protection Liens (each as defined in the second interim order authorizing the Debtors' use of cash collateral [Docket No. 261] (the "Cash Collateral Order")), shall attach to the proceeds of the Sale attributable to the property against which such liens, claims, interests, and encumbrances applied, in the same order of priority and with the same validity, force, and effect that such liens, claims, interests, and encumbrances applied prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein. Notwithstanding anything to the contrary in this Order or the Stalking Horse Agreement, any party, including, without limitation and for purposes of clarification, UE Manufacturing LLC ("UEM"), United Engines LLC ("UE"), Stewart & Stevenson Power Productions LLC ("S&S"), and SPM Flow Control, Inc. d/b/a WEIR Oil & Gas who holds a possessory lien or liens under applicable state law against any of the Acquired Assets, and turns over to the Debtors or the Buyer (as applicable) the property subject to such possessory lien or liens, shall retain such lien or liens on the Sale proceeds of such property in the same order of priority and with the same validity, force, and effect as if such party still retained possession of the property in question notwithstanding, among other things, any applicable state law or regulation requiring such party to retain possession of the property in question in order to maintain the perfected status of such liens.

22

12.     **Sale Proceeds**.  Upon receipt of the Sale proceeds, the Debtor shall segregate and separately hold each of (a) the Sale proceeds attributable to the assets in which the GACP Secured Parties (as defined in the Cash Collateral Order) have a prepetition first priority security interest and (b) the Sale proceeds attributable to the assets in which the Prepetition ABL Secured Parties (as defined in the Cash Collateral Order) have a prepetition first priority security interest.  Such Sale proceeds shall only be distributed as provided by further order of the Court.

13.     **No Liability**.  None of the Buyer or its affiliates, successors, assigns, equity holders, officers, directors, employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the Stalking Horse Agreement and the entry into and consummation of the sale of the Acquired Assets, except as expressly provided in, or to enforce the terms of, the Stalking Horse Agreement and this Order.

14.     **Assigned Contracts and Assumed Liabilities**.  Except as expressly provided in the Stalking Horse Agreement, the other Transaction Documents, or by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants, and other persons, holding Claims of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated, or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether imposed by agreement, understanding, law, equity, or otherwise), including, without limitation, the non-Debtor party or parties to each Assumed

23

Contract, arising under or out of, in connection with, or in any way relating to, the Acquired Assets

or the transfer of the Debtors' interests in the Acquired Assets to the Buyer shall be and hereby are

forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise

pursuing Claims against the Buyer or its affiliates, successors, assigns, equity holders, directors,

officers, employees or professionals, the Acquired Assets, or the interests of the Debtors in such

Acquired Assets (other than Assumed Liabilities and Permitted Liens).  Following the Closing, no

holder of a Claim against the Debtors (other than Assumed Liabilities and Permitted Liens) shall

interfere with the Buyer's title to or use and enjoyment of the Debtors' interest in the Acquired

Assets based on or related to such Claim, and, except as otherwise provided in the Stalking Horse

Agreement, the Transaction Documents or this Order, all such Claims, if any, shall be, and hereby

are transferred and will attach to the net available proceeds from the sale of the Acquired Assets

in the order of their priority, with the same validity, force, and effect which they have against such

Acquired Assets as of the Closing, subject to any rights, claims and defenses that the Debtors'

estates and the Debtors, as applicable, may possess with respect thereto.  All persons are hereby

enjoined from taking action that would interfere with or adversely affect the ability of the Debtors

to transfer the Acquired Assets in accordance with the terms of the Stalking Horse Agreement, the

Transaction Documents, and this Order.

15.     Upon assumption of the Assumed Contracts by the Debtors and assignment of same

to the Buyer, the Assumed Contracts shall be deemed valid and binding, in full force and effect in

accordance with their terms, subject to the provisions of this Order.  As of the Closing, subject to

the provisions of this Order, the Buyer shall succeed to the entirety of Debtors' rights and

obligations in the Assumed Contracts first arising and attributable to the time period occurring on

or after the date of assumption or assumption and assignment of the Assumed Contracts becomes effective and shall have all rights thereunder.

16.     Notwithstanding anything to the contrary in this Order, or any Notice related thereto, the following employee benefits agreements between Debtors and Cigna shall not be assumed and assigned pursuant to this Sale Order:  (a) Administrative Services Only Agreement (Account No. 3340809), as amended, between Cigna Health and Life Insurance Company and BJ Services Company effective 7/1/2017; (b) Group Long-Term Disability Insurance Policy (FLK 960962), as amended, between Life Insurance Company of North America ("LINA") and BJ Services, LLC ("BJ Services") effective 4/1/2017; (c) Group Accident Insurance Policy (OK 969359), as amended, between LINA and BJ Services effective 4/1/2017; (d) Group Life Insurance Policy (FLX 967863), as amended, between LINA and BJ Services effective 4/1/2017; and (e) Group Voluntary Life Insurance Policy (FLX 967864), as amended, between LINA and BJ Services effective 4/1/2017.

17.     **Cure Costs**.  Subject to paragraph 8 of this Order, upon the entry of this Order, (a) all defaults (monetary and non-monetary) under the Assumed Contracts through the Closing shall be deemed cured and satisfied through the payment of the Cure Costs, (b) no other amounts will be owed by the Debtors, their estates, or the Buyer with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed Contracts, and (c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Buyer that any additional amounts are due or defaults exist under the Assumed Contracts that arose or accrued, or relate to or are attributable to the period before the Closing, including defaults of provisions restricting change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Contracts at

any time on or prior to the Closing Date.  Assignment by the Debtors of any Assumed Contracts to the Buyer or the Buyer Designee shall relieve the Debtors and their estates from any liability for any breach of such Assumed Contracts occurring after such assignment.

18.     As set forth in paragraph 10 of this Order, with respect to any dispute regarding Cure Costs (a "Cure Dispute") or as to assignment of an Assumed Contract (an "Assignment Dispute") not resolved at or prior to the Sale Hearing, such disputes may be (a) resolved consensually by the Debtors, the Winning Bidder and the counterparty without further order of the court or (b) if such Cure Dispute or Assignment Dispute cannot be so resolved, then (i) the Winning Bidder may choose to not assume the applicable contract or (ii), if the Winning Bidder still desires to assume the contract, the parties may request a hearing to resolve the Cure Dispute or Assignment Dispute, and the Winning Bidder can determine after entry of a final order determining the cure cost, whether or not it will assume the contract.

19.     **Good Faith**.  The Stalking Horse Agreement has been entered into by the Buyer in good faith and the Buyer is a good faith purchaser of the Acquired Assets as that term is used in Bankruptcy Code section 363(m).  The Buyer is entitled to all of the protections afforded by Bankruptcy Code section 363(m).

20.     **No Bulk Sales**.  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale.  Except as otherwise provided in the Stalking Horse Agreement, and the Transaction Documents, no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment is due to any person in connection with the Stalking Horse Agreement, the other Transaction Documents, or the transactions contemplated hereby or thereby for which the Buyer is or will become liable.

21.      **Consideration**.  The consideration provided by the Buyer for the Acquired Assets under the Stalking Horse Agreement shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the sale of the Acquired Assets may not be avoided, or costs or damages imposed or awarded under Bankruptcy Code section 363(n) or any other provision of the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other similar federal or state laws.

22.      **Section 363(n) of Bankruptcy Code**.  Neither the Debtors nor the Buyer engaged in any conduct that would cause or permit the Stalking Horse Agreement or the consummation of the Sale to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable law.  Accordingly, the Stalking Horse Agreement and the Sale shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Stalking Horse Agreement or the Sale.

23.      **Closing**.  On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Debtors' rights, title, and interest in the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Buyer on the Closing Date pursuant to the terms of the Stalking Horse Agreement, free and clear of all Claims (other than Assumed Liabilities and Permitted Liens).

24.      Upon the Closing, the Buyer shall not, nor shall be deemed to,  (i) be the successor of or successor employer to any of the Debtors, including without limitation, with respect to any

collective bargaining agreement, works council agreement, or other labor Contract, any benefit plans, or any multiemployer plans, and the Buyer and/or its affiliates (including the Target Entities), as applicable, shall instead be, and be deemed to be, a new employer, including with respect to, among other things, any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws (ii) have any common law successorship liability in relation to any benefit plan or multiemployer plan, including with respect to withdrawal liability or contribution obligations; (iii) have, *de facto*, or otherwise, merged or consolidated with or into Debtors; (iv) be a mere continuation or substantial continuation of Debtors or the enterprise(s) of Debtors; or (v) be liable for any acts or omissions of Debtors in connection with any collective bargaining agreement, works council agreement, or other labor Contract, the conduct of the Business, or the operation, funding, or administration of the benefit plans or multiemployer plans or arising under or related to the Acquired Assets, except as expressly provided in the Stalking Horse Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse Agreement, the parties intend and the Court hereby orders that the Buyer shall not be liable for any encumbrance or liability (other than Assumed Liabilities and Permitted Liens) against any Seller, or any of its predecessors or affiliates, and the Buyer shall not have successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, any collective bargaining agreement, works council agreement, or other labor Contract, the operation, funding, or administration of the benefit plans or multiemployer plans, the Acquired Assets or any liabilities of any Seller arising or attributable to periods prior to the Closing Date.

25. **Free and Clear**. Other than the Buyer's assumption of the applicable Assumed Liabilities and the Buyer's obligations under the Stalking Horse Agreement and the other Transaction Documents, the Buyer and its respective affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders (or equivalent) shall have no obligations with respect to any Claims, and, upon consummation of the Sale, the Debtors and their estates are deemed to release and forever discharge the Buyer and its affiliates, and their respective successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) from any and all Claims of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, solely relating to the sale of the Acquired Assets or assignments of the Assumed Contracts. This Order: (a) is and shall be effective as a determination that other than Assumed Liabilities and Permitted Liens, all Claims of any kind or nature whatsoever existing as to Acquired Assets, including all Claims as to all Indebtedness (as defined in the Stalking Horse Agreement) and any tax liability, prior to the Closing have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected, with such claims and liens attaching in order of priority to the proceeds of the Sale, and (b) is and shall be binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets conveyed to the Buyer. Other than liens and security interests relating

to the Assumed Liabilities and Permitted Liens, all recorded Claims against the Acquired Assets from their records, official and otherwise, shall be deemed stricken.

26.     If any person or entity which has filed statements or other documents or agreements evidencing Claims against or interests in, the Acquired Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Claims (other than liens and security interests relating to the Assumed Liabilities and Permitted Liens) which the person or entity has or may assert with respect to the Acquired Assets, the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.

27.     Notwithstanding any other provisions included in this Order, or any agreements approved hereby, any statutory liens (collectively, the "Tax Liens"), of Tomball Independent School District, the City of Tomball (and any other Texas taxing entities represented by Perdue, Brandon, Fielder, Collins & Mott, LLP), Brazos County, Medina County, Erath County, Bexar County, Dallas County, Ector CAD, Fort Bend County, Harris County, Hood CAD, Liberty County and Victoria County (collectively, the "Taxing Authorities") shall not be primed by nor made subordinate to any liens granted to any party hereby to the extent such Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Taxing Authorities are fully preserved.  From the proceeds of the sale of any of the Debtors' assets located in the state of Texas, the amount of

$2,394,773.88[4] shall be set aside by the Debtors in a segregated account as adequate protection for the asserted secured claims of the Taxing Authorities prior to the distribution of any proceeds to any other creditor.  The liens of the Taxing Authorities, if any, shall attach to these proceeds to the same extent and with the same priority as the liens they now hold against the property of the Debtors.  These funds shall be on the order of adequate protection and shall constitute neither the allowance of the claims of the Taxing Authorities, nor a cap on the amounts they may be entitled to receive.

28.     For the avoidance of doubt, the Buyer assumes full responsibility for the 2020 ad valorem taxes associated with the Cementing Business owed to the Taxing Authorities and shall be responsible for paying the ad valorem taxes in full, in the ordinary course of businesses, when due.  If not timely paid, the Taxing Authorities may proceed with non-bankruptcy collections against the Buyer without leave or approval of the Court.  The Debtors' prorated share of ad valorem taxes shall be credited to the Buyer at closing on terms agreed upon by the Debtors and Purchaser as set forth in the Stalking Horse Agreement.  Any dispute regarding the proration of the ad valorem taxes between the Debtors and Purchaser shall have no effect on Buyer's responsibility to pay the 2020 ad valorem taxes.

29.     **Direction to Counterparties**.  All counterparties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, and shall not charge the Debtors or the Buyer for any instruments, applications, consents or other documents which may be required or requested by any public or quasi-public authority or other

---

[4]     For the avoidance of doubt, this figure is inclusive of all amounts owed to the Taxing Authorities is being included in each order approving a sale out of an abundance of caution and does not represent the particularized amounts owed to the Taxing Authorities relating to the assets being sold pursuant to each order.

party or entity to effectuate the applicable transfers in connection with the sale of the Acquired Assets.

30. **Direction to Government Agencies**.   Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale contemplated by the Stalking Horse Agreement.

31. Nothing in this Order or the Stalking Horse Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the Closing Date.

32. Without limiting the provisions of paragraph 28 above, but subject to Bankruptcy Code section 525(a), no governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Acquired Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the sale of the Acquired Assets.

33. **Governing Terms**.  To the extent this Order is inconsistent with any prior order or pleading filed in these Chapter 11 Cases, the terms of this Order shall govern.  To the extent there is any inconsistency between the terms of this Order and the terms of the Stalking Horse Agreement, the terms of this Order shall govern.

34. **Surrender of Possession**.  All entities (other than holders of Assumed Liabilities and Permitted Liens[5]) that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer as of the Closing Date.  The Debtors shall use commercially reasonable efforts to assure

---

[5]   Permitted Liens means Permitted Encumbrances, as defined in the Stalking Horse Agreement.

that all persons that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets surrender possession of the Acquired Assets to either (i) the Debtors before the Closing Date or (ii) the Buyer (or its designee) on or after the Closing Date.

35. **Binding on Creditors and Interest Holders**.  This Order and the Stalking Horse Agreement shall be binding in all respects upon all creditors and interest holders of the Debtors, all non-debtor parties to the Assumed Contracts, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Chapter 11 Cases or upon a conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Stalking Horse Agreement, including the Transaction Documents (including, for the avoidance of doubt, the Transition Services Agreement) and the Assumed Contracts shall not be subject to rejection or avoidance under any circumstances.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to the Buyer hereunder shall remain effective and, notwithstanding such dismissal or conversion, shall remain binding on parties in interest.

36. **Debtors' Indemnification and Guarantee Obligations**.  Notwithstanding any provision in this Order to the contrary, the Debtors' indemnification and guarantee obligations under the Stalking Horse Agreement, if any, shall not be subject to rejection or discharge under any circumstances.

37. **No Modification by Plan; Incorporation into Confirmation Order**.  This Order shall not be modified by any chapter 11 plan of any of the Debtors confirmed in these Chapter 11 Cases.

38.     **Retention of Jurisdiction**.  The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to:  (a) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and the terms of the Stalking Horse Agreement, all amendments thereto and any waivers and consents thereunder; (b) protect the Buyer, or the Acquired Assets, from and against any of the Claims (other than Assumed Liabilities and Permitted Liens); (c) compel delivery of all Acquired Assets to the Buyer (other than those in the possession of the holder of an Assumed Liability or Permitted Lien); (d) compel the Buyer to perform all of its obligations under the Stalking Horse Agreement, the Transaction Documents, and this Order; and (e) resolve any disputes arising under or related to the Stalking Horse Agreement or the sale of the Acquired Assets.

39.     **Amendments**.   The Stalking Horse Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of this Court; provided, however, that any such modification, amendment, or supplement neither is material nor materially changes the economic substance of the transactions contemplated hereby; provided, further, however, that the Official Committee of Unsecured Creditors shall receive three days' notice of, and an opportunity to raise objections to, any such modification, amendment, or supplement.

40.     **Conditions Precedent**.  Neither the Buyer nor the Debtors shall have an obligation to close the Sale until all conditions precedent in the Stalking Horse Agreement to each of their respective obligations to close the Sale have been met, satisfied, or waived in accordance with the terms of the Stalking Horse Agreement.

41.     **Final Order**.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rules 6004(h), 6006(d) and 7062, the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly:  (a) the terms of this Order shall be immediately effective and enforceable upon its entry; (b) the Debtors are not subject to any stay of this Order or in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

42.     **Nonseverable**.  The provisions of this Order are nonseverable and mutually dependent.

43.     The failure specifically to include or make reference to any particular provisions of the Stalking Horse Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the provisions of the Stalking Horse Agreement are authorized and approved in their entirety.

Signed:  August 24, 2020

_____
Marvin Isgur
United States Bankruptcy Judge

35

## Exhibit 1

**Stalking Horse Agreement**

**Execution Version**

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF AUGUST 6, 2020**

**BY AND BETWEEN**

**AMERICAN CEMENTING, LLC**

**AS PURCHASER,**

**BJ SERVICES, LLC**

**AS THE COMPANY AND SELLER**

---

# TABLE OF CONTENTS

**Page**

**Article I Purchase and Sale of the Acquired Assets; Assumption of Assumed Liabilities** ...................................................................................................5

    1.1    Purchase and Sale of the Acquired Assets ..............................................5
    1.2    Excluded Assets ......................................................................................6
    1.3    Assumption of Certain Liabilities ...........................................................8
    1.4    Excluded Liabilities ................................................................................8
    1.5    Assumption/Rejection of Certain Contracts ...........................................9

**Article II Consideration; Payment; Closing** ..............................................10

    2.1    Consideration; Payment ........................................................................10
    2.2    Deposit ..................................................................................................12
    2.3    Closing ..................................................................................................12
    2.4    Closing Deliveries by Seller .................................................................12
    2.5    Closing Deliveries by Purchaser ..........................................................13
    2.6    Withholding ..........................................................................................14
    2.7    Closing Inventory; Closing Property Taxes; Adjustment to Purchase Price ........14
    2.8    Disputes Concerning Adjustment ..........................................................16

**Article III Representations and Warranties of Seller** ..............................17

    3.1    Organization and Qualification .............................................................17
    3.2    Authorization of Agreement .................................................................17
    3.3    Conflicts; Consents ..............................................................................17
    3.4    Financial Statements .............................................................................18
    3.5    Absence of Certain Developments ........................................................18
    3.6    Title to Properties .................................................................................18
    3.7    Contracts ...............................................................................................19
    3.8    Litigation ..............................................................................................21
    3.9    Permits; Compliance with Laws ...........................................................21
    3.10   Environmental Matters ..........................................................................21
    3.11   Intellectual Property .............................................................................22
    3.12   Tax Matters ...........................................................................................23
    3.13   Seller Plans ...........................................................................................23
    3.14   Employees .............................................................................................24
    3.15   Affiliate Transactions ...........................................................................24
    3.16   Brokers .................................................................................................25

**Article IV Representations and Warranties of Purchaser** ........................25

    4.1    Organization and Qualification .............................................................25
    4.2    Authorization of Agreement .................................................................25
    4.3    Conflicts; Consents ..............................................................................25
    4.4    Financing ..............................................................................................26

4.5     Brokers ................................................................................26
4.6     No Litigation .......................................................................26
4.7     Certain Arrangements .........................................................26
4.8     No Additional Representations or Warranties ....................27
4.9     No Outside Reliance ...........................................................27

**Article V BANKRUPTCY COURT MATTERS** .............................................**28**

5.1     Bankruptcy Actions ............................................................28
5.2     Bid Protections and Break-Up Fee. ....................................29
5.3     Cure Costs ...........................................................................30
5.4     Sale Order ...........................................................................30
5.5     Approval ..............................................................................30

**Article VI COVENANTS AND AGREEMENTS** ...........................................**30**

6.1     Conduct of Business of Seller.............................................30
6.2     Access to Information..........................................................32
6.3     Employee Matters ...............................................................34
6.4     Regulatory Approvals .........................................................36
6.5     Antitrust Notification .........................................................37
6.6     Reasonable Efforts; Cooperation .......................................38
6.7     Notification of Certain Matters...........................................39
6.8     Further Assurances..............................................................39
6.9     Insurance Matters ...............................................................39
6.10    Receipt of Misdirected Assets ...........................................40
6.11    Acknowledgment by Purchaser ..........................................40
6.12    Mixed-Use Contracts ..........................................................42
6.13    Retained Names and Marks .................................................42
6.14    Background License to Mixed-Use Acquired Intellectual Property....................44
6.15    Certain Contracts; New Leases ...........................................44
6.16    .............................................................................................44

**Article VII CONDITIONS TO CLOSING**.....................................................**45**

7.1     Conditions Precedent to the Obligations of Purchaser and Seller .........................45
7.2     Conditions Precedent to the Obligations of Purchaser ............................45
7.3     Conditions Precedent to the Obligations of the Company......................46
7.4     Waiver of Conditions..........................................................46

**Article VIII Termination** .............................................................................**46**

8.1     Termination of Agreement...................................................46
8.2     Effect of Termination..........................................................48

**Article IX TAXES** ............................................................................................**48**

9.1     Transfer Taxes ....................................................................48
9.2     Allocation of Purchase Price...............................................49
9.3     Cooperation.........................................................................49

|       |                                                                                       |     |
| ----- | ------------------------------------------------------------------------------------- | --- |
| 9.4   | Preparation of Tax Returns and Payment of Taxes                                        | 49  |
| 9.5   | Wage Reporting                                                                         | 50  |

**Article X MISCELLANEOUS** .............................................................................**50**

| 10.1  | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers  | 50  |
| 10.2  | Expenses                                                                               | 51  |
| 10.3  | Notices                                                                                | 51  |
| 10.4  | Binding Effect; Assignment                                                             | 52  |
| 10.5  | Amendment and Waiver                                                                   | 52  |
| 10.6  | Third Party Beneficiaries                                                              | 52  |
| 10.7  | Non-Recourse                                                                           | 52  |
| 10.8  | Severability                                                                           | 53  |
| 10.9  | Construction                                                                           | 53  |
| 10.10 | Schedules                                                                              | 53  |
| 10.11 | Complete Agreement                                                                     | 54  |
| 10.12 | Specific Performance                                                                   | 54  |
| 10.13 | Jurisdiction and Exclusive Venue                                                       | 54  |
| 10.14 | Governing Law; Waiver of Jury Trial                                                    | 55  |
| 10.15 | No Right of Set-Off                                                                    | 56  |
| 10.16 | Counterparts and PDF                                                                   | 56  |
| 10.17 | Publicity                                                                              | 56  |
| 10.18 | Bulk Sales Laws                                                                        | 56  |
| 10.19 | Fiduciary Obligations                                                                  | 57  |
| 10.20 | No Solicitation                                                                        | 57  |

**Article XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** ........................................**57**

| 11.1  | Certain Definitions                                                                    | 57  |
| 11.2  | Index of Defined Terms                                                                 | 65  |
| 11.3  | Rules of Interpretation                                                                | 66  |

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT B    FORM OF IP ASSIGNMENT AGREEMENT

EXHIBIT C    FORM OF ADJUSTMENT ESCROW AGREEMENT

EXHIBIT D    FORM OF DEPOSIT ESCROW AGREEMENT

EXHIBIT E    FORM OF TRANSITION SERVICES AGREEMENT

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), is dated as of August 6, 2020, by and among American Cementing, LLC, a Delaware limited liability company ("Purchaser"), BJ Services, LLC, a Delaware limited liability company (the "Company" or "Seller"). Purchaser and Seller are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth in Article XI or otherwise set forth herein.

WHEREAS, the Company and certain of its Affiliates filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), which chapter 11 cases are being jointly administered for procedural purposes as Case No. 20-33627 (MI) (collectively, the "Bankruptcy Case");

WHEREAS, Seller and its Affiliates will continue to manage their properties and operate their businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code;

WHEREAS, Seller is engaged in, among other things, the business of providing downhole well cementing services to owners and operators of oil or natural gas wells in the United States (the well cementing business, "Business");

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale (the "Sale") authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, 365, 1123, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of an Order, in form and substance reasonably acceptable to Purchaser, Approving the Sale of the Acquired Assets under Section 363(b) of the Bankruptcy Code (the "Sale Order"); and

WHEREAS, certain Affiliates of Purchaser have, as an inducement to Seller to enter into this Agreement, executed an Equity Commitment Letter (the "Equity Commitment Letter") pursuant to which such Affiliates have agreed, subject to certain conditions set forth therein, to make an equity investment in Purchaser at the Closing, if any, in an amount of cash that, together with any other cash then held by Purchaser, will be equal to the Closing Date Payment.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and intending to be legally bound hereby, Purchaser and Seller hereby agree as follows.

# ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1    <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, at the Closing, on the terms and subject to the conditions set forth herein and in the Sale Order, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest, as of the Closing, in and to the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "<u>Acquired Assets</u>" means all of the following properties, rights, interests and other assets of Seller, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP (but excluding in all cases the Excluded Assets):

(a)    all Contracts (excluding any accounts receivable relating thereto with respect to periods prior to the Closing), to the extent assignable under applicable Law, in each case listed on <u>Schedule 1.1(a)</u> (the "<u>Assigned Contracts</u>");

(b)    all Documents;

(c)    the Owned Real Property listed on <u>Schedule 1.1(c)</u> (the "<u>Acquired Owned Real Property</u>");

(d)    the Leased Real Property listed on <u>Schedule 1.1(d)</u> (the "<u>Acquired Leased Real Property</u>"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto;

(e)    the Equipment and other assets listed on <u>Schedule 1.1(e)</u> (the "<u>Core Equipment</u>");

(f)    all Ancillary Assets of Seller primarily related to or primarily used in the Business;

(g)    to the extent transferable under applicable Law, all of the rights, interests and benefits accruing under all Permits, and all pending applications therefor, in each case that are primarily related to or primarily used in the Business;

(h)    the registered, filed, issued and applied for Intellectual Property listed on <u>Schedule 1.1(h)</u>, all rights to collect royalties and proceeds in connection with such Intellectual Property with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property, and any and all corresponding rights that, now or hereafter, may be secured within the United States of America;

(i)    Intellectual Property owned by the Seller in the Software listed on <u>Schedule 1.1(i)</u>;

(j)      Intellectual Property owned by the Seller in any trade secrets or other unregistered Intellectual Property that is exclusively used in or exclusively related to the Business;

(k)      all goodwill and rights of Seller primarily used in or primarily related to the Business other than any of the foregoing connected with the use of and symbolized by any Retained Names and Marks; and

(l)      all Inventory.

1.2      Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, or convey, and Seller (or its applicable Affiliates) shall retain all right, title and interest to, in and under, any assets of Seller (or its applicable Affiliates) that are not Acquired Assets, which assets shall expressly include the following assets, properties, interests and rights of Seller (collectively, the "Excluded Assets"):

(a)      all assets expressly excluded from the definition of Acquired Assets pursuant to Section 1.1;

(b)      all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

(c)      all Mixed-Use Contracts and all other Contracts that are not Assigned Contracts, including the Contracts listed on Schedule 1.2(c) (the "Excluded Contracts");

(d)      all accounts receivable, negotiable instruments and chattel paper owing from Persons that are not Seller and that are attributable to periods prior to the Closing;

(e)      all rights, title and interest in and to information technology systems and Software used in connection with the Business to the extent not constituting Software listed on Schedule 1.1(i);

(f)      all Intellectual Property registered, issued, applied for, or subsisting in countries outside of the United States of America;

(g)      rights in third party licenses of Software that may be required for the operation or maintenance of the Software referenced on Schedule 1.1(i), other than such licenses that are set forth on Schedule 1.1(a);

(h)      all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller); (ii) that are Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller as pertaining to ownership, organization or existence of Seller, Tax Returns (and any related work papers) and any other Tax information or records, corporate seal, checkbooks, and canceled checks; or (iii) that Seller is required by Law to retain or prohibited by Law from selling, transferring, assigning,

conveying or delivering to Purchaser; provided that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents referenced in clauses (i) and (iii) that, but for such clauses (i) or (iii), respectively, would be Acquired Assets (including, for the avoidance of doubt, any Tax information or records that relate to the Business or the Acquired Assets to the extent such information would be relevant to Purchaser post-Closing, but excluding any income, franchise or similar Tax Returns or information or records of Seller related thereto);

(i)      all Documents prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets, this Agreement, or the transactions contemplated hereby, including (i) all records and reports prepared or received by Seller, any of its Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Seller's businesses or assets, (iii) all privileged materials, documents and records of Seller or any of its Affiliates and (iv) copies of the documents, materials and data to the extent related to the Acquired Assets prior to the Closing Date;

(j)      all current and prior insurance policies of Seller or any of its Affiliates, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller and its Affiliates with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(k)      all membership interests or other equity interests of Seller or any of its Subsidiaries or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(l)      the sponsorship of all Seller Plans and any right, title or interest in any of the assets thereof or relating thereto;

(m)      (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date, and (iii) all claims that Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(n)      Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser in connection with the transactions contemplated hereby, or any other agreement between Seller and Purchaser entered into on or after the date hereof;

(o)      all claims of Seller or any of its Affiliates for refunds of, or loss carry forwards with respect to, (i) Taxes attributable to the Acquired Assets for any Pre-Closing Tax Period or the pre-Closing portion of any Straddle Period, (ii) income or franchise Taxes of Seller or any of its Affiliates, or (iii) Taxes attributable to the Excluded Assets;

(p)    all real estate and all interests in real estate other than the Acquired Leased Real Property and the Acquired Owned Real Property, including any Leasehold Improvements thereon;

(q)    all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date;

(r)    all Retained Names and Marks, and goodwill and rights to sue associated with such Retained Names and Marks; and

(s)    the properties and assets set forth on Schedule 1.2(s).

1.3    Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, Purchaser shall irrevocably assume from Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall irrevocably convey, transfer, and assign to Purchaser, only the following Liabilities, without duplication and only to the extent such Liabilities are not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)    all Liabilities of Seller under the Assigned Contracts that arise and accrue after the Closing, relate exclusively to periods following the Closing and are by their terms to be observed, paid, discharged and performed following the Closing;

(b)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)    all Liabilities (including all Liabilities arising under Environmental Laws and all applicable Taxes) arising out of the conduct of the Business or the use, ownership or operation of the Acquired Assets, in each case, from and after the Closing Date, excluding all obligations, liabilities and commitments for Accounts Payable;

(d)    all Liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement, including any Transfer Taxes;

(e)    all Liabilities assumed by Purchaser pursuant to Section 6.3; and

(f)    all Liabilities set forth on Schedule 1.3(f).

1.4    Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or relating to the Acquired Assets or Employees, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become

due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"), which Excluded Liabilities include, for the avoidance of doubt, (a) all obligations, liabilities and commitments for Accounts Payable, (b) all income, franchise or similar Taxes of Seller or any of its Affiliates and (c) subject to Section 9.4(b), all Taxes arising from or with respect to the Acquired Assets or the operation of the Business that are attributable to any Pre-Closing Tax Period or the pre-Closing portion of any Straddle Period (determined in accordance with Section 9.4(d)).

1.5     Assumption/Rejection of Certain Contracts.

(a)     Assumption and Assignment of Executory Contracts. Purchaser shall, in its sole discretion, determine those Contracts that shall become Assigned Contracts, in the time frames and as otherwise set forth herein.  Seller shall provide timely and proper written notice of the Sale Order to all parties to any executory Contracts or unexpired leases to which Seller is a party that are (or are to become) Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, a notice filed in connection with the motion for approval of the Sale Order, or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Seller shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)     Excluding or Adding Assigned Contracts Prior to Closing. Purchaser shall have the right to notify Seller in writing of any Assigned Contract (other than any purchase orders) that it does not wish to assume or a Contract to which Seller is a party and that is used in or related to the Business (excluding Mixed-Use Contracts) that Purchaser wishes to add as an Assigned Contract (whether or not previously considered an Excluded Contract (except with respect to Mixed-Use Contracts)) up to the later of (i) the close of the Auction, if any, or (ii) one day prior to the last date set for final hearing for approval of the Sale by the Bankruptcy Court, and (x) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without

any adjustment to the Purchase Price, and (y) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract that is primarily related to or primarily used in the Business shall be automatically deemed added to the Schedules related to Assigned Contracts, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

(c)     Non-Assignment. Notwithstanding the foregoing, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract (i) is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption or (ii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights under such Contract, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder. In addition, a Permit shall not be assigned to, or assumed by, Purchaser to the extent that such Permit requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights under such Permit, and no such Consent or Governmental Authorization has been obtained prior to the Closing. In the event that any Assigned Contract is deemed not to be assigned pursuant to clause (ii) of the first sentence of this Section 1.5(c), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six (6) months following the Closing (or the remaining term of such Contract or the closing of the Bankruptcy Case, if shorter), Seller and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Assigned Contract, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Seller or its Affiliates) under such Assigned Contract with respect to which the Consent and/or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation (including performance) with respect to such Assigned Contract. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Assigned Contract after the Closing, such Assigned Contract shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1     Consideration; Payment.

(a)     Subject to any adjustment pursuant to Section 2.7, the aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the

Acquired Assets shall be: (y) the assumption of Assumed Liabilities and (z) a cash payment (the "Cash Payment") of $35,000,000, (A) plus (in the event the Estimated Inventory exceeds the Target Inventory) the amount, if any, by which the Estimated Inventory exceeds the Target Inventory or (B) minus (in the event the Target Inventory exceeds the Estimated Inventory) the amount, if any, by which the Target Inventory exceeds the Estimated Inventory, and (C) minus the Estimated Property Taxes.  The Cash Payment shall be deemed allocated among the Acquired Assets as follows (and any post-Closing adjustments to the Purchase Price in respect of Closing Property Taxes shall be allocated to the applicable category of assets set forth below for which any such adjustments relate):

(i)  $4,500,000 plus or minus (as applicable) 75% of any post-Closing adjustments to the Purchase Price for Closing Inventory pursuant to Section 2.7 shall be deemed to be in consideration for the Inventory;

(ii)  $200,000 shall be deemed to be in consideration for all Intellectual Property and goodwill;

(iii)  $200,000 shall be deemed to be in consideration for the Acquired Owned Real Property located at 28730 US Highway 6, Rifle, CO 81650;

(iv)  $200,000 shall be deemed to be in consideration for the Acquired Owned Real Property located at 4402 N Main St, Liberty, TX 77575; and

(v)  the Cash Payment less the amounts set forth in Sections 2.1(a)(i) – (iv) shall be deemed to be in consideration for all Core Equipment and all other Acquired Assets for which an allocation is not made hereunder.

(b)  At the Closing, Purchaser shall deliver, or cause to be delivered, to the Company an amount equal to (i) the Cash Payment (increased or decreased, as applicable and for the avoidance of doubt, by the items listed in clauses (A), (B) and (C) of Section 2.1(a)(z)), minus (ii) the Deposit, minus (iii) the Adjustment Escrow Amount (the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two (2) Business Days prior to the date such payment is to be made.

(c)  At the Closing, Purchaser shall deliver to Citibank, N.A. (the "Escrow Agent"), by wire transfer of immediately available funds for deposit into a separate escrow account (the "Adjustment Escrow Account") established pursuant to the escrow agreement to be executed on the Closing Date by and among the Company, Purchaser and the Escrow Agent, substantially in the form attached hereto as Exhibit C (the "Adjustment Escrow Agreement"), an amount equal to one percent (1%) of the Cash Payment (the "Adjustment Escrow Amount"). The Adjustment Escrow Amount shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any of Seller or Purchaser, and shall be held by the Escrow Agent in the Adjustment Escrow Account in accordance with the Adjustment Escrow Agreement until distributed to the applicable Party as provided herein.

2.2     <u>Deposit</u>.

(a)     Purchaser will, on or within one (1) Business Day after the date hereof, make an earnest money deposit with Escrow Agent in the amount of five percent (5%) of the Cash Payment (the "<u>Deposit</u>"), by wire transfer of immediately available funds for deposit into a separate escrow account (the "<u>Deposit Escrow Account</u>"), established pursuant to the escrow agreement by and among the Company, Purchaser and the Escrow Agent, substantially in the form attached hereto as <u>Exhibit D</u> (the "<u>Deposit Escrow Agreement</u>"). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any of Seller or Purchaser and shall be applied against payment of the Cash Payment on the Closing Date.

(b)     If this Agreement has been terminated by the Company pursuant to <u>Section 8.1(f)</u> or <u>8.1(h)</u> (or by Purchaser pursuant to <u>Section 8.1(b)</u>, <u>8.1(d)</u> or <u>8.1(e)</u>, in each case in circumstances where the Company would be entitled to terminate this Agreement pursuant to <u>Section 8.1(f)</u> or <u>8.1(h)</u>), then the Company shall retain the Deposit together with all received investment income, if any.  For the avoidance of doubt and notwithstanding anything herein to the contrary, if this Agreement is terminated as contemplated by this <u>Section 2.2(b)</u> prior to the time such Deposit is actually made to the Escrow Agent, Seller shall be entitled to be paid, and Purchaser shall be obligated to pay to Seller, an amount equal to the Deposit, and such obligation shall survive the termination of this Agreement.

(c)     If this Agreement has been terminated by any Party, other than as contemplated by <u>Section 2.2(b)</u>, then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five (5) Business Days after such termination.

(d)     The Parties agree that the Company's right to retain the Deposit, as set forth in <u>Section 2.2(b)</u>, is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e)     If the Closing occurs, the Deposit shall be transferred to the Company.

2.3     <u>Closing</u>. The closing of the purchase and sale of the Acquired Assets, the delivery of the Closing Date Payment, the payment of the Adjustment Escrow Amount, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "<u>Closing</u>") will take place by telephone conference and electronic exchange of documents at 10 a.m. Central Time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in <u>Article VII</u> (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree. The date on which the Closing actually occurs is referred to herein as the "<u>Closing Date</u>."

2.4     <u>Closing Deliveries by Seller</u>. At or prior to the Closing, Seller shall deliver to Purchaser:

(a)     a bill of sale and assignment and assumption agreement substantially in the form of <u>Exhibit A</u> (the "<u>Assignment and Assumption Agreement</u>") duly executed by Seller;

(b)     each "<u>IP Assignment Agreement</u>" substantially in the form of <u>Exhibit B</u>, duly executed by the Seller;

(c)     a transition services agreement (the "<u>Transition Services Agreement</u>") substantially in the form of <u>Exhibit E</u>, duly executed by the Company;

(d)     a copy of the Sale Order, as entered by the Bankruptcy Court;

(e)     a duly executed statement from the Company (or, if the Company is a disregarded entity for U.S. federal income tax purposes, from its regarded owner) meeting the requirements of Treasury Regulation section 1.1445-2(b)(2) certifying that the Company (or its regarded owner for U.S. federal income tax purposes) is not a foreign person within the meaning of the Code and the Treasury Regulations promulgated thereunder;

(f)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in <u>Sections 7.2(b)</u> and <u>7.2(c)</u> have been satisfied;

(g)     quit claim deeds (or special or limited warranty deeds solely to the extent required by Law for a title insurance company to issue a title insurance policy with respect to an Acquired Owned Real Property) in recordable form and form reasonably acceptable to Purchaser for all Acquired Owned Real Property, duly executed by Seller;

(h)     the New Leases, duly executed by Seller or purchaser of any New Lease Property;

(i)     a joint written instruction, duly executed by the Company, instructing the Escrow Agent to release to the Company by wire transfer of immediately available funds, the Deposit; and

(j)     the Adjustment Escrow Agreement, duly executed by Seller and the Escrow Agent.

2.5     <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to (or at the direction of) the Company:

(a)     the Closing Date Payment;

(b)     the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)     the Transition Services Agreement, duly executed by Purchaser;

(d)     the New Leases, duly executed by Purchaser;

(e)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied;

(f)     a joint written instruction, duly executed by Purchaser, instructing the Escrow Agent to release to the Company by wire transfer of immediately available funds, the Deposit; and

(g)     the Adjustment Escrow Agreement, duly executed by Purchaser.

2.6     Withholding. Purchaser shall be entitled to deduct and withhold from any consideration otherwise payable to any Person pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code or any provision of state, local or foreign Tax Law; provided, that, other than with respect to any withholding as a result of the Company's failure to comply with Section 2.4(e) or any withholding required as a result of a change in Tax Law that occurs within 10 days of the Closing, Purchaser shall provide at least five days' written notice to Seller if Purchaser intends to withhold any amounts pursuant to this Section 2.6 (and in the case of any withholding required as a result of any change in Tax Law that occurs within 10 days of the Closing shall use commercially reasonable efforts to provide such written notice as soon as reasonably practicable prior to the Closing). Any amounts that are so deducted and withheld and properly paid to the relevant Governmental Body shall be treated for all purposes of this Agreement as having been paid to Seller.  Purchaser and Seller shall reasonably cooperate in good faith to minimize or establish an exemption from, to the extent permissible under applicable Law, any deduction or withholding.

2.7     Closing Inventory; Closing Property Taxes; Adjustment to Purchase Price.

(a)     At least five (5) Business Days prior to the Closing Date, the Company shall deliver to Purchaser a statement setting forth in reasonable detail the Company's calculation of Closing Inventory as of the opening of business on the Closing Date ("Estimated Inventory") and Closing Property Taxes as of the opening of business on the Closing Date (the "Estimated Property Taxes"). For purposes of this Agreement, "Closing Inventory" shall mean all Inventory on hand as of the opening of business on the Closing Date, calculated in the manner set forth in Schedule 2.7. For purposes of this Agreement, "Closing Property Taxes" shall mean all known accrued but unpaid Property Taxes exclusively related to or arising out of the Acquired Assets (determined in accordance with Section 9.4(d)), as of the opening of business on the Closing Date (whether attributable to a Pre-Closing Tax Period or to the pre-Closing portion of any Straddle Period). To the extent that any Property Taxes exclusively related to or arising out of the Acquired Assets have been paid by Seller in respect of any period after the opening of business on the Closing Date, such amounts paid in respect of such period shall be credited against the Closing Property Taxes calculated hereunder to the extent the payment of such Property Taxes by Sellers will actually reduce the amount of Property Taxes payable by Purchaser and its Affiliates (determined on a with and without basis) with respect to any such period.

(b)     Within sixty (60) days after the Closing Date, Purchaser shall deliver to Seller both (i) a statement (the "Closing Inventory Statement"), setting forth Purchaser's calculation of Closing Inventory as of the opening of business on the Closing Date, calculated in

14

the manner set forth in Schedule 2.7 and (ii) a statement setting forth Purchaser's calculation of the Closing Property Taxes, as of the opening of business on the Closing Date (the "Closing Property Taxes Statement"), determined in accordance with Section 9.4(d). Seller shall cause its employees to assist Purchaser and its representatives in the preparation of the Closing Inventory Statement and the Closing Property Taxes Statement and shall provide Purchaser and its representatives reasonable access, during normal business hours and upon reasonable prior notice, to the personnel, properties, books and records of Seller for such purpose to the extent primarily related to the Business and determination of Closing Inventory and Closing Property Taxes, and to the extent consistent with and not in contravention of any policy, procedure or protocol of Seller in response to COVID-19 or any COVID-19 Measures.

(c)     If Final Inventory (as finally determined pursuant to Section 2.8 below) exceeds Estimated Inventory, then Purchaser shall pay to the Company an amount equal to the difference between Final Inventory and Estimated Inventory and the Company and the Purchaser shall jointly instruct the Escrow Agent, in accordance with the terms of the Adjustment Escrow Agreement, to pay to the Company, by wire transfer of immediately available funds to such account of the Company as specified by the Company to the Escrow Agent in writing, the Adjustment Escrow Amount, less the Property Taxes Shortfall Amount (if any). If Estimated Inventory exceeds Final Inventory (the "Shortfall Amount"), then the Company and the Purchaser shall jointly instruct the Escrow Agent, in accordance with the terms of the Adjustment Escrow Agreement, to pay to (i) Purchaser, by wire transfer of immediately available funds to such account of Purchaser as specified by Purchaser to the Escrow Agent in writing, an amount equal to the Shortfall Amount, provided that such amount and any Property Taxes Shortfall Amount shall in the aggregate be capped by and shall not exceed the Adjustment Escrow Amount and (ii) the Company, by wire transfer of immediately available funds to such account of the Company as specified by the Company to the Escrow Agent in writing, an amount equal to the excess, if any, of the Adjustment Escrow Amount over the Shortfall Amount, less the Property Taxes Shortfall Amount (if any). If Estimated Property Taxes exceed the Final Property Taxes (as finally determined pursuant to Section 2.8 below), then Purchaser shall pay to Seller an amount equal to the difference between the Estimated Property Taxes and the Final Property Taxes. If the Final Property Taxes exceed the Estimated Property Taxes (the "Property Taxes Shortfall Amount"), then the Company and the Purchaser shall jointly instruct the Escrow Agent, in accordance with the terms of the Adjustment Escrow Agreement, to pay to (i) Purchaser, by wire transfer of immediately available funds to such account of Purchaser as specified by Purchaser to the Escrow Agent in writing, an amount equal to the Property Taxes Shortfall Amount, provided that such amount combined with the payment (if any) in respect of the Shortfall Amount shall in the aggregate be capped by and shall not exceed the Adjustment Escrow Amount. Any payment or delivery of joint instructions required to be made pursuant to this Section 2.7(c) shall be made or delivered within five (5) Business Days after the Company's (actual or deemed) acceptance of the Closing Inventory Statement and the Closing Property Taxes Statement, or, if applicable, within five (5) Business Days after determination and resolution of any dispute over the Closing Inventory Statement and the Closing Property Taxes Statement, in either case, as provided in Section 2.8 below. Any such amount payable by any Party pursuant to this Section 2.7(c) shall be paid in accordance with Section 2.1(b).

2.8    <u>Disputes Concerning Adjustment</u>.

(a)    If the Company does not deliver a Dispute Notice to Purchaser within ten (10) Business Days of receiving the Closing Inventory Statement, the Company shall be deemed to have agreed with the Closing Inventory Statement and the Closing Inventory set forth on the Closing Inventory Statement shall be deemed the "<u>Final Inventory</u>" for purposes of this Agreement. If Seller does not deliver a Dispute Notice to Purchaser within ten (10) Business Days of receiving the Closing Property Taxes Statement, Seller shall be deemed to have agreed with the Closing Property Taxes Statement and the Closing Property Taxes set forth on the Closing Property Taxes Statement shall be deemed the "<u>Final Property Taxes</u>" for purposes of this Agreement.

(b)    If the Company delivers a Dispute Notice to Purchaser within ten (10) Business Days of receiving the Closing Inventory Statement or the Closing Property Taxes Statement, Seller and Purchaser shall negotiate in good faith to resolve the dispute. If, after twenty (20) days from the date a Dispute Notice is given hereunder, the Company and Purchaser fail to agree on the resolution of the dispute, then the Arbitrating Accountant shall be jointly engaged as promptly as practicable to arbitrate the dispute. Within ten (10) days after the Arbitrating Accountant accepts the engagement, as evidenced by an engagement letter signed by the Arbitrating Accountant and the Parties (the date of such acceptance being referred to herein as the "<u>Engagement Date</u>"), Purchaser, on the one hand, and the Company, on the other hand, shall prepare and submit to the Arbitrating Accountant a written brief stating their respective positions on the disputed issue(s). Such briefs shall be submitted simultaneously by the Parties. Within ten (10) days thereafter, Purchaser, on the one hand, and the Company, on the other hand, shall prepare and submit to the Arbitrating Accountant a reply brief to the brief submitted by the other Party. Such reply briefs shall be submitted simultaneously. Within thirty (30) days after the Engagement Date, the Arbitrating Accountant shall render its final decision based solely on the materials submitted by each Party in accordance with this <u>Section 2.8(b)</u>. When acting pursuant to this <u>Section 2.8(b)</u>, the Arbitrating Accountant shall determine whether and to what extent, if any, Purchaser's calculation of the Closing Inventory (as set forth in the Closing Inventory Statement) or the Closing Property Taxes (as set forth in the Closing Property Taxes Statement) requires adjustment in accordance with the terms, provisions and definitions set forth in this Agreement. The Arbitrating Accountant shall address only those issues in dispute, and may not assign a value to any item greater than the greatest value for such item claimed by a Party or less than the smallest value for such item claimed by a Party. In addition, the Arbitrating Accountant shall apportion its fees and expenses between the Company, on the one hand, and Purchaser, on the other hand, in proportion to the difference between the relative position of each Party and the Arbitrating Accountant's ultimate determination with respect to the amount of the Closing Inventory or the Closing Property Taxes, as applicable. The decision and award of the Arbitrating Accountant, including the apportionment of its fees, shall be final and binding on the Parties and shall be subject to confirmation and entry of judgment in accordance with applicable Law. In no event shall the Arbitrating Accountant award either Party consequential, incidental, punitive or any other damages. The Closing Inventory as and if determined pursuant to the terms of this <u>Section 2.8(b)</u> shall be deemed the "<u>Final Inventory</u>" for purposes of this Agreement, and the Closing Property Taxes as and if determined pursuant to the terms of this <u>Section 2.8(b)</u> shall be deemed the "<u>Final Property Taxes</u>" for purposes of this Agreement.

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES OF SELLER**

Except as (a) disclosed in any forms, statements or other documents filed with the Bankruptcy Court or (b) set forth in the Schedules delivered by the Company concurrently herewith and Sections 6.7(a) and 10.10, Seller represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date.

3.1     Organization and Qualification. Each of the Company and its Subsidiaries (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties primarily used in or primarily related to the Business and to carry on the Business as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property primarily used in or primarily related to the Business or the conduct of the Business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

3.2     Authorization of Agreement. The execution, delivery, and performance of this Agreement by Seller, and the consummation by Seller of the transactions contemplated hereby, subject to requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by Seller. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly and validly executed and delivered by Seller, and, assuming this Agreement is a valid and binding obligation of Purchaser, this Agreement constitutes a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as limited by the application of bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium, or other Laws relating to or affecting creditors' rights or general principles of equity (whether considered in a proceeding in equity or at law) (the "Enforceability Exceptions").

3.3     Conflicts; Consents.

(a)     Except as set forth on Schedule 3.3(a) and assuming that (y) requisite Bankruptcy Court approvals are obtained, (x) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 3.3(b) are made, given or obtained (as applicable), (y) the requirements of the HSR Act and any other applicable antitrust, competition or merger control Laws promulgated by any Governmental Body ("Foreign Competition Laws") are complied with and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of the Company or any of its Subsidiaries; (ii) violate any Law applicable to the Company or any of its Subsidiaries or by which any of the Acquired Assets is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the

17

creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any property or asset of the Company or any of its Subsidiaries under, any Lease or Contract listed on Schedule 3.7(a); except, in each case, for any such violations, breaches, defaults or other occurrences that are not material to the Business taken as a whole.

(b)     Except as set forth on Schedule 3.3(b), Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the transactions contemplated hereby, except (i) requisite Bankruptcy Court approvals, (ii) any filings required to be made under the HSR Act and any Foreign Competition Laws, (iii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, (iv) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, is not material to the Business taken as a whole, or (v) as may be necessary as a result of any facts or circumstances relating to Purchaser or any of its Affiliates.

3.4     Financial Statements. Attached to Schedule 3.4 are the Company's unaudited statements of income for the Business as of June 30, 2020 for the six (6) month period then ended (the "Financial Statements"). Except as set forth on Schedule 3.4, the Financial Statements have been prepared, in each case, in conformity in all material respects with GAAP consistently applied and present fairly in all material respects, in accordance with GAAP consistently applied, the consolidated financial condition and results of operations of the Company and its Subsidiaries with respect to the Business as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto and subject, in the case of the unaudited financial statements, to (y) the absence of footnote disclosures and other presentation items and (z) changes resulting from normal year-end adjustments (which are expected to be consistent with past practice).

3.5     Absence of Certain Developments. Since the date of the Financial Statements through the date of this Agreement except (a) for the negotiation and execution of this Agreement and consummation of the transactions contemplated hereby, and the discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Acquired Assets, and (b) for the preparation and commencement of the Bankruptcy Case and Seller's debtor-in-possession financing in the Bankruptcy Case, the Business has been carried on and conducted in all material respects in the Ordinary Course, and there has not been any Material Adverse Effect or any effect, change, event or occurrence that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.6     Title to Properties.

(a)     Schedule 3.6(a) contains a list of all real property leased by the Company and its Subsidiaries primarily related to or primarily used in the Business (the "Leased Real Property") and the agreements pursuant to which such Leased Real Property is leased (the "Leases"), in each case as of the date hereof. Except as set forth on Schedule 3.6(a), subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Lease in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, the Company or its Subsidiaries have a valid leasehold estate in all of the Acquired Leased Real Property, free and clear of all

18

Encumbrances, other than Permitted Encumbrances. Except as set forth in Schedule 3.6(a), neither the Company nor its Subsidiaries has leased or otherwise granted to any Person rights to use or occupy any of the Acquired Leased Real Property that would reasonably be expected to materially impair the use or occupancy of the Acquired Leased Real Property in the operation of the Business taken as a whole.

(b)     Except as set forth on Schedule 3.6(b) (the "Owned Real Property"), neither the Company nor any of its Subsidiaries owns any real property that is used in connection with the Business. Except as set forth on Schedule 3.6(b), (i) the Company or its Subsidiaries have fee title to all Owned Real Property, free and clear of all Encumbrances, other than Permitted Encumbrances, (ii) neither the Company nor any of its Subsidiaries has leased or otherwise granted to any Person rights to use or occupy the Owned Real Property that would reasonably be expected to materially impair the use or occupancy of the Owned Real Property in the operation of the Business taken as a whole, and (iii) there are no outstanding options, rights of first offer or rights of first refusal to purchase the Owned Real Property. Neither the Company nor its Subsidiaries is a party to any agreement or option to purchase any real property or interest therein primarily related to the Business.

(c)     Schedule 3.6(c) sets forth a correct and complete list as of the date hereof of all material Owned Real Property or Leased Real Property of Seller that are not being included in the Acquired Assets but that are used by the Business.

(d)     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, the Company and its Subsidiaries own good title to, or hold a valid leasehold interest in, all of the material tangible property necessary in the conduct of the Business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to the Business taken as a whole.

3.7     Contracts.

(a)     Except as set forth on Schedule 3.7(a), as of the date hereof, neither the Company nor any of its Subsidiaries is a party to any of the following primarily relating to or primarily used in the Business or the Acquired Assets (in each case, excluding any Seller Plans):

(i)     collective bargaining agreement with any labor union;

(ii)    agreement primarily related to the Business or the Acquired Assets under which the Company or one of its Subsidiaries has borrowed any money or issued any note, indenture or other evidence of similar indebtedness or guaranteed such indebtedness of others (other than intercompany indebtedness among the Company and its Subsidiaries, guarantees of indebtedness of the Company or any of its Subsidiaries, endorsements for the purpose of collection or purchases of equipment or materials made under conditional sales agreements, in each case in the Ordinary Course), in each case, having an outstanding principal amount in excess of $1,000,000;

19

(iii)    lease or other agreement primarily used in or primarily related to the Business or the Acquired Assets under which the Company or any of its Subsidiaries is lessee of, or holds or operates any personal property owned by any third party, for which the annual rental exceeds $250,000 that is not terminable by the Company or such Subsidiary upon notice of sixty (60) days or less for a cost of $250,000 or less;

(iv)    lease or other agreement primarily used in or primarily related to the Business or the Acquired Assets under which the Company or any of its Subsidiaries is lessor of or permits any third party to hold or operate any property, real or personal, for which the annual rental exceeds $250,000 that is not terminable by the Company or such Subsidiary upon notice of sixty (60) days or less for a cost of $250,000 or less;

(v)    agreement or group of related agreements with the same party for the purchase of products or services primarily used in or primarily related to the Business or the Acquired Assets, in either case, under which the aggregate undelivered balance of such products and services has a selling price in excess of $500,000 and which is not terminable by the Company or such Subsidiary upon notice of sixty (60) days or less for a cost of $500,000 or less (other than purchase orders entered into in the Ordinary Course);

(vi)    agreement that materially prohibits the Company or any of its Subsidiaries from freely engaging in the Business anywhere in the world;

(vii)    agreement relating to any acquisition or disposition by the Company of the Business or the Acquired Assets (whether by asset or stock purchase or otherwise) or any merger, consolidation or similar business combination transaction, in each case, pursuant to which the Company has an outstanding obligation to pay any purchase price thereunder or other material obligation;

(viii)    agreement that involves any take-or-pay or requirements arrangement other than in the Ordinary Course;

(ix)    agreement relating to any joint venture or partnership; or

(x)    agreement in writing to enter into any of the foregoing.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, each Contract listed on Schedule 3.7(a) and each Lease is in full force and effect and is a valid, binding and enforceable obligation of the Company and its Subsidiaries and, to the Knowledge of the Company, each of the other parties thereto, except as may be limited by the Enforceability Exceptions. Except as set forth on Schedule 3.7(b), as a result of the commencement of the Bankruptcy Case or as would not reasonably be expected to be material to the Business taken as a whole, neither the Company nor any of its Subsidiaries, as applicable, is in material default, or is alleged in writing by the counterparty thereto to have materially breached or to be in material default, under any Lease or Contract listed on Schedule 3.7(a), and, to the Knowledge of the Company, the other party to each Lease or each Contract listed on Schedule 3.7(a) is not in material default thereunder. The Company has made available to Purchaser complete and correct copies of

20

all Contracts required to be listed on <u>Schedule 3.7(a)</u> and all Leases, each as amended to the date hereof.  None of the Contracts listed on <u>Schedule 3.7(a)</u> or any of the Leases has been canceled or otherwise terminated, and neither the Company, nor its Subsidiaries, has received any written notice from any Person regarding any such cancellation or termination. Except as listed on <u>Schedule 3.7(a)</u>, Seller and its Subsidiaries are in material compliance with all payment terms specified in such Contracts.

3.8    <u>Litigation</u>. Except as set forth on <u>Schedule 3.8</u> and other than the Bankruptcy Case, there are, and during the prior two (2) years there have been, no Actions pending against or by the Company or any of its Subsidiaries, at law or in equity, or before or by any Governmental Body, primarily related to the Business or the Acquired Assets, other than any Action pursuant to which no injunctive or equitable relief is sought and where the monetary damages are covered by insurance or would not reasonably be expected to be material to the Business taken as a whole. Except as set forth on <u>Schedule 3.8</u> and other than in connection with the Bankruptcy Case, neither the Company nor any of its Subsidiaries is, or during the prior two (2) years has been, subject to any outstanding Order primarily related to the Business or the Acquired Assets, other than any such Order where no injunctive or equitable relief was granted and where the monetary damages were covered by insurance or were not be material to the Business taken as a whole.

3.9    <u>Permits; Compliance with Laws</u>. Except as set forth on <u>Schedule 3.9</u>:

(a)    Each of the Company and its Subsidiaries holds and is in compliance, in all material respects, with all permits, certificates, licenses, approvals, registrations and authorizations that are material to the Company and its Subsidiaries taken as a whole and required in connection with the conduct of the Business under Laws (the "<u>Permits</u>"). All of the Permits are valid and in full force and effect.

(b)    The Company and its Subsidiaries are, and have been during the prior two (2) years, in compliance, in all material respects, with all applicable Laws primarily applicable to or primarily related to the conduct or operations of the Business, and during the prior two (2) years neither the Company nor any of its Subsidiaries has received any written notice of any Action against it alleging any failure to comply in any material respect with any such Laws, except in each case as would not reasonably be expected to be material to the Business taken as a whole. No investigation by any Governmental Body with respect to the Company or any of its Subsidiaries primarily related to the conduct or operations of the Business is pending or, to the Company's Knowledge, threatened, and during the prior two (2) years neither the Company nor any of its Subsidiaries has received any written notice of any such investigation, except, in each case, for any such investigation that would not reasonably be expected to be material to the Business taken as a whole.

3.10    <u>Environmental Matters</u>. Except as set forth on <u>Schedule 3.10</u>:

(a)    The Company and each of its Subsidiaries are in compliance in all material respects with all Environmental Laws applicable to the Business, except in each case as would not reasonably be expected to be material to the Business taken as a whole;

21

(b)     With respect to the Business, each of the Company and its Subsidiaries holds and is in compliance, in all material respects, with all material Permits required under Environmental Laws for the current ownership or operation of the Acquired Assets, except in each case as would not reasonably be expected to be material to the Business taken as a whole;

(c)     With respect to the Business, neither the Company nor any of its Subsidiaries has during the prior two (2) years received unresolved written notice from any Governmental Body regarding any actual or alleged material violation of Environmental Laws except as would not reasonably be expected to be material to the Business taken as a whole;

(d)     To the Knowledge of the Company, no Hazardous Substance has been released at any Owned Real Property or Leased Real Property by the Company or its Subsidiaries in violation of, and in a manner that would reasonably be expected to result in liability for the Business under, any Environmental Law, except in each case as would not reasonably be expected to be material to the Business taken as a whole; and

(e)     The Company has made available to Purchaser copies of all non-privileged, material environmental audits, assessments and reports in its possession primarily relating to the Business, the Owned Real Property or the Leased Real Property prepared by a third party within the last two (2) years.

(f)     This Section 3.10 contains the sole and exclusive representations and warranties of the Company and each of its Subsidiaries with respect to any environmental, health or safety matters primarily related to the Business and the Acquired Assets, including any arising under any Environmental Law or with respect to any Hazardous Substance.

3.11    Intellectual Property.

(a)     Except as set forth on Schedule 3.11(a), the Company or one or more of its Subsidiaries owns the Intellectual Property included in the Acquired Assets, free and clear of all Encumbrances, other than Permitted Encumbrances.

(b)     To the Knowledge of the Company, neither the Company's nor any of its Subsidiaries' respective businesses infringes, misappropriates or otherwise violates any Intellectual Property of any other Person in connection with the conduct or operation of the Business, except where such infringement, misappropriation or violation is not material to the Business taken as a whole.

(c)     To the Knowledge of the Company, no third party infringes, misappropriates or otherwise violates any Intellectual Property included in the Acquired Assets, except where such infringement, misappropriation or violation is not material to the Business taken as a whole. The Company and its Subsidiaries have used efforts that are reasonable under the circumstances to maintain the secrecy of their material trade secrets included in the Acquired Assets, except where such failure to maintain such material trade secrets would not be material to the Business taken as a whole.

(d)     To the Knowledge of the Company, all of the issued patents and registered trademarks that are material to the Business and included in the Acquired Assets are valid,

subsisting and enforceable. Except for office actions issued in the ordinary course of prosecution by the United States Patent and Trademark Office, during the prior two (2) years, no claim by any third party contesting the validity or enforceability of any of the material Intellectual Property included in the Acquired Assets has been made or has been threatened against the Company or any of its Subsidiaries, in each case in writing.

(e)     This <u>Section 3.11</u> contains the sole and exclusive representations and warranties of the Company with respect to Intellectual Property.

3.12     <u>Tax Matters</u>. (a) All material Tax Returns required to be filed under applicable Law by Seller or any of its Affiliates with respect to the Acquired Assets have been timely filed and such Tax Returns are complete in all material respects, (b) all material Taxes payable by Seller or any of its Affiliates with respect to the Acquired Assets (whether or not shown to be due on such Tax Returns) have been paid, except to the extent nonpayment of which is permitted or required by the Bankruptcy Code, (c) no claims have been asserted in writing against Seller or any of its Affiliates by any Governmental Body with respect to any such Taxes and (d) there are no Encumbrances for Taxes (other than any Encumbrance for Taxes that is a Permitted Encumbrance) on any of the Acquired Assets. The representations and warranties in this <u>Section 3.12</u> and in <u>Section 3.13</u> are the sole and exclusive representations and warranties of Seller relating to Taxes. No representation or warranty is made in this Agreement with respect to (i) the amount, sufficiency or usability of any Tax basis or other Tax attribute with respect to the Acquired Assets or otherwise or (ii) the availability of any Tax position in any taxable period (or portion thereof) beginning after the Closing.

3.13     <u>Seller Plans</u>.

(a)     Except as set forth on <u>Schedule 3.13(a)</u>, and other than any "multiemployer plan" as defined in Section 3(37) of ERISA (the "<u>Multiemployer Plans</u>"), neither the Company nor any of its Subsidiaries maintains or contributes to any (i) nonqualified deferred compensation or retirement plans, (ii) qualified "defined contribution plans" (as such term is defined under Section 3(34) of ERISA), (iii) qualified "defined benefit plans" (as such term is defined under Section 3(35) of ERISA) (the plans set forth in clauses (ii) and (iii) are collectively referred to herein as the "<u>Pension Plans</u>"), (iv) "welfare benefit plans" (as such term is defined under Section 3(1) of ERISA) (the "<u>Welfare Plans</u>") or (v) severance, incentive or bonus, stock purchase, stock option or equity incentive or any other material employee benefit plans, programs or arrangements, in each case, sponsored or maintained by the Company or any of its Subsidiaries for the benefit of the Employees (collectively, the "<u>Seller Plans</u>").

(b)     Each Seller Plan that is a Pension Plan that is intended to meet the requirements of a "qualified plan" under Section 401(a) of the Code has either (i) received a favorable determination letter from the Internal Revenue Service or (ii) may rely on a favorable opinion letter issued by the Internal Revenue Service.

(c)     The Seller Plans comply in form and in operation in all material respects with their terms and applicable Laws, including the requirements of the Code and ERISA, except as would not reasonably be expected to be material to the Business taken as a whole.

23

(d)    With respect to the Seller Plans and except as would not reasonably be expected to be material to the Business taken as a whole: (i) all material contributions required to be made by the Company or any of its Subsidiaries have been made or properly accrued; (ii) there are no Actions pending or, to the Company's Knowledge, overtly threatened other than routine claims for benefits; and (iii) to the Company's Knowledge, there have been no "prohibited transactions" (as that term is defined in Section 406 of ERISA or Section 4975 of the Code).

(e)    Except as set forth on Schedule 3.13(e), neither the Company nor any of its Subsidiaries contributes to any Multiemployer Plan that is subject to Title IV of ERISA and Section 412 of the Code for the benefit of any Employees.

(f)    None of the Seller Plans that are Welfare Plans obligates the Company or its Subsidiaries to provide an Employee (or any dependent thereof) any material life insurance or medical or health benefits after his or her termination of employment with the Company or any of its Subsidiaries, other than as required under Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code or any similar state or local Law.

3.14    Employees. Except as set forth on Schedule 3.14:

(a)    The Company and its Subsidiaries are in compliance in all material respects with all applicable Laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining, layoffs and immigration compliance, in each case primarily related to or primarily involving the Business, except for such non-compliance that is not material to the Business taken as a whole. There are no administrative charges or court complaints pending or, to the Company's Knowledge, threatened against the Company or any of its Subsidiaries primarily related to or primarily involving the Business before the U.S. Equal Employment Opportunity Commission or any other Governmental Body concerning alleged employment discrimination or any other matters relating to the employment of labor, in each case, that would reasonably be expected to be material to the Business taken as a whole.

(b)    There is no unfair labor practice charge or complaint pending or, to the Company's Knowledge, threatened against the Company primarily related to or primarily involving the Business before the National Labor Relations Board or any similar Governmental Body. To the Knowledge of the Company, during the prior two (2) years, the Company has not experienced any union organizing or decertification activities, work stoppage, slowdowns or other material labor disputes primarily related to or primarily involving the Business, and, to the Knowledge of the Company, no such activities or disputes are underway or threatened.

3.15    Affiliate Transactions. Except as set forth on Schedule 3.15, to the Knowledge of the Company, no Affiliate of the Company (other than Seller or any of its Subsidiaries), or any officer or director of the Company or any of its Subsidiaries currently (a) is a party to any agreement or transaction with the Company or its Subsidiaries primarily involving the Business having a potential or actual value or a contingent or actual liability exceeding $250,000, other than (i) loans and other extensions of credit to directors and officers of the Company and its Subsidiaries for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans, (b) has any material ownership interest in any material property used by the Company or its Subsidiaries

primarily in connection with the Business or (c) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a material supplier or customer of the Business.

3.16    <u>Brokers</u>. Except as set forth on <u>Schedule 3.16</u>, there is no investment banker, broker, finder or other such intermediary that has been retained by, or has been authorized to act on behalf of, the Company or any of its Subsidiaries in respect of the Business and is entitled to a fee or commission in connection with the transactions contemplated by this Agreement from the Company or any of its Subsidiaries.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to the Company as follows as of the date hereof and as of the Closing Date.

4.1    <u>Organization and Qualification</u>. Purchaser (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

4.2    <u>Authorization of Agreement</u>. The execution, delivery and performance of the Transaction Documents by Purchaser, and the consummation by Purchaser of the transactions contemplated thereby, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of the Transaction Documents by Purchaser. This Agreement has been, and the other Transaction Documents will be, duly and validly executed and delivered by Purchaser, and, assuming this Agreement is a valid and binding obligation of Seller, this Agreement constitutes, and each other Transaction Document will constitute, a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as limited by the Enforceability Exceptions.

4.3    <u>Conflicts; Consents</u>.

(a)    Except as set forth on <u>Schedule 4.3(a)</u> and assuming that (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 4.3(b)</u> are made, given or obtained (as applicable), and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of Purchaser; (ii) violate any Law applicable to Purchaser or by which

25

any property or asset of Purchaser is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance on any property or asset of Purchaser under, any Lease or Contract; except, in each case, for any such violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

(b)     Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the transactions contemplated hereby, except (i) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

4.4     <u>Financing</u>. Purchaser has as of the date hereof, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the transactions contemplated by this Agreement. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.  As of the date hereof, Purchaser has provided Seller with a true, correct and complete copy of the Equity Commitment Letter, which has been duly authorized and executed by Purchaser and the other signatories thereto, and constitutes the legal, valid and binding obligation of the Purchaser and the other parties thereto enforceable by Purchaser against each such other party in accordance with its terms.

4.5     <u>Brokers</u>. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.6     <u>No Litigation</u>. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

4.7     <u>Certain Arrangements</u>. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management or board of directors (or applicable governing body) of the Company or its Subsidiaries, any holder of equity or debt securities of the Company or its Subsidiaries, or any lender or creditor of the Company or its Subsidiaries, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the other transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of the Company to entertain, negotiate or participate in any such transactions.

4.8     No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, Seller acknowledges that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Seller by Purchaser.

4.9     No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the representations and warranties made by Seller to Purchaser in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the transactions contemplated by this Agreement. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (other than solely to the extent expressly set forth in the Express Representations) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) with respect to the completeness or accuracy of, or any omission to state or to disclose, any information, including in the Projections, the confidential information presentation prepared by Piper Sandler & Co. (the "Information Presentation"), in that certain datasite administered by Donnelley Financial Solutions (the "Dataroom"), any Projections or in any meetings, calls or correspondence with management of the Company and its Subsidiaries or any other Person on behalf of the Business or the Company, its Subsidiaries or any of their respective Affiliates or Advisors and (b) the historical, current or future business, financial condition, results of operations, assets, liabilities, properties, contracts, or prospects of the Business or the Company or any of its Subsidiaries, or the quality, quantity or condition of the Business's or the Company's or its Subsidiaries' assets, in each case, are specifically disclaimed by Seller, and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, liabilities, properties, contracts and prospects of the Business, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, the Information Presentation, any Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or the Company, its Subsidiaries or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except to the extent express set forth in the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations).

# ARTICLE V

# BANKRUPTCY COURT MATTERS

5.1     <u>Bankruptcy Actions</u>.

(a)     The bidding procedures to be utilized with respect to this Agreement shall be those approved in the Bidding Procedures Order. Purchaser agrees and acknowledges that Seller, including through its representatives, is and may continue soliciting inquiries, proposals, or offers from third parties in connection with any Alternative Transaction subject to the terms and conditions of the Bidding Procedures Order.

(b)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, the Company shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(c)     Purchaser shall promptly take all actions as are reasonably requested by the Company to assist in obtaining the Bankruptcy Court's entry of the Sale Order or any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(d)     Each of the Company and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement or the Sale Order and (ii) keep the other reasonably apprised of the status of material matters related thereto, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court or any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement or the Sale Order.

(e)     If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "<u>Successful Bidder</u>") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "<u>Backup Bidder</u>") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated, including pursuant to <u>Sections 8.1(k)</u> or <u>8.1(d)</u>. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder prior to the termination of this Agreement, the Backup Bidder will be deemed to have the new prevailing bid, and the Company may consummate the transactions contemplated by this Agreement on the

28

terms and conditions set forth in this Agreement as such terms may have been improved upon in the Auction.

(f)     The Company and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. The Company and Purchaser acknowledge that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about the Company to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction. The bidding procedures to be employed with respect to this Agreement and any Auction shall be those approved in the Bidding Procedures Order.

(g)     Notwithstanding any other provision of this Agreement to the contrary, Purchaser acknowledges that Seller and its Affiliates and Advisors are and may continue soliciting inquiries, proposals, or offers for the Acquired Assets in connection with any Alternative Transaction.

(h)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information, and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(i)     Nothing in this Section 5.1 shall prevent Seller from modifying the bidding procedures as necessary or appropriate to maximize value for Seller's estate in accordance with Seller's fiduciary obligations.

5.2     Bid Protections and Break-Up Fee.

(a)     Certain Bid Protections, including the Break-Up Fee, have been approved in the Bidding Procedures Order.

(b)     The Break-Up Fee shall be due and payable to Purchaser upon closing of an Alternative Transaction.  In any Alternative Transaction, Seller shall make arrangements to have the Break-Up Fee paid directly to Purchaser, in cash, at such closing.  Notwithstanding anything in this Agreement to the contrary, (i) Purchaser's right to the Break-Up Fee in accordance with the terms of hereof shall be the sole and exclusive remedy of Purchaser and its Affiliates against Seller or any of its Affiliates or any of their respective members, partners, officers, managers or representatives for any and all losses that may be suffered based upon, resulting from or arising out of Seller's failure to consummate the transactions contemplated by this Agreement, and (ii) upon Purchaser's receipt of the Break-Up Fee, neither Seller nor any of its Affiliates nor any of their respective members, partners, officers, managers or representatives shall have any further liability or obligation relating to or arising out of the circumstances giving rise to Purchaser's right

to receive the Break-Up Fee or otherwise under this Agreement or any other agreement, document or instrument contemplated hereby.

5.3     Cure Costs. Subject to entry of the Sale Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Transferred Contracts and Assumed Leases so that such Contracts may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.4     Sale Order. The Sale Order must be reasonably acceptable to Purchaser in all material respects and shall, among other things, (a) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement; (b) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts; (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code; (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts; and (f) find that Purchaser shall have no Liability for any Excluded Liability. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Company to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

5.5     Approval. Seller's obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Bidding Procedures Order and the Sale Order). Nothing in this Agreement shall require the Company or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1     Conduct of Business of Seller. Until the earlier of the termination of this Agreement and the Closing, except (w) for any limitations on operations imposed by the Bankruptcy Court or

the Bankruptcy Code or the Seller's debtor-in-possession financing, (x) as required by applicable Law, (y) as otherwise required by or reasonably necessary to carry out the terms of this Agreement or as set forth on <u>Schedule 6.1</u> or (z) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), Seller shall conduct the Business only in the Ordinary Course and shall not with respect to the Business or the Acquired Assets:

(a)     terminate (other than by expiration), or amend or modify (other than by automatic extension or renewal and including with respect to payment provisions) in any material respect, the terms of any Assigned Contract;

(b)     issue any notes, bonds or other debt securities, or otherwise incur any indebtedness for borrowed money or otherwise become liable for any such indebtedness of any other Person, in each case, other than Excluded Liabilities;

(c)     settle or compromise any pending or threatened Action that could give rise to liabilities that are not Excluded Liabilities;

(d)     sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any material portion of the Acquired Assets, other than (i) sales of Inventory in the Ordinary Course, (ii) licenses of Intellectual Property granted on a non-exclusive basis, (iii) the expiration of Intellectual Property at the end of the governing terms thereof or abandonment or lapse of Intellectual Property that is not material, or (iv) pursuant to existing Contracts;

(e)     subject any portion of the Acquired Assets that is material to the Business taken as a whole to any Encumbrance, except for Permitted Encumbrances;

(f)     change or modify any material accounting practice, policy or procedure, except as required by GAAP or applicable Law;

(g)     enter into any commitment for capital expenditures or otherwise make any capital expenditures in excess of $250,000, except to the extent permitted under the terms of Seller's debtor-in-possession financing;

(h)     fail to use reasonable efforts consistent with Seller's practices immediately prior to the date of this Agreement to pay any accounts payable and trade payables of vendors providing services or supplies used, in whole or in part, by the Business, including, for the avoidance of doubt, accounts payable and trade payables for all Cementing Vendors accrued subsequent to the filing of the Bankruptcy Case;

(i)     modify or change, in any material manner, including with respect to any discounts given or collections practices followed, in which Seller collects accounts receivable owed by any customer of the Business, unless consistent with the practice followed by Seller immediately prior to the date of this Agreement;

(j)     authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions; or

(k)     fail to use reasonable efforts consistent with Seller's practices immediately prior to the date of this Agreement to maintain relations with Seller's vendors, including with respect to Fritz Industries, Inc.

Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the Business prior to the Closing. Notwithstanding anything herein to the contrary, nothing herein shall prevent Seller or the Business from taking or failing to take any action, including the establishment of any policy, procedure or protocol, in response to COVID-19 or any COVID-19 Measures, and no such actions or inactions shall be deemed to violate or breach this Agreement in any way, be deemed to constitute any action taken outside of the Ordinary Course or serve as a basis for Purchaser to terminate this Agreement or assert that any of the conditions to the Closing contained herein have not been satisfied.

6.2     <u>Access to Information</u>.

(a)     From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), the Company (in its discretion) will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of the Company and its Subsidiaries to the extent primarily related to the Business, in order for Purchaser and its authorized Advisors to access such information regarding the Company and its Subsidiaries to the extent primarily related to the Business as Purchaser reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement; <u>provided</u> that (i) such access does not unreasonably interfere with the normal operations of the Business or the Company and its Subsidiaries, (ii) such access will occur in such a manner as the Company reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to Aaron James or such other Person(s) as the Company may designate in writing from time to time, (iv) such access shall occur only if permitted by and only in a manner consistent with and not in contravention of any policy, procedure or protocol of Seller or the Business in response to COVID-19 or any COVID-19 Measures, (v) Purchaser shall not be permitted to conduct any environmental testing, sampling or other invasive investigation at any Owned Real Property or Leased Real Property unless, (A) a Phase I environmental site assessment identifies a "recognized environmental condition" on a parcel of Acquired Owned Real Property or Acquired Leased Real Property requiring further on-site investigation or sampling and the nature of such recognized environmental condition lends itself to targeted on-site investigation or sampling, (B) a copy of such Phase I environmental site assessment is provided to Seller and (C) Seller provides its prior written consent, not to be unreasonably withheld (it being acknowledged and agreed that it shall not be unreasonable for Seller to withhold consent regarding any Acquired Leased Real Property for which the consent of a third party would also be required), and (vi) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to the Business or the Company or any of its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (B) would require the Company or any of its Subsidiaries to disclose any financial or proprietary information of or regarding the Affiliates of the Company (other than the Subsidiaries of the Company) or otherwise disclose information regarding the Affiliates of the Company (other than the Subsidiaries of the Company) that the Company deems to be commercially sensitive, (C) would waive any legal privilege or (D) would be in violation of applicable Laws (including the HSR Act

and Foreign Competition Laws) or the provisions of any agreement to which the Company or any of its Subsidiaries is bound or would violate any fiduciary duty; provided that, in the event that the Company withholds access or information in reliance on the foregoing clause (C) or (D), the Company shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Purchaser that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

(b)     The information provided pursuant to this Section 6.2 will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. The Company does not make any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will provide Seller and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records); provided, however, that any such access will be permitted only to the extent consistent with and not in contravention of any policy, procedure or protocol of Seller or the Business in response to COVID-19 or any COVID-19 Measures. Unless otherwise consented to in writing by the Company, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of the books and records without first offering to surrender to the Company such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Seller with reasonable assistance, support and cooperation with Seller's wind-down and related activities (e.g., helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)     Except as otherwise expressly provided in Section 6.2(e), Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of the Business or the Company or its Subsidiaries prior to the Closing with respect to the Business or the Company, its Subsidiaries, their business or the transactions contemplated by this Agreement without the prior written consent of the Company for each such contact.

(e)    Notwithstanding the foregoing, Seller hereby consents to Purchaser contacting and interviewing, for due diligence purposes, the Persons listed on Schedule 6.2(e) (the "Customer & Vendor List"), prior to Closing on the terms set forth in this Section 6.2(e). The Customer & Vendor List shall include the Cementing Vendors and a maximum of twenty (20) customers. The purpose of Purchaser's contact in respect of each listed customer shall be to inform such customer of Purchaser's intent to continue the Business and the relationship and Contract with such customer. The purpose of Purchaser's contact with each Cementing Vendor shall be to ensure the relationship with such Cementing Vendor is positive. Purchaser shall be permitted to contact the Persons on the Customer & Vendor List according to the following procedures: (i) unless waived by Seller, Purchaser must give Seller at least one (1) Business Day notice prior to contacting any Person on the Customer & Vendor List; (ii) Purchaser may contact a Person on the Customer & Vendor List only by email or by telephone; (iii) if Purchaser contacts a Person on the Customer & Vendor List by email, Purchaser must give Seller a reasonable opportunity to review and comment on such email, incorporate any reasonable comments from Seller, and keep Aaron James copied on any email to such Person; (iv) if Purchaser contacts a Person on the Customer & Vendor List by telephone, Purchaser must give Seller a reasonable opportunity to review and comment on an outline of the proposed conversation, incorporate any reasonable comments from Seller, not materially deviate from the agreed conversation outline, and not maintain any telephone contact with such Person unless Aaron James or any other Person designated by Aaron James is also on the telephone call; (v) unless otherwise waived by Seller, under no circumstances may any contact, correspondence or conversation with a Person on the Customer & Vendor List exceed the scope set forth in this Section 6.2(e); and (vi) prior to such time as Purchaser becomes the Successful Bidder, Purchaser shall explain to each Person on the Customer & Vendor List that Purchaser contacts that the consummation of the transactions contemplated hereby is subject to the Auction and Purchaser being the Successful Bidder, and that it is possible that another Person may be selected as the Successful Bidder.  Notwithstanding the foregoing, Purchaser may not disclose any Confidential Information (as defined in the Confidentiality Agreement) to any Person on the Customer & Vendor List except as otherwise expressly permitted under the Confidentiality Agreement.

6.3    Employee Matters.

(a)    Purchaser shall extend to those employees of the Business set forth on Schedule 6.3(a) (the "Employees"), an offer of employment in a position that is comparable to such Employee's position immediately prior to the Closing (including level of responsibility, primary location of employment, and authority) on the terms set forth in this Section 6.3 ("Transfer Offer") that, if accepted, shall become effective immediately upon the Closing.  Employees who accept such Transfer Offers and begin employment with Purchaser in accordance with this Section 6.3(a) shall be referred to herein as "Transferred Employees." Nothing herein shall be construed as a representation or guarantee by Seller or any of its Affiliates that any or all of the Employees will accept the offer of employment from Purchaser or will continue in employment with Purchaser following the Closing. Purchaser shall carry out all actions necessary under applicable Law to effect the transfer of employment to it of each such Transferred Employee who has accepted that offer. Effective as of the Closing, each Transferred Employee shall cease to be an employee of Seller and its Affiliates and shall cease to be an active participant in any Seller Plan. Seller intends that for purposes of any Seller Plan providing severance or termination benefits, or any comparable plan, program, policy, agreement or arrangement of Seller or any of

34

its Affiliates, the transactions contemplated by this Agreement shall not constitute a termination of employment of any Transferred Employee prior to or upon the consummation of such transactions.

(b)     For a period of one (1) year from and after the Closing Date, Purchaser shall provide each Transferred Employee with (i) base compensation/wage rate that is no lower than that provided to such Transferred Employee as of the date hereof; (ii) short-term cash bonus opportunity that is no less favorable than that provided to such Transferred Employee as of the date hereof; and (iii) other employee benefits (other than equity incentive, retention or change in control arrangements) that are substantially comparable in the aggregate to those provided under the Seller Plans as of the date hereof. For purposes of eligibility, determining level of benefits, vacation and paid time off accrual, and vesting (other than vesting of future equity awards) under the benefit plans and programs maintained by Purchaser or any of its Affiliates and providing compensation or benefits to Transferred Employees after the Closing Date (the "Purchaser Plans"), each Transferred Employee shall be credited with his or her years of service with Seller and its Affiliates before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)     Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans; (ii) for purposes of each Purchaser Plan providing welfare benefits, Purchaser shall cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under the corresponding Seller Plans); and (iii) Purchaser shall cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents under the Seller Plan providing medical, dental, hospital, pharmaceutical, or vision benefits during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)     Without limiting the generality of any other provision of this Agreement, as soon as reasonably practicable on or after the Closing Date, Purchaser shall have in effect, and shall permit the Transferred Employees to participate in, one or more defined contribution plans that include a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (and a related trust exempt from tax under Section 501(a) of the Code) (as applicable, the "Purchaser 401(k) Plan"). Purchaser shall cause the Purchaser 401(k) Plan to accept a "direct rollover" to such Purchaser 401(k) Plan of the account balances of each Transferred Employee (including promissory notes evidencing outstanding loans) under any Seller Plan that is a 401(k) plan, if such direct rollover is elected in accordance with applicable Law by such Transferred Employee.

(e)     Purchaser shall assume all Liabilities and obligations related to, and honor, all vacation days and other paid-time-off accrued or earned, but not yet taken, by each Transferred Employee as of the Closing Date. If such vacation days or other paid time off is required by applicable Law to be paid by Seller upon the Closing, Purchaser shall reimburse Seller for any such Liabilities.  Purchaser shall assume all Liabilities associated with relocating Timothy Adams

and Bryan Wilson up to an aggregate maximum of $65,000, and shall reimburse Seller to the extent Seller or its Affiliates pays any such expenses.

(f)       Purchaser and its Affiliates shall be responsible for compliance with the requirements of Section 4980B of the Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in Treasury Regulation Section 54.4980B-9.

(g)       The provisions of this Section 6.3 are for the sole benefit of the Parties to this Agreement and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any Employees or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied shall be construed to establish, amend, or modify any benefit or compensation plan, program, agreement or arrangement.

(h)       Purchaser will, or will cause its Affiliates to, provide any required notice under the federal Worker Adjustment and Retraining Notification Act of 1988 or any similar Law (collectively, the "WARN Act") and to otherwise comply with the WARN Act with respect to any "plant closing" or "mass layoff" (as defined in the WARN Act) or group termination or similar event affecting Employees (including as a result of the consummation of transactions contemplated by this Agreement) occurring from and after the Closing. Purchaser will not, and will cause its Affiliates not to, take any action on or after the Closing Date that would cause any termination of employment of any Employees by Seller or its Affiliates occurring prior to the Closing to constitute a "plant closing," "mass layoff" or group termination or similar event under the WARN Act, or to create any Liability or penalty to Seller or any of its Affiliates for any employment terminations under Law.

6.4       Regulatory Approvals.

(a)       Subject to Section 6.5, the Company will (i) make or cause to be made all filings and submissions required to be made by the Company or its Subsidiaries under any applicable Laws for the consummation of the transactions contemplated by this Agreement set forth on Schedule 6.4, (ii) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with the foregoing and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)       Subject to Section 6.5, Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the transactions contemplated by this Agreement, (ii) cooperate with the Company in exchanging such information and providing such assistance as the Company may reasonably request in connection with all of the foregoing, and (iii) (A) supply promptly any additional information and

36

documentary material that may be requested in connection with such filings and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

   6.5  <u>Antitrust Notification</u>.

    (a)  The Company and Purchaser will, as promptly as practicable (and in the case of the HSR Act filing, and only to the extent necessary, no later than ten (10) Business Days) following the date hereof, (i) file with the United States Federal Trade Commission and the United States Department of Justice, the notification form required pursuant to the HSR Act for the transactions contemplated by this Agreement, which form will specifically request early termination of the waiting period prescribed by the HSR Act and (ii) make all notifications, filings, registrations or other materials required or necessary under the Foreign Competition Laws set forth on <u>Schedule 6.5(a)</u>. Each of the Company and Purchaser will (and shall cause their respective Affiliates to) furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act or such Foreign Competition Laws and will provide any supplemental information requested by any Governmental Body as promptly as practicable. Purchaser will use all reasonable best efforts to comply as promptly as practicable with any requests made for any additional information in connection with such filings, including a request for additional information or documentary material issued pursuant to the HSR Act regulations (*i.e.*, a "second request"). Purchaser will be responsible for all filing fees payable in connection with such filings.

    (b)  Subject to the immediately following sentence, the Company and Purchaser will use their reasonable best efforts to promptly obtain any clearance required under the HSR Act or such Foreign Competition Laws for the consummation of this Agreement and the transactions contemplated hereby and will keep each other apprised of the status of any substantive communications with, and any inquiries or requests for additional information from, any Governmental Body and will comply promptly with any such inquiry or request. Purchaser will take, and will cause its Affiliates to take, any and all steps necessary to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Body or any other Person so as to enable the Parties to expeditiously close the transactions contemplated by this Agreement, including (i) opposing any motion or action for a temporary, preliminary or permanent injunction or Order against or preventing or delaying the consummation of the transactions contemplated by this Agreement, (ii) entering into a consent decree, consent agreement or other agreement or arrangement containing Purchaser's agreement to hold separate, license, sell or divest (pursuant to such terms as may be required by any Governmental Body) such assets or businesses of Purchaser and its Affiliates after the Closing (including entering into customary ancillary agreements relating to any such sale, divestiture, licensing or disposition of such assets or businesses), and (iii) agreeing to such limitations on conduct or actions of members of Purchaser and its Affiliates after the Closing as may be required in order to obtain satisfaction of the closing conditions set forth in <u>Section 7.1(a)</u> prior to the Outside Date.

    (c)  The Parties commit to instruct their respective counsel to cooperate with each other and use reasonable best efforts to facilitate and expedite the identification and resolution of any issues arising under the HSR Act or such Foreign Competition Laws at the earliest practicable dates. Such reasonable best efforts and cooperation include counsel's undertaking (i)

to keep each other appropriately informed of communications from and to personnel of the reviewing Governmental Bodies and (ii) to confer with each other regarding appropriate contacts with and response to personnel of such Governmental Bodies and the content of any such contacts or presentations. Neither the Company nor Purchaser will participate in any substantive meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body and reasonably practicable, the opportunity to attend and participate in such meeting or discussion (which, at the request of either Purchaser or the Company, will be limited to outside antitrust counsel only). The Company will have the right to review (subject to appropriate redactions for confidentiality and attorney-client privilege concerns) and approve the content of any presentations, white papers or other written materials to be submitted to any Governmental Body in advance of any such submission.

(d)     Purchaser will not, and will not permit any member of the Purchaser Group or their respective Affiliates to, acquire or agree to acquire (by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner), any Person or portion thereof, or otherwise acquire or agree to acquire any assets, if the entering into a definitive agreement relating to, or the consummation of, such acquisition, merger or consolidation could reasonably be expected to (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any permits, Orders or other approvals of any Governmental Body necessary to consummate the transactions contemplated by this Agreement or the expiration or termination of any applicable waiting period, (ii) increase the risk of any Governmental Body entering an Order prohibiting the consummation of the transactions contemplated by this Agreement or (iii) delay the consummation of the transactions contemplated by this Agreement.

6.6     Reasonable Efforts; Cooperation.

(a)     Subject to the other terms of this Agreement provisions hereof, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, advisable or permitted under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of the Company will not require the Company or any of its Subsidiaries, Affiliates or Advisors to expend any money, to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)     The obligations of the Company pursuant to this Agreement, including this Section 6.6, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Seller's use of cash collateral or debtor-in-possession financing, and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Sale Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

(c)     Subject to any limitations on operations imposed by the Bankruptcy Court, the Bankruptcy Code or Seller's debtor-in-possession financing or applicable Law, after Closing, Seller shall use its reasonable efforts, and shall cause its Affiliates to use reasonable efforts, to maintain ongoing relationships as of immediately prior to the date of this Agreement in respect of any former customer, vendor or supplier of the Business.

6.7     Notification of Certain Matters.

(a)     The Company will promptly notify Purchaser of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body related to or in connection with the transactions contemplated by this Agreement; and (iii) promptly upon discovery thereof, any variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause, any of the representations and warranties contained in Article III to be untrue or inaccurate such that the condition set forth in Section 7.2(b) not to be satisfied. If the subject matter of any such notification required by the previous sentence requires any change in the Schedules, the Company shall deliver to Purchaser prior to the Closing a supplement to such Schedule (the "Updated Schedules") with such change; provided that in no event will any Updated Schedule serve to amend, supplement or modify the Schedules for purposes of Section 7.2(b); provided further that if the Closing occurs, the Updated Schedules will be considered and deemed to be part of the Schedules for all purposes under this Agreement, and each reference in this Agreement to a particular Schedule will mean such Schedule in, or as updated by, the Updated Schedules.

(b)     Purchaser will promptly notify the Company of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body related to or in connection with the transactions contemplated by this Agreement; (iii) any Actions relating to or involving or otherwise affecting Purchaser or its Affiliates that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.6 or that relate to the transactions contemplated by this Agreement; and (iv) any breach or inaccuracy of any representation or warranty contained in this Agreement at any time during the term hereof that could reasonably be expected to cause the conditions set forth in Article VII not to be satisfied; provided that the delivery of any notice pursuant to this Section 6.7(b) will not limit the remedies available to Seller under or with respect to this Agreement.

6.8     Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

6.9     Insurance Matters. Purchaser acknowledges that, unless otherwise expressly set forth in this Agreement, upon Closing, all insurance coverage provided in relation to the Business and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are

maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.10    Receipt of Misdirected Assets. From and after the Closing, if Seller or any of its Affiliates receives any right, property or asset that is an Acquired Asset, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the Company, and such right, property or asset will be deemed the property of the Company held in trust by Purchaser for the Company until so transferred.

6.11    Acknowledgment by Purchaser.

(a)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, Liabilities, properties, Contracts and prospects of the Company and its Subsidiaries, the Business, the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except to the extent expressly set forth in the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the transactions contemplated by this Agreement; and (ii) (other than solely to the extent expressly set forth in the Express Representations) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (1) with respect to the completeness or accuracy of, or any omission to state or to disclose, any information including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of the Company and its Subsidiaries, any of the Seller Parties or any other Person on behalf of the Business or the Company, its Subsidiaries or any of the Seller Parties or any of their respective Affiliates or Advisors and (2) the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, or prospects of the Business or the Company or any of its Subsidiaries, or the quality, quantity or condition of the Business's or the Company's or its Subsidiaries' assets, in each case,

40

are specifically disclaimed by the Company, on its behalf and on behalf of the Seller Parties, and Seller. Purchaser, on its own behalf and on behalf of the Purchaser Group: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither the Company, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A) any potentially material information regarding the Business or the Company, its Subsidiaries or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (B) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of the Business or the Company's or its Subsidiaries' business, operations, assets, Liabilities, prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)        Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of the Company and its Subsidiaries, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of the Company, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of the Business and the Company and its Subsidiaries, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)        Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.11, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures or materials in the Information Presentation, the Dataroom or Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information.

(d)        Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this Section 6.11 (i) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years; and (ii) are an integral part of the transactions contemplated by this Agreement and that, without these agreements set forth in this Section 6.11, Seller would not enter into this Agreement.

41

6.12    <u>Mixed-Use Contracts</u>. Seller shall, and shall cause its Affiliates to, use commercially reasonable efforts (which shall not include the making of any payment or giving of any other consideration) to cooperate with Purchaser to separate the Mixed-Use Contracts into separate contracts with the applicable counterparty, one (or more) of such contracts with terms and conditions that are related solely to the Business ("<u>Transferred Mixed-Use Contract</u>"), and one or more of such contracts that relate to the other businesses of Seller or its Affiliates ("<u>Retained Mixed-Use Contract</u>"); <u>provided</u>, that Seller and its Affiliates shall not be obligated to agree to terms and conditions related to a Retained Mixed-Use Contracts that are less favorable that those terms and conditions that existed prior to such separation in respect of the other businesses of Seller or its Affiliates; and <u>provided</u> <u>further</u>, that Seller and its Affiliates shall not be obligated to take any actions or efforts to cause the terms and conditions of any Transferred Mixed-Use Contract to be better than those terms and conditions that existed in respect of the Business prior to such separation. If a Mixed-Use Contract is separated prior to Closing, the Transferred Mixed-Use Contract shall be an Assigned Contract and the Retained Mixed-Use Contract shall be an Excluded Contract. In the event that any Mixed-Use Contract is not separated prior to the Closing, Seller and Purchaser shall: (a) cooperate in good faith in any lawful and commercially reasonable arrangement, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Mixed-Use Contract solely with respect to the terms and conditions of such Mixed-Use Contract that primarily relate to the Business, under which (i) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Seller or its Affiliates) under such Mixed-Use Contract to the extent primarily related to the Business and (ii) Purchaser shall assume any related burden and obligation (including performance) with respect to such Mixed-Use Contract to the extent primarily related to the Business; (b) use reasonable efforts to obtain the counterparty's consent to permit Purchaser to continue to perform work under such Mixed-Use Contract; and (c) at Purchaser's option, Seller and Purchaser shall use reasonable efforts to cause any such Mixed-Use Contract to be transferred and assigned to Purchaser as soon as is reasonably practicable as determined in Seller's sole discretion (taking into account any obligations or rights of Seller's retained businesses related to such Mixed-Use Contract) in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code. In furtherance of the foregoing, Seller shall not, before or after Closing, transfer or assign a Mixed-Use Contract to any other party, unless and until (x) such Mixed-Use Contract becomes a Transferred Mixed-Use Contract, (y) such Mixed-Use Contract is transferred and assigned to Purchaser (or its Affiliates) (z) or Purchaser (or its Affiliates) enters into a new Contract with the counterparty under such Mixed-Use Contract; <u>provided</u>, that Purchaser shall act in good faith and cooperate with Seller in effectuating one of the foregoing actions described in <u>clauses</u> <u>(x)</u>–<u>(z)</u> in respect of such Mixed-Use Contract.

6.13    <u>Retained Names and Marks</u>.

(a)    Purchaser hereby acknowledges that Seller or its Affiliates own all right, title and interest in and to the trademarks, service marks, domain names, logos and names of Seller or its Affiliates not set forth in <u>Schedule 1.1(h)</u>, together with all variations, translations, acronyms and other derivations thereof and all trademarks, service marks, Internet domain names, logos, trade names, trade dress, company names and other identifiers of source or goodwill containing, incorporating or associated with any of the foregoing, whether registered, applied for, or unregistered, together with any translations, adaptations, derivations, acronyms, variations,

abbreviations, insignias, designations or combinations of the foregoing, including any name or mark confusingly similar thereto or reasonably likely to cause confusion therewith (collectively, the "Retained Names and Marks"), and that, except as expressly provided below, any and all rights of the Business to use the Retained Names and Marks shall terminate as of the Closing and shall immediately revert to Seller and its Affiliates, along with any and all goodwill associated therewith. Purchaser further acknowledges that it has no rights, and is not acquiring any rights, directly or indirectly, to use the Retained Names and Marks, except as expressly provided herein.

(b)     Purchaser shall, for a period of ninety (90) days after the Closing Date, be entitled to use, solely in connection with the operation of the Business as operated immediately prior to the Closing, all of the Business's existing signs, letterheads, invoices, advertisements and promotional materials and all Internet domain names, website content, other Internet or electronic communications, vehicles, equipment, machinery, inventory and other documents and materials acquired by Purchaser to the extent included in the Acquired Assets (collectively, the "Existing Marks"), in each case, containing the Retained Names and Marks, after which period Purchaser shall cause the removal or obliteration of all Retained Names and Marks from such Existing Marks or shall otherwise cease using such Existing Marks. Upon Seller's request, Purchaser shall promptly execute all assignment, transfer and other documents, and take all steps, in each case, that are necessary or desirable to confirm, effectuate or otherwise evidence Seller's and its Affiliates' rights, title and interests in and to, and control over, the Retained Names and Marks, including the Internet domain names incorporating any Retained Names and Marks.

(c)     Except as expressly provided in this Section 6.13, no other right to use the Retained Names and Marks is granted by Seller or any of its Affiliates to Purchaser, its Affiliates or, after the Closing, the Business, whether by implication or otherwise, and nothing hereunder permits Purchaser, its Affiliates or, after the Closing, the Business to: (i) use the Retained Names and Marks in any manner; or (ii) register or seek to register, or to permit any third party to register or to seek to register, any of the Retained Names and Marks in any jurisdiction. Purchaser shall ensure that all use of the Retained Names and Marks by the Business, after the Closing, as provided in this Section 6.13, shall be only with respect to goods and services of a level of quality equal to or greater than the quality of goods and services with respect to which the Business used the Retained Names and Marks prior to the Closing. Any and all goodwill generated by the use of the Retained Names and Marks under this Section 6.13 shall inure solely to the benefit of Seller and its Affiliates. In any event, and, without limiting any of Purchaser's obligations under this Section 6.13, Purchaser shall not, and shall cause its Affiliates and, after the Closing, the Business not to, use the Retained Names and Marks in any manner that may damage or tarnish the reputation of Seller or its Affiliates or the goodwill associated with the Retained Names and Marks. Purchaser shall not, and shall cause its Affiliates and, after the Closing, the Business not to use or adopt any name confusingly similar to the Retained Names and Marks.

(d)     Purchaser agrees that none of Seller or its Affiliates shall have any responsibility for claims by third parties arising out of, or relating to, the use by the Business of any Retained Names and Marks after the Closing. In addition to any and all other available remedies, Purchaser shall defend, indemnify and hold harmless the Seller and its Affiliates from and against any and all such claims that may arise out of the use of the Retained Names and Marks: (i) by the Business in accordance with the terms and conditions of this Section 6.13; or (ii) by the Business, Purchaser or any of its Affiliates in violation of or outside the scope permitted by this

43

Section 6.13.  Notwithstanding anything in this Agreement to the contrary, Purchaser hereby acknowledges and agrees that in the event of any breach or threatened breach of this Section 6.13, Seller, in addition to any other remedies available to it, (x) shall be entitled to a preliminary injunction, temporary restraining order or other equivalent relief restraining Purchaser and any of its Affiliates (including, after the Closing, the Business) from any such breach or threatened breach and (y) shall not be required to provide any bond or other security in connection with any such injunction, Order or other relief.

6.14    Background License to Mixed-Use Acquired Intellectual Property.

(a)    With respect to any items of Intellectual Property, other than trademarks and domain names, that are included in the Acquired Assets and that have been historically used in the Seller's businesses other than the Business, Purchaser hereby grants to Seller a non-exclusive, royalty-free, fully paid up, irrevocable, worldwide, perpetual right and license under such Intellectual Property for all purposes, activities and uses other than, in each case, within the scope of the Business, including for the manufacture of products and compounds, use of any invention under any patent, use and maintenance of any Software, import and export of products and components, and performance of services under such Intellectual Property.

(b)    The foregoing license shall be transferable or sublicensable to any purchaser or purchasers of all or substantially all of the assets relating to the Seller's retained business (other than the Business) or relating to any line of business therein, including in connection with any acquirer pursuant to a plan of reorganization.

6.15    Certain Contracts; New Leases.

(a)    In the event Purchaser desires to (i) assume certain Contracts pursuant to Section 1.5 but is unable to assume such Contracts, or (ii) negotiate modified terms prior to assuming certain Contracts pursuant to Section 1.5, Seller shall, and shall cause its Subsidiaries to, use commercially reasonable efforts (which shall not include the making of any payment or giving of any consideration) to cooperate with Purchaser in its efforts to assume or renegotiate such Contracts through the later of (A) the close of the Auction, if any, or (B) one day prior to the last date set for final hearing for approval of the Sale.  Unless otherwise agreed by the Parties, no actions contemplated by this Section 6.15(a) shall result in an adjustment to the Purchase Price.

(b)    The Company and its Subsidiaries, as applicable, shall, at or prior to the Closing, and as a condition to Closing, (i) enter into leases (such leases, the "New Leases") with Purchaser for the New Lease Properties, or (ii) cause any purchaser of the New Lease Properties sold in connection with the Bankruptcy Case, to enter into such New Leases as a condition to closing any such sale of the New Lease Properties. Any sale of the New Lease Properties shall be subject to the continued effectiveness of the New Leases, subject to the terms and conditions of the New Leases. Each New Lease shall (w) have an initial term of no longer than two years, (x) substantially reflect the lease rental rates set forth on Schedule 6.15(b) with respect to the applicable New Lease Property set forth therein, (y) provide that in the event the landlord terminates such New Lease prior to the expiration of the initial lease term  (other than as a result of default by Purchaser, casualty or condemnation) such landlord shall be obligated to provide at least 90 days' notice to tenant, and pay over to tenant a fee in the amount of $1,500,000, provided

44

that such fee for the New Lease for the New Lease Property in Odessa shall be $2,000,000, and (z) shall be on such other market terms and conditions as are reasonably acceptable to Purchaser and the Company acting in good faith. Notwithstanding the foregoing, the fees described in <u>clause (y)</u> of this <u>Section 6.15(b)</u> shall (I) be reduced by 50% on the 12 month anniversary of the effective date of such New Lease, (II) not be required to be paid after the 24 month anniversary of the effective date of such New Lease (in the event such New Lease is extended after the initial two (2) year term) and (III) be in full satisfaction of all Liabilities of the landlord related to or arising from the termination of such New Lease.

(c)     The Company and its Subsidiaries, as applicable, shall, at or prior to Closing, use commercially reasonable efforts to assign in part the Intellectual Property License Agreement (the "<u>Baker Hughes License</u>"), dated December 30, 2016, by and between the Company and Baker Hughes Incorporated ("<u>Baker Hughes</u>") as and to the extent that such agreement primarily relates to the Business.  Conditioned upon the consent of Baker Hughes to such partial assignment, the Baker Hughes License shall be deemed an Assigned Contract and shall be deemed to be added to <u>Schedule 1.1(a)</u> without need for formal amendment thereof.  For the avoidance of doubt, neither the consent required of Baker Hughes nor the consummation of such partial assignment shall be a condition to Closing.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1     <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     the waiting period (and any extension thereof), or any necessary approval, as applicable, related to the transactions contemplated by this Agreement under the HSR Act or under the Foreign Competition Laws or other regulations set forth in <u>Schedule 7.1</u> shall have been received, terminated or shall have expired, as applicable;

(b)     no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; and

(c)     the Bankruptcy Court shall have entered the Sale Order.

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     Seller shall have delivered to Purchaser a certified copy of the Sale Order;

(b)     the representations and warranties made by Seller in <u>Article III</u> shall be true and correct in all material respects as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" (other than the use of "Material Adverse Effect" in <u>Section 3.5</u> which shall remain as written and shall not be subject to a further materiality qualifier) and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date);

(c)     Seller shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by Seller by the Closing; and

(d)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u>.

7.3     <u>Conditions Precedent to the Obligations of the Company</u>. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects as of the Closing Date (without giving effect to any materiality or similar qualification contained therein), in each case as of the date hereof and as of the Closing Date, with the same force and effect, as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date);

(b)     Purchaser shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by Purchaser by the Closing; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 2.5</u>.

7.4     <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Seller may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

## ARTICLE VIII

## TERMINATION

8.1     <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

46

(a)      by the mutual written consent of the Company and Purchaser;

(b)      by written notice of either Purchaser or the Company, upon the issuance by any Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Order was caused by the breach or action or inaction of such Party;

(c)      by written notice of the Purchaser, if the Sale Order has not been entered on or before August 17, 2020;

(d)      by written notice of either Purchaser or the Company, if the Closing shall not have occurred on or before September 4, 2020 (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(d) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

(e)      by written notice of either Purchaser or the Company, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Bankruptcy Case;

(f)      by written notice from the Company to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Sections 7.3(a) or 7.3(b) would not be satisfied; provided that (i) if such breach is curable by Purchaser then the Company may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after the Company notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to the Company at any time that the Company is in material breach of, any covenant, representation or warranty hereunder;

(g)      by written notice from Purchaser to the Company, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller will have become untrue, in each case, such that the conditions set forth in Sections 7.2(b) or 7.2(c) would not be satisfied, including a breach of Seller's obligation to consummate the Closing; provided that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this Section 8.1(g) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchaser notifies the Company of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(g) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(h)      by written notice from the Company to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are

47

to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by <u>Section 2.3</u>;

(i)      by written notice from the Company to Purchaser, if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(j)      by written notice of either Purchaser or the Company, if (i) Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder; or

(k)      by written notice from Purchaser to the Company, if Purchaser is not the Successful Bidder at the Auction; <u>provided</u> that Purchaser shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(k)</u> until after the twenty-fifth (25th) day following entry by the Bankruptcy Court of an Order authorizing and approving an Alternative Transaction with the Successful Bidder at the Auction and, notwithstanding Purchaser not having been the Successful Bidder at the Auction, until such time (if any) as Purchaser terminates this Agreement pursuant to this <u>Section 8.1(k)</u>, the obligations of Purchaser to consummate the transactions contemplated by this Agreement shall remain unaffected by Purchaser's right to terminate this Agreement pursuant to this <u>Section 8.1(k)</u>.   Notwithstanding anything to the contrary in the Bidding Procedures Order, Purchaser's right to terminate the Agreement under this provision shall not be impaired if Purchaser is selected as the Backup Bidder.

8.2      <u>Effect of Termination</u>. In the event of termination of this Agreement pursuant to <u>Section 8.1</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any Party or any of its partners, officers, directors or shareholders; <u>provided</u> that Section 2.2, this <u>Section 8.2</u>, <u>Article X</u> and any Bid Protections in favor of Purchaser, including the Break-Up Fee, shall survive any such termination; <u>provided further</u> that no termination will relieve Purchaser from any Liability for damages (including damages based on the loss of the economic benefits of the transactions contemplated by this Agreement, including the Cash Payment, to Seller), losses, costs, or expenses (including reasonable legal fees and expenses) resulting from any willful breach of this Agreement prior to such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder); and provided further that no termination will relieve Seller of its obligation to pay the Break-Up Fee in accordance with its terms. Notwithstanding the foregoing, Purchaser's Liability for damages under this <u>Section 8.2</u> shall be capped at the amount of the Deposit as liquidated damages of Seller.

## ARTICLE IX

## TAXES

9.1      <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, or other similar Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this

Agreement or the transactions contemplated hereby (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes. Seller and Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes.

9.2     Allocation of Purchase Price. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Seller, and their respective Affiliates shall allocate the Purchase Price (but including Assumed Liabilities only to the extent such liabilities are required to be treated as part of the purchase price for applicable U.S. income Tax purposes) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. As soon as commercially practicable, but no later than sixty (60) days following the determination of the Final Inventory, Purchaser shall provide a proposed allocation to Seller setting forth the allocation of the Purchase Price (but including Assumed Liabilities only to the extent such liabilities are required to be treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets (the "Allocation"). If Seller delivers a written objection within thirty (30) days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Seller shall negotiate in good faith to resolve any such objection, and, if Seller and Purchaser cannot resolve such dispute within thirty (30) days of Purchaser's receipt of Seller's objection, then each Party shall be entitled to take their own position regarding the Allocation for U.S. federal income tax purposes. If the Parties agree on the Allocation, the Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code; provided, however, that nothing contained herein shall prevent any Party from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation, and no Party shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging the Allocation.

9.3     Cooperation. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party at such other Party's expense, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.4     Preparation of Tax Returns and Payment of Taxes.

(a)     Except as otherwise provided by Section 9.1, Seller shall prepare and timely file all Tax Returns with respect to the Acquired Assets required to be filed on or before the Closing Date and shall timely pay the Taxes due with respect thereto.

(b)     Purchaser shall prepare and timely file all other Tax Returns with respect to Property Taxes related to the Acquired Assets required to be filed after the Closing Date (excluding, for the avoidance of doubt, any Tax Returns with respect to any income, franchise or similar Taxes of any Seller or any of its Affiliates) with respect to any Pre-Closing Tax Period or any Straddle Period and shall timely pay the Property Taxes due with respect to such Tax Returns; provided, that this Section 9.4(b) shall not be construed to limit Purchaser's right to adjust the Purchase Price (and obtain payment from the Escrow Agent out of the Adjustment Escrow Amount) for any such Taxes attributable to any Pre-Closing Tax Period or the pre-Closing portion of any Straddle Period to the extent permitted under Sections 2.7 and 2.8.

(c)     Purchaser shall not file any Tax Return, file an amendment to any previously-filed Tax Return, or otherwise take any Tax position that could reasonably be expected to have the effect of increasing the Tax liability of Seller or any of its Affiliates, in each case without the prior written consent of Seller (such consent not to be unreasonably withheld, conditioned or delayed).

(d)     For purposes of determining whether Property Taxes are attributable to the pre-Closing or post-Closing portion of a Straddle Period, Property Taxes shall be allocated pro rata per day between the period ending on the day prior to the Closing Date and the period beginning on the Closing Date, with the portion of Property Taxes attributable to the period ending on the day prior to the Closing Date being treated as pre-Closing Taxes, and the portion of the Property Taxes attributable to the period beginning on the Closing Date being treated as post-Closing Taxes.

9.5     <u>Wage Reporting</u>. Purchaser and Seller agree to utilize, or cause their respective Affiliates to utilize, the "alternate procedure" set forth in Revenue Procedure 2004-53 with respect to wage reporting.

## ARTICLE X

## MISCELLANEOUS

10.1     <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in Contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. PURCHASER GROUP, ON ITS OWN BEHALF AND ON BEHALF OF (AFTER THE CLOSING) THE BUSINESS, HEREBY WAIVES ALL RIGHTS AND REMEDIES WITH RESPECT TO ANY ENVIRONMENTAL, HEALTH OR SAFETY MATTERS, INCLUDING THOSE ARISING UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED, OR ANY OTHER ENVIRONMENTAL LAWS, RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

10.2    Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 8.2), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all fees and expenses in connection with any filing or submission that is necessary under the HSR Act and any Foreign Competition Laws (if any) will be allocated pursuant to Section 6.4, (b) all Transfer Taxes will be allocated pursuant to Section 9.1 and (c) all Cure Costs will be allocated pursuant to Section 5.3.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

American Cementing, LLC
c/o Argonaut Private Equity
7030 South Yale Ave., #810
Tulsa, Oklahoma 74136
Attention:      Phil VanTrease
Email:          philvt@argonautpe.com

with a copy to (which shall not constitute notice):

Frederic Dorwart, Lawyer PLLC
124 East Fourth Street
Tulsa, Oklahoma 74114
Attention:      Steve Walton
Email:          swalton@fdlaw.com

Notices to Seller:

BJ Services, LLC
11211 Farm to Market 2920 Road
Tomball, Texas 77375
Attention:      John R. Bakht, General Counsel
Email:          john.bakht@bjservices.com

51

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
609 Main Street
Houston, Texas 77002
Attention: Sean T. Wheeler, P.C.
Email: sean.wheeler@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Joshua A. Sussberg, P.C.
         Christopher T. Greco, P.C.
Email: jsussberg@kirkland.com
      cgreco@kirkland.com

10.4    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; <u>provided</u> that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and the Company, and any attempted assignment or delegation without such prior written consent shall be null and void; *provided*, that Purchaser may assign its rights to acquire all or a portion of the Business or the Acquired Assets to one or more Affiliates without consent other than to portfolio companies of Argonaut Private Equity or any Affiliate that could cause the Closing to be inhibited or delayed as a result of the acquisition (or agreement to acquire) such Acquired Assets, but Purchaser may not delegate any of its obligations under this Agreement without the prior written consent of Seller.

10.5    <u>Amendment and Waiver</u>. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and the Company or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    <u>Third Party Beneficiaries</u>. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this

Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party or any Subsidiary of Seller will have any liability (whether in Contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10   Schedules. The schedules to the Agreement ("Schedules") have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement.  Information disclosed in any section of the Schedules, and any disclosure in any Disclosure Statement, will be deemed to be disclosed for other sections of the Schedules and the representations and warranties set forth in this Agreement to the extent that such disclosure sets forth facts in sufficient detail that the relevance of such disclosure would be reasonably apparent to a reader of such disclosure. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, Updated Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement.  The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information

herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11 <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12 <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Seller pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings an action, in each case in accordance with <u>Section 10.12</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require Seller to remedy any breach of any representation or warranty of Seller made herein.  In furtherance of and to the same extent as the foregoing, it is acknowledged and agreed that Seller shall be entitled to seek specific performance to enforce the terms of the Equity Commitment Letter against the parties thereto and Purchaser's rights thereunder.

10.13 <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation,

execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) (clauses (a) – (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to this agreement to serve process in any other manner permitted by Law.

10.14   Governing Law; Waiver of Jury Trial.

(a)   Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO

ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   <u>No Right of Set-Off</u>. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Cash Payment or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   <u>Counterparts and PDF</u>. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a facsimile machine, .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   <u>Publicity</u>. Neither the Company nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or the Company, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or the Company lists securities, <u>provided</u> that the Party intending to make such release shall use its best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.18   <u>Bulk Sales Laws</u>. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other

similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.19   <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of its directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate.

10.20   <u>No Solicitation</u>. This Agreement, the Sale Order, and the transactions contemplated herein and therein are the product of negotiations among the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder, or the Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, and none of the Company nor its Subsidiaries will solicit acceptances of any plan of reorganization from any party until such party has been provided with copies of a Disclosure Statement containing adequate information as required by section 1125 of the Bankruptcy Code.

## ARTICLE XI

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1   <u>Certain Definitions</u>.

(a)   "<u>Accounts Payable</u>" means all accounts payable and trade payables existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable), of Seller primarily related to the Business or the Acquired Assets.

(b)   "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

(c)   "<u>Advisors</u>" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(d)    "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(e)    "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of the Business or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise); <u>provided</u>, <u>however</u>, that no such transaction will be considered to be an "Alternative Transaction" if such transaction would not prevent the Closing from occurring in accordance with the terms of this Agreement; and <u>provided</u> <u>further</u>, that the foregoing shall not include sales of Inventory, equipment sales or other dispositions of immaterial or obsolete assets, or granting of licenses of Intellectual Property rights in the Ordinary Course.

(f)    "<u>Ancillary Assets</u>" means any and all computers, furniture, furnishings, fixtures, office supplies, tools and related accessories and any such assets on order to be delivered to Seller, including, desks, chairs, tables, computer and computer-related hardware such as computers, file servers, facsimile servers, scanners, color printers, laser printers and networks, copiers, cellular and hardwired telephones, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies, in each case that are primarily used in connection with the operation or conduct of the Business (including by Transferred Employees) except to the extent related to or used in connection with or located on any Owned Real Property or Leased Real Property of Seller that is not included in the Acquired Assets; <u>provided</u>, that Ancillary Assets shall not include Equipment or any other category of assets described in <u>Section 1.1</u> other than <u>Section 1.1(f)</u>.

(g)    "<u>Arbitrating Accountant</u>" means (i) a nationally recognized certified public accounting firm jointly selected by Purchaser and the Company that is not then engaged to perform accounting, tax or auditing services for the Company or Purchaser or (ii) if the Company and Purchaser are unable to agree on an accountant, then a nationally recognized certified public accounting firm jointly selected by the Company's accounting firm and Purchaser's accounting firm.

(h)    "<u>Auction</u>" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(i)    "<u>Bid Protections</u>" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(j)    "<u>Bidding Procedures Order</u>" means the Order (I) Establishing Bidding Procedures for the Sale of the Cementing Business, (II) Scheduling Bid Deadlines and an Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief [Docket No. 224].

(k)  "Break-Up Fee" shall mean a fee payable by Seller to Purchaser in the amount of $1,050,000.00, upon the terms and conditions set forth in Section 5.2 and the Bidding Procedures Order; *provided* that the provision of any other Bid Protections to Purchaser (including reimbursement of professional fees of Purchaser) shall reduce the Break-Up Fee dollar-for-dollar.

(l)  "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(m)  "Cash and Cash Equivalents" means all of the Company's cash (including petty cash and checks received on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held, in each case related to or derived primarily from the Business.

(n)  "Cementing Vendors" means all cementing, chemical and iron vendors of the Company.

(o)  "Code" means the United States Internal Revenue Code of 1986, as amended.

(p)  "Confidentiality Agreement" means that certain letter agreement, dated as of July 2, 2020, by and between the Company and Argonaut Private Equity.

(q)  "Consent" means any approval, consent, ratification, permission, waiver or other authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(r)  "Contract" means any contract, master services agreement, work order, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, purchase order, license or other agreement that is binding upon a Person or its property.

(s)  "COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions thereof or related or associate epidemics, pandemic or disease outbreaks.

(t)  "COVID-19 Measures" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester or any other Law, Order, directive, guidelines or recommendations by any Governmental Body in connection with or in response to COVID-19, including, but not limited to, the Coronavirus Aid, Relief, and Economic Security Act (CARES).

(u)  "Disclosure Statement" means a disclosure statement (including all exhibits and schedules thereto) for a plan of reorganization approved by the Bankruptcy Court pursuant to an Order entered by the Bankruptcy Court, which Order, among other things, approves (i) the Disclosure Statement and (ii) the commencement of a solicitation of votes to accept or reject the plan of reorganization.

(v)      "Dispute Notice" means a notice delivered by the Company to Purchaser in which the Company (i) disputes the calculation of Closing Inventory or Closing Property Taxes included in the Closing Inventory Statement or the Closing Property Taxes Statement, as applicable, and (ii) provides the basis of such dispute in reasonable detail.

(w)      "Documents" means all of the Company's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports and records, department of transportation records and logs, records related to Transferred Employees (including drug testing reports), data, studies, and documents, Tax Returns (other than income, franchise and similar Tax Returns of Seller or any of its Affiliates), ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case primarily related to or primarily used primarily in the Business and whether or not in electronic form.

(x)      "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, encroachments, Orders and conditional sale or other title retention agreements.

(y)      "Environmental Laws" all applicable Laws concerning pollution or protection of the environment.

(z)      "Equipment" means equipment, machinery and vehicles primarily related to or primarily used by or in the Business.

(aa)      "ERISA" means the Employee Retirement Income Security Act of 1974.

(bb)      "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(cc)      "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(dd)      "Governmental Body" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(ee)     "<u>Hazardous Substance</u>" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(ff)     "<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

(gg)     "<u>Intellectual Property</u>" means all of the following: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, trade dress and corporate names, registrations and applications for any of the foregoing, together with all goodwill associated with each of the foregoing; (iii) copyright registrations and copyright applications, and unregistered copyrights in works of authorship; (iv) Internet domain names; (v) trade secrets; and (vi) all other intellectual property arising under the Laws of the United States of America or any state therein.

(hh)     "<u>Inventory</u>" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) maintained or held by, stored by or on behalf of, or in transit to, Seller, in each case primarily related to or primarily used in the Business, as reflected in the books and records of the Company and its Affiliates, whether for sale or non-commercial use, or otherwise, together with any interests therein, including such inventory (i) being held by customers pursuant to consignment arrangements or (ii) being held by suppliers or vendors under tolling or similar arrangements.

(ii)     "<u>Knowledge of the Company</u>", "<u>Company's Knowledge</u>", "<u>Knowledge of Seller</u>", "<u>Seller's Knowledge</u>" and words of similar import mean the actual knowledge of the Knowledge Parties and the knowledge that such Knowledge Parties would have after reasonable investigation if a reasonable Person with a Knowledge Party's actual knowledge of the relevant facts and circumstances at that time, would have deemed a further investigation necessary.

(jj)     "<u>Knowledge Parties</u>" means Warren Zemlak, Christine Morris and Caleb Barclay.

(kk)     "<u>Law</u>" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(ll)     "<u>Leasehold Improvements</u>" means all buildings, structures, improvements and fixtures which are owned by Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Leased Real Property.

(mm)     "<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether

known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(nn) "Material Adverse Effect" means any event, change, occurrence, or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, has had, or would reasonably be expected to have, a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or economic conditions affecting the industry in which the Business operates, (ii) Effects in, arising from or relating to local, state and national or international political or social conditions, including rioting and the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon or within the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States or any state or local authority or municipality thereof, (iii) Effects in, arising from or relating to financial, banking, commodities or securities markets or market index (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract or index, (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement and (E) any changes to commodity prices or other adverse effects resulting from decisions made by, or any lack of action by, the members of the Organization of Petroleum Exporting Countries), (iv) Effects in, arising from or relating to changes in, GAAP, (v) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body (including, for the avoidance of doubt, any such items related to Section 6.5), (vi) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1 or (D) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of Purchaser, including the impact thereof on the relationships, contractual or otherwise, of the Business with employees, customers, lessors, suppliers, vendors or other commercial partners, (vii) Effects in, arising from or relating to any existing event, occurrence, or circumstance with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Schedules, (viii) Effects that arise from any seasonal fluctuations in the Business, (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (x) the effect of any action taken by Purchaser or its Affiliates with respect to the transactions completed by this Agreement or the financing thereof or any breach by Purchaser of the Agreement, (xi) the matters set forth on the Schedules and any changes or developments in, or effects or results arising from or relating to, matters expressly set forth on the Schedules, (xii) (A) the commencement or pendency of the Bankruptcy Case; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the reorganization of

Seller, a plan of reorganization or a Disclosure Statement, (3) the Bidding Procedures Order, (4) the Sale Order or (5) the assumption or rejection of any Assigned Contract; (C) any Order of the Bankruptcy Court or any actions or omissions of Seller or its Subsidiaries in compliance therewith and (xiii) any pandemic (including COVID-19 and any policy, procedure or protocol of Seller or the Business in response to COVID-19 or any COVID-19 Measures), earthquake, hurricane, tsunami, tornado, flood, mudslide, wild fire or other natural disaster or act of god, or other casualty loss or force majeure event; except in the case of the clauses (i), (ii) or (iii), to the extent such Effects have a materially disproportionate impact on the Acquired Assets, as compared to other participants engaged in the industries and geographies in which the Business operates.

(oo)    "Mixed-Use Contract" means each of the following: (i) that certain Master Service Agreement, dated as of October 12, 2017, by and between BJ Services, LLC (and its Affiliates) and Aethon Energy Operating LLC (and its Affiliates); and (ii) that certain Master Service Agreement, dated as of March 14, 2017, by and among BJ Services, LLC and Comstock Resources, Inc., Comstock Oil & Gas, LP and Comstock Oil & Gas-Louisiana, LLC.

(pp)    "New Lease Properties" means that portion of the real property primarily used in connection with the Business with respect to each of the following parcels of Owned Real Property: (i) 3415 Millennium Boulevard Southeast, Massillon, Ohio 44646; (ii) 11245 Old Corpus Christi Highway, San Antonio, Texas 78223; (iii) 6970 West 70th Street, Shreveport, Louisiana 71129; (iv) 272 34th Street West, Dickinson, North Dakota 58601; and (v) 6165 West Murphy Street, Odessa, Texas 79763.

(qq)    "Order" means any order, injunction, order, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

(rr)    "Ordinary Course" means the ordinary and usual course of operations of the Business taken as a whole consistent with past practice and taking into account the commencement and pendency of the Bankruptcy Case (including, for the avoidance of doubt, recent past practice in light of the current pandemic, epidemic or disease outbreak); provided, that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall be deemed to be in the Ordinary Course.

(ss)    "Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated in any material respect by the current use or occupancy of such Leased Real Property, as applicable, (iv) builders' materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis, (vi) matters which would be

disclosed by an inspection or accurate survey, (vii) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (viii) any Encumbrances set forth on Schedule 11.1(ss), (ix) any Encumbrances that will be removed or released by operation of the Sale Order, (x) purchase money liens and (xi) customary liens of lessors, lessees, sublessors, sublessees, licensors or licensees arising under lease arrangements or license arrangements.

(tt)     "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(uu)     "Pre-Closing Tax Period" means any Tax period ending at or before the Closing.

(vv)     "Property Taxes" means all Taxes that are real property Taxes, ad valorem Taxes, personal property Taxes and similar Taxes.

(ww)     "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(xx)     "Seller Parties" means Seller and the Company's Subsidiaries and each of its and their respective former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(yy)     "Software" means computer software applications, libraries, objects and related documentation.

(zz)     "Straddle Period" means any Tax period beginning before, and ending on or after, the Closing.

(aaa)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(bbb)    "Target Inventory" means $6,000,000.

(ccc)    "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use,

transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(ddd) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(eee) "Transaction Documents" means this Agreement and all other agreements and documents contemplated to be executed by a Party in connection with the transactions contemplated hereby.

11.2   Index of Defined Terms.

Acquired Assets ........................................... 5
Acquired Leased Real Property ................. 5
Acquired Owned Real Property ................. 5
Adjustment Escrow Account .................... 11
Adjustment Escrow Agreement ............... 11
Adjustment Escrow Amount..................... 11
Agreement.................................................... 4
Allocation.................................................. 49
Assigned Contracts ...................................... 5
Assignment and Assumption Agreement.. 13
Assumed Liabilities ..................................... 8
Backup Bidder ......................................... 28
Baker Hughes............................................ 45
Baker Hughes License ............................. 45
Bankruptcy Case ......................................... 4
Bankruptcy Code ........................................ 4
Bankruptcy Court........................................ 4
Business ...................................................... 4
Cash Payment............................................ 11
Chosen Courts ........................................... 55
Closing ...................................................... 12
Closing Date.............................................. 12
Closing Date Payment............................... 11
Closing Inventory...................................... 14
Closing Inventory Statement..................... 14
Closing Property Taxes.............................. 14
Closing Property Taxes Statement............ 15
Company ..................................................... 4
Core Equipment .......................................... 5
Cure Costs ................................................... 8
Customer & Vendor List............................ 34
Dataroom.................................................. 27
Deposit ..................................................... 12

Deposit Escrow Account............................ 12
Deposit Escrow Agreement ....................... 12
Employees................................................. 34
Enforceability Exceptions......................... 17
Engagement Date ...................................... 16
Equity Commitment Letter .......................... 4
Escrow Agent............................................ 11
Estimated Inventory ................................. 14
Estimated Property Taxes ......................... 14
Excluded Assets .......................................... 6
Excluded Contracts ..................................... 6
Excluded Liabilities .................................... 9
Existing Marks .......................................... 43
Express Representations ............................ 27
Final Inventory.......................................... 16
Final Property Taxes ................................. 16
Financial Statements ................................. 18
Foreign Competition Laws ....................... 17
Information Presentation........................... 27
IP Assignment Agreement ........................ 13
Leased Real Property ................................ 18
Leases........................................................ 18
Multiemployer Plans................................. 23
New Leases ............................................... 44
Outside Date.............................................. 47
Owned Real Property ................................ 19
Parties.......................................................... 4
Party ............................................................ 4
Pension Plans ............................................ 23
Permits ...................................................... 21
Projections................................................. 41
Property Taxes Shortfall Amount ............. 15
Purchase Price ........................................... 10

| | | | | |
|---|---|---|---|---|
| Purchaser | 4 | Shortfall Amount | 15 |
| Purchaser 401(k) Plan | 35 | Successful Bidder | 28 |
| Purchaser Plans | 35 | Transfer Offer | 34 |
| Retained Mixed-Use Contract | 42 | Transfer Taxes | 49 |
| Retained Names and Marks | 43 | Transferred Employees | 34 |
| Sale | 4 | Transferred Mixed-Use Contract | 42 |
| Sale Order | 4 | Transition Services Agreement | 13 |
| Schedules | 53 | Updated Schedules | 39 |
| Seller | 4 | Warn Act | 36 |
| Seller Plans | 23 | Welfare Plans | 23 |

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)     Any document or item will be deemed "delivered," "provided" or "made available" by the Company, within the meaning of this Agreement if such document or item (i) is included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at the Company's or any of its Subsidiaries' offices.

(k)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)     All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(n)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

*[Signature page(s) follow.]*

67

**EXHIBIT A**

Form of Bill of Sale and Assignment and Assumption Agreement

[*See attached.*]

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is executed and effective as of [●], 2020 (the "Closing Date"), by and [among // between] (i) American Cementing, LLC, a Delaware limited liability company ("Assignee") and (ii) BJ Services, LLC, a Delaware limited liability company (the "Company")[, and the subsidiaries of the Company that are indicated on the signature pages attached hereto (together with the Company, each an "Assignor" and collectively "Assignors")].  Assignor[s] and Assignee may be referred to herein, individually, as a "Party" and, collectively, as the "Parties."

WHEREAS, this Agreement is being delivered in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of August 6, 2020, by and between the Company and Assignee (the "Purchase Agreement");

WHEREAS, pursuant to the Purchase Agreement, [each] Assignor has agreed to sell, transfer, assign and convey to Assignee, and Assignee has agreed to purchase, acquire and accept from such Assignor[s], all of each such Assignor's direct or indirect right, title and interest in, to and under certain assets, liabilities and contractual relationships; and

WHEREAS, the Closing of the purchase and sale under the Purchase Agreement has occurred contemporaneously herewith and this Agreement is delivered pursuant to the Purchase Agreement and as a part of such Closing.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements contained herein and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Assignee and Assignor[s] do hereby agree as follows:

## I.

## BILL OF SALE; ASSIGNMENT AND ASSUMPTION

1.1.    Definitions.  Capitalized terms used but not defined in this Agreement have the meanings given to such terms in the Purchase Agreement.

1.2.    Assignment. On the terms and subject to the conditions set forth in Section 1.1 of the Purchase Agreement, [each] Assignor hereby grants, bargains, sells, transfers, assigns and conveys to Assignee all of [such] Assignor's right, title and interest in, to and under the Acquired Assets held by [such] Assignor free and clear of all Encumbrances other than Permitted Encumbrances, TO HAVE AND TO HOLD unto Assignee and its successors and assigns, forever.

1.3.    Excluded Assets. [Each] Assignor hereby excepts, reserves, and excludes all of [such] Assignor's right, title and interest in, to and under the Excluded Assets, as provided in the Purchase Agreement. Without limiting the foregoing, [each] Assignor does not hereby sell, transfer, assign and convey to Assignee any right, title or interest in any assets, properties and rights of [such] Assignor that are not Acquired Assets.

1.4. <u>Assumed Liabilities</u>. On the terms and subject to the conditions set forth in Section 1.3 of the Purchase Agreement, Assignee hereby assumes and becomes responsible for the Assumed Liabilities. Assignee agrees to pay, perform, honor and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof.

1.5. <u>Excluded Liabilities</u>. Assignee shall not assume, be deemed to have assumed or be liable or obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for the Excluded Liabilities, as provided in the Purchase Agreement.

## II.

## MISCELLANEOUS

2.1. <u>Purchase Agreement</u>. This Agreement is expressly made subject to the terms of the Purchase Agreement. The delivery of this Agreement shall not amend, affect, enlarge, diminish, supersede, modify, replace, rescind, waive or otherwise impair any of the representations, warranties, covenants, indemnities, terms or provisions of the Purchase Agreement or any of the rights, remedies or obligations of any Assignor or Assignee provided for therein or arising therefrom in any way, all of which shall remain in full force and effect in accordance with their terms. The representations, warranties, covenants, indemnities, terms and provisions contained in the Purchase Agreement shall not be merged with or into this Agreement but shall survive the execution and delivery of this Agreement to the extent, and in the manner, set forth in the Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Agreement (including the schedules thereto), the terms of the Purchase Agreement shall control.

2.2. <u>Successors and Assigns</u>. The provisions of this Agreement shall bind and inure to the benefit of Assignor[s] and Assignee and their respective successors and permitted assigns.

2.3. <u>Amendment and Waiver</u>. Any provision of this Agreement may be (a) amended only in a writing signed by Assignor[s] and Assignee or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default hereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

2.4. <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction. Upon such a determination, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties hereto as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

2.5.    <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (i) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (ii) in the event the Bankruptcy Case is closed, or if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court or any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware) (clauses (i) and (ii), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby.  Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*.  The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action.  Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3 of the Purchase Agreement.  Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by Law.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH

OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 2.5(c)</u>.

2.6.    <u>Captions</u>.  The captions and article and section numbers in this Agreement are for convenience only and do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.  References in this Agreement to articles and sections are to articles and sections of this Agreement unless otherwise specified.

2.7.    <u>Counterparts and PDF</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original. At the request of any Party, each other Party hereto will re-execute original forms of this Agreement and deliver them to all other Parties. No Party will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each such Party forever waives any such defense.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written, to be effective as of the Closing Date.

**ASSIGNOR[S]:**

**BJ SERVICES, LLC**


By: _____

Name:

Title:

**ASSIGNEE:**

**AMERICAN CEMENTING, LLC**


By:  _____
Name:
Title:

**EXHIBIT B**

Form of IP Assignment Agreement

[*See attached.*]

# IP ASSIGNMENT AGREEMENT

This IP ASSIGNMENT AGREEMENT (this "Agreement") is executed as of [●], 2020, by and among BJ Services, LLC, a Delaware limited liability company ("Assignor"), and American Cementing, LLC, a Delaware limited liability company ("Assignee").  Assignor and Assignee may be referred to herein, individually, as a "Party" and, collectively, as the "Parties."

WHEREAS, this Agreement is being delivered in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of August 6, 2020, by and among Assignor and Assignee (the "Purchase Agreement");

WHEREAS, pursuant to the Purchase Agreement, Assignor has agreed to sell, transfer, assign and convey to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignor, all of Assignor's right, title and interest in, to and under certain Intellectual Property included in the Acquired Assets;

WHEREAS, Assignee is a successor to that part of Assignor's business to which the Marks (as defined below) pertain, and that business is ongoing and existing;

WHEREAS, this Agreement, as duly executed by Assignor and Assignee, is being delivered as of the date hereof by each Party to the other Party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing, the consideration set forth in the Purchase Agreement, and the covenants and agreements herein contained and intending to be legally bound hereby, Assignor and Assignee do hereby agree as follows:

## I.

## ASSIGNMENT OF INTELLECTUAL PROPERTY

1.1.    Definitions.  Capitalized terms used but not defined in this Agreement have the meanings given to such terms in the Purchase Agreement.

1.2.    Assignment.  Assignor hereby sells, transfers, sets over and assigns to Assignee all of Assignor's right, title and interest in, to and under the: (a) patents and patent applications listed in Schedule A, including but not limited to any provisionals, nonprovisionals, continuations, continuations-in-part, divisionals, reissues, reexaminations, substitutes, renewals, or improvements thereof, and in and to any and all patents of the United States which may be issued for said inventions, including the right to sue and collect damages for infringement of those patents, and (b) trademark registrations and trademark applications listed in Schedule B (the "Marks"), together with any common law rights and all of the goodwill of the business symbolized therewith, including the right (but not the obligation) to assert the Marks and to collect for all past, present and future infringements, and claims for damages and the proceeds thereof, including, without limitation, license royalties and proceeds of infringement suits and all rights corresponding thereto by reason of any past and future acts of infringement that have occurred or may occur, as fully and effectually as they would have been held by Assignor had this Agreement not been made.

1.3.     <u>Recordation</u>.  Assignor hereby authorizes Assignee to file this Agreement at the United States Patent & Trademark Office, the United States Copyright Office, and their respective counterparts in any applicable jurisdiction in the world.

1.4.     <u>Excluded Assets</u>.  Assignor reserves and excludes all of Assignor's rights, titles and interests in, to and under the Excluded Assets, as provided in the Purchase Agreement.  Without limiting the foregoing, Assignor does not hereby sell, transfer, assign and convey to Assignee any right, title or interest in any assets, properties and rights of Assignor that are not Acquired Assets.

## II.

## MISCELLANEOUS

2.1.     <u>Purchase Agreement</u>.  This Agreement is expressly made subject to the terms of the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Agreement (including the schedules hereto), the terms of the Purchase Agreement shall control.

2.2.     <u>Successors and Assigns</u>.  The provisions of this Agreement shall bind and inure to the benefit of Assignor and Assignee and their respective successors and permitted assigns.

2.3.     <u>Amendment and Waiver</u>.  Any provision of this Agreement may be (a) amended only in a writing signed by Assignor and Assignee or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought.  No waiver of any provision hereunder or any breach or default hereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

2.4.     <u>Severability</u>.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.  Upon such a determination, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties hereto as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

2.5.     <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)      Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (i) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (ii) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) (clauses (i) and (ii), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby.  Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*.  The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action.  Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3 of the Purchase Agreement.  Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

(c)      EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.  EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.  EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 2.5(c).

2.6.    Captions.  The captions and article and section numbers in this Agreement are for convenience only and do not constitute a part of this Agreement and shall not affect in any way

the meaning or interpretation of this Agreement.  References in this Agreement to articles and sections are to articles and sections of this Agreement unless otherwise specified.

2.7.    <u>Counterparts and PDF</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  Any counterpart, to the extent signed and delivered by means of a facsimile machine, .PDF or other electronic transmission, will be treated in all manner and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.  Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature.  At the request of any Party, each other Party hereto will re-execute original forms of this Agreement and deliver them to all other Parties.  No Party will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each such Party forever waives any such defense.

2.8    <u>Further Assurances</u>.  Assignor shall and Assignor shall cause its employees, officers and inventors, at Assignee's expense, to take all actions and execute all documents reasonably necessary or desirable for Assignee to record and perfect the interest of Assignee in and to the Marks and the patents and patent applications contemplated herein, and shall not enter into any agreement in conflict with this Agreement.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written, to be effective as of the Closing Date.

**ASSIGNOR:**

**BJ SERVICES, LLC**

By: _____

Name:

Title:

**ASSIGNEE:**

**AMERICAN CEMENTING, LLC**


By: _____
Name:
Title:

**<u>Schedule A - Patents</u>**

**<u>Schedule B - Trademarks</u>**

**EXHIBIT C**

Form of Adjustment Escrow Agreement

[*See attached.*]

*Exhibit C to Asset Purchase Agreement*

**Final Form**

ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made and entered into as of [●], 2020, by and among American Cementing, LLC, a Delaware limited liability company ("Buyer"), BJ Services, LLC, a Delaware limited liability company ("Seller") and Citibank, N.A., as escrow agent (the "Escrow Agent"). Capitalized terms used but not defined herein shall have the meanings assigned to them in that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of August 6, 2020, by and between Seller and Buyer. Each of Buyer and Seller is also referred to herein as a "Party" and, collectively, as the "Parties."

RECITALS

WHEREAS, the Purchase Agreement contemplates the execution and delivery of this Agreement and the deposit by Buyer with the Escrow Agent of an amount equal to USD $[●] (the "Adjustment Escrow Funds");

WHEREAS, Buyer and Seller desire for the Adjustment Escrow Funds to be subject to the terms and conditions set forth herein and in the Purchase Agreement; and

WHEREAS, Buyer agrees to place or cause to be placed the Adjustment Escrow Funds in escrow and the Escrow Agent agrees to hold and distribute such funds in accordance with the terms of this Agreement and the Purchase Agreement.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties and the Escrow Agent agree as follows:

1.      Appointment. The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.      Adjustment Escrow. Simultaneous with the execution and delivery of this Agreement, Buyer shall deposit with the Escrow Agent the Adjustment Escrow Funds in immediately available funds. The Escrow Agent hereby acknowledges receipt of the Adjustment Escrow Funds and agrees to hold the Adjustment Escrow Funds in a separate and distinct account (the "Escrow Account") subject to and in accordance with the terms and conditions of this Agreement.

3.      Investment of Adjustment Escrow Funds.

(a)      The Escrow Agent shall not invest the Adjustment Escrow Funds and shall hold the Adjustment Escrow Funds in a "noninterest-bearing deposit account" of Citibank N.A., insured by the Federal Deposit Insurance Corporation (the "FDIC") up to the applicable limits. The Adjustment Escrow Funds shall at all times remain available for distribution in accordance with the terms of Section 4 below.

(b)      The Escrow Agent shall send an account statement to each of the Parties on a monthly basis reflecting activity in the Escrow Account for the preceding month.

4.      Disposition and Termination of the Adjustment Escrow. The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Adjustment Escrow Funds as provided in, this Section 4 as follows:

      (a)     <u>Joint Release Instruction</u>.

      (i)     Subject to <u>Section 4(a)(ii)</u>, the Escrow Agent shall hold the Adjustment Escrow Funds until Buyer and Seller submit a Joint Release Instruction (as defined below), setting forth the amounts and parties to whom the Adjustment Escrow Funds are to be disbursed pursuant to the Purchase Agreement.  Upon receipt of such Joint Release Instruction with respect to the Adjustment Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of such Joint Release Instruction, disburse the Adjustment Escrow Funds in accordance with such Joint Release Instruction.

      (ii)     Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in any Escrow Account under the terms of this Agreement must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the Person or Persons (an "<u>Authorized Representative</u>") set forth on <u>Exhibit A-1</u> and <u>Exhibit A-2</u> and delivered to the Escrow Agent attached to an e-mail received on a Business Day from an e-mail address set forth in <u>Section 11</u> (with receipt by the Escrow Agent confirmed).  In the event a Joint Release Instruction or Final Determination is delivered to the Escrow Agent in accordance with this Agreement, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the Person or Persons designated in <u>Exhibit A-1</u> and <u>Exhibit A-2</u> annexed hereto (the "<u>Call Back Authorized Individuals</u>"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual.  To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs.  If the Escrow Agent is unable to verify the instructions, or is not reasonably satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved to the reasonable satisfaction of the Escrow Agent.  The Persons and telephone numbers for call backs may be changed only in a writing, executed by an Authorized Representative and actually received and acknowledged by the Escrow Agent in accordance with <u>Section 11</u>.

      (b)     <u>Final Determination</u>.  If at any time any of the Parties receives a Final Determination, such Party shall concurrently deliver to the Escrow Agent and the other Party a copy of such Final Determination, and then upon receipt by the Escrow Agent of a copy of such Final Determination from any Party, the Escrow Agent shall (i) promptly deliver a courtesy copy of such Final Determination to the other Parties and (ii) on the fifth (5th) Business Day following receipt by the Escrow Agent of the Final Determination, disburse as directed, part or all, as the case may be, of the Adjustment Escrow Funds (but only to the extent such funds are available in the Escrow Account) in accordance with such Final Determination.  Subject to the terms of this <u>Section 4(b)</u>, the Escrow Agent will act on such Final Determination without further inquiry.

      (c)     <u>Method of Payment</u>.  All payments of any part of the Adjustment Escrow Funds shall be made by wire transfer of immediately available funds as set forth in the Joint Release Instruction or Final Determination, as applicable.

      (d)     <u>Certain Definitions</u>.

      (i)     "<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which banks are not required or authorized by Law to be closed in New York, New York.

      (ii)     "<u>Final Determination</u>" means a final non-appealable order of any court of competent jurisdiction which may be issued with respect to the ownership or disbursement of Adjustment Escrow Funds, together with (A) a certificate executed by an Authorized Representative of the prevailing Party (as between Buyer and Seller) to the effect that such order is final and non-appealable and from a

court of competent jurisdiction having proper authority and (B) the written payment instructions executed by an Authorized Representative of the prevailing Party to effectuate such order.

       (iii)    "Governmental Entity" means any nation or government, any state, province or other political subdivision thereof, any entity exercising executive, legislative, judicial or regulatory or administrative functions of or pertaining to government, including any court, arbitrator or other body or administrative, regulatory or quasi-judicial authority, agency, department, board, commission or instrumentality of any federal, state, local or foreign jurisdiction.

       (iv)    "Joint Release Instruction" means the joint written instruction executed by an Authorized Representative of each of Buyer and Seller, which is executed by Buyer and Seller, to the Escrow Agent directing the Escrow Agent to disburse all or a portion of the Adjustment Escrow Funds, as applicable.

       (v)    "Person" means any natural person, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or Governmental Entity.

       5.    Escrow Agent.  The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no duties, including but not limited to any fiduciary duties, shall be implied.  The Escrow Agent shall give the property held in escrow by it hereunder the same degree of care that it gives its own similar property, which in no event shall be less than the standard of care reasonably expected of a professional escrow agent.  The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, other than for purposes of the defined terms used but not defined herein, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement.  Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of Escrow Agent.  The Escrow Agent may rely upon and shall not be liable in the absence of its fraud, gross negligence or willful misconduct for acting or refraining from acting upon any Joint Release Instruction or Final Determination furnished to it hereunder and reasonably believed by it to be genuine and to have been signed by the proper Party or Parties.  Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of Exhibit A-1 and Exhibit A-2 attached hereto.  The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.  The Escrow Agent shall have no duty to solicit any payments which may be due it or the Adjustment Escrow Funds.  In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be (a) delivered a Joint Release Instruction that eliminates such conflict or (b) directed otherwise in a Final Determination.  The Escrow Agent may after thirty (30) days' notice to each Party of its intention to do so interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment.  The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions of, or its duties under, this Agreement.  The Escrow Agent shall have no liability or obligation with respect to the Adjustment Escrow Funds except for the Escrow Agent's fraud, gross negligence or willful misconduct, as adjudicated by a court of competent

jurisdiction. To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute (other than with respect to a dispute involving the Escrow Agent) without making the Escrow Agent a party to the same. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable, directly or indirectly, for any (x) damages, losses or expenses arising out of the services provided under this Agreement, other than damages, losses or expenses which result from the Escrow Agent's fraud, gross negligence or willful misconduct, as adjudicated by a court of competent jurisdiction or (y) special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

6.       Resignation and Removal of Escrow Agent. The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by Buyer and Seller acting jointly at any time by providing written notice to the Escrow Agent. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act. The Escrow Agent's sole responsibility after such 30 day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Adjustment Escrow Funds (without any obligation to reinvest the same) and to deliver the same (x) to a substitute or successor escrow agent pursuant to a joint written designation from the Parties, (y) as set forth in a Joint Release Instruction, at which time of delivery the Escrow Agent's obligations under this Agreement shall cease and terminate or (z) in accordance with the directions of a Final Determination, at which time of delivery, the Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of 30 calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the Parties.

7.       Fees and Expenses. All fees and expenses of the Escrow Agent are described in Schedule 1 attached hereto. The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent services as contemplated by this Agreement and shall be borne by the Parties one half by Buyer and one half by Seller.

8.       Indemnity. Each of Buyer and Seller agrees to jointly and severally indemnify the Escrow Agent and its Affiliates and their respective successors, assigns, directors, officers, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable and documented fees and expenses of one outside counsel and experts and their staffs and reasonable and documented out-of-pocket expenses of document location, duplication and shipment) (collectively "Escrow Agent Losses") arising out of or in connection with: (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of an Indemnitee, except to the extent that such Escrow Agent Losses, as adjudicated by a court of competent jurisdiction, have been caused by the fraud, gross negligence or willful misconduct of the Escrow Agent or any such Indemnitee or (b) its following any Joint Release Instruction or other proper directions from the Parties received in accordance with this Agreement, except to the extent that its following any such instruction or direction is not permitted under the terms hereof or applicable Law. Notwithstanding anything to the contrary herein, Buyer and Seller agree, solely as between themselves, that any obligation for indemnification under this Section 8 shall be borne by the Party or Parties

4

determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by Buyer and one-half by Seller.  The provisions of this <u>Section 8</u> shall survive the resignation or removal of the Escrow Agent and the termination of this Agreement for a period of twelve (12) months following such resignation or removal of the Escrow Agent or termination of this Agreement, as applicable.

9.      <u>Tax Matters</u>.  The Escrow Agent, its Affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its Affiliates.  This Agreement and any amendments or attachments are not intended or written to be used, and cannot be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties.  Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.      <u>Covenant of Escrow Agent</u>.  The Escrow Agent hereby agrees and covenants with Buyer and Seller that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Adjustment Escrow Funds to anyone except pursuant (a) to the express terms of this Agreement or (b) as otherwise required by Law (*provided*, that in the case of clause (b), the Escrow Agent will provide the Parties with prior written notice of such delivery).

11.      <u>Notices</u>.  All notices, demands, requests, instructions, claims, consents, waivers and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered (or, if delivery is refused, upon presentment), received by email (with hard copy to follow) prior to 5:00 p.m. Eastern Time on a Business Day (or the next Business Day if after 5:00 p.m.), (b) on the next day if delivered by reputable overnight express courier (charges prepaid), or (c) three (3) calendar days following mailing by certified or registered mail, postage prepaid and return receipt requested.  Unless another address is specified in writing, notices, demands and communications to Buyer, Seller and the Escrow Agent shall be sent to the addresses indicated below:

<u>if to Seller, then to</u>:

BJ Services, LLC
11211 FM 2920 Rd.
Tomball, Texas 77375
Attn:   John R. Bakht, General Counsel
Email:  john.bakht@bjservices.com

<u>with copies (which shall not constitute notice) to</u>:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:   Joshua A. Sussberg
        Christopher T. Greco
Email:  joshua.sussberg@kirkland.com
       cgreco@kirkland.com

or, if to Buyer, then to:

American Cementing, LLC
c/o Argonaut Private Equity
7030 South Yale Ave., #810
Tulsa, Oklahoma 74136
Attn:   Phil VanTrease
Email:  philvt@argonautpe.com

with a copy to (which shall not constitute notice):
Frederic Dorwart, Lawyer PLLC
124 East Fourth Street
Tulsa, Oklahoma 74114
Attn:   Steve Walton
Email:  swalton@fdlaw.com

or, if to the Escrow Agent, then to:

Citibank, N.A.
Attn: Debbie DeMarco
Citi Private Bank
388 Greenwich Street, 29th Floor
Telephone: 212-783-7092
Facsimile: 212-783-7131
Email: debra.demarco@citi.com

12.      Termination.  This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Account in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by an Authorized Representative of both Buyer and Seller after which this Agreement shall be of no further force and effect except that the provisions of Section 8 and Section 20 hereof shall survive termination for the time period specified therein.

13.      Miscellaneous.  The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the Parties and the Escrow Agent. Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any Party, except as provided in Section 6 and Section 16, without the prior consent of the other Party and the Escrow Agent.  This Agreement shall be governed by and construed under the laws of the State of Delaware.  Each Party and the Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the exclusive jurisdiction of the Chancery Court of the State of Delaware or the Federal District Court for the District of Delaware.  EACH PARTY AND THE ESCROW AGENT HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES AND/OR THE ESCROW AGENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE RELATIONSHIPS ESTABLISHING AMONG THE PARTIES HEREUNDER. THE PARTIES AND THE ESCROW AGENT FURTHER WARRANT AND REPRESENT THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING

6

CONSULTATION WITH LEGAL COUNSEL.  This Agreement and any Joint Release Instruction may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  All signatures of the Parties and the Escrow Agent to this Agreement may be transmitted by electronic transmission in .pdf and such .pdf will, for all purposes, be deemed to be the original signature of such Party and the Escrow Agent whose signature it reproduces, and will be binding upon such Party and the Escrow Agent.  If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable Laws and regulations.  Where, however, the conflicting provisions of any such applicable Law may be waived, they are hereby irrevocably waived by the Parties and the Escrow Agent to the fullest extent permitted by Law, to the end that this Agreement shall be enforced as written.  Except as expressly provided in Section 8, nothing in this Agreement, whether express or implied, shall be construed to give to any Person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.  Buyer and Seller agree, solely as between themselves, that, notwithstanding anything to the contrary contained in this Agreement or in any other agreement, in the event of any conflict or inconsistency between the terms of this Agreement (on the one hand) and the Purchase Agreement (on the other hand), the terms of the Purchase Agreement shall govern.

14.     Compliance with Court Orders.  In the event that any Adjustment Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction; *provided*, *however*, the Escrow Agent shall immediately notify each of the Parties, to the extent legally permissible, of any such writ, order or decree as well as the course of action the Escrow Agent intends to take upon the advice of its legal counsel.  In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15.     Further Assurances.  From and after the date of this Agreement, as requested by any Party or the Escrow Agent but without further consideration, each Party and the Escrow Agent shall execute and deliver or cause to be executed and delivered any such further information, instruments and documents as the other Party or the Escrow Agent, as applicable, shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure the other Party or the Escrow Agent the benefits hereof.

16.     Assignment.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and the Escrow Agent and their respective successors and assigns; *provided*, that except as expressly set forth below and expressly contemplated with regard to the Escrow Agent in Section 6, neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by any Party or the Escrow Agent (including by operation of Law) without the prior written consent of the other Party and the Escrow Agent.  Any attempted assignment not in accordance with the terms of this Section 16 shall be null and void *ab initio*.

17.     <u>Force Majeure.</u>  The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future Law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.     <u>Compliance with Federal Law</u>.  To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds with the Escrow Agent pursuant to the terms and conditions of this Agreement.  For a non-individual Person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity.  The Escrow Agent may also ask to see licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.     <u>Use of Citibank Name.</u>  No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by a Party, or on such Party's behalf, without the prior written consent of the Escrow Agent.

20.     <u>Confidentiality.</u>  Except as required by Law, Escrow Agent agrees to keep confidential, and to cause any of its Affiliates or agents to keep confidential and not to disclose any and all documents, materials, and any other non-public information which it shall have obtained regarding the Parties in connection with the execution and delivery of this Agreement and its performance of its duties and obligations hereunder.  This <u>Section 20</u> shall survive termination of this Agreement for a period of twelve (12) months after such termination.

*   *   *   *   *

IN WITNESS WHEREOF, each of the Parties and the Escrow Agent have executed this Agreement as of the date set forth above.

**<u>BUYER</u>**:

AMERICAN CEMENTING, LLC

By: _____
Name:
Its:

**<u>SELLER</u>**:

BJ SERVICES, LLC

By: _____
Name:
Its:

**<u>ESCROW AGENT</u>**:

CITIBANK, N.A.

By: _____
Name:
Its:

**Schedule 1**

**ESCROW AGENT FEE SCHEDULE**
**Citibank, N.A., Escrow Agent**

**Acceptance Fee**
To cover the acceptance of the Escrow Agent's appointment, the study of the Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

> **Fee:**  Waived.

**Administration Fee**
The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the Escrow Account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement.  Fee is based on the Adjustment Escrow Funds being deposited in a "noninterest bearing deposit account", of Citibank, N.A., FDIC insured to the applicable limits.

> **Fee:**  Waived.

**Tax Preparation Fee**
To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

> **Fee:**  Waived.

**Transaction Fees**
To oversee all required disbursements or release of property from the Escrow Account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

> **Fee:**  Waived.

**Other Fees**
Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

---

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform.  Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change.  Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder.  The Acceptance Fee, if any, is payable upon execution of the Agreement.  Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

<u>EXHIBIT A-1</u>

<u>Certificate as to Buyer's Authorized Signatures</u>

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Buyer and are authorized to initiate and approve transactions of all types for the Escrow Account or accounts established under this Agreement, on behalf of Buyer. The below listed Persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of the Adjustment Escrow Funds from the Escrow Account.

<u>Name / Title / Telephone</u>                           <u>Specimen Signature</u>

_____          _____
Name                                              Signature

_____
Title

_____          _____
Phone                                             Mobile Phone

_____          _____
Name                                              Signature

_____
Title

_____          _____
Phone                                             Mobile Phone

_____          _____
Name                                              Signature

_____
Title

_____          _____
Telephone                                         Mobile Phone

NOTE: Actual signatures are required above.  Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

<u>EXHIBIT A-2</u>

<u>Certificate as to Seller's Authorized Signatures</u>

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Seller and are authorized to initiate and approve transactions of all types for the Escrow Account or accounts established under this Agreement, on behalf of Seller. The below listed Persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of the Adjustment Escrow Funds from the Escrow Account.

<u>Name / Title / Telephone</u>                                    <u>Specimen Signature</u>

_____          _____
Name                                                          Signature

_____
Title

_____          _____
Phone                                                         Mobile Phone


_____          _____
Name                                                          Signature

_____
Title

_____          _____
Phone                                                         Mobile Phone


_____          _____
Name                                                          Signature

_____
Title

_____          _____
Telephone                                                    Mobile Phone

NOTE: Actual signatures are required above.  Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

**EXHIBIT D**

Form of Deposit Escrow Agreement

[*See attached*.]

**Final Form**

ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made and entered into as of August [7], 2020, by and among American Cementing, LLC, a Delaware limited liability company ("Buyer"), BJ Services, LLC, a Delaware limited liability company ("Seller") and Citibank, N.A., as escrow agent (the "Escrow Agent").  Capitalized terms used but not defined herein shall have the meanings assigned to them in that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of August 6, 2020, by and between Seller and Buyer.  Each of Buyer and Seller is also referred to herein as a "Party" and, collectively, as the "Parties."

RECITALS

WHEREAS, the Purchase Agreement contemplates the execution and delivery of this Agreement and the deposit by Buyer with the Escrow Agent of an amount equal to USD $1,750,000 (the "Escrow Deposit");

WHEREAS, Buyer and Seller desire for the Escrow Deposit to be subject to the terms and conditions set forth herein and in the Purchase Agreement; and

WHEREAS, Buyer agrees to place or cause to be placed the Escrow Deposit in escrow and the Escrow Agent agrees to hold and distribute such funds in accordance with the terms of this Agreement and the Purchase Agreement.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties and the Escrow Agent agree as follows:

1.    Appointment.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.    Escrow Deposit.  Simultaneous with the execution and delivery of this Agreement, Buyer shall deposit with the Escrow Agent the Escrow Deposit in immediately available funds.  The Escrow Agent hereby acknowledges receipt of the Escrow Deposit and agrees to hold the Escrow Deposit in a separate and distinct account (the "Escrow Account") subject to and in accordance with the terms and conditions of this Agreement.

3.    Investment of Escrow Deposit.

(a)    The Escrow Agent shall not invest the Escrow Deposit and shall hold the Escrow Deposit in a "noninterest-bearing deposit account" of Citibank N.A., insured by the Federal Deposit Insurance Corporation (the "FDIC") up to the applicable limits.  The Escrow Deposit shall at all times remain available for distribution in accordance with the terms of Section 4 below.

(b)    The Escrow Agent shall send an account statement to each of the Parties on a monthly basis reflecting activity in the Escrow Account for the preceding month.

4.    Disposition and Termination of the Escrow Deposit.  The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Deposit as provided in, this Section 4 as follows:

KE 57631728

      (a)     <u>Joint Release Instruction</u>.

          (i)     Subject to <u>Section 4(a)(ii)</u>, the Escrow Agent shall hold the Escrow Deposit until Buyer and Seller submit a Joint Release Instruction (as defined below), setting forth the amounts and parties to whom the Escrow Deposit are to be disbursed pursuant to the Purchase Agreement.  Upon receipt of such Joint Release Instruction with respect to the Escrow Deposit, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of such Joint Release Instruction, disburse the Escrow Deposit in accordance with such Joint Release Instruction.

          (ii)     Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in any Escrow Account under the terms of this Agreement must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the Person or Persons (an "<u>Authorized Representative</u>") set forth on <u>Exhibit A-1</u> and <u>Exhibit A-2</u> and delivered to the Escrow Agent attached to an e-mail received on a Business Day from an e-mail address set forth in <u>Section 11</u> (with receipt by the Escrow Agent confirmed).  In the event a Joint Release Instruction or Final Determination is delivered to the Escrow Agent in accordance with this Agreement, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the Person or Persons designated in <u>Exhibit A-1</u> and <u>Exhibit A-2</u> annexed hereto (the "<u>Call Back Authorized Individuals</u>"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual.  To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs.  If the Escrow Agent is unable to verify the instructions, or is not reasonably satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved to the reasonable satisfaction of the Escrow Agent.  The Persons and telephone numbers for call backs may be changed only in a writing, executed by an Authorized Representative and actually received and acknowledged by the Escrow Agent in accordance with <u>Section 11</u>.

      (b)     <u>Final Determination</u>.  If at any time any of the Parties receives a Final Determination, such Party shall concurrently deliver to the Escrow Agent and the other Party a copy of such Final Determination, and then upon receipt by the Escrow Agent of a copy of such Final Determination from any Party, the Escrow Agent shall (i) promptly deliver a courtesy copy of such Final Determination to the other Parties and (ii) on the fifth (5th) Business Day following receipt by the Escrow Agent of the Final Determination, disburse as directed, part or all, as the case may be, of the Escrow Deposit (but only to the extent such funds are available in the Escrow Account) in accordance with such Final Determination.  Subject to the terms of this <u>Section 4(b)</u>, the Escrow Agent will act on such Final Determination without further inquiry.

      (c)     <u>Method of Payment</u>.  All payments of any part of the Escrow Deposit shall be made by wire transfer of immediately available funds as set forth in the Joint Release Instruction or Final Determination, as applicable.

      (d)     <u>Certain Definitions</u>.

          (i)     "<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which banks are not required or authorized by Law to be closed in New York, New York.

          (ii)     "<u>Final Determination</u>" means a final non-appealable order of any court of competent jurisdiction which may be issued with respect to the ownership or disbursement of Escrow Deposit, together with (A) a certificate executed by an Authorized Representative of the prevailing Party (as between Buyer and Seller) to the effect that such order is final and non-appealable and from a court of competent jurisdiction having proper authority and (B) the written payment instructions executed by an Authorized Representative of the prevailing Party to effectuate such order.

(iii)    "<u>Governmental Entity</u>" means any nation or government, any state, province or other political subdivision thereof, any entity exercising executive, legislative, judicial or regulatory or administrative functions of or pertaining to government, including any court, arbitrator or other body or administrative, regulatory or quasi-judicial authority, agency, department, board, commission or instrumentality of any federal, state, local or foreign jurisdiction.

(iv)    "<u>Joint Release Instruction</u>" means the joint written instruction executed by an Authorized Representative of each of Buyer and Seller, which is executed by Buyer and Seller, to the Escrow Agent directing the Escrow Agent to disburse all or a portion of the Escrow Deposit, as applicable.

(v)    "<u>Person</u>" means any natural person, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or Governmental Entity.

5.    <u>Escrow Agent</u>.  The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no duties, including but not limited to any fiduciary duties, shall be implied.  The Escrow Agent shall give the property held in escrow by it hereunder the same degree of care that it gives its own similar property, which in no event shall be less than the standard of care reasonably expected of a professional escrow agent.  The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, other than for purposes of the defined terms used but not defined herein, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement.  Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of Escrow Agent.  The Escrow Agent may rely upon and shall not be liable in the absence of its fraud, gross negligence or willful misconduct for acting or refraining from acting upon any Joint Release Instruction or Final Determination furnished to it hereunder and reasonably believed by it to be genuine and to have been signed by the proper Party or Parties.  Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of <u>Exhibit A-1</u> and <u>Exhibit A-2</u> attached hereto.  The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.  The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Deposit.  In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be (a) delivered a Joint Release Instruction that eliminates such conflict or (b) directed otherwise in a Final Determination.  The Escrow Agent may after thirty (30) days' notice to each Party of its intention to do so interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment.  The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions of, or its duties under, this Agreement.  The Escrow Agent shall have no liability or obligation with respect to the Escrow Deposit except for the Escrow Agent's fraud, gross negligence or willful misconduct, as adjudicated by a court of competent jurisdiction.  To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute (other than with respect to a dispute involving the Escrow Agent) without making the Escrow Agent a party to the same.  Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable, directly or

indirectly, for any (x) damages, losses or expenses arising out of the services provided under this Agreement, other than damages, losses or expenses which result from the Escrow Agent's fraud, gross negligence or willful misconduct, as adjudicated by a court of competent jurisdiction or (y) special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

6.      Resignation and Removal of Escrow Agent.  The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by Buyer and Seller acting jointly at any time by providing written notice to the Escrow Agent.  Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act.  The Escrow Agent's sole responsibility after such 30 day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Deposit (without any obligation to reinvest the same) and to deliver the same (x) to a substitute or successor escrow agent pursuant to a joint written designation from the Parties, (y) as set forth in a Joint Release Instruction, at which time of delivery the Escrow Agent's obligations under this Agreement shall cease and terminate or (z) in accordance with the directions of a Final Determination, at which time of delivery, the Escrow Agent's obligations hereunder shall cease and terminate.  In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of 30 calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the Parties.

7.      Fees and Expenses.  All fees and expenses of the Escrow Agent are described in Schedule 1 attached hereto.  The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent services as contemplated by this Agreement and shall be borne by the Parties one half by Buyer and one half by Seller.

8.      Indemnity.  Each of Buyer and Seller agrees to jointly and severally indemnify the Escrow Agent and its Affiliates and their respective successors, assigns, directors, officers, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable and documented fees and expenses of one outside counsel and experts and their staffs and reasonable and documented out-of-pocket expenses of document location, duplication and shipment) (collectively "Escrow Agent Losses") arising out of or in connection with: (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of an Indemnitee, except to the extent that such Escrow Agent Losses, as adjudicated by a court of competent jurisdiction, have been caused by the fraud, gross negligence or willful misconduct of the Escrow Agent or any such Indemnitee or (b) its following any Joint Release Instruction or other proper directions from the Parties received in accordance with this Agreement, except to the extent that its following any such instruction or direction is not permitted under the terms hereof or applicable Law.  Notwithstanding anything to the contrary herein, Buyer and Seller agree, solely as between themselves, that any obligation for indemnification under this Section 8 shall be borne by the Party or Parties determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by Buyer and one-half by Seller.  The provisions of this Section 8 shall survive the resignation or removal of the Escrow Agent and the termination of this Agreement for a period of twelve

4

(12) months following such resignation or removal of the Escrow Agent or termination of this Agreement, as applicable.

9.     Tax Matters.  The Escrow Agent, its Affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its Affiliates.  This Agreement and any amendments or attachments are not intended or written to be used, and cannot be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties.  Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.     Covenant of Escrow Agent.  The Escrow Agent hereby agrees and covenants with Buyer and Seller that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Deposit to anyone except pursuant (a) to the express terms of this Agreement or (b) as otherwise required by Law (*provided*, that in the case of clause (b), the Escrow Agent will provide the Parties with prior written notice of such delivery).

11.     Notices.  All notices, demands, requests, instructions, claims, consents, waivers and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered (or, if delivery is refused, upon presentment), received by email (with hard copy to follow) prior to 5:00 p.m. Eastern Time on a Business Day (or the next Business Day if after 5:00 p.m.), (b) on the next day if delivered by reputable overnight express courier (charges prepaid), or (c) three (3) calendar days following mailing by certified or registered mail, postage prepaid and return receipt requested.  Unless another address is specified in writing, notices, demands and communications to Buyer, Seller and the Escrow Agent shall be sent to the addresses indicated below:

if to Seller, then to:

        BJ Services, LLC
        11211 FM 2920 Rd.
        Tomball, Texas 77375
        Attn:   John R. Bakht, General Counsel
        Email:  john.bakht@bjservices.com


        with copies (which shall not constitute notice) to:

        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, New York 10022
        Attn:    Joshua A. Sussberg
                 Christopher T. Greco
        Email:  joshua.sussberg@kirkland.com
                 cgreco@kirkland.com

or, if to Buyer, then to:

        American Cementing, LLC
        c/o Argonaut Private Equity
        7030 South Yale Ave., #810
        Tulsa, Oklahoma 74136

Attn:    Phil VanTrease
Email:   philvt@argonautpe.com

with a copy to (which shall not constitute notice):
Frederic Dorwart, Lawyer PLLC
124 East Fourth Street
Tulsa, Oklahoma 74114
Attn:    Steve Walton
Email:   swalton@fdlaw.com

or, if to the Escrow Agent, then to:

Citibank, N.A.
Attn: Debbie DeMarco
Citi Private Bank
388 Greenwich Street, 29th Floor
Telephone: 212-783-7092
Facsimile: 212-783-7131
Email: debra.demarco@citi.com

12.    Termination.  This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Account in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by an Authorized Representative of both Buyer and Seller after which this Agreement shall be of no further force and effect except that the provisions of Section 8 and Section 20 hereof shall survive termination for the time period specified therein.

13.    Miscellaneous.  The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the Parties and the Escrow Agent. Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any Party, except as provided in Section 6 and Section 16, without the prior consent of the other Party and the Escrow Agent.  This Agreement shall be governed by and construed under the laws of the State of Delaware.  Each Party and the Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the exclusive jurisdiction of the Chancery Court of the State of Delaware or the Federal District Court for the District of Delaware.  EACH PARTY AND THE ESCROW AGENT HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES AND/OR THE ESCROW AGENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE RELATIONSHIPS ESTABLISHING AMONG THE PARTIES HEREUNDER. THE PARTIES AND THE ESCROW AGENT FURTHER WARRANT AND REPRESENT THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  This Agreement and any Joint Release Instruction may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  All signatures of the Parties and the Escrow Agent to this Agreement may be transmitted by electronic transmission in .pdf and such .pdf will, for all purposes, be deemed to be the original signature of such Party and the Escrow Agent whose signature it reproduces, and will be binding upon such Party and the Escrow Agent.  If any provision of this Agreement is

determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable Laws and regulations.  Where, however, the conflicting provisions of any such applicable Law may be waived, they are hereby irrevocably waived by the Parties and the Escrow Agent to the fullest extent permitted by Law, to the end that this Agreement shall be enforced as written.  Except as expressly provided in <u>Section 8</u>, nothing in this Agreement, whether express or implied, shall be construed to give to any Person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.  Buyer and Seller agree, solely as between themselves, that, notwithstanding anything to the contrary contained in this Agreement or in any other agreement, in the event of any conflict or inconsistency between the terms of this Agreement (on the one hand) and the Purchase Agreement (on the other hand), the terms of the Purchase Agreement shall govern.

14.     <u>Compliance with Court Orders</u>.  In the event that any Escrow Deposit shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction; *provided*, *however*, the Escrow Agent shall immediately notify each of the Parties, to the extent legally permissible, of any such writ, order or decree as well as the course of action the Escrow Agent intends to take upon the advice of its legal counsel.  In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15.     <u>Further Assurances</u>.  From and after the date of this Agreement, as requested by any Party or the Escrow Agent but without further consideration, each Party and the Escrow Agent shall execute and deliver or cause to be executed and delivered any such further information, instruments and documents as the other Party or the Escrow Agent, as applicable, shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure the other Party or the Escrow Agent the benefits hereof.

16.     <u>Assignment</u>.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and the Escrow Agent and their respective successors and assigns; *provided*, that except as expressly set forth below and expressly contemplated with regard to the Escrow Agent in <u>Section 6</u>, neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by any Party or the Escrow Agent (including by operation of Law) without the prior written consent of the other Party and the Escrow Agent.  Any attempted assignment not in accordance with the terms of this <u>Section 16</u> shall be null and void *ab initio*.

17.     <u>Force Majeure</u>.  The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future Law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.    <u>Compliance with Federal Law</u>. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds with the Escrow Agent pursuant to the terms and conditions of this Agreement.  For a non-individual Person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity.  The Escrow Agent may also ask to see licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.    <u>Use of Citibank Name.</u>  No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by a Party, or on such Party's behalf, without the prior written consent of the Escrow Agent.

20.    <u>Confidentiality</u>.  Except as required by Law, Escrow Agent agrees to keep confidential, and to cause any of its Affiliates or agents to keep confidential and not to disclose any and all documents, materials, and any other non-public information which it shall have obtained regarding the Parties in connection with the execution and delivery of this Agreement and its performance of its duties and obligations hereunder.  This <u>Section 20</u> shall survive termination of this Agreement for a period of twelve (12) months after such termination.

\*    \*    \*    \*    \*

IN WITNESS WHEREOF, each of the Parties and the Escrow Agent have executed this Agreement as of the date set forth above.

**<u>BUYER</u>**:

AMERICAN CEMENTING, LLC

By: _____
Name:
Its:

**<u>SELLER</u>**:

BJ SERVICES, LLC

By: _____

Name:

Its:

**<u>ESCROW AGENT</u>**:

CITIBANK, N.A.


By: _____
Name:
Its:

## Schedule 1

### ESCROW AGENT FEE SCHEDULE
### Citibank, N.A., Escrow Agent

**Acceptance Fee**

To cover the acceptance of the Escrow Agent's appointment, the study of the Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

      **Fee:**  Waived.

**Administration Fee**

The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the Escrow Account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement.  Fee is based on Escrow Deposit being deposited in a "noninterest bearing deposit account", of Citibank, N.A., FDIC insured to the applicable limits.

      **Fee:**  Waived.

**Tax Preparation Fee**

To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

      **Fee:**  Waived.

**Transaction Fees**

To oversee all required disbursements or release of property from the Escrow Account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

      **Fee:**  Waived.

**Other Fees**

Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

---

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform.  Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change.  Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder.  The Acceptance Fee, if any, is payable upon execution of the Agreement.  Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

EXHIBIT A-1

Certificate as to Buyer's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Buyer and are authorized to initiate and approve transactions of all types for the Escrow Account or accounts established under this Agreement, on behalf of Buyer. The below listed Persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Deposit from the Escrow Account.

Name / Title / Telephone                         Specimen Signature


_____         _____
Name                                     Signature

_____
Title

_____         _____
Phone                                    Mobile Phone


_____         _____
Name                                     Signature

_____
Title

_____         _____
Phone                                    Mobile Phone


_____         _____
Name                                     Signature

_____
Title

_____         _____
Telephone                                Mobile Phone

NOTE: Actual signatures are required above.  Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

<u>EXHIBIT A-2</u>

<u>Certificate as to Seller's Authorized Signatures</u>

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Seller and are authorized to initiate and approve transactions of all types for the Escrow Account or accounts established under this Agreement, on behalf of Seller. The below listed Persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Deposit from the Escrow Account.

<u>Name / Title / Telephone</u>                    <u>Specimen Signature</u>


_____        _____
Name                                    Signature


_____
Title


_____        _____
Phone                                   Mobile Phone


_____        _____
Name                                    Signature


_____
Title


_____        _____
Phone                                   Mobile Phone


_____        _____
Name                                    Signature


_____
Title


_____        _____
Telephone                               Mobile Phone

NOTE: Actual signatures are required above.  Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

*Exhibit A-2 to Escrow Agreement*

**EXHIBIT E**

Form of Transition Services Agreement

[*See attached.*]

## TRANSITION SERVICES AGREEMENT

This **TRANSITION SERVICES AGREEMENT** (this "Agreement") is dated as of [●], 2020 (the "Effective Date") by and between American Cementing, LLC, a Delaware limited liability company ("Service Recipient") and BJ Services, LLC, a Delaware limited liability company (the "Service Provider"). Service Recipient and Service Provider are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement (as defined below).

## RECITALS

**WHEREAS**, as set forth in the Asset Purchase Agreement, dated as of August 6, 2020 (the "Purchase Agreement"), by and among Service Recipient and Service Provider, Service Recipient has agreed to purchase from Service Provider and Service Provider has agreed to sell, transfer, assign and deliver to Service Recipient, in accordance with *inter alia*, sections 105, 363, 365, 1123, 1129, 1141 and 1142 of the Bankruptcy Code, the Acquired Assets, together with certain Assumed Liabilities, upon the terms and subject to the conditions set forth in the Purchase Agreement; and

**WHEREAS**, in connection with the transactions contemplated by the Purchase Agreement, Service Provider will provide Service Recipient certain transition services, on the terms and conditions set forth and as described herein;

**NOW, THEREFORE**, in consideration of the recitals and the mutual covenants, representations, warranties and agreements contained herein, the Parties agree as follows:

1.    Services Provided.

    1.1.    During the period commencing on the Effective Date and ending on the Termination Date, subject to the terms hereof, Service Provider shall provide to Service Recipient the services described on Annex A to this Agreement (each a "Service" and collectively, the "Services"), in each case until such Services are terminated in accordance with the terms hereof. Unless otherwise agreed to in writing by the Parties, all fees for such Services will be paid by Service Recipient in accordance with Section 2 and Section 3 below. Service Recipient acknowledges and agrees that Service Provider and certain of its Subsidiaries are debtors in the Bankruptcy Case and that, as such, it and such Subsidiaries are subject to limitations on debtors under chapter 11 of the Bankruptcy Code and subject to any orders of the Bankruptcy Court, and that, in addition, Service Provider is in the process of winding down, has significant limitations on its resources and has a limited ability to retain employees. Service Recipient agrees that the obligations and efforts (including commercially reasonable efforts) of the Service Provider set forth herein are qualified accordingly.

    1.2.    Service Provider shall perform the Services in a commercially reasonable manner not materially inconsistent, with the level of quality and the manner of the performance of such services by Service Provider in respect of the operations of the Business immediately prior to the Effective Date, subject to the limitations set forth in the last two sentences of Section 1.1 above. In furtherance of the foregoing,

Service Recipient acknowledges that, in connection with performing the Services hereunder, Service Provider shall have no obligation to change any practices or processes used by it prior to the Effective Date in performing the Services. EXCEPT AS SET FORTH IN THE FIRST SENTENCE OF THIS <u>SECTION 1.2</u>, THE SERVICES ARE FURNISHED HEREUNDER ON AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, AND WITHOUT REPRESENTATION, WARRANTY OR CONDITION OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OR CONDITION OF NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. Nothing in this Agreement shall require Service Provider to take or refrain from taking any action that, in Service Provider's reasonable judgment, could reasonably be expected to result in any breach or violation of any Law, any limitation imposed by Service Provider's financing or its bankruptcy process or any contract to which Service Provider or any of its Subsidiaries is a party.

1.3.   The Services will be provided during normal working hours and otherwise as reasonably requested or reasonably necessary to perform the Services. To the extent that Service Recipient is required to gain access to the Service Provider's information technology infrastructure during the course of the provision of the Services, Service Provider shall provide Service Recipient and its employees such access to such information technology infrastructure in the same general manner as it made such information technology infrastructure available to Service Provider's employees and contractors prior to the Effective Date. Service Recipient shall make available on a timely basis to Service Provider such information and materials as Service Provider may reasonably request, to the extent necessary to enable Service Provider (or an Affiliate of Service Provider or approved third-party service provider) to provide the Services, at no additional cost to Service Provider. Service Recipient shall provide Service Provider (or an Affiliate of Service Provider or approved third-party service provider) with reasonable access to Service Recipient's premises or the Acquired Assets to the extent necessary for service Provider to provide the Services, provided that all parties to which Service Recipient provides access shall conform to the policies and procedures of Service Recipient concerning health, safety and security.

1.4.   Service Provider may (a) use its personnel, its Affiliates, and the personnel of such Affiliates and/or (b) employ the services of other third parties, in each case, to perform any or all of Service Provider's obligations to provide Services under this Agreement; <u>provided</u>, that, for the purpose of providing any of the Services hereunder, the employment of any third party not already, as of immediately prior to the Effective Date, used by the Service Provider to perform functions included in such Services shall require the prior written consent of Service Recipient, which consent shall be in Service Recipient's sole discretion. Service Provider shall be liable for the failure of any subcontractor to continue providing Services, except to the extent that such failure is due to the fault of Service Recipient.

2

1.5.    Management of, and control over, the provision of all other Services and portions of the Services in accordance with the terms hereof (including the determination or designation at any time of the equipment, employees and other resources of Service Provider to be used in connection with the provision of such Services) shall reside solely with Service Provider, including with respect to all labor matters relating to any employees of Service Provider. Notwithstanding the foregoing, all Services listed on Annex A shall be provided in such a manner as to complete the required Services on or before the Termination Date.

1.6.    The Parties each agree to (a) designate an appropriate point of contact and coordination for all questions and issues relating to the Services during the Term (as defined below) of this Agreement (each a "Transition Manager" and collectively, the "Transition Managers") and (b) make available the services of appropriate qualified employees and resources to allow for the provision of the Services and to allow each Party to perform its duties, responsibilities and obligations related to the Services. The Transition Manager for Service Provider will be [●] and the Transition Manager for Service Recipient will be [●].

1.7.    In providing the Services, Service Provider shall not be obligated to: (a) hire any additional employees; (b) maintain the employment of any specific employee; (c) purchase, lease or license any additional equipment or software; (d) create or supply any documentation or information not currently existing or available without commercially unreasonable effort; (e) pay any costs related to the transfer or conversion of data or other information to Service Recipient; (f) enter into additional contracts or agreements or change the scope of current contracts or agreements. Moreover, notwithstanding anything herein to the contrary, nothing herein shall prevent Service Provider from taking any reasonable actions in response to COVID-19 or any COVID-19 Measures, and no such actions shall be deemed to violate or breach this Agreement in any way.

1.8.    Service Provider and Service Recipient each acknowledge the transitional nature of the Services, and Service Recipient agrees that it shall use commercially reasonable efforts to make a transition of each Service to its own internal organization or to obtain alternate third-party sources to provide the Services, and to migrate any Documents or other information comprising the Acquired Assets to Service Recipient, in each case as soon as reasonably possible following the Closing. Service Provider is not obligated to create any Documents or other information for Service Recipient or to provide them in a form or format other than the form or format in which they exist as of the Effective Date. Service Provider will provide the Documents and other information comprising Acquired Assets to Service Recipient in the formats and on media used by Service Provider, or native to the system in which such data or information resides. If Service Provider has any such information in an electronic format, Service Provider will deliver such information in such electronic format.

1.9.    For the avoidance of doubt, the Services do not include the rendering of any legal advice or opinion or the provision of any legal representation.

3

2.    Fees.

    2.1.   As consideration for the Services provided hereunder, Service Recipient shall pay to Service Provider a fee equal to:

        (a)    the amount of all wages, bonuses and commissions, employee benefits (including worker's compensation and healthcare benefits), and payroll taxes relating to employment or engagement of all employees, independent contractors or agents of Service Provider that are providing Services, and all direct and indirect costs and expenses for general and administrative expenses, including but not limited to office space, office supplies, equipment and all other overhead expenses of a similar nature, in each case based on the allocation of the time of such personnel spent providing the Services (relative to the other time spent by such personnel in providing services to Service Provider or its Affiliates other than the Services) and allocation of other such costs used in the performance of the Services (relative to the extent such costs are for the benefit of Service Provider or its Affiliates other than in respect of the Services) ("Service Costs"); *plus*

        (b)    an amount equal to 15% of the Service Costs (the "Surcharge"); *plus*

        (c)    any and all documented out-of-pocket expenses and costs, including Taxes incurred by or on behalf of Service Provider or any of its Subsidiaries in connection with the provision of the Services hereunder to the extent such expenses and costs are not otherwise included in the Service Costs (the "Reimbursable Expenses" and, collectively with the Service Costs and the Surcharge, the "Fees").  All out-of-pocket costs and expenses incurred by or on behalf of the Service Provider or its Affiliates in providing the Services that are not Service Costs shall be Reimbursable Expenses hereunder.

    The allocation of Service Costs set forth in clause (a) shall be monitored and recorded by Service Provider and provided to Service Recipient along with reasonable supporting information, and all records related to such allocation shall be available for audit or inspection by Service Recipient upon prior written reasonable request.

    2.2.   The Parties acknowledge and agree that on the Effective Date, the Service Recipient shall pay $[●][1] as the estimated Fees to be incurred hereunder (the "Budgeted Fees"). Service Provider shall use reasonable efforts to apprise Service Recipient of any material Reimbursable Expenses that were not contemplated as comprising the Budgeted Fees prior to incurrence of such Reimbursable Expenses; provided that this shall not be deemed to waive any right of Service Recipient to reasonably challenge whether an asserted expense that is not a Budgeted Fee qualifies as a Reimbursable Expense.

---

[1]    **Note to Draft**: Parties to reasonably cooperate in good faith to determine amount prior to Closing.

2.3.    Within ten (10) Business Days following the Termination Date of this Agreement, Service Provider shall provide to Service Recipient a report of the amounts of Service Costs and Reimbursable Expenses incurred by or on behalf of Service Provider in providing the Services during the Term (and reasonably detailed documentation evidencing such amounts), and if such actual Service Costs and Reimbursable Expenses are different from the aggregate amount of Budgeted Fees (after accounting for the Surcharge) paid to the Service Provider, including from the Designated Deposit Accounts pursuant to Section 3.2(a) (such aggregate amount, the "Prepaid Fees"), then the Parties shall work in good faith to reconcile the discrepancy, and the Service Provider shall pay to the Service Recipient (in the event such actual Fees are less than the Prepaid Fees) or the Service Recipient shall pay to the Service Provider (in the event such actual Fees exceed the Prepaid Fees), as applicable, the difference between such amounts as promptly as practicable, but in no event later than three (3) Business Days, after such reconciliation; provided that any and all Fees that are Taxes actually incurred by or on behalf of Service Provider or its Affiliates shall be the responsibility of Service Recipient, and shall be paid promptly after receipt by Service Recipient of a copy of such actual and documented Taxes.

2.4.    During the Term of this Agreement and for one month after the Termination Date, Service Recipient shall have the right, during normal business hours and on prior written notice to take such actions as are reasonably necessary to audit the amounts payable hereunder.

3.    Deposit and Application of Proceeds.

3.1.    If Service Provider receives proceeds from Service Recipient's customers intended for or on the account of Service Recipient (collectively, "Proceeds"), such Proceeds shall be collected by Service Provider and deposited into one or more segregated depository accounts designated by, and solely owned and in the name of, Service Provider, which accounts shall be used for the deposit of the Proceeds and the disbursement of amounts payable as Reimbursable Expenses hereunder (the "Designated Deposit Accounts").

3.2.    On each [Wednesday] during the Term, Service Provider and Service Recipient shall cooperate to jointly determine the Proceeds received during the prior week (i.e., Sunday through Saturday) and any additional Reimbursable Expenses that were not prepaid as Budgeted Fees and other deductions or offsets to the Proceeds, if any (the "Weekly Reconciliation"). Within five (5) Business Days after each Weekly Reconciliation, Service Provider shall disburse the Proceeds attributable to such Weekly Reconciliation from the Designated Deposit Accounts in the following order of priority: (a) to pay any Reimbursable Expenses incurred in excess of such amounts comprising the Budgeted Fees; and (b) to pay Service Recipient any remaining Proceeds.

3.3.    Within thirty (30) days after the end of the Term, or as soon as practicable thereafter, Service Provider and Service Recipient shall together work in good faith

to agree to a final, written reconciliation of the Proceeds (the "Final Reconciliation"), as a final settlement of accounts between Service Provider and Service Recipient. Within five (5) Business Days after the completion of the Final Reconciliation, Service Provider shall disburse the remaining Proceeds in the Designated Deposit Accounts based on the order of priority set forth in Section 3.2 above. During the Term and thereafter until completion of the Final Reconciliation, Service Provider and Service Recipient shall have reasonable access during normal business hours to the records of the other Party relating to: (1) the Reimbursable Expenses; (2) the Proceeds; and (3) records relating to Service Provider's provisions of the Services.

4.   Taxes. Service Recipient shall pay (or shall reimburse Service Provider for) all Taxes imposed on Service Provider or its Affiliates or that Service Provider or its Affiliates has any obligation to collect with respect to or relating to this Agreement, the Services or the performance by Service Provider of its obligations under this Agreement, other than income Taxes, gross receipt Taxes or similar Taxes imposed on the income or gross receipts of Service Provider. For the avoidance of doubt, such reimbursable Taxes include but are not limited to any value added, sales, use or excise Tax so long as such Taxes are properly evidenced and invoiced to Service Recipient. If additional amounts are determined to be due on the Services or the performance by Service Provider of its obligations under this Agreement, Service Recipient agrees to reimburse Service Provider for the additional amounts due from Service Provider including Tax, interest and penalty.

5.   Term and Termination.

5.1.   Term. This Agreement shall become effective on the Effective Date and, unless sooner terminated in accordance with the terms hereof, shall continue in effect until thirty (30) days after the Effective Date (the "Termination Date"), except as otherwise provided in this Section 5 (the "Term"). All Services will be terminated on the Termination Date, except as otherwise provided in this Section 5.

5.2.   Termination. This Agreement (or any of the individual Services) may be terminated earlier (and the Termination Date (with respect to such individual Services, if applicable) shall be effective as of such termination) in accordance with any of the following provisions:

(a)   By mutual written consent of the Parties;

(b)   By Service Recipient, upon fourteen (14) days' prior written notice given at any time to Service Provider, effective as of the date specified in such written notice; or

(c)   By Service Recipient pursuant to any Law, Order or limitations imposed by the Bankruptcy Court or any financing and funding matters related thereto;

5.3.   Effect of Termination. For the avoidance of doubt, Service Recipient may terminate any Services without terminating the entire Agreement. Upon termination of any or all Services in accordance with this Section 5, (a) Service Provider shall have no further obligation to provide the applicable terminated Services and (b) Service

6

Recipient will have no obligation to pay Reimbursable Expenses to the extent incurred with respect to actions taken in the provision of such terminated Services after such termination, other than for or in respect of steps already taken by Service Provider in the provision of such Services prior to such termination. Notwithstanding the foregoing, upon the termination of this Agreement, or upon the termination of all Services provided hereunder, Service Provider shall be entitled to prompt payment or reimbursement of, and Service Recipient shall promptly pay and reimburse Service Provider for, all amounts accrued (whether or not invoiced) or due hereunder as of the date of such termination.

5.4.    <u>Survival</u>. Notwithstanding the expiration or early termination of this Agreement or any Services hereunder, this <u>Section 5</u> and <u>Sections 7</u> through <u>16</u> will survive termination of this Agreement.

6.    <u>Intellectual Property</u>. Subject to the terms and conditions of this Agreement, and without limitation on the terms of the Purchase Agreement, during the Term, Service Recipient grants to Service Provider and Service Provider hereby accepts a limited, non-exclusive, non-sublicenseable, non-transferable and non-assignable right to use the Acquired Assets solely for the purposes of performing the Services in accordance with the terms of this Agreement. Service Provider acknowledges that except as provided in the Purchase Agreement, (a) it has no right, title or interest in or to the Acquired Assets, and (b) all rights, title and interest in or to the Acquired Assets, express or implicit, belong exclusively to Service Recipient.

7.    <u>Confidentiality</u>. Each Party (in such capacity, the "<u>Receiving Party</u>") acknowledges that it may have access to or otherwise receive certain information or data, regardless of whether it is in tangible form, concerning the business, plans, strategies, customers, technology, intellectual property, services, products and pricing ("<u>Confidential Information</u>") of the other Party (in such capacity, the "<u>Disclosing Party</u>") that is confidential, regardless of whether it is marked or identified as such. The terms and conditions of this Agreement will also be considered each Party's "Confidential Information" hereunder. Confidential Information is of substantial value to the Disclosing Party, which value would be impaired if it was disclosed to third parties. The Receiving Party shall (a) not use the Confidential Information except for internal use to perform its obligations under this Agreement, (b) not disclose Confidential Information other than to its directors, officers, employees, representatives and advisors who are required to have access to such Confidential Information in order to perform the Receiving Party's obligations under this Agreement, <u>provided</u> that such persons are directed to comply with the terms of this <u>Section 7</u> as if they were a Receiving Party hereunder, and <u>provided</u> <u>further</u> that the Receiving Party shall be responsible for any breach of such terms by such persons, and (c) protect the confidentiality of such Confidential Information and avoid disclosure and unauthorized use thereof. If a Receiving Party is requested pursuant to, or required by, applicable Law or legal process to make any disclosure of Confidential Information, it shall first provide the Disclosing Party with prompt written notice of such request or requirement in order to enable the Disclosing Party to seek an appropriate protective order or other remedy (and if the Disclosing Party seeks such an order, the Receiving Party shall provide such cooperation as the Disclosing Party shall reasonably request at the Disclosing Party's expense) and shall

consult with the Disclosing Party with respect to taking steps to resist or narrow the scope of such disclosure.

8.  <u>Dispute Resolution</u>. In the event of any dispute between the Parties with respect to the provision of any Service pursuant to this Agreement, each Party's Transition Manager shall attempt to resolve the dispute and each Transition Manager will use his or her commercially reasonable efforts to resolve the dispute promptly. If the Transition Managers are unable to resolve the dispute within five (5) Business Days of the submission of the dispute to them, the Parties hereby irrevocably consent to the exclusive jurisdiction of the Chosen Courts for the resolution of any such dispute. The failure of the Transition Managers to resolve a dispute pursuant to this <u>Section 8</u> shall not relieve a Party hereto of its obligations hereunder.

9.  <u>Indemnification; Scope of Liability</u>.

    9.1.  Service Recipient shall indemnify Service Provider and its Affiliates and each of their respective officers, directors, members, representatives, agents and employees against and hold them harmless from any Losses incurred by any such indemnified person to the extent resulting from the performance of Services by Service Provider or any of its Affiliates, other than any Losses resulting from the gross negligence, fraudulent or bad faith acts, or willful misconduct of Service Provider, as determined by a court of competent jurisdiction in a final and nonappealable judgment.

    9.2.  Except as otherwise specifically provided in this Agreement (and excluding the Fees and any other amounts payable by Service Recipient hereunder or under the Purchase Agreement or any claims arising under the Purchase Agreement), Service Provider acknowledges that its sole and exclusive monetary remedy with respect to any claims relating solely to this Agreement shall be pursuant to the terms of this <u>Section 9</u>. In furtherance of the foregoing, Service Provider and Service Recipient each hereby waives, each on behalf of itself and its respective Affiliates and indemnified parties hereunder, from and after the Closing, any and all rights, claims and causes of action they may otherwise have against Service Provider or any other party arising under or based upon Law or otherwise to the extent relating to this Agreement. To the maximum extent permitted by applicable Law, in no event shall any Loss for which indemnification is provided under this <u>Section 9</u> include consequential, lost profits, special, punitive, incidental or indirect damages.

10. <u>Independent Contractor</u>. The Parties hereto understand and agree that this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever. No Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever. The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Service Recipient in all respects, including the provision of the Services, that Service Provider is solely responsible for its own employees and permitted contractors and that the Parties are not partners, joint venturers, employees or agents of or with each other.

11.   Force Majeure. In the event that performance of any Service is interrupted, or performance of any terms or provisions of this Agreement (except for the payment of any Fees or any other amounts payable by Service Recipient hereunder) is delayed or prevented, in whole or in part, because of or related to compliance with any Order or Law, or because of riots, war, public disturbance, pandemic (including COVID-19 and any policy, procedure or protocol of Service Provider or its Affiliates in response to COVID-19 or any COVID-19 Measures), strike, labor dispute, fire, explosion, storm, flood, earthquake, acts of God, acts of terrorism, unavailability of supplies, major breakdown or failure of transportation, manufacturing, distribution or storage facilities, or for any other reason that is not within the control of the Service Provider (each, a "Force Majeure Event"), then upon prompt written notice to the Service Recipient providing reasonable detail as to the nature of such Force Majeure Event, the Service Provider shall be excused from its obligations hereunder so long as such Force Majeure Event continues, and no liability shall attach against the Service Provider on account thereof.

12.   Entire Agreement. This Agreement and the Purchase Agreement (in each case, to the extent referenced herein) constitute the entire agreement of the Parties with respect to the subject matter hereof, and supersede all prior agreements, understandings and negotiations, both written and oral, between the Parties with respect to the subject matter hereof.

13.   Amendment; Waiver. Any provision of this Agreement may be (a) amended only in a writing signed by Service Provider and Service Recipient or (b) waived only in a writing executed by the person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

14.   Assignment. Neither Party may, directly or indirectly, in whole or in part, by operation of law or otherwise, assign or transfer this Agreement without the other Party's prior written consent. Any attempted assignment, transfer or delegation without such prior written consent will be void. This Agreement will be binding upon and inure to the benefit of the Parties and their permitted successors and assigns.

15.   Annexes. Annex A shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein. In the event of any inconsistency between the terms of Annex A and the terms set forth in the main body of this Agreement, the terms of this Agreement shall govern.

16.   Other Agreements. This Agreement is not intended to amend or modify, and should not be interpreted to amend or modify in any respect the rights and obligations of Service Provider and Service Recipient under the Purchase Agreement. Sections 10.3, 10.6, 10.7, 10.8, 10.9, 10.13, 10.14, 10.15, 10.19 and 11.3 of the Purchase Agreement are hereby incorporated by reference and shall apply *mutatis mutandis* to the terms of this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

<u>**SERVICE RECIPIENT**</u>

**AMERICAN CEMENTING, LLC**

By: _____
Name: _____
Title: _____

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

<u>**SERVICE PROVIDER**</u>

**BJ SERVICES, LLC**

By: _____

Name: _____

Title: _____

## <u>ANNEX A</u>

## TRANSITION SERVICES

| Service | Service Description |
|---|---|
| Microsoft BDX | ERP software managed by Infosys, supports apps used in day-to-day operations. Company to provide access to all relevant BDX files related to Cementing division and facilitate transfer of files. |
| Coupa | Company to provide access to all relevant files contained on the Coupa module related to Cementing division and facilitate transfer of files. |
| Infosys | Primary ERP software infrastructure manager for day-to-day operations. Company to provide access to Infosys and appropriate personnel to facilitate access and transfer of data to Service Recipient system. |
| OFS | Application built on top of BDX infrastructure used for day-to-day operations of Cementing and Frac segments. Company to provide access to OFS data and personnel to facilitate access and transfer to Service Recipient system. |
| ARMS | Database software and application used for Cementing segment operations. Company to provide access to ARMS data and personnel to facilitate access and transfer to Service Recipient system. |
| Intellix | Third-party safety data and reporting software. Company to provide access to Intellix data and personnel to facilitate access and transfer to Service Recipient system or account. |
| OneStream | Software utilized by Financial reporting teams. Company to provide access to OneSteam data and personnel to facilitate access and transfer to Service Recipient system. |
| Workday | Third party payroll provider. Company to provide access to Workday data and personnel to facilitate access and transfer to Service Recipient accounts. |
| OrbCom | Third party service for Department of Transportation safety data management. Company to provide access to OrbComb historical data and personnel to facilitate access and transfer to Service Recipient accounts. |
| Phone/Internet | AT&T business account shared across BJ Services. Company to provide access to AT&T accounts to facilitate transfer of data to Service Recipient accounts. |

*Annex A - Transition Services Agreement*

| Service | Service Description |
|---|---|
| Concur | Third-party expense account management. Company to provide access to Concur data and personnel to facilitate access and transfer to Service Recipient account. |
| Drug Testing | Third party management of drug-testing. Company to provide access to Drug Testing data and personnel to facilitate access and transfer to Service Recipient account. |
| Microsoft 360 | Microsoft office suite and filing management suite via SharePoint or OneDrive. Company to facilitate access and transfer to Service Recipient account. |
| ARMS | Cementing specific ERP. Company to facilitate access and transfer to Service Recipient account. |
| Curistec | Lab database. Company to facilitate access and transfer to Service Recipient account. |
| Cemfacts | Primary cementing design software. Company to facilitate access and transfer to Service Recipient account. |
| Department of Transportation Records | Company to facilitate access and transfer to Service Recipient account. |

*Annex A - Transition Services Agreement*

## AMENDMENT TO ASSET PURCHASE AGREEMENT

THIS AMENDMENT TO ASSET PURCHASE AGREEMENT (this "Amendment") is made to be effective as of the 19th day of August, 2020, by and between BJ Services, LLC, a Delaware limited liability company ("Seller") and American Cementing, LLC, a Delaware limited liability company ("Purchaser" and together with Seller, collectively, the "Parties"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in that certain Asset Purchase Agreement by and among the Parties and dated as of August 6, 2020 (the "Agreement").

## RECITALS:

WHEREAS, the Parties entered into the Agreement on August 6, 2020; and

WHEREAS, in accordance with Section 10.5 of the Agreement, the Parties desire to amend the Agreement as provided herein.

## AGREEMENT:

NOW, THEREFORE, in consideration of the premises and of the mutual promises herein contained, the Parties, intending to be legally bound, hereby agree as follows:

1.      Section 2.1(a)(v) of the Agreement is hereby amended and restated in its entirety to read as follows:

"(v)      $29,900,000 shall be deemed to be in consideration for all Core Equipment;"

2.      Section 2.1(a) of the Agreement is hereby amended to include the following new Section 2.1(a)(vi):

"(vi)      the Cash Payment less the amounts set forth in Sections 2.1(a)(i) – (v) shall be deemed to be in consideration for all other Acquired Assets for which an allocation is not made hereunder."

3.      The reference to "August 17, 2020" in Section 8.1(c) of the Agreement is hereby amended to read "August 21, 2020 (or such other date as is mutually agreed to by the Parties in writing, email being sufficient)".

4.      Section 8.1(k) of the Agreement is hereby amended and restated in its entirety to read as follows:

"(k)      by written notice from Purchaser to the Company, if Purchaser is not the Successful Bidder at the Auction; provided that Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 8.1(k) until on or after September 4, 2020, and, notwithstanding Purchaser not having been the Successful Bidder at the Auction, until such time (if any) as Purchaser terminates this Agreement pursuant to this Section 8.1(k), the obligations of Purchaser to consummate the transactions contemplated by this Agreement shall remain unaffected by

Purchaser's right to terminate this Agreement pursuant to this <u>Section 8.1(k)</u>. Notwithstanding anything to the contrary in the Bidding Procedures Order, Purchaser's right to terminate the Agreement under this provision shall not be impaired if Purchaser is selected as the Backup Bidder."

5.      <u>Schedule 1.1(e)</u> of the Agreement is amended by deleting <u>Schedule 1.1(e)</u> in its entirety and replacing it with <u>Schedule 1.1(e)</u> attached hereto.

6.      Except as expressly provided herein, the terms of the Agreement (including all Exhibits and Schedules thereto) shall remain in full force and effect without modification and are hereby ratified and affirmed.  Upon the effectiveness of this Amendment, each reference in the Agreement and each reference in the Agreement (in each case including all Exhibits and Schedules thereto) to "this Agreement," "hereunder," "hereof," "herein" or words of similar import shall mean and be a reference to the Agreement (including all Exhibits and Schedules thereto, as applicable) as modified by this Amendment.  This Amendment shall be governed by all provisions of the Agreement, unless the context otherwise requires, including all provisions concerning enforcement, notices, governing law and venue. Any conflict between the provisions of this Amendment and the Agreement shall be controlled by the provisions of this Amendment.

7.      This Amendment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument.  This Amendment may be executed by facsimile, pdf or other electronic signature, which shall be valid for all purposes.

[Signature Page Follows]

## Schedule 1.1(e)

### Equipment

[*See Attached Equipment List*.]

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1232086 | SUB-035 | Forklift | Body Load | Auxilary | FORKLIFT | | | Fork Lift | | | CPG1B2-9E0195 |
| 1232087 | SUB-039 | Forklift | Body Load | Auxilary | FORKLIFT | | | Fork Lift | | | W1F4-960120 |
| 1232088 | SUB-040 | Forklift | Body Load | Auxilary | FORKLIFT | | | Fork Lift | | | YG1F2-9M0507 |
| 1232089 | SUB-041 | Forklift | Body Load | Auxilary | FORKLIFT | | | Fork Lift | | | YG1F2-9M0508 |
| 1232106 | TRB-607 | Maintenance Truck | Tractor | Tractor | MAINT TRUCK PETE 330 ISC | | Peterbilt | | 335 | 2008 | 2NPLHN7X98M750588 |
| 1232111 | FUB-006 | Utility | Body Load | Auxilary | STAKEBED TANDEM ISC | | Peterbilt | | 340 | 2009 | 2NPRLN9X99M750629 |
| 1232131 | TRB-601 | Tractor | Tractor | Tractor | STAKEBED TANDEM ISC | | Peterbilt | | 348 | 2011 | 2NP3LN9XXBM116855 |
| 1232137 | TRB-602 | Tractor | Tractor | Tractor | STAKEBED TANDEM ISC | | Peterbilt | | 335 | 2007 | 2NPLLZ9X27M663584 |
| 1232138 | TRB-722 | Maintenance Truck | Tractor | Tractor | MAINT TRUCK PETE 330 ISC | | Peterbilt | | 335 | 2007 | 2NPLHZ7X37M669155 |
| 1232156 | | Consumable | Fixed | | PIPING INSTRUMENTATION & CENTR | | | | | | |
| 1232157 | CTS-383 | Silo | Skid | Auxilary | LIBERTY SILOS 16309 | | | | | | 6500C049 |
| 1232158 | CTS-384 | Silo | Skid | Auxilary | LIBERTY SILOS 16310 | | | | | | |
| 1232159 | CTS-385 | Silo | Skid | Auxilary | LIBERTY SILOS 16311 | | | | | | |
| 1232160 | CTS-386 | Silo | Skid | Auxilary | LIBERTY SILOS 16312 | | | | | | |
| 1232161 | CTS-387 | Silo | Skid | Auxilary | LIBERTY SILOS 16313 | | | | | | |
| 1232162 | CTS-388 | Silo | Skid | Auxilary | LIBERTY SILOS 16314 | | | | | | 38011 |
| 1232163 | | Consumable | Fixed | | PIPING INST.& CONTROL | | | | | | |
| 1232164 | | Silo | Fixed | | SILO SLAB | | | | | | |
| 1232174 | CTS-085 | Silo | Skid | Auxilary | 1000 CU FT CEMENT SILO | | | | | | |
| 1232175 | CTS-086 | Silo | Skid | Auxilary | 1000 CU FT CEMENT SILO | | | | | | |
| 1232176 | CTS-087 | Silo | Skid | Auxilary | 1000 CU FT CEMENT SILO | | | | | | |
| 1232177 | CTS-088 | Silo | Skid | Auxilary | 1000 CU FT CEMENT SILO | | | | | | |
| 1232179 | CTS-089 | Silo | Skid | Auxilary | 1000 CU FT CEMENT SILO | | | | | | |
| 1232319 | | Cranes | Fixed | | 6 1/2 TON OVERHEAD CRANE | | | | | | K0-56313 |
| 1232368 | | Shop Equipment | Fixed | | ALKOTA HOT PRESSURE WASHER | | | | | | |
| 1232376 | | Lab Eq | Fixed | | OIL & LUBE SHOP | | | | | | |
| 1232379 | | Lab Eq | Fixed | | OIL / WATER SEPARATOR | | | | | | |
| 1232387 | | Lab Eq | Fixed | | OIL / WATER SEPARATOR | | | | | | |
| 1232392 | | Bulk Plant | Fixed | | REBUILD BULK PLANT COMPRESSORS | | | | | | |
| 1232410 | | Misc | Fixed | | INTERSYSTEMS CEMENT SAMPLER | | | | | | |
| 1232411 | CTS-091 | Silo | Skid | | 970 CU FT CEMENT SILO | | | | | 1981 | BJ6500A844 |
| 1232412 | CTS-092 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | | | | | 6500A845 |
| 1232413 | CTS-093 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | | | | | 1446 |
| 1232415 | CTS-094 | Silo | Skid | Auxilary | 1300 GAL PORTABLE CEMENT SILO | | | | | | BJ6500B191 |
| 1232416 | CTS-095 | Silo | Skid | Auxilary | 1300 GAL PORTABLE CEMENT SILO | | | | | | BJ6500B192 |
| 1232419 | CTS-098 | Silo | Skid | Auxilary | 1300 GAL PORTABLE CEMENT SILO | | | | | | BJ6500B196 |
| 1232421 | CTS-100 | Silo | Skid | Auxilary | 1300 GAL PORTABLE CEMENT SILO | | | | | | BJ6500B198 |
| 1232424 | CTS-103 | Silo | Skid | Auxilary | 1300 GAL PORTABLE CEMENT SILO | | | | | | 1481 |
| 1232425 | CTS-104 | Silo | Skid | Auxilary | 1300 GAL PORTABLE CEMENT SILO | | | | | | 1497 |
| 1232431 | CTS-109 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | | | | | S8 |
| 1232433 | CTS-111 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | | | | | 6500B276 |
| 1232445 | CTS-357 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | | | | | 1003-18 |
| 1232449 | CTS-115 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | | | | | BJ6500B281 |
| 1232451 | CTS-116 | Silo | Skid | Auxilary | 1300 CU FT CEMENT SILO | | | | | | 6492 |
| 1232456 | CTS-354 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | | | | | 1003-23 |
| 1232457 | CTS-355 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | | | | | 1003-24 |
| 1232458 | CTS-356 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | | | | | 1003-41 |
| 1232459 | CTS-120 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | | | | | BJ65008842 |
| 1232460 | | Misc | Fixed | Fixed Asset | ASSY BLOWER, GARDNER DENVER | | | | | | |
| 1232486 | CTS-122 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD | | | | | | 4216 |
| 1232487 | CTS-123 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD | | | | | | 6500c365 |
| 1232489 | CTS-124 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD | | | | | | BJ6500C369 |
| 1232490 | CTS-125 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD | | | | | | BJ6500C382 |
| 1232520 | | Silo | Fixed | | SILO MICRO-CELL STRAIN | | | | | | AF1473 |
| 1232536 | | Silo | Fixed | | 2200 CU FT CEMENT SILO | | | | | | |
| 1232541 | | Lab Eq | Fixed | | UCA CELL | | | | | | 873 |
| 1232544 | | Lab Eq | Fixed | | CONSTANT SPEED CEMENT MIXER | | | | | | 175 |
| 1232551 | | Lab Eq | Fixed | | UCA CELL | | | | | | |
| 1232569 | | Lab Eq | Fixed | | MODEL 7 CONSISTOMETER | | | | | 466L | |
| 1232573 | | Lab Eq | Fixed | | STIRRING FLUID LOSS CELL | | | | | | 401 |
| 1232591 | | Lab Eq | Fixed | | UCA CELL | | | | | | 106 |
| 1232592 | | Lab Eq | Fixed | | UCA CELL | | | | | | 188 |
| 1232594 | | Lab Eq | Fixed | | CONSISTOMETER UPGRADE | | | | | | 239 |
| 1232607 | | Lab Eq | Fixed | | UCA CELLS - CEMENT TESTING | | | | | | 158 |
| 1232625 | | Lab Eq | Fixed | | CONSISTOMETER UPGRADE TO MAG | | | | | | |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1232628 | | Lab Eq | Fixed | | UCA HARDWARE & SOFTWARE | | | | | | |
| 1232630 | | Lab Eq | Fixed | | DUAL CELL CONSISTOMETER | | | | | | 140 |
| 1232634 | | Lab Eq | Fixed | | CHANDLER CONSISTOMETER | | | | | | 353 |
| 1232636 | | Lab Eq | Fixed | | STIRRED FLUID LOSS CELL | | | | | | SF1 |
| 1232646 | | Lab Eq | Fixed | | DUAL CELL CONSISTOMETER | | | | | | 136 |
| 1232647 | | Lab Eq | Fixed | | REBUILT HALLIBURTON UCA | | | | | | 155 |
| 1232648 | | Lab Eq | Fixed | | UPGRADE/REBUILT UCA | | | | | | 156 |
| 1232649 | | Lab Eq | Fixed | | UPGRADE/REBUILT UCA | | | | | | 158 |
| 1232651 | | Lab Eq | Fixed | | REBUILT UCA | | | | | | 159 |
| 1232652 | | Lab Eq | Fixed | | CONSISTOMETER CHILLER | | | | | | |
| 1232655 | | Lab Eq | Fixed | | STIRRING FLUID LOSS CELL | | | | | | 238 |
| 1232659 | CTS-129 | Silo | Skid | Auxilary | 970 CU.FT.BULK CEMENT SILO | | | | | | BJ6800L443 |
| 1232660 | CTS-130 | Silo | Skid | Auxilary | 970 CU.FT.BULK CEMENT SILO | | | | | | BJ6800L444 |
| 1232667 | | Lab Eq | Fixed | | DUAL CELL MODEL 8 CONSISTOMETE | | | | | | 166 |
| 1232673 | | Lab Eq | Fixed | | MODEL 4002 DUAL CONSISTOMETER | | | | | | 138 |
| 1232674 | | Coil | Fixed | | CTE 40-600 HTHP CONSISTOMETER | | | | | | 187 |
| 1232680 | | Consumable | Fixed | | DIGITAL SCALES/AUTOMATED LOAD | | | | | | |
| 1232682 | | Lab Eq | Fixed | | HPHT CONSISTOMETER | | | | | | 613 |
| 1232683 | | Lab Eq | Fixed | | HPHT CONSISTOMETER | | | | | | 611 |
| 1232706 | | Lab Eq | Fixed | | ASSY, UCA, 5000 PSI | | | | | | 166 |
| 1232707 | | Lab Eq | Fixed | | ASSY, UCA, 5000 PSI | | | | | | 165 |
| 1232708 | | Lab Eq | Fixed | | DUAL CELL UCA MACHINE | | | | | | 448 |
| 1232711 | | Lab Eq | Fixed | | ULTRASONIC CEMENT ANALYZER | | | | | | 169 |
| 1232714 | | Lab Eq | Fixed | | DUAL CELL UCA | | | | | | 466 |
| 1232726 | | Lab Eq | Fixed | | CONSISTOMETER REBUILD | | | | | | 142 |
| 1232740 | | Lab Eq | Fixed | | DUAL CELL CONSISTOMETER | | | | | | 186 |
| 1232748 | | Lab Eq | Fixed | | CONSISTOMETER CHILLER | | | | | | |
| 1232818 | | Lab Eq | Fixed | | Consistometer HPHT | | Chandler | | 7322 | 2012 | 614 |
| 1232819 | | Lab Eq | Fixed | | Consistometer HPHT | | Chandler | | 7322 | 2012 | 615 |
| 1232820 | | Lab Eq | Fixed | | CHANDLER UCA TWIN CELL SYSTEM | | | | | | 467 |
| 1232831 | | Lab Eq | Fixed | | Ultra Sonic Cement Analyzer | | | | | | H14 |
| 1232832 | | Lab Eq | Fixed | | ATMOSPHERIC CONSISTOMETER | | | | | | AC1 |
| 1232838 | | Lab Eq | Fixed | | MODEL 200 ATMOSPHERIC | | | | | | AC2 |
| 1232839 | | Lab Eq | Fixed | | MODEL 200 ATMOSPHERIC | | | | | | AC3 |
| 1232840 | | Lab Eq | Fixed | | LOW PRESSURE VESSELS FOR UCA | | | | | | 159 |
| 1232841 | | Lab Eq | Fixed | | LOW PRESSURE VESSELS FOR UCA | | | | | | 156 |
| 1232853 | | Lab Eq | Fixed | | STIRRED FLUID LOSS CELL | | | | | | SF2 |
| 1232854 | | Lab Eq | Fixed | | DUAL CELL CONSISTOMETER | | | | | | |
| 1232857 | | Lab Eq | Fixed | | DUAL CONSISTOMETER | | | | | | 785 |
| 1232915 | | Bulk Plant | Fixed | | ACID BLD & BULK CEMENT BLD | | | | | 2006 | 79187970 |
| 1232936 | TRH-1822 | Tractor | Tractor | Tractor | STAKEBED TANDEM ISC | | Peterbilt | | 335 | 2006 | 2NPLLZ9X36M646176 |
| 1232940 | TRB-752 | Tractor | Tractor | Tractor | STAKEBED TANDEM ISC | | Peterbilt | | 335 | 2007 | 2NPLLZ9X77M663581 |
| 1232951 | | Land | Fixed | | 2.435 ACRES LIBERTY TEXAS | | | | | | |
| 1232995 | | Light Duty Vehicle | Body Load | Auxilary | PICKUP SUPCREW 4X4 XLT 11 F150 | | Ford | | F-150 | 2011 | 1FTFW1EF3BFB85446 |
| 1232996 | FUF-290 | Utility | Trailer | Auxilary | PICKUP F350 DIE C/C | | Ford | | F-350 | | |
| 1232997 | | Lab Eq | Fixed | | LAB EQ PRESS CONSISTOMETER | | | | | | 1309 |
| 1232999 | | Lab Eq | Fixed | | LAB MOD 50C VISCOMETER | | | | | | 91056620 |
| 1233000 | | Lab Eq | Fixed | | LAB MOD 50C VISCOMETER | | | | | | 92128608 |
| 1233006 | CTS-137 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | WILCO | | 1300 CU FT | 2012 | 5774 |
| 1233008 | CTS-139 | Silo | Skid | Auxilary | 970 CF SKD FIELD SILO | | | | | | |
| 1233009 | CTS-140 | Silo | Skid | Auxilary | 970 CF SKD FIELD SILO | | | | | | BJB73019 |
| 1233019 | CTS-149 | Silo | Skid | Auxilary | 970 CF SKD FIELD SILO | | | | | | BJB73124 |
| 1233020 | CTS-150 | Silo | Skid | Auxilary | 970 CF SKD FIELD SILO | | | | | | |
| 1233021 | CTS-151 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | S F COMPANY | | 1300 CU FT | 1978 | 456 |
| 1233022 | CTS-152 | Silo | Skid | Auxilary | 970 CF SKD FIELD SILO | | | | | | BJB73162 |
| 1233026 | CTS-156 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | CLC | | 1300 CU FT | 2007 | 1499 |
| 1233027 | CTS-157 | Silo | Skid | Auxilary | 1300 CU FT SKIDFIELD SI | | | | | | |
| 1233029 | CTS-159 | Silo | Skid | Auxilary | 970 CU FT BULK TANK | | | | | | BJB73263 |
| 1233031 | CTS-161 | Silo | Skid | Auxilary | SILO, 970 CU FT | | | | | | BJB73271 |
| 1233033 | CTS-163 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | WILCO | | 1300 CU FT | 2012 | 6194 |
| 1233034 | CTS-164 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | WILCO | | 1300 CU FT | 2012 | 6169 |
| 1233035 | CTS-165 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | WILCO | | 1300 CU FT | 2012 | 6371 |
| 1233036 | CTS-166 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | WILCO | | 1300 CU FT | 2012 | 6372 |
| 1233038 | CTS-168 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | | | | | |
| 1233039 | CTS-169 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | | | | | 6195 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1233040 | | Shop Equipment | Fixed | | DUST COLLECTOR | | | | | | |
| 1233043 | CTS-170 | Silo | Skid | Auxlary | SILO, 1300 CU FT | | MIDCAB | | 1300 CU FT | 1981 | BJ422 |
| 1233045 | | Air Compressor | Fixed | | AIR COMPRESSOR SKID | | | | | | |
| 1233049 | CTS-172 | Silo | Skid | Auxlary | 1300 CFT SILO | | | | | | |
| 1233052 | | Silo | Fixed | | 2200 CUBIC FT CMT SILO | | | | | | |
| 1233059 | CTS-175 | Silo | Skid | Auxlary | 970 CU FT SKD SILO | | | | | | 6599 |
| 1233061 | CTS-177 | Silo | Skid | Auxlary | 970 CU FT SKD SILO | | | Wilco | | | 5782 |
| 1233063 | CTS-394 | Silo | Skid | Auxlary | 1100 CU FT SKD SILO | | | | | | BJ120 |
| 1233064 | CTS-179 | Silo | Skid | Auxlary | 1300 CU FT SKD SILO | | | | | | 541 |
| 1233065 | CTS-180 | Silo | Skid | Auxlary | 950CF CMNT. FIELD BIN | | | | | | |
| 1233066 | CTS-181 | Silo | Skid | Auxlary | 970 CFT FIELD SILO | | | | | | BJBJ266 |
| 1233067 | CTS-182 | Silo | Skid | Auxlary | 970 CFT FIELD SILO | | | | | | BJBJ267 |
| 1233068 | CTS-395 | Silo | Skid | Auxlary | 1100CF CMNT FIELD BIN | | | | | | BJ268 |
| 1233069 | CTS-184 | Silo | Skid | Auxlary | 950CF CMNT FIELD BIN | | | | | | |
| 1233075 | CTS-186 | Silo | Skid | Auxlary | 1300 CU FT SKD SILO | | | | | | 3248 |
| 1233076 | CTS-187 | Silo | Skid | Auxlary | 970 CU FT SKD SILO | | | | | | |
| 1233077 | CTS-188 | Silo | Skid | Auxlary | 970 CU FT SKD SILO | | | | | | BJBJ599 |
| 1233080 | CTS-191 | Silo | Skid | Auxlary | 970 CU FT SKD SILO | | | | | | BJBJ603 |
| 1233081 | CTS-192 | Silo | Skid | Auxlary | 970 CU FT SKD SILO | | | | | | BJBJ604 |
| 1233090 | CTS-195 | Silo | Skid | Auxlary | SILO, 1300 CU FT | | WILCO | | 1300 CU FT | 2011 | 5028 |
| 1233107 | | Lab Eq | Fixed | | PC-10 PORTABLE CONSISTOMETER | | | | | | RP129 |
| 1233108 | | Facilities | Fixed | | Alvin Office Equip/Furn | | | | | | |
| 1233115 | CTS-197 | Silo | Skid | Auxlary | SILO, 1300 CU FT | | WILCO | | 1300 CU FT | 2012 | 5772 |
| 1233170 | FUF-176 | Utility | Trailer | Auxlary | Large BBQ Trailer w/Canopy | | Shopbuilt | | Blank | 1981 | TST435114SPLA |
| 1233193 | FUF-178 | Utility | Trailer | Auxlary | Double Axle-22 ft Utility Trai | | R & J Trailer | | TRL | 1993 | RJT510000401 |
| 1233228 | SUB-031 | Forklift | Body Load | | FORKLIFT | | | Fork Lift | | | |
| 1233239 | SUB-033 | Forklift | Body Load | | FORKLIFT | | | Fork Lift | | | |
| 1233249 | TRB-244 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X6CD137433 |
| 1233250 | CUT-006 | Utility | Trailer | Auxlary | COMPRESSOR TRAILER | | American | | UV16 | 2011 | 17YBP1627BB046476 |
| 1233255 | FUF-179 | Utility | Trailer | Auxlary | TRAILER UTILITY | | Texas Bragg | | ED16 | 1997 | ST580631SPLA |
| 1233272 | FUF-289 | Utility | Trailer | Auxlary | TRAILER UTILITY | | | | | 1981 | 000000000H0002308 |
| 1233286 | CUF-014 | Utility | Trailer | Auxlary | Cementing - C-Pump/Boost-Skid | 0 | Utility | | TS | 1981 | 128121246 |
| 1233294 | CBF-056 | Batch Mixer | Trailer | Auxlary | SKID BATCH MIX | | | | | | |
| 1233295 | CBF-022 | Batch Mixer | Trailer | Auxlary | SKID BATCH MIX | | | | | | 381210 |
| 1233316 | TRH-1388 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X77D735890 |
| 1233330 | TRH-469 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X48D740016 |
| 1233381 | TRH-412 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X18D740040 |
| 1233385 | TRH-455 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X98D740044 |
| 1233394 | TRH-596 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X08D739882 |
| 1233411 | TRW-164 | Tractor | Tractor | Tractor | TRACTOR,WINCH ISX 6X4 PB 213WB | | Peterbilt | | 367 | 2008 | 1XPTD49X08D739896 |
| 1233417 | TRW-054 | Tractor | Tractor | Tractor | TRACTOR WINCH W/HYD ISX | | Peterbilt | | 367 | 2008 | 1XPTD49XX8D739971 |
| 1233422 | TRH-1837 | Tractor | Tractor | Tractor | TRACTOR HYD-V ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X38D739889 |
| 1233429 | TRH-1974 | Tractor | Tractor | Tractor | TRACTOR,CONV HYD5 ISX 6X4 PB 2 | | Peterbilt | | 367 | 2008 | 1XPTD49X98D740058 |
| 1233447 | TRH-1972 | Tractor | Tractor | Tractor | TRACTOR,CONV HYD2 ISX 6X4 PB 2 | | Peterbilt | | 367 | 2008 | 1XPTD49X18D739888 |
| 1233449 | TRH-551 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X78D739894 |
| 1233450 | TRH-651 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X98D739895 |
| 1233455 | TRH-600 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X18D739986 |
| 1233456 | TRH-502 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X38D739987 |
| 1233462 | TRH-652 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 384 | 2008 | 1XPVMRDX8D740065 |
| 1233470 | TRB-351 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X28D739916 |
| 1233476 | TRB-352 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X38D739998 |
| 1233479 | TRB-353 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X28D740001 |
| 1233490 | TRB-354 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X08D740013 |
| 1233491 | TRB-108 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X08D740014 |
| 1233492 | TRB-220 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X28D740015 |
| 1233493 | TRB-355 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X38D740069 |
| 1233495 | TRB-256 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X18D740071 |
| 1233496 | TRB-356 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X38D740072 |
| 1233521 | TRB-229 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X88D739922 |
| 1233524 | TRB-230 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X38D739925 |
| 1233528 | TRB-110 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X08D739929 |
| 1233530 | TRB-177 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X98D739931 |
| 1233532 | TRB-167 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X28D739933 |
| 1233533 | TRB-168 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49XX8D740103 |
| 1233535 | TRB-179 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X38D740105 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1233555 | CUB-007 | Silo Setter | Tractor | Tractor | FIELD BIN SET TRUCK ISX | | Peterbilt | | 367 | 2008 | 1NPTL49X98D740249 |
| 1233562 | TRH-607 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X38D740122 |
| 1233564 | TRH-504 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X78D740124 |
| 1233570 | TRH-608 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X48D740131 |
| 1233611 | TRH-1474 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2008 | 1XPTD49X58D740168 |
| 1233638 | TRH-563 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X99D740224 |
| 1233686 | TRH-1882 | Tractor | Tractor | Tractor | TRACTOR HYD-VII ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X55D773351 |
| 1233695 | TRH-623 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X39D773362 |
| 1233723 | TRB-357 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X59D773396 |
| 1233724 | TRB-169 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X79D773397 |
| 1233725 | TRB-237 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X99D773398 |
| 1233726 | TRB-428 | Tractor | Tractor | Tractor | TRACTOR,COMPR ISX 6X4 PB 232WB | | Peterbilt | | 367 | 2009 | 1XPTD49X09D773399 |
| 1233727 | TRB-180 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X39D773400 |
| 1233753 | TRB-125 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X89D773425 |
| 1233754 | TRB-260 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X29D773419 |
| 1233758 | TRB-633 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X39D773445 |
| 1233768 | TRB-170 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X79D773460 |
| 1233771 | TRB-382 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X55D773463 |
| 1233780 | TRB-171 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X09D773457 |
| 1233781 | TRB-172 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X19D773458 |
| 1233782 | TRB-173 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X39D773459 |
| 1233789 | TRH-572 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X49D773423 |
| 1233814 | TRB-262 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X09D773502 |
| 1233817 | TRH-1477 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X99D773488 |
| 1233823 | TRB-263 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X79D773481 |
| 1233850 | TRH-517 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X90D788931 |
| 1233884 | TRH-442 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX | | Peterbilt | | 367 | 2009 | 1XPTD49X79D788918 |
| 1233888 | CUB-014 | Silo Setter | Tractor | Tractor | FIELD BIN SET TRUCK ISX | | Peterbilt | | 367 | 2009 | 1NPTL49X39D773538 |
| 1233904 | TRH-777 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2011 | 1XPTD49X2BD116979 |
| 1233945 | TRB-238 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2011 | 1XPTD49X2BD117016 |
| 1233958 | TRH-941 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2011 | 1XPTD49X3BD117008 |
| 1233976 | TRB-267 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2011 | 1XPTD49X7BD117061 |
| 1233983 | TRH-982 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2011 | 1XPTD49X0BD117063 |
| 1233986 | TRH-983 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2011 | 1XPTD49X2BD117064 |
| 1234001 | TRH-845 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2011 | 1XPTD49X0BD117077 |
| 1234029 | TRH-1095 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2011 | 1XPTD49X5BD117107 |
| 1234034 | TRH-1050 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2011 | 1XPTD49X9BD117112 |
| 1234068 | TRS-272 | Tractor | Tractor | Tractor | TRACTOR UNIVERSAL ISX | | Peterbilt | | 367 | 2011 | 1XPTD49X5BD117141 |
| 1234078 | CUB-015 | Silo Setter | Tractor | Tractor | FIELD BIN SET TRUCK ISX | | Peterbilt | | 367 | 2011 | 1NPTL40X3BD123143 |
| 1234081 | CUB-024 | Silo Setter | Tractor | Tractor | FIELD BIN SET TRUCK ISX | | Peterbilt | | 367 | 2011 | 1NPTL40X5BD123144 |
| 1234088 | TRH-887 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2011 | 1XPTD49X1BD123163 |
| 1234089 | TRH-888 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2011 | 1XPTD49X9BD123170 |
| 1234096 | TRB-174 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2011 | 1XPTD49X4BD123173 |
| 1234105 | TRB-181 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2011 | 1XPTD49X6BD123174 |
| 1234125 | TRW-067 | Tractor | Tractor | Tractor | TRACTOR WINCH W/HYD ISX | | Peterbilt | | 367 | 2011 | 1XPTD49X5BD123179 |
| 1234126 | TRB-175 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2011 | 1XPTD49X2BD123186 |
| 1234127 | TRB-182 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2011 | 1XPTD49X3BD123228 |
| 1234128 | TRW-081 | Tractor | Tractor | Tractor | TRACTOR WINCH W/HYD ISX | | Peterbilt | | 367 | 2011 | 1XPTD49X8BD123181 |
| 1234145 | TRH-999 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2011 | 1XPTD49X4BD123223 |
| 1234152 | TRH-1559 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X46D656160 |
| 1234171 | TRB-407 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X7D656231 |
| 1234176 | TRB-111 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X37D656264 |
| 1234178 | TRB-223 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X57D656282 |
| 1234201 | TRH-1351 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X07D656285 |
| 1234211 | TRH-1681 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X57D656198 |
| 1234223 | TRH-1483 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X47D656256 |
| 1234224 | TRH-1395 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X67D656291 |
| 1234232 | TRH-1448 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X77D656249 |
| 1234237 | TRH-1398 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X7D656200 |
| 1234241 | TRH-1570 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X76D656193 |
| 1234253 | TRH-1402 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X37D656216 |
| 1234262 | TRH-1575 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X76D656273 |
| 1234276 | TRH-1875 | Tractor | Tractor | Tractor | TRACTOR HYD-VI ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X7X7D656309 |
| 1234280 | TRH-1576 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X17D656294 |
| 1234285 | TRH-1843 | Tractor | Tractor | Tractor | TRACTOR HYD-V ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X27D656188 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1234293 | TRH-1407 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X27D730337 |
| 1234295 | TRH-1577 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X27D730340 |
| 1234327 | TRH-1494 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X27D656353 |
| 1234341 | TRH-1971 | Tractor | Tractor | Tractor | TRACTOR,CONV HYD2 ISX 6X4 PB 2 | | Peterbilt | | 378 | 2007 | 1XPFD49X37D730363 |
| 1234351 | TRH-1845 | Tractor | Tractor | Tractor | TRACTOR HYD-V ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X87D730357 |
| 1234352 | TRH-1498 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X77D730358 |
| 1234364 | TRH-1589 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X07D735875 |
| 1234377 | TRH-1856 | Tractor | Tractor | Tractor | TRACTOR HYD-V ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X07D730353 |
| 1234393 | TRB-729 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X95D835762 |
| 1234404 | CUB-005 | Silo Setter | Tractor | Tractor | FIELD BIN SET TRUCK ISX | | Peterbilt | | 378 | 2005 | 1NPFL49X85D835748 |
| 1234412 | TRB-273 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X75D835789 |
| 1234414 | TRB-274 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X45D835796 |
| 1234418 | TRH-1846 | Tractor | Tractor | Tractor | TRACTOR HYD-V ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X35D835773 |
| 1234429 | TRB-112 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X75D865116 |
| 1234435 | TRB-188 | Tractor | Tractor | | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X25D865122 |
| 1234437 | TRH-1286 | Tractor | Tractor | Tractor | TRACTOR HYD-II GOR ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X05D835810 |
| 1234442 | TRH-1600 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X5D863280 |
| 1234448 | TRH-1420 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X45D863288 |
| 1234456 | TRB-239 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X85D884175 |
| 1234460 | TRB-232 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X76D884234 |
| 1234462 | TRB-277 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X55D884179 |
| 1234471 | TRH-1343 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X75D884166 |
| 1234478 | TRH-1508 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X65D884157 |
| 1234498 | TRH-1511 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X05D884185 |
| 1234500 | TRH-1610 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X45D884156 |
| 1234502 | TRH-1612 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X16D884195 |
| 1234533 | TRH-1619 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X96D884218 |
| 1234534 | TRB-726 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X06D884219 |
| 1234542 | TRB-728 | Tractor | Tractor | Tractor | TRACTOR HYD-III ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X36D884229 |
| 1234546 | TRB-233 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X6D885717 |
| 1234554 | TRB-189 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X56D885723 |
| 1234565 | TRB-279 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X16D885735 |
| 1234568 | TRB-190 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X61606045620 |
| 1234571 | TRB-147 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X56D645619 |
| 1234576 | TRH-1435 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X06D646709 |
| 1234580 | TRB-730 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X36D645585 |
| 1234590 | TRB-733 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X06D645611 |
| 1234605 | TRH-1522 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X46D645627 |
| 1234633 | TRH-1642 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X76D645606 |
| 1234640 | TRB-176 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X76D885738 |
| 1234642 | TRW-094 | Tractor | Tractor | Tractor | TRACTOR WINCH W/HYD ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X76D646707 |
| 1234644 | TRH-1438 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2006 | 1XPFD49X36D646722 |
| 1234649 | TRB-115 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X87D656177 |
| 1234650 | TRB-193 | Tractor | Tractor | | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X17D656179 |
| 1234653 | TRB-359 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X97D656222 |
| 1234655 | TRB-219 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X47D656225 |
| 1234659 | TRB-409 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2007 | 1XPFD49X17D656229 |
| 1234672 | FUF-408 | Utility | Trailer | Auxilary | TRAILER UTILITY | | | | | | R05627A2 |
| 1234684 | FUF-296 | Utility | Trailer | Auxilary | HOSE TRAILER | | Cambelt | | Blank | 1980 | 20173192413 |
| 1234690 | CBF-051 | Batch Mixer | Trailer | Auxilary | MIX TR HI-DEN 150RCM | | J & L Tank | | SEMI | 1976 | 8413SMSS |
| 1234707 | ATF-067 | Acid Transport | Trailer | Auxilary | ACID TRANS 5000 3CMP | | Worley | | WANB | 2005 | 1W9TS39205L216016 |
| 1234723 | ATF-068 | Acid Transport | Trailer | Auxilary | ACID TRANS 5000 3CMP | | Worley | | WANB | 2007 | 1W9TS392X7L216017 |
| 1234742 | ATF-079 | Acid Transport | Trailer | Auxilary | ACID TRANS 5000 3CMP | | Worley | | TRAN | 2011 | 1W9TS3928L216003 |
| 1234833 | CPF-162 | Cement Pump | Trailer | | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2008 | 5DDKM382X81003722 |
| 1234834 | CPF-013 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2008 | 5DDKM382981003839 |
| 1234835 | CPF-136 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2008 | 5DDKM382781003841 |
| 1234837 | CPF-074 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2008 | 5DDKM382581003904 |
| 1234841 | CPF-140 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM LT WT | 1000 | Pratt | Falcon | SF40 | 2010 | 1P9CP4021AB343235 |
| 1234847 | CPF-003 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2005 | 5DDKE382251001830 |
| 1234849 | CPF-048 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2005 | 5DDKE382351001884 |
| 1234851 | CPF-174 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2005 | 5DDKE382X51001896 |
| 1234854 | CPF-137 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2006 | 5DDKE382461002236 |
| 1234856 | CPF-138 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2006 | 5DDKE382061002265 |
| 1234857 | CPF-019 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2006 | 5DDKE382461002267 |
| 1234860 | CPF-021 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2006 | 5DDKE382461002270 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1234862 | CPF-165 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | SIEB | 2006 | 5DDKE382661002304 |
| 1234864 | CPF-115 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2006 | 5DDKE382161002307 |
| 1234866 | CPF-024 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2006 | 5DDKE382361002308 |
| 1234867 | CPF-063 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2006 | 5DDKE382261002378 |
| 1234870 | CPF-176 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2006 | 5DDKE382761002425 |
| 1234871 | CPF-117 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2006 | 5DDKE383361002471 |
| 1234872 | CPF-096 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2006 | 5DDKE382761002487 |
| 1234876 | CPF-026 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2007 | 5DDKE382171002549 |
| 1234881 | CPF-027 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2007 | 5DDKE382271002821 |
| 1234882 | CPF-119 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1000 | Kalyn | Falcon | FALC | 2007 | 5DDKE382471002822 |
| 1234883 | CPF-097 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2007 | 5DDKE382X71002887 |
| 1234884 | CPF-120 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1000 | Kalyn | Falcon | FALC | 2007 | 5DDKE382X71002890 |
| 1234886 | CPF-064 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2007 | 5DDKE382671002949 |
| 1234887 | CPF-121 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1000 | Kalyn | Falcon | FALC | 2007 | 5DDKE382271002950 |
| 1234888 | CPF-058 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2007 | 5DDKE382471002951 |
| 1234889 | CPF-177 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2007 | 5DDKE382171003006 |
| 1234890 | CPF-004 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | Blank | 2007 | 5DDKE382571003008 |
| 1234892 | CPF-094 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2007 | 5DDKM382X71003055 |
| 1234895 | CPF-065 | Cement Pump | Trailer | Cement Pump | CEM PUMP BL KESTREL ISM | 400 | Peterbilt / Kestrel | Kestrel | 357 | 2007 | 1NPAL09X17D745234 |
| 1234898 | CPF-098 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2007 | 5DDKM382071003212 |
| 1234905 | CPF-179 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1000 | Kalyn | Falcon | FALC | 2008 | 5DDKM382081003292 |
| 1234908 | CPF-180 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1000 | Kalyn | Falcon | FALC | 2008 | 5DDKM382281003634 |
| 1234909 | CPF-099 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2008 | 5DDKM382081003633 |
| 1234910 | CPF-181 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1000 | Kalyn | Falcon | FALC | 2008 | 5DDKM382481003635 |
| 1234911 | CPF-122 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1000 | Kalyn | Falcon | FALC | 2008 | 5DDKM382X81003719 |
| 1234913 | CPF-100 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2008 | 5DDKM382881003721 |
| 1234914 | CPF-005 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Aspen Trailers | Falcon | Blank | 2001 | 1A9PF382311448015 |
| 1234917 | CPF-163 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Fontaine | Falcon | OPTF | 2002 | 13N78820531516978 |
| 1234918 | CPF-166 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Fontaine | Falcon | OPFT | 2003 | 13N738205315188813 |
| 1234920 | CPF-066 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Fontaine | Falcon | OPFT | 2003 | 13N738209315188815 |
| 1234921 | CPF-067 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Fontaine | Falcon | OPFT | 2004 | 13N738200415188820 |
| 1234922 | CPF-008 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Fontaine | Falcon | PLAT | 2004 | 13N738202415191127 |
| 1234923 | CPF-167 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Fontaine | Falcon | OPFT | 2004 | 13N738208415211836 |
| 1234924 | CPF-009 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Fontaine | Falcon | ST | 2004 | 13N738201415211838 |
| 1234925 | CPF-034 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | SBRT | 2004 | 5DDKE382X41001380 |
| 1234928 | CPF-035 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2004 | 5DDKE382941001421 |
| 1234930 | CPF-168 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2004 | 5DDKE382641001425 |
| 1234932 | CPF-169 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2005 | 5DDKE382551001546 |
| 1234933 | CPF-051 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2005 | 5DDKE382451001621 |
| 1234935 | CPF-010 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | Blank | 2005 | 5DDKE382851001654 |
| 1234936 | CPF-011 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2005 | 5DDKE382651001670 |
| 1234939 | CPF-170 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2005 | 5DDKE382451001733 |
| 1234947 | FUF-285 | Utility | Trailer | Auxilary | AIR COMPRESSOR | | Homemade | | SQEQ | 1981 | ND62229 |
| 1234958 | CTF-156 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPTT | 2003 | 13N73820031517438 |
| 1234959 | CTF-157 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPFT | 2003 | 13N738209315188653 |
| 1234960 | CTF-158 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPFT | 2003 | 13N738200315188809 |
| 1234961 | CTF-159 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPFT | 2003 | 13N73820X31518810 |
| 1234963 | CTF-161 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPFT | 2003 | 13N738201315188811 |
| 1234964 | CBF-068 | Batch Mixer | Trailer | Auxilary | BATCH MIX 50 BBL TM | | Stewart & Stevenson | | BT50 | 2003 | 1S9FD40273H787002 |
| 1234965 | CBF-025 | Batch Mixer | Trailer | Auxilary | BATCH MIX 50 BBL TM | | Stewart & Stevenson | | BT50 | 2003 | 1S9FD40243H787004 |
| 1234966 | CTF-162 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPFT | 2003 | 13N738203315188812 |
| 1234968 | CTF-164 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPFT | 2004 | 13N73820X41519943 |
| 1234971 | CBF-028 | Batch Mixer | Trailer | Auxilary | MIX TR HI-DEN 100BBL | | | | | 2004 | 2PLC038274BF11376 |
| 1234972 | CTF-166 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPFT | 2004 | 13N738203415199945 |
| 1234973 | CTF-167 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPFT | 2004 | 13N738205415199946 |
| 1234976 | CTF-169 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPFT | 2004 | 13N738209415199948 |
| 1234978 | CTF-171 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | 7038 | 2004 | 13N73820341521839 |
| 1234979 | CTF-172 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPFT | 2004 | 13N73820X41522177 |
| 1234980 | CTF-173 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPFT | 2004 | 13N738201415221278 |
| 1234981 | CTF-174 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | OPFT | 2004 | 13N738203415522179 |
| 1234985 | CTF-176 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2005 | 5DDKM382751001485 |
| 1234991 | CTF-178 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2005 | 5DDKM382351001547 |
| 1234992 | CTF-179 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600 | 2005 | 5DDKM382751001583 |
| 1234994 | CTF-181 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2005 | 5DDKM382451001623 |
| 1234995 | CTF-182 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2005 | 5DDKM382651001624 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1234997 | CBF-050 | Batch Mixer | Trailer | Auxilary | BATCH MIX 50 BBL TM | | WILCO | | COMB | 2004 | 1W9AC40284M257137 |
| 1234998 | CTF-183 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Wilco Machine and Fab | | 600 | 2004 | 1W9AB391X4M257138 |
| 1234999 | CTF-184 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Wilco | | 600 | 2004 | 1W9AB39214M257139 |
| 1235000 | CTF-185 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600S | 2005 | 1W9AB39215M257160 |
| 1235001 | CTF-186 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600 | 2005 | 1W9AB39235M257162 |
| 1235002 | CTF-187 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600S | 2005 | 1W9AB39255M257162 |
| 1235005 | CTF-190 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600S | 2005 | 1W9AB39205M257165 |
| 1235008 | CTF-193 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600S | 2005 | 1W9AB39255M257159 |
| 1235009 | CTF-194 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2005 | 5DDKM382951001889 |
| 1235012 | CTF-196 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2005 | 5DDKM382151001918 |
| 1235014 | CTF-198 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM TM | | WILCO | | TRLR | 2005 | 1W9AB47165M257171 |
| 1235016 | CTF-199 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2005 | 5DDKM382951001939 |
| 1235017 | CTF-200 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | KNST | | 600S | 2006 | 5DDKM382561001969 |
| 1235019 | CTF-202 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382361001971 |
| 1235020 | CTF-203 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | WILCO | | 1600 | 2005 | 1W9AB47185M257172 |
| 1235022 | CTF-205 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | WILCO | | 1600 | 2005 | 1W9AB47115M257174 |
| 1235023 | CTF-206 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | WILCO | | 1600 | 2005 | 1W9AB47135M257175 |
| 1235024 | CTF-207 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600S | 2005 | 1W9AB392X5M257168 |
| 1235025 | CTF-208 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600S | 2005 | 1W9AB39215M257169 |
| 1235026 | CTF-209 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382561001986 |
| 1235027 | CTF-210 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382761001987 |
| 1235028 | CBF-015 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | Kalyn | | 600S | 2006 | 5DDKM382961002056 |
| 1235029 | CTF-211 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382261002075 |
| 1235031 | CTF-213 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382961002073 |
| 1235033 | CTF-215 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382361002103 |
| 1235034 | CTF-216 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382561002104 |
| 1235037 | CBF-046 | Batch Mixer | Trailer | Auxilary | MIX TR HI-DEN 100BBL | | Kalyn | | 600S | 2006 | 5DDKM386100Z131 |
| 1235039 | CTF-219 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382061002124 |
| 1235040 | CTF-220 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382661002130 |
| 1235041 | CTF-221 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382X61002129 |
| 1235051 | CTF-224 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | WILCO | | 1600 | 2005 | 1W9AB47125M257247 |
| 1235053 | CTF-226 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | WILCO | | TRAN | 2006 | 1W9AB47146M257249 |
| 1235055 | CBF-017 | Batch Mixer | Trailer | Auxilary | BATCH MIX 50 BBL TM | | WILCO | | ST | 2005 | 1W9AB40295M257202 |
| 1235057 | CTF-228 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600 | 2005 | 1W9AB39245M257251 |
| 1235059 | CTF-230 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | TRAN | 2006 | 1M91P38238A211154 |
| 1235062 | CTF-232 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKE382961002345 |
| 1235063 | CTF-233 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382961002431 |
| 1235064 | CTF-234 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382661002466 |
| 1235065 | CTF-235 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382861002467 |
| 1235068 | CBF-027 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | 100 | 2006 | 1W9AB39276M257205 |
| 1235069 | CTF-238 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2007 | 5DDKM382871002504 |
| 1235070 | CTF-239 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 6002 | 2007 | 5DDKM382171002506 |
| 1235075 | CBF-029 | Batch Mixer | Trailer | Auxilary | MIX TR HI-DEN 100BBL | | WILCO | | TRAN | 2006 | 1W9AB39266M257298 |
| 1235076 | CTF-241 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2006 | 5DDKM382071002545 |
| 1235077 | CTF-242 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2007 | 5DDKM382271002546 |
| 1235078 | CTF-243 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2007 | 5DDKM382471002547 |
| 1235080 | CTF-245 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2007 | 5DDKM382171002568 |
| 1235081 | CTF-246 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600S | 2007 | 5DDKM382371002569 |
| 1235082 | CTF-247 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM | | WILCO | | 1600 | 2006 | 1W9AB471X6M257255 |
| 1235083 | CTF-248 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM TM | | WILCO | | 1600 | 2006 | 1W9AB47116M257256 |
| 1235084 | CTF-249 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600 | 2006 | 1W9AB39276M257309 |
| 1235085 | CTF-250 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600S | 2006 | 1W9AB39296M257263 |
| 1235086 | CTF-251 | Cementing Bulk | Trailer | | AIR CAN CEM TM  600 | | WILCO | | 600S | 2006 | 1W9AB39206M257264 |
| 1235087 | CTF-252 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600 | 2006 | 1W9AB39236M257257 |
| 1235088 | CTF-253 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600 | 2006 | 1W9AB39256M257258 |
| 1235089 | CTF-254 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Wilco Machine and Fab | | 600 | 2006 | 1W9AB39276M257259 |
| 1235090 | CTF-255 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600T | 2006 | 1W9AB39256M257260 |
| 1235091 | CTF-256 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | TRAN | 2006 | 1W9AB39256M257261 |
| 1235093 | CTF-258 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | TRAN | 2006 | 1W9AB39236M257310 |
| 1235095 | CBF-043 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | DRYB | 2006 | 1W9AB39276M257312 |
| 1235096 | CTF-260 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | 600S | 2006 | 1W9AB39296M257313 |
| 1235097 | CTF-261 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | WILCO | | 1600 | 2006 | 1W9AB47106M257314 |
| 1235099 | CTF-264 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | WILCO | | FB | 2007 | 1W9AB47186M257318 |
| 1235100 | CTF-265 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST  TM | | Loadcraft | | 600 | 2007 | 5ABK382087B070271 |
| 1235101 | CTF-266 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST  TM | | Loadcraft | | 600 | 2007 | 5ABK3820X7B070272 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1235103 | CTF-268 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2007 | 5DDKM382071003243 |
| 1235104 | CTF-269 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2007 | 5DDKM382271003244 |
| 1235106 | CTF-271 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Loadcraft | | 600 | 2007 | 5ABK382037B070274 |
| 1235107 | CBF-019 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | Loadcraft | | | 2007 | 5ABK382027B070282 |
| 1235108 | CBF-053 | Batch Mixer | Trailer | Auxilary | MIX TR HI-DEN 100BBL | | Loadcraft | | 100B | 2007 | 5ABK382047B070283 |
| 1235110 | CTF-272 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Loadcraft | | TRAN | 2007 | 5ABK382057B070275 |
| 1235111 | CTF-273 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Loadcraft | | TRAN | 2007 | 5ABK382077B070283 |
| 1235113 | CTF-275 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM TM | | Loadcraft | | TRAN | 2007 | 5ABK471067B070259 |
| 1235114 | CTF-276 | Cementing Bulk | Trailer | | FIELD BIN CEM | | Loadcraft | | 1600 | 2007 | 5ABK471027B070260 |
| 1235116 | CTF-278 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2007 | 5DDKM382971003242 |
| 1235118 | CTF-280 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2008 | 5DDKM382681003328 |
| 1235119 | CTF-281 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2008 | 5DDKM382881003329 |
| 1235120 | CTF-282 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Loadcraft | | 600S | 2007 | 5ABK382057B070292 |
| 1235121 | CTF-283 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Loadcraft | | 600S | 2007 | 5ABK382077B070293 |
| 1235122 | CTF-284 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Loadcraft | | 600S | 2007 | 5ABK382097B070294 |
| 1235124 | CTF-286 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Loadcraft | | 600S | 2007 | 5ABK382037B070296 |
| 1235125 | CTF-287 | Cementing Bulk | Trailer | | FIELD BIN CEM | | Loadcraft | | 1600 | 2007 | 5ABK471057B070267 |
| 1235127 | CTF-289 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2008 | 5DDKM382381003490 |
| 1235128 | CTF-290 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2008 | 5DDKM382181003489 |
| 1235129 | CTF-291 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2008 | 5DDKM382X81003488 |
| 1235131 | CTF-293 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Loadcraft | | BJ60 | 2007 | 5ABK382077B070407 |
| 1235134 | CBF-016 | Batch Mixer | Trailer | Auxilary | MIX TR HI-DEN 100BBL | | Loadcraft | | 100B | 2007 | 5ABK382037B070405 |
| 1235135 | CTF-296 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Mertz | | TRAN | 2007 | 1M91P38237A211105 |
| 1235136 | CTF-297 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Mertz | | TRAN | 2007 | 1M91P38257A211106 |
| 1235137 | CTF-298 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | Loadcraft | | 1600 | 2007 | 5ABK471027B070419 |
| 1235142 | CTF-302 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Mertz | | BULK | 2007 | 1M91P38297A211108 |
| 1235143 | CTF-303 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Mertz | | BULK | 2007 | 1M91P38207A211109 |
| 1235144 | CTF-304 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | Mertz | | STOR | 2007 | 1M91P46197A211111 |
| 1235150 | CTF-309 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Mertz | | BULK | 2007 | 1M91P38237A211122 |
| 1235153 | CTF-312 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | Mertz | | STOR | 2007 | 1M91P46197A211139 |
| 1235154 | CTF-313 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2008 | 5DDKM382381003948 |
| 1235158 | CTF-317 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2008 | 5DDKM382X81003977 |
| 1235159 | CTF-318 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2008 | 5DDKM382181003978 |
| 1235161 | CTF-320 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM TM | | Mertz | | STOR | 2008 | 1M91P46188A211148 |
| 1235162 | CTF-321 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2008 | 5DDKM382881004044 |
| 1235163 | CTF-322 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2008 | 5DDKM382X81004045 |
| 1235165 | CTF-324 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Mertz | | BULK | 2008 | 1W9AB39266M257253 |
| 1235166 | CTF-325 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM TM | | Mertz | | STOR | 2008 | 1M91P46128A211159 |
| 1235167 | CTF-326 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Mertz | | TRAN | 2008 | 1M91P38258A211169 |
| 1235169 | CTF-328 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2009 | 5DDKM382991004181 |
| 1235171 | CTF-330 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2009 | 5DDKM382991004183 |
| 1235175 | CTF-335 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Mertz | | BULK | 2008 | 1M91P38268A211214 |
| 1235176 | CTF-336 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2009 | 5DDKM382091004444 |
| 1235177 | CTF-337 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2009 | 5DDKM382491004446 |
| 1235178 | CTF-338 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2009 | 5DDKM382291004445 |
| 1235179 | CTF-339 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Kalyn | | 600S | 2009 | 5DDKM382691004447 |
| 1235180 | CTF-340 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Mertz | | TRLR | 2008 | 1M91P382X8A211233 |
| 1235181 | CTF-341 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Mertz | | BULK | 2008 | 1M91P38298A211241 |
| 1235182 | CTF-342 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | Mertz | | STOR | 2009 | 1M91P46169A211263 |
| 1235183 | CBF-021 | Batch Mixer | Trailer | Auxilary | BATCH MIX 50 BBL TM | | Pratt | | SF38 | 2009 | 1P9C38269B343158 |
| 1235184 | CTF-343 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM TM | | WILCO | | 1600 | 2010 | 1W9A84711AM257105 |
| 1235185 | CTF-344 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM TM | | WILCO | | 1600 | 2010 | 1W9A84710AM257113 |
| 1235188 | CTF-347 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Pratt | | DF38 | 2010 | 1P9CP3823AB343218 |
| 1235190 | CTF-349 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Pratt | | DF38 | 2010 | 1P9CP3821AB343220 |
| 1235191 | CTF-350 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Pratt | | DF38 | 2010 | 1P9CP3823AB343221 |
| 1235192 | CTF-351 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Pratt | | DF38 | 2010 | 1P9CP3825AB343222 |
| 1235194 | CTF-353 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Pratt | | DF38 | 2010 | 1P9CP3829AB343224 |
| 1235195 | CTF-354 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Pratt | | DF38 | 2010 | 1P9CP3820AB343225 |
| 1235196 | CBF-044 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | 100B | 2010 | 1W9AC3921AM257120 |
| 1235198 | CTF-355 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | WILCO | | 1600 | 2010 | 1W9A84711AM257122 |
| 1235199 | CTF-356 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | Pratt | | DF38 | 2010 | 1P9CP3822AB343226 |
| 1235200 | CTF-357 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Pratt | | DF38 | 2010 | 1P9CP3824AB343227 |
| 1235201 | CBF-008 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | 100B | 2010 | 1W9AC3924AM257127 |
| 1235202 | CTF-358 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | | Pratt | | DF38 | 2011 | 1P9CP3821BB343194 |
| 1235203 | CTF-359 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST TM | Pratt Industries | | | DF38 | 2011 | 1P9C93823BB343195 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1235204 | CTF-360 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST  TM | | Pratt | | DF38 | 2011 | 1P9CP3825BB343196 |
| 1235205 | CTF-361 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST  TM | | Pratt | | DF38 | 2011 | 1P9CP3827BB343197 |
| 1235206 | CTF-362 | Cementing Bulk | Trailer | | FIELD BIN CEM TM | | WILCO | | MACH | 2010 | 1W9AB4719AM257160 |
| 1235207 | CTF-363 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM TM | | WILCO | | MACH | 2010 | 1W9AB4712AM257159 |
| 1235208 | CTF-364 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM TM | | WILCO | | MACH | 2010 | 1W9AB4710AM257161 |
| 1235209 | CTF-365 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM TM | | Viking | | 1600 | 2011 | 1V9SX4710BN062305 |
| 1235210 | CTF-366 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST  TM | | Pratt | | DF38 | 2011 | 1P9CP3829BB343198 |
| 1235211 | CTF-367 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST  TM | | Pratt | | DF38 | 2011 | 1P9CP3824BB343243 |
| 1235212 | CBF-007 | Batch Mixer | Trailer | Auxilary | BATCH MIX 50 BBL TM | | WILCO | | MACH | 2012 | 1W9AC4022BM257177 |
| 1235213 | CBF-054 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | MACH | 2011 | 1W9AC3920BM257188 |
| 1235214 | CTF-374 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM TM | | Viking | | 1600 | 2011 | 1V9SX4715BN062350 |
| 1235215 | CTF-375 | Cementing Bulk | Trailer | | FIELD BIN CEM TM | | Viking | | 1600 | 2011 | 1V9SX4717BN062351 |
| 1235216 | CTF-549 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2005 | 5DDKM382751001678 |
| 1235217 | CTF-550 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2005 | 5DDKM382751001681 |
| 1235221 | CTF-554 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2005 | 5DDKM382651001767 |
| 1235222 | CTF-555 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2005 | 5DDKM382151001773 |
| 1235223 | CTF-556 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Kalyn | | 600S | 2005 | 5DDKM382351001774 |
| 1235742 | TRW-015 | Tractor | Tractor | Tractor | TRACTOR WINCH PTRBLT | | Peterbilt | | 379 | 2001 | 1XP5DR9X51D556070 |
| 1236224 | TRH-1201 | Tractor | Tractor | Tractor | TRACTOR HYD-DUAL | | Peterbilt | | 379 | 2003 | 1XP5DR9X93D807059 |
| 1236227 | TRB-063 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 379 | 2003 | 1XP5DR9X23D807064 |
| 1236230 | CUB-004 | Silo Setter | Tractor | Tractor | FIELD BIN SET TRUCK | | Peterbilt | | 378 | 2004 | 1NPFLR9X74D816992 |
| 1236231 | CUB-012 | Silo Setter | Tractor | Tractor | FIELD BIN SET TRUCK | | Peterbilt | | 378 | 2004 | 1NPFLR9X94D816993 |
| 1236246 | TRB-360 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 378 | 2004 | 1XPFD49X94D827238 |
| 1236256 | TRH-1648 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 378 | 2005 | 1XPFD49X45D835734 |
| 1236273 | FUF-184 | Utility | Trailer | Auxilary | COMPRESSOR TRAILER | | Shopbuilt | | TRLR | 1990 | 20051732413 |
| 1236281 | CUF-011 | Utility | Trailer | | Cementing - C-Pump/Boost-Skid | 0 | | | | | 000000003S100CFT1 |
| 1236295 | CUF-017 | Utility | Trailer | | Air Compressor Trailer | 0 | Shopbuilt | | UTIL | 1989 | NM117676 |
| 1236307 | CTF-558 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM | | Fruehauf | | DMP | 1980 | 0MT000807 |
| 1236308 | CTF-559 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | FB | 1980 | C1299 |
| 1236309 | CTF-560 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | TANK | 1980 | C1307 |
| 1236310 | CTF-561 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | CEMT | 1981 | 1A1A3S202B1601369 |
| 1236311 | CTF-562 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | FLAT | 1981 | 1A1A3520281601372 |
| 1236312 | CTF-563 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | Fontaine | | FLAT | 1982 | 1A1A35207C1601420 |
| 1236322 | FUF-227 | Utility | Trailer | Auxilary | TRAILER HEATER | | Wacker Neuson | | | 2008 | 5XFCA16178N000457 |
| 1236336 | FUF-364 | Utility | Trailer | Auxilary | TRAILER UTILITY | | Centex | | CT | 2011 | 5RHCT1623BH002003 |
| 1236367 | FUF-180 | Utility | Trailer | Auxilary | TRAILER UTILITY | | American | | Blank | 1998 | 17YBP1225VB016643 |
| 1236395 | FUF-181 | Utility | Trailer | Auxilary | TRAILER UTILITY | | BOURG CHEMICAL DISTRIBUTING | | Flatbed | 2002 | 4J1FS16232B007864 |
| 1236400 | CUT-005 | Utility | Trailer | Auxilary | COMPRESSOR TRAILER | | Hawk Trailers | | Blank | 2003 | 6801914 |
| 1236432 | FUF-183 | Utility | Trailer | Auxilary | TRAILER LOW BOY | | Shopbuilt | | TRLR | 2005 | 17YBP16225B029346 |
| 1236434 | CUT-003 | Utility | Trailer | Auxilary | AIR COMPRESSOR | | Shopbuilt | | 17' | 2005 | 2006802413A |
| 1236443 | FUF-291 | Utility | Trailer | Auxilary | AIR COMPRESSOR | | Big Tex | | TRLR | 2006 | 16VNX082061C88264 |
| 1236459 | TRB-561 | Trailer | Trailer | Tractor | COMPRESSOR TRAILER | | Parker | | TL | 2006 | 13ZCH102461007382 |
| 1236470 | FUF-225 | Utility | Trailer | Auxilary | TRAILER HEATER | | Great Dane Trailers | | ARCT | 2006 | 1G9UP16186S201716 |
| 1236471 | FUF-224 | Utility | Trailer | Auxilary | TRAILER HEATER | | Great Dane Trailers | | ARCT | 2006 | 1G9UP161X6S201720 |
| 1236510 | | Lab Eq | Fixed | | Consistometer, 7222, Auto | | | | | | 478 |
| 1236513 | CPF-135 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM | 1260 | Kalyn | Falcon | FALC | 2006 | 5DDKE382261002266 |
| 1236535 | CTF-376 | Cementing Bulk | Trailer | Auxilary | 1600fp Field Bin | | Viking | | 1600 | 2011 | 1V9SX4713BN062377 |
| 1236536 | CTF-569 | Cementing Bulk | Trailer | Auxilary | 1600fp Field Bin | | Viking | | 1600 | 2011 | 1V9SX4715BN062378 |
| 1236542 | TRH-162 | Tractor | Tractor | Tractor | Hydraulic 1 Tractor | | Peterbilt | | 367 | 2011 | 1XPTD49X6BD123188 |
| 1236553 | CTF-377 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | WILCO | | 600 | 2011 | 1W9AB3927BM257191 |
| 1236563 | TRS-121 | Tractor | Tractor | Tractor | 2011 Peterbilt Tractor | | Peterbilt | | 367 | 2011 | 1XPTD40X9BD123232 |
| 1236583 | CPF-046 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT TRAILER | 1000 | Pratt Industries | Falcon | SF40 | 2011 | 1P9CP4028BB343288 |
| 1236584 | CTF-379 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | WILCO | | 600S | 2011 | 1W9AB3920BM257193 |
| 1236585 | CTF-380 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | WILCO | | 600 | 2011 | 1W9AB3922BM257194 |
| 1236588 | CTF-381 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU. FT. BULK CEMENT F | | Viking | | 1600 | 2011 | 1V9SX4715BN062364 |
| 1236590 | CTF-370 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2011 | 1P9CP3820BB343199 |
| 1236591 | CTF-371 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2011 | 1P9CP3823BB343200 |
| 1236600 | CTF-398 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT FIELD BIN TM | | WILCO | | FAB | 2011 | 1W9AB4719BM257225 |
| 1236601 | CTF-388 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT FIELD BIN TM | | Viking | | 1600 | 2011 | 1V9SX4710BN062417 |
| 1236602 | CTF-389 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT FIELD BIN TM | | Viking | | 1600 | 2011 | 1V9SX4711BN062411 |
| 1236603 | CTF-387 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT FIELD BIN TM | | Viking | | 1600 | 2011 | 1V9SX4715BN062414 |
| 1236604 | CTF-390 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT FIELD BIN TM | | Viking | | 1600 | 2011 | 1V9SX4718BN062410 |
| 1236605 | CTF-386 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT FIELD BIN TM | | Viking | | 1600 | 2011 | 1V9SX4713BN062413 |
| 1236606 | CTF-397 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT FIELD BIN TM | | WILCO | | FAB | 2011 | 1W9AB4717BM257224 |
| 1236610 | CTF-400 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT FIELD BIN TM | | WILCO | | FAB | 2011 | 1W9AB4712BM257227 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1236612 | CTF-399 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT FIELD BIN TM | | WILCO | | FAB | 2011 | 1W9AB4710BM257226 |
| 1236613 | CTF-404 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3828BN062425 |
| 1236614 | CTF-403 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3824BN062423 |
| 1236615 | CTF-372 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2011 | 1P9CP3825BB343246 |
| 1236616 | CTF-391 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3218BN062427 |
| 1236617 | CTF-401 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3829BN062420 |
| 1236618 | CTF-396 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3826BN062424 |
| 1236619 | CTF-393 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3820BN062421 |
| 1236620 | CTF-394 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3822BN062419 |
| 1236621 | CTF-405 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX382XBN062426 |
| 1236627 | CPF-101 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT TRAILER | 1000 | Pratt Industries | Falcon | SF40 | 2011 | 1P9CP4021BB343228 |
| 1236629 | CTF-368 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2011 | 1P9CP3821BB343244 |
| 1236630 | CTF-369 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2011 | 1P9CP3823BB343245 |
| 1236632 | CPF-001 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT TRAILER | 1000 | Pratt | Falcon | Blank | 2011 | 1P9CP4024BB343286 |
| 1236634 | CTF-419 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3825BN062446 |
| 1236640 | CTF-382 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | WILCO | | 600S | 2011 | 1W9AB3926BM257196 |
| 1236641 | CTF-383 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | WILCO | | 600S | 2011 | 1W9AB3928BM257197 |
| 1236647 | CTF-384 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | WILCO | | 600S | 2011 | 1W9AB392XBM257198 |
| 1236648 | CTF-385 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | WILCO | | 600S | 2011 | 1W9AB3921BM257199 |
| 1236656 | CTF-392 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3825BN062429 |
| 1236657 | CTF-395 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3823BN062428 |
| 1236659 | CTF-407 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3826BN062441 |
| 1236662 | CTF-410 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2011 | 1V9SX4713BN062430 |
| 1236671 | CTF-408 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX382XBN062443 |
| 1236672 | CTF-409 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3821BN062444 |
| 1236677 | CTF-422 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3829BN062448 |
| 1236678 | CTF-441 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2011 | 1V9SX471XBN062456 |
| 1236679 | CTF-444 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2011 | 1V9SX4714BN062453 |
| 1236680 | CTF-443 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2011 | 1V9SX4718BN062455 |
| 1236681 | CTF-445 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2011 | 1V9SX4719BN062450 |
| 1236682 | CTF-446 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2011 | 1V9SX4710BN062451 |
| 1236683 | CTF-442 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2011 | 1V9SX4716BN062454 |
| 1236684 | CTF-447 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2011 | 1V9SX4712BN062452 |
| 1236694 | CTF-373 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2011 | 1P9CP3827BB343247 |
| 1236717 | CTF-417 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2011 | 1V9SX4716BN062437 |
| 1236718 | CTF-418 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2011 | 1V9SX4718BN062438 |
| 1236720 | CTF-438 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2011 | 1V9SX4718BN062459 |
| 1236722 | CTF-424 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3828BN062439 |
| 1236724 | CTF-425 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3828BN062442 |
| 1236725 | CTF-427 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3829BN062465 |
| 1236726 | CTF-428 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3820BN062466 |
| 1236727 | CTF-429 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3823BN062462 |
| 1236729 | CTF-431 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3821BN062461 |
| 1236730 | CTF-432 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3825BN062463 |
| 1236737 | CTF-437 | Cementing Bulk | Trailer | Auxilary | WST 1600 BULK CEMENT FIELD BIN | | Viking | | 1600 | 2011 | 1V9SX4713BN062458 |
| 1236748 | CBF-037 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | 100B | 2011 | 1W9TC3926BM257222 |
| 1236750 | CTF-402 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3822BN062422 |
| 1236754 | TRB-086 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X9CD137555 |
| 1236756 | TRB-041 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X9CD137622 |
| 1236758 | TRB-048 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X0CD137556 |
| 1236762 | TRB-050 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X1CD137632 |
| 1236763 | TRB-087 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49XXCD137466 |
| 1236765 | TRB-051 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X3CD137468 |
| 1236766 | TRB-052 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X5CD137469 |
| 1236767 | TRB-058 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X1CD137470 |
| 1236770 | TRH-1735 | Tractor | Tractor | Tractor | Tractor hydraulic I | | Peterbilt | | 367 | 2012 | 1XPTD49X5CD137438 |
| 1236775 | TRH-1739 | Tractor | Tractor | Tractor | Tractor hydraulic II | | Peterbilt | | 367 | 2012 | 1XPTD49X5CD137424 |
| 1236780 | TRB-065 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X5CD137631 |
| 1236781 | TRB-066 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X5CD137553 |
| 1236782 | TRB-088 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X6CD137576 |
| 1236784 | TRB-059 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X3CD137597 |
| 1236785 | TRB-053 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X5CD137598 |
| 1236786 | TRB-067 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X7CD137599 |
| 1236788 | TRB-060 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X1CD137601 |
| 1236789 | TRB-054 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X7CD137554 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1236792 | TRB-194 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X1CD123245 |
| 1236793 | TRB-195 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X3CD123246 |
| 1236795 | TRB-055 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X1CD137596 |
| 1236796 | TRB-068 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X6CD137626 |
| 1236798 | TRB-045 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49XXCD137628 |
| 1236800 | TRH-2065 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X9CD137586 |
| 1236801 | TRB-056 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X2CD137557 |
| 1236802 | TRB-070 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR | | Peterbilt | | 367 | 2012 | 1XPTD49X4CD137558 |
| 1236807 | TRH-398 | Tractor | Tractor | Tractor | Tractor Hyd I Falcon LW | | Peterbilt | | 367 | 2012 | 1XPTD49X0CD123236 |
| 1236810 | TRH-383 | Tractor | Tractor | Tractor | Tractor Hyd I Falcon | | Peterbilt | | 367 | 2012 | 1XPTD49X7CD137502 |
| 1236812 | TRH-385 | Tractor | Tractor | Tractor | Tractor Hyd I Falcon | | Peterbilt | | 367 | 2012 | 1XPTD49X7CD123251 |
| 1236813 | TRH-381 | Tractor | Tractor | Tractor | Tractor Hyd I Falcon | | Peterbilt | | 367 | 2012 | 1XPTD49XXCD137533 |
| 1236815 | TRH-382 | Tractor | Tractor | Tractor | Tractor Hyd I Falcon | | Peterbilt | | 367 | 2012 | 1XPTD49X7CD137537 |
| 1236817 | TRH-388 | Tractor | Tractor | Tractor | Tractor Hyd I Falcon | | Peterbilt | | 367 | 2012 | 1XPTD49X5CD137651 |
| 1236827 | TRH-407 | Tractor | Tractor | Tractor | Tractor Hyd I Gorilla 2011 Trl | | Peterbilt | | 367 | 2012 | 1XPTD49X0CD137464 |
| 1236832 | TRH-1148 | Tractor | Tractor | Tractor | Tractor Hyd I Rhino T unit 14 | | Peterbilt | | 367 | 2012 | 1XPTD49X9CD137474 |
| 1236834 | TRH-1150 | Tractor | Tractor | Tractor | Tractor Hyd I Rhino T unit 16 | | Peterbilt | | 367 | 2012 | 1XPTD49X7CD137439 |
| 1236837 | TRH-1154 | Tractor | Tractor | Tractor | Tractor Hyd I Rhino T unit 21 | | Peterbilt | | 367 | 2012 | 1XPTD49X3CD137518 |
| 1236840 | TRH-1158 | Tractor | Tractor | Tractor | Tractor Hyd I Rhino T unit 25 | | Peterbilt | | 367 | 2012 | 1XPTD49X6CD137447 |
| 1236852 | TRH-310 | Tractor | Tractor | Tractor | Tractor Hyd I | | Peterbilt | | 367 | 2012 | 1XPTD49X8CD137661 |
| 1236870 | TRH-1175 | Tractor | Tractor | Tractor | Tractor Hyd III | | Peterbilt | | 367 | 2012 | 1XPTD49X7CD137425 |
| 1236885 | TRH-1976 | Tractor | Tractor | Tractor | TRACTOR,CONV UNIV ISX 6X4 PB 2 | | Peterbilt | | 367 | 2012 | 1XPTD49X4CD137494 |
| 1236906 | TRH-323 | Tractor | Tractor | Tractor | Tractor Hyd I | | Peterbilt | | 367 | 2012 | 1XPTD49X4CD137642 |
| 1236908 | TRH-387 | Tractor | Tractor | Tractor | Tractor Hyd I Falcon | | Peterbilt | | 367 | 2012 | 1XPTD49X5CD123250 |
| 1236918 | CTF-439 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT CEMENT FIELD BI | | Viking | | 1600 | 2011 | 1V9SX4711BN062460 |
| 1236919 | CTF-440 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT CEMENT FIELD BI | | Viking | | 1600 | 2011 | 1V9SX4711BN062467 |
| 1236923 | CTF-426 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3824BN062468 |
| 1236924 | CTF-433 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3824BN062471 |
| 1236925 | CTF-434 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3826BN062469 |
| 1236938 | CTF-435 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3822BN062467 |
| 1236939 | CTF-436 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | TRAN | 2011 | 1V9SX3822BN062470 |
| 1236940 | CTF-453 | Cementing Bulk | Trailer | Auxilary | WST 1600 BULK CEMENT FIELD BIN | | Viking | | 1600 | 2012 | 1V9SX4718CN062490 |
| 1236942 | CTF-455 | Cementing Bulk | Trailer | Auxilary | WST 1600 BULK CEMENT FIELD BIN | | Viking | | 1600 | 2012 | 1V9SX4711CN062492 |
| 1236943 | CTF-452 | Cementing Bulk | Trailer | Auxilary | WST 1600 BULK CEMENT FIELD BIN | | Viking | | 1600 | 2012 | 1V9SX4711CN062489 |
| 1236944 | CBF-032 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | 100B | 2011 | 1W9TC3928BM257223 |
| 1236945 | CBF-039 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | BULK | 2011 | 1W9TC3922BM257234 |
| 1236946 | CBF-033 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | 100B | 2011 | 1W9TC3920BM257233 |
| 1236953 | TRB-089 | Tractor | Tractor | Tractor | Tractor Compressor 15/33 Q3-11 | | Peterbilt | | 367 | 2012 | 1XPTD49XXCD137600 |
| 1236959 | TRH-1744 | Tractor | Tractor | Tractor | Tractor hydraulic II 2011 8/10 | | Peterbilt | | 367 | 2012 | 1XPTD49X4CD137639 |
| 1236961 | TRB-093 | Tractor | Tractor | Tractor | Tractor Compressor 23/33 Q3-11 | | Peterbilt | | 367 | 2012 | 1XPTD49X4CD137625 |
| 1236962 | TRB-094 | Tractor | Tractor | Tractor | Tractor Compressor 27/33 Q3-11 | | Peterbilt | | 367 | 2012 | 1XPTD49X1CD137629 |
| 1236964 | TRH-364 | Tractor | Tractor | Tractor | Tractor Hyd I 4Q-11 Kilgore | | Peterbilt | | 367 | 2012 | 1XPTD49X3CD137695 |
| 1236965 | TRB-410 | Tractor | Tractor | Tractor | Tractor compressor repl 1/3 | | Peterbilt | | 367 | 2012 | 1XPTD49XXCD137550 |
| 1236966 | TRB-412 | Tractor | Tractor | Tractor | Tractor compressor repl 3/3 | | Peterbilt | | 367 | 2012 | 1XPTD49X3CD137552 |
| 1236967 | TRB-411 | Tractor | Tractor | Tractor | Tractor compressor repl 2/3 | | Peterbilt | | 367 | 2012 | 1XPTD49X1CD137551 |
| 1236974 | TRB-090 | Tractor | Tractor | Tractor | Tractor compressor 2011 1/9 | | Peterbilt | | 367 | 2012 | 1XPTD49X8CD137434 |
| 1236976 | TRH-1051 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2012 | 1XPTD49X0CD137484 |
| 1236981 | TRH-1745 | Tractor | Tractor | Tractor | Tractor hydraulic II 2011 9/10 | | Peterbilt | | 367 | 2012 | 1XPTD49X9CD137538 |
| 1236982 | TRB-092 | Tractor | Tractor | Tractor | Tractor compressor 2011 9/9 | | Peterbilt | | 367 | 2012 | 1XPTD49X3CD137471 |
| 1236984 | TRB-091 | Tractor | Tractor | Tractor | Tractor compressor 2011 2/9 | | Peterbilt | | 367 | 2012 | 1XPTD49X8CD137465 |
| 1236991 | TRH-342 | Tractor | Tractor | Tractor | Tractor Hyd I 41/43 addl equip | | Peterbilt | | 367 | 2012 | 1XPTD49X7CD158954 |
| 1236999 | TRH-393 | Tractor | Tractor | Tractor | Tractor Hyd I Falcon 4Q-11 | | Peterbilt | | 367 | 2012 | 1XPTD49X3CD137650 |
| 1237012 | CTF-457 | Cementing Bulk | Trailer | Auxilary | WST 166 CU FT BULK CEMENT FIEL | | Viking | | 1600 | 2012 | 1V9SX4711CN062542 |
| 1237014 | CTF-459 | Cementing Bulk | Trailer | Auxilary | WST 166 CU FT BULK CEMENT FIEL | | Viking | | 1600 | 2012 | 1V9SX4715CN062544 |
| 1237015 | CTF-460 | Cementing Bulk | Trailer | Auxilary | WST 166 CU FT BULK CEMENT FIEL | | Viking | | 1600 | 2012 | 1V9SX4717CN062545 |
| 1237022 | CTF-456 | Cementing Bulk | Trailer | Auxilary | WST 1600 BULK CEMENT FIELD BIN | | Viking | | 1600 | 2012 | 1V9SX4713CN062493 |
| 1237026 | CPF-076 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 Pratt | | Falcon | SF40 | 2011 | 1P9CP4027BB343676 |
| 1237039 | CPF-040 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 Pratt | | Falcon | SF40 | 2011 | 1P9CP4023BB343392 |
| 1237040 | CPF-042 | Cement Pump | Trailer | Cement Pump | CMT UNIT,TM FALCON LT | 1000 Pratt | | Falcon | SF40 | 2011 | 1P9CP4029BB343658 |
| 1237041 | CPF-052 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 Pratt | | Falcon | SF40 | 2011 | 1P9CP4025BB343658 |
| 1237042 | CPF-102 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 Pratt | | Falcon | SF40 | 2011 | 1P9CP4021BB343391 |
| 1237043 | CPF-039 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 Pratt | | Falcon | SF40 | 2011 | 1P9CP4026BB343229 |
| 1237044 | CPF-103 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 Pratt | | Falcon | SF40 | 2011 | 1P9CP402XBB343289 |
| 1237052 | CTF-461 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | WILCO | | TRAN | 2011 | 1W9AB3927BM257238 |
| 1237053 | CTF-462 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | WILCO | | TRAN | 2011 | 1W9AB3929BM257239 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1237054 | CTF-467 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | WILCO | | 600S | 2011 | 1W9AB392XBM257248 |
| 1237055 | CTF-468 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | WILCO | | 600S | 2011 | 1W9AB3921BM257249 |
| 1237056 | CTF-469 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | WILCO | | 600S | 2011 | 1W9AB3928BM257250 |
| 1237057 | CTS-353 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 1003-42 |
| 1237061 | CUT-007 | Utility | Trailer | Auxilary | Air Compressor Trailer | | Ameritrail | | UTIL | 2012 | 17YBP1629CB048229 |
| 1237065 | FUF-300 | Utility | Trailer | Auxilary | Air Compressor Trailer | | Ameritrail | | 80EE | 2012 | 17YBP1621BB047297 |
| 1237070 | TRB-565 | Trailer | Trailer | Tractor | Air Compressor Trailer | | American | | UV16 | 2011 | 17YBP1627BB047644 |
| 1237080 | CPF-106 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP4023BB343657 |
| 1237136 | TRB-097 | Tractor | Tractor | Tractor | Tractor compressor 4Q-11 | | Peterbilt | | 367 | 2012 | 1XPTD49X2CD137686 |
| 1237139 | TRH-390 | Tractor | Tractor | Tractor | Tractor Hyd I Falcon 4Q-11 | | Peterbilt | | 367 | 2012 | 1XPTD49X4CD137723 |
| 1237143 | TRH-391 | Tractor | Tractor | Tractor | Tractor Hyd I Falcon 4Q-11 | | Peterbilt | | 367 | 2012 | 1XPTD49X0CD137721 |
| 1237150 | TRH-352 | Tractor | Tractor | Tractor | Tractor Hyd I 4Q-11 Eldorado | | Peterbilt | | 367 | 2012 | 1XPTD49X9CD137748 |
| 1237166 | TRH-368 | Tractor | Tractor | Tractor | Tractor Hyd I 4Q-11 Vernal | | Peterbilt | | 367 | 2012 | 1XPTD49X3CD137759 |
| 1237169 | TRH-373 | Tractor | Tractor | Tractor | Tractor Hyd I 4Q-11Bakersfield | | Peterbilt | | 367 | 2012 | 1XPTD49X6CD137710 |
| 1237178 | TRH-1178 | Tractor | Tractor | Tractor | Tractor Hyd V line trailer | | Peterbilt | | 367 | 2012 | 1XPTD49X1CD137744 |
| 1237184 | TRB-106 | Tractor | Tractor | Tractor | Tractor Compressor addl equip | | Peterbilt | | 367 | 2012 | 1XPTD49X5CD137682 |
| 1237193 | TRH-344 | Tractor | Tractor | Tractor | Tractor Hyd I 43/43 addl equip | | Peterbilt | | 367 | 2012 | 1XPTD49X0CD158956 |
| 1237219 | CPF-041 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2011 | 1P9CP4025BB343393 |
| 1237225 | CTF-466 | Cementing Bulk | Trailer | Auxilary | WST 1600 CEMENT FIELD BIN TM | | Viking | | 1600 | 2011 | 1V9SX4712CN062565 |
| 1237227 | CTF-464 | Cementing Bulk | Trailer | Auxilary | WST 1600 CEMENT FIELD BIN TM | | Viking | | 1600 | 2011 | 1V9SX4719CN062563 |
| 1237230 | CTF-465 | Cementing Bulk | Trailer | Auxilary | WST 1600 CEMENT FIELD BIN TM | | Viking | | 1600 | 2011 | 1V9SX4710CN062564 |
| 1237231 | CPF-015 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2011 | 1P9CP4029BB343677 |
| 1237244 | TRS-280 | Tractor | Tractor | Tractor | TRACTOR UNIVERSAL ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X8CD137420 |
| 1237247 | TRB-247 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X4CD137432 |
| 1237248 | TRB-281 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X4CD137575 |
| 1237253 | TRH-780 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X0DD137770 |
| 1237265 | TRH-1003 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X5DD137738 |
| 1237267 | TRB-282 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X9CD155151 |
| 1237283 | TRH-745 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2012 | 1XPTD49X9CD163217 |
| 1237295 | CPF-043 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2011 | 1P9CP4021BB343656 |
| 1237296 | CPF-105 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2011 | 1P9CP402XBB343655 |
| 1237297 | CPF-016 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2011 | 1P9CP4026BB343703 |
| 1237299 | CPF-109 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP402XCB343060 |
| 1237315 | CTF-478 | Cementing Bulk | Trailer | | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3827CB343015 |
| 1237316 | CTF-479 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3829CB343016 |
| 1237317 | CTF-480 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3820CB343017 |
| 1237318 | CTF-470 | Cementing Bulk | Trailer | Auxilary | WST 1600 CEMENT FIELD BIN TM | | Viking | | 1600 | 2012 | 1V9SX4711CN062606 |
| 1237319 | CTF-471 | Cementing Bulk | Trailer | Auxilary | WST 1600 CEMENT FIELD BIN TM | | Viking | | 1600 | 2012 | 1V9SX4713CN062607 |
| 1237320 | CTF-472 | Cementing Bulk | Trailer | Auxilary | WST 1600 CEMENT FIELD BIN TM | | Viking | | 1600 | 2012 | 1V9SX4715CN062608 |
| 1237321 | CTF-473 | Cementing Bulk | Trailer | | WST 1600 CEMENT FIELD BIN TM | | Viking | | 1600 | 2012 | 1V9SX4713CN062610 |
| 1237322 | CTF-474 | Cementing Bulk | Trailer | Auxilary | WST 1600 CEMENT FIELD BIN TM | | Viking | | 1600 | 2012 | 1V9SX4715CN062611 |
| 1237323 | CTF-475 | Cementing Bulk | Trailer | Auxilary | WST 1600 CEMENT FIELD BIN TM | | Viking | | 1600 | 2012 | 1V9SX4717CN062612 |
| 1237324 | CTF-476 | Cementing Bulk | Trailer | Auxilary | WST 1600 CEMENT FIELD BIN TM | | Viking | | 1600 | 2012 | 1V9SX4719CN062613 |
| 1237325 | CTF-477 | Cementing Bulk | Trailer | | WST 1600 CEMENT FIELD BIN TM | | Viking | | 1600 | 2012 | 1V9SX4713CN062624 |
| 1237329 | CTF-448 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3820CB343003 |
| 1237330 | CTF-449 | Cementing Bulk | Trailer | | 600ST BULK CEMENT TRAILER | | Pratt | | DF28 | 2012 | 1P9CP3822CB343004 |
| 1237331 | CTF-481 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3822CB343018 |
| 1237333 | CTF-487 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3822CB343023 |
| 1237334 | CTF-498 | Cementing Bulk | Trailer | | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2012 | 1V9SX4719CN062627 |
| 1237335 | CTF-499 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2012 | 1V9SX4717CN062609 |
| 1237337 | CTF-501 | Cementing Bulk | Trailer | | WST 1600 CU FT BULK CEMENT FIE | | Viking | | 1600 | 2012 | 1V9SX4717CN062626 |
| 1237338 | CTS-389 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | |
| 1237339 | CTS-344 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 1003-37 |
| 1237340 | CTS-349 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 1003-43 |
| 1237341 | CTS-345 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 1003-17 |
| 1237342 | CTS-346 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 12-111-17 |
| 1237343 | CTS-347 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 391 |
| 1237344 | CTS-350 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 1003-25 |
| 1237345 | CTS-351 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 1003-20 |
| 1237346 | CTS-052 | Silo | Skid | Auxilary | 1300 CU FT BULK CEMENT FIELD S | | | | | | 5775 |
| 1237350 | CPF-044 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt Industries | Falcon | SF40 | 2011 | 1P9CP4022BB343701 |
| 1237359 | CTF-488 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3882CB343024 |
| 1237360 | CTF-489 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP382XCB343025 |
| 1237361 | CTF-490 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3821CB343026 |
| 1237362 | CTF-494 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | BULK | 2012 | 1P9CP3823CB343030 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1237363 | CTF-495 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3825CB343031 |
| 1237364 | CTF-496 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | BULK | 2012 | 1P9CP3827CB343032 |
| 1237365 | CTF-497 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3829CB343033 |
| 1237367 | CTS-049 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 5968 |
| 1237368 | CTS-050 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 5969 |
| 1237398 | TRH-675 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2012 | 1XPTD4X96CD163255 |
| 1237402 | TRB-240 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X9DD163316 |
| 1237424 | TRB-196 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X2DD163318 |
| 1237425 | TRB-197 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X4DD163319 |
| 1237426 | TRB-198 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X0DD163320 |
| 1237439 | TRB-199 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X5DD163314 |
| 1237443 | TRH-677 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X7D163301 |
| 1237444 | TRB-248 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X4DD163367 |
| 1237455 | SUB-032 | Forklift | Body Load | Auxilary | FORKLIFT | | Caterpillar | Fork Lift | PD | | AT19D80157 |
| 1237458 | CTF-450 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | BULK | 2012 | 1P9CP3824CB343005 |
| 1237465 | CTF-482 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3824CB343019 |
| 1237466 | CTF-483 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3820CB343020 |
| 1237467 | CTF-491 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3823CB343027 |
| 1237468 | CTF-492 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3825CB343028 |
| 1237469 | CTF-493 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3827CB343029 |
| 1237480 | CBF-059 | Batch Mixer | Trailer | Auxilary | 50BBL BATCH MIXER/COMBO | | WILCO | | BATC | 2012 | 1W9AC4029CM257260 |
| 1237481 | CBF-058 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | 100B | 2012 | 1W9TC3923CM257258 |
| 1237482 | CBF-041 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | 100B | 2012 | 1W9TC3928CM257272 |
| 1237499 | TRB-361 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X8CD163208 |
| 1237500 | TRB-362 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X0DD163317 |
| 1237505 | TRH-1137 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X9CD163296 |
| 1237513 | TRH-957 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X5DD166102 |
| 1237527 | TRS-295 | Tractor | Tractor | Tractor | TRACTOR UNIVERSAL ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X9CD163251 |
| 1237533 | CPF-111 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP4023CB343062 |
| 1237537 | ATF-005 | Acid Transport | Trailer | Auxilary | ACID TRANS 5000 3CMP | | WILCO | | WAT5 | 2012 | 1W9TS4128CM257261 |
| 1237562 | CTF-505 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3826CB343037 |
| 1237563 | CTF-506 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3820CB343039 |
| 1237564 | CBF-060 | Batch Mixer | Trailer | Auxilary | 50BBL BULK/BATCH MIXER TRL | | WILCO | | COMB | 2012 | 1W9AC4021CM257270 |
| 1237565 | CTS-053 | Silo | Skid | Auxilary | 1300 CU FT BULK CEMENT FIELD S | | | | | | AS103406490 |
| 1237567 | CTS-054 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | WILCO | | 1300 CU FT | 2006 | 1478 |
| 1237573 | CUB-002 | Silo Setter | Tractor | Tractor | SILO SETER TRUCK | | Peterbilt | | 367 | 2012 | 1NPTL40X1CD163240 |
| 1237574 | CUB-017 | Silo Setter | Tractor | Tractor | SILO SETER TRUCK | | Peterbilt | | 367 | 2012 | 1NPTL40X2CD163277 |
| 1237576 | ATF-012 | Acid Transport | Trailer | Auxilary | ACID TRANS 5000 3CMP | | Worley | | WANB | 2012 | 1W9TS3923C1216010 |
| 1237580 | CPF-134 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT LITE | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP402XCB343690 |
| 1237585 | CTF-513 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3825CN062707 |
| 1237586 | CTF-514 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3827CN062708 |
| 1237587 | CTF-516 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3825CN062710 |
| 1237588 | CTF-521 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT BULK CEMENT FIE | | Viking | | BJ16 | 2012 | 1V9SX471XCN062717 |
| 1237589 | CTS-058 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 6273 |
| 1237590 | CTS-059 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 6274 |
| 1237591 | CTS-060 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 6275 |
| 1237592 | CTS-061 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 6276 |
| 1237598 | TRS-325 | Tractor | Tractor | Tractor | STAKEBED TANDEM ISC | | | | 348 | 2013 | 2NP3LN9X2DM172209 |
| 1237621 | TRS-276 | Tractor | Tractor | Tractor | TRACTOR UNIVERSAL ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X9CD137720 |
| 1237627 | TRB-241 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X9DD163378 |
| 1237634 | TRH-946 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X2CD163298 |
| 1237635 | TRH-1010 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X8DD166126 |
| 1237640 | TRB-200 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X8CD137739 |
| 1237661 | CTF-416 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT CEMENT FIELD BI | | Viking | | 1600 | 2011 | 1V9SX4714BN062436 |
| 1237662 | CTF-486 | Cementing Bulk | Trailer | Auxilary | 600ST PROTOTYPE CEMENT TRL | | WILCO | | 600S | 2012 | 1W9AB3925CM257220 |
| 1237669 | CTF-413 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT CEMENT FIELD BI | | Viking | | 1600 | 2011 | 1V9SX4719BN062433 |
| 1237670 | CTF-412 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT CEMENT FIELD BI | | Viking | | 1600 | 2011 | 1V9SX4717BN062432 |
| 1237671 | CTF-415 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT CEMENT FIELD BI | | Viking | | 1600 | 2011 | 1V9SX4712BN062435 |
| 1237672 | CTF-414 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT CEMENT FIELD BI | | Viking | | 1600 | 2011 | 1V9SX4710BN062434 |
| 1237674 | CBF-030 | Batch Mixer | Trailer | Auxilary | MIXER,BATCH TM SNGL 50BBL DSL | | WILCO | | COMB | 2011 | 1W9AC4021BM251571 |
| 1237675 | CTF-421 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3827BN062447 |
| 1237676 | CTF-420 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | 600 | 2011 | 1V9SX3823BN062445 |
| 1237691 | CTF-502 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3828CB343038 |
| 1237692 | CTF-503 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3824CB343036 |
| 1237693 | CTF-504 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | DF38 | 2012 | 1P9CP3820CB343034 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1237715 | CUB-006 | Silo Setter | Tractor | Tractor | SILO SETTER TRUCK | | Peterbilt | | 367 | 2012 | 1NPTL40X1CD137611 |
| 1237716 | CUB-020 | Silo Setter | Tractor | Tractor | SILO SETTER TRUCK | | Peterbilt | | 367 | 2012 | 1NPTL40X6CD137734 |
| 1237717 | CUB-008 | Silo Setter | Tractor | Tractor | SILO SETTER TRUCK | | Peterbilt | | 367 | 2012 | 1NPTL40X4CD137733 |
| 1237718 | CPF-132 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP4027CB343064 |
| 1237721 | CTF-511 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3824CN062598 |
| 1237727 | CPF-133 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | DF40 | 2012 | 1P9CP4020CB343066 |
| 1237729 | CTF-517 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3820CN062713 |
| 1237734 | TRB-242 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X5CD137603 |
| 1237735 | TRB-363 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X8CD137773 |
| 1237752 | TRS-191 | Tractor | Tractor | Tractor | TRACTOR UNIVERSAL ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X4CD155168 |
| 1237758 | TRH-682 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X8DD166157 |
| 1237766 | TRH-1653 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X4DD166270 |
| 1237773 | TRH-909 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X4CD163254 |
| 1237786 | TRB-201 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X3DD166177 |
| 1237787 | TRB-243 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X7DD166179 |
| 1237804 | TRH-763 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X7DD166246 |
| 1237806 | TRH-958 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X0DD166248 |
| 1237814 | TRB-202 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X8DD166210 |
| 1237817 | TRB-203 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X3DD166213 |
| 1237824 | TRH-715 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2012 | 1XPTD49X0CD163199 |
| 1237835 | TRB-364 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2012 | 1XPTD49X5CD123247 |
| 1237855 | CBF-049 | Batch Mixer | Trailer | Auxilary | 50BBL BACH MIX TRL | | WILCO | | BATC | | 1W9AC4022CM257259 |
| 1237856 | CTF-508 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3822CN062597 |
| 1237857 | CTF-507 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Pratt | | BULK | 2012 | 1P9CP3822CB343035 |
| 1237859 | CTF-510 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3826CN062599 |
| 1237884 | CTS-062 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 6428 |
| 1237885 | CTS-063 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | 6430 |
| 1237886 | CTF-530 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT HORIZONTAL BULK | | Viking | | BJ16 | 2012 | 1V9SX4712CN062744 |
| 1237892 | CTF-518 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3822CN062714 |
| 1237893 | CTF-524 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3824CN062763 |
| 1237894 | CTS-070 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | WILCO | | 1300 CU FT | | AS103469181 |
| 1237895 | CTS-068 | Silo | Skid | Auxilary | 1300 CU FT BULK CEMENT FIELD S | | | | | | AS103469179 |
| 1237896 | CTS-069 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | | | | 2011 | 4220 |
| 1237907 | CTF-528 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT HORIZONTAL BULK | | Viking | | BJ16 | 2012 | 1V9SX4710CN062743 |
| 1237908 | CTF-529 | Cementing Bulk | Trailer | Auxilary | WST 1600 CU FT HORIZONTAL BULK | | Viking | | BJ16 | 2012 | 1V9SX4719CN062742 |
| 1237910 | CPF-089 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP4021CB343139 |
| 1237914 | CTF-526 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3821CN062767 |
| 1237936 | CTF-463 | Cementing Bulk | Trailer | Auxilary | 1600 LAYDOWN FIELD BIN TRL | | Viking | | 1600 | 2012 | 1V9SX4717CN062562 |
| 1237938 | CTF-519 | Cementing Bulk | Trailer | Auxilary | 1600 FIELD BIN TM | | Viking | | BJ16 | 2012 | 1V9SX4716CN062715 |
| 1237939 | CTF-520 | Cementing Bulk | Trailer | Auxilary | 1600 FIELD BIN TM | | Viking | | BJ16 | 2012 | 1V9SX4718CN062716 |
| 1237940 | CTF-531 | Cementing Bulk | Trailer | Auxilary | 1600 FIELD BIN TM | | Viking | | BJ16 | 2012 | 1V9SX4714CN062745 |
| 1237941 | CTF-532 | Cementing Bulk | Trailer | Auxilary | 1600 FIELD BIN TM | | Viking | | BJ16 | 2012 | 1V9SX4716CN062746 |
| 1237942 | CTF-541 | Cementing Bulk | Trailer | Auxilary | 1600 FIELD BIN TM | | Viking | | BJ16 | 2012 | 1V9SX4713CN062784 |
| 1237943 | CTF-542 | Cementing Bulk | Trailer | Auxilary | 1600 FIELD BIN TM | | Viking | | BJ16 | 2012 | 1V9SX4715CN062785 |
| 1237944 | CTF-543 | Cementing Bulk | Trailer | Auxilary | 1600 FIELD BIN TM | | Viking | | BJ16 | 2012 | 1V9SX4717CN062786 |
| 1237968 | CPF-088 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP4029CB343065 |
| 1237969 | CBF-023 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | MIXE | 2012 | 1W9TC3923CM257275 |
| 1237987 | CTF-522 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3829CN062760 |
| 1237993 | CBF-003 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | BATC | 2012 | 1W9TC4228CM257311 |
| 1237994 | CTF-523 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3822CN062762 |
| 1237995 | CTF-525 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX382XCN062766 |
| 1238000 | TRB-582 | Maintenance Truck | Tractor | Tractor | MAINT TRUCK PETE 348 ISC 4X4 | | Peterbilt | | 348 | 2012 | 2NP3JN7X4CM137405 |
| 1238002 | TRH-917 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X8DD166158 |
| 1238013 | TRB-204 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X8DD166286 |
| 1238014 | TRB-205 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49XXDD166287 |
| 1238015 | TRB-206 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49XXDD166290 |
| 1238016 | TRB-207 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X6DD166206 |
| 1238019 | TRH-1530 | Tractor | Tractor | Tractor | TRACTOR HYD-II ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X4DD166382 |
| 1238026 | TRB-208 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X3DD166289 |
| 1238029 | TRH-959 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X2DD163335 |
| 1238058 | TRH-831 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49XXDD166242 |
| 1238063 | TRH-920 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X7DD163332 |
| 1238069 | TRB-209 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49XXDD166175 |
| 1238071 | CTS-065 | Silo | Skid | Auxilary | SILO, 970 CU FT | | Troxell | | | 2012 | 6600 |
| 1238072 | CTF-527 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BH60 | 2012 | 1V9SX3925CN062804 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1238073 | CTF-534 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BH60 | 2012 | 1V9SX3929CN062806 |
| 1238076 | CTF-533 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BH60 | 2012 | 1V9SX3927CN062805 |
| 1238077 | CTF-535 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BH60 | 2012 | 1V9SX3920CN062807 |
| 1238079 | CTF-537 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BH60 | 2012 | 1V9SX3924CN062809 |
| 1238080 | CTF-538 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BH60 | 2012 | 1V9SX3920CN062810 |
| 1238081 | CTF-539 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BH60 | 2012 | 1V9SX3922CN062811 |
| 1238082 | CTF-540 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BH60 | 2012 | 1V9SX3924CN062812 |
| 1238098 | CPF-090 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP4028CB343087 |
| 1238116 | CPF-002 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | Blank | 2011 | 1P9CP4024BB343702 |
| 1238134 | CBF-040 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | BATC | 2012 | 1W9TC4222CM257329 |
| 1238151 | CTS-397 | Silo | Skid | Auxilary | 1300 CU FT BULK CEMENT FIELD S | | | | | | 5692 |
| 1238185 | CTF-515 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BJ60 | 2012 | 1V9SX3829CN062709 |
| 1238198 | CBF-038 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | BBL | 2012 | 1W9TC392XCM257274 |
| 1238199 | CUB-001 | Silo Setter | Tractor | Tractor | TRUCK,CONV TILT BED DUAL AXLE | | Peterbilt | | 367 | 2012 | 1NPTL40X0CD163276 |
| 1238200 | CUB-013 | Silo Setter | Tractor | Tractor | SILO SETTER TRUCK | | Peterbilt | | 367 | 2013 | 1NPTL40X80D166290 |
| 1238213 | CTF-546 | Cementing Bulk | Trailer | Tractor | 600ST BULK CEMENT TRAILER | | Viking | | BH60 | 2013 | 1V9SX3929DN062886 |
| 1238215 | CUB-023 | Silo Setter | Tractor | Tractor | SILO SETTER TRUCK | | Peterbilt | | 367 | 2012 | 1NPTL40XXDD166297 |
| 1238226 | TRB-731 | Tractor | Tractor | Tractor | TRACTOR HYDRAULIC 1 | | Peterbilt | | 367 | 2013 | 1XPTD49X4CD163285 |
| 1238230 | TRB-424 | Tractor | Tractor | Tractor | TRACTOR, COMPRESSOR | | Peterbilt | | 367 | 2013 | 1XPTD49X8D163372 |
| 1238232 | TRB-420 | Tractor | Tractor | Tractor | TRACTOR, COMPRESSOR | | Peterbilt | | 367 | 2013 | 1XPTD49X3D163375 |
| 1238262 | TRW-159 | Tractor | Tractor | Tractor | TRACTOR, WINCH | | Peterbilt | | 367 | 2013 | 1XPTD49X8CD163385 |
| 1238272 | TRB-421 | Tractor | Tractor | Tractor | TRACTOR, COMPRESSOR | | Peterbilt | | 367 | 2013 | 1XPTD49X1D166176 |
| 1238277 | TRH-1931 | Tractor | Tractor | Tractor | TRACTOR, HYDRAULIC 1 | | Peterbilt | | 367 | 2013 | 1XPTD49X0DD166198 |
| 1238294 | CPF-091 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Falcon | Falcon | SF40 | 2012 | 1P9CP4029CB343616 |
| 1238297 | CTS-075 | Silo | Skid | Auxilary | 970 CU. FT. BULK CEMENT FIELD | | | | | | AS103662925 |
| 1238298 | CTS-076 | Silo | Skid | Auxilary | 970 CU. FT. BULK CEMENT FIELD | | | | | | AS103662928 |
| 1238299 | CTS-348 | Silo | Skid | Auxilary | 970 CU. FT. BULK CEMENT FIELD | | | | | | 11-040-09 |
| 1238300 | CTS-078 | Silo | Skid | Auxilary | 970 CU. FT. BULK CEMENT FIELD | | | | | | 7136 |
| 1238302 | CTS-079 | Silo | Skid | Auxilary | 970 CU. FT. BULK CEMENT FIELD | | | | | | AS103663101 |
| 1238303 | CTS-081 | Silo | Skid | Auxilary | 970 CU. FT. BULK CEMENT FIELD | | | | | | AS103663103 |
| 1238304 | CTS-084 | Silo | Skid | Auxilary | 970 CU. FT. BULK CEMENT FIELD | | | | | | AS103678786 |
| 1238305 | CTS-080 | Silo | Skid | Auxilary | 970 CU. FT. BULK CEMENT FIELD | | | | | | AS103663102 |
| 1238314 | | Lab Eq | Fixed | | CTE Model 3-700-8 Cube curing | | | | | | CC124 |
| 1238315 | | Lab Eq | Fixed | | 3065-110V Wettability tester | | | | | | 249 |
| 1238319 | | Lab Eq | Fixed | | Chandler Model 7025C10 Dual Ce | | | | | | 1219 |
| 1238327 | | Lab Eq | Fixed | | Consistometer replacement | | | | | | 203 |
| 1238347 | CBF-020 | Batch Mixer | Trailer | Auxilary | 50BBL BULK/BATCH MIXER TRLR | | WILCO | | COMB | 2012 | 1W9AC4027CM257273 |
| 1238358 | TRB-568 | Trailer | Trailer | Tractor | AIR COMPRESSOR TRLR | | American | | UV16 | 2012 | 17YBP1624CB050700 |
| 1238359 | TRB-567 | Trailer | Trailer | Tractor | AIR COMPRESSOR TRLR | | American | | UV16 | 2012 | 17YBP162XCB050698 |
| 1238370 | | Bulk Plant | Fixed | Fixed Asset | Bulk Cement Plant | | | | | 2012 | #700 |
| 1238382 | | Lab Eq | Fixed | | Dickinson Lab Equipment | | | | | | |
| 1238395 | CTS-082 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | AS103678784 |
| 1238396 | CTS-083 | Silo | Skid | Auxilary | 970 CU FT BULK CEMENT FIELD SI | | | | | | AS103678785 |
| 1238413 | CTF-547 | Cementing Bulk | Trailer | Auxilary | 600ST BULK CEMENT TRAILER | | Viking | | BH60 | 2013 | 1V9SX3920DN062887 |
| 1238417 | TRS-281 | Tractor | Tractor | Tractor | TRACTOR UNIVERSAL ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X4D183344 |
| 1238434 | TRH-791 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49XXDD166306 |
| 1238440 | TRB-769 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X5DD166410 |
| 1238455 | TRH-922 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X2DD166400 |
| 1238475 | TRH-1854 | Tractor | Tractor | Tractor | TRACTOR HYD-V ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X9DD166300 |
| 1238478 | TRH-1827 | Tractor | Tractor | Tractor | TRACTOR HYD-V ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X6DD166304 |
| 1238492 | TRH-1127 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X6DD166433 |
| 1238496 | TRH-848 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X6DD183301 |
| 1238497 | TRH-773 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X5DD183305 |
| 1238501 | TRH-1140 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X3DD183304 |
| 1238502 | TRB-348 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X4DD166365 |
| 1238505 | TRH-955 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X1DD166260 |
| 1238525 | TRH-873 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X6DD166335 |
| 1238528 | TRH-1039 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X1DD166338 |
| 1238539 | TRH-850 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X0DD166351 |
| 1238544 | TRB-318 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X7DD163377 |
| 1238551 | TRB-365 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49XXDD166483 |
| 1238552 | TRB-319 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X1DD166484 |
| 1238555 | TRB-366 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X6DD183345 |
| 1238557 | TRB-367 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X6DD166285 |
| 1238560 | TRB-307 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X5DD166293 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1238561 | TRB-368 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X7D0166294 |
| 1238567 | TRH-933 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD4XXDD183302 |
| 1238570 | TRH-1849 | Tractor | Tractor | Tractor | TRACTOR HYD-V ISX | | Peterbilt | | 367 | 2013 | 1XPTD4X8DD183332 |
| 1238572 | TRB-425 | Tractor | Tractor | Tractor | TRACTOR,COMPR ISX 6X4 PB 231WB | | Peterbilt | | 367 | 2013 | 1XPTD49X2D0166221 |
| 1238591 | CPF-054 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP4020CB343455 |
| 1238592 | CPF-055 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP4026CB343086 |
| 1238606 | | Bulk Plant | Fixed | Fixed Asset | Cement Bulk Plant / Bulk Sand | | | | | | |
| 1238607 | | Lab Eq | Fixed | | lab equipment | | | | | | SN-141 |
| 1238620 | FUF-260 | Utility | Trailer | Auxilary | CEMENT TRANSFER PUMP TRAILER | | American | | UV16 | 2012 | 17YBP1629CB050823 |
| 1238675 | TRW-088 | Tractor | Tractor | Tractor | TRACTOR WINCH W/HYD ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X8D0166367 |
| 1238677 | TRW-131 | Tractor | Tractor | Tractor | TRACTOR WINCH W/HYD ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X1D0166372 |
| 1238696 | TRB-369 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD4X8DD183346 |
| 1238697 | TRB-370 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD4XXDD183347 |
| 1238699 | TRB-320 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD4X3DD183349 |
| 1238701 | TRB-249 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD49X1D0183351 |
| 1238702 | TRB-250 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD4X3D0183352 |
| 1238703 | TRB-251 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD4X5D0183353 |
| 1238704 | TRB-252 | Tractor | Tractor | Tractor | TRACTOR COMPRESSOR ISX | | Peterbilt | | 367 | 2013 | 1XPTD47D0183354 |
| 1238723 | TRB-437 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X5D0166178 |
| 1238739 | TRH-938 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X7D0166473 |
| 1238742 | TRH-1045 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X6D0166478 |
| 1238748 | TRH-1046 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD4X6DD183314 |
| 1238752 | TRH-963 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD4X5DD183319 |
| 1238753 | TRH-964 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X1D0183320 |
| 1238754 | TRH-965 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD4X5DD183322 |
| 1238771 | CBF-048 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | 100B | 2013 | 1W9TC3928CM257398 |
| 1238780 | CPF-057 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP4024CB343619 |
| 1238783 | CPF-056 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP4020CB343617 |
| 1238797 | CUB-016 | Silo Setter | Tractor | Tractor | FIELD BIN SET TRUCK ISX | | Peterbilt | | 367 | 2013 | 1NPTL40X1D0166298 |
| 1238833 | TRW-155 | Tractor | Tractor | Tractor | TRACTOR, WINCH | | Peterbilt | | 367 | 2013 | 1XPTD49X9D0166376 |
| 1238835 | ATF-007 | Acid Transport | Trailer | Auxilary | ACID TRANS 5000 3CMP | | Overland mgg | | TANK | 2013 | 1Z9251521D1258680 |
| 1238865 | | Consumable | Fixed | | Taining and Dispatch lighting | | | | | | |
| 1238903 | | Bulk Plant | Fixed | Fixed Asset | Cement Plant | | | | | | |
| 1238913 | CUB-029 | Silo Setter | Tractor | Tractor | UNIT ASSY,TBSH-200 TILT BED SI | | Peterbilt | | 367 | 2013 | 1NPTL40X3D0166299 |
| 1238922 | | Lab Eq | Fixed | | San Antonio Lab Equipment | | | | | | |
| 1238923 | | Lab Eq | Fixed | | DUAL CELL UCA MACHINE REPLACEM | | | | | | 349 |
| 1238931 | | Lab Eq | Fixed | | Viscometer | | Chandler | | 5550A-110V | 2007 | 115 |
| 1238968 | FTF-173 | Chem Transport | Trailer | Auxilary | TRLR,BULK DRY 3 CMPTMNT 1350 C | | Trail King | | BULK | 2014 | 1TKP04526EW082376 |
| 1238981 | FTF-031 | Chem Transport | Trailer | Auxilary | TRANSPORT,BULK DRY 1350 FT3 3 | | Trail King | | APB1 | 2014 | 1TKP04529EW102572 |
| 1238988 | | Bulk Plant | Fixed | Fixed Asset | Cement bulk plant - 15 3000 Cu | | | | | | |
| 1238989 | | Bulk Plant | Fixed | Fixed Asset | Cement bulk plant - 2560 cubic | | | | | | |
| 1238990 | | Bulk Plant | Fixed | Fixed Asset | Cement bulk plant - 12 700 cub | | | | | | |
| 1238991 | | Bulk Plant | Fixed | | Cement bulk plant - 2 40hp vac | | | | | | |
| 1238992 | | Bulk Plant | Fixed | | Bulk Cement Plant - 2 125hp ai | | | | | | |
| 1238993 | | Bulk Plant | Fixed | | Bulk Cement Plant - Operationa | | | | | | |
| 1238994 | | Bulk Plant | Fixed | | Bulk Cement Plant - 2 Manchest | | | | | | |
| 1238995 | | Bulk Plant | Fixed | | Bulk Cement Plant - 2 Add Hopp | | | | | | |
| 1238996 | | Bulk Plant | Fixed | | Bulk Cement Plant - 2 Pallette | | | | | | |
| 1238997 | | Bulk Plant | Fixed | Fixed Asset | Bulk Cement Plant - 2 Scale sy | | | | | | |
| 1238998 | | Bulk Plant | Fixed | Fixed Asset | Bulk Cement Plant - 2 920i Inv | | | | | | |
| 1238999 | | Bulk Plant | Fixed | Fixed Asset | Bulk Cement Plant - Manifold a | | | | | | |
| 1239011 | | Lab Eq | Fixed | | Gel Slab Concrete - - Murphy S | | | | | | |
| 1239039 | CPF-123 | Cement Pump | Trailer | Cement Pump | UNIT ASSY,CMT FALCON LITE TRLR | 1000 | Pratt | Falcon | SF40 | 2014 | 1P9CP4021EB343158 |
| 1239046 | CTF-548 | Cementing Bulk | Trailer | Auxilary | FIELD BIN CEM | | WILCO | | 1600 | 2013 | 1W9AB4717DM257551 |
| 1239049 | | Lab Eq | Fixed | | Treadwell - Submeters & Power | | | | | | |
| 1239063 | | Info Tec | Fixed | | Security Camera System - Liber | | | | | | |
| 1239072 | | Lab Eq | Fixed | | CTE Model 2000-5 UCA | | | | | | 384 |
| 1239073 | | Lab Eq | Fixed | | CTE Model 2000-5 UCA | | | | | | 243 |
| 1239090 | | Lab Eq | Fixed | | CTE Model 2000-5 UCA | | | | | | UCA242 |
| 1239110 | CPF-112 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM LT WT | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP4020CB343116 |
| 1239111 | CPF-107 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT ELEC S | 1000 | Falcon | Falcon | SF40 | 2012 | 1P9CP4025CB343452 |
| 1239112 | CTF-263 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM TM  600 | | WILCO | | TRAN | 2006 | 1W9AB3926M257317 |
| 1239113 | CTF-331 | Cementing Bulk | Trailer | Auxilary | AIR CAN CEM HP 600ST  TM | | Kalyn | | 600S | 2009 | 5DDKM382091004184 |
| 1239114 | CPF-053 | Cement Pump | Trailer | Cement Pump | UNIT ASSY,CEMENT FALCON LITE E | 1000 | Pratt | Falcon | SF40 | 2011 | 1P9CP4028BB343699 |
| 1239115 | CPF-071 | Cement Pump | Trailer | Cement Pump | FALCON LITE CEMENT UNIT ELEC S | 1000 | Pratt | Falcon | SF40 | 2012 | 1P9CP4027CB343453 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1239155 | CTS-419 | Silo | Skid | Auxilary | 700 Ft Blend Tank #5 | | WILCO | Wilco | Silo | 2013 | 7867 |
| 1239166 | | Bulk Plant | Fixed | | Air Dryer for Operation Air Co | | | | | | 1E+12 |
| 1239167 | | Bulk Plant | Fixed | | Air Dryer #1 Bulk Compress | | | | | | 1E+12 |
| 1239168 | | Bulk Plant | Fixed | | Air Dryer #2 Bulk Compress | | | | | | 1E+12 |
| 1239182 | | Bulk Plant | Fixed | | Scale System #1 for Blend Tank | | | | | | 1664900006 |
| 1239183 | | Bulk Plant | Fixed | | Scale System #2 for Blend Tank | | | | | | 1664900006 |
| 1239184 | | Bulk Plant | Fixed | | Scale System #3 for Blend Tank | | | | | | 1664900006 |
| 1239185 | | Bulk Plant | Fixed | | Scale System #4 for Blend Tank | | | | | | 1665100165 |
| 1239186 | | Bulk Plant | Fixed | | Scale System #5 for Blend Tank | | | | | | 1665100165 |
| 1239187 | | Bulk Plant | Fixed | | Scale System #6 for Blend Tank | | | | | | 1665100165 |
| 1239206 | CTS-318 | Silo | Skid | | SILO,CMT 970 FT3 LAY DOWN | | | | | | 8756 |
| 1239207 | CTS-317 | Silo | Skid | Auxilary | SILO,CMT 970 FT3 LAY DOWN | | | | | | 8755 |
| 1239208 | CTS-320 | Silo | Skid | Auxilary | SILO,CMT 970 FT3 LAY DOWN | | | | | | 8758 |
| 1239209 | CTS-321 | Silo | Skid | | SILO,CMT 970 FT3 LAY DOWN | | | | | | 8759 |
| 1239210 | CTS-319 | Silo | Skid | Auxilary | SILO, 970 CU FT | | WILCO | | 970 CuFt | 2012 | 5779 |
| 1239211 | CTS-322 | Silo | Skid | Auxilary | SILO, 970 CU FT | | ISF | | 970 CU FT | 2007 | Jul-92 |
| 1239249 | CTS-206 | Silo | Skid | Auxilary | CSB-1200 Field Storage Pressur | | | | | | PV006 |
| 1239250 | CTS-200 | Silo | Skid | Auxilary | CSB-1200 Field Storage Pressur | | | | | | PV036 |
| 1239251 | CTS-213 | Silo | Skid | Auxilary | CSB-1200 Field Storage Pressur | | | | | | PV-030 |
| 1239252 | CTS-201 | Silo | Skid | Auxilary | CSB-1200 Field Storage Pressur | | | | | | PV-028 |
| 1239254 | CTS-286 | Silo | Skid | Auxilary | SILO, 1300 CU FT | | WILCO | | 1300 CU FT | | L1 |
| 1239261 | | Lab Eq | Fixed | | CTE Model 22-400 HTHP Consisto | | | | | | CON286 |
| 1239262 | | Lab Eq | Fixed | | CTE Model 22-400 HTHP Consisto | | | | | | CON285 |
| 1239263 | | Lab Eq | Fixed | | CTE Portable Container Lab-20 | | | | | | 1 |
| 1239264 | | Lab Eq | Fixed | | CTE Model 2000-5 UCA | | | | | | UCA279 |
| 1239265 | | Lab Eq | Fixed | | Model 200 Atmospheric Consisto | | | | | | 10.29.2013 |
| 1239279 | CPF-124 | Cement Pump | Trailer | Cement Pump | CMT UNIT,TM FALCON LT | 1000 | Kalyn | Falcon | FALC | 2015 | 5DDKM4023F1007626 |
| 1239280 | CTF-570 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 600ST-03 WIDE | | WILCO | | Comm | 2015 | 1W9AB3928EM257706 |
| 1239281 | CTF-571 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 600ST-03 WIDE | | WILCO | | Comm | 2014 | 1W9AB392XEM257707 |
| 1239282 | CPF-125 | Cement Pump | Trailer | Cement Pump | CMT UNIT,TM FALCON LT | 1000 | Kalyn | Falcon | FALC | 2015 | 5DDKM4025F1007627 |
| 1239307 | CTF-572 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 600ST-03 WIDE | | WILCO | | 600S | 2014 | 1W9AB3921EM257708 |
| 1239308 | CTF-573 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 600ST-03 WIDE | | WILCO | | 600S | 2014 | 1W9AB3923EM257709 |
| 1239321 | CTF-574 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 600ST-03 WIDE | | WILCO | | 600S | 2014 | 1W9AB3923EM257710 |
| 1239325 | | Lab Eq | Fixed | | Ofite Gas Migration Tester, Mo | | | | | | 5.00322E+12 |
| 1239326 | | Lab Eq | Fixed | | CTE Static Gel Strength Analyz | | | | | | SGS001 |
| 1239327 | | Lab Eq | Fixed | | Chandler Wettability Tester, M | | | | | | 217 |
| 1239328 | | Lab Eq | Fixed | | Chandler Curing Chamber, Model | | | | | | 710 |
| 1239347 | CTF-591 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,BULK DRY 1350 FT3 3 | | Trail King | | APB 1350 | 2014 | 1TKP04528EW044132 |
| 1239359 | CPF-061 | Cement Pump | Trailer | Cement Pump | CMT UNIT,TM FALCON LT HYD STAR | 1000 | Kalyn | Falcon | Blank | 2015 | 5DDKM4029F1007629 |
| 1239360 | CPF-012 | Cement Pump | Trailer | Cement Pump | CMT UNIT,TM FALCON LT HYD STAR | 1000 | Kalyn | Falcon | Blank | 2015 | 5DDKM4027F1007628 |
| 1239375 | CTF-575 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 600ST-03 WIDE | | WILCO | | 600S | 2014 | 1W9AB3922EM257734 |
| 1239376 | CTF-577 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 600ST-03 WIDE | | WILCO | | 600S | 2014 | 1W9AB3924EM257735 |
| 1239377 | CTF-576 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 600ST-03 WIDE | | WILCO | | 600S | 2014 | 1W9AB3920EM257733 |
| 1239378 | CTF-578 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 600ST-03 WIDE | | WILCO | | 600S | 2014 | 1W9AB3926EM257736 |
| 1239379 | CTF-579 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 600ST-03 WIDE | | WILCO | | 600S | 2014 | 1W9AB3928EM257754 |
| 1239387 | CTF-594 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 1600 FT3 | | WILCO | | 1600CUFT | 2015 | 1W9AB4711FM257810 |
| 1239388 | CTF-595 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 1600 FT3 | | WILCO | | 1600CUFT | 2015 | 1W9AB4711FM257807 |
| 1239389 | CTF-596 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 1600 FT3 | | WILCO | | 1600CUFT | 2015 | 1W9AB4713FM257808 |
| 1239390 | CTF-597 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 1600 FT3 | | WILCO | | 1600CUFT | 2015 | 1W9AB4713FM257811 |
| 1239391 | CTF-598 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 1600 FT3 | | WILCO | | 1600CUFT | 2015 | 1W9AB4715FM257809 |
| 1239392 | CTF-599 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 1600 FT3 | | WILCO | | 1600CUFT | 2015 | 1W9AB4711XFM257806 |
| 1239402 | CTF-586 | Cementing Bulk | Trailer | Auxilary | TRANSPORT,CMT TM 600ST-03 WIDE | | WILCO | | BH60 | 2014 | 1W9AB3923EM257774 |
| 1239417 | | Lab Eq | Fixed | | San Antonio Lab Equipment | | | | | | |
| 1239442 | | Lab Eq | Fixed | | Ultrasonic Gel Strength/Compre | | | | | | 5265-440 |
| 1239445 | | Lab Eq | Fixed | Fixed Asset | Lab Equipment Cement - Eldorad | | | | | | 293 |
| 1239470 | | Info Tec | Fixed | | Security Gate Controlers 4402 | | | | | | |
| 1239472 | | Bulk Plant | Fixed | | SHL-A18 Styl-Air Dryer | | | | | | |
| 1239479 | CTS-332 | Silo | Skid | Auxilary | SILO,CMT 970 FT3 LAY DOWN | | | | | | PPC51497 |
| 1239480 | CTS-331 | Silo | Skid | Auxilary | SILO,CMT 970 FT3 LAY DOWN | | | | | | PPC51496 |
| 1239481 | CTS-330 | Silo | Skid | Auxilary | SILO,CMT 970 FT3 LAY DOWN | | | | | | 9485 |
| 1239482 | CTS-329 | Silo | Skid | Auxilary | SILO,CMT 970 FT3 LAY DOWN | | | | | | 9484 |
| 1239483 | CTS-328 | Silo | Skid | Auxilary | SILO,CMT 970 FT3 LAY DOWN | | | | | | 9483 |
| 1239484 | CTS-327 | Silo | Skid | Auxilary | SILO,CMT 970 FT3 LAY DOWN | | | | | | 9482 |
| 1239485 | CTS-326 | Silo | Skid | Auxilary | SILO,CMT 970 FT3 LAY DOWN | | | | | | 9481 |
| 1239486 | CTS-325 | Silo | Skid | Auxilary | SILO,CMT 970 FT3 LAY DOWN | | | | | | 9480 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1239487 | CTS-324 | Silo | Skid | Auxilary | SILO,CMT 970 FT3 LAY DOWN | | | | | | PPCS1489 |
| 1239488 | CTS-323 | Silo | Skid | Auxilary | SILO,CMT 970 FT3 LAY DOWN | | | | | | PPCS1488 |
| 1239501 | FTF-148 | Chem Transport | Trailer | Auxilary | TRAILER,BULK SAND 1000CF A572 | | EXA Industrial | | PNEUMATIC | 2015 | 3E9J142H1FT034469 |
| 1239538 | FUF-303 | Utility | Trailer | Auxilary | Field Heaters - THERM DYNAMICS | | Therm | | UTIL | 2013 | 1T9JPHC12DT499675 |
| 1239539 | FUF-302 | Utility | Trailer | Auxilary | Field Heaters - THERM DYNAMICS | | Therm | | UTIL | 2013 | 1T9JPHC1XDT499651 |
| 1239568 | FUF-255 | Utility | Trailer | Auxilary | HEATER TRAILER - ARCTIC BEAR | | Maxey | | UT | 2009 | 5R8U816279M011973 |
| 1239579 | | Lab Eq | Fixed | | Chandler Model 7 consistometer | | | | | | 620 |
| 1239581 | | Lab Eq | Fixed | | Chandler Atmospheric Consistom | | | | | | 1196 |
| 1239582 | | Lab Eq | Fixed | | Chandler Constant Speed Mixer | | | | | | 1890 |
| 1239583 | | Lab Eq | Fixed | | Chandler Viscometer, 12 speed | | | | | | 1379 |
| 1239585 | | Lab Eq | Fixed | | CHANDLER UCA TWIN CELL SYSTEM | | | | | | 798 |
| 1239591 | | Lab Eq | Fixed | | Chandler Model 7 consistometer | | | | | | 623 |
| 1239592 | | Lab Eq | Fixed | | Chandler Model 7 consistometer | | | | | | 624 |
| 1239593 | | Lab Eq | Fixed | | Chandler Model 7 consistometer | | | | | | 625 |
| 1239604 | | Lab Eq | Fixed | | Chandler Constant Speed Mixer | | | | | | 1892 |
| 1239606 | CPF-104 | Cement Pump | Trailer | Cement Pump | CMT UNIT,TM FALCON LT | 1000 | Pratt | Falcon | SF40 | 2011 | 1P9CP4027BB343394 |
| 1239610 | | Lab Eq | Fixed | | Model B Consistometer | | | | | | 593 |
| 1239611 | | Lab Eq | Fixed | | Model B Consistometer | | | | | | 829 |
| 1239612 | | Lab Eq | Fixed | | Model B Consistometer | | | | | RP 158 | | |
| 1239613 | | Lab Eq | Fixed | | UCA TWIN CELL | | | | | 829L | | |
| 1239617 | | Lab Eq | Fixed | | UCA TWIN CELL | | | | | | | 783 |
| 1239618 | | Lab Eq | Fixed | | UCA CELL | | | | | | | 816 |
| 1239619 | | Lab Eq | Fixed | | ATMOSPHERIC CONSISTOMETER | | | | | | | 1179 |
| 1239620 | | Lab Eq | Fixed | | CONSTANT SPEED MIXER | | | | | | | 1846 |
| 1239621 | | Lab Eq | Fixed | | Viscometer, 12 Speed | | | | | 3500-110V | | |
| 1239622 | | Lab Eq | Fixed | | HTHP Filter Press | | | | | | | 44018 |
| 1241592 | | Buildings | Fixed | | 4402 N. Main - Hwy. 146 N. | | | | | | |
| 1241593 | | Land | Fixed | | 4402 N. Main - Hwy. 146 N. | | | | | | |
| 1241594 | | Land Improvements | Fixed | | 4402 N. Main - Hwy. 146 N. | | | | | | |
| 1241615 | | Buildings | Fixed | | 3415 Millennium Blvd SE | | | | | | |
| 1241645 | | Bulk Plant SMI | Fixed | | Bulk Plant SMI | | | | | | |
| N/A | N/A | Bulk Plant | Fixed | | Wilco Portable Bulk Plant | | | | | | |
| N/A | N/A | Bulk Plant | Fixed | | Fixed Bulk Plant | | | | | | |
| N/A | N/A | Bulk Plant | Fixed | | Dual Sided Bulk Plant | | | | | | |
| P241626 | | Buildings | Fixed | | Rifle Real Estate - Buildings | | | | | | |
| P241817 | TRB-767 | Tractor | Tractor | Tractor | Peterbilt 388 Mechanic Supply | | Peterbilt | | 388 | 2012 | 1NPWL49X6CD137359 |
| P241830 | | Land | Fixed | | 28730 HIGHWAY 6 | | | | | | |
| P241832 | | Land | Fixed | | Rifle Real Estate - Land | | | | | | |
| P241892 | TRH-004 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2013 | 1XPTD49X2DD188512 |
| P241895 | TRH-008 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2013 | 1XPTD49X9DD188524 |
| P241916 | TRH-032 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2014 | 1XPTD49X6ED188563 |
| P241917 | TRH-033 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2014 | 1XPTD49X8ED188564 |
| P241932 | TRH-048 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2014 | 1XPTD49XXED188579 |
| P241933 | TRH-049 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2014 | 1XPTD49X6ED188580 |
| P241935 | TRH-051 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2014 | 1XPTD49XXED188582 |
| P241939 | TRH-055 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2014 | 1XPTD49X2ED188589 |
| P241966 | TRH-082 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2014 | 1XPTD49X1ED188616 |
| P241982 | TRH-098 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2015 | 1XPTD49X8FD188632 |
| P241984 | TRH-100 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2015 | 1XPTD49X1FD188634 |
| P241996 | TRH-112 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2013 | 1XPTD49X7DD186917 |
| P241998 | TRH-114 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2013 | 1XPTD49X0DD186919 |
| P242001 | TRH-117 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2013 | 1XPTD49X0DD186922 |
| P242019 | TRH-135 | Tractor | Tractor | Tractor | Standard Peterbilt 367 Class 8 | | Peterbilt | | 367 | 2013 | 1XPTD49X6DD188531 |
| P242031 | TRW-003 | Tractor | Tractor | Tractor | Peterbilt 388 Class 8 Tractor; | | Peterbilt | | 389 | 2015 | 1XPXD40X8FD278250 |
| P242070 | | Cement Heads | Fixed | Fixed Asset | Permian Basin Cement Heads | | | | | | |
| P242077 | CTF-141 | Cementing Bulk | Trailer | Auxilary | Summit 660 Bulk Trailer Pneuma | | NIMR | | 660 | 2014 | 1M9UT3428EP448259 |
| P242167 | SUB-076 | Forklift | Body Load | | FORKLIFT | | Clark | Clark | C25 | 2014 | P232L-0165-9897MP |
| P242168 | SUB-070 | Forklift | Body Load | | FORKLIFT | | Yale | | | | C810V04967K |
| P242218 | CBF-065 | Batch Mixer | Trailer | Auxilary | 100 BBL BATCH MIXER TRAILER | | WILCO | | Blank | 2013 | 1W9TC42230M257438 |
| P242221 | CTF-086 | Cementing Bulk | Trailer | | 2011 WADSWORTH 660 BULK TRAILE | | Wadsworth | | 660 | 2011 | 1W94F3520BW519127 |
| P242227 | CTF-111 | Cementing Bulk | Trailer | Auxilary | 2013 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1W9AB4711DM257478 |
| P242229 | CTF-113 | Cementing Bulk | Trailer | Auxilary | 2013 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1W9AB471XDM257480 |
| P242230 | CTF-118 | Cementing Bulk | Trailer | Auxilary | 2013 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1W9AB4714DM257510 |
| P242231 | CTF-130 | Cementing Bulk | Trailer | | 2013 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1W9AB4715DM257533 |
| P242232 | CTF-116 | Cementing Bulk | Trailer | Auxilary | 2013 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1W9AB4716DM257508 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| P242233 | CTF-125 | Cementing Bulk | Trailer | | 2013 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1W9AB4716DM257525 |
| P242234 | CTF-117 | Cementing Bulk | Trailer | | 2013 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1W9AB4718DM257509 |
| P242235 | CTF-063 | Cementing Bulk | Trailer | Auxilary | 2012 OES 1600 Cu. Ft. Field Bi | | Wadsworth | | FB | 2012 | 1W94F4713BW519722 |
| P242236 | CTF-083 | Cementing Bulk | Trailer | | 2011 WADSWORTH 1600 BULK TRAIL | | Wadsworth | | FB | 2011 | 1W94F4712BW519107 |
| P242243 | CTF-028 | Cementing Bulk | Trailer | | 2014-Wilco 660 Bulk Trailer | | | | 660 | 2014 | 1W9AB392XEM257738 |
| P242245 | CTF-143 | Cementing Bulk | Trailer | | 2014 Wilco 660 cu. ft. Bulk Tr | | WILCO | | Blank | 2014 | 1W9AB3920EM257652 |
| P242246 | CTF-058 | Cementing Bulk | Trailer | | 2011 Wilco 1600 Bulk Trailer | | WILCO | | Blank | 2012 | 1V9SX4718CN062571 |
| P242248 | CTF-069 | Cementing Bulk | Trailer | Auxilary | 2012 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1V9SX4711DN062851 |
| P242249 | CTF-070 | Cementing Bulk | Trailer | Auxilary | 2012 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1V9SX4713DN062852 |
| P242250 | CTF-073 | Cementing Bulk | Trailer | Auxilary | 2012 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1V9SX4714DN062892 |
| P242251 | CTF-071 | Cementing Bulk | Trailer | | 2012 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1V9SX4715DN062853 |
| P242252 | CTF-074 | Cementing Bulk | Trailer | | 2012 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1V9SX4716DN062893 |
| P242253 | CTF-087 | Cementing Bulk | Trailer | Auxilary | 2012 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1W9AB4712DM257425 |
| P242254 | CTF-088 | Cementing Bulk | Trailer | Auxilary | 2012 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1W9AB4710DM257424 |
| P242255 | CTF-089 | Cementing Bulk | Trailer | Auxilary | 2012 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1W9AB4714DM257426 |
| P242256 | CTF-090 | Cementing Bulk | Trailer | | 2012 Wilco 1600 Cu. Ft. Bulk T | | WILCO | | Blank | 2013 | 1W9AB4716DM257427 |
| P242259 | CTF-140 | Cementing Bulk | Trailer | Auxilary | 2014 Summit 660 cu. ft. Bulk T | | NIMR | | 660 | 2014 | 1M9UT3426EP448258 |
| P242263 | CTF-105 | Cementing Bulk | Trailer | | 2013 Wilco 660 Cu. Ft. Bulk Tr | | WILCO | | Blank | 2013 | 1W9AB3923DM257465 |
| P242265 | CTF-107 | Cementing Bulk | Trailer | | 2013 Wilco 660 Cu. Ft. Bulk Tr | | WILCO | | Blank | 2013 | 1W9AB3922DM257487 |
| P242266 | CTF-109 | Cementing Bulk | Trailer | | 2013 Wilco 660 Cu. Ft. Bulk Tr | | WILCO | | Blank | 2013 | 1W9AB3925DM257493 |
| P242267 | CTF-108 | Cementing Bulk | Trailer | | 2013 Wilco 660 Cu. Ft. Bulk Tr | | WILCO | | Blank | 2013 | 1W9AB392XDM257490 |
| P242274 | CTF-102 | Cementing Bulk | Trailer | | 2013 OES 660 Cu. Ft. Bulk Trai | | MDPR | | TRLR | 2013 | 1M9KF352XDG768646 |
| P242276 | CTF-129 | Cementing Bulk | Trailer | Auxilary | 2013 OES 660 Cu. Ft. Bulk Trai | | MDPR | | TRLR | 2013 | 1M9KF3526DG768658 |
| P242279 | CTF-103 | Cementing Bulk | Trailer | | 2013 OES 660 Cu. Ft. Bulk Trai | | Wads | | 660 | 2013 | 1W94F3527DWS19919 |
| P242281 | CTF-104 | Cementing Bulk | Trailer | Auxilary | 2012 OES 660 Cu. Ft. Bulk Trai | | MDPR | | STEP | 2013 | 1M9KF3525DG768649 |
| P242282 | CTF-099 | Cementing Bulk | Trailer | | 2012 OES 660 Cu. Ft. Bulk Trai | | Wads | | FLAT | 2013 | 1W94F3523DW519870 |
| P242283 | CTF-101 | Cementing Bulk | Trailer | | 2012 OES 660 Cu. Ft. Bulk Trai | | Wads | | FLAT | 2013 | 1W94F3525DW519871 |
| P242285 | CTF-064 | Cementing Bulk | Trailer | Auxilary | 2012 OES 660 Cu. Ft. Bulk Trai | | Wadsworth Industries | | 660 | 2012 | 1W94F3529BW519725 |
| P242287 | CTF-100 | Cementing Bulk | Trailer | | 2012 OES 660 Cu. Ft. Bulk Trai | | Wads | | 660 | 2013 | 1W94F3529DW519875 |
| P242289 | CTF-067 | Cementing Bulk | Trailer | | 2010 OES 660 Cu. Ft. Bulk Trai | | MDPR | | TRLR | 2012 | 1M9KF3522CG768638 |
| P242292 | CTF-016 | Cementing Bulk | Trailer | Auxilary | 2012 OES 440 Bulk Body Load Tr | | Viking | | Blank | 2012 | 1V9SX4718CN062747 |
| P242295 | CTF-079 | Cementing Bulk | Trailer | | 2011 WADSWORTH 660 BULK TRAILE | | Wadsworth Industries | | FLAT | 2011 | 1W94F3524BW519112 |
| P242300 | CTF-093 | Cementing Bulk | Trailer | Auxilary | 2012 OES 600 Cu. Ft. Bulk Trai | | MDPR | | TRLR | 2013 | 1M9KF3524DG768643 |
| P242301 | CTF-065 | Cementing Bulk | Trailer | Auxilary | 2012 OES 600 Cu. Ft. Bulk Trai | | Wadsworth | | 660 | 2012 | 1W94F3527BW519772 |
| P242303 | CTF-059 | Cementing Bulk | Trailer | | 2011 Tiger T1600 Field Bin Bul | | Tiger | | T1600 | 2012 | 1T9MSBT00C0002204 |
| P242309 | CTF-134 | Cementing Bulk | Trailer | Auxilary | 1060 Cu. Ft. Dry Bulk Aluminum | | Tytal | | Blank | 2014 | 3T1L1B624EC000489 |
| P242310 | CTF-136 | Cementing Bulk | Trailer | | 1060 Cu. Ft. Dry Bulk Aluminum | | Tytal | | Blank | 2014 | 3T1L1B620EC000490 |
| P242311 | CTF-137 | Cementing Bulk | Trailer | | 1060 Cu. Ft. Dry Bulk Aluminum | | Western Star | | 4900 | 2014 | 3T1L1B622EC000491 |
| P242312 | CTF-138 | Cementing Bulk | Trailer | | 1060 Cu. Ft. Dry Bulk Aluminum | | Tytal | | Blank | 2014 | 3T1L1B626EC000395 |
| P242316 | ATF-097 | Acid Transport | Trailer | | 2013 Troxell 2000/3000 Gallon | | Troxell | | Blank | 2013 | 1T9TS4022DR719665 |
| P242322 | CTS-024 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 3247 |
| P242323 | CTS-025 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 1003-45 |
| P242324 | CTS-026 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 1003-26 |
| P242325 | CTS-027 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 1003-27 |
| P242326 | CTS-028 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 1003-28 |
| P242327 | CTS-029 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 1003-29 |
| P242328 | CTS-030 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 1003-30 |
| P242329 | CTS-031 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 1003-31 |
| P242330 | CTS-032 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 1003-32 |
| P242331 | CTS-033 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 1003-3 |
| P242332 | CTS-034 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 1003-34 |
| P242333 | CTS-035 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 1003-35 |
| P242334 | CTS-036 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 1003-36 |
| P242335 | CTS-037 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 6412 |
| P242340 | CTS-043 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silo | | | | | 2015 | 5689 |
| P242348 | CTS-008 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-8 |
| P242349 | CTS-009 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-9 |
| P242350 | CTS-010 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-10 |
| P242351 | CTS-011 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-11 |
| P242352 | CTS-012 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-12 |
| P242353 | CTS-013 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-13 |
| P242354 | CTS-014 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-14 |
| P242355 | CTS-015 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-15 |
| P242356 | CTS-016 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-16 |
| P242357 | CTS-017 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| P242358 | CTS-018 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-48 |
| P242359 | CTS-019 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-19 |
| P242360 | CTS-020 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-46 |
| P242361 | CTS-021 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-21 |
| P242362 | CTS-022 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-22 |
| P242363 | CTS-023 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | 1003-40 |
| P242364 | CTS-039 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos | | | | | 2015 | P10316704 |
| P242367 | CTS-001 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos 2 of | | | | | 2015 | 1003-1 |
| P242368 | CTS-002 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos 3 of | | | | | 2015 | 1003-2 |
| P242369 | CTS-003 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos 4 of | | | | | 2015 | 1008-3 |
| P242370 | CTS-004 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos 5 of | | | | | 2015 | 1003-4 |
| P242371 | CTS-005 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos 6 of | | | | | 2015 | 1003-5 |
| P242372 | CTS-006 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos 7 of | | | | | 2015 | 1003-6 |
| P242373 | CTS-007 | Silo | Skid | Auxilary | 2015 ASME 1100 CUFT Silos 8 of | | | | | 2015 | 1003-7 |
| P242376 | | Cement Heads | Fixed | Fixed Asset | 18 5/8 BTC High Pressure Cemen | | | | | | 1309152 |
| P242378 | CTF-122 | Cementing Bulk | Trailer | Auxilary | 1060 Cu. Ft. Dry Bulk Aluminum | | Tytal | | 1060 | 2012 | 3T1L1B623CC000609 |
| P242379 | CTF-115 | Cementing Bulk | Trailer | Auxilary | 1060 Cu. Ft. Dry Bulk Aluminum | | Tytal | | 1060 | 2012 | 3T1L1B623CC000156 |
| P242381 | CTF-112 | Cementing Bulk | Trailer | Auxilary | 1060 Cu. Ft. Dry Bulk Aluminum | | Tytal | | 1060 | 2012 | 3T1L1B623CC000153 |
| P242382 | CTF-121 | Cementing Bulk | Trailer | Auxilary | 1060 Cu. Ft. Dry Bulk Aluminum | | Tytal | | 1060 | 2012 | 3T1L1B62XCC000574 |
| P242383 | CTF-120 | Cementing Bulk | Trailer | Auxilary | 1060 Cu. Ft. Dry Bulk Aluminum | | Tytal | | 1060 | 2012 | 3T1L1B628CC000573 |
| P242385 | CTF-135 | Cementing Bulk | Trailer | Auxilary | 1060 Cu. Ft. Dry Bulk Aluminum | | Tytal | | Blank | 2014 | 3T1L1B62XEC000383 |
| P242388 | CTF-096 | Cementing Bulk | Trailer | Auxilary | 1060 Cu. Ft. Dry Bulk Aluminum | | Madpro trailer | | Blank | 2012 | 3T1L1B625CC000160 |
| P242389 | CTF-094 | Cementing Bulk | Trailer | | 1060 Cu. Ft. Dry Bulk Aluminum | | Madpro trailer | | Blank | 2012 | 3T1L1B62XCC000154 |
| P242390 | CTF-097 | Cementing Bulk | Trailer | | 1060 Cu. Ft. Dry Bulk Aluminum | | Madpro trailer | | Blank | 2012 | 3T1L1B629CC000159 |
| P242391 | CTF-098 | Cementing Bulk | Trailer | Auxilary | 1060 Cu. Ft. Dry Bulk Aluminum | | Madpro trailer | | Blank | 2012 | 3T1L1B627CC000158 |
| P242401 | | Cement Heads | Fixed | Fixed Asset | 10 3/4 and 7 5/8 Cement Head P | | | | | | 120317 |
| P242442 | CTF-048 | Cementing Bulk | Trailer | Auxilary | 1999 J&L Bulk Transport Traile | | HEIL TRAILER | | BULK | 1999 | 5JLSN4220X5T05387 |
| P242490 | | Iron | Fixed | Fixed Asset | Iron - Amigos | | | | | | |
| P242491 | | Iron | Fixed | Fixed Asset | Iron - Amigos | | | | | | |
| P242492 | | Iron | Fixed | Fixed Asset | Iron Racks - Gulfstream - Midl | | | | | | |
| P242493 | | Iron | Fixed | Fixed Asset | Iron - Amigos | | | | | | |
| P242494 | | Iron | Fixed | Fixed Asset | Iron - Forum | | | | | | |
| P242495 | | Iron | Fixed | Fixed Asset | Iron - Summit | | | | | | |
| P242496 | | Iron | Fixed | Fixed Asset | Iron replace #545, 555, 499 Me | | | | | | |
| P242497 | | Iron | Fixed | Fixed Asset | Iron - SPM | | | | | | |
| P242498 | | Iron | Fixed | Fixed Asset | Iron - Amigos - New Mexico | | | | | | |
| P242499 | | Iron | Fixed | Fixed Asset | Iron - Summit | | | | | | |
| P242500 | | Iron | Fixed | Fixed Asset | Iron - Summit - WV | | | | | | |
| P242503 | | Iron | Fixed | Fixed Asset | Revised Iron for Yukon Unit 49 | | | | | | |
| P242504 | | Iron | Fixed | Fixed Asset | Iron Replacement-50swivels, st | | | | | | |
| P242505 | | Iron | Fixed | Fixed Asset | Swivel Assy, Hoses, plug, iron | | | | | | |
| P242506 | | Iron | Fixed | Fixed Asset | Iron Racks - Gulfstream - New | | | | | | |
| P242508 | | Iron | Fixed | Fixed Asset | Iron Racks - Gulfstream - Midl | | | | | | |
| P242509 | | Iron | Fixed | Fixed Asset | Iron - Northeast Pump Units | | | | | | |
| P242511 | | Iron | Fixed | Fixed Asset | Iron - Howard Supply - Yukon | | | | | | |
| P242512 | | Iron | Fixed | Fixed Asset | Iron Replacement 877 | | | | | | |
| P242513 | | Iron | Fixed | Fixed Asset | Iron Replacement 843 | | | | | | |
| P242514 | | Iron | Fixed | Fixed Asset | Iron (plug valve/union seal/ki | | | | | | |
| P242515 | | Iron | Fixed | Fixed Asset | Iron - Stewart Hose and Pipe | | | | | | |
| P242516 | | Iron | Fixed | Fixed Asset | Replacement Iron Medicine Lodg | | | | | | |
| P242517 | | Iron | Fixed | Fixed Asset | Iron - Forum | | | | | | |
| P242518 | | Iron | Fixed | Fixed Asset | Iron Swivel joint flow/valve | | | | | | |
| P242519 | | Iron | Fixed | Fixed Asset | TREATING IRON | | | | | | |
| P242520 | | Iron | Fixed | Fixed Asset | Iron | | | | | | |
| P242521 | | Iron | Fixed | Fixed Asset | Unit 653 - Replacement Iron | | | | | | |
| P242522 | | Iron | Fixed | Fixed Asset | Iron Replacement | | | | | | |
| P242524 | | Iron | Fixed | Fixed Asset | Iron (plug valve/union seal/ki | | | | | | |
| P242525 | | Iron | Fixed | Fixed Asset | Iron - Forum | | | | | | |
| P242526 | | Iron | Fixed | Fixed Asset | Iron - Summit | | | | | | |
| P242527 | | Iron | Fixed | Fixed Asset | Iron Constraints for Consul | | | | | | |
| P242528 | | Iron | Fixed | Fixed Asset | Iron - FMC | | | | | | |
| P242529 | | Iron | Fixed | Fixed Asset | Iron - SPM | | | | | | |
| P242530 | | Iron | Fixed | Fixed Asset | Iron Package for Unit 501 | | | | | | |
| P242531 | | Iron | Fixed | Fixed Asset | Iron and Hose Package for Pump | | | | | | |
| P242532 | | Iron | Fixed | Fixed Asset | Iron and Hose Package for Pump | | | | | | |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| P242533 | | Iron | Fixed | Fixed Asset | Iron and Hose Package for Pump | | | | | | |
| P242535 | | Iron | Fixed | Fixed Asset | Iron Package for Unit 517 | | | | | | |
| P242536 | | Iron | Fixed | Fixed Asset | Iron for Unit 913 | | | | | | |
| P242537 | | Iron | Fixed | Fixed Asset | Iron, Allied Cir Rack, chicksa | | | | | | |
| P242539 | | Iron | Fixed | Fixed Asset | NE - Various Units - Replaceme | | | | | | |
| P242540 | | Iron | Fixed | Fixed Asset | Unit 545* Iron Package - Repla | | | | | | |
| P242541 | | Iron | Fixed | Fixed Asset | LeGray Frac Iron 20x4 | | | | | | |
| P242542 | | Iron | Fixed | Fixed Asset | Circulating Iron Package | | | | | | |
| P242543 | | Iron | Fixed | Fixed Asset | Circulating Iron Package | | | | | | |
| P242544 | | Iron | Fixed | Fixed Asset | Circulating Iron Package | | | | | | |
| P242545 | | Iron | Fixed | Fixed Asset | Circulating Iron Package | | | | | | |
| P242547 | | Iron | Fixed | Fixed Asset | IRON RACKS | | | | | | |
| P242549 | | Iron | Fixed | Fixed Asset | Loose Iron | | | | | | |
| P242550 | | Iron | Fixed | Fixed Asset | Pearsall Iron Package | | | | | | |
| P242552 | | Iron | Fixed | Fixed Asset | Iron Package for Unit 521 | | | | | | |
| P242555 | | Lab Eq | Fixed | Fixed Asset | DUAL CONSISTOMETER | | Chandler | | 4262 | 2013 | 842 |
| P242556 | | Lab Eq | Fixed | Fixed Asset | North Dakota Lab Equipment | | | | | | |
| P242558 | | Lab Eq | Fixed | Fixed Asset | Permian Basin Lab Equipment | | | | | | |
| P242559 | | Lab Eq | Fixed | Fixed Asset | Fann Wettability Tester | | Fann | | Wettability test apparatus | 2010 | 36086 |
| P242562 | | Lab Eq | Fixed | Fixed Asset | Lab- Consistometer | | | | | 14-33 | |
| P242563 | | Lab Eq | Fixed | Fixed Asset | WV Lab upgrade (Consistometer) | | | | | 14-41 | |
| P242564 | | Lab Eq | Fixed | Fixed Asset | CONSISTOMETER | | Chandler | | 7322 | 2014 | 796 |
| P242565 | | Lab Eq | Fixed | Fixed Asset | West Virginia Lab Equipment - | | | | | | |
| P242566 | | Lab Eq | Fixed | Fixed Asset | lab equipment | | | | | | |
| P242568 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | Chandler | | 12-10 | | 71 |
| P242574 | | Lab Eq | Fixed | Fixed Asset | Data Acquisition used with Pum | | | | | 13-37 | |
| P242575 | | Lab Eq | Fixed | Fixed Asset | Data Acquisition used with Pum | | | | | | 134 |
| P242576 | | Lab Eq | Fixed | Fixed Asset | Data Acquisition Kit used with | | | | | | |
| P242577 | | Lab Eq | Fixed | Fixed Asset | Data Acquisition Kit used with | | | | | | |
| P242578 | | Lab Eq | Fixed | Fixed Asset | DATA ACQUISITION SYSTEM | | | | | | 287 |
| P242579 | | Lab Eq | Fixed | Fixed Asset | DATA ACQUISITION SYSTEM | | | | | | 239 |
| P242580 | | Lab Eq | Fixed | Fixed Asset | DATA ACQUISITION SYSTEM | | | | | | 241 |
| P242581 | | Lab Eq | Fixed | Fixed Asset | DATA ACQUISITION SYSTEM | | | | | | 240 |
| P242583 | | Lab Eq | Fixed | Fixed Asset | Data Acquisition Kit for Unit | | | | | | 1.10208E+14 |
| P242584 | | Lab Eq | Fixed | Fixed Asset | Data Acquisition Kit for Unit | | | | | | 1.27363E+14 |
| P242585 | | Lab Eq | Fixed | Fixed Asset | Data Acquisition Kit for Unit | | | | | | 1.27327E+14 |
| P242592 | | Lab Eq | Fixed | Fixed Asset | Desistometer-Transmitter Unit | | | | | | |
| P242593 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Chandler | | 5550A-110V | 2007 | 101 |
| P242594 | | Lab Eq | Fixed | Fixed Asset | Data Acquisition Kit used with | | | | | G3-10554 | |
| P242603 | | Lab Eq | Fixed | Fixed Asset | lab equipment | | | | | | |
| P242616 | | Lab Eq | Fixed | Fixed Asset | Data Acquisition used with Pum | | | | | | 226 |
| P242621 | | Lab Eq | Fixed | Fixed Asset | CONSTANT SPEED MIXER | | Chandler | | 30-60 | 2012 | 1290 |
| P242622 | | Lab Eq | Fixed | Fixed Asset | AIR CONDITIONER SYSTEM FOR LAB | | | | | | 201310-CJCC01277 |
| P242625 | | Lab Eq | Fixed | Fixed Asset | LAB PRESS | | | | | | 314524 |
| P242635 | | Light Duty Vehicle | Body Load | Auxilary | 2014 DODGE RAM 4500 REG CAB AN | | Dodge | | Ram 4500 | 2014 | 3C7WRLBLXEG182028 |
| P242636 | | Light Duty Vehicle | Body Load | Auxilary | 2014 DODGE RAM 4500 REG CAB AN | | Dodge | | Ram 4500 | 2014 | 3C7WRLBL7EG171231 |
| P242638 | | Light Duty Vehicle | Body Load | Auxilary | 2014 DODGE RAM 4500 ST CREW CA | | Dodge | | Ram 4500 | 2014 | 3C7WRLEL1EG316145 |
| P242658 | | Light Duty Vehicle | Body Load | Auxilary | 2013 Ford F-150 XLT Crew 4x4 | | Ford | | F-150 XLT Crew 4x4 | 2013 | 1FTFW1EFXDKF27601 |
| P242695 | | Light Duty Vehicle | Body Load | Auxilary | 2014-Ford F-150 | | Ford | | F-1500 | 2014 | 1FTFW1EF1EK10066 |
| P242697 | | Light Duty Vehicle | Body Load | Auxilary | 2014-Ford F250 | | Ford | | F-250 | 2015 | 1FT7W2BT2FEB88600 |
| P242702 | | Light Duty Vehicle | Body Load | Auxilary | 2015 Ford F-150 | | Ford | | F-150 | 2015 | 1FTFW1ET8EKF76951 |
| P242709 | | Light Duty Vehicle | Body Load | Auxilary | 2012 Dodge 3500 Crew Cab 4x4 | | Dodge | | Ram Chassis Cab | 2012 | 3C7WDTAL6CG326123 |
| P242731 | | Leasehold Improvements | Fixed | Fixed Asset | Bulk Plant (Portable) | | | | | | |
| P242735 | | Leasehold Improvements | Fixed | Fixed Asset | Midland Portable Lab | | | | | | |
| P242783 | CTS-410 | Silo | Skid | Auxilary | 2014-Wilco 2950cuft. silo | | WILCO | Wilco | | 2014 | |
| P242784 | CTS-418 | Silo | Skid | Auxilary | 2014-Wilco 2950cuft. silo | | WILCO | Wilco | | 2014 | |
| P242786 | | Silo | Fixed | Fixed Asset | SILO, 1300 CU FT | | MIDCAB | | 1300 CU FT | 1981 | 00381-14 |
| P242790 | | Bulk Plant | Fixed | Fixed Asset | Cement Sample Collector for Bu | | | | | | |
| P242811 | | Shop Equipment | Fixed | Fixed Asset | Rigmats for Portable Bulk Plan | | | | | | |
| P242836 | | Shop Equipment | Fixed | Fixed Asset | Shop Compressor | | | | | | |
| P242849 | | Software | Fixed | Fixed Asset | 2 USB keys, report license | | | | | | |
| P242852 | | Software | Fixed | Fixed Asset | Pegasus Vertex Software | | | | | | |
| P242861 | | Facilities | Fixed | Fixed Asset | Truck Scale | | | | | | |
| P242862 | | Facilities | Fixed | Fixed Asset | Truck Scale | | | | | | |
| P242921 | | Air Compressor | Fixed | Auxilary | Compressor 20-30HP | | | | | | |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| P243065 | CUB-027 | Silo Setter | Tractor | Tractor | 2014 Western Star Tractor/Silo | | Western Star | | 4900 | 2014 | 5KKMAED68EPFW2187 |
| P243078 | CUB-025 | Silo Setter | Tractor | Tractor | 2014 Western Star Tractor 4900 | | Western Star | | 4900 | 2014 | 5KKHALD62EPFV8660 |
| P243125 | TRS-324 | Tractor | Tractor | Tractor | 2013 Western Star Tractor 4900 | | Western Star | | 4900 SF | 2013 | 5KJJAEDR1DPFJ4756 |
| P243137 | CBF-063 | Batch Mixer | Trailer | Auxiliary | 2013 Wilco Batch Mixer | | WILCO | | Blank | 2013 | 1W9TC4128DM257548 |
| P243139 | CBF-067 | Batch Mixer | Trailer | Auxiliary | 2014 Wilco Batch Mixer | | | Wilco Machine and Fab | Blank | 2014 | 1W9TC4127EM257672 |
| Q243142 | CTS-391 | Silo | Skid | Auxiliary | 2015-Wilco 660 Bulk Trailer | | | WILCO FAB | BT 660 | 2015 | 1W9AB3927FM257794 |
| Q243157 | ATF-091 | Acid Transport | Trailer | | 2013 Troxell 2000/3000 Gallon | | | Troxell | | 2009 | 1T9TS40239R719908 |
| Q243158 | FIF-159 | Line Transport | Trailer | Auxiliary | Trailer Purchase | | Big Tex | | Blank | 2016 | 16VGX202XG6078403 |
| Q243159 | FIF-160 | Line Transport | Trailer | Auxiliary | Big Tex Trailer - Iron Trailer | | Big Tex | | Blank | 2012 | 16VGX2023C2642765 |
| Q243160 | | Cement Heads | Fixed | Fixed Asset | 4 1/2" Cement Head | | Fast Lock | | Single Plug | | 20647 |
| Q243161 | | Cement Heads | Fixed | Fixed Asset | 9 5/8" Cement Head | | Industrial Rubber | | Single Plug | | 41718-1 |
| Q243167 | | Cement Heads | Fixed | Fixed Asset | 13 3/8" Cement Head | | Industrial Rubber | | Single Plug | | 081116-8 |
| Q243173 | | Cement Heads | Fixed | Fixed Asset | 5 1/2" Cement Head | | Fast Lock | | 5 1/2" Single Plug | 2011 | 24787 |
| Q243174 | | Cement Heads | Fixed | Fixed Asset | 7 5/8" Cement Head | | Fast Lock | | 7 5/8" Single plug | 2010 | 22733 |
| Q243175 | | Cement Heads | Fixed | Fixed Asset | 8 5/8" Cement Head | | ARGUS | | CH1461 | | |
| Q243176 | | Cement Heads | Fixed | Fixed Asset | 9 5/8" Cement Head | | Fast Lock | | 9 5/8" single plug | 2013 | 17641 |
| Q243177 | | Cement Heads | Fixed | Fixed Asset | 13 3/8" Cement Head | | Industrial Rubber | | 13 3/8" Single Plug | | 12111301 |
| Q243180 | FIF-158 | Line Transport | Trailer | Auxiliary | Trailer Purchase | | Big Tex | | Blank | 2015 | 16VGX2023F6073106 |
| Q243181 | FIF-161 | Line Transport | Trailer | Auxiliary | Big Tex Trailer - Iron Trailer | | Big Tex | | Blank | 2016 | 16VGX2029G6049085 |
| Q243183 | | Cement Heads | Fixed | Fixed Asset | 13 3/8" Cement Head | | Fast Lock | | Single Plug | | 040212A10793 |
| Q243190 | | Cement Heads | Fixed | Fixed Asset | 9 5/8" Cement Head | | Fast Lock | | Single Plug | | 24606 |
| Q243191 | | Cement Heads | Fixed | Fixed Asset | 8 5/8" Cement Head | | Industrial Rubber | | Single Plug | | 130364 |
| Q243192 | | Cement Heads | Fixed | Fixed Asset | 5 5/8" Cement Head | | Fast Lock | | Single Plug | | 14567 |
| Q243196 | CPF-182 | Cement Pump | Trailer | Cement Pump | Cement Pump 1 | 1860 | Kalyn | Freemyer | Blank | 2016 | 5DDKE3437G1008306 |
| Q243197 | CPF-183 | Cement Pump | Trailer | Cement Pump | Cement Pump 2 | 1860 | Kalyn | Freemyer | Blank | 2016 | 5DDKE3435G1008305 |
| Q243198 | CPF-184 | Cement Pump | Trailer | Cement Pump | Cement Pump 3 | 1860 | Kalyn | Freemyer | Blank | 2016 | 5DDKE3439G1008307 |
| Q243203 | FIF-164 | Line Transport | Trailer | Auxiliary | Big Tex Trailer - Iron Trailer | | Big Tex | | Blank | 2016 | 16VGX2028G6093482 |
| Q243205 | | Info Tec | Fixed | | Mgmt Computers (5) | | | | | | |
| Q243214 | | Iron | Fixed | Fixed Asset | Iron rack additions | | Jet | | | 2017 | |
| Q243216 | | Iron | Fixed | Fixed Asset | Iron Package | | | | | | |
| Q243217 | | Iron | Fixed | Fixed Asset | Misc Iron | | | | | | |
| Q243218 | | Iron | Fixed | Fixed Asset | Iron Package 3 | | | | | | |
| Q243219 | | Iron | Fixed | Fixed Asset | Iron & High Pressure Hose Pkg | | | | | | |
| Q243220 | | Iron | Fixed | Fixed Asset | Iron rack additions | | | | | | |
| Q243221 | | Iron | Fixed | Fixed Asset | Iron rack additions | | | | | | |
| Q243222 | | Iron | Fixed | Fixed Asset | Iron rack additions | | | | | | |
| Q243223 | | Iron | Fixed | Fixed Asset | Iron Rack on Chem Trailer 3 | | | | | | |
| Q243224 | | Iron | Fixed | Fixed Asset | Iron Rack on Chem Trailer 4 | | | | | | |
| Q243225 | | Iron | Fixed | Fixed Asset | Addition to Iron Package | | | | | | |
| Q243227 | | Iron | Fixed | Fixed Asset | Iron rack additions | | | | | | |
| Q243237 | | Leasehold Improvements | Fixed | Fixed Asset | CWY Building - Customization | | | | | | |
| Q243238 | | Leasehold Improvements | Fixed | Fixed Asset | Parking lot grading & gravel | | | | | | |
| Q243239 | | Leasehold Improvements | Fixed | Fixed Asset | Custom Electric Work - Lab | | | | | | |
| Q243240 | | Leasehold Improvements | Fixed | Fixed Asset | Rolling Gate - Rear yard entra | | | | | | |
| Q243241 | | Leasehold Improvements | Fixed | Fixed Asset | Concrete sidewalk around build | | | | | | |
| Q243242 | CTF-018 | Cementing Bulk | Trailer | Auxiliary | Vantage 1000 cu ft Air Slide | | | Vantage | Blank | 2012 | 4E7PA4223CABA3161 |
| Q243243 | CTF-019 | Cementing Bulk | Trailer | Auxiliary | Vantage 1000 cu ft Air Slide | | | Vantage | Blank | 2012 | 4E7PA4221CABA3143 |
| Q243244 | CTF-020 | Cementing Bulk | Trailer | Auxiliary | Vantage 1000 cu ft Air Slide | | | Vantage | Blank | 2012 | 4E7PA4223CABA3144 |
| Q243245 | CTF-021 | Cementing Bulk | Trailer | Auxiliary | Vantage 1000 cu ft Air Slide Bulk | | | Vantage | Blank | 2012 | 4E7PA4227CABA3129 |
| Q243258 | | Bulk Plant | Fixed | Fixed Asset | Plant Silos (4) | | | | | | |
| Q243259 | | Bulk Plant | Fixed | Fixed Asset | Bulk Plant Silos (2) | | | | | | |
| Q243260 | CTS-392 | Silo | Skid | Auxiliary | Bulk Plant Loading Silo (1) Initial | | | | | 2015 | 1W9AB3929FM257795 |
| Q243261 | | Software | Fixed | Fixed Asset | Development | | | | | | |
| Q243262 | | Software | Fixed | Fixed Asset | September 2015 System Develo | | | | | | |
| Q243263 | | Software | Fixed | Fixed Asset | October 2015 System Developm | | | | | | |
| Q243264 | | Software | Fixed | Fixed Asset | November 2015 System Develop | | | | | | |
| Q243265 | | Software | Fixed | Fixed Asset | January 2016 System Developm | | | | | | |
| Q243266 | | Software | Fixed | Fixed Asset | March 2016 System Developmen | | | | | | |
| Q243267 | | Software | Fixed | Fixed Asset | May 2016 System Development | | | | | | |
| Q243268 | | Software | Fixed | Fixed Asset | July 2016 System Development | | | | | | |
| Q243269 | | Software | Fixed | Fixed Asset | August 2015 System Developme | | | | | | |
| Q243270 | | Software | Fixed | Fixed Asset | December 2015 System Develop | | | | | | |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Q243271 | | Software | Fixed | Fixed Asset | Cement Software2 | | | | | | |
| Q243272 | | Software | Fixed | Fixed Asset | Cement Software1 | | | | | | |
| Q243273 | | Software | Fixed | Fixed Asset | Aug 2016 System Development | | | | | | |
| Q243274 | | Software | Fixed | Fixed Asset | February 2016 System Develop | | | | | | |
| Q243294 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | CTE | | CTE | 2015 | 42715 |
| Q243307 | ATF-103 | Acid Transport | Trailer | Auxiliary | Carver | | Troxell | | Blank | 2013 | 1T9TS4029DR719906 |
| Q243312 | | Light Duty Vehicle | Body Load | Auxiliary | 2016 F350 Utility Bed 1 | | Ford | | F-350 | 2016 | 1FD8W3FT5GEA23058 |
| Q243313 | | Light Duty Vehicle | Body Load | Auxiliary | 2016 F350 Utility Bed 2 | | Ford | | F-350 | 2016 | 1FD8W3FT7GEA23059 |
| Q243313 | | Light Duty Vehicle | Body Load | Auxiliary | 2016 F350 Utility Bed 3 | | Ford | | F-350 | 2016 | 1FD8W3FT3GEA23060 |
| Q243314 | | Light Duty Vehicle | Body Load | Auxiliary | 2016 F350 Utility Bed 4 | | Ford | | F-350 | 2016 | 1FD8W3FT5GEA23061 |
| Q243315 | | Light Duty Vehicle | Body Load | Auxiliary | 2016 F350 Engineer Truck | | Ford | | F-350 | 2016 | 1FT8W3BT7GEA04263 |
| Q243316 | | Light Duty Vehicle | Body Load | Auxiliary | 2015 F150 - Field Sales | | Ford | | F-150 | 2015 | 1FTEW1EF4FKD35931 |
| Q243317 | | Light Duty Vehicle | Body Load | Auxiliary | 2016 F350 | | Ford | | F-350 | 2016 | 1FT8W3DT2GEC82226 |
| Q243318 | | Light Duty Vehicle | Body Load | Auxiliary | 2016 F350 | | Ford | | F-350 | 2016 | 1FT8W3DT3GEC60980 |
| Q243319 | TRS-105 | Tractor | Tractor | Tractor | Kenworth Tandem T880 1 | | Kenworth | | T880 | 2016 | 1XKZD40X4GJ499569 |
| Q243320 | TRS-106 | Tractor | Tractor | Tractor | Kenworth Tandem T880 2 | | Kenworth | | T880 | 2016 | 1XKZD40X2GJ499571 |
| Q243321 | TRS-107 | Tractor | Tractor | Tractor | Kenworth Tandem T880 3 | | Kenworth | | T880 | 2016 | 1XKZD40X0GJ499570 |
| Q243323 | TRS-109 | Tractor | Tractor | Tractor | Kenworth Tandem T880 5 | | Kenworth | | T880 | 2016 | 1XKZD40X4GJ499572 |
| Q243332 | CTF-034 | Tractor | Tractor | Tractor | 2013 Western Star Tractor 4900 | | Western Star | | 4900 | 2013 | 5KJJALDR2DPBY8583 |
| Q243343 | TRS-077 | Tractor | Tractor | Tractor | 2014 Western Star 4900SF Tract | | Western Star | | 4900 SF | 2014 | 5KJJAED6AEPFW1190 |
| Q243344 | TRS-040 | Tractor | Tractor | Tractor | 2014 Western Star 4900 Tractor | | Western Star | | 4900 | 2014 | 5KJJAED65EPFW1201 |
| Q243346 | CTF-013 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WST 1600 2 | | WILCO | | Blank | 2015 | 1W9AB471XFM257823 |
| Q243347 | CTF-014 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WST 1600 3 | | WILCO | | Blank | 2015 | 1W9AB4718FM257867 |
| Q243348 | CTF-015 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WST 1600 4 | | VKST | | Blank | 2012 | 1V9SX4713CN062719 |
| Q243350 | CTF-001 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WBT 620 1 | | WILCO | | Blank | 2015 | 1W9AB3926FM257804 |
| Q243351 | CTF-002 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WBT 620 2 | | WILCO | | Blank | 2015 | 1W9AB3921FM257803 |
| Q243352 | CTF-003 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WBT 620 3 | | WILCO | | Blank | 2015 | 1W9AB3921FM257855 |
| Q243353 | CTF-004 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WBT 620 4 | | WILCO | | Blank | 2015 | 1W9AB3926FM257854 |
| Q243354 | CTF-005 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WBT 660 1 | | WILCO | | Blank | 2015 | 1W9AB3928FM257805 |
| Q243355 | CTF-006 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WBT 660 2 | | WILCO | | Blank | 2013 | 1W9AB3920DM257486 |
| Q243356 | CTF-007 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WBT 660 3 | | WILCO | | Blank | 2013 | 1W9AB3924DM257488 |
| Q243357 | CTF-008 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WBT 660 4 | | WILCO | | Blank | 2013 | 1W9AB3926DM257489 |
| Q243358 | CTF-009 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WBT 660 5 | | WILCO | | Blank | 2013 | 1W9AB3921DM257490 |
| Q243359 | CTF-010 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WBT 660 6 | | WILCO | | Blank | 2013 | 1W9AB3923DM257492 |
| Q243360 | CTF-011 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WBT 660 7 | | WILCO | | Blank | 2014 | 1W9AB3922EM257653 |
| Q243361 | CTF-566 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WBT 660 8 | | WILCO | | Blank | 2015 | 1W9AB3922FM257797 |
| Q243366 | FIF-162 | Line Transport | Trailer | Auxiliary | Big Tex Trailer - Iron Trailer | | Big Tex | | Blank | 2017 | 16VGX2022G6005137 |
| Q243367 | FIF-163 | Line Transport | Trailer | Auxiliary | Big Tex Trailer - Iron Trailer | | Big Tex | | Blank | 2017 | 16VGX2025H6029353 |
| Q243368 | | Bulk Plant | Fixed | Fixed Asset | Plumb Bulk Plant into Building | | | | | | |
| USARCS-0000001 | CUF-020 | Utility | Trailer | Auxiliary | Air Compressor Trailer | 0 | Ameritrail | | UTILITY | 2011 | 17YBP1621BB047302 |
| USARCS-0000002 | FUF-313 | Utility | Trailer | Auxiliary | Air Compressor Trailer | 0 | Cummins | | 200CFM | 2006 | 16VNX082961C88263 |
| USARCS-0000003 | CUF-018 | Utility | Trailer | Auxiliary | Air Compressor Trailer | 0 | Cummins | | 200CFM | | 17YBP1625BB047299 |
| USARCS-0000004 | CUF-016 | Utility | Trailer | Auxiliary | Air Compressor Trailer | 0 | Cummins | American | 200CFM | 2012 | 17YBP1622BB047647 |
| USARCS-0000005 | CUF-021 | Utility | Trailer | Auxiliary | Air Compressor Trailer | 0 | Cummins | American | 200CFM | 2011 | 17YBP1629BB047645 |
| USBLKP-0000001 | | Bulk Plant | Fixed | | Bulk Plant (From Williston ND) | | | | | | |
| USBLKP-0000002 | | Bulk Plant | Fixed | Fixed Asset | Rifle Bulk Plant | | | | | | |
| USBOPT-0000003 | CUF-005 | Utility | Trailer | Auxiliary | Cementing - C-Pump/Boost-Skid | 0 | MCTR | | | 2013 | 1M9CH202F3W792186 |
| USBOPT-0000003 | CUF-006 | Utility | Trailer | Auxiliary | Cementing - C-Pump/Boost-Skid | 0 | TOP HAT INDUSTRIES | | | | 4R7BU2023BT110619 |
| USBOPT-0000004 | CUF-007 | Utility | Trailer | Auxiliary | Cementing - C-Pump/Boost-Skid | 0 | TOP HAT INDUSTRIES | | | 2012 | 4R7BU2029CT112456 |
| USBOPT-0000006 | CUF-008 | Utility | Trailer | Auxiliary | Cementing - C-Pump/Boost-Skid | 0 | Shop Built | | | | 1M94720242W792237 |
| USBOPT-0000009 | CUF-009 | Utility | Trailer | Auxiliary | Cementing - C-Pump/Boost-Skid | 0 | American | | UV16 | 2012 | 17YBP1627CB050819 |
| USBOPT-0000013 | CUF-012 | Utility | Trailer | Auxiliary | Cementing - C-Pump/Boost-Skid | 0 | Shopbuilt | | TRL | 1982 | NM85852 |
| USCBTA-0000052 | CTF-622 | Cementing Bulk | Trailer | Auxiliary | Cementing, Transport/Storage | | WILCO | | 660 | 2015 | 1W9AB3920FM257796 |
| USCBTA-0000057 | CTF-593 | Cementing Bulk | Trailer | Auxiliary | Cement Bulk | | FORT | | | 2002 | 20181232412 |
| USCBTA-0000061 | FUF-308 | Cementing Bulk | Trailer | Auxiliary | 1060 Cu. Ft. Dry Bulk Aluminum | | I.B.T INC. | | AIRSLIDE | 1995 | 4J8B0432XTT0007206 |
| USCBTA-0000062 | CTF-012 | Cementing Bulk | Trailer | Auxiliary | Bulk Trailer WST 1600 | | WILCO | | WST 1600 | 2015 | 1W9AB4711FM257824 |
| USCPTR-0000033 | CPF-085 | Cement Pump | Trailer | Cement Pump | CEM PUMP MCP2000 TM LT WT | 1000 | Pratt | Falcon | | | 1P9CP4023AB343236 |
| USFACI-0000006 | | Facilities | Fixed | Fixed Asset | Sales Tax - Cement Investment | | | | | | |
| USGEPT-0000029 | FUF-372 | Utility | Trailer | Auxiliary | FRAC HOSE TRAILER | | MC Trailer Mfg | | Blank | 2012 | 1M9UT202U2W792235 |
| USGEPT-0000050 | FIF-170 | Line Transport | Trailer | Auxiliary | Big Tex Trailer - Iron Trailer | | Big Tex | | Gooseneck | 2017 | 16VGX2022H6087470 |
| USGEPT-0000051 | FIF-171 | Line Transport | Trailer | Auxiliary | Big Tex Trailer - Iron Trailer | | Big Tex | | Gooseneck | 2017 | 16VGX2021H6087461 |
| USGEPT-0000052 | FIF-172 | Line Transport | Trailer | Auxiliary | Big Tex Trailer - Iron Trailer | | Big Tex | | Gooseneck | 2018 | 16VGX2021J6099521 |
| USGEPT-0000053 | FIF-173 | Line Transport | Trailer | Auxiliary | Big Tex Trailer - Iron Trailer | | Big Tex | | Gooseneck | 2017 | 16VGX2023H6087462 |
| USGEPT-0000054 | FIF-174 | Line Transport | Trailer | Auxiliary | Big Tex Trailer - Iron Trailer | | Big Tex | | Gooseneck | 2017 | 16VGX2029H6079754 |
| USGEPT-0000055 | FIF-175 | Line Transport | Trailer | Auxiliary | Big Tex Trailer - Iron Trailer | | Big Tex | | Gooseneck | 2018 | 16VGX2025J6090692 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| USGEPT-0000056 | FIF-176 | Line Transport | Trailer | Auxilary | Big Tex Trailer - Iron Trailer | | Big Tex | | Gooseneck | 2018 | 16VGX2024J6096452 |
| USGEPT-0000062 | FUF-312 | Utility | Trailer | Auxilary | PORTABLE HEATER | | TRITON | | HI750 | 2011 | 4TCSU2755BHH00102 |
| USGEPT-0000078 | FUF-182 | Utility | Trailer | Auxilary | Utility trailer | | Perkins Trailer CO | | TRL | 2002 | 44CPL16242T027228 |
| USGEPT-0000084 | FUT-072 | Utility | Trailer | Auxilary | Utility trailer | | Top Hat | Top Hat | 14000 lds | 2012 | 4R7BU242CT117610 |
| USGEPT-0000090 | FUF-052 | Utility | Trailer | Auxilary | Utility trailer | | Shop Made | | | | |
| USGEPT-0000091 | FUF-272 | Utility | Trailer | Auxilary | Utility trailer | | Circle J Trailer | | FB | 1991 | RJT610000191 |
| USHLDV-0000004 | TRB-751 | Tractor | Tractor | Tractor | STAKEBED TANDEM ISC | | Peterbilt | | 335 | 2006 | 2NPLLZ9XS6M646180 |
| USHMAN-0000011 | TRB-743 | Maintenance Truck | Tractor | Tractor | MAINT TRUCK PETE 330 ISC | | Peterbilt | | 337 | 2013 | 2NP2HN7X5DM185844 |
| USLBEQ-0000002 | | Lab Eq | Fixed | Fixed Asset | CONSTANT SPEED MIXER | | IKA | | RW20DS1 | | |
| USLBEQ-0000003 | | Lab Eq | Fixed | Fixed Asset | CONSTANT SPEED MIXER | | Chandler | | 30605 | | 472 |
| USLBEQ-0000004 | | Lab Eq | Fixed | Fixed Asset | CONSTANT SPEED MIXER | | Chandler | | 3060 | 2003 | 1140 |
| USLBEQ-0000005 | | Lab Eq | Fixed | Fixed Asset | CONSTANT SPEED MIXER | | Chandler | | 3060 | 2007 | 1393 |
| USLBEQ-0000006 | | Lab Eq | Fixed | Fixed Asset | CONSTANT SPEED MIXER | | Chandler | | 3060 | 2012 | 1873 |
| USLBEQ-0000007 | | Lab Eq | Fixed | Fixed Asset | CONSTANT SPEED MIXER | | CTE | | 7000 | | 40915 |
| USLBEQ-0000008 | | Lab Eq | Fixed | Fixed Asset | CONSTANT SPEED MIXER | | CTE | | 7000 | | 06.04.12 |
| USLBEQ-0000009 | | Lab Eq | Fixed | Fixed Asset | CONSTANT SPEED MIXER | | Chandler | | 3060 | 2007 | 1873 |
| USLBEQ-0000010 | | Lab Eq | Fixed | Fixed Asset | CONSTANT SPEED MIXER | | CTE | | 7000 | | 06.04.12 |
| USLBEQ-0000011 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | Chandler | | 12-70 | | |
| USLBEQ-0000012 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | Chandler | | 12-70 | | |
| USLBEQ-0000013 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | Chandler | | 1200 | | |
| USLBEQ-0000014 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | Chandler | | 1200 | 2007 | |
| USLBEQ-0000015 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | Chandler | | 1200 | 2003 | |
| USLBEQ-0000016 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | Chandler | | 1200 | | |
| USLBEQ-0000019 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | Chandler | | 1200 | 2012 | |
| USLBEQ-0000020 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | CTE | | M200 | 2015 | |
| USLBEQ-0000021 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | Ofite | | 60 | 2014 | |
| USLBEQ-0000022 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | CTE | | M200 | 2013 | |
| USLBEQ-0000023 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | CTE | | M200 | 2017 | |
| USLBEQ-0000024 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | CTE | | M200 | 2015 | |
| USLBEQ-0000025 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | CTE | | M200 | | |
| USLBEQ-0000026 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | Chandler | | 1200 | | |
| USLBEQ-0000027 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | CTE | | M200 | | |
| USLBEQ-0000028 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | CTE | | M200 | | |
| USLBEQ-0000029 | | Lab Eq | Fixed | Fixed Asset | ATMOSPHERIC CONSISTOMETER | | CTE | | M200 | | |
| USLBEQ-0000030 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Chandler | | 35A | 2012 | 2046 |
| USLBEQ-0000031 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Chandler | | 35A | 2012 | 1100XXXXA096 |
| USLBEQ-0000032 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 96 |
| USLBEQ-0000033 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 753 |
| USLBEQ-0000034 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 754 |
| USLBEQ-0000035 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 2490 |
| USLBEQ-0000036 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 2634 |
| USLBEQ-0000037 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 3605 |
| USLBEQ-0000038 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 40017 |
| USLBEQ-0000039 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 42990 |
| USLBEQ-0000040 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 10078503 |
| USLBEQ-0000041 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 10078689 |
| USLBEQ-0000042 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 10094990 |
| USLBEQ-0000043 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 10098478 |
| USLBEQ-0000044 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 88101652 |
| USLBEQ-0000045 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 90074365 |
| USLBEQ-0000046 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 92047856 |
| USLBEQ-0000047 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | |
| USLBEQ-0000048 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | |
| USLBEQ-0000049 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Fann | | 35A | 2012 | 10098456 |
| USLBEQ-0000050 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 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 |
| USLBEQ-0000051 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 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 |
| USLBEQ-0000052 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 03-139 |
| USLBEQ-0000053 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 03-165 |
| USLBEQ-0000054 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 03-168 |
| USLBEQ-0000055 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 04-279 |
| USLBEQ-0000056 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 05-502 |
| USLBEQ-0000057 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 05-512 |
| USLBEQ-0000058 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 06-568 |
| USLBEQ-0000059 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 06-603 |
| USLBEQ-0000060 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 07-902 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| USLBEQ-0000061 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 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 |
| USLBEQ-0000062 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 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 |
| USLBEQ-0000063 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 04-304 |
| USLBEQ-0000064 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 05-464 |
| USLBEQ-0000065 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 05-511 |
| USLBEQ-0000066 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 07-822 |
| USLBEQ-0000067 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 08-1024 |
| USLBEQ-0000068 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 10-1284-003 |
| USLBEQ-0000069 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 11-1388-003 |
| USLBEQ-0000070 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 13-5284-001 |
| USLBEQ-0000071 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | M900 | 2012 | 04-302 |
| USLBEQ-0000072 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Ofite | | 800 | 2012 | 5.02019E+12 |
| USLBEQ-0000073 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Grace | | M3600 | 2013 | M3600-0361 |
| USLBEQ-0000074 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Grace | | M3600 | 2013 | M3600-0363 |
| USLBEQ-0000075 | | Lab Eq | Fixed | Fixed Asset | Viscometer | | Grace | | M3600 | 2013 | M3600-5-0450 |
| USLBEQ-0000084 | | Lab Eq | Fixed | Fixed Asset | HTHP Viscometer | | Chandler | | 5550 | | 151 |
| USLBEQ-0000085 | | Lab Eq | Fixed | Fixed Asset | HTHP Viscometer | | Chandler | | 5550 | | 152 |
| USLBEQ-0000086 | | Lab Eq | Fixed | Fixed Asset | HTHP Viscometer | | Chandler | | 5550 | | 106 |
| USLBEQ-0000087 | | Lab Eq | Fixed | Fixed Asset | HTHP Viscometer | | Chandler | | 5550 | | 440 |
| USLBEQ-0000088 | | Lab Eq | Fixed | Fixed Asset | HTHP Viscometer | | Chandler | | 5550 | | 441 |
| USLBEQ-0000089 | | Lab Eq | Fixed | Fixed Asset | HTHP Viscometer | | Fann | | 50 | | 1178 |
| USLBEQ-0000090 | | Lab Eq | Fixed | Fixed Asset | HTHP Viscometer | | Fann | | 50 | | 1178 |
| USLBEQ-0000091 | | Lab Eq | Fixed | Fixed Asset | Digital Scale | | A&D Company | | 50031 | | 5215469 |
| USLBEQ-0000092 | | Lab Eq | Fixed | Fixed Asset | Digital Scale | | Mettler | | AB204-S | | 1122140049 |
| USLBEQ-0000093 | | Lab Eq | Fixed | Fixed Asset | Digital Scale | | Ohaus | | PA3102 | 2013 | B408317294 |
| USLBEQ-0000094 | | Lab Eq | Fixed | Fixed Asset | Digital Scale | | Ohaus | | PA3102 | | B4308423 |
| USLBEQ-0000095 | | Lab Eq | Fixed | Fixed Asset | Digital Scale | | Mettle | | AE160 | | E01648 |
| USLBEQ-0000096 | | Lab Eq | Fixed | Fixed Asset | Digital Scale | | Ohaus | | EP3102 | | J1151126131769P |
| USLBEQ-0000097 | | Lab Eq | Fixed | Fixed Asset | Digital Scale | | Mettle | | AE50 | | N33294 |
| USLBEQ-0000099 | | Lab Eq | Fixed | Fixed Asset | Chiller | | Thermo | | 41103 | | |
| USLBEQ-0000103 | | Lab Eq | Fixed | Fixed Asset | Wettability Tester | | Chandler | | 3065 | | 227 |
| USLBEQ-0000109 | | Lab Eq | Fixed | Fixed Asset | Compressive Strength Tester | | Chandler | | 4297D | 2012 | 337 |
| USLBEQ-0000110 | | Lab Eq | Fixed | Fixed Asset | Compressive Strength Tester | | Carver | | 3851-0 | 2010 | 140179 |
| USLBEQ-0000116 | | Lab Eq | Fixed | Fixed Asset | CONSTANT SPEED MIXER | | CTE | | 7000 | | 62216 |
| USLBEQ-0000118 | | Lab Eq | Fixed | Fixed Asset | Rheometer | | Brookfield | | PVS002AB | | 5529512 |
| USLBEQ-0000119 | | Lab Eq | Fixed | Fixed Asset | Rheometer | | Brookfield | | PVS002AB | | 6529612 |
| USLBEQ-0000121 | | Lab Eq | Fixed | Fixed Asset | Rheometer | | Brookfield | | PVS002AB | | P072103-1 |
| USLBEQ-0000122 | | Lab Eq | Fixed | Fixed Asset | Rheometer | | Brookfield | | PVS002AB | | P103197-1 |
| USLBEQ-0000123 | | Lab Eq | Fixed | Fixed Asset | Rheometer | | Brookfield | | PVS002AB | | P122403-1 |
| USLBEQ-0000124 | | Lab Eq | Fixed | Fixed Asset | Single Control Dry-Block Teste | | Conders Instruments | | CI3510J001 | | 27386 |
| USLBEQ-0000125 | | Lab Eq | Fixed | Fixed Asset | Single Cell UCA | | Chandler | | 4265 | 2009 | 607 |
| USLBEQ-0000127 | | Lab Eq | Fixed | Fixed Asset | Single Cell UCA | | CTE | | M2000-5 | 2015 | 235 |
| USLBEQ-0000128 | | Lab Eq | Fixed | Fixed Asset | Single Cell UCA | | CTE | | M2000-5 | 2015 | 297 |
| USLBEQ-0000129 | | Lab Eq | Fixed | Fixed Asset | Single Cell UCA | | CTE | | M2000-5 | 2015 | 298 |
| USLBEQ-0000130 | | Lab Eq | Fixed | Fixed Asset | Single Cell UCA | | CTE | | M2000-5 | 2015 | 303 |
| USLBEQ-0000131 | | Lab Eq | Fixed | Fixed Asset | DUAL CELL UCA | | Chandler | | 4262 | 2012 | 746 |
| USLBEQ-0000132 | | Lab Eq | Fixed | Fixed Asset | DUAL CELL UCA | | Chandler | | 4262 | 2012 | 748 |
| USLBEQ-0000133 | | Lab Eq | Fixed | Fixed Asset | DUAL CELL UCA | | Chandler | | 4262 | 2012 | 791 |
| USLBEQ-0000134 | | Lab Eq | Fixed | Fixed Asset | DUAL CELL UCA | | Chandler | | 4262 | 2012 | 792 |
| USLBEQ-0000135 | | Lab Eq | Fixed | Fixed Asset | DUAL CELL UCA | | Chandler | | 4262 | 2012 | 847 |
| USLBEQ-0000136 | | Lab Eq | Fixed | Fixed Asset | DUAL CELL UCA | | Chandler | | 4262 | 2012 | 853 |
| USMCSL-0000001 | CTF-625 | Cementing Bulk | Trailer | Auxilary | 4000 CU FT Ports Bulk Storage | | Troxell | Viking | Tow Away | 2010 | 1T9SS5617ER719145 |
| USMCSL-0000002 | CTF-624 | Cementing Bulk | Trailer | Auxilary | 1600 CU FT LAYDOWN FIELD BIN | | Viking | | | 2010 | 1V9SX4710BN062255 |
| USMCSS-0000003 | CTS-407 | Silo | Skid | Auxilary | 1300 CU FT CEMENT SILO | | WILCO | Wilco | | 2009 | 1981 |
| USMCSS-0000004 | CTS-429 | Silo | Skid | Auxilary | 1300 CU FT CEMENT SILO | | WILCO | | | 2008 | 2818 |
| USMCSS-0000005 | CTS-413 | Silo | Skid | Auxilary | 1300 CU FT CEMENT SILO | | WILCO | | | | |
| USMCSS-0000006 | CTS-466 | Silo | Skid | Auxilary | 1300 CU FT CEMENT SILO | | WILCO | Wilco | | | |
| USMCSS-0000007 | CTS-409 | Silo | Skid | Auxilary | 1300 CU FT CEMENT SILO | | WILCO | | | | |
| USMCSS-0000008 | CTS-428 | Silo | Skid | Auxilary | 1300 CU FT CEMENT SILO | | WILCO | Wilco | | | |
| USMCSS-0000009 | | Silo | Fixed | Fixed Asset | 1300 CU FT CEMENT SILO | | WILCO | | | | |
| USMCSS-0000010 | CTS-411 | Silo | Skid | Auxilary | 1300 CU FT CEMENT SILO | | WILCO | | | | |
| USMCSS-0000012 | CTS-416 | Silo | Skid | Auxilary | 1300 CU FT CEMENT SILO | | WILCO | | | | |
| USMCSS-0000013 | CTS-426 | Silo | Skid | Auxilary | 1300 CU FT CEMENT SILO | | WILCO | | | 2013 | |
| USMCSS-0000014 | CTS-390 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | B73133 |
| USMCSS-0000015 | CTS-433 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| USMCSS-0000016 | CTS-424 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | ISF | | 2007 | 07-Z185 |
| USMCSS-0000017 | CTS-430 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | Wilco | | 2008 | 1003-38 |
| USMCSS-0000018 | CTS-432 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | ASME | | 2014 | 1003-39 |
| USMCSS-0000019 | CTS-422 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | Wilco | | 2012 | 5780 |
| USMCSS-0000020 | CTS-420 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | Wilco | | 2012 | 6429 |
| USMCSS-0000021 | CTS-414 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | BJ-73052-32021-2 |
| USMCSS-0000022 | CTS-423 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | BJ-J604-32021-1 |
| USMCSS-0000023 | CTS-403 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | |
| USMCSS-0000024 | CTS-401 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | S-6 |
| USMCSS-0000025 | CTS-400 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | Wilco | | | 6500B925 |
| USMCSS-0000026 | CTS-412 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | |
| USMCSS-0000027 | CTS-352 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | 2012 | 1003-33 |
| USMCSS-0000028 | CTS-427 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | |
| USMCSS-0000029 | CTS-431 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | |
| USMCSS-0000030 | CTS-405 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | H-6 |
| USMCSS-0000031 | CTS-415 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | |
| USMCSS-0000032 | CTS-402 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | H-2 |
| USMCSS-0000033 | CTS-404 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | BH058-4 |
| USMCSS-0000034 | CTS-408 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | Appco | | | |
| USMCSS-0000035 | CTS-406 | Silo | Skid | Auxilary | 970 CU FT CEMENT SILO | | WILCO | | | | |
| USMCSS-0000036 | CTS-434 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 1 |
| USMCSS-0000037 | CTS-435 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 3A |
| USMCSS-0000038 | CTS-436 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 7 |
| USMCSS-0000039 | CTS-437 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | Fabrication Co. Inc. | Silo | 2005 | 1430 |
| USMCSS-0000040 | CTS-438 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | Wilco | Silo | 2012 | 5966 |
| USMCSS-0000041 | CTS-439 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 661 |
| USMCSS-0000042 | CTS-440 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 665 |
| USMCSS-0000043 | CTS-441 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | 8760 |
| USMCSS-0000044 | CTS-442 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | 6800M |
| USMCSS-0000045 | CTS-443 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | 66182 |
| USMCSS-0000046 | CTS-444 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | 66183 |
| USMCSS-0000047 | CTS-445 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | Industrial Service & | Silo | 2006 | Jun-21 |
| USMCSS-0000048 | CTS-446 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | 664 |
| USMCSS-0000049 | CTS-447 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 12 |
| USMCSS-0000050 | CTS-448 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 17 |
| USMCSS-0000051 | CTS-449 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 6 |
| USMCSS-0000052 | CTS-450 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 39 |
| USMCSS-0000053 | CTS-451 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 22 |
| USMCSS-0000054 | CTS-452 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 3 |
| USMCSS-0000055 | CTS-453 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 653 |
| USMCSS-0000056 | CTS-454 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 26 |
| USMCSS-0000057 | CTS-455 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 673 |
| USMCSS-0000058 | CTS-456 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | Wilco | Silo | | 5762 |
| USMCSS-0000059 | CTS-457 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 14 |
| USMCSS-0000060 | CTS-458 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 10 |
| USMCSS-0000061 | CTS-459 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 659 |
| USMCSS-0000062 | CTS-460 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 660 |
| USMCSS-0000063 | CTS-461 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | BH193 |
| USMCSS-0000064 | CTS-462 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 16 |
| USMCSS-0000065 | CTS-463 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 19 |
| USMCSS-0000066 | CTS-464 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 2 |
| USMCSS-0000067 | CTS-465 | Silo | Skid | Auxilary | BULK CEMENT FIELD SILO | | | | Silo | | Silo 02 |
| USMCSS-0000068 | CTS-134 | Silo | Skid | Auxilary | 970 CU FT SILO | | | | | | BJ6800M153 |
| USMSCI-0000003 | | Intangible | Fixed | Fixed Asset | Cement Tech Agreement | | | | | | |
| USTRCT-0000128 | TRH-832 | Tractor | Tractor | Tractor | Tractor - Hydraulic | | Peterbilt | | 367 | 2013 | 1XPTD49X7DD166389 |
| USTRCT-0000140 | TRH-678 | Tractor | Tractor | Tractor | Tractor - Hydraulic | | Peterbilt | | 367 | 2013 | 1XPTD49X7DD163279 |
| USTRCT-0000274 | TRB-761 | Tractor | Tractor | Tractor | TRUCK,CONV STAKEBED | | Kenworth | | T8 Series | 2000 | 2XKDDB9X4KM921228 |
| USTRCT-0000295 | TRH-1016 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2013 | 1XPTD49X0DD166105 |
| USTRCT-0000300 | TRH-2080 | Tractor | Tractor | Tractor | TRACTOR HYD I ISX LT WT | | Peterbilt | | 367 | 2011 | 1XPTD49X7BD117044 |
| USTRCT-0000320 | TRH-855 | Tractor | Tractor | Tractor | TRACTOR, HYDRAULIC | | Peterbilt | | 367 | 2011 | 1XPTD49X1BD117086 |
| USTRCT-0000321 | TRH-778 | Tractor | Tractor | Tractor | TRACTOR, HYDRAULIC | | Peterbilt | | 367 | 2011 | 1XPTD49X7BD123166 |
| USTRCT-0000341 | TRH-790 | Tractor | Tractor | Tractor | Tractor - Hydraulic | | Peterbilt | | 367 | 2013 | 1XPTD49X5DD166150 |
| USTRCT-0000343 | TRH-788 | Tractor | Tractor | Tractor | Tractor - Hydraulic | | Peterbilt | | 367 | 2013 | 1XPTD49X9DD166247 |
| USTRCT-0000349 | TRH-154 | Tractor | Tractor | Tractor | TRACTOR HYDRAULIC | | Peterbilt | | 367 | 2012 | 1XPTD49X7CD137442 |
| 1233330e | | Engine | Child Asset | Child Asset | Engine | | | | | | |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1233385e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRCT-0000152 | | Tractor | Child Asset | Child Asset | Refurb-TRACTOR HYD I ISX | | | | | | |
| 1233411e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1233422e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRCT-0000232 | | Tractor | Child Asset | Child Asset | Refurb: US01-00000137: TRH-183 | | | | | | |
| 1233455e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1233456e | 79237853 | Engine | Child Asset | Child Asset | Engine | | | | | | 79237853 |
| USTRCT-0000282 | | Tractor | Child Asset | Child Asset | Refurb- TRACTOR COMPRESSOR ISX | | | | | | |
| 1233476e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRCT-0000280 | | Tractor | Child Asset | Child Asset | Refurb- TRACTOR COMPRESSOR ISX | | | | | | |
| 1233490e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRCT-0000228 | | Tractor | Child Asset | Child Asset | Refurb: US01-00000395: TRB-220 | | | | | | |
| 1233493e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1233495e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1233496e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1233555e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1233564e | 79233639 | Engine | Child Asset | Child Asset | Engine | | | | | | 79233639 |
| USTRCT-0000098 | | Tractor | Child Asset | Child Asset | Refurb-TRACTOR HYD-II ISX | | | | | | |
| USTRCT-0000201 | | Tractor | Child Asset | Child Asset | Refurb-TRACTOR HYD-VII ISX | | | | | | |
| 1233724e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1233725e | 79312041 | Engine | Child Asset | Child Asset | Engine | | | | | | 79312041 |
| 1233726e | 79312040 | Engine | Child Asset | Child Asset | Engine | | | | | | 79312040 |
| 1233727e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRCT-0000281 | | Tractor | Child Asset | Child Asset | Refurb- TRACTOR COMPRESSOR ISX | | | | | | |
| USTRCT-0000034 | | Tractor | Child Asset | Child Asset | Refurb- TRACTOR HYD I ISX | | | | | | |
| USTRCT-0000206 | | Tractor | Child Asset | Child Asset | Refurb-TRACTOR HYD I ISX | | | | | | |
| 1233945e | 79422076 | Engine | Child Asset | Child Asset | Engine | | | | | | 79422076 |
| 1233958e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1233983e | 79422933 | Engine | Child Asset | Child Asset | Engine | | | | | | 79422933 |
| 1233986a | | Tractor | Child Asset | Child Asset | Refurb - TRACTOR HYD I ISX LT | | | | | | |
| 1233986f | | Tractor | Child Asset | Child Asset | Refurb - TRACTOR HYD I ISX LT | | | | | | |
| USTRCT-0000001 | | Tractor | Child Asset | Child Asset | Refurb-TRACTOR HYD I ISX LT WT | | | | | | |
| 1234029d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234125e | 79449132 | Engine | Child Asset | Child Asset | Engine | | | | | | 79449132 |
| 1234126e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRCT-0000084 | | Tractor | Child Asset | Child Asset | Refurb- TRACTOR COMPRESSOR ISX | | | | | | |
| 1234201e | 79155291 | Engine | Child Asset | Child Asset | Engine | | | | | | 79155291 |
| 1234223e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234232e | 79147868 | Engine | Child Asset | Child Asset | Engine | | | | | | 79147868 |
| USTRCT-0000053 | | Tractor | Child Asset | Child Asset | Refurb- TRACTOR HYD-II ISX | | | | | | |
| USTRCT-0000094 | | Tractor | Child Asset | Child Asset | Refurb- TRACTOR HYD-II ISX | | | | | | |
| 1234276e | 79169322 | Engine | Child Asset | Child Asset | Engine | | | | | | 79169322 |
| USTRCT-0000200 | | Tractor | Child Asset | Child Asset | Refurb-TRACTOR HYD-V ISX | | | | | | |
| USTRCT-0000054 | | Tractor | Child Asset | Child Asset | Refurb- TRACTOR HYD-II ISX | | | | | | |
| 1234327e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234341d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234352e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234412e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234418e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234448e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234456e | 79092534 | Engine | Child Asset | Child Asset | Engine | | | | | | 79092534 |
| 1234546e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRCT-0000298 | | Tractor | Child Asset | Child Asset | Refurb: ATS TRB-147 | | | | | | |
| USTRCT-0000183 | | Tractor | Child Asset | Child Asset | Refurb-TRACTOR HYD-II ISX | | | | | | |
| 1234653e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234690e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234833c | | Power End | Child Asset | | Power End | | | | | | |
| 1234833d | | Transmission | Child Asset | | Transmission | | | | | | |
| 1234833e | | Engine | Child Asset | | Engine | | | | | | |
| 1234834e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234835e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234835d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234837e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234837h | | Cement Pump | Child Asset | Child Asset | Refurb - CEM PUMP MCP2000 TM | | | | | | |
| 1234841c | | Power End | Child Asset | Child Asset | Power End | | | | | | |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1234841d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234841e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCPTR-0000023 | | Cement Pump | Child Asset | Child Asset | Refurb-CMT UNIT,TM FALCON LT | | | | | | |
| USCPTR-0000024 | | Cement Pump | Child Asset | Child Asset | Refurb-CMT UNIT,TM FALCON LT | | | | | | |
| 1234847e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRNS-0000811 | 3110088776 | Transmission | Child Asset | Child Asset | Transmission | | Allison | Allison | 6061 | | 3110088776 |
| USPREN-0000220 | GO615-11061 | Power End | Child Asset | Child Asset | Power End | | | Pacemaker | | | GO615-11061 |
| 1234849d | 30-21867 | Transmission | Child Asset | Child Asset | Transmission | | | Allison | | | 30-21867 |
| 1234849c | 68973-19 | Power End | Child Asset | Child Asset | Power End | | | Pacemaker | | | 68973-19 |
| 1234849e | 6R0813411 | Engine | Child Asset | Child Asset | Engine | | | | | | 6R0813411 |
| 1234851d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234851e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234854e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234856e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234857d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234857e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRNS-0000462 | 3033928 | Transmission | Child Asset | Child Asset | Transmission | | | Allison | | | 3033928 |
| USCPTR-0000005 | | Cement Pump | Child Asset | Child Asset | Refurb- CEM PUMP MCP2000 TM | | | | | | |
| USTRNS-0000402 | 34569 | Transmission | Child Asset | Child Asset | Transmission | | | Allison | | | 34569 |
| 1234862e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234864d | | Transmission | Child Asset | | Transmission | | | | | | |
| 1234864e | | Engine | Child Asset | | Engine | | | | | | |
| 1239354 | | Cement Pump | Child Asset | | FALCON REBUILD :ORD 4179896 C1 | | Kalyn | | FALC | 2006 | |
| 1234866e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234867h | | Cement Pump | Child Asset | Child Asset | Refurb - CEM PUMP MCP2000 TM | | | | | | |
| USCPTR-0000009 | | Cement Pump | Child Asset | Child Asset | Refurb- CEM PUMP MCP2000 TM | | | | | | |
| 1234870d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234870e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRNS-0000649 | 34367 | Transmission | Child Asset | Child Asset | Transmission | | | | | | 34367 |
| 1234871e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRNS-0000131 | | Transmission | Child Asset | Child Asset | Transmission | | | | | | 3110107467 |
| USTRNS-0000494 | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234872c | I6897323 | Power End | Child Asset | Child Asset | Power End | | | Pacemaker | | | I6897323 |
| 1234872d | 30-34518 | Transmission | Child Asset | Child Asset | Transmission | | | | | | 30-34518 |
| 1234872e | 6R0880691 | Engine | Child Asset | Child Asset | Engine | | | | | | 6R0880691 |
| 1234876d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234876e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234881e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234882e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234883d | 6610207949 | Transmission | Child Asset | Child Asset | Transmission | | | Allison | | | 6610207949 |
| 1234883e | 6R0934050 | Engine | Child Asset | Child Asset | Engine | | | | | | 6R0934050 |
| USTRNS-0000376 | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234884c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1234884d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234884e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USPREN-0000188 | GO615-11015 | Power End | Child Asset | Child Asset | Power End | | | Pacemaker | | | GO615-11015 |
| 1234886h | | Cement Pump | Child Asset | Child Asset | Refurb - CEM PUMP MCP2000 TM | | | | | | |
| 1234887d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| USENGE-0000249 | 06RE300458 | Engine | Child Asset | Child Asset | Engine | | Detroit | Detroit | Series 60 | | 06RE300458 |
| USENGE-0000302 | 06R0934808 | Engine | Child Asset | Child Asset | Engine | | Detroit | Detroit | Series 60 | | 06R0934808 |
| USPREN-0000349 | 141219PTL2 | Power End | Child Asset | Child Asset | Power End | | | Pacemaker | | | 141219PTL2 |
| 1234889e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCPTR-0000018 | | Cement Pump | Child Asset | Child Asset | Refurb- CEM PUMP MCP2000 TM | | | | | | |
| USENGE-0000238 | 06R1044519 | Engine | Child Asset | Child Asset | Engine | | Detroit Diesel (MTU) | Detroit | Series 60 | | 06R1044519 |
| 1234898c | 190393-85 | Power End | Child Asset | Child Asset | Power End | | | Pacemaker | | | 190393-85 |
| 1234898e | 6R0954740 | Engine | Child Asset | Child Asset | Engine | | | | | | 6R0954740 |
| USENGE-0000043 | 06R0967264 | Engine | Child Asset | Child Asset | Engine | | Detroit Diesel (MTU) | Detroit | Series 60 | | 06R0967264 |
| 1234905e | | Engine | Child Asset | Child Asset | Engine | | Detroit Diesel (MTU) | | Series 60 | | |
| USENGE-0000047 | 06R1041723 | Engine | Child Asset | Child Asset | Engine | | Detroit Diesel (MTU) | Detroit | Series 60 | | 06R1041723 |
| USTRNS-0000403 | 6610331856  B Side | Transmission | Child Asset | Child Asset | Transmission | | Allison | Allison | 4700 | | 6610331856 |
| USTRNS-0000229 | 6610348836 | Engine | Child Asset | Child Asset | Transmission | | Allison | Allison | HD4700 TC561 | | 6610348836 |
| USTRNS-0000754 | MIE015771RBE | Transmission | Child Asset | Child Asset | Transmission | | Allison | Allison | 4700 | | MIE015771RBE |
| 1234909d | 06L08 | Transmission | Child Asset | Child Asset | Transmission | | | Allison | | | 06L08 |
| 1234909e | 6R0969911 | Engine | Child Asset | Child Asset | Engine | | | | | | 6R0969911 |
| USTRNS-0000143 | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1234910e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USPREN-0000435 | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1234911c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1234911e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234913c | I90393-96 | Power End | Child Asset | Child Asset | Power End | | | Pacemaker | | | I90393-96 |
| 1234913d | 6610215953 | Transmission | Child Asset | Child Asset | Transmission | | | Allison | | | 6610215953 |
| 1234913e | 6R0969910 | Engine | Child Asset | Child Asset | Engine | | | | | | 6R0969910 |
| USCPTR-0000020 | | Cement Pump | Child Asset | Child Asset | Refurb- CEM PUMP MCP2000 TM | | | | | | |
| 1234918e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRNS-0000397 | 3517485 | Transmission | Child Asset | Child Asset | Transmission | | Allison | Allison | CLT 6061 | | 3517485 |
| 1234920h | | Cement Pump | Child Asset | Child Asset | Refurb - CEM PUMP MCP2000 TM | | | | | | |
| 1234921h | | Cement Pump | Child Asset | Child Asset | Refurb - CEM PUMP MCP2000 TM | | | | | | |
| USTRNS-0000463 | 731004769 | Transmission | Child Asset | Child Asset | Transmission | | | Allison | | | 731004769 |
| USTRNS-0000782 | 3110107467 | Transmission | Child Asset | Child Asset | Transmission | | Allison | Allison | 6061 | | 3110107467 |
| 1234923e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCPTR-0000008 | | Cement Pump | Child Asset | Child Asset | Refurb- CEM PUMP MCP2000 TM | | | | | | |
| 1234928d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234928e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1234930c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1234930d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234930e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USPREN-0000351 | 112 | Power End | Child Asset | Child Asset | Power End | | | Pacemaker | | | 112 |
| USPREN-0000409 | F0314-23459 | Power End | Child Asset | Child Asset | Power End | | | | | | F0314-23459 |
| 1234932c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1234932d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234932e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USPREN-0000158 | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| USTRNS-0000495 | 311088249 | Transmission | Child Asset | Child Asset | Transmission | | Allison | Allison | 6061 | | 311088249 |
| 1234933c | 4032AL | Power End | Child Asset | Child Asset | Power End | | | Pacemaker | | | 4032AL |
| 1234933e | 6R0785950 | Engine | Child Asset | Child Asset | Engine | | | | | | 6R0785950 |
| USCPTR-0000043 | | Cement Pump | Child Asset | Child Asset | REFURB - CEMENT PUMP | | | | | | |
| 1234939c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1234939e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000025 | | Cement Bulk | Child Asset | Child Asset | Refurb-TRANSPORT,CMT TM 600ST- | | | | | | |
| USCBTA-0000026 | | Cement Bulk | Child Asset | Child Asset | Refurb-TRANSPORT,CMT TM 600ST- | | | | | | |
| 1234964e | 6VF221995 | Engine | Child Asset | Child Asset | Engine | | | | | | 6VF221995 |
| 1234965e | 6VF222047 | Engine | Child Asset | Child Asset | Engine | | | | | | 6VF222047 |
| USCBTA-0000049 | | Cement Bulk | Child Asset | Child Asset | Refurb at ATS CTF-164 | | | | | | |
| 1234971e | 4R0042979 | Engine | Child Asset | Child Asset | Engine | | | | | | 4R0042979 |
| USCBTA-0000054 | | Cement Bulk | Child Asset | Child Asset | Refurb- AIR CAN CEM TM  600 | | | | | | |
| USCBTA-0000004 | | Cement Bulk | Child Asset | Child Asset | Refurb- AIR CAN CEM TM  600 | | | | | | |
| USCBTA-0000036 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000217: CTF-169 | | | | | | |
| USCBTA-0000037 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000329: CTF-169 | | | | | | |
| USCBTA-0000050 | | Cement Bulk | Child Asset | Child Asset | Refurb at ATS E373/CTF-171 | | | | | | |
| USCBTA-0000056 | | Cement Bulk | Child Asset | Child Asset | Refurb- TRANSPORT,CMT TM 600ST | | | | | | |
| USCBTA-0000001 | | Cement Bulk | Child Asset | Child Asset | Refurb- AIR CAN CEM TM  600 | | | | | | |
| 1234997d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1234997e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000055 | | Cement Bulk | Child Asset | Child Asset | Refurb- TRANSPORT,CMT TM 600ST | | | | | | |
| 1235014e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000030 | | Cement Bulk | Child Asset | Child Asset | Refurb-AIR CAN CEM TM  600 | | | | | | |
| 1235020e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USENGE-0000251 | 68134995 | Engine | Child Asset | Child Asset | Engine | | Cummins | Cummins | 2600 | | 68134995 |
| 1235022e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000002 | | Cement Bulk | Child Asset | Child Asset | Refurb- AIR CAN CEM TM  600 | | | | | | |
| USCBTA-0000006 | | Cement Bulk | Child Asset | Child Asset | Refurb- AIR CAN CEM TM  600 | | | | | | |
| USCBTA-0000038 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000161: CTF-216 | | | | | | |
| USCBTA-0000039 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000330: CTF-216 | | | | | | |
| 1235037e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000027 | | Cement Bulk | Child Asset | Child Asset | Refurb-TRANSPORT,CMT TM 600ST- | | | | | | |
| USCBTA-0000020 | | Cement Bulk | Child Asset | Child Asset | Refurb-AIR CAN CEM TM  600 | | | | | | |
| 1235055e | 46548275 | Engine | Child Asset | Child Asset | Engine | | | | | | 46548275 |
| USCBTA-0000040 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000515: CTF-233 | | | | | | |
| USCBTA-0000021 | | Cement Bulk | Child Asset | Child Asset | Refurb-AIR CAN CEM TM  600 | | | | | | |
| 1235075e | 46616055 | Engine | Child Asset | Child Asset | Engine | | | | | | 46616055 |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| USCBTA-0000028 | | Cement Bulk | Child Asset | Child Asset | Refurb-TRANSPORT,CMT TM 600ST- | | | | | | |
| 1235083e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1235087e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000029 | | Cement Bulk | Child Asset | Child Asset | Refurb-TRANSPORT,CMT TM 600ST- | | | | | | |
| 1235095e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1235097e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000008 | | Cement Bulk | Child Asset | Child Asset | Refurb- AIR CAN CEM HP 600ST | | | | | | |
| 1235104e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1235107e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000022 | | Cement Bulk | Child Asset | Child Asset | Refurb-AIR CAN CEM HP 600ST  T | | | | | | |
| USCBTA-0000023 | | Cement Bulk | Child Asset | Child Asset | Refurb-AIR CAN CEM HP 600ST  T | | | | | | |
| USENGE-0000281 | 68134994 | Engine | Child Asset | Child Asset | Engine | | Cummins | Cummins | 3.3 | | 68134994 |
| USCBTA-0000041 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000350: CTF-281 | | | | | | |
| USENGE-0000244 | 68134996 | Engine | Child Asset | Child Asset | Engine | | Cummins | Cummins | | 2018 | 68134996 |
| USCBTA-0000042 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000219: CTF-297 | | | | | | |
| USCBTA-0000043 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000332: CTF-297 | | | | | | |
| USCBTA-0000044 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000220: CTF-302 | | | | | | |
| USCBTA-0000045 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000333: CTF-302 | | | | | | |
| 1235144e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000053 | | Cement Bulk | Child Asset | Child Asset | Refurb- AIR CAN CEM HP 600ST | | | | | | |
| 1235163e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1235169d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1235171e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000046 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000085: CTF-337 | | | | | | |
| 1235183e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1235185e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1235196e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1235206e | | Engine | Child Asset | | Engine | | | | | | |
| 1235209e | | Engine | Child Asset | | Engine | | | | | | |
| 1235212e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1235215e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000018 | | Cement Bulk | Child Asset | Child Asset | Refurb- AIR CAN CEM TM  600 | | | | | | |
| 1235742e | 6R0637300 | Engine | Child Asset | Child Asset | Engine | | | | | | 6R0637300 |
| 1236224e | 6R0716526 | Engine | Child Asset | Child Asset | Engine | | | | | | 6R0716526 |
| USTRCT-0000227 | | Tractor | Child Asset | Child Asset | Refurb: US01-00000563: TRB-063 | | | | | | |
| 1236230e | 6R0738987 | Engine | Child Asset | Child Asset | Engine | | | | | | 6R0738987 |
| 1236231e | 6R0738523 | Engine | Child Asset | Child Asset | Engine | | | | | | 6R0738523 |
| USTRCT-0000085 | | Tractor | Child Asset | Child Asset | Refurb- TRACTOR COMPRESSOR ISX | | | | | | |
| 1236273e | 3D-175081 | Engine | Child Asset | Child Asset | Engine | | | | | | 3D-175081 |
| 1236295e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236309e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236513e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRNS-0000175 | 3110085787 | Transmission | Child Asset | Child Asset | Transmission | | Allison | Allison | CLT 6061 | | 3110085787 |
| USTRCT-0000277 | | Tractor | Child Asset | Child Asset | Refurb- Hydraulic 1 Tractor | | | | | | |
| 1236583e | 6R104443 | Engine | Child Asset | Child Asset | Engine | | | | | | 6R104443 |
| 1236678e | S096107 | Engine | Child Asset | Child Asset | Engine | | Cummins | | | | S096107 |
| 1236681e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236682e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236683e | 68325924 | Engine | Child Asset | Child Asset | Engine | | | | | | 68325924 |
| 1236694e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236717e | 68325408 | Engine | Child Asset | Child Asset | Engine | | | | | | 68325408 |
| 1236748e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236758e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236766e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236767e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236781e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236801e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236810e | 794746341 | Engine | Child Asset | Child Asset | Engine | | | | | | 794746341 |
| 1236815e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236817e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRCT-0000158 | | Tractor | Child Asset | Child Asset | Refurb-Tractor Hyd I Rhino T u | | | | | | |
| USTRCT-0000202 | | Tractor | Child Asset | Child Asset | Refurb-Tractor Hyd I | | | | | | |
| 1236943e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1236953e | 79500152 | Engine | Child Asset | Child Asset | Engine | | Cummins | Cummins | ISX15 | | 79500152 |
| 1236959a | | Tractor | Child Asset | Child Asset | Refurb - Tractor hydraulic II | | | | | | |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1236959f | | Tractor | Child Asset | Child Asset | Refurb - Tractor hydraulic II | | | | | | |
| USTRCT-0000163 | | Tractor | Child Asset | | Refurb-Tractor hydraulic II 20 | | | | | | |
| USTRCT-0000164 | | Tractor | Child Asset | | Refurb-Tractor hydraulic II 20 | | | | | | |
| 1236961e | | Engine | Child Asset | | Engine | | | | | | |
| USTRCT-0000287 | | Tractor | Child Asset | | Refurb- TRACTOR HYD I ISX LT W | | | | | | |
| USCPTR-0000010 | | Cement Pump | Child Asset | | Refurb- FALCON LITE CEMENT UNI | | | | | | |
| 1237039c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1237039e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237041d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1237041e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237043e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237053e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237178e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237193e | 79511447 | Engine | Child Asset | Child Asset | Engine | | | | | | 79511447 |
| USCBTA-0000047 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000087: CTF-465 | | | | | | |
| 1237231c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1237231e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237248e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237253e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237283e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237295c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| USPREN-0000308 | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| USPREN-0000309 | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| USCPTR-0000029 | | Cement Pump | Child Asset | Child Asset | Refurb- CMT UNIT,TM FALCON LT | | | | | | |
| USCPTR-0000031 | | Cement Pump | Child Asset | Child Asset | Refurb unit CPF-016 | | | | | | |
| USTRNS-0000721 | 6610224168 | Transmission | Child Asset | Child Asset | Transmission | | Allison | Allison | 4700 | | 6610224168 |
| 1237299c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1237299e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRNS-0000767 | 6610224170 | Transmission | Child Asset | Child Asset | Transmission | | Allison | Allison | 4700 | | 6610224170 |
| 1237319e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237320e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237321e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237325e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237330d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1237337e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000016 | | Cement Bulk | Child Asset | Child Asset | Refurb- 600ST BULK CEMENT TRL | | | | | | |
| 1237363e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237402e | 79543999 | Engine | Child Asset | Child Asset | Engine | | | | | | 79543999 |
| 1237482e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237499e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237500e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237533c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| USTRNS-0000228 | 9510088470 | Transmission | Child Asset | Child Asset | Transmission | | Allison | Allison | HD4700 TC561 | | 9510088470 |
| USATTR-0000007 | | Acid Transport | Child Asset | Child Asset | Refurb-5000 GAL 3 COMPARTMENT | | | | | | |
| 1237563e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237580e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237627e | 79547179 | Engine | Child Asset | Child Asset | Engine | | | | | | 79547179 |
| USTRCT-0000087 | | Tractor | Child Asset | Child Asset | Refurb- TRACTOR HYD I ISX LT W | | | | | | |
| 1237661e | 68325407 | Engine | Child Asset | Child Asset | Engine | | | | | | 68325407 |
| 1237672e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237674e | 73255918 | Engine | Child Asset | Child Asset | Engine | | | | | | 73255918 |
| 1237692e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237715e | 79500946 | Engine | Child Asset | Child Asset | Engine | | | | | | 79500946 |
| 1237717e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237718e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237727d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1237727e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237734e | 79500566 | Engine | Child Asset | Child Asset | Engine | | | | | | 79500566 |
| 1237735e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1237752a | | Tractor | Child Asset | | Refurb - TRACTOR UNIVERSAL ISX | | | | | | |
| 1237752e | | Engine | Child Asset | | Engine | | | | | | |
| USTRCT-0000247 | | Tractor | Child Asset | Child Asset | Refurb TRH-1653 / 1K49 | | | | | | |
| 1237908e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCPTR-0000014 | | Cement Pump | Child Asset | Child Asset | Refurb- FALCON LITE CEMENT UNI | | | | | | |
| 1237936d | | Transmission | Child Asset | | Transmission | | | | | | |

| Fixed Asset ID | Object ID | Asset Type Group | Asset Type Group 2 | Cement Group | Asset Name (FA) | SpecHHP | Make (FA) | Make (EAM) | Model (FA) | Year (FA) | VIN / Serial # (FA) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1237968h | | Cement Pump | Child Asset | Child Asset | Refurb - FALCON LITE CEMENT UN | | | | | | |
| USCPTR-0000013 | | Cement Pump | Child Asset | Child Asset | Refurb- FALCON LITE CEMENT UNI | | | | | | |
| USCBTA-0000031 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000080: CBF-023 | | | | | | |
| USTRCT-0000138 | | Tractor | Child Asset | Child Asset | Refurb- TRACTOR HYD I ISX LT W | | | | | | |
| USTRCT-0000010 | | Tractor | Child Asset | Child Asset | Refurb-TRACTOR HYD I ISX LT WT | | | | | | |
| 1238063e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1238098h | | Cement Pump | Child Asset | Child Asset | Refurb - FALCON LITE CEMENT UN | | | | | | |
| 1238198e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1238277e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCPTR-0000002 | | Cement Pump | Child Asset | Child Asset | Refurb-FALCON LITE CEMENT UNIT | | | | | | |
| USCPTR-0000028 | | Cement Pump | Child Asset | Child Asset | Refurb: CPF-091 | | | | | | |
| 1238496e | 79591010 | Engine | Child Asset | Child Asset | Engine | | Cummins | Cummins | ISX15 | | 79591010 |
| 1238505e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USTRCT-0000075 | | Tractor | Child Asset | Child Asset | Refurb- TRACTOR HYD I ISX LT W | | | | | | |
| 1238561e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1238591c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1238591e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1238592c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1238592e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1238675d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1238704e | 79591403 | Engine | Child Asset | Child Asset | Engine | | Cummins | Cummins | ISX15 | | 79591403 |
| 1238783c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1238783e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1238835a | | Acid Transport | Child Asset | Child Asset | Refurb - 5000 GAL 3 COMPARTMEN | | | | | | |
| 1238835e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1239039e | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| USTRNS-0000227 | 10340030 | Transmission | Child Asset | Child Asset | Transmission | | Allison | Allison | HD4700 | | 10340030 |
| 1239110e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USPREN-0000221 | 520 | Power End | Child Asset | Child Asset | Power End | | | Pacemaker | | | 520 |
| USTRNS-0000354 | | Transmission | Child Asset | Child Asset | Transmission | | Allison | | S9820 DTE RW | | |
| USCBTA-0000024 | | Cement Bulk | Child Asset | Child Asset | Refurb-AIR CAN CEM TM  600 | | | | | | |
| USCBTA-0000012 | | Cement Bulk | Child Asset | Child Asset | Refurb- AIR CAN CEM HP 600ST | | | | | | |
| 1239114c | | Power End | Child Asset | Child Asset | Power End | | | | | | |
| 1239114d | | Transmission | Child Asset | Child Asset | Transmission | | | | | | |
| 1239114e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1239279e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| 1239282e | | Engine | Child Asset | Child Asset | Engine | | | | | | |
| USCBTA-0000019 | | Cement Bulk | Child Asset | Child Asset | Refurb- TRANSPORT,CMT TM 600ST | | | | | | |
| USTRNS-0000535 | 6610318861 | Transmission | Child Asset | Child Asset | Transmission | | | Allison | | | 6610318861 |
| USCBTA-0000048 | | Cement Bulk | Child Asset | Child Asset | Refurb: US01-00000589: CTF-586 | | | | | | |
| USCPTR-0000030 | | Cement Pump | Child Asset | Child Asset | Refurb- CMT UNIT,TM FALCON LT | | | | | | |
| USCPTR-0000034 | | Cement Pump | Child Asset | Child Asset | Refurb-CEM PUMP MCP2000 TM LT | | | | | | |
| USTRCT-0000136 | | Tractor | Child Asset | Child Asset | Refurb - Tractor TRH-832 | | | | | | |
| USTRCT-0000137 | | Tractor | Child Asset | Child Asset | Refurb - Tractor TRH-832 | | | | | | |
| USTRCT-0000323 | | Tractor | Child Asset | Child Asset | Refurb - Tractor, Hydraulic | | | | | | |
| USTRCT-0000346 | | Tractor | Child Asset | Child Asset | Refurb - Tractor Hydraulic | | | | | | |
| USTRCT-0000347 | | Tractor | Child Asset | Child Asset | Refurb - Tractor Hydraulic | | | | | | |
| USTRCT-0000350 | | Tractor | Child Asset | Child Asset | Refurb - Tractor Hydraulic | | | | | | |