**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
08/25/2020

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| BJ SERVICES, LLC, *et al.*,[1] | ) Case No. 20-33627 (MI) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) Re:  **Docket No. 160, 223** |

**ORDER (I) APPROVING THE SALE OF
CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR
OF CLAIMS, LIENS, INTERESTS AND ENCUMBRANCES;
(II) APPROVING THE ASSUMPTION OR ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (the "Debtors"), for, among other things, entry of an order (this "Order"):  (a) authorizing and approving the sale (the "Sale") of the assets defined as Purchased Assets in the Asset Purchase Agreements (the "Sale Assets") pursuant to the Motion and the Asset Purchase Agreements (attached hereto at **Exhibit 1** and **Exhibit 2**), as amended, supplemented, or modified from time to time, and which for purposes of this Order shall include all exhibits, schedules and ancillary documents related thereto, (collectively, the "Transaction Documents"), free and clear of all claims, liens, interests and encumbrances (other than Assumed Liabilities and any Permitted

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  BJ Services, LLC (3543); BJ Management Services, L.P. (8396); BJ Services Holdings Canada, ULC (6181); and BJ Services Management Holdings Corporation (0481).  The Debtors' service address is:  11211 Farm to Market 2920 Road, Tomball, Texas 77375.

[2]    *Debtors' Emergency Motion for Entry of an Order (I) Approving the Bidding Procedures with Respect to Certain of the Debtors' Fracking Equipment and Intellectual Property, (II) Scheduling an Auction and A Sale Hearing, (III) Approving the Form and Manner of Notices Related Thereto, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 160].  Unless otherwise defined herein, capitalized terms shall have the meanings given to them in the Motion, the Bidding Procedures Order (defined below), or the Asset Purchase Agreements, as applicable.

Liens); (b) authorizing the assumption of certain liabilities (collectively,  the "Assumed Liabilities"), each as more fully described in the Asset Purchase Agreement; and (c) granting related relief, and the Court having held a hearing on August 21, 2020 (the "Sale Hearing") to approve the Sale; and the Court having reviewed and considered the relief sought in the Motion with respect to the Sale, the declarations submitted in support of the Sale, all objections to the Sale and the Debtors' reply thereto, and the arguments of counsel made and the testimony and evidence proffered or adduced at the Sale Hearing; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale and the relief requested in this Order; and due and sufficient notice of the Sale Hearing and the relief sought therein having been given under the particular circumstances and in accordance with the Bidding Procedures Order; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion and at the Sale Hearing with respect to the Sale is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and upon the record of the Sale Hearing and these chapter 11 cases (the "Chapter 11 Cases"), and after due deliberation thereon, and good cause appearing therefor,  References in this Order to the Sale or the Sale Assets refers to the collective sale of assets governed by both Asset Purchase Agreements or, where the context requires, the sale of assets under each individual Asset Purchase Agreement.

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A.      **Jurisdiction and Venue**.  This Court has jurisdiction over the Motion and the Sale pursuant to 28 U.S.C. §§ 157 and 1334 and may enter a final order on the Motion consistent with

---

[3]   The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  Furthermore, any findings of fact or conclusions of law made by the Court on the record at the close of the Sale Hearing are incorporated herein pursuant to Fed. R. Bank. P. 7052.

Article III of the United States Constitution.  This is a core proceeding under 28 U.S.C. § 157(b).

Venue of these chapter 11 cases and this Motion in this district is proper under 28 U.S.C. §§ 1408

and 1409.

B.    **Statutory Predicates**.  The legal predicates for the relief requested in the Motion

are Bankruptcy Code sections 105, 363, 364, 365 and 503.  Such relief is also warranted pursuant

to Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014.

C.    **Opportunity to Object**.  A reasonable opportunity to object or to be heard

regarding the requested relief has been afforded to all interested parties and entities.

D.    **Bidding Procedures Order**.  On July 29, 2020 the Court entered an order [Docket

No. 224] (the "Bidding Procedures Order"), which, among other things, (i) approved the Bidding

Procedures, and (ii) approved the Assumption and Assignment Procedures and the form and

manner of the Cure Notice in connection thereto.  In accordance with the Bidding Procedures

Order, each Asset Purchase Agreement was deemed a Qualified Bid, and upon conclusion of the

Auction, a Winning Bid.

E.    **Asset Purchase Agreement**.  On August 20, 2020, the Debtors entered into the

Asset Purchase Agreement, subject to higher or better offers.

F.    **Opportunity to Bid**.  The Bidding Procedures were substantively and procedurally

fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable

opportunity for any person to make a higher or otherwise better offer to purchase the Sale Assets.

The Debtors conducted the sale process without collusion and in accordance with the Bidding

Procedures.  The Debtors and their professionals adequately marketed the Sale Assets and

conducted the marketing and sale process in compliance with the Bidding Procedures and the

Bidding Procedures Order.  Based upon the record of these proceedings, creditors and other parties

3

in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Sale Assets.  The Debtors and their professionals conducted the sale process in compliance with the Bidding Procedures Order, and afforded potential purchasers a full, fair and reasonable opportunity to make a higher or otherwise better offer for the Sale Assets than the offer reflected in the Asset Purchase Agreements.

G.  **Extensive Efforts by Debtors**.  The Debtors, with the assistance of their counsel, investment banker, and other advisors, evaluated strategic alternatives including extensive marketing efforts.  The Debtors have presented credible evidence that they explored various strategic alternatives for the Debtors' businesses over an extended period of time and communicated with numerous parties regarding, among other potential transactions, a sale of all or substantially all of the Sale Assets.  The Sale is the result of the Debtors' extensive efforts in seeking to maximize recoveries to the Debtors' estates for the benefit of creditors.

H.  **Business Justification**.  The Debtors have articulated good and sufficient business reasons for the Court to authorize (i) the immediate assumption of the Asset Purchase Agreements, and, subject to the terms of this Order, consummation of the Sale including the sale of the Sale Assets to the winning bidder and/or its permitted assigns (collectively, the "Buyer") pursuant to the terms of the Asset Purchase Agreements, and (ii) the assumption of the Assumed Liabilities as set forth herein and in the Asset Purchase Agreements.  Entry into the Asset Purchase Agreements and consummation of the Sale are sound exercises of the Debtors' business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.

I.  The Debtors have articulated good and sufficient business reasons justifying the sale of the Sale Assets to the Buyer.  Additionally:  (i) the Debtors conducted a robust marketing process to sell the Sale Assets and the Asset Purchase Agreements constitute the highest or best

offer for the Sale Assets; (ii) the Bidding Procedures utilized were designed to yield the highest or otherwise best bids for the Sale Assets; (iii) the Asset Purchase Agreements and the closing of the Sale present the best opportunity to realize the highest value for the Sale Assets; (iv) there is risk of deterioration of the value of the Sale Assets if the Asset Purchase Agreements are not immediately assumed and the Sale is not consummated in accordance with the terms of the Asset Purchase Agreements and this Order; (v) the Asset Purchase Agreements and the sale of the Sale Assets to the Buyer provide greater value to the Debtors' estates than would be provided by any other presently available alternative; and (vi) the Buyer would not agree to purchase the Sale Assets pursuant to the terms of the Asset Purchase Agreements and this Order if the Sale Assets remained subject to higher or better offers after the entry of this Order.  Good and sufficient reasons for approval of the Asset Purchase Agreements and the Sale have been articulated by the Debtors. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose for (i) the sale of the Sale Assets outside of the ordinary course of business pursuant to Bankruptcy Code section 363(b); (ii) a restriction on the Debtors pursuing, considering or accepting any further offers for the Sale Assets from and after the entry of this Order through the earlier of the consummation of the Sale or termination of the Asset Purchase Agreements in accordance with their terms; and (iii) the immediate assumption of the Asset Purchase Agreements. To maximize the value of the Sale Assets and preserve the viability of the operations to which the Sale Assets relate, it is essential that the Sale occur within the time constraints set forth in the Asset Purchase Agreements and this Order and that the Buyer be protected against any further offers for the Sale Assets.

     J.    **Notice**.  As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and

sufficient notice of the Sale Hearing, the Sale and the Assumption and Assignment Procedures and has been provided in compliance with the Bidding Procedures Order and in accordance with Bankruptcy Code sections 102(1), 363, and 365, and Bankruptcy Rules 2002, 4001, 6004, 6006, 9006, 9007, and 9014, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing or the Sale is or shall be required.  Such notice was sufficient and reasonably calculated under the circumstances to reach all known and unknown holders of claims and interests and non-Debtor counterparties to executory contracts.

K.     **Auction**.  The Debtors' marketing process with respect to the Sale afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer. Therefore, in accordance with the Bidding Procedures Order, following the Auction, the Debtors determined that the Asset Purchase Agreements constituted the highest or best offer and selected the Asset Purchase Agreements as the winning bid.  The Debtors therefore determined in a valid and sound exercise of their business judgment, and in accordance with the Bidding Procedures and Bidding Procedures Order, that the highest or best Qualified Bid for the Sale Assets is that of the Buyer and that the Asset Purchase Agreements will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.

L.     **Good Faith**.  The Asset Purchase Agreements were negotiated and is undertaken by the Debtors and the Buyer at arm's-length, without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m).  The Buyer is not an "insider" or "affiliate" of any of the Debtors as those terms are defined by Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Debtors and the Buyer. The Buyer recognized that the Debtors were free to deal with any other party interested in acquiring

4844-8856-0328.4

the Sale Assets, complied with the Bidding Procedures Order, and agreed to, and did, subject its bid to the competitive Bidding Procedures approved in the Bidding Procedures Order.  All releases and payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed.  The Buyer has not violated Bankruptcy Code section 363(n) by any action or inaction on its part.  As a result of the foregoing, the Buyer is entitled to the protections of Bankruptcy Code section 363(m), including in the event this Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with these cases.

M.     **Title to Sale Assets**.  The Sale Assets sought to be transferred and/or assigned, as applicable, by the Debtors to the Buyer pursuant to the Asset Purchase Agreements are property of the Debtors' estates and good title thereto is presently vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  Except as provided in the Asset Purchase Agreements, the Debtors are the sole and rightful owners of the Sale Assets with all rights, title and interests to the Sale Assets, and no other person has any ownership right, title, or interest therein.

N.     **Authority**.  The Debtors:  (i) have full power and authority to execute and assume the Asset Purchase Agreements and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreements subject to the terms of this Order, and (iii) have taken all corporate action necessary to authorize and approve the Asset Purchase Agreements and the immediate assumption thereof, the sale of the Sale Assets, and all other actions required to be performed by the Debtors in order to consummate the transactions contemplated in the Asset Purchase Agreements.  No consents or

approvals, other than those already obtained or expressly provided for in the Asset Purchase Agreements or this Order, are required for the Debtors to consummate the Sale.

O.     **Highest or Otherwise Best Offer**.  The total consideration provided by the Buyer for the Sale Assets represents the highest or best offer received by the Debtors, and the amount of aggregate consideration provided by the Buyer to the Debtors pursuant to the Asset Purchase Agreements constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable laws, and may not be avoided under Bankruptcy Code section 363(n) or any provision of chapter 5 of the Bankruptcy Code or under any other law of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  No other person or entity or group of persons or entities has offered to purchase the Sale Assets for an amount of aggregate consideration that would provide greater economic value to the Debtors' estates than the Buyer.  The Debtors' determination that the Asset Purchase Agreements constitute the highest or best offer for the Sale Assets constitutes a valid and sound exercise of the Debtors' business judgment.  The Court's approval of the Motion, the Sale, and the Asset Purchase Agreements, and the immediate assumption thereof, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

P.     **No Further Bidding**.  The Buyer would not have entered into the Asset Purchase Agreements and would not consummate the Sale if the sale of the Sale Assets to the Buyer were subject to higher or better bids from and after the entry of this Order, through and including the earlier of the consummation of the Sale or termination of the Asset Purchase Agreements in accordance with their terms.

Q.     **Necessity of Order; Free and Clear**.  Other than the Assumed Liabilities and any Permitted Liens, the Buyer would not have entered into the Asset Purchase Agreements and would not consummate the Sale without all of the relief provided for in this Order, including if (i) the Sale was not free and clear, pursuant to Section 363(f) of the Bankruptcy Code, of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges, charges, security interests, of whatever kind or nature, rights of first refusal, rights of offset or recoupment, royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights-of recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets, recoupments, claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other interests of any kind or nature whatsoever against the Debtors or any of the Sale Assets, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employment or labor law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against any of the Debtors, claims or liabilities relating to any act or omission of any originator, holder or servicer of mortgage loans prior to the closing date of the Sale, any indemnification claims or liabilities relating to any act or omission of the Debtors or any other person prior to the closing date of the Sale, any derivative, vicarious, transferee or successor liability claims, alter ego claims, de facto merger claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or

possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether known or unknown, contingent or matured, liquidated or unliquidated, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material statutory or non-statutory, legal or equitable, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Sale Assets, the operation of any of the Debtors' businesses before the closing date of the Sale (collectively, the "Claims"), or (ii) if the Buyer would, or in the future could, be liable for any such Claims.

R.      Except as provided otherwise in the Asset Purchase Agreements or this Order, neither the Buyer nor any of the Buyer's affiliates (including any subsidiary of Buyer, any person or entity that could be treated as a single employer with the Buyer pursuant to Section 4001(b) the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 414(b), (c), (m) or (o) of the Internal Revenue Code of 1986, as amended ("IRC")), shall be responsible for any Claims, including in respect of the following:  (i) any labor or employment agreements; (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between one or more of the Debtors and any Debtor; (iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability, (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability

10

related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the IRC and of any similar state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) any liabilities arising under any Environmental Laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the closing date of the Sale; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the IRC; and (ix) any any excluded liabilities.

S.      **Satisfaction of 363(f) Standards**.  The Debtors may sell the Sale Assets free and clear of all Claims (other than Assumed Liabilities and any Permitted Liens) because, with respect to each creditor asserting a Claim, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied.  Those holders of Claims that did not object to or that withdrew their objections to the Sale or the Motion, are deemed to have consented to the Motion and the Sale pursuant to Bankruptcy Code section 363(f)(2).

T.      Neither the Debtors nor the Buyer engaged in any conduct that would cause or permit the Asset Purchase Agreements, the other Transaction Documents, or the consummation of the Sale to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n)

or under any other law of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable law.

U.    **Valid and Binding Contract**.    Each Asset Purchase Agreement is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms. Each Asset Purchase Agreement and the consideration offered by the Buyer pursuant to such Asset Purchase Agreement constitute reasonably equivalent value and fair consideration.  Neither Asset Purchase Agreement was not entered into, and the Sale is not consummated, for the purpose of hindering, delaying or defrauding the Debtors' creditors under the Bankruptcy Code or under any other law of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Buyer has entered into the Asset Purchase Agreements or the other Transaction Documents or is consummating the Sale for any fraudulent or otherwise improper purpose.

V.    **No Successor Liability**.    Except as provided for in the Asset Purchase Agreements or in this Order, upon the closing of the Sale, the Buyer shall not be deemed to, (i) be the successor of or successor employer to any of the Debtors, including without limitation, with respect to any collective bargaining agreement, works council agreement, or other labor Contract, any benefit plans, or any multiemployer plans, and the Buyer and/or its affiliates, as applicable, shall instead be, and be deemed to be, a new employer, including with respect to, among other things, any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws (provided that the Buyer shall pay any employee-related liabilities to the extent included in the Assumed Liabilities); (ii) have any common law successorship liability in relation to any benefit plan or multiemployer plan, including with respect to withdrawal liability or contribution obligations; (iii) have, *de facto*, or otherwise, merged or consolidated with or into

12

Debtors; (iv) be a mere continuation or substantial continuation of Debtors or the enterprise(s) of Debtors; or (v) be liable for any acts or omissions of Debtors in connection with any collective bargaining agreement, works council agreement, or other labor Contract, the conduct of the Business, or the operation, funding or administration of the benefit plans or multiemployer plans or arising under or related to the Sale Assets other than as expressly set forth in the Asset Purchase Agreements and the Transaction Documents.  Without limiting the generality of the foregoing, and except as otherwise provided in the Asset Purchase Agreements, the parties intend and the Court hereby finds that the Buyer shall not be liable for any encumbrance or liability (other than Assumed Liabilities and any Permitted Liens) against any Seller, or any of its predecessors or affiliates, and the Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the closing date of the Sale, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, any collective bargaining agreement, works council agreement, or other labor Contract, the operation, funding, or administration of the benefit plans or multiemployer plans, the Sale Assets or any liabilities of any Seller arising or attributable to periods prior to the closing date of the Sale.  The Buyer would not have acquired the Sale Assets but for the foregoing protections against potential claims based upon "successor liability," *de facto* merger, or theories of similar effect.

W.  **Injunction**.  An injunction against creditors and third parties pursuing Claims against, and liens, interests and encumbrances on, the Sale Assets is necessary to induce the Buyer to close the Sale, and the issuance of such injunctive relief is therefore necessary to avoid irreparable injury to the Debtors' estates and will benefit the Debtors' creditors.

4844-8856-0328.4

X.     **No *Sub Rosa* plan**.  The Sale does not constitute a *sub rosa* chapter 11 plan.  The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for any of the Debtors.

Y.     **Final Order**.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h), 6006(d) and 7062, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the immediate approval and consummation of the Sale as contemplated by the Asset Purchase Agreements.  The Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the Sale subject to the terms of this Order.

Z.     **Best Interests**.  The relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

AA.    **Time is of the Essence**.  Time is of the essence in the Asset Purchase Agreements consummating the Sale.  In order to maximize the value of the Sale Assets, it is essential that the Sale to the Buyer occur within the time constraints set forth in the Asset Purchase Agreements. Specifically, the Asset Purchase Agreements must be assumed immediately and the Sale must be approved promptly in order to preserve the viability of the business subject to the Sale as a going concern, to maximize the value to the Debtors, their estates, their creditors, and all other parties in interest.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.     **Relief Granted**.  The Motion is **GRANTED**, to the extent set forth herein.

2.      **Objections Overruled**.  Any objections to the Motion, or any other relief granted in this Order, to the extent not resolved, adjourned for hearing on a later date, waived or withdrawn or previously overruled, and all reservations of rights included therein, is hereby **OVERRULED** and **DENIED** on the merits.

3.      **Bidding Procedures**.  The Bidding Procedures utilized by the Debtors with respect to the Sale are hereby ratified and were and are appropriate under the circumstances in order to maximize the value obtained from the Sale for the benefit of the Debtors' estates.

4.      **Immediate Assumption of Asset Purchase Agreements.**  The Asset Purchase Agreements shall be deemed assumed immediately upon entry of this Order without the need for further action by any party or the Court.

5.      **No Further Bidding**.  Immediately upon entry of this Order, and pending consummation of the Sales or termination of the Asset Purchase Agreements in accordance with its terms, the Debtors shall neither solicit nor accept any bids or offers for the Sale Assets.  The Debtors shall immediately close access to any "due diligence data room" or similar information sharing medium to all third parties other than the Buyer, and shall require that all information provided to prospective bidders in connection with the sale process be returned or destroyed in accordance with the terms of applicable confidentiality agreements.

6.      **Approval of Asset Purchase Agreements and Sale**.  Pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503 and the Asset Purchase Agreements, the Sale is hereby approved and the Debtors are authorized to enter into and perform under the Asset Purchase Agreements and the other Transaction Documents.  Pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503 and in accordance with the terms of the Asset Purchase Agreements and this Order, each of the Debtors and the Buyer are hereby authorized and directed to take any and

15

all actions necessary or appropriate to: (i) consummate the Sale and the closing of the Sale in accordance with the winning bid, the Transaction Documents, and this Order; (ii) provide for the assumption of the Assumed Liabilities; and (iii) perform, consummate, implement and close fully the Asset Purchase Agreements together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale pursuant to the Asset Purchase Agreements. The Debtors and each other party to the Transaction Documents are hereby authorized and directed to perform each of their covenants and undertakings as provided in the Asset Purchase Agreements and the Transaction Documents prior to, on or after the closing date of the Sale without further order of the Court. The Buyer and the Debtors shall have no obligation to close the Sale except as is contemplated and provided for in the Asset Purchase Agreements and this Order.

7.     **Valid Transfer**.  Upon the closing of the Sale: (a) the Debtors are hereby authorized to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of all of the Debtors' rights, title and interest in the Sale Assets to the Buyer free and clear of all Claims (other than the Assumed Liabilities and any Permitted Liens); and (b) except as otherwise expressly provided in the Asset Purchase Agreements, all encumbrances and liabilities (other than the Assumed Liabilities and any Permitted Liens) shall not be enforceable as against the Buyer or the Sale Assets. Unless otherwise expressly included in the Assumed Liabilities and any Permitted Liens, or as otherwise expressly provided by this Order, the Buyer shall not be responsible for any Claims, liens, liabilities, obligations, interests or encumbrances, including in respect of the following: (i) any labor or employment agreements; (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between one or more of the Debtors and any Debtor; (iv) any pension, multiemployer plan (as such term is defined

in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) COBRA, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) any liabilities arising under any Environmental Laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the closing date of the Sale; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the IRC, as amended; and (ix) any excluded liabilities.  A certified copy of this Order may be filed with the appropriate clerk and/or recorder to act to cancel any such lien, claim, interest or encumbrance of record.

8.      The transfer to the Buyer of the Debtors' rights, title, and interest in the Sale Assets pursuant to the Asset Purchase Agreements shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' rights, title, and interest in the Sale Assets, notwithstanding any requirement for approval or consent by any person, and vests with or will vest in the Buyer all rights, title, and interest of the Debtors in the Sale Assets, free and clear of all Claims of any kind

or nature whatsoever (other than the Assumed Liabilities and any Permitted Liens), with any such Claims attaching to the net available proceeds with the same validity, extent, and priority as immediately prior to the sale of the Sale Assets, subject to the provisions of the Asset Purchase Agreements and this Order, and any rights, claims, and defenses of the Debtors and other parties in interest; provided, that all liens, claims, interests, and encumbrances on the Purchased Assets, including, without limitation the Prepetition ABL Liens, Prepetition GACP Liens, and Adequate Protection Liens (each as defined in the second interim order authorizing the Debtors' use of cash collateral [Docket No. 261] (the "Cash Collateral Order")), shall attach to the proceeds of the Sale attributable to the property against which such liens, claims, interests, and encumbrances applied, in the same order of priority and with the same validity, force, and effect that such liens, claims, interests, and encumbrances applied prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.  Notwithstanding anything to the contrary in this Order or the Asset Purchase Agreements, any party, including, without limitation and for purposes of clarification, UE Manufacturing LLC ("UEM"), United Engines LLC ("UE"), Stewart & Stevenson Power Productions LLC ("S&S"), and SPM Flow Control, Inc. d/b/a WEIR Oil & Gas, who holds a possessory lien or liens under applicable state law against any of the Sale Assets, and turns over to the Debtors or the Buyer (as applicable) the property subject to such possessory lien or liens, shall retain such lien or liens on the Sale proceeds of such property in the same order of priority and with the same validity, force, and effect as if such party still retained possession of the property in question notwithstanding, among other things, any applicable state law or regulation requiring such party to retain possession of the property in question in order to maintain the perfected status of such liens.

9.      **Sale Proceeds**.  Upon receipt of the Sale proceeds, the Debtor shall segregate and separately hold each of (a) the Sale proceeds attributable to the assets in which the GACP Secured Parties (as defined in the Cash Collateral Order) have a prepetition first priority security interest and (b) the Sale proceeds attributable to the assets in which the Prepetition ABL Secured Parties (as defined in the Cash Collateral Order) have a prepetition first priority security interest.  Such Sale proceeds may be distributed as provided by further order of the Court.

10.      **No Liability**. None of the Buyer or its affiliates, successors, assigns, equity holders, officers, directors, employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the Asset Purchase Agreements and the entry into and consummation of the sale of the Sale Assets, except as expressly provided in, or to enforce the terms of, the Asset Purchase Agreements and this Order.

11.      **Assumed Liabilities**.  Except as expressly provided in the Asset Purchase Agreements, the other Transaction Documents, or by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants, and other persons, holding Claims of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Sale Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated, or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to, in connection with, or in any way relating to, the Sale Assets or the transfer of the Debtors' interests in the Sale Assets to the Buyer shall be and hereby

are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing Claims against the Buyer or its affiliates, successors, assigns, equity holders, directors, officers, employees or professionals, the Sale Assets, or the interests of the Debtors in such Sale Assets (other than Assumed Liabilities and Permitted Liens).  Following the closing of the Sale, no holder of a Claim against the Debtors (other than Assumed Liabilities and any Permitted Liens) shall interfere with the Buyer's title to or use and enjoyment of the Debtors' interest in the Sale Assets based on or related to such Claim, and, except as otherwise provided in the Asset Purchase Agreements, the Transaction Documents or this Order, all such Claims, if any, shall be, and hereby are transferred and will attach to the net available proceeds from the sale of the Sale Assets in the order of their priority, with the same validity, force, and effect which they have against such Sale Assets as of the closing of the Sale, subject to any rights, claims and defenses that the Debtors' estates and the Debtors, as applicable, may possess with respect thereto.  All persons are hereby enjoined from taking action that would interfere with or adversely affect the ability of the Debtors to transfer the Sale Assets in accordance with the terms of the Asset Purchase Agreements, the Transaction Documents, and this Order.

12.    **Good Faith**.  Each Asset Purchase Agreement has been entered into by the Buyer in good faith and the Buyer is a good faith purchaser of the Sale Assets as that term is used in Bankruptcy Code section 363(m).  The Buyer is entitled to all of the protections afforded by Bankruptcy Code section 363(m).

13.    **No Bulk Sales**.  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale.  Except as otherwise provided in the Asset Purchase Agreements, and the Transaction Documents, no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment is due to any person

20

in connection with the Asset Purchase Agreements, the other Transaction Documents, or the transactions contemplated hereby or thereby for which the Buyer is or will become liable.

14.     **Consideration**.  The consideration provided by the Buyer for the Sale Assets under the Asset Purchase Agreements shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the sale of the Sale Assets may not be avoided, or costs or damages imposed or awarded under Bankruptcy Code section 363(n) or any other provision of the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other similar federal or state laws.

15.     **Section 363(n) of Bankruptcy Code**.  Neither the Debtors nor the Buyer engaged in any conduct that would cause or permit the Asset Purchase Agreements or the consummation of the Sale to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable law.   Accordingly, the Asset Purchase Agreements and the Sale shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Asset Purchase Agreements or the Sale.

16.     **Closing of the Sale**.  On the closing date of the Sale, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Debtors' rights, title, and interest in the Sale Assets or a bill of sale transferring good and marketable title in such Sale Assets to the Buyer on the closing date of the Sale pursuant to the terms of the Asset Purchase Agreements, free and clear of all Claims (other than Assumed Liabilities and any Permitted Liens).

17.     Upon the closing of the Sale, the Buyer shall not, nor shall be deemed to, (i) be the successor of or successor employer to any of the Debtors, including without limitation, with respect to any collective bargaining agreement, works council agreement, or other labor Contract, any benefit plans, or any multiemployer plans, and the Buyer and/or its affiliates (including the Target Entities), as applicable, shall instead be, and be deemed to be, a new employer, including with respect to, among other things, any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws (ii) have any common law successorship liability in relation to any benefit plan or multiemployer plan, including with respect to withdrawal liability or contribution obligations; (iii) have, *de facto*, or otherwise, merged or consolidated with or into Debtors; (iv) be a mere continuation or substantial continuation of Debtors or the enterprise(s) of Debtors; or (v) be liable for any acts or omissions of Debtors in connection with any collective bargaining agreement, works council agreement, or other labor Contract, the conduct of the Business, or the operation, funding, or administration of the benefit plans or multiemployer plans or arising under or related to the Sale Assets, except as expressly provided in the Asset Purchase Agreements. Without limiting the generality of the foregoing, and except as otherwise provided in the Asset Purchase Agreements, the parties intend and the Court hereby orders that the Buyer shall not be liable for any encumbrance or liability (other than Assumed Liabilities and any Permitted Liens) against any Seller, or any of its predecessors or affiliates, and the Buyer shall not have successor or vicarious liability of any kind or character whether known or unknown as of the closing date of the Sale, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, any collective bargaining agreement, works council agreement, or other labor Contract, the operation, funding,

or administration of the benefit plans or multiemployer plans, the Sale Assets or any liabilities of any Seller arising or attributable to periods prior to the closing date of the Sale.

18.     **Free and Clear**.  Other than the Buyer's assumption of the applicable Assumed Liabilities and the Buyer's obligations under the Asset Purchase Agreements and the other Transaction Documents, the Buyer and its respective affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders (or equivalent) shall have no obligations with respect to any Claims, and, upon consummation of the Sale, the Debtors and their estates are deemed to release and forever discharge the Buyer and its affiliates, and their respective successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) from any and all Claims of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, solely relating to the sale of the Sale Assets.  This Order:  (a) is and shall be effective as a determination that other than Assumed Liabilities and any Permitted Liens, all Claims of any kind or nature whatsoever existing as to Sale Assets, including all Claims as to all indebtedness  and any tax liability, prior to the closing of the Sale have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected, with such claims and liens attaching in order of priority to the proceeds of the Sale, and (b) is and shall be binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Sale Assets conveyed to the Buyer.  Other than liens and security interests relating to

23

the Assumed Liabilities and any permitted liens, all recorded Claims against the Sale Assets from their records, official and otherwise, shall be deemed stricken.

19.     If any person or entity which has filed statements or other documents or agreements evidencing Claims against or interests in, the Sale Assets shall not have delivered to the Debtors before the closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Claims (other than liens and security interests relating to the Assumed Liabilities and any Permitted Liens) which the person or entity has or may assert with respect to the Sale Assets, the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Sale Assets.

20.     Notwithstanding any other provisions included in this Order, or any agreements approved hereby, any statutory liens (collectively, the "Tax Liens"), of Tomball Independent School District, the City of Tomball (and any other Texas taxing entities represented by Perdue, Brandon, Fielder, Collins & Mott, LLP), Brazos County, Medina County, Erath County, Bexar County, Dallas County, Ector CAD, Fort Bend County, Harris County, Hood CAD, Liberty County and Victoria County (collectively, the "Taxing Authorities") shall not be primed by nor made subordinate to any liens granted to any party hereby to the extent such Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Taxing Authorities are fully preserved.  From the proceeds of the sale of any of the Debtors' assets located in the state of Texas, the amount of

$2,394,773.88[4] shall be set aside by the Debtors in a segregated account as adequate protection for the asserted secured claims of the Taxing Authorities prior to the distribution of any proceeds to any other creditor.  The liens of the Taxing Authorities, if any, shall attach to these proceeds to the same extent and with the same priority as the liens they now hold against the property of the Debtors.  These funds shall be on the order of adequate protection and shall constitute neither the allowance of the claims of the Taxing Authorities, nor a cap on the amounts they may be entitled to receive.

21.     For the avoidance of doubt, and notwithstanding anything to the contrary in this Order, the Asset Purchase Agreements or otherwise, the Buyer assumes full responsibility for the 2020 ad valorem taxes associated with the Sale Assets owed to the Taxing Authorities and shall be responsible for paying the ad valorem taxes in full, in the ordinary course of businesses, when due.  If not timely paid, the Taxing Authorities may proceed with non-bankruptcy collections against the Buyer without leave or approval of the Court.  The Taxing Authorities shall retain their respective liens against the real and personal property of the Sale Assets, as applicable, until the respective ad valorem taxes are paid in full, including any applicable penalties or interest.

22.     **Direction to Government Agencies**.     Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale contemplated by the Asset Purchase Agreements.

23.     Nothing in this Order or the Asset Purchase Agreements releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit

---

[4]   For the avoidance of doubt, this figure is inclusive of all amounts owed to the Taxing Authorities is being included in each order approving a sale out of an abundance of caution and does not represent the particularized amounts owed to the Taxing Authorities relating to the assets being sold pursuant to each order.

that any entity would be subject to as the owner or operator of property after the closing date of the Sale.

24.     Without limiting the provisions of paragraph 22 above, but subject to Bankruptcy Code section 525(a), no governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Sale Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the sale of the Sale Assets.

25.     **Governing Terms**.  To the extent this Order is inconsistent with any prior order or pleading filed in these Chapter 11 Cases, the terms of this Order shall govern.  To the extent there is any inconsistency between the terms of this Order and the terms of the Asset Purchase Agreements, the terms of this Order shall govern.

26.     **Surrender of Possession**.  All entities (other than holders of Assumed Liabilities and any Permitted Liens) that are presently, or on the closing date of the Sale may be, in possession of some or all of the Sale Assets are hereby directed to surrender possession of the Sale Assets to the Buyer as of the closing date of the Sale.  The Debtors shall use commercially reasonable efforts to assure that all persons that are presently, or on the closing date of the Sale may be, in possession of some or all of the Sale Assets surrender possession of the Sale Assets to either (i) the Debtors before the closing date of the Sale or (ii) the Buyer (or its designee) on or after the closing date of the Sale.

27.     **Binding on Creditors and Interest Holders**.  This Order and the Asset Purchase Agreements shall be binding in all respects upon all creditors and interest holders of the Debtors, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Chapter 11 Cases or upon a

conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Asset Purchase Agreements, including the Transaction Documents shall not be subject to rejection or avoidance under any circumstances.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to the Buyer hereunder shall remain effective and, notwithstanding such dismissal or conversion, shall remain binding on parties in interest.

28.     **Debtors' Indemnification and Guarantee Obligations**.  Notwithstanding any provision in this Order to the contrary, the Debtors' indemnification and guarantee obligations under the Asset Purchase Agreements, if any, shall not be subject to rejection or discharge under any circumstances.

29.     **No Modification by Plan; Incorporation into Confirmation Order**.  This Order shall not be modified by any chapter 11 plan of any of the Debtors confirmed in these Chapter 11 Cases.

30.     **Retention of Jurisdiction**.  The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to:  (a) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and the terms of the Asset Purchase Agreements, all amendments thereto and any waivers and consents thereunder; (b) protect the Buyer, or the Sale Assets, from and against any of the Claims (other than Assumed Liabilities and any Permitted Liens); (c) compel delivery of all Sale Assets to the Buyer (other than those in the possession of the holder of an Assumed Liability or Permitted Lien); (d) compel the Buyer to perform all of its obligations under the Asset Purchase Agreements, the Transaction Documents, and this Order; and

(e) resolve any disputes arising under or related to the Asset Purchase Agreements or the sale of the Sale Assets.

31.     **Amendments**.   The Asset Purchase Agreements and any related agreements, documents or other instruments may be modified, amended or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of this Court; provided, however, that any such modification, amendment, or supplement neither is material nor materially changes the economic substance of the transactions contemplated hereby; provided, further, however, that the Official Committee of Unsecured Creditors shall receive three days' notice of, and an opportunity to raise objections to, any such modification, amendment, or supplement.

32.     **Conditions Precedent**.   Neither the Buyer nor the Debtors shall have an obligation to close the Sale until all conditions precedent in the Asset Purchase Agreements to each of their respective obligations to close the Sale have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreements.

33.     **Final Order**.   This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).   Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rules 6004(h), 6006(d) and 7062, the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly:  (a) the terms of this Order shall be immediately effective and enforceable upon its entry; (b) the Debtors are not subject to any stay of this Order or in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

34.     **Nonseverable**.   The provisions of this Order are nonseverable and mutually dependent.

35.     The failure specifically to include or make reference to any particular provisions of the Asset Purchase Agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the provisions of the Asset Purchase Agreements are authorized and approved in their entirety.

Signed: August 25, 2020

_____
Marvin Isgur
United States Bankruptcy Judge

4844-8856-0328.4

**<u>Exhibit 1</u>**

**Asset Purchase Agreement #1**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made and entered into this 20th day of August, 2020 (the "Effective Date") by and among **BJ Services, LLC**, a Delaware limited liability company ("Seller"), and Baker Hughes Oilfield Operations LLC, a California limited liability company ("Purchaser" and together with Sellers, collectively, the "Parties").

### WITNESSETH:

**WHEREAS** Seller and certain of its Affiliates are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") and, on July 20, 2020 filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), commencing the jointly administered bankruptcy cases pending as *In re BJ Services, LLC, et al* Case No. 20-33627 (each, a "Bankruptcy Case" and collectively, the "Bankruptcy Cases"); and

**WHEREAS**, Seller desires to sell and Purchaser desires to purchase from Seller those certain assets of Seller as more particularly described herein, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365, 1123, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all in accordance with and subject to the terms and conditions of this Agreement and subject to entry of the Sale Order.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants, representations and warranties herein contained, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1 "Affiliates" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

Section 1.2 "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of the Purchased Assets or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise); provided, however, that no such transaction will be considered to be an "Alternative Transaction" if such transaction would not prevent the Closing from occurring in accordance with the terms of this Agreement; and provided further, that the foregoing shall not include sales of inventory, equipment sales or other dispositions of immaterial or obsolete assets and licenses of intellectual property rights in the ordinary course of business.

4821-5442-0423.5

Section 1.3    "<u>Bidding Procedures</u>" means the Bidding Procedures for the Sale of the Debtors' Fracking Equipment and Intellectual Property filed in the Bankruptcy Cases.

Section 1.4    "<u>Bidding Procedures Order</u>" means an order of the Bankruptcy Court approving the Bidding Procedures.

Section 1.5    "<u>Governmental Authority</u>" means any court, administrative agency or any (i) national, federal, provincial, state, regional, municipal, local or other government, governmental or public department, officials, ministers, Crown corporations, central bank, court, tribunal or dispute settlement panel, arbitral body, commission, board, bureau or agency, domestic or foreign; (ii) subdivision, agency, commission, board or authority of any of the foregoing; or (iii) quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing.

Section 1.6    "<u>Law</u>" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

Section 1.7    "<u>Permitted Liens</u>" means (a) Liens for taxes that are not yet due and payable or the nonpayment of which is permitted or required by the Bankruptcy Code, (b) Liens imposed by applicable Law and incurred in the ordinary course of business for obligations not yet due and payable, or the nonpayment of which is permitted or required by the Bankruptcy Code, to landlords, carriers, warehousemen, laborers, repairmen, materialmen and the like, (c) non-exclusive licenses to proprietary rights granted to customers and suppliers in the ordinary course of business (d) any Liens that will be removed or released by operation of the Sale Order and (e) minor imperfections of title and encumbrances disclosed in writing and reasonably acceptable to Purchaser, if any, that are *de minimis* and do not impair the value or interfere with the present or continued use of such property or asset.

Section 1.8    "<u>Person</u>" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Authority or other entity or group.

Section 1.9    "<u>Qualified Bid</u>" has the meaning set forth in the Bidding Procedures.

Section 1.10    "<u>Sale Order</u>" shall be an order of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Seller, approving the sale of the Purchased Assets to Purchaser free and clear of all Liens other than Permitted Liens.

Section 1.11    "<u>Shared Lab</u>" has the meaning given to such term in that certain Amended & Restated Services Agreement effective as of December 1, 2018 by and between Seller and Purchaser, as amended by the First Amendment to Amended & Restated Services Agreement dated August 26, 2019, a copy of which is attached hereto as <u>Exhibit A</u>.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

Section 2.1    Purchase of Assets; Use Rights.

(a)    On and subject to the terms and conditions of this Agreement, the Sale Order, at the Closing Seller will sell, transfer, convey, assign and deliver to Purchaser, and Purchaser will purchase and acquire from Seller, free and clear of all liens, mortgages, pledges, security interests, charges, claims, options or other encumbrances (collectively, "Liens") other than Permitted Liens, all of Seller's right, title and interest, as of the Closing, in and to the Purchased Assets.  For purposes hereof, the "Purchased Assets" shall mean the equipment and other tangible assets listed on Schedule 1.  The Purchased Assets do not include, and Seller shall retain, all of Seller's assets not specifically identified in this Section 2.1 as being Purchased Assets.

(b)    Seller shall not sell any equipment on Schedule 2 unless the purchaser of such equipment enters into an arrangement reasonably acceptable to Purchaser that preserves Purchaser's right to use it; provided, that the foregoing shall not prohibit any purchaser of such equipment from moving, storing or otherwise using the equipment at any location.  If Seller sells substantially all of its assets or substantially all of its assets relating to a particular division or line of business of Seller as a going concern to a successor, Purchaser agrees to enter into a reasonable arrangement with such successor that preserves the successor's right to use the equipment on Schedule 3.

Section 2.2    Assumption of Liabilities.  On and subject to the terms and conditions of this Agreement and the Sale Order, as of and after the Closing, Purchaser shall assume, and Seller shall convey, transfer and assign to Purchaser, all Liabilities relating to the Purchased Assets that arise and accrue after the Closing, relate exclusively to periods following the Closing and are by their terms to be observed, paid, discharged, and performed following the Closing (in each case, except as otherwise provided herein, not resulting in whole or in part from, arising out of, relating to, in the nature of, or caused by any pre-Closing breach, violation, breach of warranty, tort, strict liability, infringement or breach or violation of Law) (the "Assumed Liabilities").  Except as expressly provided pursuant to the foregoing, Purchaser shall not assume or be liable for any Liabilities of Seller.  For purposes hereof, "Liability" means any debt, damage, claim, liability, obligation, loss (whether lost business opportunity or measured as a multiple of earnings, book value, lost profits, diminution in value, revenues, cash flow, or otherwise), fines, costs, expenses, charges, interest, penalties, or commitment of any nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, or due or to become due, or otherwise).

Section 2.3    Consideration.  In consideration of the sale, transfer, conveyance, assignment and delivery of the Purchased Assets by Seller to Purchaser, Purchaser shall pay to Seller a total purchase price in the total amount of Two Million Two Hundred Fifty Thousand Dollars (USD $2,250,000) (the "Purchase Price").  An amount equal to (x) the Purchase Price minus, (y) the Deposit, shall be paid by Purchaser to Seller by wire transfer of immediately available funds to one or more bank accounts designated by Seller at the Closing (the "Closing Date Payment").

Section 2.4        Deposit.

(a)        On or prior to the date of the Auction, Purchaser shall make an earnest money deposit with a third party designated by Seller prior to the date hereof ("Escrow Agent") in the amount of five percent (5%) of the Purchase Price (the "Deposit"), by wire transfer of immediately available funds for deposit into an escrow account designated by Seller prior to the date hereof (the "Deposit Escrow Account").  The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)        If this Agreement has been terminated by Seller pursuant to Section 7.1(c)(i) or Section 7.1(c)(ii) (or by Purchaser pursuant to Section 7.1(b)(ii) in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 7.1(c)(i) or Section 7.1(c)(ii)), then Seller shall retain the Deposit together with all received investment income, if any.

(c)        If this Agreement has been terminated by Seller, on the one hand, or Purchaser on the other hand, in each case other than as contemplated by Section 2.4(b), if Purchaser is not a Successful Bidder or Backup Bidder or if Seller consummates any transaction in respect of the Purchased Assets with a Person other than Purchaser, then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five (5) business days after such termination, determination or consummation, respectively.

(d)        The Parties agree that Seller's right to retain the Deposit, as set forth in Section 2.4(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.  Notwithstanding anything in this Agreement to the contrary, (i) Seller's right to retain the Deposit in accordance with the terms of hereof shall be the sole and exclusive remedy of Seller and its Affiliates against Purchaser or any of its Affiliates or any of their respective members, partners, officers, managers or representatives for any and all losses that may be suffered based upon, resulting from or arising out of Purchaser's failure to consummate the transactions contemplated by this Agreement, and (ii) upon Seller's retention of the Deposit, none of Purchaser or any of its Affiliates or any of their respective members, partners, officers, managers or representatives shall have any further liability or obligation relating to or arising out of the circumstances giving rise to Seller's right to retain the Deposit or otherwise under this Agreement or any other document contemplated hereby.  If Seller elects to retain the Deposit, then Seller shall not seek any (x) equitable relief or equitable remedies of any kind whatsoever or (y) money damages or any other recovery, judgment, or damages of any kind, including consequential, indirect, special or punitive damages, in each case, relating to or arising out of Purchaser's failure to consummate the transactions contemplated by this Agreement or any other document contemplated hereby.  Other than Seller's right to retain the Deposit, Seller's sole and exclusive remedy with respect to any matters under this Agreement shall be to seek specific performance in accordance with Section 7.13.

(e)        If the Closing occurs, the Deposit shall be transferred to Seller.

**ARTICLE III**
**CLOSING**

Section 3.1    Closing.  The closing of the transactions contemplated by this Agreement ("Closing") shall occur within two (2) days after the conditions precedent set forth in Article VI (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived ("Closing Date") or at such other time that is mutually agreeable to Seller and Purchaser, by a mutual exchange of electronic documents.  Seller and Purchaser agree that Closing documents that do not require originally signed copies may be signed and exchanged by electronic mail.

Section 3.2    Closing Deliveries by Seller.  At or prior to the Closing, Seller shall deliver to Purchaser:

(a)    assignment agreements necessary to transfer the Purchased Assets in form and substance reasonably acceptable to Purchaser and Seller (the "Assignment Agreements") duly executed by Seller;

(b)    delivery of the Purchased Assets to the Shared Lab, to the extent that they are not physically located there on the Closing Date; provided, however, that the costs of such delivery shall be borne by Purchaser;

(c)    a certificate of non-foreign status executed by Seller that meets the requirements set forth in U.S. Treasury Regulations Section 1.1445-2(b)(2); and

(d)    a joint written instruction, duly executed by Seller, instructing the Escrow Agent to release to Seller by wire transfer of immediately available funds, the Deposit.

Section 3.3    Closing Deliveries by Purchaser.  At or prior to the Closing, Purchaser shall deliver to Seller:

(a)    the Closing Date Payment;

(b)    the Assignment Agreements duly executed by Purchaser; and

(c)    a joint written instruction, duly executed by Purchaser, instructing the Escrow Agent to release to Seller by wire transfer of immediately available funds, the Deposit.

**ARTICLE IV**
**ADDITIONAL AGREEMENTS**

Section 4.1    Bidding Procedures.  The bidding procedures to be utilized with respect to this Agreement shall be those approved in the *Bidding Procedures Order*.  Purchaser agrees and acknowledges that, notwithstanding anything in this Agreement to the contrary, Seller, including through its Affiliates, advisors and representatives, are and may continue soliciting inquiries, proposals, or offers from third parties for the Purchased Assets in connection with any Alternative Transaction, including through an investment banker or other means.  Nothing in this Agreement shall prevent Seller from modifying the bidding procedures as necessary or appropriate to

maximize value for Seller's respective estates in accordance with Seller's fiduciary obligations. For purposes of clarity, Purchaser agrees and acknowledges that, notwithstanding anything in this Agreement to the contrary, Seller, including through its Affiliates, advisors and representatives, are and may continue soliciting inquiries, proposals, or offers from third parties for the Purchased Assets in connection with any Alternative Transaction.

Section 4.2    Auction.  Subject to the terms of the *Bidding Procedures Order*, on or prior to August 19, 2020 (or such later date as agreed in writing by all of the Parties hereto, which may be by email correspondence among counsel), Seller shall commence the auction (an "Auction") contemplated by the Bidding Procedures, if any Qualified Bid is submitted prior to the Bid Deadline. For the avoidance of doubt, Seller may conduct an auction process utilizing dates consistent with this Agreement even if approval of such process is not required by the Bankruptcy Court. Subject to the terms of the *Bidding Procedures Order*, on or prior to August 17, 2020 (or such later date as agreed in writing by all of the Parties hereto, which may be by email correspondence among counsel) (the "Bid Deadline"), any and all Qualified Bids shall have been submitted pursuant to the *Bidding Procedures Order*.

Section 4.3    Sale Hearing.  The *Bidding Procedures Order* shall contemplate the occurrence of a Sale Hearing (as defined therein) on or prior to August 21, 2020.

Section 4.4    Operations Pending Closing.  From the date of this Agreement until the earlier of the termination of this Agreement or the Closing, and taking into account the commencement and pendency of the Bankruptcy Cases and, except with respect to Section 4.4(a), Seller's liquidity and financing limitations associated therewith, except (x) as required by applicable Law, (y) as otherwise expressly required by terms of this Agreement or (z) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), Seller shall operate the Purchased Assets in the ordinary course of business.  Without limiting the generality of or any exception to the foregoing, Seller shall, from the date of this Agreement through the Closing:

(a)    operate the Purchased Assets consistent with their operation immediately prior to the date of this Agreement;

(b)    refrain from removing any Purchased Assets from the Shared Lab; and

(c)    maintain the Purchased Assets in good or their current operating condition, ordinary wear and tear excepted, in the ordinary course of business.

The Parties acknowledge and agree that Seller shall be subject to any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code.

Section 4.5    Bankruptcy Actions.

(a)    Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order or any other order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and advisors or

representatives of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(b)     Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by any of the other Parties or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement, the Sale Order, and (ii) keep the other Parties reasonably apprised of the status of material matters related thereto, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court or any third party and/or any Governmental Authority with respect to the transactions contemplated by this Agreement, the Sale Order.

(c)     The Seller's obligations under this Agreement and in connection with the transactions contemplated hereby and thereby are subject to entry of and, to the extent entered, the Sale Order.  Nothing in this Agreement shall require Seller to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

(d)     Seller and Purchaser acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher and better bids, the *Bidding Procedures Order* and Bankruptcy Court approval.  Seller and Purchaser acknowledge that Seller must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best transaction in connection with the Purchased Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, determining in Seller's business judgment to conduct an Auction.  The bidding procedures to be employed with respect to this Agreement and any Auction shall be those approved in the *Bidding Procedures Order*.

(e)     Notwithstanding any other provision of this Agreement to the contrary, Purchaser acknowledges that Seller and its Affiliates and advisors or representatives are and may continue soliciting inquiries, proposals, or offers for the Purchased Assets in connection with any Alternative Transaction.

(f)     If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "Backup Bidder") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated. If the Successful Bidder fails to consummate the applicable transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Seller may consummate the transactions contemplated by this Agreement on

the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

# ARTICLE V
# REPRESENTATIONS AND WARRANTIES

Section 5.1    Representations and Warranties of Seller.  Seller represents and warrants to Purchaser that the following statements are true and correct as of the date hereof and as of the Closing Date:

(a)    Organization.  Such Seller is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, and is qualified to do business in each other jurisdiction where such Seller's business related to the Purchased Assets requires it to be so qualified.  Such Seller has all requisite power and authority to own, lease and operate its properties and, taking into account the commencement and pendency of the Bankruptcy Cases and Seller's liquidity and financing limitations associated therewith, to carry on its applicable portion of the operations associated with the Purchased Assets.

(b)    Authorization.  Subject to requisite Bankruptcy Court approval, such Seller has all requisite corporate power and authority to execute and deliver this Agreement and any documents and agreements to be executed and delivered in connection herewith (the "Ancillary Deliverables") to which such Seller is a party, to perform its obligations hereunder and thereunder, and to carry on the operations of the Purchased Assets as it is now being conducted.  Subject to requisite Bankruptcy Court approval, and assuming this Agreement is a valid and binding obligation of Purchaser, the execution and delivery of this Agreement and the Ancillary Deliverables and the consummation of the transactions contemplated hereby or thereby by such Seller have been duly authorized by all necessary action on the part of such Seller, and no further action is necessary for such Seller to execute and deliver this Agreement and the Ancillary Deliverables to which such Seller is a party and to perform the obligations of such Seller hereunder and thereunder.  This Agreement and the Ancillary Deliverables to which such Seller is a party have been duly executed and delivered by such Seller and constitute the legal, valid and binding obligations of such Seller enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application referring to or affecting the enforcement of creditors' rights, or by general equitable principles.

(c)    No Violation; Consents.    Assuming that requisite Bankruptcy Court approval is obtained (collectively, the "Requisite Approval"), the execution, delivery and performance of this Agreement and the Ancillary Deliverables by such Seller and the consummation of the transactions contemplated thereby will not (i) violate any provision of the certificate of formation, articles of incorporation, bylaws, operating agreement or other analogous charters or governing documents of such Seller, (ii) violate any Law or order of any Governmental Authority by which such Seller or any of its properties or assets are bound or (iii) result in a violation or breach of, or constitute a default under, or result in the creation of any Lien (other than Permitted Liens) upon, or create any rights of termination, cancellation or acceleration in any Person with respect to any contract to which such Seller is a party or any permit of such Seller, or

any other contract, indenture, mortgage or instrument to which such Seller is a party or by which any of its properties or assets are bound. No order or filing, including without limitation any consent, approval or other authorization of any Governmental Authority or under any contract to which such Seller is a party or by which its respective portion of the Purchased Assets are bound, is required as a result of or in connection with the execution or delivery of this Agreement and the Ancillary Deliverables or the consummation by such Seller of the transactions contemplated hereby except the Requisite Approvals.

        (d)    <u>Title; Condition of Assets</u>.  Except as expressly disclosed to the Purchaser in writing, Seller owns all of the Purchased Assets free and clear of any Lien except for Permitted Liens.

        Section 5.2    <u>Representations and Warranties of Purchaser</u>.  Purchaser represents and warrants to Seller that the following statements are true and correct as of the date hereof and as of the Closing Date:

        (a)    <u>Organization</u>.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California and has full limited liability company power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

        (b)    <u>Power and Authority of Purchaser; Authorization</u>.  Purchaser has all requisite limited liability company power and authority to execute and deliver this Agreement and the Ancillary Deliverables to which it is a party, and to perform Purchaser's obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Ancillary Deliverables to which Purchaser is a party and the consummation of the transactions contemplated hereby or thereby have been duly authorized by all necessary limited liability company action on the part of Purchaser, and no further action is necessary for Purchaser to execute and deliver this Agreement and Purchaser's Ancillary Deliverables and to perform the obligations of Purchaser hereunder and thereunder.  This Agreement and the Ancillary Deliverables to which Purchaser is a party have been and will be duly executed and delivered by Purchaser and constitute the legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application referring to or affecting the enforcement of creditors' rights, or by general equitable principles.

        (c)    <u>Financing</u>.  Purchaser (i) has as of the date hereof sufficient funds to deliver the Deposit and access to committed capital subscriptions to pay the remainder of the Purchase Price at the Closing and (ii) will have at the Closing sufficient funds in an aggregate amount necessary to pay the Purchase Price and to consummate all of the other transactions contemplated by this Agreement.

        (d)    <u>No Outside Reliance</u>.  Notwithstanding anything in this Agreement to the contrary, Purchaser acknowledges and agrees that the representations and warranties made by Seller in <u>Section 5.1</u> (as qualified therein) (the "<u>Express Representations</u>") are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser and any of its Affiliates may rely in connection with the transactions contemplated by

Page 9

this Agreement.  Purchaser acknowledges and agrees that (other than solely to the extent expressly set forth in the Express Representations) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, or prospects of the Purchased Assets or Seller, or the quality, quantity or condition of the Purchased Assets, in each case, are specifically disclaimed by Seller, and that neither Purchaser nor any of its Affiliates has relied on any such representations, warranties or statements.  Purchaser acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the Purchased Assets, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the results of its or its Affiliates' own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or advisors or representatives, in each case, whether written or oral, made or provided by Seller or any of its Affiliates, advisors or representatives, or any failure of any of the foregoing to disclose information, except to the extent expressly set forth in the Express Representations.

## ARTICLE VI
## CONDITIONS PRECEDENT

Section 6.1    Conditions to Purchaser's Obligations.  Purchaser's obligation to effect the Closing shall be subject to the satisfaction or Purchaser's waiver of the following conditions:

(a)    all representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct in all material respects as of such date);

(b)    Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by such Seller at or prior to the Closing;

(c)    the Bankruptcy Court shall have entered the Sale Order, and the effectiveness of the Sale Order shall not be subject to any stay;

(d)    there shall be no order from any Governmental Authority in existence that prohibits or restricts the sale of the Purchased Assets to Purchaser; and

(e)    Seller shall have delivered or caused to be delivered all of the items set forth in Section 3.2.

Section 6.2    Conditions to Seller's Obligations.  Seller's obligation to effect the Closing shall be subject to the satisfaction or Seller's waiver of the following conditions:

(a)    all representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing as if made on the Closing Date

(other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct in all material respects as of such date);

(b)     there shall be no order from any Governmental Authority in existence that prohibits or restricts the sale of the Purchased Assets to Purchaser;

(c)     Purchaser shall have delivered or caused to be delivered all of the items set forth in Section 3.3; and

(d)     Purchaser shall have paid for or reimbursed Seller for, or be prepared to pay or reimburse Seller for, any costs associated with Seller's obligations under Section 3.2.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1     Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Purchaser;

(b)     by Purchaser by written notice to Seller if:

(i)     Purchaser is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VI and such breach, inaccuracy or failure has not been cured by the applicable Seller within thirty (30) days of the applicable Seller's receipt of written notice of such breach from Purchaser;

(ii)     the Closing shall not have occurred on or before September 4, 2020 (or such other date as is mutually agreed to by the Parties in writing) (the "Outside Date"), unless such failure shall be due to the failure of Purchaser to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iii)     the Sale Order has not been entered by the Bankruptcy Court by August 21, 2020; or

(iv)     if Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; provided that Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 7.1(b)(iv) until after the thirtieth (30th) day following entry by the Bankruptcy Court of an order authorizing and approving an Alternative Transaction with the Successful Bidder at the Auction and, notwithstanding Purchaser not having been the Successful Bidder or the Backup Bidder at the Auction, until such time (if any) as Purchaser terminates this Agreement pursuant to this Section 7.1(b)(iv), the obligations of Purchaser to consummate the transactions contemplated by this Agreement shall remain unaffected by Purchaser's right to terminate this Agreement pursuant to this Section 7.1(b)(iv);

Page 11

(c)      by Seller by written notice to Purchaser if:

(i)      no Seller is then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Purchaser pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VI and such breach, inaccuracy or failure has not been cured by Purchaser within thirty (30) days of Purchaser's receipt of written notice of such breach from Seller;

(ii)      if all of the conditions set forth in Section 6.1 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 3.1;

(iii)      the Closing shall not have occurred on or before the Outside Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iv)      if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's fiduciary duties;

(v)      if Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder;

(vi)      the Sale Order has not been entered by the Bankruptcy Court by August 21, 2020; or

(d)      by Seller or Purchaser in the event that (i) there shall be any applicable law that makes the consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued any order enjoining the transactions contemplated by this Agreement, and such order shall have become final and non-appealable.

In the event of termination of this Agreement pursuant to this Section 7.1, this Agreement shall forthwith become void and there shall be no Liability on the part of any Party or any of its partners, officers, directors or shareholders; provided that Section 2.4, this last sentence of Section 7.1, and Section 7.7 through Section 7.14 shall survive any such termination.

Section 7.2      Reasonable Efforts; Cooperation.

(a)      Subject to the other terms of this Agreement, each Party shall, and shall cause its advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable law to cause the transactions contemplated herein to be effected as soon as

practicable (subject to the following sub-clause (b)) in accordance with the terms hereof and to cooperate with each other Party and its advisors in connection with any step required to be taken as a part of its obligations hereunder.  The "reasonable best efforts" of Seller will not require Seller or any of its subsidiaries, Affiliates or advisors to expend more than a *de minimis* amount of money to remedy any breach of any representation or warranty to commence any action, to waive or surrender any right, to modify any contract or to waive or forego any right, remedy or condition hereunder.

(b)      The obligations of Seller pursuant to this Agreement, including this <u>Section 7.2</u>, shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case, and including entry of the *Bidding Procedures Order* (if applicable) and the Sale Order), any debtor-in-possession financing or order authorizing the use of cash collateral of Seller (including any budgets in connection with such financing or use of cash collateral), and Seller's obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (including the *Bidding Procedures Order* (if applicable)) and Seller's duty to seek and obtain the highest or otherwise best transaction for the Purchased Assets as required by the Bankruptcy Code.

Section 7.3    <u>Necessary Consents</u>.    Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not affect the assignment or transfer of any Purchased Asset if an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "<u>Necessary Consent</u>"), would constitute a breach thereof or of any Law or order or in any way adversely affect the rights of Purchaser thereunder. In such event, Seller and Purchaser will (a) use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser and (b), in the event a Necessary Consent is not obtained, cooperate in good faith in any lawful and commercially reasonable arrangement, including subcontracting, licensing, or sublicensing to Purchaser any or all of such Seller's rights and obligations with respect to any such Purchased Asset under which (i) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related tax costs imposed on such Seller or its Affiliates) and (ii) Purchaser shall assume any related burden and obligation (including performance) with respect to such Purchased Asset. Notwithstanding the foregoing, neither Seller nor Purchaser shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.

Section 7.4    <u>Further Assurances.</u>  Each party agrees, without further consideration, to cooperate and to promptly execute such other and further documents, instruments and papers after the Closing Date which are required to fully transfer the Purchased Assets to Purchaser.  To the extent that either Party discovers after the Closing Date that (i) any rights, interests or assets intended to be transferred and conveyed to Purchaser through this Agreement were inadvertently not conveyed to Purchaser, or (ii) any rights, interests or assets not intended to be transferred and conveyed to Purchaser through this Agreement were inadvertently conveyed to Purchaser, then each Party shall cooperate and take, at such Party's sole cost and expense, such actions as are

necessary to effectuate the transfer and conveyance, or as the case may be, the retransfer to the relevant other Party, of such rights, interests and assets without payment of further consideration.

Section 7.5    Transfer Taxes.  Any transfer, documentary, sales, use, stamp, registration and other similar taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the transfer of the Purchased Assets to Purchaser pursuant to this Agreement and not exempted under the Sale Order, by Section 1146(a) of the Bankruptcy Code or applicable state or municipal law ("Transfer Taxes") shall be borne by Purchaser.  Purchaser will, at its own expense, file all necessary tax returns and other documentation with respect to all Transfer Taxes, and, if required by applicable law, the Parties will, and will cause their Affiliates to, join in the execution of any such tax returns and other documentation.

Section 7.6    Allocation of Purchase Price.  Purchaser and Seller shall use commercially reasonable efforts to agree to an allocation of the consideration (and other items treated as consideration for federal income tax purposes) among the Purchased Assets in accordance with Code §1060 and the regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate) (the "Tax Allocation") within 30 days after the Closing Date. If Seller and Purchaser reach an agreement with respect to the Tax Allocation pursuant to the foregoing sentence, Seller and Purchaser each agree to report, and to cause their respective Affiliates to report, the U.S. federal, state and local income and other tax consequences of the transactions contemplated herein, and in particular to report the information required by Code §1060(b), and to jointly prepare Internal Revenue Service Form 8594 (Asset Acquisition Statement under Section 1060) in a manner consistent with the Tax Allocation, as may be revised to take into account subsequent adjustments to the Purchase Price, and shall not take any position for U.S. federal, state or local income tax purposes inconsistent therewith upon examination of any tax return, in any refund claim, in any tax litigation, investigation or otherwise, unless required to do so by a "determination" (as defined in Code §1313(a)(1)), or with such other Party's prior consent; provided, however, that nothing contained herein shall prevent Purchaser or Seller from settling any proposed deficiency or adjustment by any taxing authority based upon or arising out of the Tax Allocation, and neither Purchaser nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any taxing authority challenging the Tax Allocation.  If Seller and Purchaser do not reach an agreement with respect to the Tax Allocation under this Section 7.6, Seller and Purchaser shall be free to file their own asset allocation statements and shall not be subject to the reporting requirements of this Section 7.6. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 7.6 shall survive the Closing without limitation.

Section 7.7    Notices.  All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been given on the date of delivery in person or by facsimile (receipt confirmed) or of deposit in the United States mail, postage prepaid, if sent by registered or certified mail, return receipt requested, addressed as follows:

If to Purchaser:                                    If to Seller:

Baker Hughes Oilfield Operations LLC

Page 14

17021 Aldine Westfield Road
Houston, Texas 77073
Attn: Kristin McLaurin
Email: kristin.mclaurin@bakerhughes.com

with copy to:

Foley & Lardner LLP
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Attn: Harold L. Kaplan
E-mail: hkaplan@foley.com

BJ Services, LLC
11211 FM 2920 Rd.
Tomball, Texas 77375
Attn:  John R. Bakht, General Counsel
Email: john.bakht@bjservices.com

with copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:  Joshua A. Sussberg
          Christopher T. Greco
E-mail: joshua.sussberg@kirkland.com
          cgreco@kirkland.com

Any Party may change its address for receipt of notices and other communications hereunder by giving appropriate written notice to the other Parties in accordance with the provisions of this Section 7.7.

Section 7.8   Governing Law; Exclusive Venue.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to its conflict of laws principles.  Subject to the foregoing, the Parties hereby agree that any litigation arising hereunder shall be filed in and resolved exclusively in the Bankruptcy Court or, if the Bankruptcy Court is unwilling or unable to hear such litigation, in the federal or state courts located in Harris County, Texas, United States of America.  Each Party hereby irrevocably consents to the personal jurisdiction of such courts and agrees that venue shall be exclusive with such courts.

Section 7.9   Amendment and Waiver.  This Agreement may be amended or modified only by written instrument executed by all of the Parties.  A waiver of any term or condition of this Agreement shall only be effective if in writing.  No waiver by any Party of any breach of any of the covenants to be performed by any other Party shall be construed as a waiver of any subsequent breach of the same term or condition, or a waiver of any other term or condition of this Agreement.

Section 7.10   Assignment.  No Party shall assign this Agreement, or any right or duty hereunder, voluntarily or involuntarily, by operation of law or otherwise, without the prior written consent of the other Parties (which consent shall not be unreasonably withheld, delayed or conditioned).

Section 7.11   AS IS Transaction.  UPON CLOSING, IT IS UNDERSTOOD THAT, EXCEPT WITH RESPECT TO THE EXPRESS REPRESENTATIONS, PURCHASER HAS ACCEPTED THE PURCHASED ASSETS IN THEIR "AS IS" CONDITION.  EXCEPT AS EXPRESSLY SET FORTH HEREIN, NO WARRANTY, EITHER EXPRESS OR IMPLIED, AND NO REPRESENTATION AS TO THE CONDITION OF SAID PURCHASED ASSETS, THEIR FITNESS FOR ANY PARTICULAR USE OR MERCHANTABILITY, HAS BEEN GIVEN OR IS BINDING UPON SELLER, ALL OF WHICH SUCH IMPLIED WARRANTIES

Page 15

ARE DISCLAIMED BY PURCHASER.  Purchaser acknowledges and agrees that it will, and it will cause its Affiliates to, not assert, institute, or maintain any proceeding, action or lawsuit that makes any claim contrary to this <u>Section 7.11</u> and <u>Section 5.2(d)</u>, including any such proceeding, action or lawsuit with respect to any information, statements, disclosures, or materials, in each case whether written or oral, provided to Purchaser or its Affiliates or their respective advisors and representatives by Seller or any of its Affiliates, or any failure by any of the foregoing to disclose any information.  Purchaser acknowledges and agrees that the covenants and provisions contained in this <u>Section 7.11</u> and <u>Section 5.2(d)</u> require performance after the Closing and are an integral part of the transactions contemplated by this Agreement and that Seller would not have entered into this Agreement without such covenants and provisions.

Section 7.12   <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>.  Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date. Purchaser and Seller acknowledge and agree that the agreements contained in this <u>Section 7.12</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years; and (b) are an integral part of the transactions contemplated hereby and that, without such agreements, none of the Parties would enter into this Agreement.

Section 7.13   <u>Specific Performance</u>.  The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement.  It is accordingly agreed that (a) the Parties will be entitled to seek an injunction or injunctions, specific performance or other equitable relief to remedy breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Purchaser would have entered into this Agreement.  The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other order to remedy breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement will not be required to provide any bond or other security in connection with any such order.  If, prior to the Outside Date, any Party brings any action to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such action is pending, <u>plus</u> ten (10) days or (z) by such other time period established by the court presiding over such action, as the case may be.  In no event will this <u>Section 7.13</u> be used, alone or together with any other provision of this Agreement, to require Seller to remedy any breach of any representation or warranty of Seller made herein.

Section 7.14   <u>Miscellaneous</u>.  This Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof and supersedes all prior agreements and understandings, whether written or oral, between the Parties.  This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one Party but all of which taken together shall constitute one and the same Agreement.  The section headings in this Agreement are included for convenience only and shall not affect the interpretation of this Agreement.  The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor case.  It is the intention of the Parties that nothing in this Agreement shall be deemed to create any right or cause of action in or on behalf of any Person other than the Parties.  If any provision of this Agreement is found to be contrary to Law or unenforceable by a court of competent jurisdiction, then the remaining provisions shall be severable and enforceable in accordance with their terms, unless such unlawful or unenforceable provision is material to the transactions contemplated hereby, in which case the Parties shall negotiate in good faith a substitute provision.

[Signatures on following page]

4821-5442-0423.5

## SCHEDULE 1

### Purchased Assets

## Idle Equipment

| Fixed Asset ID | Main Asset ID | Asset Name (FA) | VIN / Serial # (FA) |
|---|---|---|---|
| 1232539 | 1232539 | GAS FLOW MODEL UPGRADE BJ | 10054 |
| 1232560 | 1232560 | CO2 CHILLER | |
| 1232581 | 1232581 | MASS FLOWEMETER FOR FRICTION | 54651955 |
| 1232584 | 1232584 | FRACTURE CONDUCTIVITY CELL SET | 10 |
| 1232589 | 1232589 | REFRIGERATED BATH | 110173045 |
| 1232603 | 1232603 | FRACTURE CONDUCTIVITY | BJ10420 |
| 1232606 | 1232606 | FRICTION LOOP FOR SCREENING | TK-6 |
| 1232609 | 1232609 | FRACTURE CONDUCTIVITY CELLS | 6 |
| 1232610 | 1232610 | FRACTURE CONDUCTIVITY CELLS | 5 |
| 1232611 | 1232611 | FRACTURE CONDUCTIVITY CELLS | |
| 1232616 | 1232616 | KARL FISHER ANALYZER | 1116481435 |
| 1232617 | 1232617 | FRACTURING CONDUCTIVITY | BJ10005 |
| 1232661 | 1232661 | GAS FLOW MODEL BJ | 10054 |
| 1232686 | 1232686 | Rheometer HPHT | 543 |
| 1232687 | 1232687 | Rheometer HPHT | 400 |
| 1232693 | 1232693 | TENSILE STRENGTH PRESSURE CELL | 10121 |
| 1232694 | 1232694 | FRACTURE CONDUCTIVITY TESTING | BJ10006 |
| 1232699 | 1232699 | FRACTURING CONDUCTIVITY TEST | BJ10421 |
| 1232700 | 1232700 | FRACTURING CONDUCTIVITY TEST | BJ10007 |
| 1232701 | 1232701 | FRACTURING CONDUCTIVITY TEST | BJ10008 |
| 1232702 | 1232702 | FRACTURING CONDUCTIVITY TEST | 205D20105,205C20209,201L0317, 210297, 200J20287, 215A20199 |
| 1232703 | 1232703 | ACCUPYC 1330 HELIUM PYNCNOMETE | 3953 |
| 1232724 | 1232724 | PARTICLE SIZE ANAYLZER | AK38328 |
| 1232746 | 1232746 | LOW ANGLE LASER FOR GPC | 302-0906-304 |
| 1232812 | 1232812 | CHANDLER MODEL 5550 AUTOMATED | 502 |
| 1232813 | 1232813 | CHANDLER MODEL 5550 AUTOMATED | 540 |
| 1232815 | 1232815 | PLASMA SPECTROMETER | ICP20064810 |
| 1232816 | 1232816 | CHANDLER M-PRO ANALYZER | 114 |
| 1232825 | 1232825 | CHANDLER CONDUCTIVITY LAB | 10526 |
| 1232826 | 1232826 | CHANDLER CONDUCTIVITY LAB | 10524 |
| 1232827 | 1232827 | CHANDLER CONDUCTIVITY LAB | 10525 |
| 1232828 | 1232828 | CHANDLER CONDUCTIVITY LAB | 10523 |
| 1232829 | 1232829 | GAS CHROMATOGRAPHY/ MS | US73347041 |

| 1232834 | 1232834 | LUMINOMETER 20/20N | 2030000919 |
|---------|---------|--------------------|------------|
| 1232846 | 1232846 | CONDUCTIVITY PUMP | A0027968 |
| 1232847 | 1232847 | CONDUCTIVITY PUMP | A0027969 & A12740 |
| 1232848 | 1232848 | CONDUCTIVITY PUMP | A0029561 & A0029560 |
| 1232849 | 1232849 | CONDUCTIVITY PUMP | A0027971 |
| 1232855 | 1232855 | MOLECULAR WEIGHT TESTING | 3020906304 |
| 1232864 | 1232864 | HP HT VISCOMETER 5500 SPR-225 | 1 |
| 1232868 | 1232868 | CHANDLER 5550-SPR-225RF | 267 |
| 1232869 | 1232869 | MASS FLOW METER / TRANSMITTER | 14022400 |
| 1232870 | 1232870 | MASS FLOW METER / TRANSMITTER | 14022413 |
| 1232871 | 1232871 | MASS FLOW METER / TRANSMITTER | 14022003 |
| 1232872 | 1232872 | MOYNO PUMP SKID RHEOLOGY | |
| 1232875 | 1232875 | CONDUCTIVITY PRESS UPGRADE & | 205D20171 & 201L20328 |
| 1232883 | 1232883 | QUIZIX DUAL PUMP 1 | 627170 & 627169 |
| 1232884 | 1232884 | QUIZIX DUAL PUMP 2 | 964 |
| 1232885 | 1232885 | HTHP RHEOMETER | 108 |
| 1232924 | 1232924 | THERMO SCIENTIFIC BATH CIRCULA | |
| 1232975 | 1232975 | GAS CHROMATOGAPH W/AUTO SAMPLE | CN10727105 |
| 1238340 | 1238340 | Conductivity cells 2-double | 11,12,13,14 |
| 1238598 | 1238598 | Test cell apparatus | |
| 1238634 | 1238634 | Yokogawa CX1000 Controllers | ENT1N607337 |
| 1238635 | 1238635 | Yokogawa CX1000 Controllers | |
| 1238641 | 1238641 | Yokogawa CX 1000 Controllers | |
| 1238650 | 1238650 | Chandler UCA pressure vessel r | |
| 1238651 | 1238651 | Chandler Model 4265 UCA Pressu | 587 |
| 1238953 | 1238953 | Chandler 5550 HPHT viscometer | 491 |
| 1238954 | 1238954 | Chandler 5550 HPHT viscometer | 492 |
| 1239061 | 1239061 | Chandler 5550 Rheometers | 340 |
| 1239080 | 1239080 | Chandler Model 5550 HTHP 110V | 341 |
| 1239108 | 1239108 | Chandler 5550 Rheometers | 614 |
| 1239109 | 1239109 | Chandler 5550 Rheometers | 617 |
| 1239574 | 1239574 | Chandler 5550 Rheometer | 706 & 707 |
| 1239575 | 1239575 | Pump replacement for Conductiv | 200J20229 |
| 1239576 | 1239576 | CO2 Chiller for Flow Loop | 127060201140416 |
| 1239577 | 1239577 | Chandler 5550 Rheometer | 713 & 715 |
| Q243233 | Q243233 | Rheometer HPHT | 159 |

| | | | |
|---|---|---|---|
| Q243236 | Q243236 | Rheometer HPHT | 1263 |
| Q243275 | Q243275 | Rheometer HPHT | 241 |
| Q243276 | Q243276 | Rheometer HPHT | 396 |
| USLBEQ-0000104 | USLBEQ-0000104 | Flow Loop | |
| USLBEQ-0000105 | USLBEQ-0000105 | Flow Loop | |
| USLBEQ-0000106 | USLBEQ-0000106 | Flow Loop | |
| USLBEQ-0000107 | USLBEQ-0000107 | Flow Loop, Pump | 10171 |
| USLBEQ-0000108 | USLBEQ-0000108 | Flow Loop, Pump | |
| USLBEQ-0000111 | USLBEQ-0000111 | CONDUCTIVITY PUMP | A0027970 |
| USLBEQ-0000112 | USLBEQ-0000112 | CONDUCTIVITY PUMP | A12963 |
| USLBEQ-0000113 | USLBEQ-0000113 | CONDUCTIVITY PUMP | A12966 |
| USLBEQ-0000114 | USLBEQ-0000114 | CONDUCTIVITY PUMP | Z0053746 |
| USLBEQ-0000117 | USLBEQ-0000117 | Rheometer | 10299 |
| USLBEQ-0000120 | USLBEQ-0000120 | Rheometer | 1200102336006 |

FRAC ONGOING

| Unique | Fixed Asset ID | Type | Description |
|---|---|---|---|
| us011232669 | 1232669 | Lab Eq | KRUSS TENSIOMETER |
| us011232836 | 1232836 | Lab Eq | UV-VISIBLE SPECTROPHOTOMETER |
| us011232922 | 1232922 | Lab Eq | GRACE 7500 VISCOMETER |
| us011232925 | 1232925 | Lab Eq | FTTR SPECTROMETER UNIT T37 TEN |
| us011232931 | 1232931 | Lab Eq | CHANDLER HTHP 5550 VISCOMETER |
| us011238818 | 1238818 | Lab Eq | Density meter _ DMA4100 |
| us011239105 | 1239105 | Lab Eq | Chandler 5550 Rheometers |
| us011239135 | 1239135 | Lab Eq | ELEMENTAL ANALYZER |
| us011239600 | 1239600 | Lab Eq | Chandler 5550 Rheometers |
| us011239580 | 1239580 | Lab Eq | Chandler 5550 Rheometers |

CMT BIZ SALE

| Fixed Asset ID | Main Asset ID | Asset Name (FA) | VIN / Serial # (FA) |
|---|---|---|---|
| 1232501 | 1232501 | CONSTANT SPEED MIXER | 1000 |
| 1232524 | 1232524 | ULTRASONIC CEMENT ANALYZER | 803 |
| 1232537 | 1232537 | Oven | 10057 |
| 1232562 | 1232562 | Cement Curing Chamber | 316 |
| 1232563 | 1232563 | Cement Curing Chamber | 10485 |
| 1232565 | 1232565 | CONSISTOMETER | 466 |
| 1232566 | 1232566 | CONSISTOMETER | 922 |
| 1232567 | 1232567 | UCA | 805 |
| 1232568 | 1232568 | UCA | |
| 1232588 | 1232588 | CHILLER FOR CEMENT LAB | |
| 1232595 | 1232595 | ANALYTICAL BALANCE | 115063575 |
| 1232599 | 1232599 | REFRIGERATED COOLER | 0090-206261-00 |
| 1232605 | 1232605 | OSCILLARY RHEOMETER | 1030 |
| 1232620 | 1232620 | PROPPANT CONDUCTIVITY TEST EQU | 216L02347 |
| 1232623 | 1232623 | GRACE BENCHTOP RHEOMETER | M3600-0326 |
| 1232650 | 1232650 | OFITE VISCOMETER | 06-588 |
| 1232688 | 1232688 | Viscometer | 103 |
| 1232689 | 1232689 | Stirring Fluid Loss Tester | 170 |
| 1232729 | 1232729 | HP/HT CHANDLER CONSISTOMETER | 923 |
| 1232730 | 1232730 | HP/HT CHANDLER CONSISTOMETER | 925 |
| 1232731 | 1232731 | HP/HT CHANDLER CONSISTOMETER | 957 |
| 1232732 | 1232732 | HP/HT CHANDLER CONSISTOMETER | 549 |
| 1232733 | 1232733 | HP/HT CEMENT CURING CHAMBERS | 488 |
| 1232734 | 1232734 | HP/HT CEMENT CURING CHAMBERS | 525 |
| 1232814 | 1232814 | CHANDLER HPHT VISCOMETER | 544 |
| 1232835 | 1232835 | ISCO 500D PUMP & CONTROLLER | 6008R565 |
| 1232837 | 1232837 | VISCOMETER-CHANDLER 5550 | 180 |
| 1232845 | 1232845 | CONSTANT SPEED MIXER | 1816 |
| 1232856 | 1232856 | ISCO 500D PUMP & CONTROLLER | 208J20082, 208J20081, 208J20123 |
| 1232865 | 1232865 | VISCOMETER OFITE MODEL 900 | 07-802 |
| 1232866 | 1232866 | VISCOMETER OFITE MODEL 900 | 03-138 |
| 1232873 | 1232873 | ISCO PUMP AND CONTROLLER | 201G20405 |
| 1232876 | 1232876 | OFITE MODEL 900 VISCOMETER | 08-1047 |
| 1232877 | 1232877 | OFITE MODEL 900 VISCOMETER | 08-1043 |
| 1232886 | 1232886 | HTHP UCA SECOND | 829 |

| 1232887 | 1232887 | FLUID LOSS CELL TEST APPARTUS | |
| 1232888 | 1232888 | FLUID LOSS CELL TEST APPARTUS | |
| 1232889 | 1232889 | FLUID LOSS CELL TEST APPARTUS | |
| 1232890 | 1232890 | FLUID LOSS CELL TEST APPARTUS | |
| 1232891 | 1232891 | HPHT WETTABILITY APPARATUS | |
| 1232930 | 1232930 | VISCOMETER,OFITE MODEL 900 | 06-599 |
| 1233002 | 1233002 | LAB EQ CHANDLER CONSIST | 924 |
| 1233062 | 1233062 | LAB EQ PRESS CURING CHA | 342 |
| 1233128 | 1233128 | THICKENING TIME TESTER | 781 |
| 1233150 | 1233150 | THICKENING TIME TESTER | 955 |
| 1233151 | 1233151 | THICKENING TIME TESTER | 956 |
| 1233152 | 1233152 | THICKENING TIME TESTER | 958 |
| 1238338 | 1238338 | SYSTEM,5550 VISCOMETER,110V 2 | 401 & 402 |
| 1238342 | 1238342 | Grace 5600 Rheometer for G & G | 151 |
| 1238597 | 1238597 | OFI 900; LL Masster remote mix | 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 |
| 1238601 | 1238601 | Chandler Eng Consisteometer - | 704 |
| 1238602 | 1238602 | Chandler Eng Consisteometer - | 314 |
| 1238603 | 1238603 | Chandler Eng Consisteometer - | 417 |
| 1238604 | 1238604 | Chandler Eng Consisteometer - | 165 |
| 1238636 | 1238636 | CTE model 15-400GS SGSA | RP 137 |
| 1238819 | 1238819 | Fluid Loss Cell | |
| 1238858 | 1238858 | Viscometers, Pressurized 110V | 183 |
| 1238859 | 1238859 | Viscometers, Pressurized 110V | 544 |
| 1238952 | 1238952 | Shear history simulator | |
| 1238955 | 1238955 | 5550-110V-SPR-225 rheometers | 519 |
| 1238956 | 1238956 | 5550-110V-SPR-225 rheometers | 520 |
| 1238957 | 1238957 | 5550-110V-SPR-225 HPHT viscome | 531 |
| 1238958 | 1238958 | 5550-110V-SPR-225 HPHT viscome | 532 |
| 1239062 | 1239062 | Viscometers, Pressurized 110V | 466 |
| 1239104 | 1239104 | Wettability Tester | 153 |
| 1239510 | 1239510 | Static Gel Strenght Analyzer | 1160 |
| 1239573 | 1239573 | CTE Curing Chamber M3-700-4 | CC 146 |
| P242613 | P242613 | Data Acquisition PCs | |
| Q243230 | Q243230 | OFITE | 08-1012 |
| Q243231 | Q243231 | Sedimentation Tube | |
| Q243232 | Q243232 | Stainless Steel Sedimentatio | |

| | | | |
|---|---|---|---|
| Q243234 | Q243234 | Sedimentation Mold - WND Lab. | |
| Q243235 | Q243235 | Mud Scales (4) | |
| Q243292 | Q243292 | UCA Twin Cell 4262 | 676L AND 676R |
| Q243293 | Q243293 | CONSISTOMETER | 114 |
| Q243296 | Q243296 | CURING CHAMBER | 174 |
| Q243297 | Q243297 | CONSISTOMETER | 122 |
| Q243298 | Q243298 | CTE UCA | UCA 10 |
| Q243301 | Q243301 | CONSTANT SPEED MIXER | 1816 |
| Q243302 | Q243302 | CTE Atmospheric Consistomete | 42617 |
| Q243303 | Q243303 | Atmospheric Consistometer fo | 852 |
| USLBEQ-0000017 | USLBEQ-0000017 | ATMOSPHERIC CONSISTOMETER | |
| USLBEQ-0000018 | USLBEQ-0000018 | ATMOSPHERIC CONSISTOMETER | |
| USLBEQ-0000076 | USLBEQ-0000076 | Viscometer | 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 |
| USLBEQ-0000077 | USLBEQ-0000077 | Viscometer | 05-463 |
| USLBEQ-0000078 | USLBEQ-0000078 | Viscometer | 07-806 |
| USLBEQ-0000079 | USLBEQ-0000079 | Viscometer | 08-1054 |
| USLBEQ-0000080 | USLBEQ-0000080 | Viscometer | M3500A-5 |
| USLBEQ-0000081 | USLBEQ-0000081 | Viscometer | M3600-5-0340 |
| USLBEQ-0000082 | USLBEQ-0000082 | HTHP Viscometer | 169/170 |
| USLBEQ-0000083 | USLBEQ-0000083 | HTHP Viscometer | 284/285 |
| USLBEQ-0000098 | USLBEQ-0000098 | Chiller | |
| USLBEQ-0000100 | USLBEQ-0000100 | Chiller | |
| USLBEQ-0000101 | USLBEQ-0000101 | Chiller | |
| USLBEQ-0000102 | USLBEQ-0000102 | Chiller | |
| USLBEQ-0000115 | USLBEQ-0000115 | Convection Oven | 21AK3 |
| USLBEQ-0000126 | USLBEQ-0000126 | Single Cell UCA | UCA 11 |

ADDITIONAL EQUIPMENT NOT ON MASTER ASSET LIST

| BJS Asset Number | Description | Department |
|---|---|---|
| 1239509 | Manufacture of one off Experimental Shear Bond Mac | Cement |
| 1239069 | CTE Model 1 SACOGS Gel Sven | Cement |
| 1238585 | High Pressure Test Cell | Cement |
| 1238325 | C02 Test Equipment | Cement |
| 1232998 | LAB EQ COMPACT CURING C | Cement |
| 1232833 | aumx DUAL PUMP 1 | Cement |
| 1232716 | DEDICATED CEMENT TENSILE | Cement |
| 1232670 | 3-G550 DUALHEAD DDR 3.17 in.LcO | Cement |
| 1232637 | FLEXURAL STRENGTH PROTOTYPE | Cement |
| 1232507 | ULTRASONIC CEMENT ANALYZER | Cement |
| 1232471 | YOKOGAWA CONTROL & MEASUREMENT | Cement |
| 1238640 | Chandler Quizix Model Q5220 Dual pump | Cement |
| 1238639 | Chandler Quizix Model Q5220 Dual pump | Cement |
| 1238638 | Chandler Quizix Model Q5220 Dual pump | Cement |
| 1238637 | Chandler Quizix Model Q5220 Dual pump | Cement |
| 1232824 | AUTOMATED INTRINSIC VISCOSITY | QC |
| 1239526 | Dell Computer | Frac |
| 1238599 | CS Mixer; spare parts; bath, OH mixer | Frac |
| 1238339 | Chandler HTPT (2) | Frac |
| 1232920 | EIRICH HIGH INTENSITY LAB | Frac |
| 1232874 | RHEOLOGY LOOP ASSEMBLY | Frac |
| 1232867 | TUBING FURNANCE | Frac |
| 1232852 | GENESYS 6-UV VIS SCANNING | Frac |
| 1232705 | LINDBERG BOX FURNACE | Frac |
| 1232704 | LINDBERG BOX FURNACE | Frac |
| 1232604 | METERS & PUMPS | Frac |
| 1232582 | CROSSLINKER PUMP FOR FRICTION | Frac |
| 1232203 | DISPOSAL TANK & INSTALLATION | Frac |

| Baker Asset # | Asset Description |
|---|---|
| 900000051022 | HTHP Filter Press |
| 629474 | CEMENT ANALYZER (HP) |
| 867357 | Fiber Optic Cables and accessories |
| 863651 | Convection Oven, Coreholder, Autoclave Valves |
| 850626 | FEI ESEM Upgrade |
| 837553 | 600 cc stainless steel accumulators |
| 837552 | 200 cc stainless steel accumulators |
| 836485 | CD23-A-2-A-1-C Std 3 1/2 display (four) |
| 836165 | Fiber Optic Data Acquisition equipment |
| 815987 | 216-0023-ASSY-316/GFT |
| 815983 | Teledyne Isco E260-D pump |
| 627293 | BINDER FEB 400UL HIGH TEMP |
| 627292 | BINDER FEB 400UL HIGH TEMP |
| 627277 | COLLINS INSTRUMENTS HIGH |
| 627276 | TELEDYNE ISCO MODEL E260 DUAL |
| 627205 | TESTING PREPARATION EQUIPMENT |
| 627204 | ESPEC HUMIDITY OVEN |
| 627202 | COREPLUG ULTRA CENTRIFUGE |
| 627161 | CATHODOLUMINESCENCE DETECTOR |
| 627159 | ULTRA-LOW PERMEAMETER & |
| 627151 | ISCO PUMP (2) AND CONTROLLER |
| 627128 | ULTRA-LOW TRANSDUCER |
| 627125 | UPGRADE OF EXISTING MTS-311 |
| 627005 | HEATING MANTLES REPLACEMENT & |
| 626829 | SCA LAB DATA ACQUIS SOFTWARE |
| 626803 | SPEX SHATTERBOX |
| 626720 | LEICA MZ 12.5 STEROMICROSCOPE |
| 626649 | TYPE TWO CART |
| 626647 | TYPE TWO CART |
| 626646 | TYPE TWO CART |
| 626529 | GEOLOGICAL SERVICES LAB EQUIP |

626442   CONFORMANCE SUPPORT EQUIPMENT
626427   UNCONSOLIDATED SAND TEST EQUIP
626413   ENVIRONMENTAL SCANNING
626388   CORE FLOW AUTOMATION
626357   CONFORMANCE LABORATORY STARTUP
626356   CORE FLOW LAB EQUIPMENT
626268   PROPPANT PACK ANALYSIS
626266   COREFLOW EQUIP
626112   PROTYPE/DYNAMIC MODULUS
626106   ELECTRONICS FOR MTS EQUIPMENT
626047   X RAY FLUORESCENCE SYSTEM
626033   COREFLOW AUTOMATION EQUIPMENT
626029   CORE FLOW EQUIPMENT UPGRADE
626021   PRESSURE TESTER
148603   MiniFlex + Desktop Diffraction
 37032   X-Ray Fluorescence Sys for Tech Svcs La
626352   PRESSURIZED CONSISTOMETER
626016   UCA
626070   UCA
503656   Lost Circulation Apparatus
626438   Atmospheric Consistometer

## **SCHEDULE 2**

Non-Purchased Assets to Which Purchaser Will Have Use Rights

us01P241880          P241880   Lab Eq     Flow Loop

## **SCHEDULE 3**

Purchased Assets to Which Seller and its Successor Will Have Use Rights

| | | | |
|---|---|---|---|
| us011232669 | 1232669 | Lab Eq | KRUSS TENSIOMETER |
| us011232836 | 1232836 | Lab Eq | UV-VISIBLE SPECTROPHOTOMETER |
| us011232925 | 1232925 | Lab Eq | FTTR SPECTROMETER UNIT T37 TEN |
| us011239135 | 1239135 | Lab Eq | ELEMENTAL ANALYZER |

EXHIBIT A

AMENDED AND RESTATED SERVICES AGREEMENT
(Attached)

## FIRST AMENDMENT TO AMENDED & RESTATED SERVICES AGREEMENT

This First Amendment to Amended & Restated Services Agreement (this "**Amendment**") is entered into effective as of August 26, 2019 (the "**Effective Date**"), by and between **BJ SERVICES, LLC**, a Delaware limited liability company ("**BJ**"), and **BAKER HUGHES OILFIELD OPERATIONS LLC,** a California limited liability company, successor by conversion to Baker Hughes Oilfield Operations, Inc. ("**Baker Hughes**"). Capitalized Terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Agreement (hereinafter defined).

### R E C I T A L S:

BJ and Baker Hughes entered into that certain Amended & Restated Services Agreement dated effective as of December 1, 2018 (the "**Existing Agreement**"), providing for (i) the shared use of that certain 114,905 square foot laboratory and office building owned by BJ, commonly known as the TEDC Building, bearing the address 11211 FM 2920, Tomball, Texas 77375 as shown on Exhibit F to the Existing Agreement (the "Premises") and (ii) for the sharing of certain technology arising out of the activities conducted by the Parties at the Premises, for a term of five (5) years from December 1, 2018, through November 30, 2023;

Pursuant to the Original Agreement, Baker Hughes was allocated 25,789 square feet of office space and 9,458 square feet of laboratory space as shown on Exhibit F to the Existing Agreement; however, the parties now desire to allocate additional laboratory and office space to Baker Hughes and to adjust rent and expenses payable by Baker Hughes accordingly; and

Baker Hughes and BJ desire to execute this Amendment to set forth in writing all such changes, all as more fully set out in this Amendment.

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS:

THAT, for and in consideration of the premises, the mutual promises contained in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, BJ and Baker Hughes do hereby amend the Existing Agreement as follows, effective as of the Effective Date:

1. Preliminary Statement C. is hereby deleted in its entirety and replaced with the following:

C.    Portions of the Premises consisting of approximately 31,270 square feet as shown colored yellow (the "Shared Lab"), pink (the "BJ Lab") and green (the "Baker Hughes Lab") on Exhibit F, attached hereto and made a part hereof for all purposes, are used, together with the tools and equipment contained therein, as laboratory space (the Shared Lab, the BJ Lab and

the Baker Hughes Lab, together with their contents, are collectively referred to as the "Lab") for laboratory and non-field scientific activities relating to cementing, acidizing, fracturing, fluid analysis and geomechanics (the "Scope"); and additional space with an area of roughly 28,791 square feet within the Premises as shown colored purple on Exhibit F (the "Offices") is dedicated for Baker Hughes' use as office and conference room space under and pursuant to this Agreement.

2.  Preliminary Statement F is hereby deleted in its entirety.

3.  Exhibit B to the Original Agreement is hereby deleted in its entirety and replaced with Exhibit B, attached hereto and made a part hereof for all purposes.

4.  Exhibit F to the Original Agreement is hereby deleted in its entirety and replaced with Exhibit F, attached hereto and made a part hereof for all purposes.

5.  Miscellaneous.

(i)     The Agreement will be binding on and inure to the benefit of BJ, Baker Hughes, and their respective successors and assigns.  If BJ sells or otherwise transfers the Premises to another person or entity, BJ will have the buyer or transferee assume this Agreement in writing, but even if no such assumption is executed, this Agreement will remain in effect and be binding on the purchaser or transferee.

(ii)    The term "**Agreement**" as used in the Existing Agreement and this Amendment means the Existing Agreement, as amended by this Amendment and as further amended from time to time.  As hereby expressly amended, the Agreement is hereby ratified and confirmed to be in full force and effect. If there is a conflict between the provisions set out in this Amendment and those set out in the Existing Agreement, the provisions set out in this Amendment will govern and control. This Amendment may be executed in multiple counterparts, and all such executed counterparts shall constitute the same agreement.  It shall be necessary to account for only one such counterpart in proving the existence, validity or content of this Amendment.

IN WITNESS WHEREOF, the parties have executed this Amendment effective as of the date first set forth above.

**BAKER HUGHES OILFIELD OPERATIONS LLC**, a California limited liability company

By: _____
    Lee Whitley
    Vice President


**BJ SERVICES, LLC**, a Delaware limited liability company

By: _____
Name: _____ Warren Zemlak
Title: _____
                        President & CEO

# EXHIBIT B

## Fees

This <u>Exhibit B</u> forms a part of, and is incorporated into, the Amended & Restated Services Agreement (the "<u>Agreement</u>") dated effective December 1, 2018, by and between BJ Services, LLC ("<u>BJ</u>") and Baker Hughes Oilfield Operations LLC ("<u>Baker Hughes</u>").  Capitalized terms not otherwise defined in this <u>Exhibit B</u> shall have the meanings set forth in the Agreement.

Unless agreed otherwise by the parties, Baker Hughes shall pay BJ the following, non-refundable fees.

**Rental Fees**

1.    **Exclusive Office/Conference Space.**  Office and conference room space of approximately 28,791 square feet located in the Premises, as depicted on **Exhibit F** to the Agreement, which are dedicated to Baker Hughes' exclusive use under this Agreement, at a base rent per square foot of $16 per square foot per annum for a total of $460,656.00 per annum.

2.    **Shared Lab Space.** Shared Lab space of 15,594 square feet multiplied by $16 per square foot per annum (totaling $273,504 per annum,) multiplied by 75% (which is the initial Baker Hughes utilization rate), which totals $187,128 base rent chargeable to Baker Hughes for the Shared Lab (based on 75% utilization).

3.    **Exclusive Baker Hughes Lab Space.**  The Baker Hughes Lab (exclusive) space of 10,958 square feet multiplied by $16 per square foot per annum for a total base rent of $175,328 per annum.

4.    **Common Area Space Allocation.**  An allocation of 76.08% of the total common area of the Premises of 47,282 square feet for Baker Hughes' non-exclusive use, being 35,972 square feet at a price per foot of $16 per annum, totaling base rent of $575,552 per annum.  (This amount is fixed for the term and is without regard to utilization of the Shared Lab.)

5.    **Depreciation and Amortization of Existing Shared Lab Equipment.** Depreciation expense of $221,155 per annum for the Shared Lab lab equipment in place as of the effective date  multiplied by 75% utilization (the initial Baker Hughes utilization rate), totaling $165,866 per annum. (This amount is subject to any change in the utilization rate for the Shared Lab.)

Together, items 1 through 4 above sum to an equivalent of 87,416.5 s.f. of space at a fee of **$1,398,664** per year, plus $165,866 of depreciation pursuant to item 5 for a total base fee of $1,564,550 payable in monthly installments of **$130,379.17** on the first day of each calendar month of Term.

**Variable Fees and Expenses**

6.    General expenditures for the Premises/Tomball Campus, excluding expenses specific to the Lab.

(a)    *General*.  Baker Hughes shall pay as a quarterly fee a percentage of the operating costs of the Premises/Tomball campus.  This fee is calculated using Baker Hughes' allocable square footage as described under the Rental Fee section above totaling 87,416.5 s.f. and dividing such square footage by the total useable square footage of the Tomball Campus *i.e.*, 563,564, resulting in 15.51% of the actual costs of operating and maintaining the Tomball Campus being chargeable to Baker Hughes.  These expenses include items such as property taxes, repair and maintenance, telephony and telecoms, office supplies, food/vending/kitchen, common area maintenance, gas, electricity, water, sewer, security, landscaping, janitorial services, waste removal, applicable property and casualty insurance premiums and other utilities and services for the Tomball Campus, excluding the exclusions below.

4

(b)     *Exclusions.* Excluded from 4(a) above are salaries and benefits of BJ personnel, premiums for insurance (other than property and casualty insurance) and capital expenditures (other than Shared Lab-specific capital expenditures (see Section 5(a), below), and other than capital expenditures requested by Baker Hughes), all of which shall be for the sole account of BJ.

5.     *Expenses Specific to the Lab and only the Lab.* Baker Hughes shall pay the following quarterly overhead allocation fees (collectively, the "Shared Lab Quarterly Overhead Allocation"):

(a)     *Lab Overhead.* Baker Hughes shall pay a quarterly fee representing Baker Hughes' allocable percentage (described in Section 5(c)) of Shared Lab operating expenses, repair and maintenance of Shared Lab equipment/facilities, Shared Lab waste permitting and removal, and other costs associated solely with Shared Lab operations.  In addition, for any new expenditures for lab equipment for the Shared Lab only, such expenditures shall be allocated using the Shared Lab Quarterly Overhead Allocation in effect at the time the expenditure was approved and paid back quarterly for operating expenses and over an 18-month period for capital expenditures.  Except in an approved budget, any Shared Lab capital expenditures in excess of $50,000 for any item or group of related items shall require the approval of the Steering Committee.  Other than non-waste permitting, each party shall be responsible for any new expenditures relating to their respective exclusive labs (i.e., the BJ Lab and the Baker Hughes Lab).  For the avoidance of doubt, any expenditures or overhead specifically for the Baker Hughes Lab and other Baker Hughes dedicated areas, excluding ordinary utilities and common areas services as otherwise provided in this Agreement, shall be the responsibility of Baker Hughes and shall be paid directly by Baker Hughes unless otherwise agreed by BJ Services to be paid by BJ Services and subsequently reimbursed by Baker Hughes.

(b)     *Lab Staff.* Each party shall maintain its own staff.  Lab Staff shall be available to work on Joint Projects and, subject to availability, the other party's independent projects for up to 30 minutes per month per staff member without charge or as otherwise agreed by the Steering Committee.  To the extent one party utilizes Lab Staff of the other party in excess of such amount, the parties shall cooperate to have the employer of such staff reimbursed for any overage based on hourly rates determined by the Steering Committee.  Such amounts which total less than $5,000 per month in the aggregate shall be considered *de minimis* and non-chargeable.

(c)     The Shared Lab Quarterly Overhead Allocation percentage shall be determined by the Steering Committee taking into account the relative size of the parties' respective Lab Staff and the parties' respective utilization of the Shared Lab and Shared Lab-related equipment, machines, tools, materials and supplies.  An example is set forth on Exhibit D.  The initial allocation shall be 75% to Baker Hughes and 25% to BJ.  In consideration of BJ making the Lab available to Baker Hughes, it is agreed that Baker Hughes' percentage of the Lab Quarterly Overhead Allocation shall not be less than 40% during any quarter.

**Payment Process**

BJ shall submit to Baker Hughes an itemized invoice for the applicable amounts due hereunder.  Such invoices shall be submitted on a monthly basis and a quarterly basis in accordance with respect to the applicable fees periods set forth above.  Payment shall be due 30 days from date of Baker Hughes' receipt of an invoice, and unless otherwise instructed Baker Hughes shall remit such payment via wire transfer pursuant to instructions provided by BJ.

\*          \*          \*

5

**EXHIBIT F**

**TEDC Building Floor Plans**



## LEGEND (114,905 SF TOTAL BLDG AREA)

| | | |
|---|---|---|
| 🟧 | BJ SERVICES OFFICE | 7,562 sq ft |
| 🟪 | BAKER HUGHES OFFICE | 28,791 sq ft |
| ⬜ | COMMON SPACE | 47,282 sq ft |
| 🟨 | SHARED LABS | 15,594 sq ft |
| 🟥 | BJ SERVICES LABS | 4,718 sq ft |
| 🟩 | BAKER HUGHES LABS | 10,958 sq ft |
| ⬜ | EXCLUDED FROM AREA CALCULATIONS | |

### TEDC Space Allocations

| Tomball TEDC | First | Second | Third | Total |
|---|---|---|---|---|
| BJ Services Office | 7,115 | 447 | 0 | 7,562 |
| Baker Hughes Offices | 4,904 | 13,372 | 10,515 | 28,791 |
| Common Space | 20,773 | 15,190 | 11,319 | 47,282 |
| Shared Labs | 9,012 | 6,582 | 0 | 15,594 |
| BJ Services Labs | 0 | 1,838 | 2,880 | 4,718 |
| Baker Hughes Labs | 2,437 | 5,395 | 3,126 | 10,958 |
| Excluded from Calcs | N/A | N/A | N/A | N/A |
| TOTAL | 44,241 | 42,824 | 27,840 | 114,905 |

## Space Allocations Level 1









**LEGEND (114,905 SF TOTAL BLDG AREA)**

- BJ SERVICES OFFICE — 7,562 sq ft
- BAKER HUGHES OFFICE — 28,791 sq ft
- COMMON SPACE — 47,282 sq ft
- SHARED LABS — 15,594 sq ft
- BJ SERVICES LABS — 4,718 sq ft
- BAKER HUGHES LABS — 10,958 sq ft
- EXCLUDED FROM AREA CALCULATIONS

| Tomball TEDC | First | Second | Third | Total |
|---|---|---|---|---|
| BJ Services Office | 7,115 | 447 | 0 | 7,562 |
| Baker Hughes Offices | 4,904 | 13,372 | 10,515 | 28,791 |
| Common Space | 20,773 | 15,190 | 11,319 | 47,282 |
| Shared Labs | 9,012 | 6,582 | 0 | 15,594 |
| BJ Services Labs | 0 | 1,638 | 2,680 | 4,718 |
| Baker Hughes Labs | 2,437 | 5,395 | 3,126 | 10,958 |
| Excluded from Calcs | N/A | N/A | N/A | N/A |
| **TOTAL** | **44,241** | **42,624** | **27,840** | **114,905** |

TEDC Space Allocations

## Space Allocations Level 2









**LEGEND (114,905 SF TOTAL BLDG AREA)**

| Color | Category | Area |
|---|---|---|
| | BJ SERVICES OFFICE | 7,562 sq ft |
| | BAKER HUGHES OFFICE | 28,791 sq ft |
| | COMMON SPACE | 47,282 sq ft |
| | SHARED LABS | 15,594 sq ft |
| | BJ SERVICES LABS | 4,718 sq ft |
| | BAKER HUGHES LABS | 10,958 sq ft |
| | EXCLUDED FROM AREA CALCULATIONS | |

### TEDC Space Allocations

| Tomball TEDC | First | Second | Third | Total |
|---|---|---|---|---|
| BJ Services Office | 7,115 | 447 | 0 | 7,562 |
| Baker Hughes Offices | 4,904 | 13,372 | 10,515 | 28,791 |
| Common Space | 20,773 | 15,190 | 11,319 | 47,282 |
| Shared Labs | 9,012 | 6,582 | 0 | 15,594 |
| BJ Services Labs | 0 | 1,838 | 2,880 | 4,718 |
| Baker Hughes Labs | 2,437 | 5,395 | 3,126 | 10,958 |
| Excluded from Calcs | N/A | N/A | N/A | N/A |
| TOTAL | 44,241 | 42,824 | 27,840 | 114,905 |

## Space Allocations Level 3









# SERVICES AGREEMENT

This Services Agreement (this "<u>Agreement</u>") is made effective as of the Effective Date (hereinafter defined) by and between **BJ SERVICES, LLC,** a Delaware limited liability company ("<u>BJ</u>"), and **BAKER HUGHES OILFIELD OPERATIONS LLC,** a California limited liability company ("<u>Baker Hughes</u>" and, along with BJ, each a "<u>party</u>" and together the "<u>parties</u>"). This Agreement consists of these terms and conditions together with <u>Schedule I</u>, Schedule II, <u>Exhibit A</u>, <u>Exhibit B</u>, <u>Exhibit C</u>, <u>Exhibit D</u>, <u>Exhibit E</u>, and <u>Exhibit F</u>, attached hereto and incorporated herein, and all exhibits, schedules and other addenda executed by the parties from time to time that reference and incorporate this Agreement.

## PRELIMINARY STATEMENTS

A.   BJ is the owner of certain real property located at 11211 FM 2920, Tomball, Texas 77375, which is the site of multiple buildings and warehouse space totaling 563,564 square feet (the "<u>Tomball Campus</u>").

B.   The Tomball Campus includes a structure of approximately 114,905 square feet referred to as the "TEDC Building" (the "<u>Premises</u>") and a 70,423 square feet structure referred to as the "Engineering Building" (the "<u>Engineering Building</u>") in addition to an approximately 78,916 square foot administration building and other owner-occupied structures on the Tomball Campus.

C.   Portions of the Premises consisting of approximately 31,270 square feet as shown colored yellow (the "Shared Lab"), pink (the "BJ Lab") and green (the "Baker Hughes Lab") on Exhibit F are used as laboratory space, together with the tools and equipment contained therein (the Shared Lab, the BJ Lab and the Baker Hughes Lab, together with their contents, are collectively referred to as the "<u>Lab</u>") for laboratory and non-field scientific activities relating to cementing, acidizing, fracturing, fluid analysis and geomechanics (the "<u>Scope</u>"); and an additional space of roughly 8,015 square feet within the Premises as shown colored purple on Exhibit F (the "Offices") is dedicated for Baker Hughes' use as office and conference room space under and pursuant to this Agreement.

D.   BJ and Baker Hughes desire to enter into an arrangement whereby the parties share use and enjoyment of the Lab, both with respect to each party's independently owned and controlled projects within the Scope ("<u>Independent Project(s)</u>," including a "<u>BJ Independent Project</u>" or a "<u>Baker Hughes Independent Project</u>," as the context requires) and further including the parties' joint projects within the Scope ("<u>Joint Projects</u>" and, together with Independent Projects, "<u>Projects</u>"), pursuant to the terms and conditions set forth herein.

E.   In order to effectuate the contemplated arrangement, the parties desire to terminate (a) that certain Lease Agreement dated November 30, 2016 (the "<u>Lease Agreement</u>"), and (b) to the extent not already terminated that certain Transition Services Agreement dated December 30, 2016 (the "<u>TSA</u>") to the extent relating to the Lab.

F.   BJ and Baker Hughes have entered into a separate lease agreement dated December 1, 2018, whereby Baker Hughes will lease a portion of the Engineering Building upon the terms and conditions set forth in such separate lease agreement (the "Engineering Lease").



**Services Agreement**

**AGREEMENT**

The parties, intending to be legally bound, agree as follows:

**1.      SERVICES & EFFECTIVE DATE**

1.1 <u>Services</u> Baker Hughes hereby agrees with BJ for BJ to provide the services set forth on <u>Exhibit A</u>, which services include the use of and access to the Shared Lab and the Baker Hughes Lab (collectively, the "<u>Services</u>").

1.2 <u>Effective Date</u>.  This Agreement shall be effective upon the Commencement Date (as defined in the Engineering Lease) of the Engineering Lease, being the date of substantial completion of certain tenant improvements to the Engineering Building.

**2.      TERMS OF PAYMENT**

In consideration of BJ's provision of the Services, Baker Hughes agrees to pay BJ fees pursuant to <u>Exhibit A</u> and <u>Exhibit B</u> exclusive of any applicable tax and/or local surcharges and fees; provided, however, that any value added tax ("VAT") and/or similar tax that is recoverable to Baker Hughes will not be included in fees, but will be separately identified on BJ's invoice.

**3.      MANAGEMENT & STEERING COMMITTEE**

Each party agrees to reasonably cooperate with the other party in scheduling its use of the Shared Lab so as not to unreasonably interfere with the other party's use and enjoyment of, and access to, the Shared Lab.  Further to the foregoing, each of BJ and Baker Hughes shall appoint one representative each (a "<u>Committee Representative</u>") to serve on, and who will comprise in total, a joint steering committee with respect to the Shared Lab on behalf of the parties (the "<u>Steering Committee</u>").  The Steering Committee shall meet (whether in person or via remote communication) no less than once per calendar quarter and on such other dates as unanimously agreed by the Steering Committee.  Each meeting shall be conducted at the Premises, or another specific location if unanimously agreed by the Steering Committee, or remotely via telecommunication if required by one member of the Steering Committee.  The Steering Committee shall periodically consider (a) the coordination and oversight of the scheduling of use of the Shared Lab by the parties pursuant to this Agreement, including with respect to any Projects, (b) decisions relating to operations, use, repair and maintenance, capital improvements and other matters regarding the Shared Lab in connection with this Agreement, and (c) such other matters that may be relevant to the performance of this Agreement and the use of and/or access to the Shared Lab.  The Steering Committee will determine all variable cost allocations, including the Shared Lab Quarterly Overhead Allocation as defined in <u>Exhibit B for the quarter following its quarterly meeting.</u>  If the Steering Committee fails to determine applicable allocations within 30 days of the end of the quarter, BJ shall invoice based on the prior quarter and the parties shall cooperate reasonably and in good faith to true up the amount as soon as practicable.  The Steering Committee shall also be responsible for the management of, and is hereby given authority to amend or otherwise modify as appropriate, the common operating rules and procedures for the Shared Lab described in <u>Exhibit E</u>.  Unless authorized in writing by the Steering Committee, neither Baker Hughes nor any of its representatives may claim or exercise any authority to act, or to enter into any contract or agreement, on behalf of the Shared Lab.  Except as otherwise provided herein or by applicable law, all power and authority to manage, direct and control the Shared Lab will be and remain under the ownership and control of BJ.

**4.      SALES AND USE TAXES**

BJ shall solely be responsible for the payment of any and all taxes, duties, levies, charges, salaries, insurance premium and contributions and any interest or penalties thereon for which, in relation to the Agreement, BJ is responsible and liable (collectively the "Seller Payments").  Baker Hughes shall solely be responsible for and

29839566.11

Page 2

**Services Agreement**

shall pay when due and payable sales and use, value added taxes ("VAT") or other similar taxes imposed or assessed, in relation to the Agreement, by any governmental authority, but excluding Seller Payments.

As of the Effective Date, Baker Hughes is not aware of any obligation to withhold taxes on any amounts payable to BJ pursuant to this Agreement; however, if Baker Hughes is required by Law to withhold taxes for which BJ is responsible, Baker Hughes shall promptly advise BJ in the event it becomes aware that it is required to withhold any taxes on the payments to BJ hereunder in accordance with applicable law and the applicable amount of tax to be withheld ("Applicable Tax"). Baker Hughes will deduct such Applicable Tax from payment to BJ and shall duly and timely pay the Applicable Tax to the applicable tax authority in accordance with applicable Law. Baker Hughes shall provide to BJ, within sixty (60) days from payment, evidence that such taxes have been duly paid in the form of an official receipt of payment issued by the applicable tax authority, or a copy of any return required by law to report such payment or other evidence of such payment reasonably satisfactory to relevant tax authorities in BJ's name. If BJ is obligated by applicable laws, treaties, conventions, protocols, common law, regulations, ordinances, codes, standards, directives, orders, including judicial orders, and rules issued by governmental agencies or authorities which are applicable to the services and/or activities contemplated or provided (collectively, "Laws") under this Agreement to charge any VAT and/or similar tax to Baker Hughes, BJ shall ensure that such tax is invoiced to Baker Hughes in accordance with applicable rules so as to allow Baker Hughes to reclaim it from the appropriate government.

**5.      OWNERSHIP AND LICENSES**

5.1.    Existing Ownership of Lab Assets.  Notwithstanding anything to the contrary, the parties hereby acknowledge and agree that (a) all equipment and other tangible assets currently located at the Lab, including but not limited to the equipment and other tangible assets listed in Part A of Schedule I (but excluding the equipment and other tangible assets listed in Part B of Schedule I) are the sole property of BJ and (b) the equipment and other tangible assets listed in Part B of Schedule I are the sole property of Baker Hughes.  Any new equipment and other tangible assets purchased by BJ for the Lab following the Effective Date shall be the sole property of BJ subject to the terms of this Agreement unless otherwise agreed in writing by the Steering Committee.  Any new equipment and other tangible assets purchased by Baker Hughes for the Lab following the Effective Date shall be the sole property of Baker Hughes subject to the terms of this Agreement unless otherwise agreed in writing by the Steering Committee.  Baker Hughes shall place appropriate asset tags on all new equipment purchased by Baker Hughes.

5.2.    Project Rights.  Prior to commencement of any Project relating to any of the Shared Lab, the parties' Committee Representatives shall meet in person to discuss the scope of such Project.  Each party will have the option to participate in any Project proposed by the other party in connection with any of the Shared Lab, unless such Project relates to Excluded Technology.  For purposes of this Agreement, "Excluded Technology" is defined on Schedule II.  .  For each proposed Project, the Committee Representatives shall document the scope of the Project and the mutually agreed designation of such Project as either a Joint Project or an Independent Project.  If the parties agree that any such Project will be a Joint Project, the parties shall complete a Joint Project SOW generally in the form attached hereto as Exhibit C, signed by each party's Committee Representative.  Unless otherwise agreed in a Joint Project SOW, neither party shall have any obligation to disclose or make available any particular Baker Hughes Background IP (defined below) or BJ Background IP (defined below), as the case may be, for any Joint Project. Nothing in this Agreement requires or implies any obligation to enter into any Joint Project SOW. If the parties are unable to agree on a Joint Project SOW, then if the Project was proposed by Baker Hughes it shall be conducted solely in the Baker Hughes Lab and shall be a Baker Hughes Independent Project, unless otherwise agreed by the Steering Committee as confirmed in writing or by email. If the parties are unable to agree on a Joint Project SOW, then if the Project was proposed by BJ it shall be conducted solely in the BJ Lab and shall be a BJ Independent Project, unless otherwise agreed by the Steering Committee as confirmed in writing or by email.

29839566.11



**Services Agreement**

5.3.     Intellectual Property Rights Ownership and Patent Prosecution.

(a)      All intellectual property rights, including design rights, patent rights, copyrights, database rights, trade secret rights, and other intellectual property rights other than rights to trademarks, logos, domain names and other similar indicia of source or association, and all applications and grants associated therewith, as such rights exist or may exist anywhere in the world ("Intellectual Property Rights"):

(i)  created, controlled, owned or licensed by Baker Hughes: (A) prior to the Effective Date; or (B) during the Project Term, but outside of any Joint Project or Baker Hughes Independent Project, shall remain, as between the parties, the sole and exclusive property of Baker Hughes ("Baker Hughes Background IP");

(ii)  created, controlled, owned or licensed by BJ: (A) prior to the Effective Date; or (B) during the Project Term, but outside of any Joint Project or BJ Independent Project, shall remain, as between the parties, the sole and exclusive property of BJ ("BJ Background IP" and, together with Baker Hughes Background IP, "Background IP");

(iii) created for or arising out of a Joint Project ("Foreground IP") shall be owned by the parties (either as "Baker Hughes Foreground IP" or "BJ Foreground IP," as the case may be) as required by Section 5.3(d), unless otherwise expressly agreed by parties in a Joint Project SOW;

(iv) created for or arising out of a Baker Hughes Independent Project ("Baker Hughes Independent IP") shall be the sole and exclusive property of Baker Hughes.

(v) created for or arising out of a BJ Independent Project ("BJ Independent IP") shall be the sole and exclusive property of BJ.  Baker Hughes Independent IP and BJ Independent IP are collectively referred to as "Independent IP."

(b)      Independent Project Rights.  For the avoidance of doubt, except as provided in this Agreement, BJ shall not acquire or otherwise hold any ownership interest whatsoever in Baker Hughes Independent Projects and, except as expressly stated herein or in a Joint Project SOW, shall acquire no rights to any Baker Hughes Background IP or Baker Hughes Independent IP pursuant to this Agreement.  For the avoidance of doubt, except as provided in this Agreement, Baker Hughes shall not acquire or otherwise hold any ownership interest whatsoever in BJ Independent Projects and, except as expressly stated herein or in a Joint Project SOW, shall acquire no rights to any BJ Background IP or BJ Independent IP pursuant to this Agreement. For the avoidance of doubt, all Projects conducted in BJ Lab will be considered BJ Independent Projects unless otherwise agreed by the parties in writing, and all Projects conducted in Baker Hughes Lab will be considered Baker Hughes Independent Projects unless otherwise agreed by the parties in writing.

(c)      IP Licenses.  In order to facilitate the development and commercialization of Foreground IP, unless otherwise agreed by the parties in a Joint Project SOW or other written agreement, the parties agree as follows:

(i)      Baker Hughes Licenses to BJ.

(1)  Exclusive License to Baker Hughes Foreground IP. Baker Hughes hereby grants to BJ and its Affiliates a perpetual, fully-paid, royalty free, exclusive license onshore in the United States and Canada, excluding the Gulf of Mexico and territorial waters along the U.S. Atlantic and Pacific coasts (hereinafter "Territory") to Baker Hughes Foreground IP to make, use, reproduce, perform, display, distribute, test, modify, improve and create derivative works of, and to use, make, have made, sell, offer for sale, import or export products or services under, and/or otherwise market ("Exploit") any article, device, composition, method, process or service, in each case directlyresulting from a Joint Project.

(2) Non-Exclusive License to Baker Hughes Foreground IP. Baker Hughes grants to BJ and its Affiliates a perpetual, fully-paid, royalty free, non-exclusive, worldwide but excluding the Territory, license to Baker



Services Agreement

Hughes Foreground IP to manufacture and test (but not commercialize) any article, device, composition, method, process or service, in each case directly resulting from a Baker Hughes Independent Project or Joint Project.

(3) <u>Non-Exclusive License to Baker Hughes Independent IP</u>. Baker Hughes hereby grants to BJ and its Affiliates a royalty free, non-exclusive, license in the United States and Canada to Baker Hughes Independent IP excluding any Excluded Technology IP, (hereinafter "Excluded IP") to Exploit any article, device, composition, method, process or service directly resulting from a Baker Hughes Independent Project for a period of five years from the Effective Date. Upon the expiration of the license in this Section 5.3(i)(3), the parties agree to negotiate a replacement license in good faith and, at a minimum, Baker Hughes agrees to license Baker Hughes Independent IP to BJ on terms that are at least as favorable as any other license that Baker Hughes grants to any third party for the same Intellectual Property.

(4) <u>Non-Exclusive License to Baker Hughes Background IP</u>.  Baker Hughes hereby grants to BJ and its Affiliates a royalty-free, non-exclusive, non-transferable, limited license to use the Baker Hughes Background IP for the purpose of and to the extent necessary, to use the Baker Hughes Foreground IP or Baker Hughes Independent IP subject to the terms and conditions of this Agreement.

(ii) <u>BJ Licenses to Baker Hughes</u>.

(1) <u>Exclusive License to BJ Foreground IP</u>. BJ hereby grants to Baker Hughes and its Affiliates a perpetual, fully-paid, royalty free, worldwide but excluding the Territory, exclusive license to BJ Foreground IP to Exploit any article, device, composition, method, process or service, in each case directly resulting from a Joint Project.

(2) <u>Non-Exclusive License to BJ Foreground IP</u>. BJ hereby grants to Baker Hughes and its Affiliates a perpetual, fully-paid, royalty free, non-exclusive license in the Territory to BJ Foreground IP to manufacture and test (but not commercialize) any article, device, composition, method, process or service, in each case directly resulting from a BJ Independent Project or Joint Project.

(3) <u>Non-Exclusive License to BJ Independent IP</u>. BJ hereby grants to Baker Hughes and its Affiliates a royalty free, non-exclusive, worldwide but excluding the Territory, license to BJ Independent IP solely to Exploit any article, device, composition, method, process or service directly resulting from a BJ Independent Project for a period of five years from the Effective Date. Upon the expiration of the license in this Section 5.3(ii)(3), the parties agree to negotiate a replacement license in good faith and, at a minimum, BJ agrees to license BJ Independent IP to Baker Hughes on terms that are at least as favorable as any other license that BJ grants to any third party for the same Intellectual Property.

(4) <u>Non-Exclusive License to BJ Background IP</u>.  BJ hereby grants to Baker Hughes and its Affiliates a royalty-free, non-exclusive, non-transferable, limited license to use the BJ Background IP for the purpose of and to the extent necessary, to use the BJ Foreground IP or BJ Independent IP subject to the terms and conditions of this Agreement.

(d) <u>Patent Ownership and Prosecution</u>.

(i) <u>Background IP</u>. Except as otherwise agreed in writing, each party shall own any patents directed to its respective Background IP, Independent IP, or Excluded IP, and each party shall be responsible for, and have sole discretion over, filing any patent applications directed to its respective Background IP, Independent IP or Excluded IP.

(ii) <u>Foreground IP</u>.

(1) <u>Prosecution.</u> Unless otherwise provided in a Joint Project SOW, neither party will file any patent application directed to any Foreground IP except in accordance with this Agreement.  A pre-condition of any such filing shall be, at a minimum, the notification and opportunity for involvement and substantial input of the other party.



**Services Agreement**

The parties' Committee Representatives shall collaborate to define the scope of such patent application(s) and select mutually-agreeable outside counsel to prepare and prosecute such patent application(s). Unless otherwise agreed by the parties in a Joint Project SOW, the parties shall share equally the costs applicable to preparing a Patent Cooperation Treaty (PCT) application, United States Patent application, or other application that will be used for purposes of establishing an initial priority claim for additional patent applications. For all other costs related to the preparation or prosecution of patent applications: (i) BJ shall be responsible for such costs relating any patent applications filed in the United States and Canada, and (ii) Baker Hughes shall be responsible for such costs related to any patent applications filed outside of the United States and Canada. For all annuity and maintenance-related costs: (i) BJ shall be responsible for such costs relating any patent applications filed in the United States and Canada, and (ii) Baker Hughes shall be responsible for such costs related to any patent applications filed outside of the United States and Canada.

(2) <u>Patent Ownership</u>. Unless otherwise agreed by the parties, regarding patent applications and patents directed to Foreground IP, Baker Hughes will own any patent application filed in, or patent that issues in, a jurisdiction outside of the United States and Canada, and BJ will own any patent application filed in, or patent that issues in, the United States or Canada. The parties hereby agree to prepare and sign any assignment or other documentation necessary to effectuate the ownership of patents and patent application as required in this Section 5.3(d)(2).

(3) <u>Dispute Resolution</u>. In the event of a dispute between the parties regarding the appropriate claim scope or other decision to be made regarding the prosecution of patent applications directed to Foreground IP, the parties and their Committee Representatives shall work together in good faith to resolve such dispute. However, if the parties cannot find a mutually-agreeable resolution to such dispute, the parties agree to engage mutually-agreeable independent third-party outside counsel (other than the counsel that is prosecuting the patent applications) to help the parties resolve such dispute. The parties agree to make reasonable accommodations proposed by such outside counsel to resolve the dispute. However, in the event that the parties are still unable to find an agreeable resolution to such dispute, for patent applications pending in: (A) the United States or Canada, BJ shall have the ultimate decision-making authority, and (B) any jurisdiction outside of the United States and Canada, Baker Hughes shall have the ultimate decision-making authority.

(f)      <u>Exclusions</u>. For the avoidance of doubt, except as otherwise provided in this Agreement or a Joint Project SOW, neither party shall acquire or be deemed to have acquired (by receipt or rendering of Services or otherwise) any right, title, license or interest in any Intellectual Property Rights owned by the other party.

5.4      <u>Lab Facility and Equipment Access Licenses</u>.

(a)      <u>Grant of Licenses</u>. BJ hereby grants to Baker Hughes a non-exclusive, non-transferable license to use and access the Shared Lab, together with the non-exclusive, non-transferable right to use all of the equipment and tangible assets located in the Shared Lab as specifically referenced on <u>Schedule I</u> owned by BJ (the "<u>Non-Exclusive Lab License</u>"). Such license, and use and access by Baker Hughes, shall, at all times, be subject to the continued and concurrent rights of BJ to use and access the Shared Lab. Baker Hughes' use of the Shared Lab shall be limited to Projects primarily relating to the Scope, and such other uses as may be necessary or incidental and shall be conducted in accordance with applicable laws and the facilities rules and policies of BJ. BJ further grants to Baker Hughes an exclusive license to use and occupy the Offices and other space in the TEDC Building colored purple on Exhibit F and the Baker Hughes Lab colored green on Exhibit F (the "Exclusive License"). Such Non-Exclusive Lab License and Exclusive License are both licenses coupled with an interest and the parties agree that neither license may be terminated apart from a termination of this Agreement as specifically provided for herein.

(b)      <u>Reservation of Right of Entry</u>. Representatives of BJ shall have the right to enter all portions of the Lab, to inspect the same and to observe performance of Baker Hughes' obligations under this Agreement. Nothing in this <u>Section 5.4</u> is intended or shall be construed to limit any other rights of BJ under this Agreement, including, without limitation, BJ's continued and concurrent right to use and access the Shared Lab; provided, however, that in no event does such entry give BJ rights to examine any information or data related to a Baker Hughes Independent Project.

29839566.11



**Services Agreement**

(c)    <u>Use and Condition</u>.  BJ and Baker Hughes, collectively, shall be responsible for: (i) keeping and maintaining the Shared Lab in a safe and attractive condition in accordance with all applicable federal, state and local statutes, laws, governmental rules, regulations and ordinances applicable to the Shared Lab; (ii) utilizing the Shared Lab in a manner so that the Shared Lab is not in violation of any Environmental Laws or any order or requirement of any governmental authority pertaining to health or the environment;  and iii) utilizing the Shared Lab in a manner so that there will not exist any environmental condition at the Lab that would constitute a violation of any Environmental Law, that would require any remediation under Environmental Laws or that would cause the imposition of any environmental liabilities. Except as otherwise provided in this Agreement, BJ shall be responsible for maintaining in full force and effect all material permits necessary or required for the Lab pursuant to the provisions set forth in <u>Exhibit A</u> (collectively the "Lab Duties").  BJ is solely responsible for the Lab Duties with respect to the BJ Lab and Baker Hughes is solely responsible for the Lab Duties with respect to the Baker Hughes Lab. Moreover, Baker Hughes shall have the same duties as set forth in (i) through (iii) above with respect to the Baker Hughes Lab.  The term "<u>Environmental Laws</u>" means any and all applicable federal, state and local laws (whether under common law, statute, rule, regulation, or otherwise), requirements under permits issued with respect thereto and other requirements, having the force of law, of any governmental authority having jurisdiction with respect to or relating to human health or the environment, to any Hazardous Substance or to any activity involving Hazardous Substances and shall include, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §9601 *et seq*., the Resource Conservation and Recovery Act, 42 U.S.C. §6901 *et seq*., the Federal Water Pollution Control Act, as amended by the Clean Water Act, 33 U.S.C. §1251 *et seq*., the Clean Air Act, 42 U.S.C. §7401 *et seq*., the Toxic Substances Control Act, 15 U.S.C. §2601 *et seq*., the Oil Pollution Act of 1990, 33 U.S.C. §2701 *et seq*., all similar state statutes and local ordinances, and all regulations promulgated under any of those statutes, and all administrative and judicial actions respecting such legislation, all as amended from time to time. The term "<u>Hazardous Substance</u>" shall mean and include any chemical, compound, element, material, mixture, waste or substance that is defined or listed in, or otherwise classified pursuant to, any Environmental Laws as a "hazardous substance," "hazardous material," "hazardous waste," "extremely hazardous waste," "infectious waste," "toxic substance," "toxic pollutant" or any other definition or formulation intended to define, list or classify a substance as "hazardous," including, without limitation, any petroleum, natural gas, natural gas liquids, liquefied natural gas or synthetic gas usable for fuel (or mixture of natural gas and such synthetic gas).  "Hazardous Substances" shall include, without limitation, any hazardous or toxic substance, material or waste or any chemical, element, compound or mixture which is: (i) asbestos; (ii) designated as a "pollutant" or "toxic pollutant" pursuant to the Federal Water Pollution Control Act (33 U.S.C. Paragraph 1251 *et seq*.); (iii) defined as a "solid or hazardous waste" pursuant to the Federal Resource Conservation and Recovery Act (42 U.S.C. Paragraph 6901 *et seq*.); (iv) defined as "hazardous substances" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Paragraph 9601 *et seq*.); (v) listed in the United States Department of Transportation Table (49 CFR 172.101) or by the Environmental Protection Agency as hazardous substances (40 CFR part 302); (vi) chemicals, elements, compounds, mixtures, substances, materials or wastes otherwise regulated under any applicable federal, state or local Environmental Laws; (vii) polychlorinated biphenyls; (ix) "pesticides" as defined in the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136 *et seq*.; (x) "contaminant" as defined in the Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq*.; (xi) "extremely hazardous substances" as defined in the Emergency Planning and Community Right to Know Act, 42 U.S.C. §§ 11001 *et seq*.; (xii) "hazardous materials" as defined in the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101 *et seq*.; (xiii) "hazardous air pollutants" as defined in the Clean Air Act, 42 U.S.C. §§ 7401 *et seq*.; or (xiv) "oil" as defined in the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq*. BJ may decline to permit any Baker Hughes activities that it reasonably determines, in its sole discretion, to present any unacceptable level of risk.

(d)    <u>No Liens</u>. Baker Hughes shall keep the Premises free and clear of all liens and encumbrances resulting from any activities hereunder.  In the event any lien or encumbrance shall attach to any portion of the Premises by, through or under the actions of Baker Hughes, Baker Hughes shall be liable therefor and shall promptly cause the same to be released and removed of record to the reasonable satisfaction of BJ.

29839566.11



Services Agreement

(e)  <u>Safety and Security</u>.  Baker Hughes shall comply with all safety and access practices and policies of BJ with respect to the Lab.  Without limiting the foregoing, BJ and Baker Hughes, respectively, shall each implement and obtain all necessary and appropriate safety and security policies, procedures and safeguards required or necessary for their utilization of the Lab in a safe and secure manner.

(f)  <u>Waste</u>.  In addition to any other obligations regarding Environmental Laws provided above, the parties shall each obtain its own EPA Identification Number for purposes of waste disposal from their respective laboratories and shall abide by the Co-Generation Agreement between the parties.  Unless otherwise expressly agreed in a Joint Project SOW or in the Co-Generation Agreement, BJ shall be responsible for obtaining an EPA Identification Number and disposing of waste from the Shared Lab.

## 6.   TERM & TERMINATION

6.1  <u>General</u>.  This Agreement shall commence on the Effective Date and shall continue thereafter until the last day of the month in which the five-year anniversary of the Effective Date occurs (the "<u>Initial Term</u>").  At the end of the Initial Term, if there is no mutual agreement as to extension and no notice of termination, the Initial Term shall be extended on a quarterly basis under the same terms and conditions unless otherwise agreed in writing.  The Initial Term along with any extension of the term of this Agreement beyond the Initial Term shall be referred to as the "<u>Project Term.</u>"  This Agreement may be terminated by either party (a) for any reason, or for no reason, at any time during the Project Term upon 18 months' prior written notice to other party, or (b) upon 12 months' prior written notice upon a Change of Control of the other party; *provided, that*, if the then term is quarter-to-quarter such notice periods shall be 12 months.  For purpose of this Agreement, a "<u>Change of Control</u>" shall mean (i) the sale of all or substantially all the assets of such party, (ii) any merger, consolidation or acquisition of such party with, by or into another corporation, entity or person or (iii) any change in the ownership of more than 50% of the voting capital stock or membership interests of such party in one or more related transactions.  In the event of any expiration or termination of this Agreement, Baker Hughes will make payment for Services rendered through the date of expiration or termination.  For the avoidance of doubt, (i) the initial public offering of BJ's or any of its affiliate's securities or any internal restructuring of BJ shall not be considered a Change of Control and (ii) any public offering of Baker Hughes, a GE company ("BHGE") or any of its affiliate's securities, any other divestiture of interests in BHGE by General Electric Company (other than the sale of more than fifty percent (50%) control of BHGE to a competitor of BJ as determined in BJ's reasonable discretion) or any internal restructuring of BHGE, Baker Hughes or their affiliates shall not be considered a Change of Control.  Neither the termination nor expiration of this Agreement shall relieve a party of any obligations arising or accruing prior to such termination or expiration.  In addition, upon termination or expiration of this Agreement for any reason, Baker Hughes shall promptly reimburse BJ for the unamortized portion of the cost of leasehold improvements and capitalized equipment incurred or purchased specifically for Baker Hughes (regardless of whether it is placed in a Shared Lab or a Baker Hughes Lab) as described in Exhibit B, based upon a five-year, straight-line depreciation.

6.2  <u>Termination upon Breach</u>.  Each of BJ and Baker Hughes may terminate this Agreement if the other party breaches its obligations under this Agreement; *provided, however*, that the breaching party is provided 30 days written notice prior to the proposed termination date during which time the breaching party shall be provided the opportunity to cure the breach to the reasonable satisfaction of the other party or, if the default cannot reasonably be cured within such 30 days, commence remedial steps reasonably satisfactory to the non-breaching party to cure the default.

6.3  <u>Additional Termination Rights</u>.  Each of BJ and Baker Hughes may terminate this Agreement immediately upon notice to the other party because of: (a) termination or cessation of the business of the other party; (b) the filing of a voluntary or involuntary bankruptcy, receivership or similar proceeding with respect to the other party; (c) the other party becoming insolvent or making an assignment for the benefit of its creditors; or (d) the taking of the whole or any material part of the Premises by a governmental agency or utility under the power of eminent domain.  In addition, each of BJ and Baker Hughes may terminate this Agreement immediately upon notice to the other party if: (i) the other party is convicted of a felony; (ii) the other party or its representatives commit fraud in the course of performance of this Agreement; or (iii) the other party breaches any of the provisions of <u>Section 8</u>.

29839566.11



**Services Agreement**

6.4 <u>Holding Over</u>. Except as otherwise agreed by the parties in writing and as provided for in Section 6.1, Baker Hughes shall not be entitled to holdover after the expiration of this Agreement. As such, Baker Hughes must vacate and surrender the Lab and Offices in accordance with this Agreement.

## 7. GENERAL INDEMNIFICATION AND INSURANCE

7.1 <u>Indemnification</u>. SUBJECT TO <u>SECTION 10</u>, EACH PARTY SHALL INDEMNIFY, HOLD HARMLESS AND DEFEND THE OTHER PARTY AND SUCH PARTY'S DIRECT AND INDIRECT SUBSIDIARIES AND AFFILIATES, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES (COLLECTIVELY, INCLUDING THE PARTY ITSELF, THE "<u>INDEMNIFIED PARTIES</u>") FROM AND AGAINST, AND WILL PAY TO THE INDEMNIFIED PARTIES THE MONETARY VALUE OF, ANY AND ALL LIABILITIES, LOSSES, DAMAGES, CLAIMS, COSTS, DEFICIENCIES, DIMINUTIONS OF VALUE OR EXPENSES (INCLUDING COSTS OF INVESTIGATION AND DEFENSE, PENALTIES AND REASONABLE LEGAL FEES AND COSTS), WHETHER OR NOT INVOLVING A THIRD-PARTY CLAIM (COLLECTIVELY, "<u>LOSSES</u>"), INCURRED OR SUFFERED BY THE INDEMNIFIED PARTIES ARISING OUT OF, RELATING TO OR RESULTING FROM THE INDEMNIFYING PARTY'S (A) INDEPENDENT PROJECTS, INCLUDING, BUT NOT LIMITED TO, ANY THIRD PARTY CLAIMS OF INFRINGEMENT (B) RESPECTIVE EMPLOYEES AND REPRESENTATIVES WITH RESPECT TO JOINT PROJECTS, AND/OR (C) NEGLIGENCE OR WILLFUL MISCONDUCT IN CONNECTION WITH THIS AGREEMENT. The indemnifying party shall defend or settle, at its expense, any claim, action, suit or demand against any of the indemnified parties for which the indemnifying party is responsible hereunder; *provided, however*, that the indemnifying party may not, without the consent of the other party (with such consent not to be unreasonably withheld), settle any third party claim if such settlement obligates the other party to pay money, to perform obligations (or be prohibited from acting) or to admit liability. Each party shall notify the other party promptly of any claim, action, suit or demand covered by this indemnity and shall cooperate with the other party (at the other party's expense) by furnishing all evidence reasonably required by the other party for the defense of any such claim, action, suit or demand.

7.2 <u>Insurance</u>. Each party shall maintain, or cause to be maintained, a policy or policies of general liability insurance ("<u>Liability Insurance</u>") with commercially reasonable single and combined liability limits in force at all times, insuring the activities, conditions, operation and usage of the party, its agents and employees, on or about the Premises. Such Liability Insurance shall be issued by insurance companies with a reliable general policyholder's rating and financial rating and qualified to issue such policy(ies). All policies of insurance carried by each party as provided in this <u>Section 7.2</u> shall name the other party as an additional insured and shall contain waivers of subrogation against the other party. Each party shall have the power to adjust and settle and loss under such policies with its insurer. Each party shall provide a certificate to the other party upon request for each such policy, as renewed from time to time, showing the additional insured, and stating that such insurance is in force and effect and that the premiums therefor have been paid. Such insurance shall provide that the same may not be canceled without at least 30 days' prior written notice to the other party. Such insurance shall be in an amount of not less than $5,000,000 per occurrence. As for Baker Hughes' personal property in the Baker Hughes Lab, Baker Hughes shall be responsible to insure such property under its own separate property insurance policies.

*Notwithstanding anything to the contrary herein contained, BJ and Baker Hughes each hereby release and* relieve the other and waive its entire right of recovery against the other, for any and all loss, damage, or consequential damage to (i) in the case of BJ, all buildings and improvements forming part of the Premises and all furniture, fixtures, equipment, and other property located in or about the Premises and belonging to BJ or one of its employees, agents, contractors, or invitees, and (ii) in the case of Baker Hughes, all of Baker Hughes's alterations and improvements and any and all furniture, fixtures, equipment, and other property located in or about the Premises and belonging to Baker Hughes or one of its employees, agents, contractors, or invitees, arising out of or incident to perils insured against or that could have been insured against by a "special form" policy of property insurance, even if this loss or damage is due to the negligence of BJ or Baker Hughes, or their respective agents, employees, contractors or invitees. This waiver will include a waiver by each party of all rights of subrogation that their insurers

29839566.11



Services Agreement

may have against the other party. Baker Hughes and BJ shall, upon obtaining the policies of insurance covering property loss or damage required hereunder, give notice to their insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Lease, or if the insurance policy does not permit a party to waive the insurer's rights of subrogation, then the policy shall contain an endorsement in which the insurer waives all of its rights of subrogation against the party that is not the insured party. NOTWITHSTANDING THE FOREGONG, THIS PARAGRAPH SHALL NOT APPLY TO THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR FRAUD OF THE RELEASED PARTY. **THIS PARAGRAPH IS INTENDED TO RELEASE EACH PARTY FROM LIABILITY FOR LOSS OF OR DAMAGE TO PROPERTY CAUSED BY THAT PARTY'S OWN NEGLIGENCE TO THE FULLEST EXTENT PERMITTED BY LAW, OTHER THAN SUCH PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR FRAUD.**

8.     **CONFIDENTIALITY**

8.1     "Confidential Information" as used in this Agreement means any and all technical and non-technical information, including but not limited to non-public patent applications, copyright, trade secret and proprietary information, techniques, models, inventions, know-how, processes, equipment, software programs and formulae related to the current, future and proposed products and services of each of the parties, including, without limitation, information concerning product or process research and development, design details and specifications, engineering, financial data, manufacturing, customer lists, business forecasts and marketing plans. Confidential Information includes both the existence and the terms of this Agreement.

8.2     Each party acknowledges that in the provision of any Services it may be supplied with Confidential Information of the other party. Each party shall treat, protect and safeguard as proprietary and confidential all Confidential Information disclosed to the other under this Agreement using at least as great a degree of care as used to maintain the confidentiality of its own Confidential Information, but in no event less than a reasonable degree of care. Except with specific prior written authorization, neither party shall use any of the other party's Confidential Information other than for the purpose for which it has been disclosed in connection with the provision of the Services. Each party agrees that it will disclose the other party's Confidential Information only to its employees who need to know such information, provided that such employees are bound by terms and conditions protecting such Confidential Information substantially similar to those of this Agreement.

8.3     Each party acknowledges that the disclosure of any Confidential Information, except as expressly permitted by this Agreement, may cause irreparable injury for which the injured party may not have an adequate remedy at law. Accordingly, either party may seek injunctive relief against the breach or threatened breach of any of the foregoing undertakings in addition to any other legal remedies that may be available.

8.4     The foregoing restrictions shall not apply to information: (a) that is or becomes part of the public domain through no fault of recipient; (b) that the recipient can show was in its possession prior to its receipt from the other party; (c) that recipient can show was received by it from a third party not prohibited from disclosing the information; (d) that was developed independently by the recipient without the use of Confidential Information; or (e) that is required to be disclosed by applicable law, stock exchange requirement or regulation. If disclosure is required as set forth in (e), the recipient may make such disclosure provided the disclosing party is notified in writing prior to the disclosure (to the extent legally permissible) and every reasonable effort is made to protect the proprietary interests in the information.

8.5     All Lab Staff (as defined in Exhibit A) shall be required to execute a confidentiality and work-for-hire agreement in a form acceptable to the Steering Committee prior to being granted access to the Lab. Each Committee Representative shall be required to execute a separate confidentiality agreement in a form acceptable to each party prior to attending any Steering Committee meetings or otherwise performing his or her role as Committee Representative.

8.6     The provisions of this Section 8 shall remain in effect for a period of three years from the date of the termination of this Agreement.

29839566.11



**Services Agreement**

## 9.   REPRESENTATIONS AND WARRANTIES

9.1   <u>Representations and Warranties</u>.  Each party represents and warrants to the other party that: (a) it is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, with full power and authority to perform all its obligations under this Agreement, and it has all right and authority necessary to enter into this Agreement; (b) assuming due authorization, execution and delivery of this Agreement by the other party, this Agreement constitutes the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or similar laws affecting creditors' rights generally and principles of equity affecting the availability of specific performance and other equitable remedies; (c) such party is not and will not be required to give any notice to or obtain any governmental authorization or other consent from any person in connection with the execution, delivery or performance of this Agreement; and (d) the execution, delivery and performance of this Agreement do not violate any provision of the formative or governing documents of the such party and do not violate any law or judgment to which such party or any of its respective properties or assets are subject.

9.2   <u>Disclaimer for Services and As-is Condition</u>.  Baker Hughes understands that the non-exclusive Lab license granted pursuant to this Agreement is for the Baker Hughes Lab and the Shared Lab in their current condition, **"AS-IS, WHERE IS, AND WITH ALL FAULTS."**  Except as expressly set forth herein, and to the fullest extent permitted by law, BJ has not made, does not make, and **expressly disclaims, any representations or warranties whatsoever of any kind, whether by statute, case law, equity or otherwise, including without limitation warranties of habitability, merchantability, or fitness for a particular purpose, with respect to the Labs and the conditions thereof, or the Services**.

9.3   <u>Disclaimer for IP</u>.  SUBJECT TO EACH PARTY'S OBLIGATIONS UNDER SECTION 7.1 OF THIS AGREEMENT, NEITHER PARTY MAKES, AND EXPRESSLY DISCLAIMS, ANY REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, NON-INFRINGEMENT, VALIDITY AND ENFORCEABILITY OF PATENT RIGHTS, OR THE PROSPECTS OR LIKELIHOOD OF DEVELOPMENT OR COMMERCIAL SUCCESS OF ANY INTELLECTUAL PROPERTY RIGHTS LICENSED UNDER THIS AGREEMENT.

## 10.   LIMITATION OF LIABILITY

EXCEPT FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF A PARTY'S SENIOR MANAGEMENT OR SUPERVISORY STAFF OR AS OTHERWISE STATED HEREIN, NEITHER PARTY NOR ANY OF EITHER PARTY'S PARTNERS, EMPLOYEES, AGENTS, CONTRACTORS AND/OR SUBCONTRACTORS SHALL BE LIABLE TO THE OTHER PARTY OR ANYONE CLAIMING BY, THROUGH OR UNDER THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES WHATSOEVER, INCLUDING LOST PROFITS OR LOSS OF BUSINESS, ARISING OUT OF, RESULTING FROM OR IN ANY WAY RELATED TO THE SERVICES OR THIS AGREEMENT FROM ANY CAUSE OR CAUSES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  THE FOREGOING LIMITATION DOES NOT LIMIT A PARTY'S DUTY TO INDEMNIFY THE OTHER PARTY WITH RESPECT TO THIRD PARTY CLAIMS PURSUANT TO <u>SECTION 7.1</u>.  FOR THE AVOIDANCE OF DOUBT, THIS LIMITATION OF LIABILITY SHALL NOT APPLY TO BAKER HUGHES' INDEMNITY OBLIGATIONS UNDER <u>SECTION 11.2</u> OF THIS AGREEMENT.

## 11.   INDEPENDENT CONTRACTOR

11.1   Both parties agree and acknowledge that BJ is an independent contractor in relation to Baker Hughes and shall not be considered an agent or servant of Baker Hughes.  It is agreed that BJ shall have the right to control the methods, details and other means of the Services.  Nothing in this Agreement shall be construed to

29839566.11



**Services Agreement**

constitute the parties as employer and employee, principal and agent, franchisor and franchisee, partners, or joint venturers. Neither party has any right, authority or power to enter into any contract, to assume or create any obligation of any kind, or to otherwise act on behalf of the other party.

11.2 BAKER HUGHES SHALL INDEMNIFY, HOLD HARMLESS AND DEFEND BJ'S INDEMNIFIED PARTIES FROM AND AGAINST, AND WILL PAY TO BJ THE MONETARY VALUE OF, ANY AND ALL LOSSES INCURRED OR SUFFERED BY BJ'S INDEMNIFIED PARTIES ARISING OUT OF, RELATING TO OR RESULTING FROM ANY ALLEGED OR ACTUAL MISCLASSIFICATION OR MISDESIGNATION OF ANY BAKER HUGHES WORKER SUBJECT TO THIS AGREEMENT.

**12.    ENTIRE AGREEMENT; TERMINATION OF PRIOR AGREEMENTS; SEVERABILITY**

Unless otherwise provided herein, this Agreement, with all exhibits and addenda described in the preamble to this Agreement, is the exclusive statement of the terms and conditions between the parties with respect to the Lab and the other matters set forth herein and supersedes all prior agreements, negotiations, representations and proposals, written and oral; provided however, that it does not supersede the Intellectual Property License Agreement dated December 30, 2016 between the Parties; which will control in the event of a conflict with this Agreement. The parties hereby acknowledge and agree that (a) the Lease Agreement is hereby terminated in its entirety and (b) the TSA is hereby terminated to the extent, and only to the extent, the TSA relates to the Lab (and all remaining terms and conditions of the TSA unaffected by this Agreement shall remain in full force and effect). Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

**13.    AMENDMENT; WAIVER; COUNTERPARTS; CONSTRUCTION**

No provision of this Agreement shall be deemed waived, modified or amended, and no breach shall be deemed excused, unless such a waiver, modification, amendment or excuse is in writing and signed by the authorized representative of the party against whom it is asserted. Failure or delay of either party to exercise any right or remedy hereunder shall not constitute a waiver of rights or remedies under this Agreement. This Agreement may be executed in one or more counterparts, each of which will constitute an original. The section headings contained in this Agreement are inserted only for convenience and shall not affect the meaning or interpretation of this Agreement. All references to "$" in this Agreement or any exhibits and/or addenda shall refer to U.S. dollars, the currency of the United States of America.

**14.    GOVERNING LAW**

This Agreement shall be interpreted and governed pursuant to the laws of the State of Texas without regard to its principles of conflicts of laws.

**15.    DISPUTE RESOLUTION**

17.1    Amicable Resolution. The parties shall attempt to settle any dispute between them amicably. To this end, the Steering Committee and/or a party's Committee Representative or a senior executive from each party shall consult and negotiate with each other in good faith to reach a solution.

17.2    Failure to Amicably Resolve. If a disputed matter remains unresolved for a period of 60 days following the date on which discussions commenced, either party may refer the dispute to arbitration in accordance with the Federal Arbitration Act and using the rules of the American Arbitration Association or any successor thereof when not in conflict with such act, by one arbitrator mutually selected by the parties in accordance with such rules. The place of arbitration shall be Houston, Texas. The language of the arbitration shall be English. The arbitrator's



**Services Agreement**

decision shall be in writing and shall be supported by detailed findings of fact and conclusions of law. The arbitration decision shall be final and binding on all parties. All costs and expenses of such arbitration shall be borne in the manner determined by the arbitrator.

16.    ASSIGNMENT; SUCCESSORS & ASSIGNS

Except where this Agreement specifically contemplates otherwise, neither party may assign, sublicense or otherwise transfer the Services, any Confidential Information or otherwise assign its rights (including rights to intellectual property and rights to access and use the Premises) or obligations under this Agreement to any other entity without the prior written consent of the other party. This Agreement shall be binding on the successors and permitted assigns of BJ and Baker Hughes. In the event of a Change of Control of one party, the controlling entity or transferee will agree to be bound hereby and shall honor and continue the existing commitments to the other party under this Agreement.

17.    NOTICES

All notices and other communications under this Agreement must be in writing and are deemed duly delivered when (a) delivered, if delivered personally or by nationally recognized overnight courier service (costs prepaid), (b) sent by e-mail with confirmation of transmission by the transmitting equipment (or, the first business day following such transmission if the date of transmission is not a business day), or (c) received or rejected by the addressee, if sent by U.S. certified or registered mail, return receipt requested; in each case to the following physical or email addresses marked to the attention of the individual (by name or title) designated below (or to such other physical or email address  or individual as a party may designate by notice to the other party). Telephone numbers are provided below for courtesy communications, any information received by telephone or left on a voicemail shall not constitute notice.

If to BJ:

BJ Services, LLC
11211 FM 2920
Tomball, TX 77377
Attention: John Bakht, General Counsel
E-mail: John.bakht@bjservices.com
Tel: 281-408-2361

If to Baker Hughes:

Baker Hughes, a GE company
17021 Aldine Westfield Road
Houston, TX 77073-5101
Attention: Will Marsh,
E-mail: Will.Marsh@bhge.com
Tel: +1 713-879-1257

18.    BROKERAGE.

Each of BJ and Baker Hughes hereby warrants to the other party that it has not dealt with any real estate broker, salesman, or person who may be entitled to a commission in the negotiation of this Agreement and that no commissions are payable in respect to this Agreement.

19.    FORCE MAJEURE

29839566.11



**Services Agreement**

Neither party shall be liable for failure to perform any of its obligations hereunder when such performance is prevented by riots, wars or hostilities between any nations, acts of God, fires, storms, floods, earthquakes, strikes, shortages or curtailments of raw materials, power or other utility services and other causes beyond the reasonable control of the parties hereto, provided that the party suffering the disability acts reasonably and prudently in light of the circumstances.  This provision shall not be construed as relieving either party from its obligation to timely pay any sums due the other party.

## 20.    BRANDING; PUBLICITY

(a)    The Lab shall be branded as a BJ facility, and BJ shall have the right and authority to place its name, logo and/or other BJ-related signage in and around the Lab in its discretion.  Notwithstanding the foregoing, BJ shall permit certain collaboration related branding such as "in collaboration with Baker Hughes, a GE Company" including utilization of the BHGE logo as well as Baker Hughes branding within any Baker Hughes dedicated meeting spaces including the Baker Hughes Lab.

(b)    Neither party may use the other party's name as a reference or publicize the other party as a retained or former client or customer in any proposal sent to third parties or in any of its other promotional materials, news releases, advertisement or disclosures without the other party's prior written consent in each instance of publication (unless otherwise agreed in writing in advance).  In addition to any other remedies available, either party may be entitled to injunctive relief for any breach or threatened breach of this Section by the other party.

The parties have executed and delivered this Agreement as of the Effective Date.

BJ SERVICES, LLC

By: _____
Name: ~~Warren Zemlak~~
Title: ~~President & CEO~~

BAKER HUGHES OILFIELD OPERATIONS LLC

By: _____
Name: _____ _Lee Whitley_
Title: _____ _VP_



Services Agreement

## SCHEDULE I

### List of Lab Equipment and Assets

Part A

| Asset Number | Asset Description | Department |
|---|---|---|
| 1239573 | CTE Curing Chamber M3-700-4 | Cement |
| 1239510 | Static Gel Strength Analyzer | Cement |
| 1239509 | Manufacture of one off Experimental Shear Bond Mac | Cement |
| 1239069 | CTE Model 15-400GS Gel Strength Analyzer | Cement |
| 1238598 | Test cell apparatus | Cement |
| 1238585 | High Pressure Test Cell | Cement |
| 1238325 | CO2 Test equipment | Cement |
| 1233152 | THICKENING TIME TESTER | Cement |
| 1233151 | THICKENING TIME TESTER | Cement |
| 1233150 | THICKENING TIME TESTER | Cement |
| 1233128 | THICKENING TIME TESTER | Cement |
| 1233062 | LAB EQ PRESS CURING CHA | Cement |
| 1233002 | LAB EQ CHANDLER CONSIST | Cement |
| 1232998 | LAB EQ COMPACT CURING C | Cement |
| 1232891 | HPHT WETTABILITY APPARATUS | Cement |
| 1232886 | HTHP UCA (SECOND) | Cement |
| 1232885 | HTHP RHEOMETER | Cement |
| 1232884 | QUIZIX DUAL PUMP 2 | Cement |
| 1232883 | QUIZIX DUAL PUMP 1 | Cement |
| 1232816 | CHANDLER M-PRO ANALYZER | Cement |
| 1232734 | HP/HT CEMENT CURING CHAMBERS | Cement |
| 1232733 | HP/HT CEMENT CURING CHAMBERS | Cement |
| 1232732 | HP/HT CHANDLER CONSISTOMETER | Cement |
| 1232731 | HP/HT CHANDLER CONSISTOMETER | Cement |
| 1232730 | HP/HT CHANDLER CONSISTOMETER | Cement |
| 1232729 | HP/HT CHANDLER CONSISTOMETER | Cement |
| 1232724 | PARTICLE SIZE ANAYLZER | Cement |
| 1232716 | DEDICATED CEMENT TENSILE | Cement |
| 1232693 | TENSILE STRENGTH PRESSURE CELL | Cement |
| 1232689 | CHANDLER AUTO PRESSURIZED | Cement |
| 1232688 | CHANDLER AUTO PRESSURIZED | Cement |
| 1232687 | CHANDLER AUTO PRESSURIZED | Cement |
| 1232686 | CHANDLER AUTO PRESSURIZED | Cement |
| 1232670 | 3-G550 DUALHEAD DDR,3-17 in.LCD | Cement |
| 1232661 | GAS FLOW MODEL (BJ) | Cement |
| 1232637 | FLEXURAL STRENGTH PROTOTYPE | Cement |
| 1232589 | REFRIGERATED BATH | Cement |
| 1232588 | CHILLER FOR CEMENT LAB | Cement |
| 1232585 | EXPANSION APPARATUS/ CMT R&D | Cement |
| 1232568 | UCA | Cement |
| 1232567 | UCA | Cement |

29839566.11



**Services Agreement**

| 1232566 | CONSISTOMETER | Cement |
|---|---|---|
| 1232565 | CONSISTOMETER | Cement |
| 1232563 | Cement Curing Chamber | Cement |
| 1232562 | Cement Curing Chamber | Cement |
| 1232560 | CO2 CHILLER | Cement |
| 1232539 | GAS FLOW MODEL UPGRADE (BJ) | Cement |
| 1232507 | ULTRASONIC CEMENT ANALYZER | Cement |
| 1232471 | YOKOGAWA CONTROL & MEASUREMENT | Cement |
| 1238651 | Chandler Model 4265 UCA Pressure vessel | Cement |
| 1238650 | Chandler UCA pressure vessel replacement | Cement |
| 1238644 | Chandler Model 8 Pressure vessel | Cement |
| 1238643 | Chandler Model 8 Pressure vessel | Cement |
| 1238642 | Chandler Model 8 Pressure vessel | Cement |
| 1238641 | Yokogawa CX 1000 Controllers | Cement |
| 1238640 | Chandler Quizix Model Q5220 Dual pump | Cement |
| 1238639 | Chandler Quizix Model Q5220 Dual pump | Cement |
| 1238638 | Chandler Quizix Model Q5220 Dual pump | Cement |
| 1238637 | Chandler Quizix Model Q5220 Dual pump | Cement |
| 1238636 | CTE model 15-400GS SGSA | Cement |
| 1238635 | Yokogawa CX1000 Controllers | Cement |
| 1238634 | Yokogawa CX1000 Controllers | Cement |
| 1238596 | Chandler Model 8 40k psi pressure vessel | Cement |
| 1239135 | ELEMENTAL ANALYZER | QC |
| 1239109 | Chandler 5550 Rheometers | QC |
| 1239108 | Chandler 5550 Rheometers | QC |
| 1239107 | Chandler 5550 Rheometers | QC |
| 1239106 | Chandler 5550 Rheometers | QC |
| 1239105 | Chandler 5550 Rheometers | QC |
| 1238819 | Fluid Loss Cell | QC |
| 1238818 | Density meter  DMA4100 | QC |
| 1232975 | GAS CHROMATOGAPH W/AUTO SAMPLE | QC |
| 1232931 | CHANDLER HTHP 5550 VISCOMETER | QC |
| 1232930 | VISCOMETER,OFITE MODEL 900 | QC |
| 1232925 | FTTR SPECTROMETER UNIT T37 TENSOR 37 | QC |
| 1232837 | VISCOMETER-CHANDLER 5550 | QC |
| 1232836 | UV-VISIBLE SPECTROPHOTOMETER | QC |
| 1232834 | LUMINOMETER 20/20N | QC |
| 1232829 | GAS CHROMATOGRAPHY/ MS | QC |
| 1232824 | AUTOMATED INTRINSIC VISCOSITY | QC |
| 1232815 | PLASMA SPECTROMETER | QC |
| 1232746 | LOW ANGLE LASER FOR GPC | QC |
| 1232703 | ACCUPYC 1330 HELIUM PYNCNOMETE | QC |
| 1232669 | KRUSS TENSIOMETER | QC |
| 1232616 | KARL FISHER ANALYZER | QC |
| 1239577 | Chandler 5550 Rheometer | Frac |
| 1239576 | CO2 Chiller for Flow Loop | Frac |
| 1239575 | Pump replacement for Conductivity Lab | Frac |



**Services Agreement**

| | | |
|---|---|---|
| 1239574 | Chandler 5550 Rheometer | Frac |
| 1239526 | Dell Computer | Frac |
| 1239080 | Chandler Model 5550 HTHP 110V (1); ChanP | Frac |
| 1232668 | FANN 50 SOFTWARE DATABASING | Frac |
| 1239062 | Viscometers, Pressurized 110V | Frac |
| 1239061 | Chandler 5550 Rheometers | Frac |
| 1238958 | 5550-110V-SPR-225 HPHT viscometers | Frac |
| 1238957 | 5550-110V-SPR-225 HPHT viscometers | Frac |
| 1238956 | 5550-110V-SPR-225 rheometers | Frac |
| 1238955 | 5550-110V-SPR-225 rheometers | Frac |
| 1238954 | Chandler 5550 HPHT viscometer w/PC sys. | Frac |
| 1238953 | Chandler 5550 HPHT viscometer w/PC sys. | Frac |
| 1238952 | Shear history simulator | Frac |
| 1238859 | Viscometers, Pressurized 110V | Frac |
| 1238858 | Viscometers, Pressurized 110V | Frac |
| 1238599 | CS Mixer; spare parts; bath, OH mixer | Frac |
| 1238597 | OFI 900; LL Master remote mixer, FSoven | Frac |
| 1238344 | Chandler  Viscometers 5550-110V-SPR-225 | Frac |
| 1238343 | Chandler  Viscometers 5550-110V-SPR-225 | Frac |
| 1238342 | Grace 5600 Rheometer for G & G | Frac |
| 1238341 | Foam bubble distribution & analysis software | Frac |
| 1238340 | Conductivity cells 2-double | Frac |
| 1238339 | Chandler HTPT (2) | Frac |
| 1238338 | SYSTEM,5550 VISCOMETER,110V (2) | Frac |
| 1232924 | THERMO SCIENTIFIC BATH CIRCULATOR,REFRIGERATED | Frac |
| 1232922 | GRACE 7500 VISCOMETER | Frac |
| 1232920 | EIRICH HIGH INTENSITY LAB | Frac |
| 1232890 | FLUID LOSS CELL TEST APPARTUS | Frac |
| 1232889 | FLUID LOSS CELL TEST APPARTUS | Frac |
| 1232888 | FLUID LOSS CELL TEST APPARTUS | Frac |
| 1232887 | FLUID LOSS CELL TEST APPARTUS | Frac |
| 1232877 | OFITE MODEL 900 VISCOMETER | Frac |
| 1232876 | OFITE MODEL 900 VISCOMETER | Frac |
| 1232875 | CONDUCTIVITY PRESS UPGRADE & | Frac |
| 1232874 | RHEOLOGY LOOP ASSEMBLY | Frac |
| 1232873 | ISCO PUMP AND CONTROLLER | Frac |
| 1232872 | MOYNO PUMP SKID (RHEOLOGY | Frac |
| 1232871 | MASS FLOW METER / TRANSMITTER | Frac |
| 1232870 | MASS FLOW METER / TRANSMITTER | Frac |
| 1232869 | MASS FLOW METER / TRANSMITTER | Frac |
| 1232868 | CHANDLER 5550-SPR-225RF | Frac |
| 1232867 | TUBING FURNANCE | Frac |
| 1232866 | VISCOMETER OFITE MODEL 900 | Frac |
| 1232865 | VISCOMETER OFITE MODEL 900 | Frac |
| 1232864 | HP HT VISCOMETER 5500 SPR-225 | Frac |
| 1232856 | ISCO 500D PUMP & CONTROLLER | Frac |
| 1232855 | MOLECULAR WEIGHT TESTING | Frac |



**Services Agreement**

| | | |
|---|---|---|
| 1232852 | GENESYS 6-UV VIS SCANNING | Frac |
| 1232849 | CONDUCTIVITY PUMP | Frac |
| 1232848 | CONDUCTIVITY PUMP | Frac |
| 1232847 | CONDUCTIVITY PUMP | Frac |
| 1232846 | CONDUCTIVITY PUMP | Frac |
| 1232845 | CONSTANT SPEED MIXER | Frac |
| 1232835 | ISCO 500D PUMP & CONTROLLER | Frac |
| 1232828 | CHANDLER CONDUCTIVITY LAB | Frac |
| 1232827 | CHANDLER CONDUCTIVITY LAB | Frac |
| 1232826 | CHANDLER CONDUCTIVITY LAB | Frac |
| 1232825 | CHANDLER CONDUCTIVITY LAB | Frac |
| 1232814 | CHANDLER HPHT VISCOMETER | Frac |
| 1232813 | CHANDLER MODEL 5550 AUTOMATED | Frac |
| 1232812 | CHANDLER MODEL 5550 AUTOMATED | Frac |
| 1232705 | LINDBERG BOX FURNACE | Frac |
| 1232704 | LINDBERG BOX FURNACE | Frac |
| 1232702 | FRACTURING CONDUCTIVITY TEST | Frac |
| 1232701 | FRACTURING CONDUCTIVITY TEST | Frac |
| 1232700 | FRACTURING CONDUCTIVITY TEST | Frac |
| 1232699 | FRACTURING CONDUCTIVITY TEST | Frac |
| 1232694 | FRACTURE CONDUCTIVITY TESTING | Frac |
| 1232650 | OFITE VISCOMETER | Frac |
| 1232623 | GRACE BENCHTOP RHEOMETER | Frac |
| 1232620 | PROPPANT CONDUCTIVITY TEST EQU | Frac |
| 1232617 | FRACTURING CONDUCTIVITY | Frac |
| 1232611 | FRACTURE CONDUCTIVITY CELLS | Frac |
| 1232610 | FRACTURE CONDUCTIVITY CELLS | Frac |
| 1232609 | FRACTURE CONDUCTIVITY CELLS | Frac |
| 1232606 | FRICTION LOOP FOR SCREENING | Frac |
| 1232605 | OSCILLARY RHEOMETER | Frac |
| 1232604 | METERS & PUMPS | Frac |
| 1232603 | FRACTURE CONDUCTIVITY | Frac |
| 1232584 | FRACTURE CONDUCTIVITY CELL SET | Frac |
| 1232582 | CROSSLINKER PUMP FOR FRICTION | Frac |
| 1232581 | MASS FLOWEMETER FOR FRICTION | Frac |
| 1232570 | PRESSURE CONTROL PUMPS | Frac |
| 1232537 | FLOW LOOP UPGRADE - CAT PUMP | Frac |
| 1232511 | Dake Press | Frac |
| 1232501 | CONSTANT SPEED MIXER | Frac |
| 1232203 | DISPOSAL TANK & INSTALLATION | Frac |



**Services Agreement**

Part B

| Lab Located | Asset # | Description | Asset description (2) |
|---|---|---|---|
| Sand Control | 816162 | Chandler 5500 HT Viscometer | 329 |
| Sand Control | 627287 | HTHP RHEOMETER | 287 |
| Sand Control | 627084 | MOYNO PROGRESSING CAVITY | MO3053554 |
| Sand Control | 626440 | AUTOMATION OF SC LAB PERMEATER | |
| Sand Control | 626105 | SONIC SAND SIFTER W/ACCESS. | |
| Sand Control | 562142 | Hydro 2000G Sample Dispersion Unit". | |
| Sand Control | 562141 | Malvern Laser Particle Size Analyzer | |
| Sand Control | 528961 | Chandler 5500 HT Viscometer | 252 |
| StimPlus | 1132463 | Cold Finger CF15 | PSL Systemtechnik GmbH CF15120 |
| StimPlus | 924808 | DSR 5000 TUBE BLOCKING RIG | 208 |
| StimPlus | 912957 | M 590 Adv. Auto Goniometer/Tensiometer,OFITE M 900 | |
| StimPlus | 837500 | Refrigerated bath cloud/pour point, CFPP | 671481 |
| Acid | 1134622 | Acid Autoclave Chandler 5 | Serial# 63 |
| Acid | 1132328 | Acid Reaction Rate Analyzer CRS 500-35 | SN# 15-3886 Complete Unit |
| Acid | 1087534 | Chandler Model 5617 Autoclave Acid Corrosion | |
| Acid | 627291 | 2-GENERAL PURPOSE VESSEL 450ML | 100620196 |
| Acid | 627278 | 2-GENERAL PURPOSE VESSEL PART# | 100620198 |
| Acid | 627068 | HASTALLOY C276 10 in. DOUBLE END | 7183 |
| Acid | 626834 | CHANDLER CORROSION AUTOCLAVE | 40 |
| Acid | 626833 | CHANDLER CORROSION AUTOCLAVE | 39 |
| Acid | 626690 | CHANDLER CORROSION AUTOCLAVE | 38 |
| Acid | 627085 | VISCOMETER,OFITE MODEL 900 | 81056 |
| GeoMech | 896339 | Instrumentation -Geological Laboratories | |
| GeoMech | 815990 | Model CLC-200R Hardness Tester | 1286 |
| GeoMech | 627160 | PRECISION HYDRAULIC SURFACE | 96268 |
| GeoMech | 627124 | RAPID TRIAXIAL ROCK TESTING | |
| GeoMech | 626715 | INSTRON MODEL 3345 MATERIALS | 51458 |
| GeoMech | 626133 | LOW PSI ROCK MECHANICS PRESS | 597527 |
| GeoMech | 626320 | ISCO PUMP | 209537 |
| Geo | 867356 | Desktop Recovery Pump | 7500000084 |
| Geo | 837485 | Sputter Coater | C4971 |
| Geo | 816159 | Grinding mill-Geologic Svc Lab | BTRM # 456 |
| Geo | 816148 | Bruker Part# P500E130, Diffrac.Topas. Up | 2-2219927 |
| Geo | 629644 | Micro Sectioneer | |
| Geo | 627203 | HASKRIS CHILLER | HB20491 |
| Geo | 626988 | LEICA POLARING MICROSCOPE | 2.84034E+11 |
| Geo | 626928 | DIGITAL CAMERA | 338810 |
| Geo | 626864 | JADE SOFTWARE UPGRADE | MDIR95298 |
| Geo | 626108 | XRAY DIFFRACTOMETER | 7595033 |
| SCAL | 863651 | Convection Oven, Coreholder, Autoclave Valves | |
| SCAL | 851182 | Fluid Loss Cell | 7500000140 |
| SCAL | 851181 | Density meter _ DMA4100 | 7500000141 |
| SCAL | 837553 | 600 cc stainless steel accumulators | |
| SCAL | 837552 | 200 cc stainless steel accumulators | |
| SCAL | 836485 | CD23-A-2-A-1-C Std 3 1/2 display (four) | |
| SCAL | 815987 | 216-0023-ASSY-316/GFT | |



**Services Agreement**

| | | | |
|---|---|---|---|
| SCAL | 815983 | Teledyne Isco E260-D pump | |
| SCAL | 627293 | BINDER FEB 400UL HIGH TEMP | 915602 |
| SCAL | 627292 | BINDER FEB 400UL HIGH TEMP | 915600 |
| SCAL | 627277 | COLLINS INSTRUMENTS HIGH | 2160012 |
| SCAL | 627276 | TELEDYNE ISCO MODEL E260 DUAL | 210D20008 |
| SCAL | 627159 | ULTRA-LOW PERMEAMETER & | |
| SCAL | 626829 | SCA LAB DATA ACQUIS SOFTWARE | |
| SCAL | 626021 | PRESSURE TESTER | |
| Cement | 629474 | CEMENT ANALYZER (HP) | |
| Acid | 503963 | CHANDLER CORROSION AUTOCLAVE | SN#50 |

Additional items Purchased

**2nd AFE# 7500003438**

| | |
|---|---|
| | Upgrades: CTE SGS model 15-400 SN# 198, SGS 15-400 SN# 131; |
| Cement | Curing Chamber model MS-700-16 SN# 161, |
| Cement | Chandler SGSA model 5265 SN# 1188,  UCA model 4265 HT SN# 697 |

**1st AFE #007500003347**

| | |
|---|---|
| Cement | CTE Atmos Consit. model 200 SN# 111612-2, Atmos Consit. model 200 SN# 70417-1 |
| GeoMech | ASC Slab saw  model HP 14 SN#1018134 |
| GeoMech | GCTS Break out box model ULT-2050 SN#5255, Pulsar Receiver box model ULT-200 SN# 5184, Platens does not have SN |
| **Transfer from GOM on 7/27/17** | |
| Cement | Chandler PC model 8340 SN 1263 |
| Cement | Chandler PC model 7222 SN 122 |
| Cement | Chandler PC model 7222 SN 114 |
| Cement | Chandler PC model 8240 SN 884 |
| Cement | Chandler PC model 8240 SN 896 |



**Services Agreement**

## SCHEDULE II

**Baker Hughes Excluded Projects**

All Baker Hughes projects related to "Sorb" technology

Any Baker Hughes cross product line R&D projects conducted entirely outside the Lab that do not primarily relate to cementing, acidizing, or fracturing.

All Baker Hughes software development and testing projects

All Baker Hughes client specific projects where Baker Hughes does not own the resulting IP or have the right to license it out

Any projects conducted in Exclusive Laboratories

Any project for which advance written notice is given to BJ Services, or documented by the Steering Committee, that such project is deemed to be a Baker Hughes Excluded Project.

**BJ Excluded Projects**

All BJ software development and testing projects

Confirmatory testing of supplier products

All BJ client specific projects where BJ does not own the resulting IP or have the right to license it out

Any projects conducted by BJ Services entirely outside the Lab that do not primarily relate to cementing, acidizing or fracturing.

Any projects conducted in Exclusive Laboratories

Any project for which advance written notice is given to Baker Hughes, or documented by the Steering Committee, that such project is deemed to be a BJ Excluded Project.



**Services Agreement**

## EXHIBIT A

### Services

This <u>Exhibit A</u> forms a part of, and is incorporated into, the Services Agreement (the "<u>Agreement</u>") dated December 1, 2018, by and between BJ Services, LLC ("<u>BJ</u>") and Baker Hughes Oilfield Operations LLC ("<u>Baker Hughes</u>"). Capitalized terms not otherwise defined in this <u>Exhibit A</u> shall have the meanings set forth in the Agreement. If any provision of this <u>Exhibit A</u> (including with respect to any rights or obligations of the parties) conflicts with the terms of the Agreement, the terms of this Exhibit will control.

**Project Description**

The parties agree for BJ to provide the Services described by this <u>Exhibit A</u> to Baker Hughes in connection with the Projects on the terms and conditions set forth in the Agreement and this <u>Exhibit A</u> and <u>Exhibit B</u>.

**Lab**

During the Project Term, BJ shall make the Shared Lab (including all equipment and assets located at the Shared Lab) available for the use and access of Baker Hughes on a non-exclusive basis and shall make the Offices available for the use and access of Baker Hughes on an exclusive basis, both on a twenty-four hour per day, seven days per week basis, subject to the terms and conditions of the Agreement.

During the Project Term and with respect to the Premises, except as otherwise provided in the Agreement, BJ shall provide all operations, property management and maintenance services necessary or advisable in order to operate and maintain the Premises using prudent commercial business practices, including, without limitation, the following:

(a)  day-to-day administrative services in support of the Shared Lab and general facility operations and property management activities hereunder, including, but not limited to: the acquisition and maintenance of equipment; internal budgeting and accounting; maintenance of property; record-keeping; Internet access and similar administrative services;

(b)  administration of relationships with all subcontractors, vendors, suppliers, and concessionaires relating to the Shared Lab, including payment of vendors;

(c)  procurement and maintenance of electricity, gas, water, sewer and other utilities in such quantities as are necessary for the operation and use of the Lab (except as otherwise provided in the Agreement); and

(d)  procurement and maintenance of all licenses, permits and approvals necessary or required to be obtained from any governmental authority or under applicable laws or governmental requirements to operate and use the Lab, excluding any licenses, permits and approvals specifically applicable to Baker Hughes' activities, which shall be the responsibility of Baker Hughes.

BJ shall provide Baker Hughes' employees with security access credentials as reasonably required for Baker Hughes' use and/or access of the Shared Lab and the Baker Hughes Lab in connection with this Agreement.

**Lab Staff and Subject Matter Experts**

During the Project Term, each of BJ and Baker Hughes shall furnish its own staff in the Lab in order to work on Projects (respectively, "<u>BJ Lab Staff</u>" and "<u>Baker Hughes Lab Staff</u>" and, collectively, "<u>Lab Staff</u>"). Each party shall be financially responsible for its own Lab Staff. Except for matters, whether independent or joint, requiring less than 30 minutes of assistance per month (subject to the availability of such relevant BJ Lab Staff), which shall be deemed to be non-chargeable, BJ will provide BJ Lab Staff to Baker Hughes upon request, and vice



**Services Agreement**

versa, in exchange for the fees set forth on <u>Exhibit B</u>, subject to the availability of such personnel. Unless otherwise agreed by the parties, no Baker Hughes personnel other than Baker Hughes Lab Staff shall be located in or otherwise have access to the Shared Lab or the Baker Hughes Lab, and BJ shall have the right to enforce facility rules. Neither party shall have Lab Staff in excess of 36 persons occupying the Lab and Lab-related office or Lab-related conference space at any given time. The parties shall develop a protocol for Lab Staff to execute standard intellectual property assignments and confidentiality undertakings.

**Fees**

The fees payable by Baker Hughes for the Shared Lab and the Baker Hughes Lab and Services are set forth on <u>Exhibit B</u> and shall be invoiced in accordance with <u>Exhibit B</u>.

\*       \*       \*



Services Agreement

## EXHIBIT B

### Fees

This <u>Exhibit B</u> forms a part of, and is incorporated into, the Services Agreement (the "<u>Agreement</u>") dated December 1, 2018 by and between BJ Services, LLC ("<u>BJ</u>") and Baker Hughes Oilfield Operations LLC ("<u>Baker Hughes</u>"). Capitalized terms not otherwise defined in this <u>Exhibit B</u> shall have the meanings set forth in the Agreement.

Unless agreed otherwise by the parties, Baker Hughes shall pay BJ the following, non-refundable fees.

**Rental Fees**

1.    **<u>Exclusive Office/Conference Space.</u>**  Office and conference room space of approximately 8,015 square feet located in the Premises, as depicted on **Exhibit F** to the Agreement, which are dedicated to Baker Hughes' exclusive use under this Agreement, at a base rent per square foot of $16 per square foot per annum for a total of $128,240 per annum.

2.    **<u>Shared Lab Space.</u>**  Shared Lab space of 17,504 square feet multiplied by $16 per square foot per annum (totaling $280,064 per annum,) multiplied by 75% (which is the initial Baker Hughes utilization rate), which totals $210,048 base rent chargeable to Baker Hughes for the Shared Lab (based on 75% utilization).

3.    **<u>Exclusive Baker Hughes Lab Space.</u>**  The Baker Hughes Lab (exclusive) space of 7,873 square feet multiplied by $16 per square foot per annum for a total base rent of $125,968 per annum.

4.    **<u>Common Area Space Allocation.</u>**  An allocation of 38.34% of the total common area of the Premises of 39,232 square feet for Baker Hughes' non-exclusive use, being 15,042 square feet at a price per foot of $16 per annum, totaling base rent of $240,672 per annum.  (This amount is fixed for the term and is without regard to utilization of the Shared Lab.)

5.    **<u>Depreciation and Amortization of Existing Shared Lab Equipment.</u>** Depreciation expense of $221,155 per annum for the Shared Lab equipment in place as of the effective date  multiplied by 75% utilization (the initial Baker Hughes utilization rate), totaling $165,866 per annum. (This amount is subject to any change in the utilization rate for the Shared Lab.)

Together, items 1 through 5 above total an equivalent of 44,058 s.f. of space at a base fee of **$870,787**per year payable in monthly installments of **$72,566** on the first day of each calendar month of Term.

**Variable Fees and Expenses**

6.    General expenditures for the Premises/Tomball Campus, excluding expenses specific to the Lab.

      (a)    *General*.  Baker Hughes shall pay as a quarterly fee a percentage of the operating costs of the Premises/Tomball campus. This fee is calculated using Baker Hughes' allocable square footage as described under the Rental Fee section above totaling 44,058 and dividing such square footage by the total useable square footage of the Tomball Campus *i.e.*, 563,564, resulting in 7.82% of the actual costs of operating and maintaining the Tomball Campus being chargeable to Baker Hughes. These expenses include items such as property taxes, repair and maintenance, telephony and telecoms, office supplies, food/vending/kitchen, common area maintenance, gas, electricity, water, sewer, security, landscaping, janitorial services, waste removal, applicable property and casualty insurance premiums and other utilities and services for the Tomball Campus, excluding the exclusions below.

      (b)    *Exclusions*.  Excluded from 4(a) above are salaries and benefits of BJ personnel, premiums for insurance (other than property and casualty insurance) and capital expenditures (other than Shared Lab-specific



Services Agreement

capital expenditures (see Section 5(a), below), and other than capital expenditures requested by Baker Hughes), all of which shall be for the sole account of BJ.

5.      *Expenses Specific to the Lab and only the Lab.*  Baker Hughes shall pay the following quarterly overhead allocation fees (collectively, the "Shared Lab Quarterly Overhead Allocation"):

  (a)      *Lab Overhead.* Baker Hughes shall pay a quarterly fee representing Baker Hughes' allocable percentage (described in Section 5(c)) of Shared Lab operating expenses, repair and maintenance of Shared Lab equipment/facilities, Shared Lab waste permitting and removal, and other costs associated solely with Shared Lab operations.  In addition, for any new expenditures for lab equipment for the Shared Lab only, such expenditures shall be allocated using the Shared Lab Quarterly Overhead Allocation in effect at the time the expenditure was approved and paid back quarterly for operating expenses and over an 18-month period for capital expenditures.  Except in an approved budget, any Shared Lab capital expenditures in excess of $50,000 for any item or group of related items shall require the approval of the Steering Committee.  Other than non-waste permitting, each party shall be responsible for any new expenditures relating to their respective exclusive labs (i.e., the BJ Lab and the Baker Hughes Lab).  For the avoidance of doubt, any expenditures or overhead specifically for the Baker Hughes Lab and other Baker Hughes dedicated areas, excluding ordinary utilities and common areas services as otherwise provided in this Agreement, shall be the responsibility of Baker Hughes and shall be paid directly by Baker Hughes unless otherwise agreed by BJ Services to be paid by BJ Services and subsequently reimbursed by Baker Hughes.

  (b)      *Lab Staff.* Each party shall maintain its own staff.  Lab Staff shall be available to work on Joint Projects and, subject to availability, the other party's independent projects for up to 30 minutes per month per staff member without charge or as otherwise agreed by the Steering Committee.  To the extent one party utilizes Lab Staff of the other party in excess of such amount, the parties shall cooperate to have the employer of such staff reimbursed for any overage based on hourly rates determined by the Steering Committee.  Such amounts which total less than $5,000 per month in the aggregate shall be considered *de minimis* and non-chargeable.

  (c) The Shared Lab Quarterly Overhead Allocation percentage shall be determined by the Steering Committee taking into account the relative size of the parties' respective Lab Staff and the parties' respective utilization of the Shared Lab and Shared Lab-related equipment, machines, tools, materials and supplies.  An example is set forth on Exhibit D.  The initial allocation shall be 75% to Baker Hughes and 25% to BJ.  In consideration of BJ making the Lab available to Baker Hughes, it is agreed that Baker Hughes' percentage of the Lab Quarterly Overhead Allocation shall not be less than 40% during any quarter.

**Payment Process**

 BJ shall submit to Baker Hughes an itemized invoice for the applicable amounts due hereunder.  Such invoices shall be submitted on a monthly basis and a quarterly basis in accordance with respect to the applicable fees periods set forth above.  Payment shall be due 30 days from date of Baker Hughes' receipt of an invoice, and unless otherwise instructed Baker Hughes shall remit such payment via wire transfer pursuant to instructions provided by BJ.

     \*   \*   \*



**Services Agreement**

## EXHIBIT C

### Form of Joint Project SOW

*Joint Project SOW Number* ___

This Joint Project Statement of Work (this "Joint Project SOW") defines the scope of work and respective rights of the parties as agreed between BJ Services, LLC ("BJ") and Baker Hughes Oilfield Operations LLC ("Baker Hughes") to be completed under the Services Agreement effective December 1, 2018 by and between BJ and Baker Hughes (the "Agreement"). This Joint Project SOW forms a part of, and is incorporated into, the Agreement. Capitalized terms not otherwise defined in this Joint Project SOW shall have the meanings set forth in the Agreement. If any provision of this Joint Project SOW (including with respect to any rights or obligations of the parties) conflicts with the terms of the Agreement, the terms of this Joint Project SOW will control.

Joint Project Description:

Project Schedule:

Project Deliverables:

Lab Cost Allocation:  Baker Hughes: __%   BJ: __%.

Background IP To Be Made Available For Joint Project:

Ownership of Foreground IP:

Rights to Baker Hughes Foreground IP:

Rights to BJ Foreground IP:

Patent Prosecution Procedures:

Special Tax Considerations:

\*   \*   \*

The parties have executed and delivered this Joint Project SOW as of the date first above set forth.

### BJ SERVICES, LLC

By: _____

Name: _____

Title: _____

### BAKER HUGHES OILFIELD OPERATIONS LLC

By: _____

Name: _____

Title: _____

29839566.11



**Services Agreement**

**EXHIBIT D**

**Shared Lab Quarterly Overhead Allocation**

*(Illustrative Example)*

- **Utilization is based on following quotient:  BH Laboratory and Technical Personnel in TEDC / Total Lab Personnel during the preceding quarter.  Utilization shall be adjusted every six (6) months.**



**Services Agreement**

## EXHIBIT E

**Lab Rules and Procedures [to be supplemented as needed]**

This <u>Exhibit E</u> forms a part of, and is incorporated into, the Services Agreement (the "<u>Agreement</u>") dated December 1, 2018 by and between BJ Services, LLC ("<u>BJ</u>") and Baker Hughes Oilfield Operations LLC ("<u>Baker Hughes</u>"). Capitalized terms not otherwise defined in this <u>Exhibit B</u> shall have the meanings set forth in the Agreement.

The following Lab rules and procedures are applicable to all Lab Staff, and each of BJ and Baker Hughes shall ensure that their respective Lab Staff are made aware of, and adhere to, such rules and procedures.

- All Lab Staff shall behave as one team and, in so doing, shall be cooperative and courteous during all Lab activities.

- All Lab Staff attire and appearance should be maintained at a common standard.

- All Lab Staff shall wear non-marked lab coats provided by BJ at all times while in the Lab. Such lab coats shall have one designated color for BJ and one designated color for Baker Hughes.

- Lab Staff shall agree to, and assign, primary day-to-day responsibility for specific equipment, machines, tools and materials to ensure proper and timely care and maintenance.

- Lab Staff shall be located as close as reasonably practicable to the specific areas of the Lab in which the majority of such Lab Staff's work is conducted.

In the event of any unsafe or unacceptable behavior, BJ retains all right to remove or bar access of any personnel from the Tomball Campus.

\*   \*   \*



**Services Agreement**

<b>Exhibit F</b>

The Premises



**LEGEND (114,905 SF**
**TOTAL BLDG AREA)**

- BJ SERVICES OFFICE (36,388 sf)
- BAKER HUGHES OFFICE (6,015 sf)
- COMMON SPACE (39,232 sf)
- SHARED LABS (17,504 sf)
- BJ SERVICES LABS (5,893 sf)
- BAKER HUGHES LABS (7,873 SF)
- EXCLUDED FROM AREA CALCULATIONS

## Space Allocations Level 1







**LEGEND (114,905 SF TOTAL BLDG AREA)**

- BJ SERVICES OFFICE (36,388 sf)
- BAKER HUGHES OFFICE (8,015 sf)
- COMMON SPACE (39,232 sf)
- SHARED LABS (17,504 sf)
- BJ SERVICES LABS (5,893 sf)
- BAKER HUGHES LABS (7,873 SF)
- EXCLUDED FROM AREA CALCULATIONS

**Space Allocations Level 2**





LEGEND (114,905 SF
TOTAL BLDG AREA)

BJ SERVICES OFFICE
(36,388 sf)

BAKER HUGHES OFFICE
(8,015 sf)

COMMON SPACE
(39,232 sf)

SHARED LABS
(17,504 sf)

BJ SERVICES LABS
(5,893 sf)

BAKER HUGHES LABS
(7,873 SF)

EXCLUDED FROM AREA
CALCULATIONS

## Space Allocations Level 3





## Exhibit 2

**Asset Purchase Agreement #2**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>") is made and entered into this 20th day of August, 2020 (the "<u>Effective Date</u>") by and among **BJ Services, LLC**, a Delaware limited liability company ("<u>Seller</u>"), and Baker Hughes Oilfield Operations LLC, a California limited liability company ("<u>Purchaser</u>" and together with Sellers, collectively, the "<u>Parties</u>").

### WITNESSETH:

**WHEREAS** Seller and certain of its Affiliates are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "<u>Bankruptcy Code</u>") and, on July 20, 2020 filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>"), commencing the jointly administered bankruptcy cases pending as *In re BJ Services, LLC, et al* Case No. 20-33627 (each, a "<u>Bankruptcy Case</u>" and collectively, the "<u>Bankruptcy Cases</u>"); and

**WHEREAS**, Seller desires to sell and Purchaser desires to purchase from Seller those certain assets of Seller as more particularly described herein, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365, 1123, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all in accordance with and subject to the terms and conditions of this Agreement and subject to entry of the Sale Order.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants, representations and warranties herein contained, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1    "<u>Affiliates</u>" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

Section 1.2    "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of the Purchased Assets or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise); <u>provided</u>, <u>however</u>, that no such transaction will be considered to be an "Alternative Transaction" if such transaction would not prevent the Closing from occurring in accordance with the terms of this Agreement; and <u>provided</u> <u>further</u>, that the foregoing shall not include sales of inventory, equipment sales or other dispositions of immaterial or obsolete assets and licenses of intellectual property rights in the ordinary course of business.

Section 1.3     "Bidding Procedures" means the Bidding Procedures for the Sale of the Debtors' Cementing Business filed in the Bankruptcy Cases.

Section 1.4     "Bidding Procedures Order" means an order of the Bankruptcy Court approving the Bidding Procedures.

Section 1.5     "Governmental Authority" means any court, administrative agency or any (i) national, federal, provincial, state, regional, municipal, local or other government, governmental or public department, officials, ministers, Crown corporations, central bank, court, tribunal or dispute settlement panel, arbitral body, commission, board, bureau or agency, domestic or foreign; (ii) subdivision, agency, commission, board or authority of any of the foregoing; or (iii) quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing.

Section 1.6     "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

Section 1.7     "Permitted Liens" means (a) Liens for taxes that are not yet due and payable or the nonpayment of which is permitted or required by the Bankruptcy Code, (b) Liens imposed by applicable Law and incurred in the ordinary course of business for obligations not yet due and payable, or the nonpayment of which is permitted or required by the Bankruptcy Code, to landlords, carriers, warehousemen, laborers, repairmen, materialmen and the like, (c) non-exclusive licenses to proprietary rights granted to customers and suppliers in the ordinary course of business (d) any Liens that will be removed or released by operation of the Sale Order and (e) minor imperfections of title and encumbrances disclosed in writing and reasonably acceptable to Purchaser, if any, that are *de minimis* and do not impair the value or interfere with the present or continued use of such property or asset.

Section 1.8     "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Authority or other entity or group.

Section 1.9     "Qualified Bid" has the meaning set forth in the Bidding Procedures.

Section 1.10    "Sale Order" shall be an order of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Seller, approving the sale of the Purchased Assets to Purchaser free and clear of all Liens other than Permitted Liens.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

Section 2.1     Purchase of Assets.  On and subject to the terms and conditions of this Agreement, the Sale Order, at the Closing Seller will sell, transfer, convey, assign and deliver to Purchaser, and Purchaser will purchase and acquire from Seller, free and clear of all liens,

mortgages, pledges, security interests, charges, claims, options or other encumbrances (collectively, "Liens") other than Permitted Liens, all of Seller's right, title and interest, as of the Closing, in and to the Purchased Assets.  For purposes hereof, the "Purchased Assets" shall mean the cementing units and batch mixers listed on Schedule 1.

The Purchased Assets do not include, and Seller shall retain, all of Seller's assets not specifically identified in this Section 2.1 as being Purchased Assets.

Section 2.2      Assumption of Liabilities.  On and subject to the terms and conditions of this Agreement and the Sale Order, as of and after the Closing, Purchaser shall assume, and Seller shall convey, transfer and assign to Purchaser, all Liabilities relating to the Purchased Assets that arise and accrue after the Closing, relate exclusively to periods following the Closing and are by their terms to be observed, paid, discharged, and performed following the Closing (in each case, except as otherwise provided herein, not resulting in whole or in part from, arising out of, relating to, in the nature of, or caused by any pre-Closing breach, violation, breach of warranty, tort, strict liability, infringement or breach or violation of Law) (the "Assumed Liabilities").  Except as expressly provided pursuant to the foregoing, Purchaser shall not assume or be liable for any Liabilities of Seller.  For purposes hereof, "Liability" means any debt, damage, claim, liability, obligation, loss (whether lost business opportunity or measured as a multiple of earnings, book value, lost profits, diminution in value, revenues, cash flow, or otherwise), fines, costs, expenses, charges, interest, penalties, or commitment of any nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, or due or to become due, or otherwise).

Section 2.3      Consideration.    In consideration of the sale, transfer, conveyance, assignment and delivery of the Purchased Assets by Seller to Purchaser, Purchaser shall pay to Seller a total purchase price in the total amount of One Million Two Hundred Thousand Dollars (USD $1,200,000) (the "Purchase Price").  An amount equal to (x) the Purchase Price minus, (y) the Deposit, shall be paid by Purchaser to Seller by wire transfer of immediately available funds to one or more bank accounts designated by Seller at the Closing (the "Closing Date Payment").

Section 2.4      Deposit.

(a)      On or prior to the date of the Auction, Purchaser shall make an earnest money deposit with a third party designated by Seller prior to the date hereof ("Escrow Agent") in the amount of five percent (5%) of the Purchase Price (the "Deposit"), by wire transfer of immediately available funds for deposit into an escrow account designated by Seller prior to the date hereof (the "Deposit Escrow Account").  The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)      If this Agreement has been terminated by Seller pursuant to Section 7.1(c)(i) or Section 7.1(c)(ii) (or by Purchaser pursuant to Section 7.1(b)(ii) in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 7.1(c)(i) or Section 7.1(c)(ii)), then Seller shall retain the Deposit together with all received investment income, if any.

Page 3

(c)     If this Agreement has been terminated by Seller, on the one hand, or Purchaser on the other hand, in each case other than as contemplated by Section 2.4(b), if Purchaser is not a Successful Bidder or Backup Bidder or if Seller consummates any transaction in respect of the Purchased Assets with a Person other than Purchaser, then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five (5) business days after such termination, determination or consummation, respectively.

(d)     The Parties agree that Seller's right to retain the Deposit, as set forth in Section 2.4(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.  Notwithstanding anything in this Agreement to the contrary, (i) Seller's right to retain the Deposit in accordance with the terms of hereof shall be the sole and exclusive remedy of Seller and its Affiliates against Purchaser or any of its Affiliates or any of their respective members, partners, officers, managers or representatives for any and all losses that may be suffered based upon, resulting from or arising out of Purchaser's failure to consummate the transactions contemplated by this Agreement, and (ii) upon Seller's retention of the Deposit, none of Purchaser or any of its Affiliates or any of their respective members, partners, officers, managers or representatives shall have any further liability or obligation relating to or arising out of the circumstances giving rise to Seller's right to retain the Deposit or otherwise under this Agreement or any other document contemplated hereby.  If Seller elects to retain the Deposit, then Seller shall not seek any (x) equitable relief or equitable remedies of any kind whatsoever or (y) money damages or any other recovery, judgment, or damages of any kind, including consequential, indirect, special or punitive damages, in each case, relating to or arising out of Purchaser's failure to consummate the transactions contemplated by this Agreement or any other document contemplated hereby.  Other than Seller's right to retain the Deposit, Seller's sole and exclusive remedy with respect to any matters under this Agreement shall be to seek specific performance in accordance with Section 7.13.

(e)     If the Closing occurs, the Deposit shall be transferred to Seller.

## ARTICLE III
## CLOSING

Section 3.1     Closing.  The closing of the transactions contemplated by this Agreement ("Closing") shall occur within two (2) days after the conditions precedent set forth in Article VI (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived ("Closing Date") or at such other time that is mutually agreeable to Seller and Purchaser, by a mutual exchange of electronic documents.  Seller and Purchaser agree that Closing documents that do not require originally signed copies may be signed and exchanged by electronic mail.

Section 3.2     Closing Deliveries by Seller.  At or prior to the Closing, Seller shall deliver to Purchaser:

(a)     assignment agreements necessary to transfer the Purchased Assets and, as applicable, to record their assignment with appropriate government agencies, in form and substance reasonably acceptable to Purchaser and Seller (the "Assignment Agreements") duly executed by Seller;

(b)     certificates of title along with necessary instruments of transfer to all vehicles and other rolling stock and other certificated assets included in the Purchased Assets; provided, that if Seller is unable to deliver any certificate of title, certificate or ancillary documents, or if any corrections are needed with respect to any such certificates, certificates of title or ancillary documents, Seller shall use commercially reasonable efforts, subsequent to the Closing, to provide Purchaser with replacement certificates, certificates of title or ancillary documents or otherwise correct such statements of title or ancillary documents;

(c)     custody of the Purchased Assets, including all keys and other items necessary to operate the Purchased Assets; provided, however, that any costs related to providing Purchaser with such custody shall be borne by Purchaser;

(d)     all maintenance records associated with the Purchased Assets in Seller's possession; provided however that Seller shall be entitled to retain copies;

(e)     a certificate of non-foreign status executed by Seller that meets the requirements set forth in U.S. Treasury Regulations Section 1.1445-2(b)(2); and

(f)     a joint written instruction, duly executed by Seller, instructing the Escrow Agent to release to Seller by wire transfer of immediately available funds, the Deposit.

Section 3.3     Closing Deliveries by Purchaser.  At or prior to the Closing, Purchaser shall deliver to Seller:

(a)     the Closing Date Payment;

(b)     the Assignment Agreements duly executed by Purchaser; and

(c)     a joint written instruction, duly executed by Purchaser, instructing the Escrow Agent to release to Seller by wire transfer of immediately available funds, the Deposit.

## ARTICLE IV
## ADDITIONAL AGREEMENTS

Section 4.1     Bidding Procedures.  The bidding procedures to be utilized with respect to this Agreement shall be those approved in the *Bidding Procedures Order*.  Purchaser agrees and acknowledges that, notwithstanding anything in this Agreement to the contrary, Seller, including through its Affiliates, advisors and representatives, are and may continue soliciting inquiries, proposals, or offers from third parties for the Purchased Assets in connection with any Alternative Transaction, including through an investment banker or other means.  Nothing in this Agreement shall prevent Seller from modifying the bidding procedures as necessary or appropriate to maximize value for Seller's respective estates in accordance with Seller's fiduciary obligations. For purposes of clarity, Purchaser agrees and acknowledges that, notwithstanding anything in this

Page 5

Agreement to the contrary, Seller, including through its Affiliates, advisors and representatives, are and may continue soliciting inquiries, proposals, or offers from third parties for the Purchased Assets in connection with any Alternative Transaction.

Section 4.2    Auction.  Subject to the terms of the *Bidding Procedures Order*, on or prior to August 19, 2020 (or such later date as agreed in writing by all of the Parties hereto, which may be by email correspondence among counsel), Seller shall commence the auction (an "Auction") contemplated by the Bidding Procedures, if any Qualified Bid is submitted prior to the Bid Deadline. For the avoidance of doubt, Seller may conduct an auction process utilizing dates consistent with this Agreement even if approval of such process is not required by the Bankruptcy Court. Subject to the terms of the *Bidding Procedures Order*, on or prior to August 17, 2020 (or such later date as agreed in writing by all of the Parties hereto, which may be by email correspondence among counsel) (the "Bid Deadline"), any and all Qualified Bids shall have been submitted pursuant to the *Bidding Procedures Order*.

Section 4.3    Sale Hearing.   The *Bidding Procedures Order* shall contemplate the occurrence of a Sale Hearing (as defined therein) on or prior to August 21, 2020.

Section 4.4    Operations Pending Closing.   From the date of this Agreement until the earlier of the termination of this Agreement or the Closing, and taking into account the commencement and pendency of the Bankruptcy Cases and, except with respect to Section 4.4(a), Seller's liquidity and financing limitations associated therewith, except (x) as required by applicable Law, (y) as otherwise expressly required by terms of this Agreement or (z) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), Seller shall operate the Purchased Assets in the ordinary course of business.  Without limiting the generality of or any exception to the foregoing, Seller shall, from the date of this Agreement through the Closing:

(a)    operate the Purchased Assets consistent with their operation immediately prior to the date of this Agreement; and

(b)    maintain the Purchased Assets in good or their current operating condition, ordinary wear and tear excepted, in the ordinary course of business.

The Parties acknowledge and agree that Seller shall be subject to any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code.

Section 4.5    Bankruptcy Actions.

(a)    Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order or any other order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and advisors or representatives of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser is a "good faith" purchaser under section

363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(b)     Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by any of the other Parties or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement, the Sale Order, and (ii) keep the other Parties reasonably apprised of the status of material matters related thereto, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court or any third party and/or any Governmental Authority with respect to the transactions contemplated by this Agreement, the Sale Order.

(c)     The Seller's obligations under this Agreement and in connection with the transactions contemplated hereby and thereby are subject to entry of and, to the extent entered, the Sale Order.  Nothing in this Agreement shall require Seller to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

(d)     Seller and Purchaser acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher and better bids, the *Bidding Procedures Order* and Bankruptcy Court approval.  Seller and Purchaser acknowledge that Seller must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best transaction in connection with the Purchased Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, determining in Seller's business judgment to conduct an Auction.  The bidding procedures to be employed with respect to this Agreement and any Auction shall be those approved in the *Bidding Procedures Order*.

(e)     Notwithstanding any other provision of this Agreement to the contrary, Purchaser acknowledges that Seller and its Affiliates and advisors or representatives are and may continue soliciting inquiries, proposals, or offers for the Purchased Assets in connection with any Alternative Transaction.

(f)     If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "Backup Bidder") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated. If the Successful Bidder fails to consummate the applicable transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Seller may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Section 5.1    Representations and Warranties of Seller.  Seller represents and warrants to Purchaser that the following statements are true and correct as of the date hereof and as of the Closing Date:

(a)    Organization.  Such Seller is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, and is qualified to do business in each other jurisdiction where such Seller's business related to the Purchased Assets requires it to be so qualified.  Such Seller has all requisite power and authority to own, lease and operate its properties and, taking into account the commencement and pendency of the Bankruptcy Cases and Seller's liquidity and financing limitations associated therewith, to carry on its applicable portion of the operations associated with the Purchased Assets.

(b)    Authorization.  Subject to requisite Bankruptcy Court approval, such Seller has all requisite corporate power and authority to execute and deliver this Agreement and any documents and agreements to be executed and delivered in connection herewith (the "Ancillary Deliverables") to which such Seller is a party, to perform its obligations hereunder and thereunder, and to carry on the operations of the Purchased Assets as it is now being conducted.  Subject to requisite Bankruptcy Court approval, and assuming this Agreement is a valid and binding obligation of Purchaser, the execution and delivery of this Agreement and the Ancillary Deliverables and the consummation of the transactions contemplated hereby or thereby by such Seller have been duly authorized by all necessary action on the part of such Seller, and no further action is necessary for such Seller to execute and deliver this Agreement and the Ancillary Deliverables to which such Seller is a party and to perform the obligations of such Seller hereunder and thereunder.  This Agreement and the Ancillary Deliverables to which such Seller is a party have been duly executed and delivered by such Seller and constitute the legal, valid and binding obligations of such Seller enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application referring to or affecting the enforcement of creditors' rights, or by general equitable principles.

(c)    No Violation; Consents.  Assuming that requisite Bankruptcy Court approval is obtained (collectively, the "Requisite Approval"), the execution, delivery and performance of this Agreement and the Ancillary Deliverables by such Seller and the consummation of the transactions contemplated thereby will not (i) violate any provision of the certificate of formation, articles of incorporation, bylaws, operating agreement or other analogous charters or governing documents of such Seller, (ii) violate any Law or order of any Governmental Authority by which such Seller or any of its properties or assets are bound or (iii) result in a violation or breach of, or constitute a default under, or result in the creation of any Lien (other than Permitted Liens) upon, or create any rights of termination, cancellation or acceleration in any Person with respect to any contract to which such Seller is a party or any permit of such Seller, or any other contract, indenture, mortgage or instrument to which such Seller is a party or by which any of its properties or assets are bound. No order or filing, including without limitation any consent, approval or other authorization of any Governmental Authority or under any contract to

which such Seller is a party or by which its respective portion of the Purchased Assets are bound, is required as a result of or in connection with the execution or delivery of this Agreement and the Ancillary Deliverables or the consummation by such Seller of the transactions contemplated hereby except the Requisite Approvals.

(d)     Title; Condition of Assets.  Except as expressly disclosed to the Purchaser in writing, Seller owns all of the Purchased Assets free and clear of any Lien except for Permitted Liens.

Section 5.2     Representations and Warranties of Purchaser.  Purchaser represents and warrants to Seller that the following statements are true and correct as of the date hereof and as of the Closing Date:

(a)     Organization.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California and has full limited liability company power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

(b)     Power and Authority of Purchaser; Authorization.  Purchaser has all requisite limited liability company power and authority to execute and deliver this Agreement and the Ancillary Deliverables to which it is a party, and to perform Purchaser's obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Ancillary Deliverables to which Purchaser is a party and the consummation of the transactions contemplated hereby or thereby have been duly authorized by all necessary limited liability company action on the part of Purchaser, and no further action is necessary for Purchaser to execute and deliver this Agreement and Purchaser's Ancillary Deliverables and to perform the obligations of Purchaser hereunder and thereunder.  This Agreement and the Ancillary Deliverables to which Purchaser is a party have been and will be duly executed and delivered by Purchaser and constitute the legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application referring to or affecting the enforcement of creditors' rights, or by general equitable principles.

(c)     Financing.  Purchaser (i) has as of the date hereof sufficient funds to deliver the Deposit and access to committed capital subscriptions to pay the remainder of the Purchase Price at the Closing and (ii) will have at the Closing sufficient funds in an aggregate amount necessary to pay the Purchase Price and to consummate all of the other transactions contemplated by this Agreement.

(d)     No Outside Reliance.  Notwithstanding anything in this Agreement to the contrary, Purchaser acknowledges and agrees that the representations and warranties made by Seller in Section 5.1 (as qualified therein) (the "Express Representations") are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser and any of its Affiliates may rely in connection with the transactions contemplated by this Agreement.  Purchaser acknowledges and agrees that (other than solely to the extent expressly set forth in the Express Representations) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the

historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, or prospects of the Purchased Assets or Seller, or the quality, quantity or condition of the Purchased Assets, in each case, are specifically disclaimed by Seller, and that neither Purchaser nor any of its Affiliates has relied on any such representations, warranties or statements.  Purchaser acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the Purchased Assets, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the results of its or its Affiliates' own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or advisors or representatives, in each case, whether written or oral, made or provided by Seller or any of its Affiliates, advisors or representatives, or any failure of any of the foregoing to disclose information, except to the extent expressly set forth in the Express Representations.

**ARTICLE VI**
**CONDITIONS PRECEDENT**

Section 6.1    Conditions to Purchaser's Obligations.  Purchaser's obligation to effect the Closing shall be subject to the satisfaction or Purchaser's waiver of the following conditions:

(a)     all representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct in all material respects as of such date);

(b)     Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by such Seller at or prior to the Closing;

(c)     the Bankruptcy Court shall have entered the Sale Order, and the effectiveness of the Sale Order shall not be subject to any stay;

(d)     there shall be no order from any Governmental Authority in existence that prohibits or restricts the sale of the Purchased Assets to Purchaser; and

(e)     Seller shall have delivered or caused to be delivered all of the items set forth in Section 3.2.

Section 6.2    Conditions to Seller's Obligations.  Seller's obligation to effect the Closing shall be subject to the satisfaction or Seller's waiver of the following conditions:

(a)     all representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct in all material respects as of such date);

(b)      there shall be no order from any Governmental Authority in existence that prohibits or restricts the sale of the Purchased Assets to Purchaser;

(c)      Purchaser shall have delivered or caused to be delivered all of the items set forth in Section 3.3; and

(d)      Purchaser shall have paid for or reimbursed Seller for any costs associated with Seller's obligations under Section 3.2(c).

**ARTICLE VII**
**MISCELLANEOUS**

Section 7.1    Termination.   This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Seller and Purchaser;

(b)      by Purchaser by written notice to Seller if:

(i)      Purchaser is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VI and such breach, inaccuracy or failure has not been cured by the applicable Seller within thirty (30) days of the applicable Seller's receipt of written notice of such breach from Purchaser;

(ii)      the Closing shall not have occurred on or before September 4, 2020 (or such other date as is mutually agreed to by the Parties in writing) (the "Outside Date"), unless such failure shall be due to the failure of Purchaser to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iii)      the Sale Order has not been entered by the Bankruptcy Court by August 21, 2020; or

(iv)      if Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; provided that Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 7.1(b)(iv) until after the thirtieth (30th) day following entry by the Bankruptcy Court of an order authorizing and approving an Alternative Transaction with the Successful Bidder at the Auction and, notwithstanding Purchaser not having been the Successful Bidder or the Backup Bidder at the Auction, until such time (if any) as Purchaser terminates this Agreement pursuant to this Section 7.1(b)(iv), the obligations of Purchaser to consummate the transactions contemplated by this Agreement shall remain unaffected by Purchaser's right to terminate this Agreement pursuant to this Section 7.1(b)(iv);

(c)      by Seller by written notice to Purchaser if:

(i)      no Seller is then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Purchaser pursuant to this Agreement that would give rise to the failure of any of the conditions specified in <u>Article VI</u> and such breach, inaccuracy or failure has not been cured by Purchaser within thirty (30) days of Purchaser's receipt of written notice of such breach from Seller;

(ii)      if all of the conditions set forth in <u>Section 6.1</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by <u>Section 3.1</u>;

(iii)      the Closing shall not have occurred on or before the Outside Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iv)      if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's fiduciary duties;

(v)      if Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder;

(vi)      the Sale Order has not been entered by the Bankruptcy Court by August 21, 2020; or

(d)      by Seller or Purchaser in the event that (i) there shall be any applicable law that makes the consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued any order enjoining the transactions contemplated by this Agreement, and such order shall have become final and non-appealable.

In the event of termination of this Agreement pursuant to this <u>Section 7.1</u>, this Agreement shall forthwith become void and there shall be no Liability on the part of any Party or any of its partners, officers, directors or shareholders; <u>provided</u> that <u>Section 2.4</u>, this last sentence of <u>Section 7.1</u>, and <u>Section 7.7</u> through <u>Section 7.14</u> shall survive any such termination.

Section 7.2      <u>Reasonable Efforts; Cooperation</u>.

(a)      Subject to the other terms of this Agreement, each Party shall, and shall cause its advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable law to cause the transactions contemplated herein to be effected as soon as practicable (subject to the following sub-clause (b)) in accordance with the terms hereof and to cooperate with each other Party and its advisors in connection with any step required to be taken

as a part of its obligations hereunder.  The "reasonable best efforts" of Seller will not require Seller or any of its subsidiaries, Affiliates or advisors to expend more than a *de minimis* amount of money to remedy any breach of any representation or warranty to commence any action, to waive or surrender any right, to modify any contract or to waive or forego any right, remedy or condition hereunder.

(b)     The obligations of Seller pursuant to this Agreement, including this <u>Section 7.2</u>, shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case, and including entry of the *Bidding Procedures Order* (if applicable) and the Sale Order), any debtor-in-possession financing or order authorizing the use of cash collateral of Seller (including any budgets in connection with such financing or use of cash collateral), and Seller's obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (including the *Bidding Procedures Order* (if applicable)) and Seller's duty to seek and obtain the highest or otherwise best transaction for the Purchased Assets as required by the Bankruptcy Code.

Section 7.3    <u>Necessary Consents</u>.    Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not affect the assignment or transfer of any Purchased Asset if an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "<u>Necessary Consent</u>"), would constitute a breach thereof or of any Law or order or in any way adversely affect the rights of Purchaser thereunder. In such event, Seller and Purchaser will (a) use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser and (b), in the event a Necessary Consent is not obtained, cooperate in good faith in any lawful and commercially reasonable arrangement, including subcontracting, licensing, or sublicensing to Purchaser any or all of such Seller's rights and obligations with respect to any such Purchased Asset under which (i) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related tax costs imposed on such Seller or its Affiliates) and (ii) Purchaser shall assume any related burden and obligation (including performance) with respect to such Purchased Asset. Notwithstanding the foregoing, neither Seller nor Purchaser shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.

Section 7.4    <u>Further Assurances.</u>  Each party agrees, without further consideration, to cooperate and to promptly execute such other and further documents, instruments and papers after the Closing Date which are required to fully transfer the Purchased Assets to Purchaser.  To the extent that either Party discovers after the Closing Date that (i) any rights, interests or assets intended to be transferred and conveyed to Purchaser through this Agreement were inadvertently not conveyed to Purchaser, or (ii) any rights, interests or assets not intended to be transferred and conveyed to Purchaser through this Agreement were inadvertently conveyed to Purchaser, then each Party shall cooperate and take, at such Party's sole cost and expense, such actions as are necessary to effectuate the transfer and conveyance, or as the case may be, the retransfer to the relevant other Party, of such rights, interests and assets without payment of further consideration.

Section 7.5    Transfer Taxes.  Any transfer, documentary, sales, use, stamp, registration and other similar taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the transfer of the Purchased Assets to Purchaser pursuant to this Agreement and not exempted under the Sale Order, by Section 1146(a) of the Bankruptcy Code or applicable state or municipal law ("Transfer Taxes") shall be borne by Purchaser.  Purchaser will, at its own expense, file all necessary tax returns and other documentation with respect to all Transfer Taxes, and, if required by applicable law, the Parties will, and will cause their Affiliates to, join in the execution of any such tax returns and other documentation.

Section 7.6    Allocation of Purchase Price.  Purchaser and Seller shall use commercially reasonable efforts to agree to an allocation of the consideration (and other items treated as consideration for federal income tax purposes) among the Purchased Assets in accordance with Code §1060 and the regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate) (the "Tax Allocation") within 30 days after the Closing Date. If Seller and Purchaser reach an agreement with respect to the Tax Allocation pursuant to the foregoing sentence, Seller and Purchaser each agree to report, and to cause their respective Affiliates to report, the U.S. federal, state and local income and other tax consequences of the transactions contemplated herein, and in particular to report the information required by Code §1060(b), and to jointly prepare Internal Revenue Service Form 8594 (Asset Acquisition Statement under Section 1060) in a manner consistent with the Tax Allocation, as may be revised to take into account subsequent adjustments to the Purchase Price, and shall not take any position for U.S. federal, state or local income tax purposes inconsistent therewith upon examination of any tax return, in any refund claim, in any tax litigation, investigation or otherwise, unless required to do so by a "determination" (as defined in Code §1313(a)(1)), or with such other Party's prior consent; provided, however, that nothing contained herein shall prevent Purchaser or Seller from settling any proposed deficiency or adjustment by any taxing authority based upon or arising out of the Tax Allocation, and neither Purchaser nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any taxing authority challenging the Tax Allocation.  If Seller and Purchaser do not reach an agreement with respect to the Tax Allocation under this Section 7.6, Seller and Purchaser shall be free to file their own asset allocation statements and shall not be subject to the reporting requirements of this Section 7.6. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 7.6 shall survive the Closing without limitation.

Section 7.7    Notices.  All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been given on the date of delivery in person or by facsimile (receipt confirmed) or of deposit in the United States mail, postage prepaid, if sent by registered or certified mail, return receipt requested, addressed as follows:

| If to Purchaser: | If to Seller: |
|---|---|
| Baker Hughes Oilfield Operations LLC | BJ Services, LLC |
| 17021 Aldine Westfield Road | 11211 FM 2920 Rd. |
| Houston, Texas 77073 | Tomball, Texas 77375 |
| Attn: Kristin McLaurin | |

Page 14

Email: kristin.mclaurin@bakerhughes.com

with copy to:

Foley & Lardner LLP
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Attn: Harold L. Kaplan
E-mail: hkaplan@foley.com

Attn:  John R. Bakht, General Counsel
Email: john.bakht@bjservices.com

with copy to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:  Joshua A. Sussberg
          Christopher T. Greco
E-mail: joshua.sussberg@kirkland.com
          cgreco@kirkland.com

Any Party may change its address for receipt of notices and other communications hereunder by giving appropriate written notice to the other Parties in accordance with the provisions of this Section 7.7.

Section 7.8    Governing Law; Exclusive Venue.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to its conflict of laws principles.  Subject to the foregoing, the Parties hereby agree that any litigation arising hereunder shall be filed in and resolved exclusively in the Bankruptcy Court or, if the Bankruptcy Court is unwilling or unable to hear such litigation, in the federal or state courts located in Harris County, Texas, United States of America.  Each Party hereby irrevocably consents to the personal jurisdiction of such courts and agrees that venue shall be exclusive with such courts.

Section 7.9    Amendment and Waiver.  This Agreement may be amended or modified only by written instrument executed by all of the Parties.  A waiver of any term or condition of this Agreement shall only be effective if in writing.  No waiver by any Party of any breach of any of the covenants to be performed by any other Party shall be construed as a waiver of any subsequent breach of the same term or condition, or a waiver of any other term or condition of this Agreement.

Section 7.10    Assignment.  No Party shall assign this Agreement, or any right or duty hereunder, voluntarily or involuntarily, by operation of law or otherwise, without the prior written consent of the other Parties (which consent shall not be unreasonably withheld, delayed or conditioned).

Section 7.11    AS IS Transaction.  UPON CLOSING, IT IS UNDERSTOOD THAT, EXCEPT WITH RESPECT TO THE EXPRESS REPRESENTATIONS, PURCHASER HAS ACCEPTED THE PURCHASED ASSETS IN THEIR "AS IS" CONDITION.  EXCEPT AS EXPRESSLY SET FORTH HEREIN, NO WARRANTY, EITHER EXPRESS OR IMPLIED, AND NO REPRESENTATION AS TO THE CONDITION OF SAID PURCHASED ASSETS, THEIR FITNESS FOR ANY PARTICULAR USE OR MERCHANTABILITY, HAS BEEN GIVEN OR IS BINDING UPON SELLER, ALL OF WHICH SUCH IMPLIED WARRANTIES ARE DISCLAIMED BY PURCHASER.  Purchaser acknowledges and agrees that it will, and it will cause its Affiliates to, not assert, institute, or maintain any proceeding, action or lawsuit that makes any claim contrary to this Section 7.11 and Section 5.2(d), including any such proceeding,

action or lawsuit with respect to any information, statements, disclosures, or materials, in each case whether written or oral, provided to Purchaser or its Affiliates or their respective advisors and representatives by Seller or any of its Affiliates, or any failure by any of the foregoing to disclose any information.  Purchaser acknowledges and agrees that the covenants and provisions contained in this Section 7.11 and Section 5.2(d) require performance after the Closing and are an integral part of the transactions contemplated by this Agreement and that Seller would not have entered into this Agreement without such covenants and provisions.

Section 7.12    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers.  Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date.  Purchaser and Seller acknowledge and agree that the agreements contained in this Section 7.12 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years; and (b) are an integral part of the transactions contemplated hereby and that, without such agreements, none of the Parties would enter into this Agreement.

Section 7.13    Specific Performance.  The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement.  It is accordingly agreed that (a) the Parties will be entitled to seek an injunction or injunctions, specific performance or other equitable relief to remedy breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Purchaser would have entered into this Agreement.  The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other order to remedy breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement will not be required to provide any bond or other security in connection with any such order.  If, prior to the Outside Date, any Party brings any action to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (y) for the period during which such action is pending, plus ten (10) days or (z) by such other time period established by the court presiding over such action, as the case may be.  In no event will this Section 7.13 be used, alone or together with any other provision of this Agreement, to require Seller to remedy any breach of any representation or warranty of Seller made herein.

Section 7.14    Miscellaneous.  This Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof and supersedes all prior agreements and understandings, whether written or oral, between the Parties.  This Agreement may be executed in

one or more counterparts, any one of which need not contain the signatures of more than one Party but all of which taken together shall constitute one and the same Agreement.  The section headings in this Agreement are included for convenience only and shall not affect the interpretation of this Agreement.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor case.  It is the intention of the Parties that nothing in this Agreement shall be deemed to create any right or cause of action in or on behalf of any Person other than the Parties.  If any provision of this Agreement is found to be contrary to Law or unenforceable by a court of competent jurisdiction, then the remaining provisions shall be severable and enforceable in accordance with their terms, unless such unlawful or unenforceable provision is material to the transactions contemplated hereby, in which case the Parties shall negotiate in good faith a substitute provision.

[Signatures on following page]

4840-9283-5272.4

## SCHEDULE 1

**Pumps:**

| Unique Asset ID | Fixed Asset ID | Unit No. | Asset Type Group | Asset Name (FA) |
|---|---|---|---|---|
| ca01CACPTR-0000008 | CACPTR-0000008 | CPF-146 | Cement Pump | Cement Pump - Falcon Lite |
| us011238086 | 1238086 | CPF-173 | Cement Pump | FALCON LITE CEMENT UNIT |
| us011238784 | 1238784 | CPF-047 | Cement Pump | FALCON LITE CEMENT UNIT |
| us011237982 | 1237982 | CPF-113 | Cement Pump | FALCON LITE CEMENT UNIT |
| 1234894 | 1234894 | CPF-029 | Cement Pump | Falcon Heavy - Twin |
| 1234836 | 1234836 | CPF-139 | Cement Pump | Falcon Heavy - Twin |
| 1234906 | 1234906 | CPF-157 | Cement Pump | Falcon |
| 1234875 | 1234875 | CPF-025 | Cement Pump | Falcon |
| 1234897 | 1234897 | CPF-030 | Cement Pump | Falcon |
| 1234903 | 1234903 | CPF-032 | Cement Pump | Falcon |
| 1234891 | 1234891 | CPF-178 | Cement Pump | Falcon |
| 1234904 | 1234904 | CPF-156 | Cement Pump | Falcon |
| 1234902 | 1234902 | CPF-155 | Cement Pump | Falcon |

**Batch Mixers**

| | | | | | |
|---|---|---|---|---|---|
| 1238769 | 1238769 | CBF001 | Batch Mixer | 100bbls Batch Mixer | 2012 |
| 1234989 | 1234989 | CBF042 | Batch Mixer | 100bbls Batch Mixer | 2005 |
| 1237934 | 1237934 | CBF057 | Batch Mixer | 100bbls Batch Mixer | 2011 |
| 1237366 | 1237366 | CBF024 | Batch Mixer | 100bbls Batch Mixer | 2012 |
| 1236685 | 1236685 | CBF031 | Batch Mixer | 100bbls Batch Mixer | 2011 |
| 1240571 | 1240571 | CBF072 | Batch Mixer | 100bbls Batch Mixer | 2014 |