ENTERED
11/06/2020

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BJ SERVICES, LLC, *et al.*,[1] | ) | Case No. 20-33627 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |

## ORDER CONFIRMING THE DEBTORS'
## COMBINED DISCLOSURE STATEMENT AND
## JOINT FIRST AMENDED CHAPTER 11 PLAN

The above-captioned debtors (collectively, the "Debtors") having:

a.  commenced, on July 20, 2020 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");[2]

b.  continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code;

c.  filed, on the Petition Date, the *Declaration of Warren Zemlak, Chief Executive Officer of BJ Services, LLC, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 22] (the "First Day Declaration"), detailing the facts and circumstances of these Chapter 11 Cases;

d.  filed, on September 7, 2020, the *Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan.* [Docket No. 595], and the *Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy Of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Joint Chapter 11 Plan, (III) Approving the Forms of*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  BJ Services, LLC (3543); BJ Management Services, L.P. (8396); BJ Services Holdings Canada, ULC (6181); and BJ Services Management Holdings Corporation (0481).  The Debtors' service address is:  11211 Farm to Market 2920 Road, Tomball, Texas 77375.

[2]   Capitalized terms used but not otherwise defined in these findings of fact, conclusions of law, and order (collectively, the "Confirmation Order") have the meanings given to them in the *Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan.* (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "Plan").  The rules of interpretation set forth in Article I.B of the Plan apply to this Confirmation Order.

*Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 596];

e.    filed, on September 11, 2020, the *Debtors' Amended Combined Disclosure Statement and Joint Chapter 11 Plan* [Docket No. 639] (the "<u>Amended Plan and Disclosure Statement</u>");

f.    filed, on September 11, 2020, the *Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan [Solicitation Version]* [Docket No. 647];

g.    filed, on September 11, 2020, the revised *Order (I) Conditionally Approving the Adequacy Of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* (the "<u>Disclosure Statement Order</u>") [Docket No. 638];

h.    obtained, on September 11, 2020, entry of the *Order (I) Conditionally Approving the Adequacy Of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 641];

i.    caused the Solicitation Packages and notice of the Confirmation Hearing and the deadline for objecting to confirmation of the Plan to be distributed on or about July 3, 2020, (collectively, the "<u>Solicitation Date</u>"), in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the *Certificate of Service re: Solicitation Materials* [Docket No. 595] (the "<u>Solicitation Affidavit</u>");

j.    caused, on September 23, 2020, the *Notice of Hearing to Consider (I) the Adequacy of the Debtors' Disclosure Statement, (II) Confirmation of the Plan, and (III) Related Voting and Objection Procedures* (the "<u>Combined Notice</u>") to be published in *The New York Times*, as evidenced by the *Affidavit of Publication* [Docket No. 730] (the "<u>Publication Affidavit</u>");

k.    served, on or about September 14, 2020, the *Notice of Non-Voting Status to Holders of Impaired Claims and Interests Deemed to Reject the Plan* [Docket No. 672] (the "<u>Notice of Impaired Non-Voting Status and Opportunity to Opt Out</u>") on all holders or potential holders of Claims or Interests in impaired non-voting Classes;

l.    served, on or about September 14, 2020, the *Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan* [Docket No. 672] (the "<u>Notice of Non Impaired Non-Voting Notice</u>" and, together with the Combined Notice and the Notice of Impaired Non-Voting Status and Opportunity to Opt Out, the "<u>Notices</u>");

m.     filed, on September 29, 2020, the *Notice of Filing of Plan Supplement* [Docket No. 768] (the "<u>Plan Supplement</u>");

n.     filed, on November 4, 2020, the *Debtors' Motion for Entry of an Order (I) Approving (A) the Settlement Agreement and (II) Granting Related Relief* (the "<u>Settlement Motion</u>") [Docket No. 1068];

o.     filed, on November 4, 2020, the *Declaration of M. Benjamin Jones in Support of Debtors' Motion for Entry of an Order (I) Approving (A) the Settlement Agreement and (II) Granting Related Relief* [Docket No. 1069] (the "<u>Settlement Declaration</u>");

p.     filed, on November 4, 2020, the *Declaration of John Burlacu on Behalf of Donlin, Recano & Company, Inc. Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan* [Docket No. 1075], which accounts for ballots received up to the Voting Deadline of 11:59 p.m. prevailing Central Time on November 3, 2020 (the "<u>Voting Report</u>"); and

q.     filed, on November 4, 2020, the *Debtors' Combined Disclosure Statement and Joint First Amended Chapter 11 Plan* (the "<u>First Amended Plan and Disclosure Statement</u>") [Docket Nos. 1070, 1084];

r.     filed, on November 5, 2020, the *Proposed Order Confirming the Debtors' Combined Disclosure Statement and Joint First Amended Chapter 11 Plan* [Docket Nos. 1080, 1085]; and

s.     filed, on November 5, 2020, the *Declaration of M. Benjamin Jones in Support of Confirmation of the Joint Amended Chapter 11 Plan* [Docket No. 1082] (the "<u>Jones Declaration</u>");

t.     filed, on November 5, 2020, the *Notice of Filing of First Amended Plan Supplement* (the "<u>First Amended Plan Supplement</u>") [Docket No.1086];

u.     obtained, on November 6, 2020, entry of the *Order (I) Approving (A) the Settlement Agreement and (II) Granting Related Relief* (the "<u>Settlement Order</u>") approving, among other things, the terms of the settlement agreement dated November 1, 2020, (the "<u>Settlement Agreement</u>," and the parties thereto, the "<u>Settlement Parties</u>").

This Court having:

v.     conditionally entered the Disclosure Statement Order on September 11, 2020 [Docket No. 641];

w.     set November 3, 2020, at 11:59 p.m. (prevailing Central Time) as the deadline to vote on the Plan;

x.     set November 3, 2020, at 11:59 p.m. (prevailing Central Time) as the deadline to file objections to the Plan;

y.      set November 5, 2020, at 8:00 a.m. (prevailing Central Time) as the date and time for the commencement of the Confirmation Hearing in accordance with rules 3017 and 3018 of the Bankruptcy Rules and sections 1126, 1128, and 1129 of the Bankruptcy Code;

z.      reviewed the Plan, the Disclosure Statement, the Settlement Agreement, Settlement Motion, Settlement Order, the Voting Report, and all pleadings, exhibits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

aa.     held the Confirmation Hearing;

bb.     heard the statements and arguments made by counsel with respect to Confirmation;

cc.     considered all oral representations, live testimony, written direct testimony, exhibits, documents, filings, and other evidence presented at the Confirmation Hearing;

dd.     entered rulings on the record at the Confirmation Hearing held on November 5, 2020 (the "Confirmation Ruling");

ee.     overruled any and all objections to the Plan and Confirmation, except as otherwise stated or indicated on the record, and all statements and reservations of rights not consensually resolved, agreed to, or withdrawn, unless otherwise indicated; and

ff.     taken judicial notice of all papers and pleadings filed in the Chapter 11 Cases.

NOW, THEREFORE, the Bankruptcy Court having found that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby; and the record of the Chapter 11 Cases and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing including, without limitation, the Jones Declaration establishes just cause for the relief granted in this Confirmation Order; and after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact, conclusions of law, and order:

## I.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY FOUND AND DETERMINED THAT:

**A.      Findings and Conclusions**

1.      The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

**B.      Jurisdiction and Venue**

2.      This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Consideration of whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.   Venue is proper in this district pursuant to sections 1408 and 1409 of title 28 of the United States Code.

**C.      Eligibility for Relief**

3.      The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

**D.      Commencement and Joint Administration of the Chapter 11 Cases**

4.      On the Petition Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  In accordance with the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 13], these Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015. Since the Petition Date, the Debtors have operated their businesses and managed their properties

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

**E.     Appointment of the Creditors' Committee**

5.      On July 28, 2020, 2020, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") to represent the interests of the unsecured creditors of the Debtors in the Chapter 11 Cases [Docket No. 199].

**F.     Plan Supplement**

6.      On September 29, 2020, the Debtors filed the Plan Supplement with the Bankruptcy Court.  The Plan Supplement complies with the terms of the Plan, and the Debtors provided good and proper notice of the filings in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement Order, and the facts and circumstances of the Chapter 11 Cases.  No other or further notice is or will be required with respect to the Plan Supplement.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan, the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement before the Effective Date, subject to compliance with the Bankruptcy Code and the Bankruptcy Rules; *provided* that no such alteration, amendment, update, or modification shall be inconsistent with the terms of this Confirmation Order or the Plan.

**G.     Modifications to the Plan**

7.      Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan since the commencement of solicitation described or set forth herein constitute (i) technical changes or changes with respect to particular Claims or Interests made pursuant to the agreement of the Holders of such Claims or Interests and/or otherwise (ii) do not materially and adversely affect the treatment of any Claims or Interests.  Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or

the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

8.      This Confirmation Order contains modifications to the Plan that were made to address the Settlement Agreement objections and informal comments received from parties in interest.  Modifications to the Plan since entry of the Disclosure Statement Order, if any, are consistent with the provisions of the Bankruptcy Code.  The disclosure of any Plan modifications prior to or on the record at the Confirmation Hearing constitutes due and sufficient notice of any and all Plan modifications.   The Plan, as modified, shall constitute the Plan submitted for Confirmation.

**H.      Objections Overruled**

9.      Any resolution or disposition of objections to Confirmation explained or otherwise ruled upon by the Bankruptcy Court on the record at the Confirmation Hearing is hereby incorporated by reference.  All unresolved objections, statements, and reservations of rights are hereby overruled on the merits.

**I.      Adequacy of the Disclosure Statement**

10.     The Disclosure Statement contains "adequate information" (as such term is defined in Bankruptcy Code § 1125(a) and used in Bankruptcy Code § 1126(b)(2)) with respect to the Debtors, the Plan, and the transactions contemplated therein.

**J.      Transmittal and Mailing of Materials; Notice**

11.     As evidenced by the Solicitation Affidavit, the Publication Affidavit, and the Voting Report, the Debtors provided due, adequate, and sufficient notice of the Plan, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Packages, the Confirmation Hearing Notice, the Plan Supplement, the Notices, and all the other materials that the Debtors

distributed in connection with the Confirmation of the Plan are in compliance with the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules"), and the procedures set forth in the Disclosure Statement Order. The Debtors provided due, adequate, and sufficient notice of the Voting and Plan Objection Deadline, the Confirmation Hearing (as may be continued from time to time), and any applicable bar dates and hearings described in the Disclosure Statement Order in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Disclosure Statement Order. No other or further notice is or shall be required.

**K.      Solicitation**

12.      The Debtors solicited votes for acceptance and rejection of the Plan in good faith, and the Solicitation Packages provided the opportunity for voting creditors to opt out of the releases set forth in the Plan. Such solicitation complied with sections 1125 and 1126 and all other applicable sections of the Bankruptcy Code, rules 3017, 3018, and 3019 of the Bankruptcy Rules, the Disclosure Statement Order, the Bankruptcy Local Rules, and all other applicable rules, laws, and regulations.

**L.      Voting Report**

13.      Before the Confirmation Hearing, the Debtors filed the Voting Report. The Voting Report was admitted into evidence during the Confirmation Hearing. The procedures used to tabulate ballots were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all other applicable rules, laws, and regulations.

14.      As set forth in the Plan, Holders of Claims in Class 3, Class 4, Class 5, and Class 6 (collectively, the "Voting Classes") were eligible to vote on the Plan in accordance with the

Solicitation Procedures.  Holders of Claims in Classes 1 and 2 (collectively, the "Deemed Accepting Classes") are Unimpaired and conclusively deemed to accept the Plan and, therefore, did not vote to accept or reject the Plan.  Holders of Interests in Class 7, Class 8, Class 9, and Class 10 (the "Deemed Rejecting Classes") are Impaired under the Plan and are entitled to no recovery under the Plan and are, therefore, deemed to have rejected the Plan.

15.     As evidenced by the Voting Report, Class 3, Class 4, Class 5, and Class 6 voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

**M.     Bankruptcy Rule 3016**

16.     The Plan and all modifications thereto were dated and identified the entities submitting such modification, thus satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure Statement and the Plan with the Bankruptcy Court, thereby satisfying Bankruptcy Rule 3016(b).  The injunction, release, and exculpation provisions in the Disclosure Statement and the Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined, released, and exculpated and identify the entities that will be subject to the injunction, releases, and exculpations, thereby satisfying Bankruptcy Rule 3016(c).

**N.     Burden of Proof**

17.     The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, the applicable evidentiary standard for Confirmation.  Further, the Debtors have proven the elements of sections 1129(a) and 1129(b) by clear and convincing evidence.  Each witness who testified on behalf of the Debtors in connection with Confirmation was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

**O.      Compliance with the Requirements of Section 1129 of the Bankruptcy Code**

18.      The Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code as follows:

**a.   Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code**

19.      The Plan complies with all applicable provisions of the Bankruptcy Code, including sections 1122 and 1123, as required by section 1129(a)(1) of the Bankruptcy Code.

**i.      Sections 1122 and 1123(a)(1)—Proper Classification**

20.      The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.  In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into nine different Classes based on differences in the legal nature or priority of such Claims and Interests (other than Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims, which are addressed in Article II of the Plan and are not required to be designated as separate Classes by section 1123(a)(1) of the Bankruptcy Code).  Valid business, factual, and legal reasons exist for the separate classification of such Claims and Interests, such classifications were not implemented for any improper purpose and do not unfairly discriminate between or among Holders of Claims and Interests.

21.      In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims or Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  Accordingly, the Plan satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

### ii. Section 1123(a)(2)—Specification of Unimpaired Classes

22. Article III of the Plan specifies that Claims in Classes 1 and 2 are Unimpaired under the Plan, and Claims and Interests, as applicable, in Classes 3, 4, 5, 6, 7, 8, 9, and 10 are Impaired. In addition, Article II of the Plan specifies that each Holder of Administrative Claims or Allowed Priority Tax Claims against the Debtors shall be allowed and shall receive full and final satisfaction of its Administrative Claim in an amount of Cash equal to the amount of such Allowed Administrative Claim or Allowed Priority Tax Claim. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### iii. Section 1123(a)(3)—Specification of Treatment of Impaired Classes

23. Article III of the Plan specifies the treatment of each Impaired Class under the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### iv. Section 1123(a)(4)—No Discrimination

24. Article III of the Plan provides the same treatment to each Claim or Interest in any particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest. Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

### v. Section 1123(a)(5)—Adequate Means for the Plan's Implementation

25. The Plan, the Settlement Agreement, and the various documents included in the Plan Supplement provide adequate and proper means for the Plan's execution and implementation, including: (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Wind-Down Trust Agreement; (d) the Settlement Order; and (e) the Liquidation Trust Agreement. Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### vi.   Section 1123(a)(6)—Non-Voting Equity Securities

26.     The Plan does not provide for the issuance of new equity interests.  Accordingly, section 1123(a)(6) of the Bankruptcy Code is inapplicable.

### vii.   Section 1123(a)(7)—Directors, Officers, Managers, and Trustees

27.     The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. Article VI.G of the Plan discharges all of the Debtors' directors, officers, and managers, as applicable, from their duties effective as of the Effective Date without any further action.

28.     Article VI.E provides that the Wind-Down Trustee shall act for the Wind-Down Trust in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions of Article VI.E.  The Wind-Down Trustee shall succeed the Debtors' managers and officers.  The manner for selection of the Wind-Down Trustee is set forth in the Wind-Down Trust Agreement.  The selection of Anthony Schnur as the Wind-Down Trustee and the process therefor is consistent with the interests of Holders of Claims and Interests and public policy.

29.     In addition, on the Effective Date, the Liquidation Trust shall be formed for the benefit of Holders of Allowed General Unsecured Claims in accordance with Article IX of the Plan.  The manner and selection of the Liquidation Trustee is set forth in the Liquidation Trust Agreement.  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### b.   Section 1123(b)—Discretionary Contents of the Plan

30.     The Plan's discretionary provisions, including, but not limited to, the Settlement Agreement incorporated therein, comply with section 1123(b) of the Bankruptcy Code and are not inconsistent with the applicable provisions of the Bankruptcy Code.  Thus, the Plan satisfies section 1123(b).

### i.        Impairment/Unimpairment of Any Class of Claims or Interests

31.     Pursuant to the Plan, Article IV of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests, as contemplated by section 1123(b)(1) of the Bankruptcy Code.

### ii.       Assumption and Rejection of Executory Contracts and Unexpired Leases

32.     Article VII of the Plan provides that on the Effective Date, except as otherwise provided therein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including, without limitation, any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (a) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (b) is a D&O Policy or relates to the indemnification obligations of the Debtors or Wind-Down Trustee; (c) is subject to a rejection notice or assumption notice Filed with the Bankruptcy Court pursuant to the rejection and assumption procedures order [Docket No. 219]; or (d) is a Purchase Agreement.  Solely for purposes of clarity, the Settlement Agreement is not and shall not be considered an Executory Contract subject to rejection pursuant to the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption and assignment of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

33.     Therefore, the Plan satisfies section 1123(b)(2) of the Bankruptcy Code.

### iii.    Compromise and Settlement

34.    In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan and with the support of the various creditors, stakeholders, and other parties in interest, including the Committee, the provisions of the Plan constitute a good-faith compromise of all Claims, Interests, Causes of Action, as applicable, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  Those settlements and compromises are fair, equitable, and reasonable and approved as being in the best interests of the Debtors and their Estates.

35.    The Plan incorporates the Settlement Agreement that resolves numerous Claims, issues, and disputes and is designed to achieve a beneficial and efficient resolution of the chapter 11 cases for all parties in interest.  Accordingly, except as otherwise set forth in the Plan, the Settlement Agreement, or herein, in consideration for the distributions and other benefits provided under the Plan, including the release, exculpation, and injunction provisions, the Plan shall constitute a good faith compromise and settlement of all claims and controversies resolved pursuant to the Plan and the Settlement Agreement.  Each component of the compromise and settlement, including the treatment of Claims and Interests pursuant to the Plan, is an integral, non-severable, integrated, and inextricably linked part of the Settlement Agreement.

### iv.    Release by the Debtors

36.    In accordance with section 1123(b)(3)(A) of the Bankruptcy Code, the releases of claims and Causes of Action by the Debtors described in Article XII.D of the Plan (the "Debtor Release") represent a valid exercise of the Debtors' business judgment under Bankruptcy Rule 9019.  The Debtors' pursuit of any such claims against the Released Parties is not in the best interests of the Estates' various constituencies because the costs involved would likely outweigh

any potential benefit from pursuing such claims.  The Debtor Release is fair and equitable and complies with the absolute priority rule.

37.     Creditors in Class 3, Class 4, Class 5, and Class 6 have voted in favor of the Plan, including the Debtor Release.  The Plan, including the Debtor Release, was negotiated at arm's-length and in good faith by sophisticated parties represented by able counsel and financial advisors.  Therefore, the Debtor Release is the result of an arm's-length negotiation process.

38.     The Debtor Release appropriately offers protection to parties that participated in the Debtors' restructuring process.  Specifically, the Released Parties under the Plan—including (a) each Debtor; (b) the Debtors' current and former officers, directors, and managers; (c) the Wind-Down Trustee and the Wind-Down Trust Oversight Committee; (d) the Liquidation Trustee and the Trust Oversight Committee; (e) the Agents, (f) the Lenders (solely in their respective capacities as Lenders under the Credit Documents); (g) the Committee; (h) the Sponsors; (i) all Holders of Claims or Interests that vote to accept or are presumed to accept the Plan; (j) all Holders of Claims or Interests that abstain from voting on the Plan, who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan, and who do not object to the Plan; and (k) with respect to each of the Debtors, the Post-Effective Date Debtors, and each of the foregoing Entities in clauses (a) through (j), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), interest holders, predecessors, participants, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory

board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any Holder of a Claim or Interest that opts out of the releases or objects to the Plan shall not be a "Released Party"—made significant concessions and contributions to the Debtors' Chapter 11 Cases, including, as applicable, actively supporting the Plan and the Chapter 11 Cases, entering into the Settlement Agreement, and settling and compromising substantial rights and claims against the Debtors under the Plan.

39.     The scope of the Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases and the Settlement Agreement.  In light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Debtor Release to the Plan and the Settlement Agreement, the Debtor Release is approved.

### v.     Release by Holders of Claims and Interests

40.     The release by the Releasing Parties (the "Third-Party Release"), set forth in Article XII.E of the Plan, is an essential provision of the Plan.  The Third-Party Release is (a) consensual, (b) in exchange for the good and valuable consideration provided by the Released Parties, (c) a good-faith settlement and compromise of the claims and Causes of Action released by the Third-Party Release, (d) materially beneficial to and in the best interests of the Debtors, their Estates, and their stakeholders and is important to the overall objectives of the Plan and Settlement Agreement to finally resolve certain Claims among or against certain parties in interest in the Chapter 11 Cases, (e) fair, equitable, and reasonable, (f) given and made after due notice and opportunity for hearing, (g) a bar to any of the Releasing Parties asserting any claim or Cause of Action released by the Third-Party Release against any of the Released Parties, and (h) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.

41.     The Third-Party Release is an integral part of the Plan that is supported by many of the Debtors' creditors and provides a meaningful recovery under the facts and circumstances of these Chapter 11 Cases.  Like the Debtor Release, the Third-Party Release facilitated participation of the Released Parties in both the Plan and the chapter 11 processes generally.  The Third-Party Release is instrumental to the Plan and was critical in incentivizing the Released Parties to support the Plan and the Settlement Agreement and preventing potentially significant and time-consuming litigation regarding the parties' respective rights and interests.  The Third-Party Release was instrumental in developing a plan that maximized value for all of the Debtors' stakeholders, preserved certain of the Debtors' businesses through the going-concern Sale Transaction, and allowed for the orderly wind down of these Chapter 11 Cases.  The Third-Party Release is necessary to bringing these Chapter 11 Cases to a resolution.

42.     The Third-Party Release appropriately offers certain protections to parties who constructively participated in the Debtors' restructuring process, Unimpaired Creditors whose claims are being satisfied in full in cash or otherwise receiving a full recovery, or Holders of Claims or Interests that abstained from voting but did not opt out of the Third-Party Release (to the extent such holders of Claims or Interests were entitled to opt out of the Third-Party Release under the Plan).  And the Released Parties have made a substantial contribution to the Debtors' Chapter 11 Cases.  Furthermore, the Third-Party Release is consensual as the Releasing Parties were provided adequate notice of the chapter 11 proceedings, the Plan, and the deadline to object to confirmation of the Plan, voting creditors and interest holders were given the opportunity to opt out of the Third-Party Release, and the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, and the ballots.

43.     Each of the Released Parties, as stakeholders and critical participants in the Debtors' Chapter 11 Cases and the Plan process, share a common goal with the Debtors in seeing the Plan succeed.

44.     The scope of the Third-Party Release is appropriately tailored to the facts and circumstances of the Chapter 11 Cases, and parties received due and adequate notice of the Third-Party Release.  Among other things, the Plan provides appropriate and specific disclosure with respect to the claims and Causes of Action that are subject to the Third-Party Release, and no other disclosure is necessary.  The Debtors, as evidenced by the Solicitation Affidavit, provided sufficient notice of the Third-Party Release, and no further or other notice is necessary.  The Third-Party Release is specific in language, integral to the Plan, and given for substantial consideration.

45.     In light of the foregoing, the Third-Party Release is approved.

### vi.     Exculpation

46.     The exculpation provisions set forth in Article XII.F of the Plan are essential to the Plan.  The record in the Chapter 11 Cases fully supports the exculpation and the exculpation provisions set forth in Article XII.F of the Plan, which are appropriately tailored to protect the Exculpated Parties from unnecessary litigation and contain appropriate carve outs for gross negligence, actual fraud, and willful misconduct.

### vii.    Injunction

47.     The injunction provisions set forth in Article XII.G of the Plan are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the discharge the Debtor Release, the Third-Party Release, and the exculpation provisions in Article XII of the Plan.  Such injunction provisions are appropriately tailored to achieve those purposes.

### viii.   Preservation of Causes of Action

48.    Article VI.L of the Plan appropriately provides for the preservation by the Debtors of certain Causes of Action in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.

49.    The Plan provides that all Retained Causes of Action shall be conveyed to the Debtors, the Wind-Down Trust, or the Liquidation Trustee, as applicable, and the Plan and Plan Supplement provide meaningful disclosure with respect to the potential Retained Causes of Action that the Debtors, Wind-Down Trust, or Liquidation Trustee may retain, and all parties in interest received adequate notice with respect to such Causes of Action.  The provisions regarding the Retained Causes of Action in the Plan are appropriate and in the best interests of the Debtors, their respective Estates, and Holders of Claims and Interests.  For the avoidance of doubt, except with respect to the Retained Causes of Action and as otherwise provided in the Plan, all Claims and Causes of Action released or exculpated under the Plan and/or released and/or waived pursuant to the Cash Collateral Orders or Settlement Agreement will not be retained by the Debtors, the Wind-Down Trust, or the Liquidation Trustee.

### ix.   Lien Releases

50.    Except as otherwise provided in the Plan, the Plan Supplement, this Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article IV.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges,

or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Debtors, the Wind-Down Trust, or the Liquidation Trustee, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of this Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

### x. Additional Plan Provisions

51.     The other discretionary provisions in the Plan, including the Plan Supplement, are appropriate and consistent with applicable provisions of the Bankruptcy Code, including, without limitation, provisions for the allowance of certain Claims and Interests, treatment of D&O Policies, and the retention of court jurisdiction.

### c. Section 1129(a)(2)—Compliance of the Debtors and Others with the Applicable Provisions of the Bankruptcy Code

52.     The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1128, and 1129, and with Bankruptcy Rules 2002, 3017, 3018, and 3019.

53.     The Debtors and their agents solicited votes to accept or reject the Plan after the Bankruptcy Court conditionally approved the adequacy of the Disclosure Statement, pursuant to section 1125(a) of the Bankruptcy Code and the Disclosure Statement Order.

54. The Debtors and their agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e), and in a manner consistent with the applicable provisions of the Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article XII.F of the Plan.

55. The Debtors and their agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and, therefore, are not and, on account of such distributions, will not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan so long as such distributions are made consistent with and pursuant to the Plan, the Settlement Agreement, and the Settlement Order.

**d.    Section 1129(a)(3)—Proposal of Plan in Good Faith**

56. The Debtors have proposed the Plan in good faith and not by any means forbidden by law. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation. The Debtors' good faith is evident from the facts and the record of the Chapter 11 Cases, the Disclosure Statement, the hearing on the Disclosure Statement, and the record of the Confirmation Hearing and other proceedings held in the Chapter 11 Cases.

57. The Plan is the product of good faith, arm's-length negotiations by and among the Debtors, the Debtors' directors, officers and managers, the Committee, the parties to the Settlement

Agreement, and the other constituencies involved in the Chapter 11 Cases. The Plan itself and the process leading to its formulation provide independent evidence of the Debtors', Committee's, and such other parties' good faith, serve the public interest, and assure fair treatment of holders of Claims and Interests. Consistent with the overriding purpose of chapter 11, the Debtors filed the Chapter 11 Cases with the belief that the Debtors were in need of restructuring and the Plan was negotiated and proposed with the intention of maximizing stakeholder value and for no ulterior purpose. Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

### e.    Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable

58.    Any payment made or to be made by the Debtors or by a person acquiring property under the Plan for services or costs and expenses in connection with the Chapter 11 Cases, the Plan, or the Settlement Agreement, and incident to the Chapter 11 Cases, as applicable, has been approved by or is subject to the approval of the Bankruptcy Court as reasonable. Accordingly, the Plan satisfies the requirements of section 1129(a)(4).

### f.    Section 1129(a)(5)—Disclosure of Directors, Officers, and Managers and Consistency with the Interests of Creditors and Public Policy

59.    Because the Plan provides for the liquidation of the Estates' assets and resignation of the Debtors' officers, directors, and managers, section 1129(a)(5) of the Bankruptcy Code does not apply. To the extent section 1129(a)(5) of the Bankruptcy Code applies to the Wind-Down Trust, the Debtors have satisfied the requirements of this provision by, among other things, disclosing the identity and terms of compensation of the Wind-Down Trustee in the Plan Supplement.

g.      **Section 1129(a)(6)—Rate Changes**

60.     The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and, accordingly, will not require governmental regulatory approval.  Therefore, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

h.      **Section 1129(a)(7)—Best Interests of Holders of Claims and Interests**

61.     The evidence in support of the Plan that was proffered or adduced at the Confirmation Hearing, and the facts and circumstances of the Chapter 11 Cases, establishes that each Holder of Allowed Claims or Interests in each Class will recover as much or more value under the Plan on account of such Claim or Interest, as of the Effective Date, than the amount such holder would receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  As a result, the Debtors have demonstrated that the Plan is in the best interests of their creditors and equity holders and the requirements of section 1129(a)(7) of the Bankruptcy Code are satisfied.

i.      **Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Certain Impaired Classes; Fairness of Plan with Respect to Deemed Rejecting Class**

62.     The presumed accepting Classes are Unimpaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Nevertheless, because the Plan has not been accepted by the Deemed Rejecting Classes, the Debtors seek Confirmation under section 1129(b), solely with respect to the Deemed Rejecting Classes, rather than section 1129(a)(8), of the Bankruptcy Code.  Although section 1129(a)(8) has not been satisfied with respect to the Deemed Rejecting Class, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Class and, thus, satisfies section 1129(b) of the Bankruptcy Code with respect to such Class as described further below.

**j.      Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code**

63.      The treatment of Administrative Claims and Priority Tax Claims under Article II of the Plan satisfies the requirements of and complies in all respects with section 1129(a)(9) of the Bankruptcy Code.

**k.      Section 1129(a)(10)—Acceptance by at Least One Impaired Class**

64.      As set forth in the Voting Report, Holders of Claims in Class 3, Class 4, Class 5, and Class 6 voted to accept the Plan.  As such, with respect to each Debtor's Plan, there is either at least one class of Claims that is Impaired under the Plan and has accepted the Plan, which was determined without including any insiders' (as defined in the Bankruptcy Code) acceptance of the Plan.  Accordingly, the requirements of section 1129(a)(10) of the Bankruptcy Code are satisfied.

**l.      Section 1129(a)(11)—Feasibility of the Plan**

65.      The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The evidence supporting the Plan proffered or adduced by the Debtors at or before the Confirmation Hearing:  (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) has not been controverted by other persuasive evidence; (c) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by liquidation (other than as contemplated by the Plan) or the need for further financial reorganization, of the Debtors or the Wind-Down Trust, except as provided for in the Plan; and (d) establishes that the Debtors or Wind-Down Trust will have sufficient funds available to meet their obligations under the Plan.

**m.      Section 1129(a)(12)—Payment of Statutory Fees**

66.      Article III.C of the Plan provides that the Debtors shall pay any outstanding U.S. Trustee Fees, pursuant to section 1930(a) of the Judicial Code, in full on the Effective Date and

the Debtors or the Wind-Down Trust, as applicable, shall continue to pay such fees until the Chapter 11 cases are converted, dismissed, or closed, whichever occurs first. Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**n.      Section 1129(a)(13), (14), (15), and (16)—Domestic Support Obligations, Individuals, and Nonprofit Corporations**

67.      The Debtors are not required to pay domestic support obligations pursuant to a judicial or administrative order or statute as set forth in section 1129(a)(13) of the Bankruptcy Code. The Debtors are not individuals under the Bankruptcy Code. The Debtors are transferring property under the Plan in accordance with applicable nonbankruptcy law that governs the particular property. Therefore, sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code, respectively, have been complied with the Plan.

**o.      Section 1129(b)—Confirmation of Plan Over Nonacceptance of Impaired Classes**

68.      Notwithstanding the fact that the Deemed Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because (a) Class 3, Class 4, Class 5, and Class 6 voted to accept the Plan and (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Interests in the Deemed Rejecting Classes. As a result, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Thus, the Plan may be confirmed even though section 1129(a)(8) of the Bankruptcy Code is not satisfied. After entry of this Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding upon the members of the Deemed Rejecting Classes.

**p.      Section 1129(c)—Only One Plan**

69.      The Plan is the only plan filed in the Chapter 11 Cases and, accordingly, section 1129(c) of the Bankruptcy Code is satisfied.

**q.     Section 1129(d)—Principal Purpose of the Plan is Not Avoidance of Taxes or Section 5 of the Securities Act**

70.     No Governmental Unit has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  As evidenced by its terms, the principal purpose of the Plan is not such avoidance.  Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

**r.     Section 1129(e)—Not Small Business Cases**

71.     The Chapter 11 Cases are not small business cases, and accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

**s.     Satisfaction of Confirmation Requirements**

72.     Based upon the foregoing and all other pleadings and evidence proffered or adduced at or prior to the Confirmation Hearing, the Plan and the Debtors, as applicable, satisfy all the requirements for plan confirmation set forth in section 1129 of the Bankruptcy Code.

**t.     Good Faith**

73.     The Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders.  The Plan is the product of extensive collaboration among the Debtors, the Committee and key stakeholders and accomplishes this goal.  Accordingly, the Debtors or the Wind-Down Trust, as appropriate, have been, are, and will continue acting in good faith if they proceed to (a) consummate the Plan, the Restructuring Transactions, and the agreements, settlements, transactions, and transfers contemplated thereby, including, but not limited to, the Settlement Agreement, and (b) take the actions authorized and directed or contemplated by this Confirmation

Order and Settlement Order. Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

**u.      Disclosure:  Agreements and Other Documents**

74.      The Debtors have disclosed all material facts, to the extent applicable, regarding the following:   (a) the identity, terms, and compensation of the Wind-Down Trustee and Liquidation Trustee; (b) the method and manner of distributions under the Plan; (c) the adoption, execution, and implementation of the other matters provided for under the Plan, including those involving corporate action to be taken by or required of the Debtors or Wind-Down Trust, as applicable; (d) the exemption under section 1146(a) of the Bankruptcy Code; (e) the Retained Causes of Action; (f) the adoption, execution, and delivery of all contracts, leases, instruments, securities, releases, indentures, and other agreements related to any of the foregoing; and (g) the Settlement Agreement.

**v.      Conditions to Effective Date**

75.      The Plan shall not become effective unless and until the conditions set forth in Article XIII.A of the Plan have been satisfied or waived pursuant to Article XIII.B of the Plan.

**w.      Implementation**

76.      All documents and agreements necessary to implement the transactions contemplated by the Plan, including those contained or summarized in the Plan Supplement, and all other relevant and necessary documents (including the Settlement Agreement) have been negotiated in good faith and at arm's-length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.  The documents and agreements are essential elements of the Plan and entry into and consummation of the transactions contemplated by each such document or agreement is in the best interests of the Debtors, the

estates, and the Holders of Claims and Interests.  The Debtors have exercised reasonable business judgment in determining which documents and agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.  The Debtors are authorized to take any action reasonably necessary or appropriate to consummate such agreements and the transactions contemplated thereby.

### x.     Vesting of Assets

77.     Except as otherwise provided in this Confirmation Order, the Plan, or any other agreement, instrument, or other document incorporated therein or in the Plan Supplement or the Settlement Agreement or Settlement Order, on the Effective Date, any Estate assets remaining shall vest in the Wind-Down Trust or the Liquidation Trust, as applicable, for the purpose of liquidating the Estates and effecting Consummation of the Plan.  Such assets shall be held free and clear of all liens, claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or this Confirmation Order.  Any distributions to be made under the Plan from such assets shall be made by the Liquidation Trustee, the Wind-Down Trustee, or their designees.  The Wind-Down Trust, Wind-Down Trustee, and the Liquidation Trustee shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

### y.     Treatment of Executory Contracts and Unexpired Leases.

78.     Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, the Plan provides for the assumption or rejection of certain Executory Contracts and Unexpired Leases, effective as of the Effective Date except as otherwise provided therein or another prior or pending notice and/or motion.  The Debtors' determinations regarding the assumption or rejection of Executory Contracts and Unexpired Leases are based on and within the sound business judgment of the Debtors, are necessary to the implementation of the Plan, and are in the best interests of the

Debtors, their Estates, Holders of Claims and Interests and other parties in interest in the Chapter 11 Cases.

### z.     The Settlement Agreement

79.     The Settlement Agreement is an essential element of the Plan, necessary for confirmation and consummation of the Plan, and critical to the overall success and feasibility of the Plan.  Entry into the Settlement Agreement is in the best interest of the Debtors, their Estates, and all Holders of Claims or Interests, and the Bankruptcy Court's findings in the Settlement Order are incorporated as if set forth in full herein.

### aa.     Objections

80.     All objections, responses, reservations, statements, and comments in opposition to the Plan, other than those resolved, adjourned, or withdrawn with prejudice prior to, or on the record at, the Confirmation Hearing are overruled on the merits in all respects.  All withdrawn objections, if any, are deemed withdrawn with prejudice.  All objections to Confirmation not filed and served prior to the deadline for filing objections to the Plan set forth in the Confirmation Hearing Notice, if any, are deemed waived and shall not be considered by the Bankruptcy Court.

81.     All parties have had a full and fair opportunity to litigate all issues raised or might have been raised in the objections to Confirmation of the Plan, and the objections have been fully and fairly litigated or resolved, including by agreed-upon reservations of rights as set forth in this Confirmation Order.

## II.  <u>ORDER</u>

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

82.     This Confirmation Order confirms the Plan in its entirety.

83.     This Confirmation Order approves the adequacy of the Disclosure Statement.

84.     This Confirmation Order approves the Plan Supplement, including the documents contained therein, as they may be amended through and including the Effective Date in accordance with and as permitted by the Plan.  The terms of the Plan, the Plan Supplement, the Settlement Agreements, the Settlement Order, and the exhibits thereto are incorporated herein by reference and are an integral part of this Confirmation Order; *provided* that, if there is any direct conflict between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control solely to the extent of such conflict.

85.     The terms of the Plan, the Plan Supplement, all exhibits thereto, and this Confirmation Order shall be effective and binding as of the Effective Date on all parties in interest, including, but not limited to, the following:  (a) the Debtors; (c) Holders of General Unsecured Claims; (d) the Prepetition ABL Lenders and the Prepetition ABL Agent; (e) the Equipment Term Loan Lenders and the Equipment Term Loan Agent; (f) the Real Estate Term Loan Lender and the Real Estate Term Loan Agent; (g) the Committee; and (f) all holders of Claims and Interests.

86.     The failure to include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document, agreement, or exhibit does not impair the effectiveness of that article, section, or provision; it being the intent of the Bankruptcy Court that the Plan, the Plan Supplement, and any related document, agreement, or exhibit are approved in their entirety.

**A.     Objections**

87.     To the extent that any objections (including any reservations of rights contained therein) to Confirmation have not been withdrawn, waived, or settled before entry of this Confirmation Order, are not cured by the relief granted in this Confirmation Order, or have not been otherwise resolved as stated on the record of the Confirmation Hearing, all such objections

(including any reservation of rights contained therein) are hereby overruled in their entirety and on their merits in all respects.

**B.     Plan Modifications**

88.     In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are presumed to accept the Plan, subject to modifications, if any.  No Holder of a Claim who has voted to accept the Plan shall be permitted to change its vote as a consequence of the Plan or Plan Supplement modifications.  All modifications to the Plan or Plan Supplement made after the Voting Deadline are hereby approved pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

**C.     Findings of Fact and Conclusions of Law**

89.     The findings of fact and the conclusions of law set forth in this Confirmation Order constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to Confirmation, including the Confirmation Ruling, are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such.  To the extent any finding of fact or conclusion of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of this Court, it is adopted as such.

**D.     Post-Confirmation Modification of the Plan**

90.     Subject to the limitations and terms contained in Article XIV.A and XIV.B of the Plan, the Debtors are hereby authorized to amend or modify the Plan at any time prior to the

substantial consummation of the Plan, but only in accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, without further order of this Court, subject to the consent rights in the Plan.

### E.       Plan Classification Controlling

91.       The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder and the classifications set forth on the ballots tendered to or returned by the Holders of Claims or Interests in connection with voting on the Plan:  (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent and in no event shall be deemed to modify or otherwise affect the actual classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors except for voting purposes.

### F.       General Settlement of Claims and Interests

92.       Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and the Settlement Order and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan.  All distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.  The Settlement Parties are deemed to accept the Plan with respect to any Claims and Interests they hold, and any ballots submitted to the contrary by any such party shall be deemed modified to acceptance.

## G.      Restructuring Transactions

93.      On the Effective Date, the applicable Debtors or the Wind-Down Trust shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (collectively, the "Restructuring Transactions").  The actions to implement the Restructuring Transactions may include:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (d) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan; *provided*, *however*, that no such restructuring transactions may violate the terms of the Settlement Agreement, any Executory Contract or Unexpired Lease assumed by the Debtors.

## H.     Corporate Action

94.     On the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on or after the Effective Date, shall be deemed authorized and approved in all respects, including:  (a) implementation of the Restructuring Transactions; (b) the effectuation of the Settlement Agreement and Settlement Order; and (c) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Trust, and any corporate action required by the Debtors or the Wind-Down Trust in connection with the Plan or corporate structure of the Debtors or Wind-Down Trust shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, manages, or officers of the Debtors or the Wind-Down Trust.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Trust, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Trust.  The authorizations and approvals contemplated by Article IV shall be effective notwithstanding any requirements under non-bankruptcy law.

## I.     Vesting of Assets in the Wind-Down Trust or the Liquidation Trustee, as applicable, and Continued Corporate Existence

95.     Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date, the assets of the Debtors shall vest in the Wind-Down Trust, Wind-Down Trustee or the Liquidation Trustee, as applicable, for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other

encumbrances. On and after the Effective Date, the Wind-Down Trust may (at the direction of the Wind-Down Trustee) use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The M&E shall vest in the Wind-Down Trust encumbered by the Equipment Term Loan Agent's unavoidable Liens and subject to the Lift Stay Order.

96.     Except as otherwise provided in this Confirmation Order, the Debtors shall continue in existence after the Effective Date as the Wind-Down Trust in accordance with the Plan and the Wind-Down Trust Agreement. The Wind-Down Trust shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (1) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (2) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Wind-Down Trustee to file motions or substitutions of parties or counsel in each such matter.

97.     On the Effective Date, any Estate non-Cash assets remaining shall vest in the Wind-Down Trust or Liquidation Trust, as applicable, for the purpose of liquidating the Estates and Consummating the Plan. Such assets shall be held free and clear of all liens, claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan. Any distributions to be made under the Plan from such assets shall be made by the Wind-Down Trustee, the Liquidation Trustee, or their designees. The Wind-Down Trustee and the Liquidation Trustee shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order. Notwithstanding anything herein to the contrary, the Prepetition ABL Lenders shall retain any valid and enforceable liens and/or security interests in any Prepetition Collateral and/or Postpetition Collateral.

Notwithstanding the foregoing provisions of this paragraph or anything else in this Order or the Plan, M&E to vest in the Wind-Down Trust encumbered by the Equipment Term Loan Agent's unavoidable Liens and subject to the Lift Stay Order.

**J.     Wind-Down Trust**

98.     The Wind-Down Trustee shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan and as otherwise provided in the Confirmation Order.

99.     The Wind-Down Trustee shall act for the Wind-Down Trust in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).   On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such, and a representative of the Wind-Down Trustee shall be appointed as the sole manager and sole officer of the Wind-Down Trust and shall succeed to the powers of the Debtors' directors and officers.   From and after the Effective Date, the Wind-Down Trustee shall be the sole representative of, and shall act for, the Wind-Down Trust, subject to the terms of the Wind-Down Trust Agreement.   For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Trust or the Wind-Down Trustee, as applicable, to continue the employment any former manager or officer.

**K.     Plan Implementation Authorization**

100.     The Debtors, the Wind-Down Trust, the Wind-Down Trustee, or the Liquidation Trustee, as the case may be, and their respective directors, officers, members, agents, and attorneys, financial advisors, and investment bankers are authorized and empowered from and after the date hereof to negotiate, execute, issue, deliver, implement, file, or record any contract,

instrument, release, or other agreement or document related to the Plan, as the same may be modified, amended and supplemented, and to take any action necessary or appropriate to implement, effectuate, consummate, or further evidence the Plan in accordance with its terms and the terms hereof, or take any or all corporate actions authorized to be taken pursuant to the Plan or this Confirmation Order, whether or not specifically referred to in the Plan or any exhibit thereto, without further order of the Bankruptcy Court.  To the extent applicable, any or all such documents shall be accepted upon presentment by each of the respective state filing or recording offices and filed or recorded in accordance with applicable state law and shall become effective in accordance with their terms and the provisions of state law.  Pursuant to section 303 of the General Corporation Law of the State of Delaware and any comparable provision of the business corporation laws of any other state, as applicable, no action of the Debtors' boards of directors or the Wind-Down Trust will be required to authorize the Debtors or the Wind-Down Trust, as applicable, to enter into, execute and deliver, adopt or amend, as the case may be, any such contract, instrument, release, or other agreement or document related to the Plan, and following the Effective Date, each of the Plan documents will be a legal, valid, and binding obligation of the Debtors, the Wind-Down Trust, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, enforceable against the Debtors, the Wind-Down Trust, the Wind-Down Trustee and the Liquidation Trustee, in accordance with the respective terms thereof.

**L.     The Settlement Agreement**

101.    The Settlement Order shall remain in full force and effect, and its terms are incorporated by reference herein and are an integral part of this Confirmation Order.  The Debtors, the Wind-Down Trust, and the Liquidation Trustee, as applicable, shall continue to fulfill their obligations thereunder.

### M.    Cancellation of Securities and Agreements

102.    Upon the Effective Date: (a) the obligations of the Debtors under the Credit Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be canceled solely as to the Debtors and their affiliates, and the Wind-Down Trust shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released.

### N.    Wind Down and Dissolution

103.    On and after the Effective Date, the Wind-Down Trustee will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court (including the Settlement Order), and the Wind-Down Trustee shall have the power and authority to take any action necessary to Wind Down and dissolve the Estates and implement the terms of the Settlement Agreement.  As soon as practicable after the Effective Date, the Wind-Down Trustee shall cause the Debtors to take such other actions as the Wind-Down Trustee may determine to be necessary or desirable to carry out the purposes of the Plan and the Settlement Agreement.  Except to the

extent necessary to complete the wind down of any remaining assets or operations from and after the Effective Date the Debtors (a) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (b) shall be deemed to have canceled pursuant to the Plan all Interests, and (c) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Wind-Down Trustee.

**O.    Approval of Consents and Authorization to Take Acts Necessary to Implement Plan**

104.    This Confirmation Order shall constitute all authority, approvals, and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Settlement Agreement, the Plan Supplement, the Disclosure Statement, and any documents, instruments, securities, or agreements, and any amendments or modifications thereto.

**P.    The Releases, Injunction, Exculpation, and Related Provisions Under the Plan**

105.    As discussed in detail in the Disclosure Statement, the Plan, and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled,

compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of this Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VIII of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

106.   The following releases, injunctions, exculpations, and related provisions set forth in Article XII of the Plan are incorporated herein in their entirety, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order or action on the part of this Court or any other party:

   a.   *Release by the Debtors*

107.   **Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, irrevocably, and forever released by each and all of the Debtors, the Wind-Down Trust, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Trust, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen,**

matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Wind-Down Trust, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Trust, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital structure, management, ownership, or operation thereof, the Credit Documents or any draws thereunder, the restructuring transactions, the sale and marketing process in connection with any of the Sale Transactions, the wind-down of the Debtors' estates, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Sale Transactions, the negotiation, implementation, or terms of the Settlement Agreement and any applicable related term sheets or proposals, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction,

agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the forgoing.

108. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article XII of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article XII of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-Down Trust or the Liquidation Trust or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

109. Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors,  or (iii) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan; *provided* that any of the Debtors' Causes of Action settled pursuant to the Plan shall be released.

b.  *Release of Liens*

110. Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan,

and as necessary to effectuate the terms of the Lift Stay Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article IV.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Debtors, or the Wind-Down Trust, or Liquidation Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

   c. *Third-Party Release.*

   111. Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or

integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released each Debtor, the Post-Effective Date Debtors, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Trust, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Trust, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital structure, management, ownership, or operation thereof, the Credit Documents, the restructuring transactions, the sale and marketing process in connection with any of the Sale Transactions, the wind-down of the Debtors' estates, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Sale Transactions, the negotiation, implementation, or terms of the Settlement Agreement and any applicable related term sheets or proposals, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the

pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the forgoing.

112.  **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article XII of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article XII of the Plan is:   (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) an absolute and complete bar to any of the Debtors or Wind-Down Trust or the Liquidation Trust or their respective Estates conveying direct or derivative standing to any person or entity to pursue any claim, Causes of Action or liability against any Released Party, or asserting any claim, Causes of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

113.  **Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (iii) the rights of the Debtors with respect to any confidentiality**

provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (iv) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan; *provided* that any of the Debtors' Causes of Action settled pursuant to the Plan shall be released.

      d.    *Exculpation*

114.    **Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale Transactions, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Settlement Agreement and any term sheets or proposals related thereto, the Plan, or any restructuring transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws**

with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

     e.    *Injunction*

115.    **Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that: (a) are subject to compromise and settlement pursuant to the terms of the Plan; (b) have been released by the Debtors pursuant to the Plan; (c) have been released by third parties pursuant to the Plan, (d) are subject to exculpation pursuant to the Plan; or (e) are otherwise discharged, satisfied, stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Trust, the Released Parties, or the Exculpated Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities**

unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities discharged, released, exculpated, or settled pursuant to the Plan. Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article XII.G of the Plan.

## Q. Assumption and Cure of Executory Contracts and Unexpired Leases

116. The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in Article VII of the Plan (including the procedures regarding the resolution of any and all disputes concerning the assumption or rejection, as applicable, of such Executory Contracts and Unexpired Leases) shall be and hereby are approved in their entirety.

117. On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is

specifically described in the Plan as to be assumed in connection with confirmation of the Plan, is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, or otherwise is specifically described in the Plan to not be rejected; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Confirmation Date (unless the counterparty to such Unexpired Lease or Executory Contract and the Debtors agree otherwise); (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; or (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  For the avoidance of doubt, such assumptions, assignments, and rejections will be effective on the Effective Date of the Plan.

**R.      Provisions Governing Distributions**

118.    The distribution provisions of Article VIII of the Plan shall be and hereby are approved in their entirety.  Except as otherwise set forth in the Plan or this Confirmation Order, the Liquidation Trustee or the Wind-Down Trustee shall make all distributions required under the Plan.  The timing of and reserves from distributions required under the Plan or this Confirmation Order shall be made in accordance with and as set forth in the Plan, the Settlement Agreement, the Settlement Order, or this Confirmation Order, as applicable.

**S.      Release of Liens**

119.    Except as otherwise specifically provided in the Plan, the Settlement Agreement, this Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable

distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Wind-Down Trust and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Wind-Down Trust.  The Prepetition ABL Agent, the Real Estate Term Loan Agent, and the Equipment Term Loan Agent shall execute and deliver all documents reasonably requested by the Wind-Down Trust or the Wind-Down Trustee to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Wind-Down Trust to file UCC-3 termination statements (to the extent applicable) with respect thereto.  Equipment Term Loan Agent's Liens on the Equipment Term Loan Collateral shall continue unimpaired, remain perfected, enforceable, valid, and unavoidable without the need to take any action on the part of the Equipment Term Loan Agent to continue such Lien on the Equipment Term Loan Collateral on or following the Effective Date, which Liens shall be and remain and continue perfected pursuant to this Order.  Notwithstanding, the Equipment Term Loan Agent may file any notice or recordation of the such Liens as within the Equipment Term Loan Agent's discretion.

**T.      Post-Confirmation Notices and Bar Dates**

120.    In accordance with Bankruptcy Rules 2002 and 3020(c), no later than ten (10) Business Days after the Effective Date, the Wind-Down Trust or the Wind-Down Trustee, as applicable, must cause notice of Confirmation and the occurrence of the Effective Date (the "Notice of Confirmation") to be filed on the docket and be served by United States mail, first-class postage prepaid, by hand, by overnight courier service, or by electronic service to all parties served with the Confirmation Hearing Notice; *provided* that no notice or service of any

kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice but received such notice returned marked as "undeliverable as addressed," "moved, left no forwarding address," "forwarding order expired," or similar language, unless such Entity has informed the Debtors in writing of or the Debtors are otherwise aware of such Entity's new address.  For those parties receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements.

121.    To supplement the notice procedures described in the preceding sentence, no later than ten (10) Business Days after the Effective Date, the Wind-Down Trust must cause the Notice of Confirmation, modified for publication, to be published on one occasion in *The New York Times*. Mailing and publication of the Notice of Confirmation in the time and manner set forth in this paragraph will be good, adequate, and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c).  No further notice is necessary.

122.    The Notice of Confirmation will have the effect of an order of the Bankruptcy Court, will constitute sufficient notice of the entry of this Confirmation Order to filing and recording officers, and will be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law.

123.    Except as otherwise provided in the Plan, requests for payment of Administrative Claims must be Filed no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to File and serve a request for such payment of such Administrative Claims that do not file and serve such a request on or before the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against

the Debtors, any purchasers of their assets, or their respective property, and such Administrative

Claims shall be deemed compromised, settled, and released as of the Effective Date.

**U.  Notice of Subsequent Pleadings**

124.  Except as otherwise provided in the Plan or in this Confirmation Order, notice of

all subsequent pleadings in the Chapter 11 Cases after the Effective Date will be limited to the

following parties:  (a) the Wind-Down Trust and their counsel; (b) the U.S. Trustee; (c) the

Wind-Down Trustee, (d) the Liquidation Trustee; (e) the Prepetition ABL Lenders, (f) the Trust

Oversight Committee, (g) any party known to be directly affected by the relief sought by such

pleadings; and (h) any party that specifically requests additional notice in writing to the Debtors

or Wind-Down Trust, as applicable, or files a request for notice under Bankruptcy Rule 2002 after

the Effective Date.  The Notice and Claims Agent shall not be required to file updated service lists.

**V.  Section 1146 Exemption**

125.  To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any

transfers of property pursuant hereto, including the issuance, transfer or exchange of any security

under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee,

intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax,

or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the

appropriate state or local governmental officials or agents shall forgo the collection of any such

tax or governmental assessment and accept for filing and recordation any of the foregoing

instruments or other documents pursuant to such transfers of property without the payment of any

such tax, recordation fee, or governmental assessment.

**W.  Preservation of Causes of Action**

126.  Except as otherwise provided in this Confirmation Order, the Settlement

Agreement, or the Settlement Order, or in any contract, instrument, release or other agreement

entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, the Wind-Down Trust shall have vested in them as of the Effective Date, and the Wind-Down Trustee shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions described in the Schedule of Retained Causes of Action set forth in the Plan Supplement, and the Wind-Down Trust' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including as set forth in Article XII thereof.  Notwithstanding the terms of the Schedule of the Retained Causes of Action, Retained Causes of Action shall not include Avoidance Actions against "Released Parties."

## X.      Reports

127.    Except as required under the Cash Collateral Orders (in respect of the Prepetition ABL Lenders), after entry of this Confirmation Order, the Debtors or Wind-Down Trust, as applicable, shall have no obligation to file with the Bankruptcy Court, serve on any parties, or otherwise provide any party with any other report that the Debtors or Wind-Down Trust, as applicable, were obligated to provide under the Bankruptcy Code or an order of the Bankruptcy Court, including obligations to provide (a) any reports to any parties otherwise required under the "first" and "second" day orders entered in these Chapter 11 Cases and (b) monthly operating reports (even for those periods for which a monthly operating report was not filed before the Confirmation Date); *provided* that the Debtors or Wind-Down Trust, as applicable, will comply with the U.S. Trustee's quarterly reporting requirements.  The Wind-Down Trust and the Wind-Down Trustee shall no longer have the obligation to file quarterly reports with respect to a Debtor once such Debtor's case is converted, dismissed or a final decree has been entered by the

Bankruptcy Court. Nothing herein shall limit the Wind-Down Trustee's obligation to report and provide information to the Trust Oversight Committee to the extent provided in the Wind-Down Trust Agreement.

**Y.    Effectiveness of All Actions**

128.    Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, before, or after the Effective Date pursuant to this Confirmation Order, without further application to, or order of the Bankruptcy Court, or further action by the Debtors, the Wind-Down Trust, and/or the Wind-Down Trustee and their respective directors, officers, members, or stockholders, and/or the Liquidation Trust, and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or stockholders.

**Z.    Binding Effect**

129.    On the date of and after entry of this Confirmation Order and subject to the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, the Settlement Agreement and this Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunction described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

130.    Pursuant to section 1141 of the Bankruptcy Code, subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Confirmation Order, all prior orders entered in the Chapter 11 Cases, all documents and agreements executed by the Debtors as

authorized and directed thereunder and all motions or requests for relief by the Debtors pending before this Court as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors, the Wind-Down Trust, the Wind-Down Trustee, the Liquidation Trustee, and each of their respective successors and assigns.

131.     The Plan, all documents and agreements executed by the Debtors in connection therewith, this Confirmation Order, and all prior orders of the Bankruptcy Court in the Chapter 11 Cases shall be binding against and binding upon and shall not be subject to rejection or avoidance by any Chapter 7 or Chapter 11 trustee appointed in any of the Chapter 11 Cases, the Liquidation Trustee, and the Wind-Down Trustee.

## AA.     Directors, Officers and Managers

132.     As of the Effective Date, the existing boards of directors or boards of managers of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, shareholders, and members and any all remaining officers, directors, managers, or managing members, with the exception of certain officers of each Debtor shall be dismissed without any further action required on the part of any such Debtor, the shareholders of such Debtor, the officers and directors of such Debtor, or the members of such Debtor, *provided that* the Wind-Down Trust or the Wind-Down Trustee may enter into agreements for the continued employment of certain employees on reasonable terms, if reasonably necessary to conduct their remaining business.

133.     The Debtors shall pay any outstanding U.S. Trustee Fees, pursuant to section 1930(a) of the Judicial Code, in full on the Effective Date, and the Wind-Down Trust or the Wind-Down Trustee shall continue to pay such fees until the Chapter 11 cases are converted, dismissed, or closed, whichever occurs first.

## BB.   Claims Reconciliation Process

134.   The procedures and responsibilities for, and costs of, reconciling Disputed Claims shall be as set forth in the Plan or as otherwise ordered by the Bankruptcy Court.

## CC.   Professional Compensation and Reimbursement Claims and Professional Fee Escrow Account

135.   Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Wind-Down Trust and/or the Liquidation Trust, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, the Wind-Down Trust and/or the Liquidation Trust (as applicable).  The Debtors, Wind-Down Trust, the Wind-Down Trustee, and/or the Liquidation Trustee (as applicable) shall pay, within ten business days after submission of a detailed invoice to the Debtors, Wind-Down Trust, the Wind-Down Trustee and/or the Liquidation Trustee (as applicable), such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors, the Wind-Down Trust and/or the Liquidation Trust (as applicable).  If the Debtors, Wind-Down Trust, the Wind-Down Trustee and/or the Liquidation Trustee (as applicable) dispute the reasonableness of any such invoice, the Debtors Wind-Down Trust, the Wind-Down Trustee and/or the Liquidation Trustee (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Wind-Down Trust and/or

the Liquidation Trust, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**DD.     Nonseverability of Plan Provisions upon Confirmation**

136.     Notwithstanding the possible applicability of Bankruptcy Rules 3020(e), 6004(g), 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Confirmation Order will be effective and enforceable immediately upon its entry.  Each term and provision of the Plan, and the transactions related thereto as it heretofore may have been altered or interpreted by the Bankruptcy Court is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (c) nonseverable and mutually dependent.  Notwithstanding the foregoing, the Settlement Agreement and Settlement Order may be severed, if and only if, under such circumstances the Settlement Agreement and Settlement Order shall remain in full force and effect.

**EE.     Waiver or Estoppel**

137.     Except as otherwise set forth in the Plan or this Confirmation Order, each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

**FF.     Authorization to Consummate**

138.     The Debtors are authorized to consummate the Plan, including the Restructuring Transactions contemplated thereby, at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in Article XIII of the Plan.  The substantial consummation of the Plan, within the meaning

of sections 1101(2) and 1127 of the Bankruptcy Code, is deemed to occur on the first date, on or after the Effective Date, on which distributions are made in accordance with the terms of the Plan to Holders of any Allowed Claims or Interests (as applicable).

**GG.    Injunctions and Automatic Stay**

139.    Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order (including the Injunction) shall remain in full force and effect in accordance with their terms.

**HH.    Real Estate Term Loan Agent**

140.    The Real Estate Term Loan Agent will pay any liquidated damages and/or lease termination fees on account of termination of those certain leases with American Cementing LLC (the "American Cementing Leases") encumbering the real property constituting the collateral of the Real Estate Term Loan Agent, to the extent the Real Estate Term Loan Agent chooses to terminate the American Cementing Leases.  The Real Estate Term Loan Agent shall have no recourse against the Debtors, the Wind-Down Trust, or the Liquidation Trust in respect of any such fees or damages.

**II.    Mississippi Department of Revenue**

141.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order:

      a.    notwithstanding anything to the contrary in the Plan or Confirmation Order, all rights of the Mississippi Department of Revenue (the "MDOR") related to any

claims filed by the MDOR are reserved and all parties reserve all rights related thereto;

b.  the MDOR shall not be required to file any proofs of claim or requests for payment in the Chapter 11 Cases for any Administrative Claims for the liabilities described in section 503(b)(1)(B) and (C) of the Bankruptcy Code;

c.  the Chapter 11 Cases shall have no effect on the MDOR's rights as to non-Debtor third parties;

d.  the MDOR may timely amend any Proof of Claim against any Debtor after the governmental Claims Bar Date, or the Effective Date, whichever is later, with respect to (a) a pending audit, (b) an audit that may be performed, with respect to any pre- or post-petition tax return, or (c) a filed tax return; and

e.  in the event of a default in payment of Priority Tax Claims of the MDOR, the MDOR shall send written notice of default to the Wind-Down Trust or the Wind-down Trustee, as applicable, to the address in MDOR's records.  If such default is not cured within 30 business days after such notice of default is mailed, the MDOR may (a) proceed with Mississippi state law remedies for collection of any amounts due and/or (b) seek such relief as may be available from the Court; *provided*, *further*, that notwithstanding anything contained herein to the contrary, the Court shall retain jurisdiction to determine the extent, priority, and allowance of the MDOR's Claims.

## JJ.   Louisiana Department of Revenue

142.   Notwithstanding any provision of the Plan, there shall be no requirement that the Louisiana Department of Revenue ("LDR") file any request for payment of Administrative Claims, nor any deadline for the filing of such requests.

143.   LDR shall be deemed to have opted out of the third-party releases in the Plan and Confirmation Order and shall not be "Releasing Parties" pursuant to the Plan or the Confirmation Order.

144.   On and after the Effective Date, LDR's Allowed Administrative Claims, if any, may accrue statutory interest and penalty in accordance with applicable law.

145.   To the extent the LDR's Priority Tax Claims, if any, are not paid in full in cash on the Effective Date, such Priority Tax Claims shall, at minimum, be paid by regular, quarterly

installment payments (to commence on the first day of the first calendar quarter following the Effective Date) in cash (including applicable interest) over a period not to exceed five years from the Petition Date.

146.     In no event shall a claim of the LDR be disallowed and/or expunged except in accordance with a properly filed and noticed objection to such claims with an opportunity to respond and be heard on such objection.

147.     Nothing in the Plan, this Confirmation Order, or the Plan Supplement limits LDR's rights under La. Rev. Stat. Ann. § 47:1561.  The rights of the LDR to exercise any right of set off or recoupment remains unaffected by the Plan.

148.     Nothing in the Plan or this Confirmation Order shall excuse the Debtors or the Wind-Down Trustee from any obligation under applicable Louisiana state law to timely submit returns (including, for the avoidance of doubt, any delinquent returns) which returns shall be filed by the later of, unless otherwise agreed by LDR in writing (email being sufficient), (a) 120 days after the Effective Date or (b) the applicable due date under Louisiana law and remit payment of taxes in the ordinary course of business.

149.     Unless otherwise provided by court order, Article VIII.I.1 is not applicable to LDR.

150.     For the avoidance of doubt, Article X.B and Article XI.G of the Plan shall not apply to LDR.

**KK.     Chubb Companies' Insurance Contracts**

151.     For the avoidance of doubt, notwithstanding anything to the contrary in the Plan (including Article VII.A), Disclosure Statement, the Plan Supplement, the Purchase Agreements, the Confirmation Order, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening), the following provisions shall apply to any insurance policies that

have been issued by ACE American Insurance Company and Federal Insurance Company and each of their U.S.-based affiliates and successors (collectively, the "Chubb Companies") to, or that provide coverage to, any of the Debtors at any time, and all agreements, documents or instruments relating thereto entered into by any of the Chubb Companies (collectively, the "Chubb Insurance Contracts"):

    a.   nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Chubb Companies, the Debtors (or, after the Effective Date, the Wind-Down Trust), or any other individual or entity, as applicable, under any of the Chubb Insurance Contracts and any such rights and obligations shall be determined under the Chubb Insurance Contracts and applicable non-bankruptcy law; and to the extent coverage or payment is sought under any Chubb Insurance Contracts, the Chubb Companies shall be entitled to payment or reimbursement in full from the applicable Debtor or Post-Effective Date Debtor, as applicable, to the extent required under the applicable Chubb Insurance Contract, in the ordinary course and without the need for the Chubb Companies to file a Proof of Claim, Administrative Claim or to object to any cure amount; provided that any and all rights of the Debtors to dispute such payments or reimbursements are expressly reserved except that any payments made to the Chubb Companies at any time shall not be subject to avoidance under the bankruptcy code or applicable law; *provided* that the Chubb Companies shall not bring a cause of action against or otherwise directly pursue the Debtors' current or former directors, managers, officers, employees, or Professionals for such payments or reimbursements arising under the Chubb Insurance Contracts, except for actions determined by Final Order to have constituted actual fraud or gross negligence or to the extent necessary with respect to subrogation or similar claims; and

    b.   the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article XII.G. of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against the Chubb Companies under applicable non-bankruptcy law to proceed with their claims; (II) the Chubb Companies to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against the Chubb Companies under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article XII.G of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Chubb Companies to cancel any Chubb Insurance Contracts, and take, in their sole discretion, other actions relating to the Chubb Insurance Contracts (including setting off amounts due by the Debtors or the Wind-Down Trust against any amounts due to the Debtors or Wind-Down Trust or against (or otherwise applying) any collateral or security provided by the Debtors or Wind-Down Trust, regardless of when any such amounts arise, become due or are

provided), to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Chubb Insurance Contracts. Upon the Effective Date, based on the foregoing treatment, all Proofs of Claim on account of or in respect of the Chubb Insurance Contracts shall be deemed withdrawn automatically and without further notice to or action by the Court.

## LL.     Synchro LLC

152.     Notwithstanding anything to the contrary in the Plan or this Confirmation Order, Synchro LLC ("Synchro") shall be deemed to have opted out of the Third Party Release in the Plan and Confirmation Order and shall not be "Releasing Parties" pursuant to the Plan or the Confirmation Order. Synchro's material and mechanic lien claim filed against Debtor BJ Services, LLC, at claim no. 127, is classified as a Class 1, Other Secured Claim. Synchro's lien claim is not otherwise released, settled, discharged or expunged, pending further order of a court of competent jurisdiction, payment of the claim in full, or agreement between the Debtors and Synchro. The Debtors reserve all rights to settle, object to, or otherwise challenge the validity, priority, and/or enforceability of all of Synchro claims against the Debtors or the Wind-Down Trust.

## MM.    Texas Taxing Authorities[3]

153.     Notwithstanding anything in the Plan or this Confirmation Order to the contrary, the liens securing the Texas Taxing Authorities' Claims in any assets not previously sold, shall not be released and/or discharged until the Texas Taxing Authority Claims are paid in full. The Debtors or the Wind-Down Trust, as applicable, shall pay the Allowed Texas Taxing Authority Claims on the Effective Date (or as soon as reasonably practicable thereafter after reconciliation of the amounts due by and between the Debtor or the Wind-Down Trust and the Texas Taxing Authorities). The Debtors or the Wind-Down Trust shall maintain a segregated account in the amount of $3,530,176.25 for the benefit of the Texas Taxing Authorities to hold the

---

[3]     "Texas Taxing Authorities" means Brazos County, Erath County, Bexar County, Dallas County, Ector CAD, Fort Bend County, Harris County, Hood CAD, Liberty County, Victoria County, Tomball ISD and City of Tomball.

proceeds of the assets securing the Texas Taxing Authorities' Claims until such Claims are paid in full or otherwise agreed by the Texas Taxing Authorities and the Debtors. The liens of the Texas Taxing Authorities shall attach to the segregated account with the same priority and validity as exist at state law. Any real property transferred to CLMG as provided in the Settlement Agreement and Settlement Order shall be transferred to CLMG subject to the Texas Taxing Authorities' liens and CLMG shall assume full responsibility for the payment of the 2020 taxes on all transferred properties. In the event CLMG fails to timely pay the taxes on the transferred properties, the Texas Taxing Authorities may proceed with non-bankruptcy collections against CLMG and/or the transferred properties without leave or approval of the Court. The Texas Taxing Authorities may amend their respective Proofs of Claims in accordance with applicable law to reflect the results of the actual assessment of the current year's ad valorem taxes without agreement with the Reorganized Debtors or approval of the Court. Further, nothing in the Plan or this Confirmation Order shall be construed as a determination as to whether the Texas Taxing Authorities are entitled to interest on any prepetition or postpetition Claims, or the amount or rates of such interest. The Debtors and the Texas Taxing Authorities reserve all rights with respect to any Claims for prepetition or postpetition interest on any Claims made by the Texas Taxing Authorities.

**NN.  Imperial PFS**

154.  For the avoidance of doubt, the remaining obligations under the *Premium Finance Agreement*, effective April 1, 2020, by and between the Debtors and Talbot Premium Financing, LLC (the "Finance Agreement"), as assigned to Imperial PFS ("IPFS"), shall constitute an unimpaired "Other Secured Claim" under the Plan; nothing within this Order or the Plan prejudices or impairs IPFS's liens, rights, and interests in the scheduled policies (the "Policies") under the Finance Agreement, including, without limitation, any return premiums (the "Collateral"); such

liens, rights, and interests shall attach to the Collateral to same extent, validity, and priority as existed prior to the Petition Date. To the extent applicable, relief from the automatic stay is granted effective immediately upon entry of this Order to permit the transfer by Lockton Companies LLC (the "Agent") of any return premiums with respect to canceled Policies to IPFS and IPFS's application of the same to the obligations under the Finance Agreement. IPFS shall apply any such return premiums to the obligations and, upon receipt, remaining monthly payments under the Finance Agreement shall be reduced to an amount sufficient to pay the remaining balance by the loan's maturity date of January 21, 2021. IPFS shall provide an accounting to the Debtors/Reorganized Debtors of IPFS's application of any return premiums or additional unearned return premiums IPFS receives from the Agent. If any additional Policies subject to the Finance Agreement are cancelled, whether before or after the effective date of the Plan, IPFS shall be entitled to receive and apply any additional return premiums under such Policies consistent with the terms of the Finance Agreement without further relief from the Court; provided, however, for the avoidance of doubt, any additional return premiums in excess of the amounts owed to IPFS under the Finance Agreement shall be returned to the Debtors/Reorganized Debtors, as directed by the Debtors/Reorganized Debtors. To the extent applicable, any stay under Bankruptcy Rule 4001(a)(3) shall not apply and the terms of this paragraph shall be immediately enforceable upon entry of this Order.

**OO.  Eagle Valley Development, LLC**

155.    Notwithstanding anything in this Order, the Plan or otherwise, the defenses, Claims and alleged rights of setoff or recoupment asserted by Eagle Valley Development, LLC ("Eagle Valley"), including but not limited to those matters set forth in Eagle Valley's Proof of Claim, shall not be extinguished, released or otherwise impaired and Eagle Valley may continue to assert and prosecute such matters in connection with any efforts to collect on claims or actions asserted

against Eagle Valley. The Debtors' rights are reserved in all respects in connection with any claim or Lien asserted by Eagle Valley and/or Solaris Oilfield Infrastructure, Inc.

**PP.    Equipment Term Loan Lenders**

156.    Notwithstanding anything to the contrary in this Order and the Plan:

a.    the *Agreed Order with Respect to GACP Finance Co., LLC's Emergency Motion for Relief from the Automatic Stay*, [Docket No. 290] (the "GACP Lift Stay Order"), and the obligations of the Equipment Term Loan Agent and the Debtors, including any successors in interest, shall remain in full effect and shall not be impacted by any provisions of the Order and the Plan;

b.    As set forth in Article IV.B.4 of the Plan, the Equipment Term Loan Lenders shall retain their liens on the Equipment Term Loan Collateral until such time as they have received indefeasible payment in full in Cash on account of their Claims, or have received and accepted the Equipment Term Loan Collateral in satisfaction of their Claims.

**QQ.    Infosys**

157.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the assumption of the Master Services Agreement between Infosys Limited and BJ Services, LLC [Docket No. 1054] shall not impair or be deemed to disallow (a) the prepetition proofs of claim filed in these cases by Infosys Limited, Infosys BPM Limited and Infosys McCamish Systems LLC, or (b) any claims such parties may file for rejection damages resulting from the Debtors' rejection of prepetition statements of work between BJ Services, LLC and such parties [Docket. No. 1055].

**RR.    Third-Party Release Opt Out**

158.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order, Rhodes Development Company, Marjorie S. Rhodes, LLC, the QTIP Marital Trust created under the Frank A. Rhodes, Jr. Separate Property Trust, dated July 14, 1998, and any affiliates thereof

shall be deemed to have opted out of the third party releases in the Plan and Confirmation Order and shall not be "Releasing Parties" pursuant to the Plan or the Confirmation Order.

**SS.     United States**

159.    Nothing in this Confirmation Order or the Plan discharges, releases, precludes, or enjoins any liability to a Governmental Unit on the part of any Person or entity other than the non-Debtors or the Wind-Down Trust.  Nothing in this Confirmation Order or the Plan shall affect any valid right of setoff or recoupment of any Governmental Unit.

**TT.     UE Manufacturing LLC**

160.    Notwithstanding anything in this Order, the Plan or otherwise, the rights, claims and/or liens, if any, of UE Manufacturing LLC ("UEM") with respect to that portion of the Equipment Term Loan Collateral in UEM's possession as described in a separate Letter Agreement (the "Letter Agreement") between UEM and the Equipment Term Loan Agent (the "Possessed Equipment"), and the Equipment Term Loan Agent's rights, claims, objections and defenses thereto, shall not be allowed, determined, extinguished, released or otherwise impaired in any way and shall be addressed as set forth in such Letter Agreement.

**UU.     Dissolution of the Creditors' Committee**

161.    On the Effective Date, the Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of (i) preparing, filing, reviewing, prosecuting and resolving requests for payment of Professional Fee Claims and (ii) any appeal of this Order.  The Wind-Down Trust and Wind-Down Trustee shall not be responsible for paying any fees or expenses incurred by the Committee Members or advisors to the Committee after the Effective Date except for the limited purposes identified above.

**VV.  Effect of Non-Occurrence of Conditions to the Effective Date**

162.  If the Effective Date of the Plan does not occur, (a) the Plan shall be null and void in all respects other than as set forth herein and (b) nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

**WW.  Effect of Conflict Between Plan, the Disclosure Statement, the Plan Supplement, and Confirmation Order**

163.  Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or the Plan Supplement (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided*, however, to the extent that either the Plan or Confirmation Order is inconsistent with the Settlement Agreement or the Settlement Order with respect to provisions of the Plan that explicitly refer to or incorporate the Settlement Agreement or the Settlement Order, the Settlement Agreement or the Settlement Order, as applicable, shall govern solely with respect to the sections of the Plan concerning the Settlement Agreement and the Settlement Parties.

**XX.  Retention of Jurisdiction**

164.  This Court retains jurisdiction over the Chapter 11 Cases, all matters arising out of or related to the Chapter 11 Cases and the Plan, the matters set forth in Article XI and other applicable provisions of the Plan.

## YY.     Waiver of 14-Day Stay

165.    Notwithstanding Bankruptcy Rule 3020(e), and to the extent applicable, Bankruptcy Rules 6004(h), 7062, and 9014, this Confirmation Order is effective immediately and not subject to any stay.

## ZZ.     Final Order

166.    This Confirmation Order is a Final Order and the period in which an appeal must be filed will commence upon entry of this Confirmation Order.

Signed: November 06, 2020

Marvin Isgur
United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BJ SERVICES, LLC, *et al.*,[1] | ) | Case No. 20-33627 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

**DEBTORS' COMBINED DISCLOSURE STATEMENT AND
JOINT FIRST AMENDED CHAPTER 11 PLAN**

---

Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com
        cgreco@kirkland.com

- and -

Joshua M. Altman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    josh.altman@kirkland.com

Dated:  November 6, 2020

*Co-Counsel to the Debtors and Debtors in Possession*

Jason S. Brookner (TX Bar No. 24033684)
Paul D. Moak (TX Bar No. 00794316)
Amber M. Carson (TX Bar No. 24075610)
**GRAY REED & McGRAW LLP**
1300 Post Oak Boulevard, Suite 2000
Houston, Texas 77056
Telephone:    (713) 986-7127
Facsimile:    (713) 986-5966
Email:    jbrookner@grayreed.com
        pmoak@grayreed.com
        acarson@grayreed.com

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  BJ Services, LLC (3543); BJ Management Services, L.P. (8396); BJ Services Holdings Canada, ULC (6181); and BJ Services Management Holdings Corporation (0481).  The Debtors' service address is: 11211 Farm to Market 2920 Road, Tomball, Texas 77375.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (THIS "<u>DISCLOSURE STATEMENT</u>" OR "<u>PLAN</u>," AS APPLICABLE). NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN Article XVI HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND ALL OF THE ACTIONS NECESSARY TO EFFECTUATE THE PLAN. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3016(B), THE PROCEDURES FOR COMPLEX CASES IN THE SOUTHERN DISTRICT OF TEXAS (EFFECTIVE AUGUST 7, 2020) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"). SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTORS' EXPECTATIONS WITH RESPECT TO FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. <u>MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS, THEREFORE, SPECULATIVE.</u>

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE

DEBTORS' BUSINESSES. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE WIND-DOWN TRUSTEE OR THE LIQUIDATION TRUSTEE MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED AMENDED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN Article XIII OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED. YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING BUT NOT LIMITED TO THE PLAN AND Article XVI OF THIS DISCLOSURE STATEMENT ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND ANY TRANSACTIONS CONTEMPLATED THEREBY.

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

UNLESS SIGNIFICANT MODIFICATIONS ARE MADE TO THE PLAN, THE COMMITTEE BELIEVES IT MAY NOT PROVIDE FOR ANY CERTAIN RECOVERY FOR UNSECURED CREDITORS, IMPERMISSIBLY HINDERS OR OTHERWISE LIMITS THE COMMITTEE'S ONGOING INVESTIGATION OF CLAIMS AND CAUSES OF ACTION, AND PROVIDES IMPROPER RELEASES WITHOUT ADEQUATE

CONSIDERATION OR OTHER APPROPRIATE JUSTIFICATION.  ACCORDINGLY, THE COMMITTEE DOES
NOT CURRENTLY SUPPORT CONFIRMATION OF THE PLAN.

## TABLE OF CONTENTS

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**...........................................................................................................**2**
    A.    Defined Terms ...................................................................................................2
    B.    Rules of Interpretation ...................................................................................13
    C.    Computation of Time ......................................................................................14
    D.    Governing Law ...............................................................................................14
    E.    Reference to Monetary Figures .....................................................................14
    F.    Controlling Document ....................................................................................14

**ARTICLE II. BACKGROUND AND DISCLOSURES** ................................................................**14**
    A.    Corporate History...........................................................................................14
    B.    The Debtors' Assets and Operations.............................................................16
    C.    Prepetition Capital Structure .........................................................................18
    D.    Events Leading to the Chapter 11 Cases .......................................................19
    E.    Market and Industry-Specific Challenges .....................................................19
    F.    Borrowing Base Redetermination .................................................................21
    G.    Exploration of Potential Alternatives ...........................................................22
    H.    Events of the Chapter 11 Cases .....................................................................23

**ARTICLE III. ADMINISTRATIVE AND PRIORITY CLAIMS** ..............................................**27**
    A.    Administrative Claims and Priority Claims ..................................................27
    B.    Professional Compensation............................................................................28
    C.    U.S. Trustee Statutory Fees ...........................................................................29

**ARTICLE IV. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**...........**29**
    A.    Summary of Classifications ...........................................................................29
    B.    Treatment of Classes of Claims and Interests ...............................................30
    C.    Special Provision Governing Unimpaired Claims .........................................34
    D.    Elimination of Vacant Classes.......................................................................34
    E.    Voting Classes; Presumed Acceptance by Non-Voting Classes ....................35
    F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ..................35
    G.    Controversy Concerning Impairment.............................................................35
    H.    Subordinated Claims ......................................................................................35
    I.    Classes Not Entitled to Vote on the Plan ......................................................35
    J.    Classes Entitled to Vote on the Plan .............................................................36
    K.    Votes Required for Acceptance by a Class ....................................................36
    L.    Certain Factors to Be Considered Prior to Voting ........................................36
    M.    Solicitation Procedures ..................................................................................37
    N.    Voting Procedures .........................................................................................38
    O.    Plan Objection Deadline ................................................................................40

**ARTICLE V. CONFIRMATION OF THE PLAN** ....................................................................**40**
    A.    Combined Hearing .........................................................................................40
    B.    Requirements for Confirmation of the Plan ..................................................40
    C.    Best Interests of Creditors .............................................................................41
    D.    Feasibility.......................................................................................................42
    E.    Acceptance by Impaired Classes ...................................................................42
    F.    Confirmation without Acceptance by All Impaired Classes .........................42

**ARTICLE VI. MEANS FOR IMPLEMENTATION OF THE PLAN** ..........................................**43**
    A.    Restructuring Transactions ............................................................................43
    B.    Settlement ......................................................................................................44
    C.    Sources of Consideration for Plan Distributions ...........................................44
    D.    General Settlement of Claims ........................................................................45

| | | |
|---|---|---|
| E. | [Reserved] | 45 |
| F. | Wind-Down Trust and Liquidation Trust | 45 |
| G. | Cancellation of Securities and Agreements | 47 |
| H. | Corporate Action | 47 |
| I. | Release of Liens | 48 |
| J. | Effectuating Documents; Further Transactions | 48 |
| K. | Exemption from Certain Taxes and Fees | 48 |
| L. | Causes of Action | 48 |
| M. | Lift Stay Order | 49 |
| N. | Committee Challenge Rights | 49 |
| O. | Closing the Chapter 11 Cases | 49 |

**ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 49**

| | | |
|---|---|---|
| A. | Assumption and Assignment of Executory Contracts and Unexpired Leases | 49 |
| B. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 49 |
| C. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 50 |
| D. | D&O Policies | 50 |
| E. | Indemnification Obligations | 50 |
| F. | Reservation of Rights | 51 |
| G. | Nonoccurrence of Effective Date | 51 |

**ARTICLE VIII. PROVISIONS GOVERNING DISTRIBUTIONS ... 51**

| | | |
|---|---|---|
| A. | Timing and Calculation of Amounts to Be Distributed | 51 |
| B. | Payment of Prepetition ABL Agent Fees and Expenses | 51 |
| C. | Rights and Powers of the Debtors, Wind-Down Trust, and the Liquidation Trustee | 52 |
| D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 52 |
| E. | Compliance with Tax Requirements/Allocations | 53 |
| F. | Allocation of Plan Distributions Between Principal and Interest | 53 |
| G. | Setoffs and Recoupment | 53 |
| H. | No Postpetition Interest on Claims | 54 |
| I. | Claims Paid or Payable by Third Parties | 54 |

**ARTICLE IX. THE LIQUIDATION TRUST ... 54**

| | | |
|---|---|---|
| A. | Appointment of the Liquidation Trustee | 54 |
| B. | Establishment of a Trust Oversight Committee | 55 |
| C. | Reserved | 55 |
| D. | Creation of the Liquidation Trust | 55 |
| E. | Liquidation Trust Beneficiaries of the Liquidation Trust | 55 |
| F. | Vesting and Transfer of Assets to the Liquidation Trust | 55 |
| G. | Certain Powers and Duties of the Liquidation Trust and Liquidation Trustee | 56 |
| H. | U.S. Federal Income Tax Reporting and Withholding Obligations of the Liquidation Trustee | 57 |
| I. | Term of Liquidation Trust | 57 |
| J. | Limitation of Liability | 57 |

**ARTICLE X. RESERVES ADMINISTERED BY THE LIQUIDATION TRUSTEE OR WIND-DOWN TRUST ... 58**

| | | |
|---|---|---|
| A. | Establishment of Reserve Accounts | 58 |
| B. | Undeliverable Distribution Reserve | 58 |
| C. | Administrative and Priority Claims Reserve | 58 |
| D. | Other Secured Claims Reserve | 59 |

**ARTICLE XI. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS ... 59**

| | | |
|---|---|---|
| A. | Allowance of Claims and Interests | 59 |
| B. | Claims and Interests Administration Responsibilities | 59 |

C. Estimation of Claims........................................................................................................59
D. Adjustment to Claims Register Without Objection............................................................60
E. Time to File Objections to Claims ....................................................................................60
F. Disallowance of Claims....................................................................................................60
G. Amendments to Claims .....................................................................................................60
H. No Distributions Pending Allowance................................................................................60
I. Distributions After Allowance ..........................................................................................61
J. Single Satisfaction of Claims ...........................................................................................61

**ARTICLE XII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS.....................61**
A. Compromise and Settlement of Claims, Interests, and Controversies ...........................61
B. Term of Injunctions or Stays............................................................................................61
C. **Release of Liens**............................................................................................................61
D. **Release by the Debtors**................................................................................................62
E. **Third Party Release** ....................................................................................................63
F. **Exculpation**.................................................................................................................64
G. **Injunction**....................................................................................................................64
H. Recoupment .....................................................................................................................64
I. Subordination Rights........................................................................................................65

**ARTICLE XIII. SUBSTANTIAL CONSUMMATION OF THE PLAN .............................................65**
A. Conditions Precedent to Consummation of the Plan........................................................65
B. Waiver of Conditions........................................................................................................65
C. Substantial Consummation ..............................................................................................65
D. Effect of Non-Occurrence of Conditions to the Effective Date ........................................66

**ARTICLE XIV. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ..........................66**
A. Modification and Amendments .........................................................................................66
B. Effect of Confirmation on Modifications ..........................................................................66
C. Revocation or Withdrawal of the Plan .............................................................................66

**ARTICLE XV. RETENTION OF JURISDICTION ..............................................................................66**

**ARTICLE XVI. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING ............................68**
A. Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims Under
the Plan .............................................................................................................................68
B. Certain Bankruptcy Law Considerations .........................................................................70
C. Disclosure Statement Disclaimer .....................................................................................72
D. Liquidation under Chapter 7 ............................................................................................73

**ARTICLE XVII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
THE PLAN ...................................................................................................................................74**
A. Introduction......................................................................................................................74
B. Certain U.S. Federal Income Tax Consequences to the Debtors......................................75
C. Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims
Entitled to Vote .................................................................................................................77
D. Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims
Entitled to Vote .................................................................................................................79
E. Information Reporting and Back-Up Withholding ............................................................81

**ARTICLE XVIII. MISCELLANEOUS PROVISIONS .........................................................................82**
A. Immediate Binding Effect.................................................................................................82
B. Additional Documents ......................................................................................................82
C. Dissolution of Committee .................................................................................................82
D. Reservation of Rights........................................................................................................82
E. Successors and Assigns.....................................................................................................82

F.    Service of Documents ................................................................................................. 82
G.    Entire Agreement ........................................................................................................ 84
H.    Nonseverability of Plan Provisions ............................................................................ 84
I.    Votes Solicited in Good Faith .................................................................................... 84
J.    Waiver or Estoppel ..................................................................................................... 84

## INTRODUCTION

The Debtors propose the following *Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan* for the resolution of outstanding Claims against, and Interests in, the Debtors. Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in Article I of the Plan. On July 20, 2020, the Bankruptcy Court entered an order [Docket No. 13] authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

**Each of the Debtors' boards of managers or directors or sole member has approved the Plan and believes the Plan is in the best interests of the Debtors' Estates. As such, the Debtors recommend that all Holders of Claims entitled to vote accept the Plan by returning their ballots (each, a "Ballot") so as to be actually received by the Solicitation Agent (as defined herein) no later than November 3, 2020, at 11:59 p.m. (prevailing Central Time). Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing on November 6, 2020, at 10:00 a.m. (prevailing Central Time).**

As more fully described below, the Debtors Filed voluntary petitions for relief pursuant to chapter 11 on the Petition Date. The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan. To that end, the Debtors Filed the Plan, the terms of which are more fully described herein, contemporaneously herewith. The Plan contemplates a liquidation of each of the Debtors and their Estates. The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and Allowed Interests and to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates and therefore seek to confirm the Plan.

Generally speaking, the Plan: (a) provides for the full and final resolution of certain funded debt obligations; (b) contemplates the creation of the Wind-Down Trust and appointment of a Wind-Down Trustee to (i) wind down the Debtors' businesses and affairs; (ii) pay and reconcile certain Claims; and (iii) administer the Plan in an efficacious manner; (c) provides for Cash distributions in accordance with the Plan; and (d) pays Allowed Administrative and Priority Claims. In addition, a Liquidation Trust will be created and a Liquidation Trustee appointed to, among other things, act as the Liquidation Trust representative on the Wind-Down Trust Oversight Committee, reconcile General Unsecured Claims and make distributions to Holders of Unsecured Claims. The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and additional cost of liquidation under chapter 7 of the Bankruptcy Code.

The Plan classifies Holders of Claims or Interests according to the type of the Holder's Claim or Interest, as more fully described below. Holders of Claims in Class 3 (Prepetition ABL Facility Claims), Class 4 (Equipment Term Loan Claims), Class 5 (Real Estate Term Loan Claims), and Class 6 (General Unsecured Claims) are entitled to vote to accept or reject the Plan.

ALL HOLDERS OF CLAIMS OR INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS COMBINED PLAN AND THE DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED IN THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS UNDER THE CIRCUMSTANCES. THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

# ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Administrative Claim*" means a Claim for the costs and expenses of administration of the Estates entitled to priority under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) any Allowed Diminution in Value Claims (to the extent provided for under the Settlement).

2.      "*Administrative Claims Bar Date*" means the first Business Day that is 30 days following the Effective Date, except as specifically set forth in the Plan or a Final Order, including, without limitation, the Bar Date Order.

3.      "*Administrative and Priority Claims Reserve*" means a reserve established by the Wind-Down Trust on the Effective Date to be used to pay Holders of all Allowed Priority Claims and Allowed Administrative Claims (subject to the terms of the Settlement Agreement), to the extent that such claims have not been paid in full on or before the Effective Date.  For the avoidance of doubt, Allowed Diminution in Value Claims shall not be included, nor be paid from, the Administrative and Priority Claims Reserve.

4.      "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

5.      "*Agent*" means each of the agents under the Credit Documents.

6.      "*Allowed*" means with respect to Claims:  (a) any Claim, proof of which is timely Filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court, a Proof of Claim is not or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order; *provided*, *further*, that the Liquidation Trustee may affirmatively determine to deem Allowed any General Unsecured Claim described in clause (a) notwithstanding the fact that the period within which an objection may be interposed has not yet expired.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor, as applicable.  For the avoidance of doubt, except as provided herein or otherwise agreed, no Entity may File a Proof of Claim after the Claims Bar Date without further order of the Bankruptcy Court.  "Allow" and "Allowing" shall have correlative meanings.

7.      "*Avoidance Actions*" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws, including, without limitation, all preference, fraudulent transfer, fraudulent conveyance and/or similar avoidance claims, rights and causes of action whether or not demand has been made or litigation has been commenced as of the Effective Date to prosecute such Avoidance Actions.

8.     "*Ballot*" means a ballot authorized by the Bankruptcy Court pursuant to the Disclosure Statement Order to indicate acceptance or rejection of the Plan and to make an election with respect to the third party release provided by Article XII.E hereof.

9.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as the same may be amended from time to time.

10.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

11.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

12.     "*Bar Date Order*" means the *Order (A) Setting Bar Dates for Submitting Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim, (C) Approving Notice Thereof, and (D) Granting Related Relief* [Docket No. 547].

13.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

14.     "*Canadian Court*" means the Court of Queen's Bench of Alberta in the Judicial Centre of Calgary located in Calgary, Alberta, Canada conducting foreign recognition proceedings of the Chapter 11 Cases of BJ Services, LLC and BJ Services Holdings Canada, ULC.

15.     "*Cash*" means the legal tender of the United States or the equivalent thereof.

16.     "*Cash Collateral Orders*" means each of the Orders (whether interim or a notice extending a prior order) approving the Debtors' use of cash collateral [Docket Nos. 88, 261, 505, 551, 622, 750, 847, 882, 952, 965, 1005, 1027, and 1060].

17.     "*Causes of Action*" means, subject to the releases, exculpations, and injunctions set forth in the Plan, any claim, cause of action (including Avoidance Actions), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, which was not conveyed to the Purchasers in connection with any of the Sale Transactions and which was property of the Debtors or in which the Debtors held rights as of the Effective Date.

18.     "*Challenge Deadline*" means the deadline by which the Committee may assert a challenge pursuant to the Cash Collateral Orders, as extended by the Bankruptcy Court from time to time.

19.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases commenced by the Debtors on the Petition Date and styled *In re BJ Services, LLC.*, Case No. 20-33627 (MI), which are currently pending before the Bankruptcy Court.

20.     "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

21. "*Claims Bar Date*" means the bar date by which a Proof of Claim must be or must have been Filed, as established by (a) a Final Order of the Bankruptcy Court, including, without limitation, the Bar Date Order, or (b) pursuant to the Plan.

22. "*Claims Objection Deadline*" means the date that is one hundred eighty days (180) days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

23. "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent.

24. "*Class*" means a category of Holders of Claims or Interests as set forth in Article IV hereof pursuant to section 1122(a) of the Bankruptcy Code.

25. "*Combined Hearing*" means the hearing held by the Bankruptcy Court to consider final approval of the Disclosure Statement and Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, which hearing is currently scheduled to commence on November 6, 2020, at 10:00 a.m., prevailing Central Time, as may be extended from time to time pursuant to an Order of the Bankruptcy Court.

26. "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code pursuant to that certain *Notice of Appointment of Creditors' Committee* Filed by the U.S. Trustee on July 28, 2020 [Docket No. 199].

27. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

28. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

29. "*Confirmation Hearing*" means the Combined Hearing, as it relates to Confirmation of the Plan.

30. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

31. "*Consolidation*" has the meaning ascribed to it in Article IV.A.1 hereof.

32. "*Consummation*" means the occurrence of the Effective Date.

33. "*Credit Documents*" means, collectively, the Prepetition ABL Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the Prepetition ABL Credit Agreement; the Equipment Term Loan Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the Equipment Term Loan Credit Agreement; and the Real Estate Term Loan Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the Real Estate Term Loan Credit Agreement.

34. "*Credit Facility Claims*" means any Claim arising under, derived from, based upon, or related to the Credit Documents.

35. "*D&O Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', and officers' liability.

36. "*Debtors*" means, collectively, each of the following:  (a) BJ Services, LLC; (b) BJ Management Services, L.P.; (c) BJ Services Holdings Canada, ULC; and (d) BJ Services Management Holdings Corporation.

37. "*Diminution in Value Claims*" means any claims on account of diminution of value of collateral as provided for in the Cash Collateral Orders and subject to the limitations set forth in the Settlement Agreement or otherwise which Claims are Allowed by Final Order of the Bankruptcy Court.

38.    "*Disallowed*" means, with respect to any Claim, or any portion thereof, that such Claim, or any portion thereof, is not Allowed.

39.    "*Disclosure Statement Order*" means (as applicable) the interim and final Orders approving solicitation of the combined Plan and Disclosure Statement.

40.    "*Disputed*" means, with respect to any Claim, any Claim that is not yet Allowed.

41.    "*Distribution*" means Cash, property, interests in property or other value distribution to Holders of Allowed Claims, or their designated agent, including the Liquidation Trust Beneficiaries, as applicable under this Plan, Wind-Down Trust Agreement and/or the Liquidation Trust Agreement.

42.    "*Distribution Record Date*" means the first Business Day that is two Business Days after the Confirmation Date.

43.    "*Distribution Reserve Accounts*" means the respective accounts holding each of the reserves established pursuant to this Plan, and such other reserve accounts as may be established by the Liquidation Trustee, the Administrative and Priority Claims Reserve, the Undeliverable Distribution Reserve, and the Other Secured Claims Reserve.

44.    "*Effective Date*" means the later of the date (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article XIII of the Plan have been satisfied or waived; and (c) November 6, 2020. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

45.    "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

46.    "*Equipment Term Loan*" means the term loan related to the Equipment Term Loan Credit Agreement, which provides for a $200 million term loan with a maturity date of January 3, 2023.

47.    "*Equipment Term Loan Agent*" means GACP Finance Co., LLC, as administrative agent under the Equipment Term Loan, including any predecessors or successors thereto.

48.    "*Equipment Term Loan Claim*" means any claims arising from or based on the Equipment Term Loan Credit Agreement, together with all other documents, instruments, and agreements executed and delivered in connection therewith and all notices and other statements recorded or served, subject to the Settlement Agreement.

49.    "*Equipment Term Loan Contribution*" means the total amount of cash collateral of the Equipment Term Loan Lenders provided to the Debtors pursuant to the Settlement Agreement.

50.    "*Equipment Term Loan Collateral*" means the Equipment Term Loan Lenders' collateral under the Equipment Term Loan Credit Agreement.

51.    "*Equipment Term Loan Credit Agreement*" means that certain Term Loan Credit and Guaranty Agreement dated January 28, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms therein).

52.    "*Equipment Term Loan Lenders*" means the lenders party to the Equipment Term Loan Credit Agreement.

53.    "*Estate*" means, as to each Debtor, the estate created for such Debtor on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

54.    "*Exculpated Parties*" means, collectively:  (a) each Debtor; (b) the Debtors' current and former officers, directors, and managers; (c) each of the foregoing Entities' respective predecessors, successors and assigns, and

current and former stockholders, members, limited partners, general partners, equity holders, interest holders, Affiliates and its and their subsidiaries, principals, partners, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case solely in their capacity as such; and (d) the Committee and the Committee members and each of the Committee's agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case solely in their capacity as such.

55. "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

56. "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Effective Date.

57. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Solicitation Agent.

58. "*Final Order*" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Court (or the clerk of such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been reversed, stayed, modified, amended, or vacated, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with rule 8002 of the Bankruptcy Rules; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

59. "*General Unsecured Claim*" means any Claim against the Debtors that is not otherwise paid in full during the Chapter 11 Cases and is not: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) an Other Secured Claim; (f) an Intercompany Claim; (g) a Section 510(b) Claim; or (h) Credit Facility Claims. For the avoidance of doubt, any deficiency claim of any Lender that is an Allowed unsecured Claim shall be a General Unsecured Claim unless waived under the Settlement Agreement.

60. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

61. "*GUC Recovery Pool*" means the recovery allocated to General Unsecured Claims pursuant to the terms of the Settlement Agreement.

62. "*Holder*" means any Entity holding a Claim or an Interest.

63. "*Impaired*" means, with respect to a Claim or Interest, or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

64. "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, as applicable, and such parties' respective Affiliates.

65. "*Initial Distribution Date*" means the date on which the Liquidation Trustee makes initial distributions to Holders of Allowed Claims pursuant to the Plan.

66.   "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

67.   "*Intercompany Interest*" means any Interest in a Debtor held by another Debtor.

68.   "*Interest*" means any interest, equity, or share in the Debtors, including all options, warrants, or other rights to obtain such an interest or share in such Debtor, whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising therefrom.

69.   "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and (II) Granting Related Relief*, entered on August 26, 2020 [Docket No. 488].

70.   "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

71.   "*Lenders*" means collectively, the lenders under each of the Prepetition ABL Credit Agreement, the Equipment Term Loan Credit Agreement, and the Real Estate Term Loan Credit Agreement.

72.   "*Lift Stay Order*" means the order of the Bankruptcy Court lifting the automatic stay with respect to the M&E set forth therein [Docket No. 553].  Notwithstanding anything to the contrary herein, including Article XII, nothing herein shall modify the Equipment Term Loan Lenders' or the Equipment Term Loan Agent's rights or obligations under the Lift Stay Order, and the Debtors, Wind-Down Trust, the Prepetition ABL Lenders, Equipment Term Loan Lenders, the Equipment Term Loan Agent, and the Liquidation Trustee (as applicable) shall retain all rights, including the ability to seek relief from the Court, in connection with the Lift Stay Order.

73.   "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

74.   "*Liquidation Trust*" means the trust established on the Effective Date as described in Article IX of this Plan and in accordance with the Liquidation Trust Agreement.

75.   "*Liquidation Trust Beneficiary*" means any beneficiary of the Liquidation Trust that is or was a Holder of an Allowed General Unsecured Claim.

76.   "*Liquidation Trust Agreement*" means the trust agreement, in form and substance reasonably acceptable to the Committee to be executed by the Debtors and the Liquidation Trustee as of the Effective Date establishing the Liquidation Trust described in Article IX of this Plan.

77.   "*Liquidation Trust Assets*" means all assets transferred to the Liquidation Trust from the Debtors or the Wind-Down Trust after satisfaction of (i) all claims senior to Class 6 Claims (in accordance with Article III, Article IV, and the Settlement Agreement) and (ii) all fees and expenses incurred by (and that are the obligation of) the Debtors or Wind-Down Trust in connection with the wind-down.  In addition, the GUC Recovery Pool shall be an asset of the Liquidation Trust.

78.   "*Liquidation Trust Advisors*" means any firm(s) or individual(s) retained by the Liquidation Trustee to serve as the Liquidation Trustee's legal counsel or provide other professional services in connection with the performance of the Liquidation Trustee's duties and responsibilities under this Plan and the Liquidation Trust Agreement.

79.   "*Liquidation Trustee*" means the Person selected by the Committee and appointed to administer the Liquidation Trust, with such rights, duties, and obligations as set forth herein and in the Liquidation Trust Agreement.

80.   "*Liquidation Trust Operating Expenses*" means the overhead and other operational expenses of the Liquidation Trust to be initially funded in the amount of the Liquidation Trust Operating Reserve (or such other amount as agreed by a majority of the Trust Oversight Committee to be funded from Liquidation Trust Assets) including, but not limited to, (i) reasonable compensation for the Liquidation Trustee in accordance with the

Liquidation Trust Agreement, (ii) costs and expenses incurred by the Liquidation Trustee in administering the Liquidation Trust, (iii) Statutory Fees that may become payable after the Effective Date to the U.S. Trustee, and (iv) any fees and expenses payable to the Liquidation Trust Advisors.

81.     "*Liquidation Trust Operating Reserve*" means the reserve in the initial amount of $250,000 funded by the Debtors to the Liquidation Trust on the Effective Date deemed necessary by the Liquidation Trustee to satisfy its anticipated Liquidation Trust Operating Expenses.

82.     "*Local Bankruptcy Rules*" means the local rules of bankruptcy practice and procedure of the United States Bankruptcy Court for the Southern District of Texas.

83.     "*M&E*" means equipment, any certificates of title, books and records pertaining to any equipment, and proceeds of any of the foregoing, which altogether secure the Equipment Term Loan.  For the avoidance of doubt, M&E includes tools, machinery and equipment, but not fixtures, located at each of the Debtors' locations, which tools, machinery and equipment are encumbered by an unavoidable Lien in favor of the Agent for the Holders of the Equipment Term Loan Claims.

84.     "*Net Sale Proceeds*" shall have the meaning ascribed to such term in the Lift Stay Order.

85.     "*Non-Voting Status Notice*" means the notice to non-voting parties substantially in the form approved by the Bankruptcy Court.

86.     "*Order*" means an order of the Bankruptcy Court.

87.     "*Ordinary Course Professional*" means professionals employed by the Debtors in the ordinary course of their business pursuant to the Ordinary Course Professionals Order.

88.     "*Ordinary Course Professionals Order*" means the *Order (I) Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief*, entered on August 26, 2020 [Docket No. 489].

89.     "*Other Priority Claim*" means a Claim asserting a priority described in section 507(a) of the Bankruptcy Code, other than:  (a) a Credit Facility Claim; (b) an Administrative Claim; (c) a Professional Fee Claim; or (d) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

90.     "*Other Secured Claim*" means any Secured Claim, including a Secured Tax Claim, that is not a Prepetition ABL Facility Claim, Equipment Term Loan Claim, or Real Estate Term Loan Claim.

91.     "*Other Secured Claims Reserve*" means the account to be established and maintained by the Wind-Down Trust and funded with the proceeds of the sale of assets securing the Other Secured Claims pursuant to Article X.D.

92.     "*Parent*" means BJ Services, LLC.

93.     "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

94.     "*Petition Date*" means July 20, 2020, the date on which the Debtors commenced the Chapter 11 Cases.

95.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed at least 7 days prior to the Plan Objection Deadline (as defined herein), as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including:  (a) the Wind-Down Trust Agreement, (b) the Liquidation Trust Agreement; (c) a list of Executory Contracts and Unexpired Leases to be assumed and assigned pursuant to the Plan; (d) a schedule of Retained Causes of Action; and (e) identification and compensation of the Wind-Down Trustee and Liquidation

Trustee, which unless otherwise provided for herein, such documents shall be reasonably acceptable to the Committee, Prepetition ABL Lenders, Equipment Term Loan Lenders, and Real Estate Term Loan Lenders.

96.    *Post-Effective Date Debtors*" means the Debtors, the Wind-Down Trust, or any successor thereto after the Effective Date responsible for winding down the Debtors' Estates and implementing the terms of the Plan.

97.    "*Prepetition ABL Agent*" means JP Morgan Chase, N.A., as the administrative agent under the Debtors' Prepetition ABL Facility.

98.    "*Prepetition ABL Collateral*" means the Prepetition ABL Lenders' collateral under the Prepetition ABL Credit Agreement.

99.    "*Prepetition ABL Facility Claim*" means any claims arising from or based on the Prepetition ABL Credit Agreement, together with all other documents, instruments, and agreements executed and delivered in connection therewith and all notices and other statements recorded or served, subject to the limitations set forth in the Settlement Agreement.

100.   "*Prepetition ABL Credit Agreement*" means that certain Revolving Credit and Guaranty Agreement dated May 30, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms therein).

101.   "*Prepetition ABL Facility*" means the Debtors' asset-based revolving credit facility provided for under the Prepetition ABL Credit Agreement.

102.   "*Prepetition ABL Lenders*" means the lenders party to the Prepetition ABL Credit Agreement.

103.   "*Priority Claims*" means, collectively the Priority Tax Claims and Other Priority Claims.

104.   "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105.   "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

106.   "*Professional*" means any Entity retained in the Chapter 11 Cases in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 326, 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

107.   "*Professional Fee Claims*" means all Claims for reasonable and documented accrued fees and expenses (including transaction or sale fees) for services rendered by a Professional through and including the Effective Date, to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Court and regardless of whether a monthly fee statement or interim fee application has been Filed for such fees and expenses.  To the extent the Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

108.   "*Professional Fee Escrow*" means an interest-bearing escrow account to hold and maintain an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors as soon as reasonably practicable after the Effective Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed and unpaid Professional Fee Claims.  Such Cash shall remain subject to the jurisdiction of the Bankruptcy Court.

109.   "*Professional Fee Escrow Amount*" means the aggregate unpaid Professional Fee Claims through the Confirmation Date as estimated in accordance with Article III.B.1.

110. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

111. "*Purchasers*" means any purchaser of the Debtors' assets pursuant to any Purchase Agreements.

112. "*Purchase Agreements*" means any agreement for the purchase of certain of the Debtors' assets, including, without limitation, the credit bid by the Agent for the Holders of the Equipment Term Loan Claims for certain assets, approved by the Bankruptcy Court.

113. "*Real Estate Term Loan*" means the term loan related to the Real Estate Term Loan Credit Agreement.

114. "*Real Estate Term Loan Agent*" means CLMG Corp. as administrative agent under the Equipment Term Loan, including any predecessors or successors thereto.

115. "*Real Estate Term Loan Claim*" means any claims arising from or based on the Real Estate Term Loan Credit Agreement, together with all other documents, instruments, and agreements executed and delivered in connection therewith and all notices and other statements recorded or served, subject to the limitations set forth in the Settlement Agreement.

116. "*Real Estate Term Loan Collateral*" means the collateral under the Real Estate Term Loan Credit Agreement.

117. "*Real Estate Term Loan Credit Agreement*" means that certain Credit Agreement dated December 31, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms therein.

118. "*Real Estate Term Loan Lenders*" means the lenders party to the Real Estate Term Loan Credit Agreement.

119. "*Released Parties*" means: (a) each Debtor; (b) the Debtors' current and former officers, directors, and managers; (c) the Wind-Down Trustee and the Wind-Down Trust Oversight Committee; (d) the Liquidation Trustee; (e) the Agents, (f) the Lenders (solely in their respective capacities as Lenders under the Credit Documents); (g) the Committee and the Trust Oversight Committee; (h) the Sponsors; (i) all Holders of Claims or Interests that vote to accept or are presumed to accept the Plan; (j) all Holders of Claims or Interests that abstain from voting on the Plan, who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan, and who do not object to the Plan; and (k) with respect to each of the Debtors, the Post-Effective Date Debtors, and each of the foregoing Entities in clauses (a) through (j), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), interest holders, predecessors, participants, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any Holder of a Claim or Interest that opts out of the releases or objects to the Plan in respect of the releases shall not be a "Released Party."

120. "*Releasing Parties*" means: (a) the Released Parties; (b) all Holders of Claims or Interests that vote to accept or are presumed to accept the Plan; (c) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; (d) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to grant the releases provided in the Plan; and (e) with respect to each of the Debtors, the Post-Effective Date Debtors, and each of the foregoing Entities in clauses (a) through (d), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), interest holders, predecessors, successors, and assigns, subsidiaries, affiliates, managed

accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively.

121. "*Restructuring Transactions*" means the transactions described in Article VI.A of the Plan.

122. "*Retained Causes of Action*" means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Estate may hold against any Entity, including (a) [reserved]; (b) claims and causes of action brought prior to the Effective Date, (c) claims and causes of action against any Entities for failure to pay for products or services provided or rendered by any of the Debtors, (d) claims and causes of action relating to strict enforcement of any of the Debtors' intellectual property rights, including patents, copyrights and trademarks, including claims against third parties for infringement of any such intellectual property rights or other misuse of such intellectual property, and (e) claims and causes of action seeking the recovery of any of the Debtors' accounts receivable or other receivables or rights to payment created or arising in connection with any of the Debtors' businesses, including claim overpayments and tax refunds; *provided* that the Retained Causes of Action shall not include all Causes of Action settled, released, or exculpated under the Plan.

123. "*Sale Proceeds*" means all proceeds from the Sale Transactions, including the cash sale proceeds from the Sale Transactions and the right to enforce any Purchase Agreements.

124. "*Sale Transactions*" means all transactions between the Debtors and the Purchasers as set forth in any Purchase Agreements.

125. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

126. "*Section 510(b) Claims*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

127. "*Secured Claim*" means a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan or a Final Order as a Secured Claim.

128. "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

129. "*Segregated Collateral Accounts*" means segregated accounts that will hold the cash collateral, if any, of the Prepetition ABL Collateral, Equipment Term Loan Collateral, Real Estate Term Loan Collateral, and the proceeds of any assets subject to the adequate protection Liens (payable to the Prepetition ABL Lenders), in each case in accordance with the terms of the Settlement Agreement. For the avoidance of doubt, the Equipment Term Loan Contribution shall not be held in the Segregated Collateral Accounts.

130. "*Settlement*" means the compromise and settlement by and among the parties to the Settlement Agreement, including the Debtors and their respective estates, as set forth in the Settlement Agreement, as may be amended, supplemented, or otherwise modified.

131. "*Settlement Agreement*" means the terms of the Settlement set forth in that certain settlement agreement by and among the Debtors and the parties thereto as set forth in the *Debtors' Motion for Entry of an Order (1)*

*Approving the Settlement among the Debtors and the Parties to the Settlement Agreement and (II) Granting Related Relief* [Docket No. 1068].

132. "*Settlement Order*" means the Final Order(s) of the Bankruptcy Court approving the Settlement Agreement, including the Confirmation Order if the Settlement is approved thereby.

133. "Settlement Parties" means the "Parties," as defined in the Settlement Order.

134. "*Solicitation Date*" means the date upon which the Debtors commence the solicitation process in accordance with the Disclosure Statement Order.

135. "*Solicitation Procedures*" means that form of solicitation procedures approved by and attached as an exhibit to the Disclosure Statement Order.

*136.* "*Sponsors*" means each holder of an Interest in the Parent.

137. "*Subsequent Distribution Date*" means each date following the Initial Distribution Date on which the Liquidation Trustee in its reasonable discretion elects to make distributions to Holders of Allowed Claims pursuant to the Plan.

138. "*Trust*" means the Liquidation Trust or the Wind-Down Trust, as applicable.

139. "*Trust Agreement*" means the Liquidation Trust Agreement or the Wind-Down Trust Agreement, as applicable.

140. "*Trust Assets*" means the Liquidation Trust Assets and/or the Wind-Down Trust Assets, as applicable.

141. "*Trust Beneficiary*" means a Liquidation Trust Beneficiary or a Wind-Down Trust Beneficiary, as applicable.

142. "*Trust Oversight Committee*" means the oversight committee of up to three creditors appointed by the Committee pursuant to the terms of the Liquidation Trust Agreement and this Plan, which members will be identified in the Plan Supplement.

143. "*Trustee*" means the Liquidation Trustee or the Wind-Down Trustee, as applicable.

144. "*Undeliverable Distribution Reserve*" means the segregated, interest-bearing account designated for Distributions to Holders of Allowed Claims that are returned to the Liquidation Trustee or Wind-Down Trust (as applicable) as undeliverable or are otherwise unclaimed.

*145.* "*Unencumbered Sale Proceeds*" means the proceeds from the sale of the Debtors' or Wind-Down Trust (as applicable) assets, that are unencumbered by (i) prepetition Liens or proceeds greater than the amount required to satisfy the Liens on such assets and (ii) adequate protection Liens (subject to the terms of the Settlement Agreement).

146. "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

147. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

148. "*United States*" means the United States of America and its agencies.

149. "*U.S. Trustee*" means the United States Trustee for the Southern District of Texas.

150. "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

151. "*Wind-Down Trust*" means that certain trust that may be created on the Effective Date, as described in Article VI.F.1.

152. "*Wind-Down Trust Assets*" means (a) the Sale Proceeds and the Unencumbered Sale Proceeds, (b) the Equipment Term Loan Contribution, (c) the Excluded Assets, as defined in each of the Purchase Agreements, to the extent not otherwise sold; (d) the Debtors' rights under the Purchase Agreements and associated documents, including all rights of recovery under the Purchase Agreements and any ancillary agreements among the Debtors and the Purchasers; (e) the Distribution Reserve Accounts; (f) the Net Sales Proceeds and Excess Collateral (both as defined in the Lift Stay Order and subject to the terms thereof) and title to the Equipment Term Loan Collateral, to the extent not otherwise sold (and subject to the terms of the Lift Stay Order); and (g) all other assets of the Debtors or of the Estates existing on the Effective Date after giving effect to all distributions required to be made as of, prior to, or after the Effective Date by an Entity other than the Liquidation Trustee, including, but not limited to, any Cash and any real or personal property. For the avoidance of doubt, the Wind-Down Trust Assets shall not include (y) any claims or Causes of Action released pursuant to Article XII.D hereof or exculpated pursuant to Article XII.F hereof; or (z) funds held in the Professional Fee Escrow.

153. "*Wind-Down Trust Account*" means the Debtors' bank account or accounts funded in the amount of $250,000 used to fund all expenses and payments that are the responsibility of the Wind-Down Trustee in connection with the wind-down.

154. "*Wind-Down Trust Agreement*" means the agreement to be executed as of the Effective Date establishing the Wind-Down Trust pursuant to this Plan, substantially in the form Filed with the Plan Supplement and all ancillary documents and agreements related there.

155. "*Wind-Down Trust Beneficiary*" means any beneficiary of the Wind-Down Trust, including each party that is or was a Holder of an Allowed Prepetition ABL Facility Claim or an Allowed Equipment Term Loan Claim.

156. "*Wind-Down Trustee*" means the Person acting as trustee of and administrator of the Wind-Down Trust as described in Article VI.F.1.

157. "*Wind-Down Trust Oversight Committee*" means the oversight committee set forth in the Wind-Down Trust Agreement.

B.    *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (5) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the

Bankruptcy Court in the Chapter 11 Cases; (11) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (12) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Liquidation Trustee in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (14) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and except to the extent the *Companies' Creditors Arrangement Act*, RSC 1985, c C-36, as amended, applies with respect to foreign recognition proceedings before the Canadian Court, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles; *provided*, *however*, that corporate governance matters relating to the Debtors or the Wind-Down Trust, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States, unless otherwise expressly provided in the Plan.

F.      *Controlling Document*

In the event of an inconsistency herein between the Plan portion and the Disclosure Statement portion, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan shall control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.  To the extent, however, either the Plan or Confirmation Order, on the one hand, is inconsistent with either the Settlement Agreement or the Settlement Order, on the other hand, the parties agree that the Settlement Agreement or the Settlement Order, as applicable, shall control.

# ARTICLE II.

# BACKGROUND AND DISCLOSURES

A.      *Corporate History*

BJ Services is one of the oilfield services industry's oldest brands, with a 148-year history.  Founded in 1872 by Byron Jackson, the firm designed and manufactured pumps and other equipment for miners and farmers, including the Jackson Feeder, a major labor-saving device.  In 1879, the company moved to San Francisco, where, under the moniker of Byron Jackson Machine Works, it manufactured prototypes of both deep-well turbine and submersible pumps.

After the oil boom of the early 1970s, there was a slowdown in the petroleum industry that reached a nadir in the mid-1980s.  During that time, the Company went through a series of restructurings and name changes.  In 1974,

14

Hughes Tool Company purchased the Company and changed its name to BJ-Hughes Inc. In 1985, a subsidiary of Dresser Industries named Titan Services formed a partnership with Hughes, using the name BJ Titan Services; that partnership ultimately dissolved in 1989.

The Company began to take its current shape in 1990, after it was reorganized and incorporated as a public company and commenced an aggressive expansion through acquisitions and consolidation. The Company's major additions in the following years included the Western Company of North America, Unichem, and Nowsco Well Services Ltd.

In 2010, Baker Hughes ("BKR") closed its acquisition of then-named BJ Services Company in a transaction valued at approximately $5.5 billion. During a downturn in the oil and gas sector that commenced in November 2014, BKR decided to divest a controlling stake in the North American business operations of BJ Services Company. On November 29, 2016, the Company, Allied Energy JV Contribution LLC, Allied Completions Holdings, and Baker Hughes Oilfield Operations Inc., a wholly owned subsidiary of BKR, entered into a contribution agreement to contribute cash and assets to the Company. In addition to a substantial, high-quality equipment base, BKR's contribution to the Company included premier facilities and labs, proprietary technologies, including chemistries, an extensive intellectual property portfolio, and the legacy "BJ" brand's associated goodwill. The transaction closed on December 30, 2016, and there have been no major mergers or acquisitions since. Since formation, BJ Services, LLC has operated has a stand alone entity, and even though BKR retained a 47% ownership, it has had only limited commercial activity with BKR.

A simplified version of the Debtors' current corporate structure is as follows:[2]



When founded, the Company was the second largest provider of hydraulic fracturing and cementing services to upstream oil and gas companies in North American, and the Company operated or had a presence in most major basins throughout the United States and in western Canada. The Debtors derived the majority of their revenue from hydraulic fracturing services, but their well-cementing business had a substantial share of the North American cementing market and consistently represented over 15% of their annual revenue. The Company had operating facilities that supported well-site operations in western Canada as well as across the United States in North Dakota, Montana, Wyoming, Colorado, New Mexico, Texas, Louisiana, Oklahoma, Ohio, West Virginia, and Pennsylvania.

---

[2]   The following graphic is intended to be used for illustrative purposes only and may not reflect actual structure and ownership interests.

All of the Company's sites were networked and overseen from the Company's central corporate office in Tomball, Texas.  Some of these facilities were later shut down or consolidated following the decline in market activity.

B.      The Debtors' Assets and Operations

1.      The Debtors' Assets

Between 2011 and 2016, BKR invested approximately $3.5 billion in BJ Services' predecessor entity for capital expenditures, repair, and maintenance expenses related to hydraulic fracturing and cementing equipment.  Given this well-maintained base of assets, the Debtors were able to refurbish and quickly redeploy idle equipment, and reactivated 35 operational fleets at attractive capital costs.  The majority of this redeployment, which occurred between January 2017 and the first half of 2018, created approximately 3,400 jobs as the Company regained its position as one of the largest hydraulic fracturing and cementing service providers in North America.

As of the Petition Date, the Debtors' fracturing assets included approximately 42 fracturing fleets made up of 2.1 million hydraulic horsepower and auxiliary support equipment, and the Debtors' cementing assets included 180 cementing pumps and auxiliary support equipment.

(a)      TITAN

The BJ Services brand is recognized for its reliability, high-quality equipment and facilities, and history of innovation.  These attributes are highlighted in the TITAN™ next-generation fracturing fleet technology, which was sold as part of the going-concern Sale Transactions described below.  TITAN is a fracturing fleet platform that is more eco-friendly than traditional fracturing equipment and is expected to allow operators to enjoy lower operating costs and enhanced performance, mobility and reliability.  Prior to the going concern sale discussed below, the Debtors concluded a field trial of the TITAN prototype pump, and the first customer deployment is scheduled for late this year.

2.      The Debtors' Operations Prior to the Sale Transactions

The oil and gas industry is typically divided into three major sectors: "upstream," "midstream," and "downstream."  The upstream sector comprises E&P activities that focus on locating and extracting crude oil, raw natural gas, and other hydrocarbons.  The midstream sector includes the activities involved in the gathering, transporting, processing, and storing of hydrocarbons.  The downstream sector is focused on the marketing and distribution of the products derived from the extracted hydrocarbons to the ultimate end users.  The Debtors' operations are considered to be in the upstream sector.

Most upstream E&P companies do not complete the labor-intensive tasks of drilling, operating, and maintaining oil and natural gas wells themselves—instead opting to contract with oilfield services companies, such as the Debtors, for such services.  The Debtors provided land-based well-cementing and hydraulic-fracturing services to E&P companies in the United States and Canada.

(a)      Hydraulic Fracturing Services

"Hydraulic Fracturing" is a generic term used to describe the activities necessary to stimulate production from an oil or gas well after initial drilling operations have been completed.  In many cases, especially for low-permeability reservoirs, diagenetic processes created over geological time restrict the openings of the rock in the reservoir and create resistance for fluid or gas to naturally flow from the reservoir.  Many wells would be uneconomical without a successful fracturing treatment, and low-permeability rocks are normally excellent candidates for stimulation by fracturing.  Fracturing is commonly employed in low-permeability reservoirs, which involves injecting high volumes of fluid into the well site at high pressure to create cracks in targeted oil and gas bearing reservoirs through which oil or natural gas can flow.  The perfection of fracturing technology was a driving force behind the boom in United States oil and gas production over the past two decades.

Through consummation of the Sale Transactions, the Company often supplied proppant—a material, such as sand, designed to keep hydraulic fractures open—and additives, some of which are proprietary, used in the overall

fracturing fluid mixture.  The Company mixed the additives and proppant with the base fluid and then pumped the mixture down a wellbore to create the desired fractures in the target formation.  For the year ended December 31, 2019, the Company's fracturing services product line accounted for approximately 80 percent of its revenues.

(b)      *Cementing Services*

The primary objective of cementing services is to provide zonal isolation in an oil or gas well.  Cementing is the process of mixing a slurry consisting of cement and water and pumping it down through a steel casing to critical points that create a bond between the rock and the casing string used to allow flow from the reservoir to the surface.  The principal function of this cementing process is to control fluid movement between reservoirs and/or aquifers and to bond and support the casing deep in the earth against various layers of rock formations.  In 2019, cementing services accounted for approximately 20 percent of the Company's revenues.  The Company had been able to build upon a strong list of clients, with 75 percent of its business coming from North America's top 20 drillers.  The Company also maintained the number one market share position in the Haynesville and Eagle Ford basins, a number two position in the Rockies, and a number four position in the Permian basin.  As a result of its diversified presence, the Company held the number two market share position across all North American land.

(c)      *Service Area*

The geographical spread of the Debtors' North American operations is depicted in the following graphic:



The Company's results were driven by a number of interrelated factors, primarily:  (a)  expenditures of its E&P company customer base (*i.e.*, the level of new drilling, completion, and production activity), which directly affected demand for the Company's services; (b) the price the Company was able to charge for its products and services, which was driven primarily by upstream demand and the competitive landscape in a given geographic locale; (c) labor and supply costs and the Company's ability to pass such costs on to its customers; and (d) the Company's asset utilization rate.

C.      *Prepetition Capital Structure*

1.      The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $356.8 million in total funded debt obligations, as set forth below:

| Debt | Approx. Principal Amount Outstanding |
|------|-------------------------------------|
| Prepetition ABL Credit Agreement | $101.6 million |
| Equipment Term Loan Credit Agreement | $190.0 million |
| Real Estate Term Loan Credit Agreement | $65.2 million |
| **Total Funded Debt Obligations** | **$356.8 million** |

2.      Prepetition ABL Facility

On May 30, 2017, the Debtors entered into the Prepetition ABL Credit Agreement, by and among BJ Services, LLC, as borrower; BJ Management Services, L.P., BJ Services Management Holding Corporation, and BJ Services Holdings Canada ULC, as guarantors; the Prepetition ABL Lenders; and the Prepetition ABL Agent.  Prior to the Petition Date, the Prepetition ABL Credit Agreement provided for a $400 million asset-based lending facility (subsequently amended to $350 million) with a maturity date of May 30, 2022.  The Prepetition ABL Facility accrues interest at a rate per annum equal to:  (a) the base rate plus an applicable margin of 0.25%, 0.50%, or 0.75% based on the quarterly average excess availability under the Prepetition ABL Facility; or (b) LIBOR plus an applicable margin of 1.25%, 1.50%, or 1.75% based on quarterly average the excess availability under the Prepetition ABL Facility.  The Prepetition ABL Facility was secured on a first-priority basis by cash, inventory, and accounts receivable.  The borrowing base under the Prepetition ABL Facility is subject to redetermination from time to time.  As of the Petition Date, approximately $101.6 million was outstanding under the Prepetition ABL Facility.

3.      Equipment Term Loan

On January 28, 2019, the Debtors entered into the Equipment Term Loan Credit Agreement, by and among BJ Services, LLC, as borrower; BJ Management Services, L.P., BJ Services Management Holding Corporation, and BJ Services Holdings Canada ULC, as guarantors; the Equipment Term Loan Lenders; and the Equipment Term Loan Agent.  The Equipment Term Loan Credit Agreement provides for a $200 million term loan with a maturity date of January 3, 2023.  The obligations under the Equipment Term Loan are secured by the M&E.  As of the Petition Date, there was approximately $190 million aggregate principal outstanding under the Equipment Term Loan.[3]  The Term Loan Agent sent the Debtors a notice of acceleration on July 17, 2020 based on, among other things, the Debtors' failure to make a payment due under the Equipment Term Loan on June 30, 2020.

4.      Real Estate Term Loan

On December 31, 2019, BJ Services, LLC entered into the Real Estate Term Loan Credit Agreement, by and among BJ Services, as borrower; the Real Estate Term Loan Lenders; and Real Estate Term Loan Agent.  The Real Estate Term Loan Credit Agreement provides for a $65.2 million term loan with a maturity date of February 28, 2028.  The Real Estate Term Loan is secured by seven certain parcels of real property and any other rights, title, and interest

---

[3]      Calculated as of June 30, 2020.

related to such properties.  As of the Petition Date, there was approximately $65.2 million aggregate principal outstanding under the Real Estate Term Loan.[4]

D.     *Events Leading to the Chapter 11 Cases*

At the outset of 2020, the Debtors had $350 million in committed financing under the Prepetition ABL Facility and sufficient collateral and liquidity to support their funded debt obligations.  However, in the latter half of March 2020, drastic and unprecedented global events, including a "price war" between OPEC and Russia and the macroeconomic effects of the global COVID-19 pandemic, caused many of the Company's E&P clients to curtail their well drilling and completion programs and/or to pause operations for an indeterminate period.  These sudden, unanticipated events went far beyond the ordinary volatility of the E&P industry and had significant and unanticipated implications for the Company, including a sharp decline in accounts receivable, which comprised the majority of the Company's borrowing base under its Prepetition ABL Facility.

E.     *Market and Industry-Specific Challenges*

The difficulties faced by the Debtors are industry-wide issues.  Historically, the markets for oil, natural gas, and natural gas liquids have been volatile and will likely remain volatile in the future, particularly in light of current geopolitical and economic conditions.  Among the factors causing such volatility are the domestic and foreign supply of oil and natural gas, the ability of OPEC members to comply with the agreed upon production cuts and the cooperation of other producing countries to reduce production levels, social unrest and political instability, particularly in major oil and natural gas producing regions outside the United States, and the levels and growth of domestic and global economic activity.

These market conditions have affected oil and gas companies at every level of the industry around the world.  During 2019, the price for natural gas continued to decline from already depressed levels.  This year, commodity prices have experienced increased volatility, which has been exacerbated by the sudden, combined global impact of the COVID-19 pandemic and the oil -price dispute between Saudi Arabia and Russia.

The initial spread of COVID-19 caused decreased factory output and demand for transportation, resulting in a decline in energy demand and prices.  While OPEC called for additional cuts in oil production, subject to an agreement with Russia, the parties failed to reach an agreement as to production levels.  Consequently, both Saudi Arabia and Russia announced that they would increase, rather than decrease, production in March of 2020, resulting in surplus supply amidst already decreasing demand for energy.

Meanwhile, the COVID-19 pandemic continued (and continues) to spread at rates causing governments across the world to institute drastic measures that have driven energy demand down even further.  National, state, and local governments in the United States and throughout the world have imposed, or strongly recommended, quarantines, social distancing protocols, and shelter-in-place orders.  Major airlines have suspended or reduced flights to and from the affected regions in light of worldwide travel restrictions.  While the United States and certain countries throughout the world have begun to reopen, increasing COVID-19 infections may result in the re-institution of government or corporate policies that would decrease demand for energy.

With surging supply and depressed demand, the global energy market has suffered unprecedented losses.  On April 20, 2020, oil futures for May declined to well below $0 per barrel for the first time in history.  The graph below shows the movements of WTI crude oil prices in the six months leading up to the Petition Date:

---

[4]     Calculated as of May 31, 2020.

Case 20-33627   Document 1084   Filed in TXSB on 11/06/20   Page 96 of 161



Source:  Business Insider

The freefall in commodity markets and the obliteration of demand brought on by the economic shutdown presented unparalleled challenges for E&P companies, the source of the Debtors' business, and has made it especially difficult for some companies to execute out-of-court restructuring alternatives.  At least 18 large E&P companies and related service providers filed for chapter 11 protection in the first six months of 2020, including Whiting Petroleum Corporation, Ultra Petroleum Corp., Chesapeake Energy Corporation, and Sable Permian Resources, LLC, all of which were clients of the Debtors.

Due to their direct exposure to commodity price swings, E&P companies have experienced the most severe distress to date and have significantly pared back new drilling activity.  But the market malaise has not been limited to the E&P sector.  Because the Company's performance is heavily influenced by the drilling, completion, and

production activities of its E&P company customer base, the Company has felt the weight of the market decline. The following graphic demonstrates the rapid decline in active U.S. hydraulic fracturing fleets:



Source: Primary Vision

Indeed, because the type of services that the Company offered can be easily "started" and "stopped," oilfield services companies like the Debtors tend to experience a rapid decline for their services when commodities prices are low or volatile as E&P companies become less risk tolerant. Oilfield services companies may also experience a lagging recovery when commodities prices improve because demand for their services depends in large part on how E&P companies perceive the stability and sustainability of commodities markets.

F.      *Borrowing Base Redetermination*

Due to the macroeconomic events affecting the oil and gas industry, the Debtors moved quickly to reevaluate their financial position and determine immediate next steps to address their challenges. As part of that process, the Debtors implemented headcount and cost-cutting measures to scale the business to a rapidly decreasing topline. Specifically, since March 2020, the Debtors have laid off approximately 800 employees and over 200 additional employees are currently on furlough. This allowed the Debtors to operate at a near EBITDA breakeven basis with close to no capital expenditures. The Debtors also drew down all available liquidity—approximately $32.5 million—under the Prepetition ABL Facility on April 3, 2020, and shortly thereafter began evaluating potential transactions to reduce their aggregate funded indebtedness and/or address potential upcoming liquidity constraints.

But these efforts were not enough. The sharp decrease in revenue triggered a borrowing base redetermination under the Prepetition ABL Facility at the end of May 2020 that required a paydown of the Prepetition ABL Facility of approximately $47.5 million at the end of June (and likely future paydowns as accounts receivable continued to decline). Separately, on May 26, 2020, Prepetition ABL Agent provided the Debtors with notice that effective June 2, 2020, an $86.1 million reserve would be imposed against the borrowing base as a result of a field examination and inventory appraisal conducted on behalf of the Prepetition ABL Agent.

The Debtors' operations in this constrained environment could not bear this burden. On June 2, 2020, after intense negotiations, the Debtors and the Prepetition ABL Lenders entered into a waiver agreement pursuant to which the lenders waived the scheduled redetermination of the borrowing base and imposition of the reserve through June 12, 2020. To secure this waiver, the Debtors paid down $7.5 million of the Prepetition ABL Facility and agreed to certain other reporting and financial covenants. The Prepetition ABL Lenders subsequently agreed to additional

extensions of the waiver, through June 23, 2020 (in exchange for an additional $20 million Prepetition ABL Facility paydown), June 30, 2020 (in exchange for an additional $15 million Prepetition ABL Facility paydown), July 16 (several "no-fee" extensions between June 30 and July 16), and July 19, 2020 (in exchange for an additional $5 million Prepetition ABL Facility paydown), in the weeks leading up to and through the Petition Date.[5]

The Committee is analyzing whether the Debtors' secured lenders are properly perfected in their respective collateral and, to the extent there are defects in such perfection, will seek authority to commence appropriate actions to avoid asserted liens on collateral for the benefit of unsecured creditors. In addition, the Committee is analyzing whether any causes of action exist as a result of actions taken by any of the Prepetition Secured Lenders. The Committee believes that such investigation is necessary and should be completed prior to any hearing on confirmation of the Plan. If the confirmation hearing occurs before the Committee's investigation is complete and the expiration of the Challenge Deadline, the Prepetition Secured Lenders will obtain a release and may absorb value that could have otherwise been available to unsecured creditors and the Committee (or any other proper party) will not be able to assert valid challenge claims. The Committee's investigation is ongoing, but is still in its relative infancy due to the Committee's belief that the Debtors and the Prepetition Secured Lenders have failed to adequately respond to information and document requests propounded by the Committee prior to the date hereof. The Debtors have made every attempt timely respond to the Committee's document requests, which are expansive and, thus, time consuming to compile, review and produce. The Committee will endeavor to complete its investigation as expeditiously as possible, but it does not anticipate being able to do so before the expiration of the Challenge Deadline and, as a result, believes that the hearing to consider confirmation of the Plan should not occur until after expiration of that deadline on October 19, 2020.

G.    *Exploration of Potential Alternatives*

1.    Retention of Restructuring Advisors

In March 2020, the Debtors began to seek external strategic advice and assistance, engaging Kirkland & Ellis LLP ("Kirkland") as restructuring counsel and PJT Partners ("PJT") as investment banker and financial advisor. In May 2020, the Debtors retained Ankura Consulting Group, LLC ("Ankura") as restructuring advisor. In June 2020, the Debtors retained Simmons Energy, a division of Piper Sandler ("Simmons"), to assist in the sale of the cementing business. These advisors were retained to assist the Debtors with exploring strategic restructuring and sale alternatives. The Debtors are also working with Hilco Valuation Services, LLC (and certain of its affiliates) and Ritchie Bros. Auctioneers (America) Inc., (and certain of its affiliates) to conduct appraisals and sales of the balance of the Debtors' assets.

Since retaining Kirkland, PJT, and Ankura, the Debtors and their advisors have engaged the major constituents in their capital structure, as well as third parties, regarding potential restructuring transactions that could be effectuated either in- or out-of-court, including potential out of-court financing and bank facility amendments.

2.    Out-of-Court Restructuring Efforts

The Debtors initially solicited offers to consummate a comprehensive out-of-court balance sheet reorganization that would obviate the need for a chapter 11 filing. The Debtors had previously considered potential merger transactions with strategic partners within the industry, but industry and market conditions cooled discussions before any viable transaction structures materialized. In April 2020, the Debtors and their advisors began negotiating with the Prepetition ABL Lenders to build consensus around a holistic out-of-court restructuring transaction. The Debtors and their advisors sought debt and equity investments from within their existing capital structure as well as from third parties. The Debtors were able to attract proposals from outside capital, but believed the third-party proposals would have resulted in an overleveraged go-forward enterprise that would only further stress liquidity.

---

[5]    The Equipment Term Loan Lenders, to whom a payment was due on June 30, 2020, provided the Debtors waivers through July 16, 2020 and sent a notice of acceleration to the Debtors on July 17, 2020.

Ultimately, after fielding several such third-party proposals, the Debtors concluded the most actionable proposals would come from their own diverse group of existing stakeholders.

As described above, the Debtors capitalized on the additional time provided by the waiver agreements to explore a number of out-of-court and in-court reorganization options. During this time, the Debtors focused their efforts on current stakeholders, holding numerous telephonic conferences and exchanging proposals, term sheets, and draft agreements. Potential transaction structures began to take shape as the Debtors continued to make progress with their creditors.[6]

Unfortunately, given the current challenges in the energy service provider industry, the complexity and risk associated with a potential reorganization of the business, and the challenging operating structure of the business, the Debtors and their various stakeholders were unable to align on a going concern strategy. Ultimately, the Company, in consultation with its advisors and key stakeholders, determined that each out-of-court proposal was not actionable because, among other reasons, the proposals would not provide sufficient liquidity to materially delay the necessity of a chapter 11 filing.

The Committee has requested documents regarding, among other things, the Debtors' prepetition restructuring efforts but has yet to receive a majority of such documents. The Committee asserts that it is necessary to review and analyze such documents and information so that it can determine whether there is any action that can be taken to unlock value for unsecured creditors. The Company believes that the Debtors, however, have delayed in providing such documents and information and, thus, the Committee has yet to form an opinion in that regard. The Committee has also requested documents and information from the Prepetition Secured Lenders, but to date has similarly not received most of such requested documents.

3.   Strategic Asset Marketing Efforts

In parallel with exploring out-of-court restructuring alternatives—and even prior to the industry-wide headwinds faced by the oil and gas industry in the wake of the COVID-19 global pandemic and OPEC price wars— the Debtors solicited interest from third parties in purchasing underutilized assets of the Company. Due to the large volume of assets owned by the Debtors and the reduced client activity levels, the Debtors believed they could theoretically sell significant portions of their assets without disrupting ongoing business operations. In the period prior to the COVID-19 pandemic, the Company was in talks with various parties who expressed strong interest in participating in asset purchases of varying sizes, ranging from buying underutilized or unused equipment to purchasing larger segments of the Debtors' business. Demand for these assets dissipated when oil prices dropped (and drilling and fracturing activity decreased), as the market became oversaturated with underutilized oilfield services equipment for sale. The Debtors were not able to find a holistic solution to their financial challenges through asset sales alone, and market volatility caused delays in realizing those asset sales to any material degree.

H.   *Events of the Chapter 11 Cases*

1.   First and Second Day Relief

On or shortly after the Petition Date, the Debtors Filed certain motions and applications requesting various types of "first day" and "second day" relief. The relief granted enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including, among other things: (a) an order authorizing the Debtors to use cash collateral during the Chapter 11 Cases, and granting certain adequate protection to certain secured parties [Docket Nos. 88, 170, 261, 505, 551, and 622]; (b) an order authorizing the Debtors to continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions [Docket No. 485]; (c) an order directing joint administration of the Chapter 11 Cases [Docket No. 13]; (d) an order authorizing the Debtors to pay certain prepetition taxes and fees [Docket No. 221]; (e) an order authorizing the Debtors to pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums

---

[6]   The Debtors also considered available government funding programs.

thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business [Docket No. 86]; (f) an order granting authority to pay employees' wage Claims and related obligations in the ordinary course of business and continue certain employee benefit programs [Docket No. 84]; (g) an order authorizing the Debtors to make payment on account of prepetition Claims of certain working interest expenses, joint interest billings, marketing expenses, and 503(b)(9) claimants [Docket No. 486]; (h) an order authorizing the Debtors to retain and compensate professionals utilized in the ordinary course of business [Docket No. 489]; and (i) an order approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide additional adequate assurance [Docket No. 242].

2.  Canadian Foreign Recognition Proceedings

On July 23, 2020, with the assistance of its Canadian counsel Bennett Jones LLP, BJ Services Holdings Canada, ULC filed an application with the Canadian Court to serve as the foreign representative of its own estate and recognizing the Chapter 11 Cases as "foreign main proceedings," and granting a stay of proceedings with respect to BJ Services Holdings Canada, ULC.  On July 28, 2020, the Canadian Court entered an order recognizing the Chapter 11 Case of BJ Services Holdings Canada, ULC as foreign main proceedings and recognizing and giving force and effect in Canada to certain of the "first day" relief granted by the Bankruptcy Court.  On August 14, 2020, the Canadian Court amended its order recognizing the Chapter 11 Case of BJ Services Holdings Canada, ULC to also recognize the Chapter 11 Case of BJ Services, LLC as foreign main proceedings, and approved the appointment of BJ Services Holdings Canada, ULC as the foreign representative of BJ Services Holdings Canada, ULC and of BJ Services, LLC. On August 14, 2020 and subsequently, the Canadian Court regularly granted recognition and enforcement of certain Orders entered by the Bankruptcy Court.

3.  Retention of Chapter 11 Professionals

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered Final Orders authorizing the Debtors to retain and employ the following professionals:  (a) Donlin Recano & Company, Inc., as the notice and claims agent and administrative advisor for the Debtors [Docket No. 90]; (b) Kirkland & Ellis LLP, as counsel [Docket No. 582]; (c) Gray Reed & McGraw LLP, as co-counsel [Docket No. 583]; (d) Piper Sandler & Co. as investment banker [Docket No. 378]; and (e) Ritchie Bros. Auctioneers (America) Inc. and Hilco Valuation Services, LLC, as auctioneers, brokers, and exclusive marketing agents [Docket No. 492].  On August 19, 2020, the Debtors Filed a retention application for Ankura Consulting Group, LLC, as financial advisor [Docket No. 383].  On August 26, 2020, the Bankruptcy Court entered an order approving procedures for the interim compensation and reimbursement of expenses of retained professionals [Docket No. 488].  On August 26, 2020, the Bankruptcy Court also granted the Debtors the authority to retain and compensate certain professionals utilized by the Debtors in the ordinary course of business [Docket No. 489].

4.  Appointment of Official Committee of Unsecured Creditors

On July 28, 2020, the Office of the U.S. Trustee appointed the Committee [Docket No. 199].  The members of the Committee are: (a) Gardner Denver Petroleum Pumps, LLC; (b) Infosys Limited; (c) SPM Flow Control; (d) DTE Enterprises; (e) Solvay USA d/b/a Chemplex; (f) High Roller Sand Operating; and (g) Circle Bar A, Inc.

The Committee has retained Squire Patton Boggs (US) LLP as proposed counsel and Raymond James & Associates, Inc. as proposed financial advisor and investment banker [Docket No. 507].

5.  Real Estate Term Stay Relief Motion

On August 20, 2020 the Real Estate Term Loan Agent Filed its *Motion for Relief from the Automatic Stay* [Docket No. 411] (the "Real Estate Stay Relief Motion") in order to foreclose upon their respective collateral, including, but not limited to, certain of the Debtors' real property assets. The Debtors and Real Estate Term Loan Agent are currently working towards a consensual resolution of the Real Estate Stay Relief Motion. Depending on the

resolution of the Real Estate Stay Relief Motion, the treatment of the Class 5 Claim may be different than as currently contemplated.

6.  Claims Bar Date

On September 3, 2020, the Debtors Filed the Schedules [Docket Nos. 569, 570, 571, 572, 573, 574, 575, and 576] pursuant to section 521 of the Bankruptcy Code and in accordance with the Bankruptcy Court's order [Docket No. 271]. A summary of certain key financial information as of June 2020 is set forth below:[7]

| BJ Services, LLC | |
| --- | --- |
| Summary of Assets and Liabilities | |
| **Assets** | |
| Real Property | 83,080,000.00 |
| Total Personal Property | 717,384,435.05 |
| **Total Assets** | **800,464,435.05** |
| **Liabilities** | |
| Secured Creditors | 370,858,748.69 |
| Non Priority Unsecured Claims | 149,696,558.07 |
| **Total Liabilities** | **520,555,306.76** |

| BJ Management Services, L.P. | |
| --- | --- |
| Summary of Assets and Liabilities | |
| **Assets** | |
| Real Property | - |
| Total Personal Property | 406,526.06 |
| **Total Assets** | **406,526.06** |
| **Liabilities** | |
| Secured Creditors | 293,799,938.47 |
| Non Priority Unsecured Claims | 14,596,281.00 |
| **Total Liabilities** | **308,396,219.47** |

| BJ Services Holdings Canada, ULC | |
| --- | --- |
| Summary of Assets and Liabilities | |
| **Assets** | |
| Real Property | 11,709,769.08 |
| Total Personal Property | 102,790,752.18 |
| **Total Assets** | **114,500,521.26** |
| **Liabilities** | |
| Secured Creditors | 294,279,556.45 |
| Non Priority Unsecured Claims | 99,338,343.40 |
| **Total Liabilities** | **393,617,899.85** |

| BJ Services Management Holdings Corporation | |
| --- | --- |
| Summary of Assets and Liabilities | |
| **Assets** | |
| Real Property | - |
| Total Personal Property | 2,579.42 |
| **Total Assets** | **2,579.42** |
| **Liabilities** | |
| Secured Creditors | 293,799,938.47 |
| Non Priority Unsecured Claims | 1,001.00 |
| **Total Liabilities** | **293,800,939.47** |

The Bankruptcy Code allows the Bankruptcy Court to fix the time within which Proofs of Claim must be Filed in the Chapter 11 Cases. Any creditor whose Claim is not scheduled in the Schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must File a Proof of Claim.

On September 2, 2020, the Bankruptcy Court entered the Bar Date Order [Docket No. 547] approving, among other things: (a) other than the exceptions set forth in the Bar Date Order, October 2, 2020, at 5:00 p.m. prevailing Central Time (the "Claims Bar Date") as the deadline for all non-Governmental Units to File Claims in the Chapter 11 Cases; (b) January 19, 2021, at 5:00 p.m. prevailing Central Time as the deadline for all Governmental Units to File Claims in the Chapter 11 Cases; (c) procedures for Filing Proofs of Claim; and (d) the form and manner of notice of the bar dates.

7.  The Sale Transactions

On July 21, 2020, the Debtors Filed a motion seeking, in part, approval of bidding procedures for a sale of the cementing business as a going concern through an auction pursuant to section 363 of the Bankruptcy Code [Docket No. 39] (the "Cementing Bidding Procedures Motion"). On July 24, 2020, the Debtors Filed a motion seeking, in part, approval of bidding procedures for a sale of certain of their fracturing equipment and intellectual property as a going concern through an auction pursuant to section 363 of the Bankruptcy Code [Docket No. 160] (the "Fracturing Bidding Procedures Motion," and together with the Cementing Bidding Procedures Motion, the "Bidding Procedures Motions"). The Fracturing Bidding Procedures Motion also sought approval of a stalking horse bidder for such assets.

---

[7]  This summary is provided for reference only and is qualified in all respects by the Schedules.

On July 29, 2020, the Bankruptcy Court entered orders [Docket Nos. 223, 224] (collectively, the "Bidding Procedures Orders") approving the Bidding Procedures Motions and related sale procedures, and designating a stalking horse bid for the Fracturing Business.

The Debtors, led by their investment banker, Simmons, engaged in a thorough a marketing process (for both the cementing and fracturing businesses) and sales of ancillary assets of the Debtors. These efforts also led to the Debtors selecting stalking horse bidders for the sale of the cementing business and for a portion of the hydraulic fracturing business, and to their entertaining bids for certain ancillary assets.

After considering all available options at the auction, the Debtors—in consultation with their advisors—determined that the stalking horse bidders had submitted the highest and best offers for the sale of the cementing business and fracturing equipment, respectively. The Debtors also selected bids from Baker Hughes Oilfield Operations LLC for the sale of certain additional cementing equipment and shared lab equipment. *See Notice of Winning Bidders* [Docket No. 401].

After considering the issues at a hearing on August 14, 2020, the Bankruptcy Court approved the Sale Transactions Docket Nos. [431 (as amended at 440, 493), 452, and 462]. The Canadian Court granted an order recognizing the fracturing Sale Transaction on August 24, 2020 and granted an order recognizing the Order of the Bankruptcy Court approving the sale of certain additional cementing equipment and shared lab equipment to Baker Hughes Oilfield Operations LLC on September 2, 2020. A dispute arose between the Debtors and the Equipment Term Loan Lenders over the results of the sale of certain ancillary assets (*See* Dockets Nos. 451 and 453). This dispute was resolved pursuant to a sale of such assets to the Equipment Term Loan Lenders via a credit bid. The Debtors and the Equipment Term Loan Lenders are working on submitting an agreed form of order documenting the credit bid sale to the Bankruptcy Court for approval. The Debtors and Equipment Term Loan Lenders may appear before the Bankruptcy Court regarding the credit bid sale if they are unable to reach an agreed form of order.

The Debtors consummated the cementing going-concern Sale Transaction on August 27, 2020, the fracturing going-concern Sale Transaction on August 28, 2020, and the sale of the shared lab equipment on August 28, 2020.

8.   Unresolved Controversies as of Solicitation of the Plan

Previously, certain controversies relating to such transactions, the funding of the Chapter 11 Cases, and the Committee's challenge rights under the Cash Collateral Orders, among others, remained outstanding. The Debtors, their Lenders, and the Committee had been unable to agree an allocation of proceeds from the various Sale Transactions. Additionally, these Chapter 11 Cases had been funded entirely through the use of the Prepetition ABL Lenders' cash collateral. Some of these funds had been used to preserve, maintain, and ultimately sell the Equipment Term Loan Lenders' collateral for the benefit of the Equipment Term Loan Lenders. Accordingly, the Debtors Filed a motion to surcharge the Equipment Term Loan Lenders' collateral pursuant to section 506(c) of the Bankruptcy Code and limit the Equipment Term Loan Lenders' Liens pursuant to section 552 of the Bankruptcy Code in order to fairly allocate the costs of these Chapter 11 Cases and of the Sale Transactions with the Equipment Term Loan Lenders [Docket No. 589]. The Committee had conducted an investigation of potential Estate Causes of Action that could bring additional value into the Debtors' Estates, the Debtors and the independent directors conducted their own investigation, given that the Estates' Causes of Action are property of the Debtors' Estates and properly analyzed by the Debtors in the first instance. The Debtors and the Committee determined that certain Causes of Action were viable and should be pursued or settled.

The Debtors and their stakeholders resolved these unresolved controversies pursuant to the Settlement and through modifications to the Plan in connection with seeking Confirmation of the Plan.

## ARTICLE III.

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article IV.

A.      *Administrative Claims and Priority Claims*

Subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the Debtors or the Wind-Down Trust agree to less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, the Debtors or the Wind-Down Trust shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash as provided for in the Settlement: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due) with a Cash distribution from the Administrative and Priority Claims Reserve by the Wind-Down Trust (subject to the terms of the Settlement Agreement); (3) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind-Down Trust, as applicable; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided* that any Administrative Claim that has been assumed by a Purchaser pursuant to a Purchase Agreement shall not be an obligation of the Debtors.

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors or Wind-Down Trust against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

1.      Administrative Claims Bar Date

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order) or as provided by this Article III, unless previously Filed, requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or the Liquidation Trustee, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.  Objections to such requests must be Filed and served on the requesting party by the Administrative Claims Objection Deadline.

2.      Administrative and Priority Claims Reserve

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall fund the Administrative and Priority Claims Reserve in Cash as described in Article X.C hereof.  Any Cash remaining in the Administrative and Priority Claims Reserve after payment of all Allowed Administrative and Priority Claims shall be remitted to such Lender(s) that had Liens on such Cash (to the extent not previously satisfied

in full), if applicable, with any remaining amounts deemed Liquidation Trust Assets for distribution in accordance with the Plan.

B.    *Professional Compensation*

1.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Wind-Down Trustee and/or the Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

2.    Professional Fee Escrow Account

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Wind-Down Trust.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Wind-Down Trustee or the Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Trust's obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Allowed Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which Allowed Administrative Claim shall be satisfied in accordance with Article III.A of the Plan.

When all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be transferred to the Prepetition ABL Lenders, and upon satisfaction of the Prepetition ABL Lenders' Claims in full, any remaining amounts shall be deemed Liquidation Trust Assets.

3.    Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

4. Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors, the Wind-Down Trust, or the Liquidation Trustee, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses incurred on or after the Effective Date in accordance with the Plan, Liquidation Trust Agreement, and Wind-Down Trust Agreement, as applicable. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order in seeking retention or compensation for services rendered after such date shall terminate, and the Liquidation Trustee may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *U.S. Trustee Statutory Fees*

The Debtors, the Wind-Down Trust, or the Liquidation Trustee, as applicable, shall pay all U.S. Trustee Fees for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

# ARTICLE IV.

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article IV.

A.      *Summary of Classifications*

All Claims and Interests, other than Administrative Claims, Priority Claims, and Professional Fee Claims, are classified in the Classes set forth in this Article IV for all purposes, including voting, Confirmation, and distributions under the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest, respectively, in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The Debtors reserve the right to withdraw the Plan with respect to one or more Debtors while seeking Confirmation or approval of the Plan with respect to all other Debtors. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article IV.D hereof.

1. No Substantive Consolidation of the Estates

Pursuant to this Article IV.A.1, the Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and the classifications set forth in Classes 1 through 8 and 10 shall be deemed to apply to each Debtor, except for Class 9, which only applies to Parent. If substantive consolidation is ordered pursuant to Article IV.A of the Plan, each Class with respect to the Debtors shall vote as set forth in this Article IV. If substantive consolidation is not ordered, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable, and each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each of the Debtors.

2. Class Identification

The classification of Claims against and Interests in each Debtor (as applicable) pursuant to the Plan is as set forth below.  To the extent there are no Holders of Claims or Interests in a particular Class or Classes, such Claims or Interests shall be treated as set forth in Article IV.D hereof.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Prepetition ABL Facility Claims | Impaired | Entitled to Vote |
| 4 | Equipment Term Loan Claims | Impaired | Entitled to Vote |
| 5 | Real Estate Term Loan Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Interests | Impaired[8] | Not Entitled to Vote (Deemed to Reject) |
| 9 | Interests in Parent | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.     *Treatment of Classes of Claims and Interests*

Except to the extent that the Debtors and a Holder of an Allowed Claim or Interest, as applicable, agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest.  Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course) or as soon as reasonably practicable thereafter, the timing of which shall be subject to the reasonable discretion of the Debtors or the Liquidation Trustee, as applicable.

---

[8]     The Wind-Down Trust may elect to reinstate such interests for administrative purposes to facilitate a wind down but no parties will receive any economic recovery on account of such interests.

1. <u>Class 1—Other Secured Claims</u>

   (a) *Classification*: Class 1 consists of all Other Secured Claims, including all Secured Tax Claims, against any Debtor.

   (b) *Treatment*: Except to the extent that a Holder of an Allowed Class 1 Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Class 1 Claim, each such Holder shall receive, at the Wind-Down Trust's election:

      (i) payment in full in Cash of such Holder's Allowed Other Secured Claim with a distribution from the Other Secured Claims Reserve;

      (ii) the Debtor's interest in the collateral securing such Holder's Allowed Other Secured Claim; or

      (iii) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

   (c) *Voting*: Class 1 is Unimpaired under the Plan. Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Such Holders are not entitled to vote to accept or reject the Plan.

2. <u>Class 2—Other Priority Claims</u>

   (a) *Classification*: Class 2 consists of all Other Priority Claims.

   (b) *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive:

      (i) payment in full in Cash of such Holder's Allowed Other Priority Claim; or

      (ii) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

   (c) *Voting*: Class 2 is Unimpaired under the Plan. Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Such Holders are not entitled to vote to accept or reject the Plan.

3. <u>Class 3—Prepetition ABL Facility Claims</u>

   (a) *Classification*: Class 3 consists of all Prepetition ABL Facility Claims.

   (b) *Allowance*: Class 3 Claims shall be Allowed in the principal amount of $77,050,000,[9] subject to reduction on account of paydowns pursuant to the Cash Collateral Orders, plus accrued and unpaid interest in accordance with the Cash Collateral Orders, plus to the extent such Claims are oversecured, postpetition interest and any other allowable expense, premium, cost or charge under the Prepetition ABL Credit Agreement or in such other amount as ordered by the Bankruptcy Court, including all fees and expenses of the Prepetition ABL Agent, as described in Article VIII.B.

---

[9] Drawn letters of credit shall also be Allowed Class 3 Claims.

(a)     *Treatment*:  In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim, each Holder of an Allowed Class 3 Claim shall receive:

(i)     its Pro Rata share of the Prepetition ABL Collateral and the proceeds of the Prepetition ABL Collateral, as applicable, in accordance with the terms of and subject to the limitations set forth in the Settlement Agreement, and

(ii)    the proceeds of any collateral subject to the adequate protection Liens of the Prepetition ABL Lenders pursuant to the Cash Collateral Orders payable to the Prepetition ABL Lenders in accordance with the terms of and subject to the limitations set forth in the Settlement Agreement.

(iii)   Furthermore, and subject to the Settlement Agreement, the Prepetition ABL Agent for itself and for the benefit of the Prepetition ABL Lenders shall retain their liens on (i) the Prepetition ABL Collateral until such time as they have received indefeasible payment in full in Cash on account of their Claims, or have received and accepted the Prepetition ABL Collateral, if applicable, in satisfaction of their Claims and (ii) collateral subject to the adequate protection Liens of the Prepetition ABL Lenders pursuant to the Cash Collateral Orders until such time as they have received the payment provided for pursuant to the Settlement Agreement.

(iv)    To the extent that the Prepetition ABL Facility Claims are not paid in full, any deficiency Claim shall be waived.

(b)     *Voting*:  Class 3 is Impaired.  Each Holder of an Allowed Class 3 Claim is entitled to vote to accept or reject the Plan.

4.   Class 4—Equipment Term Loan Claims

(a)     *Classification*:  Class 4 consists of all Equipment Term Loan Claims.

(b)     *Allowance*:  Class 4 Claims shall be Allowed (i) in the principal amount of $190,000,000, plus accrued and unpaid interest as of the Petition Date, and to the extent such Claims are oversecured, postpetition interest, plus any other allowable expense, premium, cost or charge under the Equipment Term Loan Credit Agreement, or (ii) in such other amount as ordered by the Bankruptcy Court.  To the extent that the Equipment Term Loan Claims are not paid in full, any deficiency Claim shall be treated as a Class 6 General Unsecured Claim.

(c)     *Treatment*:  In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim, the Equipment Term Loan Agent for itself and for the benefit of each Holder of an Allowed Class 4 Claim shall receive:

(i)     the Equipment Term Loan Collateral and the proceeds of the Equipment Term Loan Collateral, as applicable; and

(ii)    such other treatment as provided in the Settlement Agreement.

(iii)   Furthermore, the Equipment Term Loan Agent for itself and for the benefit of the Equipment Term Loan Lenders shall retain their liens on the Equipment Term Loan Collateral until such time as they have received indefeasible payment in full in Cash on account of their Claims, or have received and accepted the Equipment Term Loan Collateral in satisfaction of their Claims.

32

     (iv)     To the extent that the Equipment Term Loan Claims are not paid in full, any deficiency Claim shall be treated as a Class 6 General Unsecured Claim.

     (d)     *Voting*: Class 4 is impaired. Each Holder of an Allowed Class 4 Claim is entitled to vote to accept or reject the Plan.

5.     <u>Class 5—Real Estate Term Loan Claims</u>

     (a)     *Classification*: Class 5 consists of all Real Estate Term Loan Claims.

     (b)     *Allowance*: Class 5 Claims shall be Allowed in the principal amount of $65,160,000, plus any amounts as contemplated by the Settlement Agreement.

     (c)     *Treatment*: In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim, each Holder of an Allowed Class 5 Claim shall receive:

     (i)     the Real Estate Term Loan Collateral and the proceeds of the Real Estate Term Loan Collateral, as applicable, subject to the terms of the Settlement Agreement.

     (d)     *Voting*: Class 5 is impaired. Each Holder of an Allowed Class 5 Claim is entitled to vote to accept or reject the Plan.

6.     <u>Class 6—General Unsecured Claims</u>

     (a)     *Classification*: Class 6 consists of all General Unsecured Claims.

     (b)     *Treatment*: On the Effective Date, or as soon as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of beneficial interest in the Liquidation Trust and, as a Beneficiary of the Liquidation Trust, shall receive, on a distribution date, its Pro Rata Share of net Cash derived from the Liquidation Trust Assets available for Distribution as provided under this Combined Plan and Disclosure Statement, the Liquidation Trust Agreement, and the Settlement Agreement, until all Allowed General Unsecured Claims in Class 6 are paid in full or the Liquidation Trust Assets are exhausted; *provided*, *however*, that all Distributions to Holders of Allowed General Unsecured Claims shall be subject to the Liquidation Trustee first paying in full all Liquidation Trust Operating Expenses and/or reserving in the Liquidation Trust Operating Reserve for such Liquidation Trust Operating Expenses as reasonable and appropriate.

     (c)     *Voting*: Class 6 is Impaired under the Plan. Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.     <u>Class 7—Intercompany Claims</u>

     (a)     *Classification*: Class 7 consists of all Intercompany Claims.

     (b)     *Treatment*: Class 7 Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Class 7 Claim will not receive any distribution on account of such Class 7 Claim.

(c)     *Voting*:  Class 7 is Impaired.  Each Holder of a Class 7 Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

8.    Class 8—Intercompany Interests

(a)     *Classification*:  Class 8 consists of all Intercompany Interests.

(b)     *Treatment*:  Class 8 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of Class 8 Interests will not receive any distribution on account of such Class 8 Interests.

(c)     *Voting*:  Class 8 is Impaired.  Each Holder of Class 8 Interests is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

9.    Class 9—Interests in Parent

(a)     *Classification*:  Class 9 consists of all Interests in the Parent.

(b)     *Treatment*:  Class 9 Interests will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of Class 9 Interests will not receive any distribution on account of such Class 9 Interests.

(c)     *Voting*:  Class 9 is Impaired.  Each Holder of Class 9 Interests is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

10.   Class 10—Section 510(b) Claims

(a)     *Classification*:  Class 10 consists of all Section 510(b) Claims.

(b)     *Treatment*:  Class 10 Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Class 10 Claim will not receive any distribution on account of such Class 10 Claim.  The Debtors are not aware of any valid Section 501(b) Claims and believe that no such Section 510(b) Claims exist.

(c)     *Voting*:  Class 10 is Impaired.  Each Holder of a Class 10 Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect, diminish, or impair the rights of the Liquidation Trustee, the Debtors, or the Debtors' Estates in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

34

E.     *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

F.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XIV hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

G.     *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H.     *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Wind-Down Trust or the Liquidation Trust, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

I.     *Classes Not Entitled to Vote on the Plan*

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan. Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 7 | Intercompany Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Interests | Impaired | Deemed to Reject |
| 9 | Interests in Parent | Impaired | Deemed to Reject |

J.      *Classes Entitled to Vote on the Plan*

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim | Status |
|:---:|:---:|:---:|
| 3 | Prepetition ABL Facility Claims | Impaired |
| 4 | Equipment Term Loan Claims | Impaired |
| 5 | Real Estate Term Loan Claims | Impaired |
| 6 | General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined herein) or a Ballot. If your Claim or Interest is included in the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein. Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provide to you.

K.      *Votes Required for Acceptance by a Class*

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Each Class of Claims entitled to vote on the Plan will have accepted the Plan if: (a) the Holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan.

L.      *Certain Factors to Be Considered Prior to Voting*

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan, including that:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of Holders within the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to Article XVI hereof, entitled "Certain Risk Factors to Be Considered Before Voting."

M.    *Solicitation Procedures*

1.    <u>Solicitation Agent</u>

The Debtors retained Donlin Recano & Company, Inc. ("<u>Donlin Recano</u>") to act, among other things, as the solicitation agent (the "<u>Solicitation Agent</u>") in connection with the solicitation of votes to accept or reject the Plan.

2.    <u>Solicitation Package</u>

Pursuant to the Disclosure Statement Order, Holders of Claims who are entitled to vote to accept or reject the Plan as of September 10, 2020 (the "<u>Voting Record Date</u>"), will receive appropriate solicitation materials (the "<u>Solicitation Package</u>"), which will include, in part, the following:

- a cover letter;

- the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage prepaid return envelope;

- instructions on where they may obtain copies of this combined Disclosure Statement and Plan;

- Committee solicitation letter; and

- a notice of the Combined Hearing substantially in the form approved by the Bankruptcy Court (the "<u>Combined Hearing Notice</u>").

3.    <u>Distribution of the Solicitation Package and Plan Supplement</u>

The Debtors caused the Solicitation Agent to distribute the Solicitation Packages to Holders of Claims in the Voting Classes on or before September 14, 2020, which was 22 days before the Voting Deadline (*i.e.*, 4:00 p.m. prevailing Central Time on October 6, 2020).

The Solicitation Package (except for the Ballots) may also be obtained: (a) from Donlin Recano by (i) visiting http://www.donlinrecano.com/bjs; (ii) writing to Donlin, Recano & Company, Inc., Re: BJ Services, LLC, et al., 6201 15th Avenue, Brooklyn, NY 11219; and/or (iii) emailing BJSinfo@DonlinRecano.com; or (b) for a fee via PACER at http://www.deb.uscourts.gov.

The Debtors filed the Plan Supplement at least seven (7) days prior to the Plan Objection Deadline.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at http://www.donlinrecano.com/bjs.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (a) from Dolin Recano by (i) calling the Debtors' restructuring hotline at 877-274-7653 (toll free) or 212-771-1128 (international); (ii) visiting the Debtors' restructuring website at: http://www.donlinrecano.com/bjs; (iii) writing to Donlin, Recano & Company, Inc., Re: BJ Services, LLC, et al., 6201 15th Avenue, Brooklyn, NY 11219; and/or (iv) emailing BJSinfo@DonlinRecano.com; or (b) for a fee via PACER at http://www.deb.uscourts.gov.

As described above, certain Holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code.  In addition, certain Holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote.  Such Holders will receive only the Combined Hearing Notice and a Non-Voting Status Notice.  The Debtors are only distributing a Solicitation Package, including a Ballot to be used for voting to accept or reject the Plan, to the Holders of Claims or Interests entitled to vote to accept or reject the Plan as of the Voting Record Date.

N.      *Voting Procedures*

If, as of the Voting Record Date, you are a Holder of a Claim in Classes 3 through 6—the Voting Classes—you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by completing the Ballot and returning it using the instructions provided. If your Claim or Interest is not included in the Voting Classes you are not entitled to vote and you will not receive a Solicitation Package. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

1.      Voting Deadline

The Disclosure Statement Order established a deadline to vote on the Plan of November 3, 2020, at 11:59 p.m., prevailing Central Time (the "Voting Deadline"). To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by the e-balloting platform, first class mail, overnight delivery, or personal delivery, so that the Ballot is **actually received** by Donlin Recano no later than the Voting Deadline.

2.      Voting Instructions

As described above, the Debtors have retained Donlin Recano to serve as the Solicitation Agent for purposes of the Plan. Donlin Recano is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| BALLOTS |
|---|
| To be counted, all Ballots must be **actually received** by Donlin Recano by the Voting Deadline, which is November 3, 2020, at 11:59 p.m., prevailing Central Time, at the following address: |
| **IF BY FIRST CLASS MAIL**<br>Donlin, Recano & Company, Inc.<br>Re: BJ Services, LLC<br>Attn: Voting Department<br>P.O. Box 199043 Blythebourne Station<br>Brooklyn, NY 11219 |
| **IF BY HAND DELIVERY OR OVERNIGHT MAIL**<br>Donlin, Recano & Company, Inc.<br>Re: BJ Services, LLC<br>Attn: Voting Department<br>6201 15th Ave<br>Brooklyn, NY 11219 |
| **OR BY USING THE E-BALLOTING PLATFORM**<br>SUBMIT AN ELECTRONIC BALLOT TO THE SOLICITATION AGENT VIA THE E-BALLOTING PLATFORM AT<br>WWW.DONLINRECANO.COM/CLIENTS/BJS/VOTE |
| If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline maintained by Donlin Recano at<br>877-274-7653 (toll free) or 212 771-1128 (international). |

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each Ballot; (b) overnight courier; (c) hand-delivery; or (d) using the e-balloting platform so that the Ballots are **actually received** by Donlin Recano no later than the Voting Deadline at the return address or e-balloting address set forth in the applicable Ballot. Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not

clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such Holder. By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked.

All Ballots will be accompanied by postage prepaid return envelopes. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

---

**As described more fully on the applicable Ballots and Non-Voting Status Notice, Holders who are entitled to vote on the Plan may opt out of the third party release provided in Article XII.E of the Plan by (a) checking the box on the Ballot and (b) voting to reject the Plan or abstaining from voting on the Plan, and with respect to non-Voting Classes, by submitting the form attached to the Non-Voting Status Notice. If a Holder votes to accept the Plan, such Holder will be deemed to consent to the third party release, even if such Holder elects to opt out of the third party release. The election to withhold consent to grant such release is at such Holder's option. Likewise, any such Holder that votes to accept or reject the Plan and submits a Ballot without checking the box to opt out of the third party release will be deemed to consent to the third party release. Accordingly, the Debtors urge Holders permitted to vote on the Plan to thoroughly and carefully read their Ballots, including their right to opt out of the third party release.**

**The Committee urges you to consult your own advisors regarding the proposed releases set forth in the Plan.**

---

       3.      <u>Ballots Not Counted</u>

**The following Ballots shall not be counted in determining the acceptance or rejection of the Plan**: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (b) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (c) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely Filed; **provided** that if the applicable Claims Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall be allowed to vote only in the amount of $1.00; (d) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, a Ballot cast via electronic mail will be deemed to be an original signature); (e) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (f) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

        **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

       4.      <u>Disputed Claims Procedures</u>

The Disclosure Statement Order authorizes the Debtors to temporarily allow Claims against which an objection is pending as of the Voting Record Date in an amount that the Bankruptcy Court deems appropriate for purposes of permitting the Holder of such Claim to vote to accept or reject the Plan. Pursuant to the Solicitation Procedures, if a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is Filed with the Court on or prior to ten days before the Voting Deadline: (a) the Debtors shall cause the applicable Holder to be served with a disputed claim notice; and (b) the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such Claim unless a Resolution Event (as defined below) occurs. The Holder of a Claim in a Voting Class that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.

If a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is Filed with the Court fewer than ten days before the Voting Deadline, the applicable Claim shall be deemed temporarily allowed *for voting purposes only*, without further action by the Holder of such Claim and without further order of the Bankruptcy Court, unless the Bankruptcy Court orders otherwise.

A "Resolution Event" means the occurrence of one or more of the following events no later than three days prior to the Voting Deadline: (a) an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) an order of the Bankruptcy Court is entered temporarily allowing such Claim *for voting purposes only* pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (c) a stipulation or other agreement is executed between the Holder of such Claim and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; (d) a stipulation or other agreement is executed between the Holder of such Claim and the Debtors temporarily allowing the Holder to vote its Claim in an agreed upon amount; or (e) the pending objection is voluntarily withdrawn by the objecting party. No later than two Business Days following the occurrence of a Resolution Event, the Debtors shall cause Donlin Recano to distribute via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant Holder.

O.      *Plan Objection Deadline*

The Disclosure Statement Order established November 3, 2020, at 11:59 p.m., prevailing Central Time, as the deadline to object to Confirmation of the Plan (the "Plan Objection Deadline"). All objections to the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are **actually** **received** on or before the Plan Objection Deadline.

## ARTICLE V.

## CONFIRMATION OF THE PLAN

A.      *Combined Hearing*

The Debtors Filed a motion seeking entry of a proposed Disclosure Statement Order approving this Disclosure Statement. Pursuant to Paragraph M of the Bankruptcy Court's Procedures for Complex Cases (Effective August 7, 2020), the Debtors obtained conditional approval of the Disclosure Statement on September 11, 2020 [Docket No. 641].

The Debtors intend to seek final approval of the Disclosure Statement and Confirmation of the Plan at the Combined Hearing. The Combined Hearing is scheduled to commence on November 6, 2020, at 10:00 a.m., prevailing Central Time, before the Honorable Judge Marvin Isgur, United States Bankruptcy Judge, in Courtroom 404 of the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Houston, Texas 19801. The Combined Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served on the entities who have Filed objections to the Plan, without further notice to other parties in interest. The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, before, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

B.      *Requirements for Confirmation of the Plan*

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy,

all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

C.      Best Interests of Creditors

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Pursuant to the Plan, the Wind-Down Trust and Liquidation Trustee (as applicable) will liquidate substantially all of the Debtors' remaining assets. As a result, a chapter 7 proceeding will do nothing more than create additional costs associated with converting to a chapter 7 liquidation. These additional costs include a percentage fee based on disbursements, as well as additional professional fees associated with a chapter 7 trustee selecting advisors.

Furthermore, the chapter 7 proceeding may reduce the value received for liquidation of certain assets due to timing considerations and accession of control to the chapter 7 trustee.

While information regarding the additional costs are inherently speculative, the Debtors believe the costs in chapter 7 are higher and recoveries are lower relative to the current proposed Plan (which do not have such incremental costs), as shown below.

| Estimated Recovery | | | | |
|---|---|---|---|---|
| | Plan Treatment | | Chapter 7 Liquidation | |
| | Low | High | Low | High |
| **Estimated Recovery** | | | | |
| Administrative and Priority Claims | 6,700 | 5,700 | 6,790 | 5,335 |
| Prepetition ABL Facility Claims | 41,300 | 66,166 | 37,874 | 49,561 |
| Equipment Term Loan Claims | 165,700 | 190,000 | 160,729 | 184,300 |
| Real Estate Term Loan Claims | 53,600 | 65,160 | 41,729 | 62,216 |
| General Unsecured Claims | - | 17,974 | - | 7,058 |
| **Total Estimated Recovery** | **267,300** | **345,000** | **247,122** | **308,470** |

| Estimated % of Recovery of Estimated Aggregate Amount of Allowed Claims | | | | |
|---|---|---|---|---|
| | Plan Treatment | | Chapter 7 Liquidation | |
| | Low | High | Low | High |
| **Claims** | | | | |
| Administrative and Priority Claims | 100.0% | 100.0% | 97.0% | 97.0% |
| Prepetition ABL Facility Claims (including paydown) | 66.8% | 91.3% | 61.4% | 72.9% |
| Equipment Term Loan Claims | 87.2% | 100.0% | 84.6% | 97.0% |
| Real Estate Term Loan Claims | 82.3% | 100.0% | 64.0% | 95.5% |
| General Unsecured Claims | 0.0% | 13.3% | 0.0% | 5.0% |

Furthermore, with respect to conversion from chapter 11 to chapter 7 and the related increased costs, delays, and lower recoveries, one bankruptcy judge in the Southern District of New York observed:

- "[L]eaving the case in Chapter 11 would, in fact, avoid the diminution of the estate that would actually occur in a Chapter 7 case." (*In re Hostess Brands, Inc.*, No. 12-22052 (Bankr. S.D.N.Y. Nov. 21, 2012), Hr'g Tr. at 146:21-23).

- "[G]iven the loss in value no new fiduciary could be expected to come up to speed in this case … without a destructive delay … unless he or she were to immediately hire the people that are implementing the wind down, which would be a difficult task without doing any analysis on his or her part, the resulting delay would seriously affect the sale value and greatly diminish the likelihood of there being a recovery here for at least the administrative claimants in full." (*Id.* at 148:17-149:6).

Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

D.    *Feasibility*

The Bankruptcy Code requires that a chapter 11 plan provide for payment in full of all Administrative and Priority claims unless holders of such claim consent to other treatment. The Plan provides for the payment of priority and administrative obligations from the Administrative and Priority Claims Reserve. The Debtors believe that the Plan is feasible on this basis. *See* Article VI.B for further discussion of the sources of consideration for distributions under the Plan.

E.    *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article IV of the Plan, if a Class contains Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Confirmation without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend,

modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

    1.   No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

    2.   Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## ARTICLE VI.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Restructuring Transactions*

On entry of the Confirmation Order, to the extent not inconsistent with the Sale Transactions, the applicable Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein and the Settlement Agreement, including, as applicable, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (the "Restructuring Transactions"). The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and the Settlement Agreement and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities and Settlement Parties may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities and Settlement Parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities and Settlement Parties determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan and Settlement Agreement.

B.    *Settlement*

The Settlement Order shall remain in full force and effect and the Debtors shall continue to fulfill their obligations thereunder.  The Settlement Agreement shall be incorporated as if fully set forth herein and is attached hereto as **Exhibit A**.

The Plan is intended to implement the Settlement Agreement in conjunction with the Settlement Order.  The Debtors, the Reorganized Debtors, the Wind-Down Trust, and the Liquidating Trustee are empowered to implement any and all Restructuring Transactions in furtherance of the Settlement Agreement and Settlement Order.

C.    *Sources of Consideration for Plan Distributions*

The Debtors' Cash on hand, collection of accounts receivable, the Sale Proceeds, the Unencumbered Sale Proceeds, liquidation of the Debtors' assets, and the Debtors' rights under the Purchase Agreements provide adequate liquidity to fund distributions to be made under the Plan and shall fund the Administrative and Priority Claims Reserve, the Other Secured Claims Reserve, among other obligations.

As of September 11, 2020 (the date of entry of the interim order approving the adequacy of the Disclosure Statement), the Debtors had approximately $89 million in Cash for satisfaction of Claims and their obligations under the Plan:

| *Cash* | |
|---|---:|
| Sale Proceeds set aside | 66,800 |
| Real Estate Escrows | 700 |
| Restricted Cash | 1,200 |
| Operating Cash | 9,400 |
| Professional Fee Carve-Out | 10,600 |
| *Total Cash* | 88,700 |

The Debtors proposed sources and uses for distributions under the Plan are described below.

| Sources | Uses | Est. Amount as of the Effective Date (Millions)[10] |
|---|---|---|
| Cash Collateral and Unencumbered Sale Proceeds | Administrative and Priority Claims Reserve | $10-13 |
| Cash Collateral and Unencumbered Sale Proceeds | Wind-Down Trust Account | $0.25 |
| Cash Collateral and Unencumbered Sale Proceeds | Liquidation Trust Operating Reserve | $0.25 |
| Professional Fee Escrow Account | Professional Fees | $16.5 |
| Prepetition ABL Collateral and ABL Adequate Protection Collateral (as defined in and consistent with the Cash Collateral Orders) and proceeds thereof | Prepetition ABL Facility Claims | *See* Art. IV |
| Equipment Term Loan Collateral and GACP Adequate Protection Liens (as defined in and consistent with the Cash Collateral Orders) and proceeds thereof | Equipment Term Loan Claims | *See* Art. IV |
| Real Estate Term Loan Collateral and CLMG Adequate Protection Liens (as defined in and consistent with the Cash Collateral Orders) and proceeds thereof | Real Estate Term Loan Claims | *See* Art. IV |
| Excess Proceeds and Unencumbered Assets | General Unsecured Claims | Residual value |

---

[10]    Estimated as of the Solicitation Date.

Any proceeds from Retained Causes of Action not previously settled, released, or exculpated under the Plan value shall be used to fund additional recoveries to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided herein.

D.      *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

E.      [Reserved]

F.      *Wind-Down Trust and Liquidation Trust*

1.   Wind-Down Trust

The Wind-Down Trustee shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof and the Wind-Down Trust Agreement (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and the Settlement Agreement. From and after the Effective Date, the Wind-Down Trustee shall be the sole representative of, and shall act for, the Debtors subject to the Wind-Down Trust Oversight Committee, subject to the terms of the Wind-Down Trust Agreement. For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Trust or the Wind-Down Trustee, as applicable, to continue the employment any former manager or officer, including pursuant to any transition services agreement or other employment agreement entered into on or after the Effective Date by and between the Wind-Down Trust.

As described herein, (i) the Wind-Down Trust shall be responsible for, among other things, winding down the Estates, satisfying Administrative, Priority, and Other Secured Claims, liquidating the Prepetition ABL Collateral, the portion of the Equipment Term Loan Collateral transferred to the Wind-Down Trust (subject to the terms of the Lift Stay Order and until such time as the Equipment Term Loan Claim is paid in full, the written consent of the Equipment Term Loan Agent), the Real Estate Term Loan Collateral (following satisfaction of the Real Estate Term Loan Claim pursuant to the Settlement Agreement), assets subject to adequate protection Liens pursuant to the Cash Collateral Orders (subject to the Settlement Agreement), and such other assets as may be necessary to satisfy Administrative, Priority, and Other Secured Claims, in each case subject to the terms of the Settlement Agreement, while (ii) the Liquidation Trustee will be responsible for resolution of General Unsecured Claims, liquidation of the Liquidation Trust Assets, and distributions to General Unsecured Creditors. Notwithstanding anything to the contrary herein and subject to the terms of the Settlement Agreement and Settlement Order, the Wind-Down Trust shall not take any material actions in respect of liquidating or otherwise disposing of the forgoing Collateral, including the selection of liquidator, without the consent of the applicable Agent, subject to the consultation, governance, and oversight rights, if any, granted to the Wind-Down Trust Oversight Committee in the Settlement Agreement, any Final Order of the Bankruptcy Court, and in the Wind-Down Trust Agreement. With respect to the liquidation of all other assets not subject to prepetition Liens by the Lenders, the Wind-Down Trust shall liquidate such assets in accordance with the Settlement Agreement and pursuant to the consultation, governance, and/or governance rights set forth in the Wind-Down Trust Agreement.

The Debtors shall continue in existence after the Effective Date as the Wind-Down Trust for purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Trust after the Effective Date (subject to the terms of the Lift Stay Order, and, with respect to any Equipment Term Loan Collateral, the written consent of the Equipment Term Loan Agent) in accordance with the terms of the Plan and the Settlement Agreement, (2) resolving any Disputed Claims (other than General Unsecured Claims), (3) paying Allowed Claims, (4) filing appropriate tax returns, (5) administering the Plan and the Settlement Agreement, and (6) transferring assets to the Liquidation Trust in accordance with the Plan. The Wind-Down Trust shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including

(a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Wind-Down Trust to file motions or substitutions of parties or counsel in each such matter.

On the Effective Date, the Wind-Down Trust will be formed pursuant to the Wind-Down Trust Agreement to receive all of the assets of the Wind-Down Trust, including the M&E subject to the Lift Stay Order to the extent not previously transferred (or the proceeds thereof transferred) to the Equipment Term Loan Lenders. The Wind-Down Trust will be established for the primary purpose of liquidating the Wind-Down Trust Assets (subject to the terms of the Lift Stay Order and to the extent not previously transferred (or the proceeds thereof transferred) to the Equipment Term Loan Lenders) and winding down the Debtors' Estates in accordance with the Settlement Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Trust. In addition, the Wind-Down Trust shall serve as an entity that: (a) shall disburse Distributions in accordance with this Plan (other than as provided in the Settlement and the Liquidation Trust Agreement) and (b) may bring causes of action against the Equipment Term Loan Lenders (i) if M&E is not liquidated in a commercially reasonable manner by the Equipment Term Loan Lenders pursuant to the Lift Stay Order and (ii) the Equipment Term Loan Lenders are not otherwise in compliance with the Lift Stay Order, and (c) assert any cause of action on behalf of the Debtors. Upon the transfer of the Wind-Down Trust Assets as more fully set forth in the Wind-Down Trust Agreement, the Debtors (other than the Wind-Down Trust) will have no reversionary or further interest in or with respect to the Wind-Down Trust Assets. For all U.S. federal income tax purposes, the beneficiaries of the Wind-Down Trust will be treated as grantors and owners thereof and it is intended that the Wind-Down Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for U.S. federal income tax purposes, it is intended that the beneficiaries of the Wind-Down Trust be treated as if they had received an interest in the Wind-Down Trust Assets and then contributed such interests to the Wind-Down Trust. The Wind-Down Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Wind-Down Trusts Assets, make timely distributions to the beneficiaries of the Wind-Down Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration.

On the Effective Date, the Wind-Down Trust shall establish Segregated Collateral Accounts for each of the Agents and deposit proceeds from the sale of each of the Agents' respective collateral and/or cash collateral in each Agents' respective Segregated Collateral Account. The Segregated Collateral Accounts shall be used to disburse proceeds from the sale of the Agent's respective Collateral (including adequate protection Liens pursuant to the Cash Collateral Orders) in each case in accordance with the terms of the Settlement Agreement until satisfaction of such respective Agents' Claims pursuant to Article IV and the Settlement Agreement; *provided* that the Equipment Term Loan Contribution shall not be placed in a Segregated Collateral Account.

Prior to the Effective Date, a committee shall be appointed to serve as the Wind-Down Trust Oversight Committee pursuant to the terms of the Wind-Down Trust Agreement. Members of the Wind-Down Trust Oversight Committee shall have the duties set forth in the Wind-Down Trust Agreement and in this Plan. Subject to the terms of the Wind-Down Trust Agreement, the Wind-Down Trustee shall serve at the direction of the Wind-Down Trust Oversight Committee, provided that the Wind-Down Trust Oversight Committee may not direct the Wind-Down Trustee or the members of the Wind-Down Trust Oversight Committee to act in a manner inconsistent with the Wind-Down Trustee's duties under the Wind-Down Trust Agreement and the Plan.

2. Liquidation Trust

On the Effective Date, in accordance with the Settlement Agreement and the Plan, the Liquidation Trust shall be formed for the benefit of Holders of Allowed General Unsecured Claims in accordance with Article IX of the Plan. The Liquidation Trust will be established for the primary purpose of liquidating the Liquidation Assets and with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. In addition, the Liquidation Trust shall serve as an entity that: (a) shall disburse Distributions in accordance with this Plan and (b) may take any other action as authorized by the Liquidation Trust Agreement including objection to Claims. Upon the transfer of the Liquidation Trust Assets as more fully set forth in the Liquidation Trust Agreement, the Debtors, Wind-Down Trust or the Liquidation Trust will have no reversionary or further interest in or with respect to the Liquidation Trust Assets. For all U.S. federal income tax purposes, the beneficiaries of the Liquidation Trust will be treated as grantors and owners thereof and it is

intended that the Liquidation Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for U.S. federal income tax purposes, it is intended that the beneficiaries of the Liquidation Trust be treated as if they had received an interest in the Liquidation Trust Assets and then contributed such interests to the Liquidation Trust. The Liquidation Trust will, in an expeditious but orderly manner, liquidate and convert to Liquidation Trusts Assets, make timely distributions to the beneficiaries of the Liquidation Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration.

G. **Cancellation of Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, including, without limitation, the Credit Documents, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; *provided* that, notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of (a) allowing such Holders to receive distributions under the Plan as provided herein and in the Settlement Agreement and (b) preserving all rights and obligations not released pursuant to Article XII of the Plan as between non-Debtor Entities bound thereunder (including any indemnity obligations that a Holder of a Claim or Interest may owe to another Holder); *provided*, *further*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Wind-Down Trust, except to the extent set forth in or provided for under this Plan.

H. **Corporate Action**

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Wind-Down Trust and/or Liquidation Trustee, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

Upon the Effective Date or as soon as reasonably practicable thereafter, after making all distributions (including to the Wind-Down Trust) required to be paid by the Debtors under the Plan, the Debtors other than BJ Services Holdings Canada, ULC shall be deemed to have been dissolved and terminated, and BJ Services Holdings Canada, ULC shall make an application pursuant to the *Business Corporations Act*, SBC 2002, c 57, s 314, to be dissolved.

Upon the Effective Date or as soon as reasonably practicable thereafter, the existing boards of directors and managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, shareholders, and members and any all remaining officers or directors of each Debtor shall be dismissed without any further action required on the part of any such Debtor, the shareholders of such Debtor, or the officers and directors of such Debtor. The directors, managers, and officers of the Debtors and the Liquidation Trustee, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate in their sole discretion to implement the provisions of this Article VI.H.

The authorizations and approvals contemplated by this Article VI.H shall be effective notwithstanding any requirements under applicable nonbankruptcy law.

I.    *Release of Liens*

Except as otherwise provided herein and in the Confirmation Order, upon the sale of any property of the Debtors, all Liens on any such property of any Debtors shall automatically terminate, all such collateral subject to such Liens shall be automatically released, and all guarantees of any Debtors shall be automatically discharged and released; *provided* that such Liens shall attach to Cash, proceeds, and other assets, as provided in this Plan, Lift Stay Order, or the Confirmation Order.

J.    *Effectuating Documents; Further Transactions*

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Wind-Down Trust and the Liquidation Trust are, and the officers and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and any other agreements or documents and take any such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

K.    *Exemption from Certain Taxes and Fees*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Trusts; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

L.    *Causes of Action*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled under the Plan, the Settlement Agreement, the Settlement Order, or any other Final Order (including, for the avoidance of doubt, any claims or Causes of Action released pursuant to Article XII hereof), the Debtors reserve and, as of the Effective Date, assign to the Wind-Down Trust, the Causes of Action, as well as those Causes of Action identified as being retained in the Plan Supplement.  On and after the Effective Date, the Wind-Down Trustee and Liquidation Trustee (following transfer of such Causes of Action to the Liquidation Trust) may pursue the Causes of Action on behalf of and for the benefit of the applicable beneficiaries.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any such Cause of Action against them as any indication that any and all available Causes of Action will not be pursued against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, reserve such Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Trustee and Liquidation Trustee, shall retain and shall have, including through their authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

M.     *Lift Stay Order*

Nothing in this Plan shall modify the Lift Stay Order and the Equipment Term Loan Agent shall continue liquidating the M&E as provided therein.  The Equipment Term Loan Agent, the Wind-Down Trustee, and the Liquidation Trustee shall cooperate as is reasonably necessary to maximize the value of the Debtors' assets (including the M&E).  Subject to the Lift Stay Order, the Equipment Term Loan Agent shall be responsible for and directly pay all costs associated with selling or removing the Equipment Term Loan Collateral from any properties owned or leased by the Debtors or the Wind-Down Trust.

N.     *Committee Challenge Rights.*

The Settlement Agreement constitutes a settlement and release of the Committee's Challenge Rights and provides for a full release of the Prepetition ABL Agent and Prepetition ABL Lenders as set forth in Article XII.E herein.

O.     *Closing the Chapter 11 Cases*

Upon the occurrence of the Effective Date, the Wind-Down Trustee shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Parent, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Parent.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Wind-Down Trust or Liquidation Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Parent in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE VII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     *Assumption and Assignment of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein or the Confirmation Order, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including, without limitation, any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (2) is a D&O Policy or relates to the indemnification obligations of the Debtors or Wind-Down Trust; (3); is subject to a rejection notice or assumption notice Filed with the Bankruptcy Court pursuant to the rejection and assumption procedures order [Docket No. 219] or (4) is the Purchase Agreements.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption and assignment of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

B.     *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with Bankruptcy Court and served on the Debtors or, after the Effective Date, the Wind-Down Trustee or Liquidation Trustee, as applicable, no later than 30 days after the later of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease.  In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the Debtors or, after the Effective Date, the

Wind-Down Trustee or Liquidation Trustee, as applicable, no later than 14 days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

**Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Wind-Down Trust, or the property for any of the foregoing without the need for any objection by the Debtors or the Liquidation Trustee, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims against the appropriate Debtor except as otherwise provided by order of the Bankruptcy Court.

C.     *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each assumed and assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors or the Debtors on behalf of the Debtors' Estates during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Bankruptcy Court order to the contrary.

D.     *D&O Policies*

The D&O Policies shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Trust  (and thereafter the Liquidation Trust) effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was rejected by the Debtors or the Debtors' Estates pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under any of the D&O Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Policies.

E.     *Indemnification Obligations*

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, officers, employees, attorneys, other professionals and agents of the Debtors, and such current and former directors' and officers' respective Affiliates, respectively, against any Claims or Causes of Action under the Indemnification Provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Trust (and thereafter the Liquidation Trust) which shall be deemed to have assumed the obligation, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date; *provided* that, notwithstanding anything herein to the contrary, the obligation to fund such indemnification obligations shall be limited to the extent of coverage available under any insurance policy assumed by the Debtors and assigned to the Wind-Down Trust, including the D&O Policies.

F.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease on Schedule G of the Debtors' Schedules or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Liquidation Trustee, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

G.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VIII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtors, the Wind-Down Trust, or the Liquidation Trustee on behalf of the Debtors, as applicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article XI hereof.  To the extent that the Equipment Term Loan Claims are not paid in full, any deficiency Claim shall be treated as a Class 6 General Unsecured Claim and an amount to be reserved on account of such deficiency Claim, if any, shall be reasonably agreed upon by the Wind-Down Trust, the Wind-Down Trustee, or Liquidating Trustee, as applicable, and the Equipment Term Loan Agent, or determined or estimated by the Court prior to the first distribution to General Unsecured Creditors.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

B.      *Payment of Prepetition ABL Agent Fees and Expenses*

The Prepetition ABL Agent shall not bear any responsibility or liability for any distributions made hereunder (other than in accordance with the Prepetition ABL Credit Agreement). On or prior to the Effective Date the Debtors shall pay in Cash all unpaid Prepetition ABL Agent fees and expenses that are payable under the Cash Collateral Orders to the extent not inconsistent with the Settlement Agreement.  From and after the Effective Date, the Wind-Down Trustee shall promptly reimburse the prepetition ABL Agent from the Wind-Down Trust Account all Prepetition ABL Agent fees and expenses incurred after the Effective Date in connection with implementation of this Plan and the Wind-Down Trust Agreement and related documents, including but not limited to, making distribution to ABL Lenders in accordance with this Plan and the Wind Down Agreement and related documents.  To the extent that any such payments are not allowed under section 506(b) of the Bankruptcy Code and not allowed on any other basis, such payments should be recharacterized and applied as payments of principal owed under the Prepetition ABL Facility.

C.      *Rights and Powers of the Debtors, Wind-Down Trust, and the Liquidation Trustee*

    1.      <u>Powers of the Debtors, Wind-Down Trust, and the Liquidation Trustee</u>

Except as otherwise set forth herein, all distributions under the Plan shall be made on the Effective Date or as soon as reasonably practicable thereafter by the Debtors, the Wind-Down Trust, or the Liquidation Trustee (or its designee(s)), the timing of which shall be subject to the reasonable discretion of the Debtors, Wind-Down Trustee, or the Liquidation Trustee, as applicable.

On and after the Effective Date, the Wind-Down Trustee and Liquidation Trustee and each of their respective designees or representatives shall have the right to object to, Allow, or otherwise resolve any Claim, subject to the terms hereof.

The Debtors, the Wind-Down Trustee, and the Liquidation Trustee, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Liquidation Trustee is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Liquidation Trust Assets.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

    1.      <u>Record Date for Distribution</u>

On the Distribution Record Date, the Claims Register shall be closed and the Debtors, the Wind-Down Trustee, the Liquidation Trustee, or any other party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. The Distribution Record Date shall not apply to the Agents in respect of Claims on account of the Credit Documents, including any deficiency Claim that is treated as a General Unsecured Claim.

    2.      <u>Delivery of Distributions in General</u>

        (a)      Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed General Unsecured Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall, in the reasonable discretion of the Liquidation Trustee, be deemed to have been made by the Liquidation Trustee on the Effective Date unless the Liquidation Trustee and the Holder of such Claim agree otherwise.

        (b)      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by, as applicable, the Debtors, or the Wind-Down Trustee, or the Liquidation Trustee, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim, other than with respect to Professional Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

        (c)      Distributions

On and after the Effective Date, the Debtors, Wind-Down Trustee, or the Liquidation Trustee, as applicable, shall make the distributions required to be made on account of Allowed Claims under the Plan. Any distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be held by the Wind-Down Trustee or Liquidation Trustee in any reserve established by the Wind-Down Trustee or Liquidation Trustee in accordance with the Plan, as applicable, and distributed on the next Subsequent Distribution Date that occurs after such Claim is Allowed. In accordance with Article VIII.H hereof, no interest shall accrue or be paid on the unpaid amount of any distribution paid pursuant to the Plan.

3. Minimum; De Minimis Distributions

No Cash payment of less than $50.00, in the reasonable discretion of the Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

4. Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder of a General Unsecured Claim is returned as undeliverable, no distribution to such Holder shall be made unless and until the Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three months from the date the initial distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidation Trust or the Wind-Down Trust (as applicable) automatically and without need for a further Order by the Bankruptcy Court for distribution in accordance with the Plan and the Claim of any Holder to such property or interest in property shall be released, settled, compromised, and forever barred; *provided* that such unclaimed property or interests in property on account of Claims shall be allocated to the Wind-Down Trust Assets or Liquidation Trust Assets (as applicable).

5. Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Debtors, the Wind-Down Trust, or the Liquidation Trustee, as applicable, by check or by wire transfer.

E. *Compliance with Tax Requirements/Allocations*

In connection with the Plan and all distributions hereunder, to the extent applicable, the Debtors, and Trustees, as applicable, are authorized to take any and all actions that may be necessary or appropriate to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto or pursuant to the Trust Agreements shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Trustees shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of a distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Trustees and the Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

F. *Allocation of Plan Distributions Between Principal and Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed therein.

G. *Setoffs and Recoupment*

Except as otherwise expressly provided herein, the Debtors, the Wind-Down Trust or the Liquidation Trust, as applicable, may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors, the Wind-Down Trust, or Liquidation Trust, as applicable, may have against the claimant, but neither

the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Wind-Down Trust or the Liquidation Trust of any such Claim it may have against the Holder of such Claim.

H.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court (such as the Cash Collateral Order), the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

I.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties; Recourse to Collateral

The Debtors or the Wind-Down Trustee or the Liquidation Trustee, as applicable, shall be authorized to reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, as applicable, including on account of recourse to collateral held by third parties that secure such Claim.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      Claims Payable by Insurance, Third Parties; Recourse to Collateral

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable.  To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party of any of the Debtor's insurance policies with respect to such policies, including the D&O Policies.

## ARTICLE IX.

## THE LIQUIDATION TRUST

A.      *Appointment of the Liquidation Trustee*

The Liquidation Trustee shall be selected by the Committee. At the Combined Hearing, the Bankruptcy Court shall consider and, if appropriate, ratify the selection of the Liquidation Trustee. All compensation for the Liquidation Trustee shall be paid from the Liquidation Trust Assets, as may be reserved by the Liquidation Trustee in the Liquidation Trust Operating Reserve, in accordance with the Liquidation Trust Agreement. The approved Person shall

serve as the Liquidation Trustee upon execution of the Liquidation Trust Agreement. The Liquidation Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. The Liquidation Trust Agreement shall be provided in the Plan Supplement and shall be in form and substance acceptable to the Debtors and the Committee. On the Effective Date, all Liquidation Trust Beneficiaries of the Liquidation Trust shall be deemed to have ratified and become bound by the terms and conditions of the Liquidation Trust Agreement. In the event that the Liquidation Trustee resigns or is removed, terminated, or otherwise unable to serve as the Liquidation Trustee, then a successor shall be appointed as set forth in the Liquidation Trust Agreement. Any successor Liquidation Trustee appointed shall be bound by and comply with the terms of this Plan, the Plan Confirmation Order, and the Liquidation Trust Agreement.

B.      *Establishment of a Trust Oversight Committee*

Prior to the Effective Date, a committee of up to three creditors shall be appointed by the Committee to serve as the Trust Oversight Committee. Members of the Trust Oversight Committee shall have the duties set forth in the Liquidation Trust Agreement and in this Plan. Subject to the terms of the Liquidation Trust Agreement, the Liquidation Trustee shall serve at the direction of the Trust Oversight Committee, provided that the Trust Oversight Committee may not direct the Liquidation Trustee or the members of the Trust Oversight Committee to act in a manner inconsistent with the Liquidation Trustee's duties under the Liquidation Trust Agreement and the Plan.

The members of the Trust Oversight Committee shall serve without compensation, however they shall be entitled to reimbursement for actual and reasonable out-of-pocket expenses, as provided for in the Plan and the Trust Agreement, including without limitation reasonable and documented expenses, including out-of-pocket expenses relating to airfare, hotel, meals and other travel costs, and postage, telephone and facsimile charges, for work performed on behalf of or relating to the administration of the Liquidation Trust or the Trust Oversight Committee, and other necessary expenses. Further, members of the Trust Oversight Committee may not be reimbursed by the Liquidation Trust for counsel in connection with their duties as members of the Trust Oversight Committee, unless first authorized pursuant to an Order of the Bankruptcy Court for cause shown.

C.      *Reserved.*

D.      *Creation of the Liquidation Trust*

On the Effective Date, the Liquidation Trustee shall sign the Liquidation Trust Agreement and, in its capacity as Liquidation Trustee, and from time to time, accept all Liquidation Trust Assets on behalf of the Liquidation Trust Beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Liquidation Trust Assets not in its possession or control. The Liquidation Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date. The Liquidation Trust shall be established for the primary purpose of liquidating the Liquidation Trust Assets and for making Distributions in accordance with this Plan and the Liquidation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.

E.      *Liquidation Trust Beneficiaries of the Liquidation Trust*

The Holders of Allowed Class 6 Claims entitled to Distributions hereunder shall be the Liquidation Trust Beneficiaries of the Liquidation Trust. Such Liquidation Trust Beneficiaries shall be bound by the Liquidation Trust Agreement. The interests of the Liquidation Trust Beneficiaries in the Liquidation Trust shall be uncertificated and shall be nontransferable except upon death of the interest holder or by operation of law.

F.      *Vesting and Transfer of Assets to the Liquidation Trust*

Pursuant to section 1141(b) of the Bankruptcy Code, the Liquidation Trust Assets shall vest in the Liquidation Trust free and clear of all Claims and Liens; *provided, however*, that the Liquidation Trustee may abandon or otherwise not accept any Liquidation Trust Assets that the Liquidation Trustee believes, in good faith, to have no value to, or will be unduly burdensome to, the Liquidation Trust. Any Liquidation Trust Assets that the Liquidation Trustee so

abandons or otherwise does not accept shall not be property of the Liquidation Trust. Following transfer from the Debtors or Wind-Down Trust to the Liquidation Trust, all Liquidation Trust Assets shall vest in the Liquidation Trust and all assets dealt with in this Combined Plan and Disclosure Statement shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in this Combined Plan and Disclosure Statement or in the Plan Confirmation Order.

G.      *Certain Powers and Duties of the Liquidation Trust and Liquidation Trustee*

   1.   Unederline: General Powers of the Liquidation Trustee

The Liquidation Trustee shall have the power and authority to perform the acts described in the Liquidation Trust Agreement (subject to approval by the Bankruptcy Court where applicable), in addition to any powers granted by law or conferred to it by any other provision of this Plan, including without limitation any set forth herein, provided however, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Liquidation Trustee to act as specifically authorized by any other provision of this Plan, the Liquidation Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidation Trustee may deem necessary or appropriate, including, without limitation, to discharge all obligations assumed by the Liquidation Trustee or provided herein and to conserve and protect the Liquidation Trust or to confer on the Liquidation Trust Beneficiaries the benefits intended to be conferred upon them by this Plan. The powers, rights, and responsibilities of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement and shall include the authority, power, and responsibility to: (a) receive, manage, invest, supervise, and protect Liquidation Trust Assets; (b) pay taxes or other obligations incurred by the Liquidation Trust and issue to employees or other Persons, and/or file with the appropriate Governmental Units, applicable tax and wage returns and forms; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution and distribution of Liquidation Trust Assets; (d) calculate and implement Distributions of Liquidation Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidation Trust Agreement and without further order of the Court, Retained Causes of Action vested in the Liquidation Trust; (f) resolve issues involving Claims and Interests in accordance with this Plan, including the power to object to Claims, and to subordinate and recharacterize Claims by objection, motion, or adversary proceeding; (g) undertake all administrative functions of the Chapter 11 Cases, including the payment of Statutory Fees and the ultimate closing of the Chapter 11 Cases and (h) take action pursuant to such other powers as may be vested in or assumed by the Liquidation Trustee pursuant to this Plan, the Liquidation Trust Agreement, Bankruptcy Court order, or as may be necessary and proper to carry out the provisions of this Plan.

   2.   Books and Records

Following satisfaction of the Lenders' Claims by the Wind-Down Trust, the Liquidation Trust shall: (a) take possession of all books, records, and files of the Debtors and the Estates that were not sold and transferred in connection with the Sale Transactions; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidation Trust determines, in accordance with the Liquidation Trust Agreement, that retention of same is no longer necessary or beneficial

   3.   Investments of Cash

The Liquidation Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments, *provided, however*, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities

   4.   Costs and Expenses of Administration of the Liquidation Trust

All Liquidation Trust Operating Expenses shall be the responsibility of and paid by the Liquidation Trust in accordance with the Liquidation Trust Agreement from the Liquidation Trust Assets.

5. Reporting

In no event later than thirty (30) Business Days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidation Trust has been released or paid out in accordance with this Plan, the Liquidation Trustee shall File a report setting forth the amounts, recipients, and dates of all Distributions made by the Liquidation Trustee under this Plan through each applicable reporting period.

H.    *U.S. Federal Income Tax Reporting and Withholding Obligations of the Liquidation Trustee*

The Liquidation Trust shall be responsible for filing all federal, state, and local tax returns for the Liquidation Trust. The Liquidation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidation Trust shall be subject to any such withholding and reporting requirements. The Liquidation Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a Distribution, the Holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Holder. Notwithstanding any other provision of this Combined Plan and Disclosure Statement, (a) each Holder of an Allowed Claim that is to receive a Distribution from the Liquidation Trust shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Liquidation Trustee to allow it to comply with its tax withholding and reporting requirements. Any property to be distributed by the Liquidation Trust shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution to be held by the Liquidation Trustee, as the case may be, until such time as the Liquidation Trustee is satisfied with the Holder's arrangements for any withholding tax obligations.

See "Certain United States Federal Income Tax Consequences of the Plan" for a discussion of certain U.S. federal income tax consequences of the Liquidation Trust.

I.    *Term of Liquidation Trust*

The Liquidation Trustee shall be discharged and the Liquidation Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Liquidation Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidation Trustee under the Liquidation Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidation Trust under this Plan and the Liquidation Trust Agreement have been made, and (v) the Parent Chapter 11 Case has been closed; *provided, however,* that in no event shall the Liquidation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed one (1) year, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets

J.    *Limitation of Liability*

The Liquidation Trust shall indemnify the Liquidation Trustee and his or her professionals against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits, or claims that the Liquidation Trustee or his or her professionals may incur or sustain by reason of being or having been a Liquidation Trustee or professionals of the Liquidation Trustee for performing any functions incidental to such service; *provided, however,* the foregoing shall not relieve the Liquidation Trustee or his or her professionals from liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing, or, in the case of an attorney professional and, as required under the applicable rules of professional conduct.

# ARTICLE X.

## RESERVES ADMINISTERED BY THE LIQUIDATION TRUSTEE OR WIND-DOWN TRUST

A.      *Establishment of Reserve Accounts*

The Liquidation Trustee and Wind-Down Trust (as applicable) shall establish each of the Distribution Reserve Accounts including under Article VIII.A (which, notwithstanding anything to the contrary contained in this Plan, may be affected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Liquidation Trustee) and shall establish the Segregated Collateral Accounts for each of the Agents.

B.      *Undeliverable Distribution Reserve*

1.      Deposits

If a distribution to any Holder of an Allowed Claim is returned to the Liquidation Trust or Wind-Down Trust (as applicable) as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed, or is deemed to have been forfeited in accordance with this Article X.B.

2.      Forfeiture

Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Undeliverable or Unclaimed Distribution within three months after the first distribution is made to such Holder shall be deemed to have forfeited its claim for such Undeliverable or Unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for the Undeliverable or Unclaimed Distribution against any Debtor, the Wind-Down Trust, any Estate, or the Liquidation Trust or their respective properties or assets.  In such cases, any Cash or other property held by the Wind-Down Trust or Liquidation Trust in the Undeliverable Distribution Reserve for distribution on account of such claims for Undeliverable or Unclaimed Distributions, including the interest that has accrued on such Undeliverable or Unclaimed Distribution while in the Undeliverable Distribution Reserve, shall become the property of the Liquidation Trust or Wind-Down Trust (as applicable), notwithstanding any federal or state escheat laws to the contrary, and shall be available for immediate distribution by the Liquidation Trustee or Wind-Down Trust (as applicable).

3.      Disclaimer

Neither the Liquidation Trustee nor Wind-Down Trustee nor his or her respective agents and attorneys are under a duty to take any action to either (i) attempt to locate any Claim Holder, or (ii) obtain an executed Internal Revenue Service Form W-9 from any Claim Holder *provided* that in his or her sole discretion, the Liquidation Trustee or Wind-Down Trustee may periodically publish notice of unclaimed distributions.

4.      Distribution from Reserve

Within fifteen (15) Business Days after the Holder of an Allowed Claim satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an Undeliverable or Unclaimed Distribution, the Liquidation Trustee or Wind-Down Trust (as applicable) shall distribute out of the Undeliverable Distribution Reserve the amount of the Undeliverable or Unclaimed Distribution attributable to such Claim, including the interest that has accrued on such Undeliverable or Unclaimed Distribution while in the Undeliverable Distribution Reserve to such Holder.

C.      *Administrative and Priority Claims Reserve*

On the Effective Date, the Wind-Down Trust, in consultation with the Prepetition ABL Agent and the Liquidation Trustee, shall establish the Administrative and Priority Claims Reserve.  The Administrative and Priority

Claims Reserve shall be used to pay Allowed Administrative and Priority Claims. If all or any portion of an Administrative or Priority Claim shall become a Disallowed Claim, then the amount on deposit in the Administrative and Priority Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in such Reserve, shall remain in the Administrative and Priority Claims Reserve to the extent that the Wind-Down Trust determines it is necessary to ensure that the Cash remaining in the Administrative and Priority Claims Reserve is sufficient to ensure that all Allowed Administrative and Priority Claims will be paid in accordance with the Plan.

D.       *Other Secured Claims Reserve*

On the Effective Date, the Wind-Down Trust, in consultation with the Prepetition ABL Agent and the Liquidation Trustee, shall establish the Other Secured Claims Reserve by depositing Cash proceeds from the sale of assets securing the Other Secured Claims. The Other Secured Claims Reserve shall be used to pay Allowed Other Secured Claims to the extent not satisfied by the return of the assets securing the Allowed Other Secured Claim. If all or any portion of an Other Secured Claim shall become a Disallowed Claim, then the amount on deposit in the Other Secured Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Other Secured Claims Reserve, shall remain in the Other Secured Claims Reserve or be transferred out of the Other Secured Claims Reserve to the extent that the Wind-Down Trust determines it is necessary to ensure that the Cash remaining in the Other Secured Claims Reserve is sufficient to ensure that all Allowed Other Secured Claims will be paid in accordance with the Plan.

The Debtors shall not have any reversionary or other interest in or with respect to any of the Distribution Reserve Accounts.

# ARTICLE XI.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS

A.       *Allowance of Claims and Interests*

Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidation Trustee or Wind-Down Trust (as applicable), shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), allowing such Claim.

B.       *Claims and Interests Administration Responsibilities*

Solely with respect to General Unsecured Claims and except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Liquidation Trustee by order of the Bankruptcy Court, shall have the sole authority, in consultation with the Trust Oversight Committee: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.       *Estimation of Claims*

Solely with respect to General Unsecured Claims, on and after the Effective Date, the Liquidation Trustee, may, at any time, request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any

objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Liquidation Trustee may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Liquidation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim, provided, however, the Debtors or the Liquidation Trustee shall reserve for such Disputed Claims pending resolution of such proceedings. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.    *Adjustment to Claims Register Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Liquidation Trustee, or Wind-Down Trust without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.    *Time to File Objections to Claims*

Any objections to or requests to estimate Claims shall be Filed on or before the Claims Objection Deadline, as such may be extended pursuant to the terms of the Plan.

F.    *Disallowance of Claims*

To the maximum extent provided by section 502(d) of the Bankruptcy Code, any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Liquidation Trustee, or Wind-Down Trust. All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

G.    *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Liquidation Trustee and any such new or amended Claim Filed without such prior authorization shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

H.    *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article XI, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim or is otherwise permitted by further order of the Bankruptcy Court.

I.      *Distributions After Allowance*

        To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Liquidation Trust or Wind-Down Trust shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in Article IV.B.

J.      *Single Satisfaction of Claims*

        Holders of Allowed Claims may assert such Claims against the Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the Debtors based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE XII.

## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

        Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan and the Settlement Agreement, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind-Down Trustee, the Liquidation Trustee, as applicable, may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.      *Term of Injunctions or Stays*

        Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

C.      **Release of Liens**

        **Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, and as necessary to effectuate the terms of the Lift Stay Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article IV.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of**

trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Debtors, or the Wind-Down Trust, or Liquidation Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

D.      *Release by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, irrevocably, and forever released by each and all of the Debtors, the Wind-Down Trust, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Trust, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Wind-Down Trust, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Trust, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital structure, management, ownership, or operation thereof, the Credit Documents or any draws thereunder, the restructuring transactions, the sale and marketing process in connection with any of the Sale Transactions, the wind-down of the Debtors' estates, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Sale Transactions, the negotiation, implementation, or terms of the Settlement Agreement and any applicable related term sheets or proposals, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the forgoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article XII by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article XII is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-Down Trust or the Liquidation Trust or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former

employee of the Debtors, or (iii) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan; *provided* that any of the Debtors' Causes of Action settled pursuant to the Plan shall be released.

E.      *Third Party Release*

        Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released each Debtor, the Wind-Down Trust, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Trust, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Trust, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital structure, management, ownership, or operation thereof, the Credit Documents, the restructuring transactions, the sale and marketing process in connection with any of the Sale Transactions, the wind-down of the Debtors' estates, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Sale Transactions, the negotiation, implementation, or terms of the Settlement Agreement and any applicable related term sheets or proposals, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the forgoing.

        Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article XII, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article XII is:    (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) an absolute and complete bar to any of the Debtors or Wind-Down Trust or the Liquidation Trust or their respective Estates conveying direct or derivative standing to any person or entity to pursue any claim, Causes of Action or liability against any Released Party, or asserting any claim, Causes of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

        Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (iv) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan; *provided* that any of the Debtors' Causes of Action settled pursuant to the Plan shall be released.

F.    *Exculpation*

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale Transactions, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Settlement Agreement and any term sheets or proposals related thereto, the Plan, or any restructuring transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

G.    *Injunction*

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that: (a) are subject to compromise and settlement pursuant to the terms of the Plan; (b) have been released by the Debtors pursuant to the Plan; (c) have been released by third parties pursuant to the Plan, (d) are subject to exculpation pursuant to the Plan; or (e) are otherwise discharged, satisfied, stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Trust, the Released Parties, or the Exculpated Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities discharged, released, exculpated, or settled pursuant to the Plan.  Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article XII.G of the Plan.

H.    *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors, unless such Holder actually has performed such recoupment and provided notice

thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

I.      *Subordination Rights*

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

## ARTICLE XIII.

## SUBSTANTIAL CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Consummation of the Plan*

It shall be a condition to Consummation of the Plan that the following conditions have been satisfied or waived pursuant to the provisions of Article XIII.B hereof:

1. the Bankruptcy Court shall have entered the Confirmation Order, prepared in consultation with the Committee and the Lenders and in form and substance materially consistent with the Plan in all respects;

2. The Bankruptcy Court shall have entered an order approving the Settlement Agreement.

3. the Liquidation Trust shall be established and funded and the Liquidation Trustee shall have been appointed in accordance with the provisions of the Plan and the terms of the Liquidation Trust Agreement;

4. all documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

5. the Administrative and Priority Claims Reserve shall have been established and funded;

6. the Professional Fee Escrow shall have been established and funded; and

7. the Other Secured Claims Reserve shall have been established and funded;

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

B.      *Waiver of Conditions*

The conditions to Consummation of the Plan set forth in Article XIII.A hereof may be waived by the Debtors with the consent of the Settlement Parties (such consent not to be unreasonably withheld, conditioned, or delayed).

C.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.      *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any Holders, or any other Entity in any respect.

## ARTICLE XIV.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Subject to the limitations contained in the Plan, upon consultation with the Committee and the Lenders, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, upon consultation with the Committee and the Lenders, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, in each case in accordance with the Settlement.  For the avoidance of doubt, such modification(s) may include a settlement pursuant to Bankruptcy Rule 9019 to resolve any unresolved controversies, including but not limited to those described in Article II.H.8.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XIV hereof.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur with respect to any Debtor, then:  (1) the Plan with respect to such Debtor shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan with respect to such Debtor (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan with respect to such Debtor, and any document or agreement executed pursuant to the Plan with respect to such Debtor, shall be deemed null and void; and (3) nothing contained in the Plan with respect to such Debtor shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

## ARTICLE XV.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Settlement Agreement, the Settlement Order, or the Confirmation Order, or any Entity's obligations incurred in connection with the Plan, the Settlement Agreement, the Settlement Order, or the Confirmation Order;

11.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article XII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VIII hereof;

14.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.    adjudicate, decide, or resolve any and all matters related to the Settlement Agreement and Settlement Order;

16.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Settlement Agreement, the Settlement Order, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

17.   adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein or in the Settlement Agreement;

18.   consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.   determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.   hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.   hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.   enforce all orders previously entered by the Bankruptcy Court;

23.   hear any other matter not inconsistent with the Bankruptcy Code;

24.   enter an order concluding or closing the Chapter 11 Cases;

25.   enforce the Purchase Agreements; and

26.   enforce the injunction, release, and exculpation provisions set forth in Article XII hereof.

## ARTICLE XVI.

## CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.   *Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims Under the Plan*

1.   Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recoveries of Some Holders of Allowed Claims

The estimates of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.

Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims and Allowed Interests under the Plan.  Some Holders are not entitled to any recovery pursuant to the terms of the Plan, and, depending on the accuracy of the Debtors' various assumptions, even those Holders entitled to a recovery under the terms of the Plan may ultimately receive no recovery.

2. The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes

The Debtors cannot know with certainty, at this time, the results of the Sale Transactions, the existence or results of any potential Causes of Action, the number or amount of Claims in the Voting Classes that will ultimately be Allowed, and how the amount of Allowed Claims will compare to the estimates provided herein. For example, a number of Proofs of Claim allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement. In addition, the Debtors are continuing to review the Proofs of Claim Filed in their Chapter 11 Cases. As such, the estimated amount of Claims may materially change due to the Debtors' ongoing review. Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

The Committee wants creditors to know that given that the Plan provides for broad releases of third-parties which could result in the release of valuable causes of action, there may not be sufficient assets to make any distributions to general unsecured creditors under the Plan.

3. Any Valuation of Any Assets to be Distributed under the Plan Is Speculative and Could Potentially Be Zero

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative, and the value of such assets could potentially be zero. Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Debtors' creditors, including Holders of Claims in the Voting Classes.

The Committee wants creditors to know that as discussed above, because the Plan contemplates broad releases of Claims and Causes of Action and unless parties otherwise opt out of such releases, there could be no recovery for general unsecured creditors.

4. The Debtors Cannot Guaranty Recoveries or the Timing of Such Recoveries

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims, including Administrative Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims, it is possible that the actual amount of such Allowed Claims is materially higher than the Debtors' estimates and/or the Debtors' available Cash, including the Equipment Term Loan Contribution and Unencumbered Sale Proceeds, is materially lower than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing of any recovery on an Allowed Claim.

5. Cash Collateral Usage

The Debtors do not yet have a Final Order approving the use of their prepetition lenders cash collateral. Absent further agreement, the Debtors may not have sufficient cash to continue operating or reach the proposed confirmation date. In such an event, the chapter 11 plan will not be confirmed and the chapter 11 cases may convert to cases under chapter 7 of the Bankruptcy Code.

6. Certain Tax Implications of the Debtors' Bankruptcy

Holders of Allowed Claims entitled to vote should carefully review Article XVII of this Disclosure Statement, "Certain United States Federal Income Tax Consequences," for a description of certain tax implications of the Plan and the Chapter 11 Cases. Holders of Allowed Claims should consult with their own tax advisors for the tax implications to them of the Plan and the Chapter 11 Cases. This Disclosure Statement only provides a summary of certain U.S. federal income tax implications of the Plan and the Chapter 11 Cases. Foreign tax considerations are not described herein.

7.    The Liquidation Trust

The ultimate amount of Cash available to make distributions to General Unsecured Creditors depends, in part, on the assets, if any, contributed to the Liquidation Trust, proceeds from the sale of the Debtors' assets, as well as the manner in which the Liquidation Trustee operates the Liquidation Trust and the expenses the Liquidation Trustee incurs. The expenses of the Liquidation Trustee will be given priority over distributions to the Liquidation Trust Beneficiaries. As a result, if the Liquidation Trustee incurs professional or other expenses in excess of current expectations, the amount of distributions to the Liquidation Trust Beneficiaries will decrease.

The ultimate amount of Cash available for distributions to the Liquidation Trust Beneficiaries also will be affected by the performance and relative success of the Liquidation Trustee in pursuing the Retained Causes of Action, if any. The less successful the Liquidation Trustee is in pursuing such matters, the less Cash there will be available for distribution to the Liquidation Trust Beneficiaries.

There is a risk that the transfer of the Retained Causes of Action to the Liquidation Trust as contemplated by the Plan could be subject to challenge that, if successful, could nullify the transfer of the Retained Causes of Action, in whole or in part, and result in the Liquidation Trust being unable to pursue those Retained Causes of Action or assert claims in connection therewith.

8.    Releases

The Plan proposes to release the Released Parties. The Debtors' assert that releases and third-party releases, included in the Plan are an integral part of the Debtors' overall restructuring efforts.

Importantly, (a) all Holders of Claims or Interests that vote to accept or are presumed to accept the Plan, (b) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form or ballot indicating that they opt not to grant the releases provided in the Plan, and (c) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form or ballot indicating that they opt not to grant the releases provided in the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and settled all Claims and Causes of Action against the Debtors.

B.    *Certain Bankruptcy Law Considerations*

The occurrence or nonoccurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests or the Amount of Such Claims or Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim when such Claim is or may be subject to an objection or is not yet Allowed. Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

2. Failure to Satisfy Vote Requirements

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind down the Estates, such as an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

3. The Debtors May Not Be Able to Secure Confirmation of the Plan

The Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the Solicitation Procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests. The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

5. Risk of Nonoccurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether such an Effective Date will, in fact, occur.

6. Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be Allowed. The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

7. Risk Affecting Potential Recoveries of Holders of Claims in the Voting Classes

The Debtors cannot state with any degree of certainty what recovery will be available to Holders of Allowed Claims in the Voting Classes. In particular, the Debtors cannot know, at this time, the number or size of Claims in the Voting Classes which will ultimately be Allowed or how many assets will remain after paying all Allowed Claims which are senior to the Claims of Holders in the Voting Classes. The ultimate amount of Allowed Claims in the Voting Classes could materially reduce the recovery available to Holders of Allowed Claims in the Voting Classes.

C. *Disclosure Statement Disclaimer*

1. The Financial Information Contained in this Disclosure Statement Has Not Been Audited

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2. Information Contained in this Disclosure Statement Is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3. This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

4. This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

5. No Legal or Tax Advice Is Provided to You by this Disclosure Statement

***This Disclosure Statement is not legal advice to you.*** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his

or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6. No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

7. Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Liquidation Trustee may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

8. No Waiver of Right to Object to Claim or Interest

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

9. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

10. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

D. *Liquidation under Chapter 7*

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for

distribution in accordance with the priorities established by the Bankruptcy Code. As discussed above, conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes. *See, e.g.*, 11 U.S.C. §§ 326(a), 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c).

## ARTICLE XVII.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A.      *Introduction*

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and Holders of Claims entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, published administrative rules, and pronouncements of the U.S. Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in Applicable Tax Law or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS would not assert, or that a court would not sustain, a position different from any position discussed herein.

This summary does not address non-U.S., U.S. state or local, or non-income tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Holders that are related to the Debtors within the meaning of the Tax Code, Holders that are liable for alternative minimum tax, the so-called "net investment income tax" under section 1411 of the Tax Code, or the base erosion and anti-abuse tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, Holders that hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code), Holders that use a mark-to-market method of accounting, and Holders that are themselves in bankruptcy). Further, this summary assumes that a Holder of Claims holds only Claims in a single class and holds such Claims only as "capital assets" within the meaning of section 1221 of the Tax Code (generally, property held for investment). This summary also assumes that the various debt, and other arrangements intended to be treated as debt for U.S. federal income tax purposes, to which any of the Debtors are a party will be respected for U.S. federal income tax purposes as such and that the Prepetition ABL Facility Claims, Equipment Term Loan Claims, and Real Estate Term Loan Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than as any other Holder of a Claim in the same Class, and the tax consequences for such Holders may differ materially from those described below. This summary does not address the U.S. federal income tax consequences to Holders (1) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (2) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this

discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) of such partnership (or other pass-through entity) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity and such partner (or other beneficial owner).  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE RESTRUCTURING TRANSACTIONS IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, AND LOCAL, NON-U.S., NON-INCOME (E.G., ESTATE), AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.      *Certain U.S. Federal Income Tax Consequences to the Debtors*

1.      Characterization of Restructuring Transactions

For U.S. federal income tax purposes, the Debtors will be treated as (a) transferring certain of their assets to the Purchasers pursuant to the Purchase Agreements in taxable transactions, (b) delivering the Sale Proceeds and the Trust Assets to creditors in satisfaction of Claims in accordance with the Plan, and (c) undertaking any further wind-down activities.  The Debtors will realize gain or loss upon the transfer of the portion of their assets to the Purchasers in amounts equal to the difference between the amounts realized on such transfers and the applicable Debtor's tax basis in the applicable assets. The Debtors will also realize gain or loss upon the transfer of the portion of their assets to the Holders of Claims in an amount equal to the difference between the fair market values of such assets and the Debtor's tax basis in the applicable assets.  The Debtors will report the transactions contemplated by the Purchase Agreements and the Plan on their tax returns consistent with such characterization.  In addition, as a result of the Restructuring Transactions, it is expected that Parent will realize cancellation of indebtedness income ("CODI") as discussed below.

Parent is treated as a partnership for U.S. federal income tax purposes.  Accordingly, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by Parent but by its members.

2.      Cancellation of Debt and Reduction of Tax Attributes

In general, if a taxpayer satisfies its outstanding indebtedness for total consideration less than the amount of such indebtedness, such taxpayer will realize and recognize CODI for U.S. federal income tax purposes.  The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of any Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other consideration (including the assets deemed received by a Holder and contributed to a Trust) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include CODI in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy Exception") or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception").  Instead, as a consequence of such exclusion, a taxpayer must reduce its tax attributes by the amount of CODI that it excluded from gross income pursuant to the rule discussed in the preceding sentence.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (including, as described above, the amount of gain or loss recognized by Parent with respect to the sale of its assets in a taxable transaction).  In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryovers; (c) minimum

tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the taxpayer remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.[11] Alternatively, a taxpayer with CODI may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. Any excess CODI over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

Under section 108(d)(6) of the Tax Code, when an entity that is a pass-through entity (other than an S corporation), such as Parent, realizes CODI, its members or partners are treated as receiving their allocable share of such CODI, and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the member or partner level rather than at the entity level. Accordingly, the holders of equity in Parent will be treated as receiving their allocable shares of the CODI realized by Parent.

As a result of the Restructuring Transactions, Parent is expected to realize CODI. Because the Plan provides that certain Holders of Claims will receive beneficial interests in a Trust, the value of which has not yet been determined, the amount of CODI and, if applicable, the amount of tax attributes required to be reduced cannot be known with certainty at this time.

3.  Tax Consequences of the Trusts.

The Debtors expect to treat each Trust as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d) and that each Trustee will take such position on its Trust's tax return. For U.S. federal income tax purposes, the transfer of assets to a Trust will be deemed to occur as (a) a first-step transfer of Trust Assets to the Holders that are beneficiaries of such Trust, and (b) a second-step transfer by such Holders to such Trust.

No request for a ruling from the IRS will be sought on the classification of either Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position regarding the classification of either Trust. If the IRS were to challenge successfully the classification of either Trust as a grantor trust, the U.S. federal income tax consequences to such Trust and its beneficiaries could vary from those discussed herein (including the potential for an entity-level tax). For example, the IRS could characterize either Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year. The remainder of this discussion assumes that each Trust will be treated as a grantor trust.

As soon as possible after the transfer of the Trust Assets to the Trusts, each Trustee shall make a good faith valuation of the Trust Assets with respect to its Trust. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, Trustees, and the Trust Beneficiaries shall take consistent positions with respect to the valuation of the applicable Trust Assets, and such valuations shall be utilized for U.S. federal income tax purposes.

Allocations of taxable income of each Trust among its beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, such Trust had distributed all its assets (valued at their tax book value) to its beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and current distributions from such Trust. Similarly, taxable loss of each Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining applicable Trust Assets. The tax book value of Trust Assets shall equal their fair market value on the date of the transfer of such Trust Assets to the applicable Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. The character of items of income, gain, loss, deduction and credit to any Holder of a beneficial

---

[11]  Under the 2017 tax reform legislation commonly referred to as the Tax Cuts and Jobs Act, interest deductions in excess of statutorily-defined limits are deferred under section 163(j) of the Tax Code unless and until a debt issuer has sufficient adjusted taxable income to be entitled to claim such deductions. It is unclear whether interest deductions that are deferred under section 163(j) of the Tax Code are subject to reduction under section 108 of the Tax Code.

interest in a Trust, and the ability of such Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the Holder. Given the treatment of each Trust as a grantor trust, a beneficiary of a Trust may incur a tax liability as a result of being a beneficiary of such Trust, regardless of whether such Trust distributes Cash or other Trust Assets. In general, a distribution of Trust Assets or other proceeds by a Trust to a Holder will not be separately taxable to a Holder of a beneficial interest in such Trust because the Holder will already be treated for U.S. federal income tax purposes as owning the underlying assets.

Each Trust shall be dissolved no later than five (5) years from its creation unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the applicable Trustee that any further extension would not adversely affect the status of such Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the applicable Trust Assets.

Each Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the applicable Trust Assets (e.g., income, gain, loss, deduction and credit). Each Trust beneficiary holding a beneficial interest in a Trust will receive a copy of the information returns with respect to such Trust and must report on its federal income tax return its share of all such items. The information provided by each Trust will pertain to its beneficiaries who receive their interests in such Trust in connection with the Plan.

C.       *Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims Entitled to Vote*

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. U.S. Holders are strongly urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.       <u>U.S. Federal Income Tax Consequences to U.S. Holders of Prepetition ABL Facility Claims, Equipment Term Loan Claims, and Real Estate Term Loan Claims</u>

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of the Prepetition ABL Facility Claims, Equipment Term Loan Claims, and Real Estate Term Loan Claims, the Holders of such Claims shall receive Sale Proceeds and interests in the Wind-Down Trust. A U.S. Holder of a Prepetition ABL Facility Claim, Equipment Term Loan Claim or Real Estate Term Loan Claim who is subject to this treatment should recognize gain or loss equal to (a) the sum of any Cash received plus the fair value of the interest in the Wind-Down Trust and any other consideration received, minus (b) the Holder's adjusted tax basis in its Prepetition ABL Facility Claim, Equipment Term Loan Claim, or Real Estate Term Loan Claim. As discussed above, the Debtors expect (and the Wind-Down Trust Agreement is expected to provide) that the Wind-Down Trustee will treat the Wind-Down Trust as a grantor trust of which the beneficiaries of the Wind-Down Trust are the grantors. Accordingly, each U.S. Holder of a Prepetition ABL Facility Claim, Equipment Term Loan Claim, or Real Estate Term Loan Claim that receives an interest in the Wind-Down Trust will be treated as having (a) received its share of the Wind-Down Trust Assets and (b) immediately thereafter, contributed such assets to the Wind-Down Trust. A Holder of such Claims will be treated as directly owning its share of the Wind-Down Trust Assets. A U.S. Holder of such Claims should obtain a tax basis in its share of the Wind-Down Trust Assets (other than those determined to be received in satisfaction of accrued but untaxed interest) equal to the fair market value of such U.S. Holder's share of such Wind-Down Trust Assets as of the date such property is treated as having been distributed to such U.S. Holder pursuant to clause (a) above. A U.S. Holder's holding period for the beneficial interest in these assets will begin on the day following the Effective Date. The tax basis of the share of the Wind-Down Trust Assets determined to be received in satisfaction of accrued but untaxed interest will be equal to the amount of such accrued but untaxed interest.

2.       <u>U.S. Federal Income Tax Consequences to U.S. Holders of General Unsecured Claims</u>

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of the General Unsecured Claims, the Holders of such Claims shall receive interests in the Liquidation Trust. A U.S. Holder of a General Unsecured Claim who is subject to this treatment should recognize gain or loss equal to (a) the fair value

of the interest in the Liquidation Trust received, minus (b) the Holder's adjusted tax basis in its General Unsecured Claim. As discussed above, the Debtors expect (and the Liquidation Trust Agreement is expected to provide) that the Liquidation Trustee will treat the Liquidation Trust as a grantor trust of which the beneficiaries of the Liquidation Trust are the grantors. Accordingly, each U.S. Holder of a General Unsecured Claim that receives an interest in the Liquidation Trust will be treated as having (a) received its share of the Liquidation Trust Assets and (b) immediately thereafter, contributed such assets to the Liquidation Trust. A Holder of such Claims will be treated as directly owning its share of the Liquidation Trust Assets. A U.S. Holder of such Claims should obtain a tax basis in its share of the Liquidation Trust Assets (other than those determined to be received in satisfaction of accrued but untaxed interest) equal to the fair market value of such U.S. Holder's share of such Liquidation Trust Assets as of the date such property is treated as having been distributed to the U.S. Holder pursuant to clause (a) above. A U.S. Holder's holding period for the beneficial interest in these assets will begin on the day following the Effective Date. The tax basis of the share of the Liquidation Trust Assets determined to be received in satisfaction of accrued but untaxed interest will be equal to the amount of such accrued but untaxed interest.

3.    Accrued Interest

To the extent that any amount received by a U.S. Holder of an Allowed Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received pursuant to the Plan is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE U.S. FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST**.

4.    Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Prepetition ABL Facility Claim, Equipment Term Loan Claim, or Real Estate Term Loan Claim who exchanges such Claim for Cash and an interest in the Wind-Down Trust on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and the U.S. Holder's initial tax basis in the debt instrument is less than (x) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (y) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of any such Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIM**S.

> 5.   Character of Gain or Loss With Respect to the Exchange of Prepetition ABL Facility Claims, Equipment Term Loan Claims, Real Estate Term Loan Claims, and General Unsecured Claims

Generally, the gain or loss recognized by a U.S. Holder with respect to the exchange of a Prepetition ABL Facility Claim, Equipment Term Loan Claim, Real Estate Term Loan Claim, or General Unsecured Claim will be a capital gain or loss unless the Claim was acquired at a market discount (as discussed above), and depending on whether and the extent to which the U.S. Holder previously claimed a bad debt deduction. Any such capital gain or loss generally should be long-term if the U.S. Holder's holding period in the Claim is more than one year and otherwise should be short-term. Under current U.S. federal income tax law, certain non-corporate U.S. Holders (including individuals) are eligible for preferential rates of U.S. federal income tax on long-term capital gains.

A U.S. Holder of a Prepetition ABL Facility Claim, Equipment Term Loan Claim, Real Estate Term Loan Claim, or General Unsecured Claim who recognizes a capital loss as a result of the distributions under the Plan will be subject to limits on the use of such capital loss. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (x) $3,000 ($1,500 for married individuals filing separate returns) or (y) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

*D.   Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims Entitled to Vote*

The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, local and foreign tax consequences of the consummation of the Plan to such non-U.S. Holder.

> 1.   Gain Recognition on Exchange of Claims

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders. Any gain realized by a non-U.S. Holder on the exchange of its Claim pursuant to the Plan (other than amounts attributable to accrued interest) generally will not be subject to U.S. federal income taxation unless (i) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or successor form). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.      Accrued Interest

Payments to a non-U.S. Holder that are attributable to accrued interest generally will not be subject to U.S. federal income tax or withholding pursuant to the portfolio interest exemption, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10 percent or more of the capital or profits of Parent;

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Parent (each, within the meaning of the Tax Code);

- the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) (i) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and (ii) if such non-U.S. Holder is a corporation for U.S. federal income tax purposes, may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A non-U.S. Holder that does not qualify for the portfolio interest exemption generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E (or successor form), special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

3.      Interests in the Trusts

As discussed above, a non-U.S. Holder of a Prepetition ABL Facility Claim, Equipment Term Loan Claim, Real Estate Term Loan Claim, or General Unsecured Claim that receives a beneficial interest in a Trust is expected to be treated as owning its share of the assets held by such Trust, as discussed above.

It is possible that the IRS could assert that either Trust and as a result, a non-U.S. Holder of interests in such Trust, is engaged in a U.S. trade or business (and, if an income tax treaty applies, as though the income of such Trust is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) by virtue of the activities of such Trust. If the IRS were to successfully assert that either Trust is engaged in a U.S. trade or business, some or all of the income recognized by such Trust could be treated as effectively connected with the U.S. trade or business ("ECI") of a non-U.S. Holder that is a Trust Beneficiary. Such non-U.S. Holder's share of any such ECI would be subject to tax at regular U.S. federal income tax rates and, if such non-U.S. Holder is a corporation for U.S. federal income tax purposes, may also be subject to U.S. branch profits tax.

As discussed above, the U.S. federal income tax obligations of a non-U.S. Holder with respect to its beneficial interest in a Trust would not be dependent on the applicable Trust distributing any Cash or other Trust Assets. This may result in such non-U.S. Holder being subject to tax on its allocable share of the applicable Trust's taxable income prior to receiving any cash or other distributions from such Trust to the extent of income generated by the applicable Trust Assets. In addition, if such Trust were deemed to be engaged in a U.S. trade or business, such non-U.S. Holder would generally be required to file a U.S. federal income tax return (even if no income allocated to such non-U.S. Holder is ECI), and such Trust would be required to withhold U.S. federal income tax with respect to such non-U.S. Holder's allocable share of the applicable Trust's income that is ECI.

In addition, under the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of non-U.S. Holders and treated as effectively connected income that is subject to U.S. federal net income tax even if a non-U.S. Holder is not otherwise engaged in a U.S. trade or business. Any disposition of a U.S. real property interests by a Trust would be subject to the FIRPTA rules on the same basis as if a non-U.S. Holder that is a beneficiary of such Trust directly held its share of the applicable Trust Assets.

**Each non-U.S. Holder is strongly urged to consult with its tax advisors concerning the tax consequences resulting from owning beneficial interests in a Trust.**

4.   FATCA

Under sections 1471 through 1474 of the Tax Code ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including interest on debt instruments). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Previously, withholding with respect to gross proceeds from the disposition of certain property like the Prepetition ABL Facility Claims, Equipment Term Loan Claims, and Real Estate Term Loan Claims was scheduled to begin on January 1, 2019; however, such withholding has been eliminated under proposed U.S. Treasury regulations, which can be relied on until final regulations become effective. Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder.

E.   *Information Reporting and Back-Up Withholding*

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of a Claim under the Plan, unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 (or successor form) or, in the case of a non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or successor form) (or, in each case, such Holder otherwise establishes eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY U.S. STATE OR LOCAL OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAW.**

## ARTICLE XVIII.

## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to the terms hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Debtors' Estates, the Liquidation Trustee, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Dissolution of Committee*

Except as provided in Article IX, on the Effective Date, the Committee shall dissolve and members thereof shall be compromised, settled, and released from all rights and duties from or related to the Chapter 11 Cases, except the Committee will remain intact solely with respect to (x) the preparation, filing, review, and resolution of applications for Professional Fee Claims and (y) any appeal of the Confirmation Order.  The Debtors and the Wind-Down Trust shall have no obligation to pay any fees or expenses incurred after the Effective Date by the Committee or the Committee Members other than with respect to (x) the preparation, filing, review, and resolution of applications for Professional Fee Claims and (y) any appeal of the Confirmation Order.

D.     *Reservation of Rights*

Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtors or any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.     *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the following entities and shall be served via first class mail, overnight delivery, or messenger on.

If to the Debtors or Wind-Down Trustee, to:

BJ Services, LLC
11211 Farm to Market 2920 Road
Tomball, Texas 77375
Attn: Anthony C. Schnur

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Joshua A. Sussberg, P.C. and Christopher T. Greco, P.C.

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn: Joshua M. Altman

Gray Reed & McGraw LLP
1300 Post Oak Boulevard, Suite 2000
Houston, Texas 77056
Attn: Jason S. Brookner, Paul D. Moak, and Amber M. Carson

If to the Liquidation Trustee, to:

Squire Patton Boggs (US) LLP
1211 Avenue of the Americas, 26th Floor
New York, New York 10136
Attn: Norman N. Kinel

If to the Committee, to:

Gardner Denver Petroleum Pumps, LLC, Committee Chair
1800 Gardner Exwy
Quincy, Illinois 62305
Attn: James Sheets

with copies to:

Squire Patton Boggs (US) LLP
2000 McKinney Avenue, Suite 1700
Dallas, Texas, 75201
Attn: Travis A. McRoberts

Squire Patton Boggs (US) LLP
1211 Avenue of the Americas, 26th Floor
New York, New York 10136
Attn: Norman N. Kinel

Squire Patton Boggs (US) LLP
201 East Fourth Street, Suite 1900
Cincinnati, Ohio 45202
Attn: Stephen D. Lerner

G. *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H. *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable, *provided* that at the request of the Debtors (in their sole discretion), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

I. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

J. *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

*[Signature Page Follows]*

Respectfully submitted, as of the date first set forth above,

BJ Services, LLC

By: _/s/ Anthony C. Schnur_
Name:   Anthony C. Schnur
Title:    Chief Restructuring Officer